**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE CREDIT DEFAULT SWAPS ANTITRUST LITIGATION | No.  13 Md. 2476 (DLC) |

**APPLICATION TO APPOINT QUINN EMANUEL URQUHART & SULLIVAN, LLP**
**INTERIM LEAD CLASS COUNSEL**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................1

BACKGROUND ...................................................................................4

      A.    Salix Capital US Inc ....................................................5

      B.    The Complaint's Allegations ......................................6

      C.    Quinn Emanuel's Investigation...................................7

ARGUMENT .........................................................................................9

I.    QUINN EMANUEL WILL BEST REPRESENT THE INTERESTS OF THE CLASS. ...............................................................................9

      A.    Quinn Emanuel Has the Resources and Ability to Win *This* Case Against *These* Defendants in *This* District. ..................................9

      B.    Quinn Emanuel Has the Right Antitrust, Class Action, and Structured Finance Experience. ...............................................15

      C.    Quinn Emanuel Has The Resources and In-House Expertise Necessary to Manage Electronic Discovery in These Consolidated Cases................................18

II.    QUINN EMANUEL WOULD BE PREPARED TO WORK WITH ANY OTHER LEAD COUNSEL SELECTED BY THE COURT.........................19

CONCLUSION.......................................................................................20

# TABLE OF AUTHORITIES

**Page**

## Cases

*AIG v. Bank of America*
 712 F.3d 775 (2d Cir. 2013)............................................................................13, 14

*Anderson v. Fiserv, Inc.*,
 Nos. 09 Civ. 5400, 09 Civ. 8397 (BSJ)(FM), 2010 WL 571812 (S.D.N.Y. Jan. 29, 2010)...........18

*Behrend v. Comcast Corp.*,
 655 F.3d 182 (3d Cir. 2011)...................................................................................12

*Damassia v. Duane Reade, Inc.*,
 250 F.R.D. 152 (S.D.N.Y. 2008) ...............................................................................9

*Dukes v. Wal-Mart, Inc.*,
 603 F.3d 571 (9th Cir. 2010) .................................................................................12

*Federal Housing Finance Agency v. UBS Americas Inc.*,
 712 F.3d 136 (2d Cir. 2013).....................................................................................13

*In re Katrina Canal Breaches Consol. Litig.*,
 No. 05 Civ. 4182 (SRD), 2008 WL 3845228 (E.D. La. Aug. 13, 2008) ...............................20

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
 No. 11-MD-2262 (NRB), 2011 WL 5980198 (S.D.N.Y. Nov. 29, 2011) ...............................12

*In re Mun. Derivatives Antitrust Litig.*,
 252 F.R.D. 184 (S.D.N.Y. 2008) .........................................................................9, 12

*Sharp v. Next Entm't, Inc.*,
 163 Cal. App. 4th 410 (2008) .................................................................................20

## Statutes

Fed. R. Civ. P. 23(g) ........................................................................................9, 18

## PRELIMINARY STATEMENT

These consolidated antitrust class actions allege that more than a dozen of the world's largest financial institutions, all represented by some of the world's largest law firms, conspired to thwart competition in the multi-trillion dollar market for Credit Default Swaps ("CDS"). We respectfully submit that Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel") alone has the resources, expertise, and experience required to litigate this large and complex case, in this District, in a manner that will best serve the interests of the proposed class of CDS investors that were harmed by Defendants' scheme.

Quinn Emanuel is the largest firm in the world devoted solely to business litigation and arbitration. *See* Declaration of Daniel L. Brockett in Supp. of Application to Appoint Quinn Emanuel Interim Lead Class Counsel ("Brockett Decl."), Ex. A at 4. We have over 600 lawyers worldwide, with over 225 attorneys located at our largest office here in New York. Our lawyers have tried over 2,200 cases and won over 88%. *Id.* at 7. When we represent defendants, our trial experience gets us better settlements or defense verdicts. When representing plaintiffs, our lawyers have won over $15 billion in judgments and settlements – a figure that grows by the month, in no small part due to our work in this Court. *See id.* at 8.

Quinn Emanuel has built its reputation on its ability to win high-stakes cases against the most formidable adversaries, including the very financial institutions the proposed class faces here. This is not puffery. This year we were once again recognized as one of just *four* U.S. firms that in-house counsel fear the most. Brockett Decl., Ex. B at 1. This recognition was based on approximately 300 interviews by The BTI Consulting Group with general counsel and other legal department heads, with companies representing over $14 billion in revenue. *Id.* The other three firms so recognized were prominent corporate defense firms – including two firms

representing *defendants* in this case.  *See id.*  None of the other firms vying for lead counsel in this action were so recognized, nor, to our knowledge, have they ever been recognized in this fashion.

This case, in particular, is squarely in Quinn Emanuel's sweet spot, combining our structured finance, antitrust, and class action practices, all widely recognized as among the nation's best – not just among plaintiff's firms, but among *all* law firms.  Our structured finance and bank litigation practice is the premier practice of its kind in the United States.  We have been at the forefront of litigation relating to financial misconduct by the world's largest banks, including cases arising from CDS (in addition to this one), residential mortgage-backed securities ("RMBS"), collateralized debt obligations ("CDOs"), interest rate swaps, Eurodollar futures, and other structured financial products and derivatives.  With regard to the RMBS cases we brought on behalf of the Federal Housing Finance Agency ("FHFA"), for example, we have demonstrated to this Court our ability to wage the type of battle against the banks this case may well require.  To date, those hard fought cases have yielded nearly $5 billion in settlements for our client.  To the extent some of those cases do not settle, we will be prepared to try them – as we will be prepared to try this case.

