UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: CREDIT DEFAULT SWAPS ANTITRUST LITIGATION | CASE NO. 1:13-MD-02476-DLC |
| | **ECF CASE** |
| This Document Relates To: | |
| ALL ACTIONS | |

**RESPONSE IN OPPOSITION TO (1) APPLICATION TO APPOINT QUINN EMANUEL URQUHART & SULLIVAN, LLP INTERIM LEAD CLASS COUNSEL; (2) THE CDS INSTITUTIONAL INVESTOR GROUP'S APPLICATION FOR APPOINTMENT AS LEAD PLAINTIFF AND APPOINTMENT OF ENTWISTLE & CAPPUCCI LLP AND KAPLAN FOX & KILSHEIMER LLP AS INTERIM CO-LEAD COUNSEL; AND (3) LOS ANGELES COUNTY EMPLOYEES RETIREMENT ASSOCIATION'S APPLICATION FOR APPOINTMENT OF PEARSON, SIMON & WARSHAW, LLP AS INTERIM LEAD COUNSEL**

## TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................................1

II.    PROPOSED INTERIM CO-LEAD COUNSEL'S EX EFFORTS
       DEMONSTRATE THEIR SUPERIOR ABILITY TO REPRESENT THE CLASS..........2

III.   QUINN POSSESSES SIGNFICANT DEFECTS WHICH PRECLUDE ITS
       SELECTION AS INTERIM CLASS COUNSEL ............................................................6

       A.     Quinn's Ongoing Representation of Defendant Morgan Stanley Is an
              Impediment that Threatens the Class .........................................................6

       B.     Salix's Relationship with Morgan Stanley Also Threatens the Class....................8

       C.     Quinn's Representation of the Class Is Inherently Inadequate ............................10

       D.     Salix Cannot Waive Quinn's Conflict on Behalf of the Class .............................12

       E.     As a Purported Assignee of Claims Assigned from FrontPoint, a Morgan
              Stanley Subsidiary During the Class Period, Salix Is an Inadequate Class
              Representative .......................................................................................14

IV.    SALIX, VALUE RECOVERY FUND, AND FUND LIQUIDATION
       HOLDINGS DO NOT HAVE STANDING BECAUSE THEIR CLAIMS ARE
       NOT ASSIGNABLE UNDER THE ISDA MASTER AGREEMENT............................15

V.     CONCLUSION ...........................................................................................................16

i

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*All Star Carts & Vehicles, Inc. v. BFI Canada Income Fund*,
No. CV 08-1816, 2010 U.S. Dist. LEXIS 53290 (E.D.N.Y. May 31, 2010)...........................12

*Chateau de Ville Productions, Inc. v. Tams-Witmark Music Library, Inc.*,
474 F. Supp. 223 (S.D.N.Y. 1979)...........................................................................................12

*Cinema 5, Ltd. v. Cinerama, Inc.*,
528 F.2d 1384 (2d Cir. 1976)...................................................................................................11

*Cohen v. Strouch*,
No. 10 Civ. 7828 (DLC), 2011 WL 1143062 (S.D.N.Y. Mar. 24, 2011)................................10

*Davis v. Kraft Foods N. Am.*,
No. Civ. A. 03-6060, 2006 WL 237512 (E.D. Pa. Jan. 31, 2006) ...........................................13

*Deangelis v. Corzine*,
286 F.R.D. 220 (S.D.N.Y. 2012) .............................................................................................10

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
240 F.R.D. 56 (E.D.N.Y. 2006) .................................................................................................3

*In re Ditropan XL Antitrust Litig.*,
No. M:06-cv-01761, 2007 WL 2978329 (N.D. Cal. Oct. 11, 2007)........................................16

*In re Dresser Indus., Inc.*,
972 F.2d 540 (5th Cir. 1992) ....................................................................................................13

*In re Katrina Canal Breaches Consol. Litig.*,
C.A. No. 08-4182, 2008 U.S. Dist. LEXIS 118674 (E.D. La. Aug. 13, 2008)........................13

*In re Mun. Deriv. Antitrust Litig.*,
252 F.R.D. 184 (S.D.N.Y 2008) .................................................................................................2

*In re Terazosin Hydrochloride Antitrust Litig.*,
223 F.R.D. 666 (S.D. Fla. 2004)...............................................................................................13

*Lewis v. Nat'l Football League*,
146 F.R.D. 5 (D.D.C. 1992).......................................................................................................10

*Madison 92nd St. Assocs., LLC v. Marriott Int'l, Inc.*,
No. 13 Civ. 291 (CM), 2013 WL 5913382 (S.D.N.Y. Oct. 31, 2013) ....................................11

*McCauley v. Family Dollar, Inc.*,
  No. 3:10:cv-363, 2010 U.S. Dist. LEXIS 116636 (W.D. Ky. Oct. 29, 2010) ........................13

*Moreno v. Autozone, Inc.*,
  No. C05-04432, 2007 WL 4287517 (N.D. Cal. Dec. 6, 2007) ................................................13

*Palumbo v. Tele-Communications, Inc.*,
  157 F.R.D. 129 (D.D.C. 1994) .............................................................................................13

*Sharp v. Next Entm't, Inc.*,
  163 Cal. App. 4th 410 (2008) .........................................................................................13, 14

*Standard Fire Ins. Co. v. Knowles*,
  133 S. Ct. 1345 (2013) .........................................................................................................12

