UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE CREDIT DEFAULT SWAPS ANTITRUST LITIGATION | No.  13 MD 2476 (DLC) |

**REPLY OF QUINN EMANUEL URQUHART & SULLIVAN, LLP
TO NEW ARGUMENTS MADE BY THE SCOTT-KOREIN-ROBBINS GROUP**

**TABLE OF CONTENTS**

Page

I. NO CONFLICT PRECLUDES QUINN EMANUEL FROM SERVING AS INTERIM LEAD CLASS COUNSEL. ...................................................................................2

    A. The Scott-Korein-Robbins Group's Claim is Irreconcilable With Their Past Positions And Is Not Shared By Other Lead Counsel Applicants. ...................2

    B. Conflict Waivers by Morgan Stanley and Class Representatives Are Effective at This Stage of the Case. ..........................................................................3

    C. Any Theoretical Concern Could Be Addressed By The Appointment of a *Co*-Lead Counsel to Serve Alongside Quinn Emanuel .............................................6

II. SALIX HAS STANDING TO BRING ANTITRUST CLAIMS. ........................................7

**PRELIMINARY STATEMENT**

Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel") respectfully submits this reply to two arguments made for the first time in the Scott-Korein-Robbins Group's November 22, 2013, Response in Opposition to the Application to Appoint Quinn Emanuel Urquhart & Sullivan, LLP Interim Lead Class Counsel (Dkt. 172).  Although the Scott-Korein-Robbins Group knew that Quinn Emanuel would be seeking appointment as interim lead class counsel, the Group saved two aggressive lines of attack against Quinn Emanuel for its Response brief.  Quinn Emanuel now responds to demonstrate that these attacks lack merit.

*First*, despite the fact that all three members of the Scott-Korein-Robbins Group were previously willing to support Quinn Emanuel as a co-lead interim counsel, with full awareness of Quinn Emanuel's representation of Morgan Stanley in certain unrelated matters, the Group now claims that this fact "precludes" Quinn Emanuel from serving as interim class counsel.  Not so.  Quinn Emanuel has secured a waiver from class representative Salix Capital and from Morgan Stanley and, under the New York Rules of Professional Conduct and Rule 23, this is sufficient.[1]  The purported contrary authority cited by the Scott-Korein-Robbins Group is inapposite at best.

More basically, the Group's claim that Quinn Emanuel might not vigorously pursue the class's claims against Morgan Stanley is baseless.  Quinn Emanuel has built its reputation on its ability to win cases like this one against defendants like these, and it will make every effort to do so again here.  Other lead counsel applicants support naming Quinn Emanuel as a co-lead, with their clients willing to waive any conflict to secure that representation, just as Salix has.

---

[1] *See* Declaration of Professor Bruce A. Green ("Green Decl.") ¶¶ 39-44, Nov. 25, 2013, ECF No. 184.  Professor Green is the Stein Professor of Law at Fordham University School of Law, and responds to the declaration of Professor Steven Lubet submitted by the Scott-Korein-Robbins Group.

*Second*, the Scott-Korein-Robbins Group attacks Salix's (and other plaintiffs') standing even to bring their claims, asserting that antitrust claims cannot be assigned under the ISDA Master Agreement. Not only does this type of attack on other plaintiffs not belong in a filing by *plaintiffs'* counsel, it is meritless as well. As confirmed by Stephen R. Greene, who, unlike the Scott-Korein-Robbins Group's purported expert, helped draft the ISDA Master Agreements, the anti-assignment clause in no way prevents the assignment of antitrust claims.[2] Case law confirms that the provision is not a bar to antitrust claims, such as Salix's, that are *extrinsic* to the Agreement.