In addition to our work for FHFA, we have represented dozens of the largest and most sophisticated financial investment entities in the world – AIG, ING Bank, MBIA Insurance Corporation, BlackRock, UniCredit, US Bank, Assured Guaranty Corporation, Prudential Insurance Company of America, Allstate Insurance Company, Massachusetts Mutual Life Insurance Company, Susquehanna International Group, and many other banks, insurers, re-insurers, hedge funds, corporations, and other market participants.  *See* Brockett Decl., Ex C. This is particularly significant because one of the principal reasons why the Judicial Panel on

Multi-District Litigation chose to consolidate these cases in this District is because it agreed with our argument that many members of the proposed class of injured investors are investment firms like these, based in and around New York.  *See* Brockett Decl., Ex. D at 2 (the Southern District of New York "has a strong connection to this litigation, inasmuch as most defendants are based there, a significant number of members of the putative classes (e.g., hedge funds, money managers, commercial banks, etc.) likely reside there, and several events giving rise to the litigation likely occurred there.").  We have represented, and continue to represent, many of these class members in other financial litigation.  We have spoken to many of them about this case, and have retained an expert to build a damages model to estimate their expected losses.  They respect our abilities in this sphere.

This case will also rely on the strengths of our antitrust practice, which too has been recognized as one of the top in the nation.  *See* Brockett Decl., Ex. E at 1.  We are unique in our representation of blue chip companies in antitrust actions as both plaintiffs and defendants, in class and non-class actions, on both sides of the "v."  This diverse practice gives us credibility with the plaintiffs' and defense bar, as well as insights into how the other side works – insights that will benefit the proposed class here.  We have won – at and before trial – high-stakes cases brought under both Section 1 and Section 2 of the Sherman Act, including some of the more high profile antitrust trials in recent memory.  Our class action practice is also recognized as one of the nation's leading practices for its work both for plaintiffs and defendants.  *See id.*, Ex. F at 1.

Quinn Emanuel's appointment as interim lead class counsel will provide unique benefits to the class in still other ways.  This case involves foreign defendants and events that took place around the world.  We have offices in all relevant locations worldwide, including some staffed with leading European Union antitrust practitioners.  We have been working with these antitrust

specialists in foreign offices to investigate and develop this case in the class's interests.  None of

the other firms vying for lead counsel have foreign offices, with or without antitrust specialists.

To our knowledge, the only other firm in the case that has an overseas office with antitrust

specialists is Hausfeld LLP, which is a prominent plaintiff's firm listed as co-counsel on Quinn

Emanuel's complaint.

We also offer the class the nation's leading Second Circuit appellate practice, and one of

the leading Supreme Court practices, headed by Kathleen Sullivan.  *See id.*, Ex. G at 1.  It is

quite likely that a successful outcome in this case will require appellate work of the highest

caliber.  No other firm vying for lead, we submit, can offer the class appellate practitioners that

remotely compare to what Quinn Emanuel can provide.

Simply put, Quinn Emanuel has the resources to lead this case on its own and is, we

submit, the ***only firm*** vying for lead counsel that has those resources.  We recognize, however,

that the size and complexity of this case may warrant the appointment of two co-lead counsel,

and we would be prepared to work cooperatively and productively with any other firm selected

by the Court.

## BACKGROUND

On August 29, 2013, Quinn Emanuel and its co-counsel[1] filed its opening complaint in

this matter on behalf of Plaintiff Salix Capital US, Inc. ("Salix") and a proposed class of all

persons and entities who entered into a buy or sell CDS contract directly with one or more of the

Dealer Defendants in the United States during the period from January 1, 2008 to the present

("Class Period").  Quinn Emanuel and its co-counsel filed an amended complaint on October 15,

2013, which added additional defendants and supplemented the original complaint's allegations.

---

[1]   Quinn Emanuel's co-counsel are Hausfeld LLP and Bernstein Liebhard LLP.  *See* Brockett
Decl., Exs. H and I.

*See* Amended Complaint in *Salix Capital US Inc. v. Bank of America Corp., et al.*, 13 Civ. 6116 (DLC) ("Am. Compl.").

### A.      Salix Capital US Inc.

Plaintiff Salix is the assignee of several entities (the "FrontPoint Funds") which were large and sophisticated investors in the CDS market.  The FrontPoint Funds invested in both single-name (linked to a specific reference entity) and index CDS (linked to a portfolio of reference entities) to implement their investment strategies, actively participating in the market as buyers and sellers.  *See id.* ¶ 17.  The individuals responsible for executing these trades for the FrontPoint Funds are the same individuals that currently own and manage Salix, so Salix has a direct and intimate knowledge of the CDS market and the trades at issue here.  As this Court is aware, the FrontPoint Funds eventually went out of business after insider trading charges were brought against a portfolio manager in an entirely different part of the business having nothing to do with the CDS investment business at issue here.[2]  In the winding down of that entity, the claims relating to FrontPoint's CDS trades were assigned to Salix, which is owned by the former managers who made those trades.