*United Int'l Holdings, Inc. v. Wharf (Holdings), Ltd.*,
  988 F. Supp. 367 (S.D.N.Y. 1997) .......................................................................................15

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
  Rule 23 ...................................................................................................................................2
  Rule 23(a)(4) .........................................................................................................................10
  Rule 23(g) ..........................................................................................................................1, 14
  Rule 23(g)(1)(A)(i) .................................................................................................................2
  Rule 23(g)(2) .........................................................................................................................16

## I.      INTRODUCTION

Scott+Scott, Attorneys at Law, LLP ("Scott+Scott"), Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), and Korein Tillery, LLC ("Korein Tillery") (collectively, "Proposed Interim Co-Lead Counsel") satisfy the criteria set forth in Fed. R. Civ. P. 23(g) and are most qualified to be appointed interim class counsel in this case.  The Court should appoint Proposed Interim Co-Lead Counsel as interim class counsel because:

- Proposed Interim Co-Lead Counsel's investigation into the claims in this MDL is unequaled (*see* Opening Memo, ECF No. 88 at 7-16);

- Proposed Interim Co-Lead Counsel's appointment is supported by the majority of plaintiffs' counsel, including firms with outstanding antitrust credentials and the proven ability to lead cases of this magnitude (*see id.* at 22);

- Proposed Interim Co-Lead Counsel have proven their ability to successfully lead similarly large and complex litigation efficiently and effectively (*see id.* at 17-21); and

- Proposed Interim Co-Lead Counsel bring a deep bench and unsurpassed resources to this MDL (*see id.* at 22).

Proposed Interim Co-Lead Counsel have the requisite experience and have handled complex antitrust and securities cases, including trials.  Indeed, their combined and individual expertise in antitrust and securities cases is unsurpassed, and Scott+Scott, Robbins Geller, and Korein Tillery possess the appropriate resources for the effective representation of the putative class.

Counsel for the other plaintiffs should not be appointed lead counsel in this case for several reasons.  ***First***, as the opening applications make clear, there is a significant gap between the thorough investigations conducted by Proposed Interim Co-Lead Counsel and the efforts of counsel representing other plaintiffs.  Entwistle & Cappucci LLP ("Entwistle & Cappucci") and Pearson, Simon & Warshaw, LLP ("Pearson, Simon") reviewed publicly available information and their clients' trading data, and Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn"), counsel

1

for Salix Capital US Inc. ("Salix"), says it spoke with market participants, conducted market research, and retained a consulting firm, but those efforts are far surpassed by the nature and breadth of Proposed Interim Co-Lead Counsel's efforts to date. *See* Opening Memo at 7-16. ***Second***, issues related to Quinn's long-standing attorney-client relationship with defendant Morgan Stanley, as well as disqualification issues raised by defendant ISDA,[1] preclude Quinn's appointment as interim class counsel. Even the appearance of such conflicts undermines the confidence of absent class members as to the adequacy and vigor of the representation. ***Finally***, the competing movants also suffer from debilitating assignment and standing defects, which not only preclude their participation in this action as representative parties, but also subject them to unique defenses that would undoubtedly harm the class. For these reasons, the Quinn, Entwistle & Cappucci, and Pearson, Simon applications should be denied.

## II.   PROPOSED INTERIM CO-LEAD COUNSEL'S EXTRAORDINARY EFFORTS DEMONSTRATE THEIR SUPERIOR ABILITY TO REPRESENT THE CLASS

Rule 23 expressly requires that the Court first consider counsel's work "in identifying or investigating potential claims in the action." Fed. R. Civ. P. 23(g)(1)(A)(i). Courts have recognized the importance of this criterion and have appointed as interim class counsel the firms that expended substantially more effort and resources, and obtained more substantial and more valuable information. *See In re Mun. Deriv. Antitrust Litig.*, 252 F.R.D. 184, 196 (S.D.N.Y

---

[1]      Submitted herewith as Exhibit 1 to the Declaration of Christopher M. Burke in Support of Response in Opposition to (1) Application to Appoint Quinn Emanuel Urquhart & Sullivan, LLP Interim Lead Class Counsel; (2) The CDS Institutional Investor Group's Application for Appointment as Lead Plaintiff and Appointment of Entwistle & Cappucci LLP and Kaplan Fox & Kilsheimer LLP as Interim Co-Lead Counsel; and (3) Los Angeles County Employees Retirement Association's Application for Appointment of Pearson, Simon & Warshaw, LLP as Application for Appointment of Pearson, Simon & Warshaw, LLP as Interim Lead Counsel ("Burke Decl.") is the Expert Declaration of Professor Roy D. Simon, Jr., which addresses the disqualification issue and casts doubt on the efficacy and viability of any ethical screens or walls Quinn erects to negate the conflict of interest it has acknowledged.

2008).   Indeed, the class suffers when counsel that performed the most substantial and comprehensive investigation are not appointed to represent the class.   *See In re Air Cargo Shipping Servs. Antitrust Litig.*, 240 F.R.D. 56, 58 (E.D.N.Y. 2006).  This factor overwhelmingly supports appointing Proposed Interim Co-Lead Counsel to represent the class.