## ARGUMENT

**I.   NO CONFLICT PRECLUDES QUINN EMANUEL FROM SERVING AS INTERIM LEAD CLASS COUNSEL.**

   **A.   The Scott-Korein-Robbins Group's Claim is Irreconcilable With Their Past Positions And Is Not Shared By Other Lead Counsel Applicants.**

The Scott-Korein-Robbins Group claims that Quinn Emanuel is precluded from serving as interim lead counsel, notwithstanding the conflict waivers executed by Morgan Stanley and Salix Capital. This assertion is irreconcilable with the fact that each of these firms was willing to support Quinn Emanuel as a co-lead counsel until ISDA's last-minute assertion that Quinn Emanuel had a disqualifying conflict – itself tactical – which extinguished the consensus that had emerged. These firms were ready to support Quinn Emanuel with full knowledge of the Morgan Stanley issue and the conflict waivers.[3] None of these firms stated that they did not believe we would vigorously represent the class against Morgan Stanley; nor did they assert we were legally

---

[2]   *See* Declaration of Stephen R. Greene ("Greene Decl."), ¶¶ 13-20.

[3]   In just one of the specious assertions that permeate their Response, the Scott-Korein-Robbins Group states: "Quinn did not request a conflict waiver from any other plaintiff. Nor has Quinn provided a copy of the conflict waiver to counsel for any other plaintiff." (ECF No. 172 at 12 n.13.) In reality, we *offered* to provide these same counsel with a copy, and none asked. *See* Declaration of Daniel L. Brockett ("Brockett Decl."), ¶ 7.

2

barred from serving as interim lead.  These assertions should thus be seen for what they are: transparently tactical.

Notably, the Scott-Korein-Robbins Group's contrived objections are *not* shared by other named plaintiffs and firms in the case.  The CDS Institutional Investor Group, for example, represented by Entwistle & Cappucci, Kaplan Fox, Hagens Berman, and others, has expressed its continued willingness to have Quinn Emanuel serve as a co-lead counsel and for the members of that group to execute their own conflict waivers.[4]  They would not do this if they had any concern that Quinn Emanuel would not be an effective and vigorous advocate in this case.

### B. Conflict Waivers by Morgan Stanley and Class Representatives Are Effective at This Stage of the Case.

The Scott-Korein-Robbins Group claims that conflict waivers are insufficient here because "named plaintiffs cannot waive conflicts on behalf of the class."  Opp. at 13.  As Professor Green explains, that is incorrect.  Green Decl. ¶¶ 41-44.  The comments to the New York Rules of Professional Conduct explain:

> When a lawyer represents or seeks to represent a class of plaintiffs or defendants in a class-action lawsuit, unnamed members of the class are ordinarily not considered to be clients of the lawyer for purposes of applying paragraph (a)(1).  Thus, the lawyer does not typically need to get the consent of such a person before representing a client suing the person in an unrelated matter.  Similarly, a lawyer seeking to represent an opponent in a class action does not typically need the consent of an unnamed member of the class whom the lawyer represents in an unrelated matter.

New York Rules of Professional Conduct, Rule 1.7, comment [25] (2010).  Thus, "Comment 25 authorizes the class representative to provide informed consent."  *Sharp v. Next Entm't, Inc.*, 163 Cal. App. 4th 410, 433 (Cal. Ct. App. 2008) (discussing New York rule and rejecting argument

---

[4] *See* CDS Institutional Investor Group's Mem. of Law in Further Supp. of its Application for Appointment as Lead Pl. and Appointment of Entwistle & Cappucci LLP and Kaplan Fox & Kilsheimer LLP as Interim Co-Lead Class Counsel (Dkt. 170) at 4 (proposing that Quinn Emanuel serve as one of four co-leads); *see also* Brockett Decl. ¶ 9.