During the Class Period, the FrontPoint Funds traded CDS with an aggregate notional value in excess of $30 billion across almost 400 transactions.  Am. Compl. ¶ 18.  While not all plaintiffs have identified the notional amount of their CDS trades during the relevant Class Period, Salix's CDS trades have a far greater notional value (and volume) than that of any plaintiff who specifically alleges its trades' value.[3]  Thus, it is likely that Salix has the largest

---

[2]   *See, e.g.*, *Former FrontPoint Manager Charged With Insider Trading*, N.Y. Times, April 13, 2011, *available at* http://dealbook.nytimes.com/2011/04/13/former-frontpoint-manager-charged-with-insider-trading/; *SEC Charges Former Hedge Fund Portfolio Manager With Insider Trading*, *available at* http://www.sec.gov/news/press/2011/2011-91.htm.

[3]   *See, e.g.*, Value Recovery Fund Am. Compl. ¶¶ 10-11 (alleging plaintiffs traded more than $5.16 billion of notional amounts of CDS); Los Angeles Cnty. Emps. Ret. Ass'n Compl. ¶ 11

claim of any of the proposed named plaintiffs.

B.     The Complaint's Allegations

Salix's Amended Complaint alleges that Defendants conspired to eliminate competition

in the CDS market so they could reap enormous financial gains by overcharging and

underpaying other market participants that lacked the information, insider status, and market

clout wielded by Defendants here.  *Id.* ¶ 1.  Acting jointly and in concert, Defendants undertook

a series of anticompetitive actions that prevented all but a handful of the world's largest banks

from acting as dealers and clearinghouse members in the multi-trillion dollar market for CDS.

Defendants' actions ensured that critical pricing information regarding the CDS market would be

accessible only to the Dealer Defendants and the co-conspirator entities they controlled, which,

in turn, allowed the Dealer Defendants to solidify and maintain their dominance over the CDS

market.  *See id.* ¶¶ 1, 2, 6-16.

Defendants took aim at potential market entrants, and worked jointly to prevent

competition that threatened their position in the market.  In 2008, at least two exchanged-based

platforms for CDS trading were in the works.  One such exchange was proposed and backed by

hedge fund giant Citadel Investment Group, LLC and the Chicago Mercantile Exchange.  *Id.*

¶¶ 109-10.  Another was an effort by Deutsche Börse, the current owner of several stock

exchanges, including the Frankfurt Stock Exchange.  *Id.* ¶¶ 118, 172-73.  Despite the widely-

acknowledged promise that these exchange-based platforms held for the CDS market, both were

strangled in the cradle by Defendants' coordinated efforts to deny them the basic tools with

which to operate.  *Id.* ¶¶ 113-16.

At the Dealer Defendants' behest, Markit and other market participants withheld the

_____

(alleging plaintiff was a party to trades involving over $2.8 billion of notional amounts of CDS).

6

rights and licenses necessary for the potential rivals to compete. *Id.* As a result, both efforts withered and made no impact on Defendants' market control. Defendants also jointly agreed to restraints that had the purpose and effect of obscuring price information to their collective advantage. For example, the Dealer Defendants instructed Markit – the only source of post-trade pricing information – to delay sharing data from dealer runs and to provide only aggregate rather than transaction-specific pricing information. *Id.* ¶¶ 89-90, 104-05.

As the Amended Complaint notes, some of these events have been the subject of government investigations dating back to at least July 2009. At that time, the U.S. Department of Justice ("DOJ") disclosed its investigation into Defendants' anticompetitive practices, when it announced that it was investigating whether Defendant Markit, through its relationship with the Dealer Defendants, received an unfair competitive advantage in the CDS market. *See id.* ¶ 164. In 2012, the DOJ announced that its investigation had expanded to include other market actors. *Id.* ¶ 165. The European Commission ("EC") also initiated an antitrust investigation against numerous banks, including the Dealer Defendants, with respect to their operation of, and control over, the CDS market. *Id.* ¶¶ 168-74. The EC issued a Statement of Objections on July 1, 2013, stating that it had preliminarily concluded that Defendants engaged in anticompetitive behavior in boycotting two would-be competitors who sought to make CDS available on exchanges because they feared it would reduce their revenue. *Id.* ¶¶ 21, 172.

### C.   Quinn Emanuel's Investigation

The investigation of these matters by Quinn Emanuel spanned several months and involved speaking with dozens of market participants. Our investigation also involved in-depth market research. Among other things, Quinn Emanuel retained a world-renowned consulting firm to analyze from an economic and financial standpoint certain basic propositions central to the case. We selected that firm from among many we interviewed for its particular expertise in

derivatives and the CDS market.  We worked with that firm to develop (among other things) an economic model that can analyze the relationship between Defendants' conduct and resulting damages to non-dealer buyers and sellers of CDS.  Quinn Emanuel has incurred substantial out-of-pocket expenses for this work costing hundreds of thousands of dollars, which will benefit the class.