Proposed Interim Co-Lead Counsel's multi-year investigation into defendants' anticompetitive conduct, and its effect on the CDS market, has been far more comprehensive than the other firms seeking to be lead.  *See* Opening Memo at 7-16.  Indeed, over the course of several years, Proposed Interim Co-Lead Counsel spent thousands of hours identifying and investigating the claims brought on behalf of the class.  *Id*.  And the investigation yielded more timely results, with the first of the plaintiffs, Sheet Metal Workers Local No. 33 Cleveland District Pension Plan, filing its complaint before the European Commission's Statement of Objections and over two months prior to the complaint filed by Entwistle & Cappucci, almost four months prior to that filed by Quinn, and six months prior to the complaint filed by Pearson Simon.

Only Proposed Interim Co-Lead Counsel has done the work to identify, contact, and interview witnesses that are supportive of the class's case.  Proposed Interim Co-Lead Counsel interviewed significantly more witnesses with knowledge of the CDS market, defendants' anticompetitive conduct, and the impact on bid-ask spreads incurred by the class than counsel for any other plaintiff.  These witnesses – diverse, knowledgeable, and critical to the class's case – include industry insiders and CDS market participants at multi-national hedge funds, mid-sized broker dealers, CDS trading desks, interdealer brokers, third-party investment managers, other buy-side CDS trading firms, government officials, existing and aspiring CDS dealers that were boycotted by defendant dealers, and personnel of CDS clearinghouses that were shut out of CDS

3

clearing by defendants.  In addition, Proposed Interim Co-Lead Counsel interviewed persons with knowledge of defendant dealers' use of a New York Federal Reserve Bank committee to avoid changes in the CDS market, the drafting of the ISDA Master Agreement, defendant dealers' use of the Agreement to restrict access to the CDS market, and the formation of ICE Trust and acquisition of the Clearing Corporation to exclude competition in the CDS market. *See* Opening Memo at 7-16.  The evidence obtained from these interviews will prove invaluable in the prosecution of this case.  The witnesses provided first-hand knowledge of how the CDS market operates, including defendant dealers' trading and pricing practices, the structural impediments in the CDS market that resulted in inflated bid-ask spreads, defendant dealers' conduct to control trading and pricing information gateways, and the impact an electronic exchange would have had on making the CDS market more transparent.

Further, unlike the experts retained by the self-styled CDS Institutional Investor Group and Salix, who focused on damages models, ECF No. 94 at 11; ECF No. 81 at 8, or the experts retained by LACERA, who only consulted generally on "the CDS trading market," ECF No. 85 at 15, Proposed Interim Co-Lead Counsel have consulted experts on all critical aspects of the case.  *See* Opening Memo at 9, 11, 13.

Proposed Interim Co-Lead Counsel have also analyzed the ISDA Master Agreement, documentation, policies, and procedures because they understand that the dealers used the ISDA documentation to restrict access to the CDS market.  Proposed Interim Co-Lead Counsel also researched defendants' efforts to restrict technologies that CDS traders were attempting to implement to circumvent defendants' control over CDS pricing and information and analyzed the organizational and risk structures, admission policies, and governance procedures of ICE Trust, which defendant dealers used as their captive clearinghouse.  Finally, in order to assess potential

damages, Proposed Interim Co-Lead Counsel and their experts analyzed literature examining the impact of defendants' anticompetitive conduct, including the Bank for International Settlements and Office of the Comptroller of the Currency derivatives reports and historical bid-ask spreads on corporate bonds relative to those on corresponding CDS.  *See* Opening Memo at 12-16.

The depth, detail, and completeness of Proposed Interim Co-Lead Counsel's investigation cannot be matched by the other attorneys seeking leadership roles in this case.  Not only is this information more ably used by the attorneys who developed it, but much of the information is from confidential sources who were only willing to come forward because of their relationship with Proposed Interim Co-Lead Counsel.  This information goes directly to the prevention of a CDS exchange, including the pressuring of the CME not to develop an exchange.

Quinn's investigation, on behalf of Salix, pales by comparison.  *See* ECF No. 81 at 7. The scope of Quinn's investigation, spanning just "several months," ECF No. 81 at 7, suggests that it was not as extensive as that of Proposed Interim Co-Lead Counsel's.  Quinn spoke with fewer market participants and conducted more limited market research.  *See* ECF No. 81 at 7.

Proposed Interim Co-Lead Counsel's investigation also began before that of counsel for the CDS Institutional Investor Group (Entwistle & Cappucci) and Los Angeles County Employees Retirement Association ("LACERA") (Pearson, Simon), which each claim to have investigated the claims beginning in 2011, when the European Commission announced it was conducting a probe of defendants' conduct in the CDS market.  The scope of their investigations, described in very summary terms, does not compare to the lengthy and detailed description of Proposed Interim Co-Lead Counsel's investigation.  *See* Opening Memo at 7-16.  And, the LACERA complaint reveals its lack of depth by completely missing the significance of defendants' efforts to kill the CMDX exchange – the linchpin of the conspiracy to maintain

anticompetitive spreads.  In fact, LACERA's complaint contains no allegations of defendants' exclusion of CMDX, which, but for defendants' collusion, would have brought exchange trading to the CDS market.[2]

## III.   QUINN POSSESSES SIGNFICANT DEFECTS WHICH PRECLUDE ITS SELECTION AS INTERIM CLASS COUNSEL

### A.   Quinn's Ongoing Representation of Defendant Morgan Stanley Is an Impediment that Threatens the Class

Quinn's close relationship with, and ongoing representation of, the firm's long-standing client, defendant Morgan Stanley, precludes Quinn from vigorously and effectively representing the class.  Quinn does not deny this relationship.  While Quinn boasts throughout its application that its clients are the "largest and most sophisticated financial investment entities in the world," ECF No. 81 at 2, Quinn scarcely mentions its *current* and *prior* representation of Morgan Stanley, only revealing (reluctantly) at the end of its application that the firm has from "time to time represented Morgan Stanley."  ECF No. 81 at 20 n.13.