3

that "each and every member of the two putative classes was required to provide written consent to representation" by plaintiff's firm in order to waive a conflict of interest). Accordingly, "in the ordinary class action, a lawyer is not required to seek such individual consents" at the pre-certification stage. *Id.*[5]

The Scott-Korein-Robbins Group misstates the 35-year old authority it cites for the proposition that this District rejects conflict waivers in the class context. In *Chateau de Ville Productions, Inc. v. TamsWitmark Music Library, Inc.*, 474 F. Supp. 223 (S.D.N.Y. 1979), plaintiffs' counsel concurrently represented the defendant's alleged co-conspirator (not yet named a party) in the same action. The court disqualified counsel from representing the co-conspirator but allowed it to continue serving as plaintiffs' counsel. *Id.* at 226. It was only in *dicta* that the court stated that "since plaintiffs still seek to proceed on behalf of a class, the consent of all would be required and this, of course, is not a practical possibility." *Id.*

The Group also mischaracterizes other case law. Opp. at 12-13. The Group relies principally on *All Star Carts & Vehicles, Inc. v. BFI Canada Income Fund*, but in that case the court ***declined*** to make any determination regarding the necessity or efficacy of a waiver, finding the issue was unripe. The cited statements are pure *dicta*. 2010 WL 2243351, at *7 (E.D.N.Y. June 1, 2010). Other cases cited by the Group are similarly inapposite:

- *Palumbo v. Tele-Communications, Inc.* 157 F.R.D. 129 (D.D.C. 1994): A lawyer obtained an ownership interest in defendant and a seat on the board of defendant's affiliate. The same attorney then sued defendant in a race discrimination class action. The court held that the attorney could not act as class counsel, as he was "essentially suing himself." *Id.* at 132. The court went on to state in *dicta* that "unidentified class members cannot waive a potential conflict of interest." *Id.* at 132-33.

---

[5] The Association of the Bar of the City of New York Committee on Professional and Judicial Ethics, Formal Opinion 2004-01, *available at* http://www2.nycbar.org/Publications/reports/show_html_new.php?rid=227 ("It is rarely practical for a class lawyer to speak individually with each class member subject to such a conflict in order to seek informed consent, although in some instances nonconsenting class members may be able to opt out of the action").

4

- *In re Dresser Indus., Inc.*, 972 F.2d 540 (5th Cir. 1992).  The court noted that there is "limited utility" in seeking the consent of a client in a class action, but never found that conflict waivers are *per se* invalid in the class context.

- *McCauley v. Family Dollar, Inc.*, No. 10 Civ. 363 (CRS), 2010 U.S. Dist. LEXIS 116636 (W.D. Ky. Oct. 29, 2010).  The class' conflict of interest was held to not have been adequately waived because the Kentucky Professional Conduct Rules require the consent of "each" client.  The basic premise underlying this ruling – that absent class members are "clients" – is squarely rejected by New York Rules of Professional Conduct, Rule 1.7, comment [25] (2010).

- *Moreno v. Autozone, Inc.*, No. 05 Civ. 4432 (MJJ), 2007 WL 4287517 (N.D. Cal. Dec. 6, 2007).  The court disqualified counsel for failing (or even attempting) to obtain waiver from clients in two concurrent matters whose interests were adverse.  The *dicta* that counsel "can not obtain written waiver of the actual conflicts of interest that exist from the absent class members," *id.* at *7, comes from *Cal-Pak Delivery, Inc. v. United Parcel Serv.*, 52 Cal. App. 4th 1, 11-12, 60 Cal. Rptr. 2d 207 (1997), which has since been rejected.  *See Sharp*, 163 Cal. App. 4th at 436.[6]

The more persuasive authority under the New York Professional Rules supports the ability to waive conflicts in the class context.  There are good reasons for this.  To hold otherwise could eviscerate the class action device – obtaining waivers from individual, absent class members prior to certification is unrealistic and impractical, and would essentially turn class actions into an "opt-in" system contrary to the basic function and structure of Rule 23.