Quinn Emanuel's expert consultant analyzed the over the counter ("OTC") CDS market, comparing it to (i) other OTC markets with greater liquidity, as well as (ii) markets that have implemented exchange trading with centralized counterparty clearing.  *See id.* ¶¶ 154-61.  As a result of this work, Quinn Emanuel's expert found that the lack of liquidity in the market for single-name CDS and the lack of an exchange trading platform with centralized counterparty clearing – *i.e.*, two of the central objects of Defendants' conspiracy – caused bid/ask spreads for single-name CDS to trade at artificially wide levels, resulting in significant damages to the class. *Id.*

Specifically, Quinn Emanuel's consultant determined that bid/ask spreads observed in markets with greater liquidity and exchange-based trading with centralized counterparty clearing were, on average, between 56% and 90% narrower than the spreads observed in the market for single-name CDS.  Based on this analysis, Quinn Emanuel's consultant has concluded that, during the 2006-2013 period, bid/ask spreads for CDS were significantly higher than they would have likely been if CDS were traded on an exchange and centrally cleared.  *Id.*  This analysis is described in Salix's Amended Complaint.

As in many of these types of cases, a number of firms can be expected to claim some "proprietary" aspect of the development of this case.  We respectfully submit, however, that Salix's Amended Complaint distinctively reflects true proprietary work, in the form of the

economic analysis outlined above.  We further submit that Salix's complaint lays out the class's allegations in a robust, comprehensive, and compelling manner that reflects our investigation and sophistication in this arena.[4]

## ARGUMENT

## I.    QUINN EMANUEL WILL BEST REPRESENT THE INTERESTS OF THE CLASS.

Federal Rule of Civil Procedure 23(g)(3) provides that a court "may designate interim counsel to act on behalf of a putative class before determining whether to certify the action as a class action."  The Advisory Committee notes explain that the rule "authorizes [a] court to designate interim counsel during the pre-certification period if necessary to protect the interests of the putative class."  "When appointing interim lead class counsel, courts generally look to the same factors used in determining the adequacy of class counsel under Rule 23(g)(1)(A)."  *In re Mun. Derivatives Antitrust Litig.*, 252 F.R.D. 184, 185-86 (S.D.N.Y. 2008).

This Court should find, as others in similar circumstances have, that "Quinn Emanuel's combination of significant trial experience, experience in representing class action plaintiffs in analogous antitrust litigation, and its nationwide resources make it stand out . . . after application of the Rule 23(g) factors."  *Four in One Company, Inc. v. SK Foods, L.P.*, No. 08 Civ. 3017 (KJM)(EFB), Dkt. No. 92, at *8 (E.D. Cal. Mar. 20, 2009).

### A.    Quinn Emanuel Has the Resources and Ability to Win *This* Case Against *These* Defendants in *This* District.

Quinn Emanuel is the firm best suited to represent the interests of the proposed class in this complex antitrust action involving financial derivatives against the major financial

---

[4]   *See Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 165 (S.D.N.Y. 2008) (noting that "the work counsel has done in identifying or investigating potential claims in the action" is an important factor in selecting class counsel) (internal citation omitted).

institutions arrayed as Defendants here.

As an initial matter, our resources are second to none.  With over 600 attorneys nationwide, Quinn Emanuel is far larger than any other firm vying to lead the class's case in this matter – and our advantage in size and depth is particularly pronounced in New York.  *See* Brockett Decl., Ex. A at 4.  While resources are always an important consideration in choosing lead counsel, the breadth and depth of a firm's available resources are a particularly important factor here.  This is, by any measure, a large and complex case.  Over a dozen of the world's largest banks are named as Defendants, and each Defendant is represented by a preeminent corporate defense firm (and some by several firms).  The discovery process alone will be massive.  Cases of comparable size have lasted many years.  For these reasons, it is essential that the class have lead counsel with sufficient resources, manpower, and financial capital to litigate this case to a successful outcome.

Quinn Emanuel has a uniquely prominent practice in this District, which is in many ways our home district.  Several of the other firms vying for lead counsel have little or no presence in the Southern District of New York.  We have over 225 attorneys based in New York, with numerous attorneys who practice antitrust law, including the three partners who will take the lead on prosecuting this matter on behalf of the class:  Daniel Brockett, Stephen Neuwirth, and Steig Olson.

**Daniel L. Brockett** is a leading business litigator with over 30 years experience who has handled numerous high-profile and significant cases.  He has served as lead trial counsel in over 15 major bench and jury trials and arbitrations.  Over the course of his career, Mr. Brockett has collected extensive antitrust experience, representing blue-chip companies such as Bell & Howell, DuPont, General Electric, Emerson Electric, and others.  He has litigated a wide array of

antitrust issues from price fixing to monopolization to merger issues, involving everything from electronic parts catalogues to dishwashers to GE jet engines.  He is currently part of the team of lawyers from Quinn Emanuel representing the plaintiff class in the railroad fuel surcharge price fixing cases.

**Stephen R. Neuwirth** chairs Quinn Emanuel's antitrust and competition law practice, which was recognized by *Law360* in 2011 as one of the top five antitrust and competition law practices in the country.  *See* Brockett Decl., Exs. E, Q.  Mr. Neuwirth was included on the Best Lawyers antitrust list in 2013, *id.*, Ex. J, and recognized as one of eight competition law "MVPs" nationwide in 2012, *id.*, Ex. K.  He has over two decades of experience in both private practice and government, including serving as Associate White House Counsel to President Clinton from 1993-96 and being retained by the U.S. Department of Justice in 1998 to assist in the Antitrust Division's litigation against Microsoft Corporation.  *Chambers USA* has described Mr. Neuwirth as "renowned for his deep understanding of corporate transactions and antitrust matters."  *Id.*, Ex. L.