Despite Quinn's attempts to marginalize its relationship with Morgan Stanley, the firm's existing engagements for Morgan Stanley, promotional materials, and press reports tell a far different story.  For example, Quinn's website is replete with references to the firm's work for Morgan Stanley, prominently highlighting the firm's retention by Morgan Stanley in the *Perelman* case:

---

[2]      In addition, Pearson, Simon's application to be appointed as sole lead counsel should be rejected because the firm lacks the resources to lead this litigation.  Pearson, Simon is a firm of 12 attorneys, all based in California.  The Pearson, Simon Application is supported solely by LACERA and two small San Francisco law firms that jointly represent LACERA.  ECF No. 85 at 2-4, 9.  The appointment of Pearson, Simon as sole interim lead counsel would be contrary to the best interests of the class and is unreasonable based on the firm's size and the resources it has already committed to other cases.  *See* Declaration of Bruce L. Simon, ECF No. 86, Exhibit B at 11 (current cases).

> Perhaps the best evidence of our reputation for delivering results is our recent engagements.  Morgan Stanley, for example, retained us to retry the $1.6 billion Perelman case in Florida, *if it is ever retried*.  That is an example of a very sophisticated company, engaging our firm to defend it in its biggest case, in a jurisdiction where we do not even have an office.[3]

(Emphasis added).  As one legal publication reported:

> With its record of suing major financial institutions, Quinn Emanuel doesn't have a lot of friends and clients at the big banks.
>
> But Morgan Stanley is the exception; Quinn Emanuel has long had a special relationship with its management.[4]

Given the breadth of work Quinn continues to perform for Morgan Stanley, it is not surprising that at least 16 of its attorneys chose to feature Morgan Stanley in their résumés.[5] Several of these featured litigations involve the very subject matter in this litigation – credit default swaps.[6]  And Quinn's new attorneys are, at least in part, recruited to the firm with the promise of working "on exciting cases involving complex legal issues for . . . companies such as . . . Morgan Stanley."[7]

---

[3]    http://www.quinnemanuel.com/why-quinn/our-results.aspx (last accessed Nov. 20, 2013); *see also* http://www.quinnemanuel.com/clients/morgan-stanley-senior-funding.aspx   (last accessed Nov. 20, 2013).

[4]    Andrew Longstreth, *Citigroup Sues Morgan Stanley over $245 Million Credit Default Swap Agreement*, THE AM LAW LITIGATION DAILY, Sept. 28, 2009, *available at* http://amlawdaily.typepad.com/amlawdaily/2009/09/citigroup-sues-morgan-stanley-over-245-million-credit-default-swap-agreement.html.

[5]    http://www.quinnemanuel.com/attorneys.aspx (résumés of Jennifer J. Barrett, Deborah K. Brown, Michael B. Carlinsky, Andrew R. Dunlap, Richard East, Faith E. Gay, Maria Ginzburg, John S. Gordon, Robert C. Juman, Isaac Nesser, Jonathan B. Oblak, Jonathan E. Pickhardt, John M. Pierce, Kevin S. Reed, Judd Spray, and Bruce E. Van Dalsem) (last accessed Nov. 17, 2013).

[6]    http://www.quinnemanuel.com/attorneys/carlinsky-michael-b.aspx (last accessed Nov. 20, 2013).

[7]    http://www.quinnemanuel.com/work-at-quinn/the-firm/talent-mandatory-suit-optional/why-work-here.aspx (last accessed Nov. 20, 2013).

Acknowledging the existence of an actual conflict of interest, Quinn states it obtained conflict waivers from its clients, Morgan Stanley and Salix.  ECF No. 81 at 20 n.13.  Morgan Stanley's agreement reflects its self-interest.  Its liability in this case is potentially in the billions of dollars, and Morgan Stanley would benefit from having a law firm with whom it has a long-standing relationship on the other side of the case.  Indeed, it is quite remarkable that Morgan Stanley would waive this conflict and permit Quinn,  which has been "recognized as one of just *four* U.S. firms that in-house counsel fear most," ECF No. 81 at 1, to prosecute this case against it.

## B.    Salix's Relationship with Morgan Stanley Also Threatens the Class

In addition to Quinn's conflict, Quinn's client, Salix, also has a relationship with Morgan Stanley, which was, during the class period, the majority owner of FrontPoint Partners,[8] a multi-billion dollar hedge fund that shuttered most of its funds in 2011 due to insider trading scandals.[9] Here, Salix purports to have acquired its antitrust claims by assignment from FrontPoint.  ECF No. 81 at 5.  Like Morgan Stanley, however, Salix has nothing to lose by executing a conflict waiver; as an assignee of FrontPoint's trades, it is merely an investor in this action.