The inability to obtain informed consent from unnamed class members is also no obstacle to the appointment of Quinn Emanuel as *interim* lead-counsel at the pre-certification stage.  All class members will receive notice of such issues at the certification stage, which "include[s] a system by which the court determines if the named class representatives can adequately represent the class.  These procedures ensure that if there are conflict of interest issues, the representative

---

[6] Other cases cited by defendants are even more attenuated.  In *Davis v. Kraft Foods N. Am.*, 2006 WL 237512 (E.D. Pa. Jan. 31, 2006), plaintiff's attempt to waive a conflict was deemed ineffective where her counsel simultaneously represented both she and defendant in concurrent cases regarding racial discrimination by the same employer.  *In re Terazosin Hydrochloride Antitrust Litig.*, 223 F.R.D. 666 (S.D. Fla. 2004) dealt with whether named class members were adequate to represent a class where the named plaintiffs failed to demonstrate that they had not benefitted economically from the allegedly harmful conduct at issue.  *Id.* at 673-77.

5

plaintiffs are capable of providing informed consent on behalf of the class." *Sharp*, 163 Cal. App. 4th at 432. Put another way, the "ultimate responsibility to ensure that the interests of class members are not subordinated to the interests of either the class representatives or class counsel rests with the district court." *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1078 (2d Cir. 1995). "[T]he court may thus in effect act for class members in deciding whether to consent to conflicts of interest involving them." Ass'n of the Bar of the City of New York Comm. on Prof'l and Judicial Ethics, Formal Opinion 2004-01.[7] *See* Green Decl. at ¶¶ 39-44.

### C. Any Theoretical Concern Could Be Addressed By The Appointment of a *Co-Lead Counsel to Serve Alongside Quinn Emanuel.*

To the extent there is any theoretical concern regarding the Morgan Stanley conflict, at this stage or at the certification stage, such a concern could be addressed by appointing co-lead counsel to serve alongside Quinn Emanuel. *See* Green Decl. at ¶ 44. Entwistle & Cappucci and Hausfeld LLP have offered to serve in this type of capacity, and other firms would be willing and able to do so as well.[8] This type of arrangement would be far better for the class then not appointing Quinn Emanuel at all, which would leave the class without the only firm that (i) is one of the four most feared adversaries, (ii) is recognized as a litigation leader in CDS, other structured finance, antitrust, and class actions, (iii) has the size and resources required for

---

[7] *Available at* http://www2.nycbar.org/Publications/reports/show_html_new.php?rid=227. *See also In re "Agent Orange" Product Liability Litigation,* 996 F.2d 1425, 1438 (2d Cir. 1993) ("A judge in a class action is obligated to protect the interests of absent class members."); *Grant v. Bethlehem Steel Corp.,* 823 F.2d 20, 22 (2d Cir. 1987) ("In approving a proposed class action settlement, the district court has a fiduciary responsibility to ensure that 'the settlement is fair and not a product of collusion, and that the class members' interests were represented adequately.'"); *Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1157, 1176 (5th Cir. 1978) (the best mechanism for protecting unnamed class members with regard to conflicts of interest is the "attorney's duty to the class requir[ing] him to point out conflicts to the court so that the court may take appropriate steps to protect the interests of absentee class members").

[8] As the Court knows, Hausfeld LLP is a preeminent plaintiff's antitrust firm, and is the only other firm in the case with foreign offices which also have antitrust practitioners.

this case, particularly in this District, (iv) with nationwide and foreign offices staffed by leading antitrust specialists, and (v) with premier Second Circuit and Supreme Court appellate practices.

## II. SALIX HAS STANDING TO BRING ANTITRUST CLAIMS.

In its second line of attack, the Scott-Korein-Robbins Group targets the legal standing of other named plaintiffs even to pursue relief in this case, supported by a purported "expert" opinion (which should be given no weight).[9] This type of attack, we submit, has no place in an application by counsel to represent *the plaintiff class as a whole*.