**Steig D. Olson** clerked for Judge Barrington Parker, Jr. on the Second Circuit after clerking for Vaughn R. Walker, the former Chief Judge of the Northern District of California and graduating *magna cum laude* from Harvard Law School.  After his clerkships, Mr. Olson worked on antitrust cases at plaintiff's firms Cohen Milstein Hausfeld & Toll (now Cohen Milstein Sellers & Toll) and then Hausfeld LLP, before joining Quinn Emanuel, where he has expanded his practice to include non-class antitrust cases and competitor antitrust cases, including on the defense side.  In 2013, Mr. Olson was named a Rising Star in the field of competition law by *Law360*, in recognition of his plaintiff and defense-side representations.  *See id.*, Ex. M.  His scholarship on complex litigation matters has been cited by the Third and Ninth Circuit Courts of

Appeal.[5]

In addition to these three New York partners, Quinn Emanuel will be able to draw upon its other talented practitioners in New York and elsewhere to meet whatever needs the case demands.[6]  In addition to its six domestic offices, the firm has nine offices abroad, including in London and Germany, where events potentially relevant to this case took place.  Lawyers in these offices include leading antitrust practitioners in Europe.

The firm's significant international presence will be particularly important in this case, which involves a number of defendants with headquarters in Europe.  International discovery of those foreign entities or their foreign-based employees may be necessary.  Interface with European Commission proceedings may also be warranted.  As courts in this District have noted, having a substantial international presence is an important factor in selecting lead counsel in class actions that may require discovery of foreign-based individuals and entities.[7]  The firm's international offices are full-scale operations, staffed with some of the world's leading

---

[5]   *See Dukes v. Wal-Mart, Inc.*, 603 F.3d 571, 589 n.9 (9th Cir. 2010); *Behrend v. Comcast Corp.*, 655 F.3d 182, 200, n.10 (3d Cir. 2011).

[6]   The core New York team will be joined by, among others, Jeremy Andersen, a partner in Quinn Emanuel's Los Angeles office.  Mr. Anderson specializes on financial-fraud cases and has considerable experience representing securities purchasers, insurance companies, and bankrupt estates against most of the world's largest banks and auditing firms.  His extensive work in the area of structured finance has involved reconstructing complex structured finance transactions, tracing cash flows (real and falsified), dealing with intercompany accounting and revenue issues, and following transactions from inception, to accounting records, to audited financial statements, and other representations.

[7]   *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-MD-2262 (NRB), 2011 WL 5980198, at *3 (S.D.N.Y. Nov. 29, 2011) ("We also find persuasive the fact that Hausfeld maintains an office in London with a full-time staff of at least five solicitors.  Given that the case appears to involve extremely complicated factual issues, we believe that having dedicated and locally trained attorneys at the site of the core operative facts could prove extremely beneficial."); *see also In re Mun. Derivatives Antitrust Litig.*, 252 F.R.D. 184, 187 (S.D.N.Y. 2008) (noting that the size of the plaintiffs' firms were relevant considerations in selecting class counsel "[b]ecause many of the defendants in [the] case are large financial institutions with substantial financial and legal resources" and "it is likely that interim lead plaintiffs in this case will have to expend considerable resources when representing the plaintiffs").

practitioners.  In recognition of our worldwide strength, *The Lawyer* magazine named Quinn

Emanuel "International Law Firm of the Year" in 2011.  *See* Brockett Decl., Ex. N at 2.

Quinn Emanuel also offers the class the most accomplished appellate group in the Second

Circuit, led by Kathleen M. Sullivan, former Dean of Stanford Law School.  Recognized as one

of the nation's preeminent appellate advocates, Ms. Sullivan was again named one of The 100

Most Influential Lawyers in America by *The National Law Journal* in 2013.  *Id.*, Ex. O at 2.

Quinn Emanuel's appellate practice group[8] was included on *The National Law Journal*'s

prestigious "Appellate Hot List" for 2013, having also been named to that list in prior years.  *See*

*id.*, Ex. P.

Appellate experience will be extremely valuable here.  As this Court is aware, appellate

issues can and do arise during the pendency of proceedings in the trial court – particularly in the

context of high-stakes, complex cases.  In the *FHFA* cases, for example, Quinn Emanuel

successfully defended this Court's statute of limitations rulings against an interlocutory appeal

taken by the defendant banks.  *Federal Housing Finance Agency v. UBS Americas Inc.*, 712 F.3d

136 (2d Cir. 2013).  Quinn Emanuel also successfully defended this Court's discovery rulings in

the *FHFA* cases against a petition for a writ of mandamus brought by those same banks.  *UBS*

*Americas Inc. v. Federal Housing Finance Agency*, No. 13-1122, Dkt. No. 97 (2d Cir. July 19,

2013) (summary order).  And, in *AIG v. Bank of America*, Quinn Emanuel recently won an

interlocutory appeal against many of the same banks that are defendants again here, in an opinion

---

[8]   Quinn Emanuel's appellate team includes, among others, Susan R. Estrich, the first female
President of the Harvard Law Review and former law clerk for U.S. Supreme Court Justice John
Paul Stevens; Andy Schapiro, former law clerk to U.S. Supreme Court Justice Harry Blackmun;
Sandy Weisburst, former law clerk to U.S. Supreme Court Justice Clarence Thomas; Christine
Chung, former chief of appeals in the U.S. Attorney's Office for the Southern District of New
York and prosecutor at the International Criminal Court; and Dan Bromberg, Derek Shaffer, and
William Adams, seasoned appellate advocates and former law clerks on the U.S. Court of
Appeals for the D.C. Circuit.

construing the scope of federal jurisdiction under the Edge Act.  712 F.3d 775 (2d Cir. 2013).