By its dual representations and assignments, Quinn has managed to have its long-standing client, Morgan Stanley, allow itself to be sued on its former subsidiaries' claims for trades made during the class period.  Thus, any claims FrontPoint may have were once those of Morgan Stanley.  And, because the class is defined, as is customary, to exclude defendants'

---

[8]    Azam Ahmed, *Morgan Stanley Completes Spinoff of FrontPoint*, N.Y. TIMES, March 1, 2011, *available at*:    http://dealbook.nytimes.com/2011/03/01/morgan-stanley-completes-frontpoint-spinoff/.

[9]    Peter Lattman & Azam Ahmed, *FrontPoint to Shut Most Funds After Insider Trading Charges*, N.Y. TIMES, May 19, 2011, *available at*:  http://dealbook.nytimes.com/2011/05/19/frontpoint-to-shut-most-funds-after-insider-charges/.

affiliates, as well as interdealer trades, such as those between Morgan Stanley and a fellow CDS

dealer, Salix is neither a class member, nor the assignee of a class member

Quinn's efforts to obfuscate Salix's relationship with Morgan Stanley are evident in a

comparison of the Salix *LIBOR* complaint[10] with Salix's amended complaint filed in this

action,[11] both of which are premised on assignments from FrontPoint – the latter of which

omitted its affiliation with Morgan Stanley:

| LIBOR COMPLAINT | CDS COMPLAINT |
|---|---|
| (a) FrontPoint Relative Value Opportunities Fund, L.P. ("FRV"), formerly known as FrontPoint Fixed Income Opportunities Fund, L.P. ("FIO"), is a limited partnership organized under the laws of Delaware with its principal place of business in Greenwich, Connecticut. Its general partner is FrontPoint Relative Value Opportunities Fund GP, LLC, a limited liability company organized under the laws of Delaware **and, until March 1, 2011, an indirect wholly owned subsidiary of Morgan Stanley.** | (a) FrontPoint Relative Value Opportunities Fund, L.P. ("FRY"), formerly known as FrontPoint Fixed Income Opportunities Fund, L.P. ("FIO"), is a limited partnership organized under the laws of Delaware with its principal place of business in Greenwich, Connecticut. Its general partner is FrontPoint Relative Value Opportunities Fund GP, LLC, a limited liability company organized under the laws of Delaware ~~and, until March 1, 2011, an indirect wholly owned subsidiary of Morgan Stanley.~~ |
| (b) FrontPoint Volatility Opportunities Fund, L.P. ("FVO") was a limited partnership organized under the laws of the Cayman Islands with its principal place of business in Greenwich, Connecticut. Its general partner was FrontPoint Volatility Opportunities Fund GP, LLC, a limited liability company organized under the laws of Delaware **and, until March 1, 2011, an indirect wholly owned subsidiary of Morgan Stanley.** | (b) FrontPoint Volatility Opportunities Fund, L.P. ("FVO") was a limited partnership organized under the laws of the Cayman Islands with its principal place of business in Greenwich, Connecticut. Its general partner was FrontPoint Volatility Opportunities Fund GP, LLC, a limited liability company organized under the laws of Delaware ~~and, until March 1, 2011, an indirect wholly owned subsidiary of Morgan Stanley.~~ |
| (c) FrontPoint Volatility Opportunities Fund | (c) FrontPoint Volatility Opportunities Fund |

---

[10]     Amended Complaint, *Salix LIBOR*, Case No. 1:13-cv-04018-NRB, ECF No. 27, ¶15.

[11]     Amended Complaint, *Salix Credit Default Swaps*, Case No. 1:13-cv-06116-UA, ECF No. 8, ¶27.

| LIBOR COMPLAINT | CDS COMPLAINT |
|---|---|
| GP, L.P. ("FVO GP") was a limited partnership organized under the laws of Delaware with its principal place of business in Greenwich, Connecticut. Its general partner was FrontPoint Volatility Opportunities Fund GP, LLC, a limited liability company organized under the laws of Delaware **and, until March 1, 2011, indirect wholly owned subsidiary of Morgan Stanley.** | GP, L.P. ("FVO GP") was a limited partnership organized under the laws of Delaware with its principal place of business in Greenwich, Connecticut. Its general partner was FrontPoint Volatility Opportunities Fund GP, LLC, a limited liability company organized under the laws of Delaware ~~and, until March 1, 2011, indirect wholly owned subsidiary of Morgan Stanley.~~ |
| (d) FrontPoint Partners, L.P. ("FPP") was a limited partnership organized under the laws of Delaware with its principal place of business in Greenwich, Connecticut. Its general partner was FrontPoint Partners LLC ("FrontPoint Partners"), a limited liability company organized under the laws of Delaware **and, until March 1, 2011, an indirect wholly-owned subsidiary of Morgan Stanley.** | (d) FrontPoint Partners, L.P. ("FPP") was a limited partnership organized under the laws of Delaware with its principal place of business in Greenwich, Connecticut. Its general partner was FrontPoint Partners LLC ("FrontPoint Partners"), a limited liability company organized under the laws of Delaware ~~and, until March 1, 2011, an indirect wholly-owned subsidiary of Morgan Stanley.~~ |

## C.  Quinn's Representation of the Class Is Inherently Inadequate

Where "there are multiple lead counsel applicants . . . 'the court must appoint the applicant best able to represent the interests of the class.'" *Deangelis v. Corzine*, 286 F.R.D. 220, 223 (S.D.N.Y. 2012) (quoting Fed. R. Civ. P. 23(g)(2)).  Counsel is "adequate" under Rule 23(a)(4) only if it can satisfy the Court that its representation will be conflict-free.  *Lewis v. Nat'l Football League*, 146 F.R.D. 5, 10 (D.D.C. 1992) (citing *In re Fine Paper Antitrust Litig.*, 617 F.2d 22, 27 (3d Cir. 1980)) ("an attorney's conflicting or divided loyalty could constitute inadequate representation").