Antitrust claims are readily assignable, and it is well established that Salix's status as an assignee does not render it an inadequate representative. Nothing in the ISDA Master Agreement alters these well-established legal precepts. As discussed in the accompanying expert Declaration of Stephen Greene, who helped write the ISDA Master Agreement, the anti-assignment provision prohibits the transfer of certain rights and obligations in the performance of the contract—not, the right to bring claims such as for antitrust violations. The cases (misleadingly) cited by the Scott-Korein-Robbins Group demonstrate as much. Salix has standing to represent the class, and the fact that it holds claims of substantial value means it will vigorously represent the class's interests.[10]

---

[9] The "expert" opinion proffered by Craig Wolson should be given no weight whatsoever. Mr. Wolson concedes that he was not directly involved with the development and promulgation of any of the ISDA Master Forms. *See* Wolson Decl. ¶ 5, Nov. 22, 2013, ECF No. 173-3. He cites no drafters' notes, user's guides, or treatises or any writings or testimony about ISDA Master Agreements. He bases his opinion only on his experience, which largely consists of being a corporate attorney at thirteen law firms. He apparently has never before been qualified as an expert. Because Mr. Wolson's opinion is not the product of any scientific, technical, or other specialized knowledge, is not based on sufficient facts or data, and is not the product of reliable principles and methods, it is improper and should not be considered. Fed. R. Evid. 702; *LinkCo, Inc. v. Fujitsu Ltd.*, No. 00 Civ. 7242 (SAS), 2002 WL 1585551, at *4 (S.D.N.Y. July 16, 2002).

[10] The Scott-Korein-Robbins Group also argues that Salix is not even a class member, since the FrointPoint Funds were formerly owned by Morgan Stanley. *See* Opp. at 8-9. This too

The Group argues that Salix lacks standing because the ISDA Master Agreement prevents "any assignment of claims" to Salix without consent of the ISDA counterparty. Opp. at 15-16. The Group relies on Section 7 of the 1992 form, which provides:

> Subject to Section 6(b)(ii), neither this Agreement, nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: – ***

The plain language of this section is limited to "any interest or obligation in or under this Agreement." As Mr. Wolson concedes, the "main basis" for the non-assignment clause is to protect parties from having to deal with contractual counterparties other than the counterparties to the original agreement. Wolson Decl. ¶ 15. Mr. Wolson does not even assert that the antitrust claims alleged in this litigation are expressly precluded by the anti-assignment clause. *Id.* ¶¶ 15-20. Instead, he argues the anti-assignment clause should be interpreted to include antitrust claims because the ISDA Master Agreement was never modified to say otherwise. *Id.* This interpretation is unsupported by the plain language of the clause, and is contrary to judicial precedent and the well-recognized rule that antitrust claims are freely assignable.

*First,* the antitrust claims alleged here do not seek or turn on performance under the ISDA Master Agreements. The claims instead turn on the Defendants' alleged agreement to enter into an unlawful, anticompetitive conspiracy. The duties Defendants breached are those imposed by law, not the form agreements used to document the CDS transactions themselves. The fact that Defendants entered into certain contracts alongside their unlawful conspiracy does not somehow transform this non-contract action into one about the "obligations" under the ISDA Master Agreement.

---

is incorrect. The class definition here only omits *current* affiliates of the defendants. *See* Salix Am. Compl. ¶ 179.

*Second*, the Group's position is at odds with judicial authority holding that antitrust claims are collateral to agreements like the ISDA Master Agreement – and are therefore not covered by the non-assignment clause. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL No. 1827 (SI), 2011 WL 4345316, at *3 (N.D. Cal. Sept. 15, 2011) ("Litigation over antitrust claims cannot be seen as an 'interest in,' or 'right or duty' contemplated by, the contract."). In *TFT-LCD*, the defendants argued the plaintiff's assigned antitrust claims should be dismissed because of anti-assignment clauses in the sales contracts between the assignors and defendants. *Id.* Rejecting that argument, the court interpreted the restriction on the assignment of a "right, interest, privilege, or obligation of this Agreement" to prohibit "assignment of rights and duties created by the agreement itself," and held defendants had not shown that "the parties intended the anti-assignment provisions to cover more than the rights and obligations set forth in the sales contracts." *Id.*