All class members would benefit from having Quinn Emanuel's appellate team available to advise on appellate issues, or to litigate any interlocutory or post-judgment appellate issues that may arise.  If Quinn Emanuel is not an interim lead, or co-lead counsel in this matter, there is a risk that the class would be outmatched by the sophisticated appellate practice groups upon which the defendants will undoubtedly draw at various points in the case.

Quinn Emanuel also offers a deep and talented pool of associates, which includes many former federal district and appellate law clerks, including at least 14 former law clerks in the Southern District of New York and/or the Second Circuit.  Quinn Emanuel associates are very often honors graduates from Harvard, Yale, Stanford, Chicago, Michigan, Columbia, and other top schools, and are trained to develop the trial skills that characterize the firm's more senior attorneys.

Thus, if this case has to go to trial, Quinn Emanuel will be prepared to try it.  Trying cases is part of our firm's culture.  We typically try 20 to 30 cases per year, and we believe we try more complex litigation matters than any other firm in the nation.  *See* Brockett Decl., Ex. A at 7.  Our ability to try cases is well-known, and the lawyers proposed to lead this case collectively have notable jury and other trial and courtroom experience.  We will also be able to draw upon other partners in the firm, more than 20 of whom are former Assistant United States Attorneys, and others who are among the most highly respected trial lawyers in the country.  *Id.* at 6.  Our ability to take a case like this to trial is unmatched.  It is just one of the reasons Quinn Emanuel is one of the four most feared adversaries, and this credibility alone will benefit the class even if the case does not go to trial.

**B.     Quinn Emanuel Has the Right Antitrust, Class Action, and Structured Finance Experience.**

Quinn Emanuel's extensive experience litigating major antitrust cases will be an invaluable asset to all class members.  We have both prosecuted and defended claims under Sections 1 and 2 of the Sherman Act, Sections 3 and 7 of the Clayton Act, the Robinson-Patman Act, California's Cartwright Act and New York's Donnelly Act, giving us unequaled perspectives and insights gained from the firm's collective experience representing clients on both sides of the "v."

The firm's antitrust practice spans numerous industries, including aerospace, agriculture, consumer electronics and other consumer products, computers, chemicals, entertainment, financial instruments, healthcare, minerals, telecommunications, transportation, and a host of others.  In 2011, Quinn Emanuel's antitrust practice was recognized by *Law360* as one of the top five competition law practices in the country.  *See id.*, Ex. Q.  We have tried, and won, complex antitrust actions as both plaintiffs and defendants.  This last year, for example, we won a victory as a plaintiff in a Section 2 attempted monopolization case, alleging that the defendant had engaged in sham litigation of a patent procured by fraud.  In recommending that we be awarded 100% of our requested attorneys' fees, the special master in the case stated that "Quinn Emanuel is one of the top litigation firms in the country," including in the antitrust field.[9]

We also won one of the most prominent defense antitrust verdicts in recent years, when we obtained a complete defense verdict for Micron Technology in a multibillion dollar antitrust case brought by Rambus Inc.  The case truly was "bet-the-company" litigation, playing out over a three month jury trial in San Francisco Superior Court.  Rambus asserted claims for violations

---

[9]   *See TransWeb, LLC v. 3M*, No. 10-CV-04413-FSH-JBC, Dkt. No. 567, at *36 (D.N.J. Sept. 24, 2013).

of the Cartwright Act and sought $4 billion in compensatory damages, trebled to $12 billion

under the Cartwright Act, as well as other relief.  As a result of Quinn Emanuel's skilled trial

team, the jury rejected Rambus's claims and awarded no damages.

On the plaintiff's side, Quinn Emanuel currently is counsel on a number of major

antitrust class actions, including:

- ***In re Rail Freight Fuel Surcharge Antitrust Litigation***, No. 07 Md. 489
  (D.D.C.).  Quinn Emanuel is court-appointed co-lead plaintiffs' counsel for direct
  purchasers suing railroads for conspiring to fix shipping rates through a system of
  fuel surcharges.  In June 2012, the Court granted plaintiffs' motion for class
  certification, and certified a nationwide class of rail freight shippers that between
  2003 and 2008 paid defendants' fuel surcharges on rate-unregulated freight
  shipments.  The papers submitted in support of class certification were notable for
  the extraordinary breadth and depth of evidentiary support brought to bear, as
  well as an expert report that utilized the full set of the defendants' transactional
  data for the entire relevant period.  In August 2013, the D.C. Circuit remanded the
  trial Court's class certification order on narrow grounds to allow the District
  Court to consider a specific issue related to the plaintiffs' expert report in light of
  the Supreme Court's recent decision in *Comcast Corp. v. Behrend*.