Burdened by significant actual conflicts, Quinn must demonstrate that the conflicts would not diminish its representation of the class.  "'Because concurrent representation is prima facie improper, it is incumbent upon the attorney to show, at the very least, that there will be no actual *or apparent* conflict in loyalties or diminution in the vigor of his representation.  [The Second

Circuit, has] noted that this is a burden so heavy that it will rarely be met.'" *Cohen v. Strouch*, No. 10 Civ. 7828 (DLC), 2011 WL 1143062 (S.D.N.Y. Mar. 24, 2011) (quoting *GSI Commerce Solutions, Inc. v. BabyCenter L.L.C.*, 618 F.3d 204, 209 (2d Cir. 2010)) (emphasis and alteration in original).  Likewise, "the lawyer who would sue his own client, asserting in justification the lack of 'substantial relationship' between the litigation and the work he has undertaken to perform for that client, is leaning on a slender reed indeed." *Cinema 5, Ltd. v. Cinerama, Inc*., 528 F.2d 1384, 1386-87 (2d Cir. 1976).

Quinn's loyalties are already inherently divided, irrespective of any ethical wall it erected or conflict waiver it obtained.  Morgan Stanley is a repeat, and very substantial, client of Quinn's.  Given the diversity and number of matters it handles for Morgan Stanley, Quinn cannot simply "turn off" its obligation to its long-standing client.  Moreover, class members cannot be confident that Quinn will prosecute their claims against Morgan Stanley with the same vigor as against other defendants.  *See* Lubet Decl., ¶¶25-28, 32-33.[12]  "This is not ethical rocket science." *Madison 92nd St. Assocs., LLC v. Marriott Int'l, Inc.,* No. 13 Civ. 291 (CM), 2013 WL 5913382 (S.D.N.Y. Oct. 31, 2013), at *1, 5 ("A clearer conflict of interest cannot be imagined. A first year law student on day one of an ethics course should be able to spot it.").  *Id.*

Quinn's divided loyalty between the class and Morgan Stanley poses significant practical problems as well.  *See* Lubet Decl., ¶¶25-28, 32-33.  For example, should Quinn settle this case with Morgan Stanley, the terms would undoubtedly be questioned by class members.  Real or imaginary, the appearance of impropriety would cast a shadow of doubt over any of Quinn's

---

[12]     Submitted herewith as Exhibit 2 to the Burke Decl. is the Report of Professor Steven Lubet ("Lubet Decl."), a professor of law at the Northwestern University School of Law. Professor Lubet opines on the conflict of interest created by Quinn's concurrent representation of the proposed plaintiff class and defendant Morgan Stanley.

dealings with Morgan Stanley. *Id.*, ¶32.  Moreover, if Quinn represents the class, objectors could delay, reduce, or even prevent class recovery on adequacy grounds. *Id.*, ¶33.  Such objections would not apply to Proposed Interim Co-Lead Counsel.  There is also the possibility that Morgan Stanley's co-defendants will seek conflict-related discovery of Salix, FrontPoint, and Quinn, an additional issue that would create extra and unnecessary expense and delay, borne ultimately by the class.  Throughout the course of this litigation, interim class counsel will make scores of discretionary strategy decisions affecting Morgan Stanley, which will compound the present issue throughout the litigation. *See id.*, ¶20.  Ultimately, it is simply unfair to the class that a law firm seeking to represent it in this significant and complex matter is concurrently representing defendant Morgan Stanley.  For these reasons, Quinn is not the best applicant to represent the class.

### D.      Salix Cannot Waive Quinn's Conflict on Behalf of the Class

The viability of Quinn's application is, at least in the first instance, contingent on the efficacy of the conflict waivers purportedly obtained from Salix and Morgan Stanley.  However, a class representative's conflict waiver is not binding on the class under these circumstances.[13] Lubet Decl., ¶¶18-22.  Indeed, Salix's pre-certification waiver only binds Salix. *Standard Fire Ins. Co. v. Knowles*, 133 S. Ct. 1345, 1349 (2013).  This is because "a plaintiff who files a proposed class action cannot legally bind members of the proposed class before the class is certified." *Id.*  While Quinn contends that the waiver frees it of any "limitation on our ability to represent the class," ECF No. 81 at 20, n.13, the great weight of authority holds that "in the class

---

[13]      Although Quinn states it obtained Salix's conflict waiver, Quinn does not have a written waiver from any, much less all, of the other named plaintiffs.  Prior to filing its application, Quinn did not request a conflict waiver from any other plaintiff.  Nor has Quinn provided a copy of the conflict waiver to counsel for any other plaintiff.

action context, a conflict of interest cannot be waived." *All Star Carts & Vehicles, Inc. v. BFI Canada Income Fund*, No. CV 08-1816, 2010 U.S. Dist. LEXIS 53290, at *24 (E.D.N.Y. May 31, 2010).