The very authorities cited by the Group further demonstrate that the scope of the anti-assignment clause contained in Section 7 is narrow. In *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, the court construed Section 7 to preclude transfer of "the ***right to enforce*** the Swap Agreement or ***sue for breach***" without consent. 988 F. Supp. 367, 373 (S.D.N.Y. 1997) (emphasis added). Even this may be an overstatement of the scope of the anti-assignment term. But even taken at face value, *United International* supports Quinn Emanuel's position here. Neither the "right to enforce" nor the right to "sue for breach" of contract is at issue in this antitrust action. Thus, in *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York* (the other case cited by the Group), the court rejected the defendant's argument that the ISDA Agreement precluded "transfer" of a fraud claim to a third party, concluding that such claim was "'collateral' or 'extraneous' to" the ISDA Master Agreement because it was "not

9

based on a commitment by [the defendant] to 'unwind' the swap transaction itself." No. 02 Civ. 1312 (LMM), 2002 WL 31426310, at *6 (S.D.N.Y. Oct. 29, 2002).[11] Like that fraud claim, the antitrust claims here are wholly collateral or extraneous to the ISDA Master Agreement.

*Finally,* the Group's position is also at odds with long-standing precedent that antitrust claims are readily assignable.[12]

### CONCLUSION

For the foregoing reasons, the Court should reject the Group's arguments that Quinn Emanuel has a conflict that cannot be waived, and that Salix lacks standing, and should appoint Quinn Emanuel interim lead class counsel for all the reasons set forth in Quinn Emanuel's Application and Response to the Applications filed by Competing Counsel.

---

[11] The other case cited by the Group is distinguishable. The court in *In re Ditropan XL Antitrust Litig.*, No. 06 Civ. 1761 (JSW), 2007 WL 2978329, at *2 (N.D. Cal. Oct. 11, 2007) dismissed the plaintiff's claims because the plaintiff lacked standing at the time the complaint was filed, and only later sought to acquire standing through a subsequent, post-filing assignment, which the court found defective under an anti-assignment provision that was far broader than the ISDA Master Agreement's section 7, which restricts only the "right to enforce the Swap Agreement or sue for breach." *United Int'l Holdings*, 988 F. Supp. at 373.

[12] *See D'Ippolito v. Cities Serv. Co.*, 374 F.2d 643, 647 (2d Cir. 1967) ("Antitrust claims have been held assignable."). Such assignment is "widely permitted, presumably in order to allow holders of claims to transfer the risk of loss to someone better able or more willing to pursue the claim or to undertake the risk. Valid claims otherwise lost may thus be salvaged." *Cordes*, 502 F.3d at 103; *see Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 139 (1968) ("[T]he purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust laws.").

| | |
|---|---|
| DATED:   New York, New York<br>            November 25, 2013 | QUINN EMANUEL URQUHART &<br>   SULLIVAN, LLP |

By:  /s/ Daniel L. Brockett
   Daniel L. Brockett
   Stephen R. Neuwirth
   Steig D. Olson
   51 Madison Avenue, 22nd Floor
   New York, New York 10010-1601
   Telephone:  (212) 849-7000
   Fax:  (212) 849-7100
   danbrockett@quinnemanuel.com
   stephenneuwirth@quinnemanuel.com
   steigolson@quinnemanuel.com

   Jeremy D. Andersen (*pro hac vice*
   application forthcoming)
   865 South Figueroa Street, 10th Floor
   Los Angeles, California 90017
   Telephone:  (213) 443-3000
   Fax:  (213) 443-3100
   jeremyandersen@quinnemanuel.com

   *Attorneys for Plaintiff Salix Capital US Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 25, 2013, I filed and therefore caused the foregoing document and accompanying papers (if any) to be served via the CM/ECF system in the United States District Court for the Southern District of New York on all parties registered for CM/ECF in the above-captioned matters.

/s/ Daniel L. Brockett
Daniel L. Brockett