- ***In re Flexible Polyurethane Foam Antitrust Litigation***, No. 10 Md. 2196 (N.D.
  Oh.).  As court-appointed co-lead counsel for direct purchaser plaintiffs, Quinn
  Emanuel defeated defendants' motions to dismiss and has secured favorable
  settlements for the class.

- ***Four In One Company, Inc. v. SK Foods, L.P.***, No. 08 Civ. 3017 (E.D. Cal.).
  Quinn Emanuel is court-appointed co-lead plaintiffs' counsel in a class action
  alleging price fixing in the market for processed tomato products.

- ***In re Egg Products Antitrust Litigation***, No. 08 Md. 2002 (E.D. Pa.).  Quinn
  Emanuel represents a class of direct purchasers of shell eggs that allege an
  industry-wide price fixing conspiracy to raise the price of eggs.  The firm helped
  defeat motions to dismiss and secure a $25 million settlement from one defendant
  and a $28 million settlement from another defendant.

- ***Universal Delaware, Inc. v. Comdata Corporation***, No. 07 Civ. 1078 (E.D. Pa.).
  Quinn Emanuel was appointed co-lead plaintiffs' counsel in a class action
  concerning monopolization in the market for truck fleet credit cards used at truck
  stops.

In recognition of this and other work, Quinn Emanuel was named to the Plaintiff's Hot

List again this year.  *See* Brockett Decl., Ex. R.  The firm has also obtained favorable results

while representing *defendants* in antitrust class actions, including:

- ***In re Flash Memory Antitrust Litigation***, No. 07 Civ. 86 (N.D. Cal.).  Quinn Emanuel successfully defeated class certification in two price-fixing class actions brought by direct and indirect purchasers of NAND flash memory.

- ***In re Static Random Access Memory Antitrust Litigation***, No. 07 Civ. 1819 (N.D. Cal.).  Quinn Emanuel represented IBM in this antitrust MDL and obtained a favorable dismissal for the company.

- ***Garcia v. DirectTV Inc.***, No. B158570 (Cal. Sup. Ct.).  Quinn Emanuel successfully defended DirectTV against two consumer class actions, with the court granting motions to dismiss all claims.

- ***Kleen Products, LLC v. Georgia-Pacific, LLC***, No. 10 Civ. 5711 (N.D. Ill.).  Quinn Emanuel currently represents Georgia-Pacific in defense of a pending federal antitrust class action against the major containerboard manufacturers.

Our class action practice is repeatedly recognized for these achievements and others.  The firm was named the 2013 "Class Action Practice Group of the Year" by *Law360* for its work for plaintiffs and defendants in class action litigation.  *See* Brockett Decl., Ex. S.  More than half of the firm's partners regularly represent clients in class actions.  As a result, Quinn Emanuel's lawyers – including the team on this case – have extensive knowledge of the procedural and litigation dynamics unique to class actions as well as expertise in the underlying substantive areas of law.

In addition to antitrust and class action issues, this case will also require a deep command of structured finance and derivatives.  Quinn Emanuel has built a preeminent structured finance and bank litigation practice, and its lawyers have particular expertise litigating cases involving CDS and other complex financial products.[10]  *See* Brockett Decl., Ex. C.  We represent clients such as FHFA, AIG, Prudential, Allstate, MBIA, and others in cases arising out of fraud in the

---

[10]   This Court has noted that industry-specific expertise is important in selecting class counsel in an antitrust class action.  *See In re Electronic Books Antitrust Litig.*, No. 11 Md. 2293 (DLC) (S.D.N.Y. Dec. 20, 2011) (Tr. 31:7-12; 42:17-20) (explaining that "knowing an industry and understanding it is invaluable" for class counsel).

structuring and sale of residential mortgage-backed securities.  The firm also represents

numerous clients in litigation relating to collateralized debt obligations, credit default swaps, and

other derivatives.

Dan Brockett, one of the lead partners on Quinn Emanuel's team in this case, has been

the lead partner in over 20 complex financial cases against the same banks that are Defendants

here.  Quinn Emanuel's experience with cases involving complex financial products – as well as

its intimate familiarity with the litigation tactics employed by the bank defendants that structure

and sell them – are invaluable assets Quinn Emanuel is uniquely positioned to offer all class

members.  *See, e.g.*, *Anderson v. Fiserv, Inc.*, Nos. 09 Civ. 5400, 09 Civ. 8397 (BSJ)(FM), 2010

WL 571812, at *2 (S.D.N.Y. Jan. 29, 2010) (where all firms had experience handling complex

litigation and class actions, the court looked for counsel that "specialize[d] in financial and class

action litigation").[11]

### C.    Quinn Emanuel Has The Resources and In-House Expertise Necessary to Manage Electronic Discovery in These Consolidated Cases.

Quinn Emanuel has a 24-person, full-time in-house Litigation Technology Advisory

Services Group ("Lit Support Group") that has the capability to manage discovery on the scale

that will be required here.  *See* Brockett Decl., Ex. T.  Given that this case involves numerous

defendants and a far-reaching conspiracy over a multi-year class period, these consolidated cases

will generate a tremendous volume of material in the discovery stage.  Quinn Emanuel's Lit

Support Group has experience with projects of comparable size and scope, having successfully

managed discovery in cases that required more than 75 lawyers to review millions of documents.