The law of this District is in accord with the majority view that named plaintiffs cannot waive conflicts on behalf of the class.  For example, in *Chateau de Ville Productions, Inc. v. Tams-Witmark Music Library, Inc.*, 474 F. Supp. 223, 227 (S.D.N.Y. 1979), the Court held that "since plaintiffs still seek to proceed on behalf of a class, the consent of all would be required, and this, of course, is not a practical possibility."  And, *Palumbo v. Tele-Communications, Inc.*, 157 F.R.D. 129, 132-33 (D.D.C. 1994), explains:

> If [the attorney] were representing only an individual plaintiff, he could conceivably seek a written waiver of conflict of interest.  But in this case, [he] seeks to represent a large, unenumerated and as yet unidentified class of plaintiffs.  Unidentified class members cannot waive a potential conflict of interest.  In the class action context, the Court has an obligation to closely scrutinize the qualifications of counsel to assure that all interests, including those of as yet unnamed plaintiffs are adequately represented.

*Id.*[14]

---

[14]    *See also In re Dresser Indus., Inc*., 972 F.2d 540, 545 n.11 (5th Cir. 1992) ("We note that there is a limited utility to seeking the consent of the client in a class action. In class actions, the court must independently determine whether the lawyer for the class can fairly represent all of the members of the class, and a lawyer's conflicts with the defense may forbid such representation."); *McCauley v. Family Dollar, Inc*., No. 3:10:cv-363, 2010 U.S. Dist. LEXIS 116636, at *9-10 (W.D. Ky. Oct. 29, 2010) ("named plaintiffs in this putative class action may not waive the conflict on behalf of the unnamed class members"); *Moreno v. Autozone, Inc*., No. C05-04432, 2007 WL 4287517, at *7 (N.D. Cal. Dec. 6, 2007) (plaintiff "can not obtain written waiver of the actual conflicts of interest that exist from the absent class members"); *Davis v. Kraft Foods N. Am.*, No. Civ. A. 03-6060, 2006 WL 237512, at *13 (E.D. Pa. Jan. 31, 2006) ("Even assuming Ms. Davis has knowingly and intelligently waived a conflict on her own behalf, I do not believe she can waive any conflict on the class's behalf."); *In re Terazosin Hydrochloride Antitrust Litig.*, 223 F.R.D. 666, 677 (S.D. Fla. 2004) (doubting whether "representative [class] members can waive any actual or potential conflicts for the remaining . . . members of the defined proposed class.").

The two out-of-district cases Quinn cites to support its contention express the minority view, are distinguishable, and do not otherwise bind this Court. *In re Katrina Canal Breaches Consol. Litig.*, C.A. No. 08-4182, 2008 U.S. Dist. LEXIS 118674, at *6 (E.D. La. Aug. 13, 2008) concerned a motion to disqualify lead counsel in the midst of litigation. The court allowed the waiver for practical reasons: "Finding replacement counsel capable of handling litigation of this size and complexity will significantly, if not fatally, stall the class suit." This case is in an entirely different procedural posture and is at its inception, and unlike *Katrina Canal*, qualified class counsel are readily available. Similarly, while the Court in *Sharp v. Next Entm't, Inc.*, 163 Cal. App. 4th 410 (2008), allowed a waiver by a named plaintiff to save its lawyer from disqualification, the court was careful to avoid holding that a class representative could waive on behalf of a certified class. *Id.* at 436. The *Sharp* court, we submit, incorrectly reasoned that prior to certification, a counsel's loyalty extended to the named plaintiff only. Notably, the court did not perform a Rule 23(g) analysis. Even the *Sharp* court recognized, however, that not all pre-certification waivers are valid, reserving the ability to reject a conflict waiver where, as here, there is an "actual conflict that may affect [the] integrity of the proceedings." *Id.*

### E. As a Purported Assignee of Claims Assigned from FrontPoint, a Morgan Stanley Subsidiary During the Class Period, Salix Is an Inadequate Class Representative

Quinn's client, Salix, also has an irreconcilable conflict. The Salix CDS trades purportedly owned by Salix were assigned from FrontPoint – a subsidiary of Morgan Stanley during the class period. Thus, if Salix is the class representative, Quinn will be required to bring forth evidence that Morgan Stanley, as a dealer defendant, conspired to artificially increase the bid-ask spread on CDS trades made between Morgan Stanley and Morgan Stanley-owned FrontPoint. This unique factor renders Salix at odds with the class, or at the very least, subject to unique defenses. Salix cannot adequately represent the class where its claims were effectively

14

assigned from one of the defendants.  The class should not be burdened with navigating around

Salix's unique set of problems.[15]

## IV.    SALIX, VALUE RECOVERY FUND, AND FUND LIQUIDATION HOLDINGS DO NOT HAVE STANDING BECAUSE THEIR CLAIMS ARE NOT ASSIGNABLE UNDER THE ISDA MASTER AGREEMENT

Plaintiffs Salix, Value Recovery Fund, and Fund Liquidation Holdings[16] admit, as they

must, that they did not make any of the CDS trades at issue in this litigation.[17]  They allege that

the claims on which they have brought suit were assigned to them.[18]

CDS contracts are governed by the ISDA Master Agreement.  Section 7 of the ISDA

Master Agreement provides that no "interest or obligation in or under this Agreement may be

transferred (whether by way of security or otherwise) by either party without the prior written