The importance of these resources and experience to the successful management of these cases

cannot be overstated.  *See* Fed. R. Civ. P. 23(g)(1)(A)(iv); *Four in One Company*, No. 08 Civ.

---

[11]    *See also* Brockett Decl., Ex. C.

3017, Dkt. No. 92, at *8 (E.D. Cal. Mar. 20, 2009) (finding that Quinn Emanuel's experience and resources warranted lead counsel status under Rule 23(g)).

In addition to its experienced litigation support staff, Quinn Emanuel will also benefit from the full support of co-counsel William P. Butterfield of Hausfeld LLP, a renowned e-discovery expert.  Mr. Butterfield has testified as an expert witness on e-discovery issues; teaches and speaks frequently on that topic domestically and abroad; and is a member of numerous influential committees working to produce high-quality commentary and guidance to the bench and bar regarding electronic information management, discovery, and disclosure.  Mr. Butterfield's insight will further ensure that Quinn Emanuel's substantial resources will be marshaled in an efficient, effective manner when discovery commences.

## II.   QUINN EMANUEL WOULD BE PREPARED TO WORK WITH ANY OTHER LEAD COUNSEL SELECTED BY THE COURT.

We are aware of this Court's presumption that naming a single lead counsel is typically the right approach.[12]  For the reasons set forth above, we submit that Quinn Emanuel is the *only* firm that offers the proposed class the breadth and depth of resources this case requires.  Given the potentially massive size of this case, however, we believe this is a case that could warrant appointment of two firms as co-lead counsel.

Before filing their respective papers, each of the firms vying for lead counsel engaged in discussions to see if we could reach a consensus on the firm or firms to propose to the Court.  Although no consensus was reached, Quinn Emanuel would be prepared to work with any firm selected by the Court as co-lead counsel in this matter.[13]  At the same time, we note that Quinn

---

[12]   *See In re Electronic Books Antitrust Litig.*, No. 11 Md. 2293 (DLC) (S.D.N.Y. Dec. 20, 2011) (Tr. 13:19-21) ("my preference is for one firm, and that is going to be the presumption under which I am proceeding").

[13]   During the proceedings before the Judicial Panel on Multi-District Litigation, certain counsel asserted that because the FrontPoint Funds were once affiliated with Morgan Stanley (a

Emanuel does not have any arrangement with any other firm that would affect how we prosecute this case as lead counsel or co-lead counsel.

## **CONCLUSION**

For the foregoing reasons, we respectfully submit that Quinn Emanuel is best suited to represent the interests of all class members, and should be appointed interim lead class counsel.

---

defendant here), Salix was a questionable class representative.  The Front Point Funds at issue here had nothing to do with the alleged conspiracy.  They were separately incorporated (Am. Compl. ¶ 27(a)-(d)), were prohibited from using Morgan Stanley to trade CDS, and nothing prevents a former affiliate fund from suing its former parent company for an antitrust violation.

We note, in addition, that we have disclosed to other counsel that Quinn Emanuel has from time to time represented Morgan Stanley.  We have also disclosed that we secured a written conflicts waiver from Morgan Stanley for this case.  We can share the written conflict waivers obtained from Salix and Morgan Stanley with the Court should it care to see them.  After we shared that information with the other firms seeking to be lead counsel in this case, each of them expressed a willingness to be a co-lead counsel with Quinn Emanuel.  With this waiver, there is no limitation on our ability to represent the class.  *See, e.g.*, *In re Katrina Canal Breaches Consol. Litig.*, No. 05 Civ. 4182 (SRD), 2008 WL 3845228, at *3-7 (E.D. La. Aug. 13, 2008) (a waiver from named plaintiffs eliminates class counsel's potential conflict of interest, and no waiver is required from unnamed class members); *Sharp v. Next Entm't, Inc.*, 163 Cal. App. 4th 410, 431 (2008) (no conflict of interest where waiver was executed by lead plaintiffs).

DATED:    New York, New York                QUINN EMANUEL URQUHART &
          November 8, 2013                      SULLIVAN, LLP


                                            By:   /s/ Daniel L. Brockett
                                                 Daniel L. Brockett
                                                 Stephen R. Neuwirth
                                                 Steig D. Olson
                                                 51 Madison Avenue, 22nd Floor
                                                 New York, New York 10010-1601
                                                 Telephone:  (212) 849-7000
                                                 Fax:  (212) 849-7100
                                                 danbrockett@quinnemanuel.com
                                                 stephenneuwirth@quinnemanuel.com
                                                 steigolson@quinnemanuel.com

                                                 Jeremy D. Andersen (*pro hac vice*
                                                 application forthcoming)
                                                 865 South Figueroa Street, 10th Floor
                                                 Los Angeles, California 90017
                                                 Telephone:  (213) 443-3000
                                                 Fax:  (213) 443-3100
                                                 jeremyandersen@quinnemanuel.com

                                                 *Attorneys for Plaintiff Salix Capital US Inc.*
                                                 *and the Proposed Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 8, 2013, I filed and therefore caused the foregoing document and accompanying papers (if any) to be served via the CM/ECF system in the United States District Court for the Southern District of New York on all parties registered for CM/ECF in the above-captioned matters.


/s/ Daniel L. Brockett
Daniel L. Brockett