---

[15]    It is anticipated that other plaintiffs will suggest that Plaintiff MF Global Capital LLC is an inadequate lead plaintiff because of the MF Global bankruptcy and associated allegations of wrongdoing.  However, MF Global Capital LLC has not been accused of wrongdoing by any private litigant, regulatory agency, or in any investigative report during any of the MF Global bankruptcy proceedings or the private litigation and regulatory enforcement actions that followed the bankruptcy.  MF Global Capital LLC was a wholly-owned subsidiary of MF Global Holdings Ltd. and conducted primarily over-the-counter foreign exchange, prime brokerage, and energy commodity and CDS brokerage services.  The Commodity Futures Trading Commission action relates solely to the futures commission merchant activity of MF Global Inc., and includes allegations relating to the use of and controls over MF Global Inc.'s customer segregated funds, while the private litigation relates primarily to such activity and, with respect to certain securities-related litigation, to disclosures by MF Global Holdings Ltd. as an issuer and public reporting company.

[16]    Value Recovery Fund and Fund Liquidation Holdings are two of the CDS Institutional Investor Group movants.

[17]    Value Recovery Fund First Amended Complaint, No. 1:13-cv-04928, ECF No. 14, ¶10 (Value Recovery Fund); ECF No. 94 at 7 (Fund Liquidation Holdings); ECF No. 81 at 5 (Salix).

[18]    Value Recovery Fund has never disclosed the assignor of its claims and none of the assignee plaintiffs have furnished the assignment, which may also call into question their standing to litigate this case.

consent of the other party." Wolson Decl., ¶13.[19]  Section 7, thus, is a "non-assignment clause."

*United Int'l Holdings, Inc. v. Wharf (Holdings), Ltd*., 988 F. Supp. 367, 370-71 (S.D.N.Y. 1997).

To be valid, any assignment of claims to Salix, Value Recovery Fund, or Fund Liquidation

Holdings, therefore, would require the prior written consent of the assignors' counterparties.

Wolson Decl., ¶14.  There is no allegation that any of the assignors obtained any such written

consent from any defendant with which it transacted during the class period, much less all of

them for each transaction during the class period.  The non-assignment clause, thus, could impact

the standing of Salix, Value Recovery Fund, and Fund Liquidation Holdings.  *Id.*, ¶20; *see also*

*In re Ditropan XL Antitrust Litig*., No. M:06-cv-01761, 2007 WL 2978329, at *2 (N.D. Cal. Oct.

11, 2007).

## V.    CONCLUSION

Scott+Scott, Robbins Geller, and Korein Tillery are "best able to represent the interests of

the class." Fed. R. Civ. P. 23(g)(2).  Accordingly, all other motions for appointment of interim

class counsel should be denied.


DATED:  November 22, 2013              Respectfully submitted,

                                       SCOTT+SCOTT, ATTORNEYS AT LAW, LLP


                                        /s/ Christopher M. Burke
                                       CHRISTOPHER M. BURKE (admitted *pro hac vice*)
                                       WALTER W. NOSS
                                       KRISTEN M. ANDERSON
                                       707 Broadway, Suite 1000
                                       San Diego, CA 92101

---

[19]     Submitted herewith as Exhibit 3 to the Burke Decl. is the Expert Declaration of Craig A. Wolson ("Wolson Decl.").  Wolson was involved in the promulgation of ISDA's Master Agreement forms and offers opinions on the inability of counterparties to assign claims under Section 7 of that Agreement.

Telephone: 619-233-4565
Facsimile: 619-233-0508

SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
DAVID R. SCOTT
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: 860-537-5537
Facsimile: 860-537-4432

SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
JOSEPH P. GUGLIELMO
DONALD A. BROGGI
MAX SCHWARTZ
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY 10174-4099
Telephone: 212-223-6444
Facsimile: 212-223-6334

ROBBINS GELLER RUDMAN
 & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631-367-7100
Facsimile: 631-367-1173
srudman@rgrdlaw.com

ROBBINS GELLER RUDMAN
 & DOWD LLP
DARREN J. ROBBINS
PATRICK J. COUGHLIN
DAVID W. MITCHELL
BRIAN O. O'MARA
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619-231-1058
Facsimile: 619-231-7423
darrenr@rgrdlaw.com
patc@rgrdlaw.com
davidm@rgrdlaw.com
bomara@rgrdlaw.com

17

KOREIN TILLERY LLC
GEORGE A. ZELCS
205 North Michigan Plaza
Suite 1950
Chicago, IL 60601
Telephone: 312-641-9750
Facsimile: 312-641-9751
gzelcs@koreintillery.com

KOREIN TILLERY LLC
STEVEN M. TILLERY
ROBERT KING
GIUSEPPE S. GIARDINA
One U.S. Bank Plaza
505 N. 7th Street, Suite 3600
St. Louis, MO 63101-1625
Telephone: 314-241-4844
Facsimile: 314-241-3525
stillery@koreintillery.com
rking@koreintillery.com
ggiardina@koreintillery.com

*Proposed Interim Co-Lead Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2013, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List, and I hereby certify that I caused the foregoing document or paper to be mailed via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on November 22, 2013.

  /s/ Christopher M. Burke
CHRISTOPHER M. BURKE
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone: 619-233-4565
Fax: 619-233-0508
E-mail: cburke@scott-scott.com
