**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE CREDIT DEFAULT SWAPS
ANTITRUST LITIGATION

This Document Relates To: All Actions

13 MD 2476  (DLC)

**JURY TRIAL DEMANDED**



## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

OVERVIEW OF THE ACTION ...................................................................................1

JURISDICTION AND VENUE ..................................................................................7

THE PARTIES..............................................................................................................8

      A.    Plaintiffs.................................................................................................8

      B.    Defendants ...........................................................................................12

FACTUAL ALLEGATIONS ......................................................................................22

I.     STARTING BEFORE 2008, DEFENDANTS JOINTLY EXPLOIT AND
       MAINTAIN AN INEFFICIENT MARKET STRUCTURE FOR CDS...........................22

      A.    CDS Contracts Generally...................................................................22

      B.    Origins of the CDS Market ................................................................23

      C.    Increased Volume, the Inter-Dealer Market, and Standardization of the
            CDS Market Create Conditions That Support Exchange Trading and
            Threaten the Dealer Defendants' Profits............................................25

      D.    Defendants Limit *Pre*-Transaction Price Transparency. .....................27

      E.    Defendants Also Restrict *Post*-Transaction Price Information.............28

      F.    Defendants Secure Additional Information Advantages Through the Inter-
            Dealer Broker Market. .......................................................................30

      G.    Defendants' Control of the CDS Market Yields Supracompetitive Bid/Ask
            Spreads................................................................................................31

II.    DEFENDANTS CONSPIRE TO BLOCK COMPETITION AND MARKET
       ENTRY IN THE U.S. CDS MARKET. ...........................................................33

      A.    CDS Exchanges and Clearinghouses Emerge As Competitors to
            Defendants' Oligopoly in the United States. ......................................33

      B.    Defendants Conspire to Block the Exchange Trading of CDS.............39

      C.    Defendants Conspire to Block Clearinghouses with Exchange-Trading
            DNA....................................................................................................44

D. Defendants Jointly Drive Clearing Business to ICE Clear. ...................................49

E. Defendants Prevent the Emergence of New Exchanges. .......................................53

III. ABSENT DEFENDANTS' COLLUSION, EXCHANGE TRADING WOULD HAVE DRAMATICALLY REDUCED BID/ASK SPREADS FOR INVESTORS..................................................................................................................55

IV. THE DEALER DEFENDANTS HAVE SUBSTANTIAL MARKET POWER. .............60

EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS DUE TO DEFENDANTS' CONCEALMENT OF THE CONSPIRACY .......................................62

CLASS ACTION ALLEGATIONS .........................................................................................69

CAUSES OF ACTION ............................................................................................................72

FIRST CAUSE OF ACTION .........................................................................................72

SECOND CAUSE OF ACTION ....................................................................................73

THIRD CAUSE OF ACTION ........................................................................................74

PRAYER FOR RELIEF .........................................................................................................74

JURY DEMAND ....................................................................................................................76

Plaintiffs Los Angeles County Employees Retirement Association, Salix Capital US Inc., Value Recovery Fund LLC, Delta Institutional, LP, Delta Onshore, Ltd., Delta Offshore, Ltd., Delta Pleiades, LP, Essex Regional Retirement System, Unipension Fondsmaeglerselskab A/S, Arkitekternes Pensionskasse, MP Pension - Pensionskassen for Magistre & Psykologer, and Pensionskassen for Jordbrugsakademikere & Dyrlæger (collectively, "Plaintiffs"), individually and on behalf of all persons and entities who, during the period of January 1, 2008 through the present, directly purchased credit default swaps from or sold credit default swaps to the Defendant banks in the United States, bring this antitrust class action for treble damages and injunctive relief and allege as follows:

## OVERVIEW OF THE ACTION

1.      This case concerns an anticompetitive scheme among the Defendant banks to make tremendous profits at the expense of investors in an important type of financial derivative – a credit default swap ("CDS").  Defendants reached a series of agreements to implement this scheme through, among other means, secret face-to-face meetings among senior personnel at the Defendant banks during the period of the worst financial crisis since the Great Depression of the 1930s – a crisis these very banks had helped to cause.  In addition to cheating investors out of billions of dollars, Defendants' conduct corrupted the allocation of risk in, and undermined the stability of, U.S. financial markets at a time those markets were particularly vulnerable.

2.      CDS offer participants in financial markets the ability to hedge credit risk and to shift that risk to the market participants best able to hold it.  CDS are contracts that transfer a credit exposure on a specific "reference entity" (such as a debt instrument issued by a corporate or governmental entity) or a "reference portfolio" (bundles of those instruments).  The buyer of the CDS (and the protection that comes with it) makes a periodic payment to the seller of the

CDS in exchange for the seller's agreement to make a payment to the buyer if a "credit event" occurs – such as a reference entity's bankruptcy or default. Thus, CDS are often used as a hedge by investors to protect themselves from their exposure to a particular reference entity. More generally, CDS investors can take a "long" or "short" position on credit risk as part of an investment strategy.

3.　　Plaintiffs and the Class Members here – pension funds, university endowment funds, hedge funds, insurance companies, corporate treasuries, fiduciary and depository institutions, small banks, and money managers – invested in CDS in the United States during the period of January 1, 2008 through the present. CDS investors occupy what is known as the "buy-side" of the CDS market. In the CDS market, buy-side participants, whether they are buying credit protection or selling it, must transact with sell-side "dealers" – *i.e.*, the "Dealer Defendants."[1]

4.　　The Dealer Defendants are the large investment banks that have dominated the CDS market for over a decade, accounting for approximately 95% of CDS trading. During this period, the Dealer Defendants have enjoyed huge profits from CDS trading due to CDS being traded in a highly inefficient fashion. CDS are traded "over-the-counter" in a way that keeps all the relevant price information in the hands of the Dealer Defendants, who ensure that they are on one side of, and thus profit from, virtually every CDS transaction.

5.　　 A CDS transaction can begin in one of two ways. An investor can request a quote directly from a Dealer Defendant through a Bloomberg terminal, e-mail message, or telephone call, and the Dealer Defendant will generally provide a private, non-binding quote in response. Or a dealer will send out a "run" to the market – essentially a non-binding form of

---

[1]　 The "Dealer Defendants" are Bank of America, Barclays, BNP, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JP Morgan, Morgan Stanley, RBS, and UBS.

advertising – that lists price quotes on a select group of CDS (those that a dealer is interested in trading), and then a buy-side participant responds to one of these runs.  In just one of the ways this market is rigged in the Dealer Defendants' favor, even these "runs" are generally non-binding.  The "runs" can be used by dealers for purposes of a bait-and-switch:  a CDS customer can see one price on the screen, but get a completely different price when it talks to the dealer.

6.      Investors have limited information to evaluate these offers because the CDS market is highly opaque.  Despite large volume and standardization across CDS transactions, the Dealer Defendants have imposed a number of restrictions on the sharing of quotes and post-trade prices that limit both pre- and post-transaction transparency.  While the Dealer Defendants have access to their own real-time price data, buy-side Class Members are forced to rely largely on aggregated pricing data that has limited utility.

7.      The Dealer Defendants have made – and continue to make – billions of dollars in supracompetitive profits by taking advantage of price opacity in the CDS market.  These profits primarily come from the "bid/ask spread" that the Dealer Defendants enjoy on transactions with investors.  For every CDS, a Dealer Defendant has a "bid" price, at which the dealer will purchase the CDS, and an "ask" price, at which it will sell the CDS.  When the dealer purchases a CDS at a lower bid price, and then sells a CDS with the same terms at a higher ask price, the dealer realizes a profit on the difference between the lower and higher prices at which the dealer transacted.  In the over-the-counter CDS market, where critical trading information is known only to the parties to the specific transaction, these bid/ask spreads are grossly inflated.

8.      This rigged structure would be patently intolerable in most settings.  As observed in a *New York Times* article that first revealed the existence of some of the secret meetings at

issue in this case,[2] it would be like a real estate agent selling a house where the buyer knows only what she paid and the seller knows only what she received. The agent would pocket the difference as her fee, rather than disclose it. Moreover, only the real estate agent – and neither the buyer nor seller – would have easy access to the prices paid recently for other homes on the same block.

9. By 2008, there was tremendous demand in the CDS market for greater transparency, efficiency, and competition. In particular, there was demand for a way to trade CDS on an exchange, just as many other financial instruments (like stocks and futures) are traded. Exchange-based trading would link CDS buyers and sellers in an efficient manner, disclose prices in a transparent way, and would thus significantly reduce the inflated bid/ask spreads that CDS investors pay. It would also displace the Dealer Defendants as the exclusive market makers in CDS.

10. To meet this demand, prominent buy-side market participant Citadel LLC ("Citadel") and exchange and clearinghouse owner CME Group Inc. ("CME") developed CMDX, an exchange and clearinghouse for CDS. This electronic exchange for commonly traded derivatives, including most CDS, would provide anonymous and firm bid and ask prices, thereby increasing transparency and efficiency. The exchange platform would have reduced credit risk inherent in over-the-counter trading and would have substantially reduced the transaction costs paid by buy-side market participants such as Plaintiffs and the Class. CMDX was ready for market and would have been operational by late 2008 and would have significantly reduced the outsized profits of the Dealer Defendants.

---

[2] Louise Story, *A Secretive Banking Elite Rules Trading in Derivatives*, N.Y. Times (Dec. 11, 2010).

11.     The Dealer Defendants, however, secretly conspired to squash this threat. Meeting in secret on at least a monthly, and sometimes a weekly, basis in the fall of 2008 and thereafter, representatives of the Dealer Defendants conspired to defend the inefficient market structure they had cultivated.  All Dealer Defendants joined this conspiracy, even though at least some of them had been planning to join CMDX in order to gain an advantage in the market. Defendants met under the guise of boards or committees on which they had planted themselves, as well as in settings entirely unconnected to any legitimate joint venture activity, in order to discuss, agree to, and maintain their anticompetitive scheme.  Although the specific identities of these representatives have in many cases been kept secret, the fact of these meetings cannot be denied.

12.     Pursuant to their agreement, the Dealer Defendants jointly blocked CMDX from entering the market by, among other things, securing an agreement from co-conspirators Defendants International Swaps and Derivatives Association and Markit Group Ltd. that these entities would deny CMDX the licenses it needed to operate.  The Dealer Defendants also jointly agreed to boycott CMDX so long as it was a trading platform, or so long as Citadel remained involved with the venture in any way.  The Dealer Defendants believed that, as long as Citadel had a stake in the venture, it would always be a threat.  By these actions, the Dealer Defendants effectively killed off the CDS exchange-trading platform that would otherwise have entered the market in 2008.

13.     Then, to ensure other potentially competitive ventures would not emerge, the Dealer Defendants worked together to prevent any CDS clearinghouse from becoming a threat. A clearinghouse is an entity designed to step in the middle of a bilateral trade, significantly reducing counterparty risk.  A clearinghouse becomes both the buyer's and the seller's

counterparty, and turns the transaction into two separate trades: a sale from the seller to the clearinghouse, and then a sale from the clearinghouse to the buyer. A major advantage of cleared trades is that every trade participant faces the same counterparty – the clearinghouse. As a result, traders do not need to evaluate the creditworthiness of their counterparty before every deal. A clearinghouse lays the groundwork for a full-blown exchange by bringing buyers and sellers to a centralized platform, creating the infrastructure for the processing of trades, and removing the necessity of case-by-case creditworthiness assessments.

14. Wherever the Dealer Defendants observed a possibility that a nascent clearinghouse could lead to an exchange, they jointly refused to deal with the entity. When the Dealer Defendants did involve themselves in clearinghouses, they jointly took control of the key committees and used that control to set the rules to prevent a transition to exchange trading.

15. As a result, to this day, the Dealer Defendants successfully have maintained an inefficient and opaque market structure that continues to yield for them exorbitant profits at the expense of investors.

16. Defendants' conduct offends the very core of the antitrust laws. Their actions have directly led to supracompetitive bid/ask spreads, the inefficient allocation of capital, and the reduction of output. The role of the antitrust laws is particularly critical here, given that, for most of the Class Period, Defendants were free from virtually any other type of regulation of their CDS activities.

17. U.S. and European antitrust enforcement agencies have investigated Defendants' conduct, with the European authorities recently taking the leading role. The U.S. Department of Justice ("DOJ") disclosed the fact, but not the details, of its investigation in July 2009. In April 2011, the European Commission stated it was also investigating Defendants' anticompetitive

conduct in the CDS market. Since then, the European Commission has stepped up to take the lead on this investigation, with U.S. antitrust authorities focusing their resources on still other well-publicized cartel activities by financial institutions, while continuing to monitor the progress of the European investigation.

18.     In July 2013, the European Commission announced it had issued a "Statement of Objections," asserting that the Defendants here had infringed antitrust rules "by colluding to prevent exchanges from entering the credit derivatives business." Although the Statement of Objections is not public, all public disclosures indicate that the European Commission has found evidence that supports the allegations in this complaint.

## JURISDICTION AND VENUE

19.     Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries to Plaintiffs and the Class, alleged herein, arising from Defendants' violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

20.     This Court has subject matter jurisdiction over this action pursuant Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, as well as pursuant to 28 U.S.C. §§ 1331 and 1337(a).

21.     On October 22, 2013, this matter was transferred to this District for consolidated proceedings by the Judicial Panel on Multidistrict Litigation. Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391(b), (c), and (d) because during the Class Period, all the Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this

District; and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

22.     Each Defendant is subject to personal jurisdiction in this Court because each transacted business throughout the United States, including in this District, including by buying and selling CDS to Class Members throughout the United States and in this District.

23.     In addition, Defendants' activities, and those of their co-conspirators, were within the flow of, were intended to, and had a substantial effect on foreign and interstate commerce.

## THE PARTIES

### A.     Plaintiffs

24.     Plaintiff **Los Angeles County Employees Retirement Association** ("**LACERA**") is a public pension fund organized under the laws of the State of California with its principal place of business in Pasadena, California. LACERA has provided retirement, disability, and death benefits to eligible County employees, retirees, and their beneficiaries since 1938. As of June 30, 2013, LACERA had over 157,000 members and held net assets in trust for pension benefits totaling $41.7 billion. During the Class Period, LACERA was a significant participant in the CDS market. LACERA purchased CDS from and sold CDS to all of the Dealer Defendants including Bank of America, Barclays, BNP Paribas, Citibank, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JP Morgan, Morgan Stanley, Royal Bank of Scotland, and UBS with trades made in the United States.

25.     Plaintiff **Salix Capital US Inc.** ("**Salix**") is a corporation organized under the laws of the State of Delaware with its principal place of business in New York, New York. Salix brings claims as assignee of the FrontPoint Funds pursuant to the terms of an Amended and Restated Assignment of Claim Agreement between Salix Capital US and the FrontPoint Funds:

(a)     FrontPoint Relative Value Opportunities Fund, L.P., formerly known as FrontPoint Fixed Income Opportunities Fund, L.P., is a limited partnership organized under the laws of Delaware with its principal place of business in Greenwich, Connecticut. Its general partner is FrontPoint Relative Value Opportunities Fund GP, LLC, a limited liability company organized under the laws of Delaware.

(b)     FrontPoint Volatility Opportunities Fund, L.P. was a limited partnership organized under the laws of the Cayman Islands with its principal place of business in Greenwich, Connecticut. Its general partner was FrontPoint Volatility Opportunities Fund GP, LLC, a limited liability company organized under the laws of Delaware.

(c)     FrontPoint Volatility Opportunities Fund GP, L.P. was a limited partnership organized under the laws of Delaware with its principal place of business in Greenwich, Connecticut. Its general partner was FrontPoint Volatility Opportunities Fund GP, LLC, a limited liability company organized under the laws of Delaware.

(d)     FrontPoint Partners, L.P. was a limited partnership organized under the laws of Delaware with its principal place of business in Greenwich, Connecticut. Its general partner was FrontPoint Partners LLC, a limited liability company organized under the laws of Delaware.

26.     Salix is owned by three individuals who during the Class Period served as advisors to the FrontPoint Funds pursuant to investment management agreements. These individuals negotiated, executed, and carried out the CDS transactions at issue here on behalf of the FrontPoint Funds. Plaintiff Salix is thus not a stranger to FrontPoint, but is instead a company whose owners advised FrontPoint and carried out the CDS trades at issue. As noted, during the Class Period, the FrontPoint Funds were significant players in the CDS market. They

purchased CDS from and sold CDS to many of the Dealer Defendants including Bank of America, Barclays, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, JP Morgan, and UBS with trades made in the United States.

27.     Plaintiff **Value Recovery Fund LLC** ("**VRF**") is a Delaware limited liability company with its principal place of business in Connecticut.  VRF brings claims as assignee of Camulos Master Fund L.P. ("Camulos"), a Cayman Islands limited partnership located in Stamford, Connecticut, pursuant to the terms of an assignment agreement between VRF and Camulos.  During the Class Period, Camulos was a significant participant in the CDS market. Camulos purchased CDS from and sold CDS to most, if not all, of the Dealer Defendants including Bank of America, Barclays, BNP Paribas, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, JP Morgan, Morgan Stanley, Royal Bank of Scotland, and UBS with trades made in the United States.

28.     Plaintiff **Delta Institutional, LP** is a Delaware limited partnership with its principal place of business in New York, New York.

29.     Plaintiff **Delta Offshore, Ltd.** is a Cayman Islands exempted company with its principal place of business in Grand Cayman, Cayman Islands.

30.     Plaintiff **Delta Onshore, Ltd.** is a Delaware limited partnership with its principal place of business in New York, New York.

31.     Plaintiff **Delta Pleiades, LP** is a Delaware limited partnership with its principal place of business in New York, New York.

32.     Plaintiffs Delta Institutional, LP, Delta Offshore, Ltd., Delta Onshore, Ltd., and Delta Pleiadas, LP are collectively referred to as the "**Delta Funds**."

33.     During the Class Period, the Delta Funds were significant participants in the CDS market.  The Delta Funds purchased CDS from and sold CDS to several of the Dealer Defendants including Goldman Sachs, Credit Suisse, and Morgan Stanley with trades made in the United States.

34.     Plaintiff **Essex Regional Retirement System** ("**Essex**") is a public pension fund organized under the laws of the State of Massachusetts with its principal place of business in Essex County, Massachusetts.  Essex administers the public pension system for 48 local entities, including 19 towns, six school districts, 17 housing authorities and six special districts throughout Essex County, Massachusetts.  As of December 2013, Essex managed over $294 million of retirement assets for its member government entities.  During the Class Period, Essex was a significant participant in the CDS market.  Essex purchased CDS from and/or sold CDS to the Dealer Defendants, including Barclays, Credit Suisse, Deutsche Bank, Goldman Sachs, and Morgan Stanley with trades made in the United States.

35.     Plaintiff **Unipension Fondsmaeglerselskab A/S** ("**Unipension**") is a pension fund management company located in Denmark.  Unipension manages investments only for specific pension funds and does not have private investors.  Unipension is owned by Plaintiffs Arkitekternes Pensionskasse ("**Architects' Pension Fund**"); the MP Pension - Pensionskassen for Magistre & Psykologer ("**MP Pension**"); and Pensionskassen for Jordbrugsakademikere & Dyrlæger ("**Pension Fund for Agricultural Academics and Veterinary Surgeons**") (collectively the "**Unipension Pension Funds**").  The Unipension Pension Funds have almost 100,000 members and have more than DKK100bn under management.

36.     Unipension manages the assets of the Unipension Pension Funds.  Unipension brings these claims on behalf of itself and as assignee of EMD Invest F.M.B.A. ("EMD Invest")

pursuant to an Agreement for Assignment of Claims between Unipension and EMD Invest. EMD Invest is a Denmark-based company that is owned, in part, by the Unipension Pension Funds. During the Class Period, EMD Invest entered into CDS transactions on behalf of and for the sole benefit of the Unipension Pension Funds, at the direction of Unipension.

37.     Plaintiff **Architects' Pension Fund** is a pension fund located in Denmark and managed by Unipension. Architects' Pension Fund purchased CDS directly from and sold CDS directly to one or more of the Dealer Defendants during the Class Period.

38.     Plaintiff **MP Pension** is a pension fund located in Denmark and managed by Unipension. MP Pension purchased CDS directly from and sold CDS directly to one or more of the Dealer Defendants during the Class Period.

39.     Plaintiff **Pension Fund for Agricultural Academics and Veterinary Surgeons** is a pension fund located in Denmark and managed by Unipension. Pension Fund for Agricultural Academics and Veterinary Surgeons purchased CDS directly from and sold CDS directly to one or more of the Dealer Defendants during the Class Period.

40.     During the Class Period, Unipension and EMD Invest were significant participants in the CDS market. Unipension and EMD Invest purchased CDS from and sold CDS to several of the Dealer Defendants including Bank of America, Barclays, Deutsche Bank, and Morgan Stanley with trades made in the United States.

41.     Collectively, Plaintiffs purchased CDS from or sold CDS to the Dealer Defendants during the Class Period in an amount in excess of $13.5 billion in notional value of CDS.

**B.     Defendants**

42.     Whenever in this Complaint reference is made to any act, deed, or transaction of any entity, the allegation means that the corporation engaged in the act, deed, or transaction by or

through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the entity's business or affairs.

43. Defendant **Bank of America Corporation** ("**BAC**") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Charlotte, North Carolina and branch locations in New York, New York. Defendant **Bank of America, N.A.** ("**BANA**") is a federally chartered national banking association with its principal place of business in Charlotte, North Carolina, and is a wholly owned subsidiary of BAC.

44. On January 1, 2009, Bank of America merged with Merrill Lynch & Co., Inc., assuming its assets and liabilities. Before the acquisition, Merrill Lynch Bank USA, a wholly owned subsidiary of Merrill Lynch & Co., Inc., was a CDS dealer and acted as a counterparty in CDS transactions.

45. As used herein, the term "**Bank of America**" includes Defendants BAC and BANA and their broker-dealer subsidiaries and affiliates, including Merrill Lynch & Co. and Merrill Lynch Bank USA, that entered into CDS contracts with the Class, including as a dealer. During the Class Period, Bank of America directly sold CDS to and bought CDS from Class Members. During the Class Period, Bank of America was a clearing member of ICE Clear and a shareholder of Markit, and representatives of Bank of America sat on the boards of ISDA and Markit as well as on ICE Clear's risk committee.

46. Defendant **Barclays Bank plc** is a corporation organized and existing under the laws of the United Kingdom with its principal place of business in London, England and branch locations in New York, New York. As used herein, the term "**Barclays**" includes Defendant Barclays Bank plc and its broker-dealer subsidiaries and affiliates, including Barclays Capital, that entered into CDS contracts with the Class, including as a dealer. During the Class Period,

Barclays directly sold CDS to and bought CDS from Class Members. During the Class Period, Barclays was a clearing member of ICE Clear and a shareholder of Markit. Representatives of Barclays also sat on the board of ISDA and on ICE Clear's risk committee.

47.    Defendant **BNP Paribas** is a company organized and existing under the laws of France with its principal place of business in Paris, France and with branch locations in New York, New York. As used herein, the term "**BNP**" includes Defendant BNP Paribas and its broker-dealer subsidiaries and affiliates that entered into CDS contracts with the Class, including as a dealer. During the Class Period, BNP directly sold CDS to and bought CDS from Class Members. During the Class Period, BNP was a shareholder of Markit and representatives of BNP also sat on the board of ISDA.

48.    Defendant **Citigroup, Inc.** ("**Citigroup**") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. Defendant **Citibank N.A.** ("**Citibank**") is a federally chartered national banking association with its principal place of business in New York, New York, and is a wholly owned subsidiary of Citigroup. Defendant **Citigroup Global Markets Inc.** ("**CGMI**") is the brokerage and securities arm of Citigroup Inc. As used herein, the term "**Citi**" includes Defendants Citigroup, Citibank, and CGMI and their broker-dealer subsidiaries and affiliates that entered into CDS contracts with the Class, including as a dealer. During the Class Period, Citi directly sold CDS to and bought CDS from Class Members. During the Class Period, Citi was a clearing member of ICE Clear and a shareholder of Markit. Representatives of Citi also sat on the board of ISDA and ICE Clear's risk committee.

49.    Defendant **Credit Suisse AG** is a corporation organized and existing under the laws of Switzerland with its principal place of business in Zurich, Switzerland and branch

locations in New York, New York. As used herein, the term "**Credit Suisse**" includes

Defendant Credit Suisse AG and its broker-dealer subsidiaries and affiliates, including Credit

Suisse Securities (USA) LLC, that entered into CDS contracts with the Class, including as a

dealer. During the Class Period, Credit Suisse directly sold CDS to and bought CDS from Class

Members. During the Class Period, Credit Suisse was a clearing member of ICE Clear and a

shareholder of Markit, and representatives of Credit Suisse sat on the board of ISDA and on ICE

Clear's risk committee.

50.     Defendant **Deutsche Bank AG** is a corporation organized and existing under the

laws of Germany with its principal place of business in Frankfurt, Germany and branch locations

in New York, New York. As used herein, the term "**Deutsche Bank**" includes Defendant

Deutsche Bank AG and its broker-dealer subsidiaries and affiliates, including Deutsche Bank

AG, London Branch and Deutsche Bank Securities, Inc., that entered into CDS contracts with the

Class, including as a dealer. During the Class Period, Deutsche Bank directly sold CDS to and

bought CDS from Class Members. During the Class Period, Deutsche Bank was a clearing

member of ICE Clear and a shareholder of Markit, and representatives of Deutsche Bank sat on

the board of ISDA and on ICE Clear's risk committee.

51.     Defendant **Goldman Sachs & Co**. is a corporation organized and existing under

the laws of the State of Delaware, with its principal place of business in New York, New York.

As used herein, the term "**Goldman Sachs**" includes Defendant Goldman Sachs & Co. and its

broker-dealer subsidiaries and affiliates, including Goldman Sachs International, that entered into

CDS contracts with the Class, including as a dealer. During the Class Period, Goldman Sachs

directly sold CDS to and bought CDS from Class Members. During the Class Period, Goldman

Sachs was a clearing member of ICE Clear and a shareholder of Markit and representatives of Goldman Sachs sat on the boards of ISDA and Markit and on ICE Clear's risk committee.

52.     Defendant **HSBC Bank plc** ("**HSBC Bank**") is a company organized and existing under the laws of the United Kingdom with its principal place of business in London, England.  Defendant **HSBC Bank USA, N.A.** ("**HSBC Bank USA**") is a federally chartered national banking association with its principal place of business in McLean, Virginia.  As used herein, the term "**HSBC**" includes Defendants HSBC Bank and HSBC Bank USA and their broker-dealer subsidiaries and affiliates that entered into CDS contracts with the Class, including as a dealer.  HSBC maintains offices and transacts business in New York, New York.  During the Class Period, HSBC directly sold CDS to and bought CDS from Class Members.  During the Class Period, HSBC was a shareholder of Markit.  Representatives of HSBC also sat on the boards of ISDA and Markit.

53.     Defendant **J.P. Morgan Chase & Co**. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  Defendant **J.P. Morgan Chase Bank, N.A.** is a federally chartered national banking association with its principal place of business in New York, New York.  On May 29, 2008, JPMorgan Chase & Co. merged with Bear Stearns & Co., assuming its assets and liabilities.  Before the acquisition, Bear Stearns & Co. was a CDS dealer and acted as a counterparty in CDS transactions.  As used herein, the term "**JP Morgan**" includes Defendants J.P. Morgan Chase & Co. and J.P. Morgan Chase Bank, N.A. and their broker-dealer subsidiaries and affiliates, including Bear Stearns & Co., that entered into CDS contracts with the Class, including as a dealer.  During the Class Period, JP Morgan directly sold CDS to and bought CDS from Class Members.  During the Class Period, JP Morgan was a clearing member of ICE Clear and a

shareholder of Markit and representatives of JP Morgan sat on the boards of ISDA and Markit and on ICE Clear's risk committee.

54.     Defendant **Morgan Stanley & Co., LLC** ("**Morgan Stanley Co.**") is a United States investment banking firm headquartered in New York, New York.  As used herein, the term "**Morgan Stanley**" includes Defendant Morgan Stanley Co. and its broker-dealer subsidiaries and affiliates, including Morgan Stanley Capital Services LLC, that entered into CDS contracts with the Class, including as a dealer.  During the Class Period, Morgan Stanley directly sold CDS to and bought CDS from Class Members.  During the Class Period, Morgan Stanley was a clearing member of ICE Clear and a shareholder of Markit and representatives of Morgan Stanley sat on the boards of ISDA and Markit and on ICE Clear's risk committee.

55.     Defendant **Royal Bank of Scotland PLC** ("**RBS plc**") is the primary operating bank of the Royal Bank of Scotland Group PLC, a corporation organized and existing under the laws of the United Kingdom with its principal place of business in Edinburgh, Scotland.  Defendant Royal Bank of Scotland, N.V. operates as a subsidiary of RBS Holdings N.V.  As used herein, the term "**RBS**" includes Defendants RBS plc and RBS N.V. and their broker-dealers subsidiaries and affiliates, including RBS Securities Inc., that entered into CDS contracts with the Class, including as a dealer.  RBS maintains offices and transacts business in New York, New York.  During the Class Period, RBS directly sold CDS to and bought CDS from Class Members.  During the Class Period, RBS was a clearing member of ICE Clear, a shareholder of Markit, and a member of the board of ISDA.

56.     Defendant **UBS AG** ("**UBS AG**") is a corporation organized and existing under the laws of Switzerland with its principal places of business in Basel and Zurich, Switzerland and regional offices in New York, New York and Stamford, Connecticut.  Defendant **UBS Securities**

LLC ("**UBS Securities**") is a subsidiary of UBS AG and is a registered broker-dealer and futures commission merchant in the United States. As used herein, the term "**UBS**" includes Defendants UBS AG, UBS Securities, and their broker-dealer subsidiaries and affiliates that entered into CDS contracts with the Class, including as a dealer/market maker. During the Class Period, UBS directly sold CDS to and bought CDS from Class Members. During the Class Period, UBS was a clearing member of ICE Clear and a shareholder of Markit and representatives of UBS sat on ICE Clear's risk committee and the ISDA board.

57. Bank of America, Barclays, BNP, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JP Morgan, Morgan Stanley, RBS, and UBS are referred to collectively herein as the "**Dealer Defendants**."

58. Defendant **International Swaps and Derivatives Association** ("**ISDA**") is a financial trade association representing hundreds of financial institutions involved in the derivatives market. ISDA operates from seven worldwide offices, including its headquarters located in New York, New York. ISDA has long provided a "Master Agreement" and other documents used in nearly every CDS transaction.

59. ISDA's members include the Dealer Defendants, which occupy seats on its board of directors. ISDA's board is chaired by Stephen O'Connor, a former managing director of Defendant Morgan Stanley, and its treasurer is Diane Genova of JP Morgan. Ten of ISDA's directors are executives of one of the Defendants: Gerhard Seebacher of Bank of America, Harry Harrison of Barclays, Guillaume Amblard of BNP, Brian Archer of Citi, Eraj Shirvani of Credit Suisse, Richard Herman of Deutsche Bank, R. Martin Chavez of Goldman Sachs, Elie El Hayek of HSBC, Diane Genova of JP Morgan, and Jeroen Krens of RBS. In 2008 and 2009, Dealer Defendants constituted a majority of ISDA's board, occupying eleven of its nineteen

seats, as well as all three of the board's officer positions – chairman, vice chairman, and treasurer.

60.     Dealer Defendants also occupy the seats of ISDA's most powerful committees. All ten of the voting dealers sitting on ISDA's determination committee are Dealer Defendants; the two global chairs of ISDA's credit steering committee are Dealer Defendants; and one of the two co-chairs of ISDA's industry governance committee, which forms the top-layer of ISDA's organizational governance, is a Dealer Defendant.

61.     Defendants **Markit Group Holdings Ltd.** ("**Markit Group Holdings**") and **Markit Group Ltd.** ("**Markit Group**") are private financial information companies organized and existing under the laws of the United Kingdom with their principal places of business in London, England and with branch locations in New York, New York.  Markit Group is a subsidiary of Markit Group Holdings.  As used herein, the term "**Markit**" includes Defendants Markit Group Holdings and Markit Group and their subsidiaries, affiliates, and assigns that owned any interest in or negotiated the licensing of any CDS indices.

62.     Markit Group Holdings is owned, in part, by sixteen shareholder banks, including Dealer Defendants Bank of America (including its subsidiary Merrill Lynch), Barclays, BNP, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JP Morgan, Morgan Stanley, RBS, and UBS.  According to 2009 filings at U.K. Companies House, the aforementioned Dealer Defendants collectively owned over 70% of Markit's voting shares.

63.     The Dealer Defendants also occupy seats on Markit Group Holdings' board of directors.  During the Class Period, these board members included Richard S. Cohen (director at Bank of America), Simon Andrew Harvey Davidson (director, head of the Securities Markets Group at Credit Suisse), Michael Davie (managing director at JP Morgan), Eric Dumas (head of

US Credit Trading and global head of Flow Credit Trading at BNP), Arne Groes (global head of Flow Credit Trading at BNP), William John Hartnett (managing director at Citigroup), Bradford Levy (managing director in Principal Strategic Investments Group at Goldman Sachs), Thomas Mosimann (executive director and global head of Strategic Investments for Interest Rates, Currency, and Credit Division at Morgan Stanley), Michelle Neal (head of Fixed-income Electronic Commerce, Rates and Credit, and Head of Debt Markets Electronic Commerce at Royal Bank of Scotland), Jon Pliner (managing director at Merrill Lynch), Dexter Emory Senft (director at Barclays), and Lawrence Shaw (chief operating officer for the Global Markets Equity at Deutsche Bank).

64. Co-conspirator ICE Clear Credit LLC ("ICE Clear"), formerly known as ICE Trust U.S. LLC (and before that as ICE US Trust, LLC), is wholly owned by ICE US Holding Company L.P. ("ICE LP") and is organized under the laws of the State of Delaware, with its principal place of business in New York. ICE LP is a Cayman Islands exempted limited partnership. ICE US Holding Company GP LLC ("ICE GP") owns 50 percent of and is the general partner of ICE LP. Other owners of ICE LP include Dealer Defendants Citigroup, Deutsche Bank, Goldman Sachs, JP Morgan, and Morgan Stanley, as well as Merrill Lynch, which is owned by Defendant Bank of America. The Dealer Defendants share in ICE Trust's profits. ICE GP is a Delaware limited liability corporation that is wholly owned by co-conspirator IntercontinentalExchange Inc.

65. In March 2009, ICE Clear began operating as a central counterparty clearing facility for CDS contracts, clearing CDS transactions between Defendants as well as and between Defendants and other dealers. (As discussed below, however, Defendants ensured that ICE Clear would operate in a way that retained the inefficiencies of the over-the-counter trading

that yielded them inflated profits.)  ICE Clear is also an affiliate of Creditex, which jointly

administers the Credit Event Fixing Product with Defendant Markit.  Dealer Defendants control

ICE Clear's membership and rules through seats on ICE Clear's risk committee, which writes or

approves ICE Clear's clearing rules.  The membership of ICE Clear's risk committee is not

publicly disclosed, but at the relevant time was reported to include senior personnel of Dealer

Defendants, including Ali Balali of Bank of America, Paul Mitrokostas of Barclays, Biswarup

Chatterjee of Citi, Andy Hubbard of Credit Suisse, Athanassios Diplas of Deutsche Bank, Oliver

Frankel of Goldman Sachs, Thomas J. Benison of JPMorgan, James Hill of Morgan Stanley, and

Paul Hamill of UBS.

66.     Co-Conspirator IntercontinentalExchange Inc. ("ICE") is a corporation organized

and existing under the laws of the State of Delaware, with its principal place of business in

Atlanta, Georgia and offices in New York, New York.  ICE is an operator of regulated futures

exchanges and over-the-counter markets and derivatives clearing houses.  In March 2009,

through its subsidiary ICE Clear Credit, ICE became the first clearinghouse to process CDS

transactions in the United States, and to this day clears the vast majority of all CDS transactions,

and all dealer-to-dealer CDS transactions, in the United States.

67.     Various other non-parties also participated as co-conspirators, performed acts, and

made statements in furtherance of the conspiracy.  Plaintiffs reserves the right to identify other

co-conspirators and to name subsequently some or all co-conspirators, whether identified here or

not, as defendants.

68.     Defendants are jointly and severally liable for the act of their co-conspirators

whether named or not named as Defendants in this complaint.  Each Defendant acted as the

agent or joint-venturer of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

**FACTUAL ALLEGATIONS**

I.      **STARTING BEFORE 2008, DEFENDANTS JOINTLY EXPLOIT AND MAINTAIN AN INEFFICIENT MARKET STRUCTURE FOR CDS.**

      A.      **CDS Contracts Generally**

69.      A CDS is a type of credit derivative. A derivative is a financial instrument, the value of which depends on the value of some other underlying asset, such as a stock, bond, or commodity. Derivatives permit market participants to manage and transfer risk by allowing them to separate out and trade individual risk components, such as credit risk. Derivatives also have informational value – they can signal current market sentiment regarding contingent future events, such as the risk of a company defaulting on its debts.

70.      A CDS can operate like insurance: one party (the protection buyer) makes periodic payments to the other party (the protection seller) in exchange for the seller's promise to make the buyer whole on an agreed amount in the event of some "credit event," such as bankruptcy, by a third party, known as the "reference entity."

71.      The payments made by the buyer in exchange for protection are known as the "premium" (or, in industry lingo, the "CDS spread" or "CDS rate"). These payments are typically expressed in basis points, *i.e.*, one-hundredths of a percent of the notional amount of protection being sold, and are paid annually, until the maturity of the CDS contract or until a default (or other credit event) of a referenced entity. Generally speaking, there is a positive correlation between the CDS premium and the riskiness of the reference entity, meaning that a higher CDS premium generally indicates a higher perceived risk of a credit event on the reference entity.

72.     An investor can buy a CDS to hedge its credit exposure on a particular liability, such as a bond or loan issued by the reference entity.  Thus, an investor may, for example, choose to "buy protection" through the CDS market in order to hedge its risk of default on an outstanding bond held on its books.  If the underlying bond defaults, the investor loses its principal (or some portion of its principal) on that bond, but will recover approximately the amount of the loss through a CDS protection payment triggered by the bond's default.  The CDS market, like almost any financial market, also allows participants to speculate on the value of credit protection by buying protection with CDS (and betting that credit protection will become more valuable) or selling protection with CDS (and betting that credit protection will become less valuable).

**B.     Origins of the CDS Market**

73.     CDS originated in the 1990s as a means to transfer credit exposure.  In the early days, there were few participants in the market, and in many cases, the protection buyer owned the underlying asset.

74.     Initially, CDS trading was largely ad hoc.  Because CDS instruments were not standardized, the various terms of a CDS contract had to be individually negotiated resulting in high transaction costs.  One of those transaction costs was the cost of searching for a counterparty willing to take the other side of a trade – that is, a party willing to buy the protection the investor wanted to sell (or *vice versa*).  In response to this "matching" problem, "market makers" emerged to match buyers and sellers of CDS.  Market makers sell to buyers, buy from sellers, and hold inventory until a matching offer emerges.

75.     The Dealer Defendants are the primary market makers for CDS, also known as the "sell-side."  Their customers, the buyers and sellers of CDS who take the price quoted by the dealer, are known as the "buy-side" of the market.  What the buy-side is buying is liquidity, also

known as "immediacy" – the ability (ideally) to trade at the market bid or offer without having to wait for a counterparty to come along who is willing to transact. The sell-side sells this liquidity.

76. The Dealer Defendants supply liquidity by providing a "bid" price, at which the dealer will purchase, and an "ask" price, at which the dealer will sell. The dealers generally keep their ask price higher than their bid price, and capture the difference, which is known as the "bid/ask spread."

77. By way of illustration, assume a dealer purchases and sells an equal volume of credit protection on the same underlying asset with the same transaction documentation and no transaction costs. Under these circumstances, the dealer makes an annual profit equivalent to the difference between the price it bought at (its bid) and the price it sold at (its ask), expressed in terms of basis points – or $1/100^{th}$ of a percent – of the total notional value of credit protection bought and sold multiplied by that total notional value. For example, if a dealer purchases protection for 100 basis points on $100 million of XYZ and sells protection for 150 basis points on $100 million of XYZ, the dealer makes a profit of 0.5% * $100 million, or $500,000 per year.

78. By the early 2000s, the Dealer Defendants had established themselves as over-the-counter CDS dealers. At that time, the dealer's role as market maker was valuable because there were not many buyers and sellers in the market, so there was an acute need for the provision of liquidity. In addition to high demand for liquidity, there were substantial barriers to entry in the over-the-counter dealer market. With low trading volume and a lack of standardized products, a potential dealer would need to address the risk of being left with unwanted CDS exposure, which only extremely large financial institutions could manage. As such, the dealers

were able to charge hefty prices (in the form of bid/ask spreads) for their services – a luxury the Dealer Defendants would guard jealously and ultimately violate the antitrust laws to protect.

**C.**     **Increased Volume, the Inter-Dealer Market, and Standardization of the CDS Market Create Conditions That Support Exchange Trading and Threaten the Dealer Defendants' Profits.**

79.     By the mid 2000s, several structural changes had occurred in the CDS market that fundamentally altered the market's structure, significantly increased liquidity, and therefore substantially reducing the value of the liquidity provision services offered by the Dealer Defendants.

80.     First, the volume of CDS transactions increased significantly from the 1990s to the mid 2000s. In 2001, the outstanding notional amount of CDS was $918 billion. By 2007, the market had ballooned by a factor of 60 to $62.2 trillion.

81.     Second, the structure of CDS transactions was standardized under the ISDA Master Agreement in the late 1990s and early 2000s. The ISDA Master Agreement is a master service agreement designed by ISDA to create standard terms, confirmations, and credit definitions for CDS transactions. As a standardized document, most of the terms of the Master Agreement do not need to be re-negotiated for each transaction and instead apply automatically.

82.     Third, and perhaps most importantly, CDS products themselves became highly standardized. As the CDS market grew, two categories of CDS – single-name and index CDS – emerged as highly fungible products.

      a.   Single-name CDS are CDS based on a single debt instrument issued by an underlying reference entity. The vast majority of single-name CDS are standardized contracts based on the ISDA 2003 Credit Default Swap Definitions. By November 2004, 50-60% of single-name CDS complied with the 2003 ISDA definitions. As of 2011, approximately 92% of all CDS trades include a standard

coupon, while 97% of all CDS trades have fixed quarterly payment dates.

b. A CDS index is a credit derivative that references a basket of reference-entities. It is generally used to hedge macro credit risk rather than take a position on a particular entity's credit profile. In 2003, the first major families of CDS indices, Trac-x and iBoxx, became available for trading, and in 2004 they were merged to form iTraxx for the European and Asian markets and CDX for the United States market.

83. The contract terms of the CDX and iTraxx indices such as maturity are (and always have been) standardized, with the only variable being price. These contract terms are set by Defendant Markit. Of course, the indices themselves are also standardized, covering a basket of reference entities selected by Markit.

84. With so many CDS trading in standardized form, the market was able to support alternative mechanisms for trading CDS, including trading through an electronic exchange. Had the market been permitted to develop in response to customer demand for these alternative execution mechanisms, the buy-side's dependence on over-the-counter trading services offered by the Dealer Defendants would have significantly diminished.

85. Additionally, increased volume meant increased liquidity for the Dealer Defendants, which allowed them to offset their positions more efficiently. Increased volume also created economies of scale and scope for the Dealer Defendants, particularly through netting of counterparty risk, resulting in reduced per-trade risk management and processing costs. The Dealer Defendants were also able to mitigate risk through a robust inter-dealer broker market, through which the Dealer Defendants were able to enter into offsetting transactions with other dealers and gain insights into market supply and demand, which they carefully hid from their

customers.

86.     As a result of these developments, the Dealer Defendants faced two threats to their lucrative profits on the bid/ask spread.  First, they faced the threat of competition from alternative methods for conducting CDS transactions, especially electronic exchanges, which would put downward pressure on the bid/ask spread.  Second, they faced the risk of competition because more banks were able to provide more liquidity for standardized products.  These threats were unacceptable to the Dealer Defendants, and so they conspired to neutralize them.

**D.     Defendants Limit *Pre*-Transaction Price Transparency.**

87.     In order to protect their market power and to block entry by more efficient alternatives now possible, the Dealer Defendants went to great lengths to keep investors in the dark – both in terms of the volume of supply and demand at any given moment and the real price at which products were bought and sold in the market.

88.     When the Dealer Defendants would solicit bids and offers from the market, their solicitation were private, so they could not be seen by the market generally.  The Dealer Defendants do not publicly announce the prices at which they are willing to buy and sell CDS.  Instead, they periodically send "runs" in electronic messages on Bloomberg financial terminals to select customers with which they have transacted in the past.  The runs contain only "indications" of the prices at which the Dealer Defendants will buy and sell CDS.  Thus, the Dealer Defendants do not commit to trade at their indicated prices.  Rather, customers must make a "reverse inquiry" via telephone or a return Bloomberg message to find out whether and at what price the dealer is actually willing to transact.

89.     The Dealer Defendants' prices routinely vary from their indicated prices, especially when a customer does not make a reverse inquiry almost immediately upon receiving the run.  The Dealer Defendants use their knowledge of their customers' interest to adjust their

prices. The Dealer Defendants also send runs out simply to mislead the market about their intentions. For example, the Dealer Defendants use an investor's response as a way to "front run" the investor by entering into a deal with another dealer, thereby stacking the supply or demand for that CDS against that investor.

### E. Defendants Also Restrict *Post*-Transaction Price Information.

90. The Dealer Defendants also erected barriers to meaningful post-transaction transparency. Virtually no CDS data can be shared without the Dealer Defendants' express consent. Where data is shared – essentially, only to information providers owned or controlled by the Dealer Defendants themselves – the terms are such that the disclosure does not threaten the information asymmetry status quo.

91. ***Defendants prevent publication of real-time transaction data.*** Once a Dealer Defendant consummates a CDS trade, the terms, payments, and parties to that transaction must be formally processed and confirmed. These tasks are generally accomplished by the Depository Trust & Clearing Corporation (DTCC) which, through its subsidiaries Warehouse Trust Company, LLC and DTCC Derv/SERV, LLC, handles the settling of the Dealer Defendants' CDS trades. As the central repository of CDS settlement data, DTCC is able to derive transaction prices from the data. That information could be disseminated widely on a real-time basis to data vendors or other service providers.

92. The Dealer Defendants have used their role on the DTCC board of directors to promulgate rules to prevent the release of such information. These board members – including Lori Hricik and Paul H. Compton of JP Morgan, Suni Harford of Citi, Robin A. Vince of Goldman Sachs, Stephen Duffron of Morgan Stanley, Darryll Hendricks of UBS, Jason Hitchon of Deutsche Bank and Mark D. Linsz of Bank of America – met during the period at issue here to discuss limiting the dissemination of CDS trading data maintained by DTCC.

93.      ***Defendants restrict Markit from providing pricing information***.  DTCC
provides real-time post-trade data only to the DTCC's members (which include all of the Dealer
Defendants) and, importantly, to Defendant Markit.  At all relevant times, Defendants owned
more than 70% of the voting shares of Markit Group Holdings, which is the parent of Markit.
Through the Dealer Defendants' ownership of these voting shares, presence on Markit's holding
company's board, and Markit's position as the sole source of pricing data, the Dealer Defendants
have worked together to impose limits on Markit's dissemination of CDS pricing information
that favor them at the expense of their investor customers.

94.      As a result, the Dealer Defendants have prohibited Markit from providing real-
time pricing information to its subscribers.  Instead, Markit is required to wait ten to twenty
minutes before sending out data to its subscribers so as to permit the Dealer Defendants to quote
prices different from the price indications from Markit.

95.      This delay renders the data substantially less valuable to non-dealer investors, as
the market price for a given CDS product can change from one minute to the next.  It also allows
the Dealer Defendants to disavow the prices quoted in their runs as stale, permitting them to
adjust their prices advantageously in response to the investor's intended position.

96.      In addition, rather than providing data about specific trades closed that day, the
end-of-the day information published by Markit is essentially only an *average* of the "marks"
data provided to it by the Dealer Defendants.  "Marks" are prices ascribed by the traders, at their
discretion, to the value of the positions on the dealer's books.  Markit does not provide
information revealing whether the marks data are based on recent transactions.  Thus, an investor
would have difficulty knowing whether the execution price received on a new trade is at variance
with recent execution prices, which in turn makes it difficult for an investor to discriminate

among dealers based on their reputation for execution price quality. That reduces the pressure on the Dealer Defendants to compete with each other by offering good execution to their customers.

97.     Markit's agreement to withhold this real-time information is contrary to its own economic interests. If Markit were acting in its independent interest instead of pursuant to an agreement with the Dealer Defendants, it would sell real-time price information to investors, and other market participants, because such information is conspicuously lacking from the CDS market and would be extremely valuable to many market participants.

**F.      Defendants Secure Additional Information Advantages Through the Inter-Dealer Broker Market.**

98.     In addition to the informational advantages the Dealer Defendants enjoy as a result of the above restrictions on real-time price information, they also enjoy informational advantages by virtue of their exclusive participation in the inter-dealer market.

99.     When dealers trade CDS with each other, they use intermediaries called inter-dealer brokers ("IDBs"). Dealers submit the prices at which they are willing to buy or sell CDS with another dealer to the IDBs. These brokers in turn solicit interest from other dealers and attempt to match bids and offers. Dealers see each other's quotes, but not each other's identity (to maintain anonymity), and can choose to enter CDS transactions at the quoted prices without negotiation or inquiry and without submitting their own quotes. IDBs operate both voice brokerages and electronic brokerages.

100.    This system provides the Dealer Defendants with many of the benefits they deny to non-dealers:  the ability to quote bid and ask prices anonymously, the ability to accept quoted bid and ask prices without further inquiry, and ready knowledge of a larger array of bid and ask prices. Thus, the IDB system itself possesses some of the key attributes of an electronic exchange and demonstrates that CDS are suitable for exchange trading.

101.    The Dealer Defendants, however, have prevented non-dealers from participating in that system.  In particular, the Dealer Defendants have threatened the IDBs with losing their business – which would effectively destroy them – if they facilitate CDS transactions with non-dealers.

102.    The Dealer Defendants have also forbidden the IDBs from trading with non-dealers out of fear the IDBs would begin brokering trades between non-dealers, thereby shutting out the Dealer Defendants.  No Dealer Defendant has partnered with an IDB to facilitate additional trades between non-dealers.  Nor has any Defendant broken ranks with the other Dealer Defendants in their joint efforts to ensure that all CDS transactions include at least one dealer.  In this way, the Dealer Defendants have acted as a cartel to preserve their continued control over CDS pricing and other critical information.

**G.    Defendants' Control of the CDS Market Yields Supracompetitive Bid/Ask Spreads.**

103.    Generally, in any over-the-counter market, increased liquidity and standardization of trades should result in lower prices to consumers – here a reduction in bid/ask spreads.  But, because of the Dealer Defendants' control over real-time pricing information, and the other conduct alleged above, the Dealer Defendants have been able to maintain supracompetitive bid/ask spreads, notwithstanding these procompetitive developments.

104.    The Dealer Defendants structured the CDS market in a manner that is very profitable to them, and unnecessarily costly to investors.  By keeping prices opaque even when trading volume has increased and CDS products have become standardized, the Dealer Defendants have maintained a cash cow that has generated billions of dollars in profits for Defendants over the Class Period.

105.    During this period, the Dealer Defendants also enjoyed a virtually complete

freedom from any regulation of the CDS market. Since the passage of the Commodity Futures Modernization Act of 2000 ("CFMA"), CDS did not qualify as "swap agreements," and were therefore not regulated by the Commodity Exchange Act. Additionally, the CFMA exempted CDS from the definition of "securities" and prohibited the SEC from, among other things, imposing reporting, recordkeeping, or disclosure requirements on swaps transactions. While the SEC retained limited authority to enforce certain anti-fraud and anti-manipulation clauses of the securities laws, it could not even promulgate prophylactic measures designed to prevent fraud with respect to security-based swap agreements.

106. As the SEC's Director of the Division of Trading and Markets testified to a House of Representatives Committee in 2008, referring expressly to CDS: "Thus, the tools necessary to oversee this market effectively and efficiently do not exist."[3] Similarly, Walter Lukken, acting chairman of the Commodity Futures Trading Commission ("CFTC"), told the same House Committee: "With respect to the CFTC, the Commodity Exchange Act (CEA) excludes most OTC financial derivatives, including CDS, from its regulatory and enforcement jurisdiction."[4] Christopher Cox, chairman of the SEC, characterized the CDS market as a "regulatory hole," which is "regulated by no one" as "[n]either the SEC nor any regulator has authority over the CDS market, even to require minimal disclosure to the market."[5]

---

[3] Erik Sirri, *Testimony Concerning Credit Default Swaps* (Oct. 15, 2008), *available at* http://www.sec.gov/news/testimony/2008/ts101508ers.htm.

[4] Walter Lukken, *Testimony Concerning Review of Credit Derivatives* (Oct. 15, 2008), *available at* http://www.cftc.gov/ucm/groups/public/@newsroom/documents/speechandtestimony/opalukken-49.pdf.

[5] Christopher Cox, *Testimony Concerning Turmoil in U.S. Credit Markets* (Sept. 23, 2008), *available at* http://www.sec.gov/news/testimony/2008/ts092308cc.htm.

## II.  DEFENDANTS CONSPIRE TO BLOCK COMPETITION AND MARKET ENTRY IN THE U.S. CDS MARKET.

### A.  CDS Exchanges and Clearinghouses Emerge As Competitors to Defendants' Oligopoly in the United States.

107.    By early 2008, if not before, the CDS market was ready for increased transparency and competition.  This provided a major business opportunity for entry into this market.

108.    As a result, potential market entrants – specifically, CDS exchanges and clearinghouses – emerged in 2008 aiming to bring more transparency and competition to the market and to reduce investors' costs of doing business.  While considerable barriers to entry prevented direct buy-side competition with the major dealers in the over-the-counter market, CDS trading through exchanges could force direct competition on bid/ask spreads.

109.    One of these exchange platforms was CMDX, a joint venture by the hedge fund giant Citadel and the derivatives exchange giant CME.  At the time, Citadel was one of the five largest buy-side CDS traders and had been developing a proprietary CDS tracking product that could be used to establish a CDS trading and clearing platform.  CME was and is the world's largest and most diverse derivatives exchange.  Together Citadel and CME had the capital, industry experience and credibility, trading and clearing platform, and requisite technology to launch a successful CDS exchange and central clearinghouse.  Citadel and CME made huge investments in this endeavor.

110.    CMDX would have been an open, anonymous exchange for the trading of CDS indices and some single-name CDS using, like most exchanges, Central Limit Order Booking ("CLOB").  CLOB is a trading method that matches customers orders (*e.g*., bids and offers) on a "price time priority" basis whereby the highest (or best) bid order and the lowest (or cheapest)

offer order constitutes the best market in a given swap. CLOB is fully transparent, real-time, anonymous, and low cost in execution.

111.    In a CLOB model, customers can trade directly with dealers, dealers can trade with other dealers, and customers can trade directly with other customers anonymously. Thus, CMDX using CLOB would cut out the Dealer Defendants as the middlemen in most CDS transactions and make CDS pricing information readily available to investors in real time. Membership would generally be open to dealers, banks, and institutional investors.

112.    CMDX would also have utilized straight-through-processing, which means that transactions would have been conducted electronically without the need for manual entry of the trade or subsequent confirmation from a trading desk. This would have allowed trade processing to occur faster while also minimizing settlement risk.

113.    Citadel and CME invested millions of dollars to develop, build, and test CMDX, such that exchange trading and central clearing through CMDX was operationally ready by at least the fall of 2008. Based on modeling conducted by Citadel and CME, the exchange would be operating by late 2008 and would be adopted quickly by the market.

114.    On June 9, 2008, CMDX was presented to the dealer community and the buy-side market. At the time, the Federal Reserve Bank of New York had become interested in encouraging central counterparty clearing and other infrastructure improvements in the CDS market, and it hosted a meeting with CDS market participants to discuss these topics. At that meeting, CME and Citadel made a presentation regarding CMDX and its potential as a platform for CLOB trading and as a clearinghouse.

115.    Soon after, CME and Citadel began to pitch CMDX to the market, and market participants expressed interest. Citadel and CME met with buy-side firms with substantial CDS

trading volume – including Blackrock Inc., AllianceBernstein LP, D.E. Shaw Group, and

BlueMountain Capital Management – about initial participation in CMDX.  Citadel and CME

promoted CMDX as having clearing capabilities through CME, proprietary trading through a

CLOB mechanism, trading of major CDS indices and some single-name CDS, and a launch by

late 2008.

116.    Citadel and CME also made targeted pitches to certain sell-side participants in the

CDS market, including some of the Dealer Defendants.  Citadel and CME engaged in

discussions with at least six banks – including obvious candidates with smaller CDS market

shares, such as Barclays, UBS, and Merrill – and offered them equity in CMDX.  Term sheets

reflected between a 30 to 50 percent equity stake for those sell-side participants who became

involved.  As a result, there was a sizeable first-mover advantage for early sell-side participants

signing on to CMDX, including substantial trading and clearing revenues.  While the exchange

would reduce customers' transaction costs, its economies were still weighted toward the sell

side.

117.    As a result, certain of the Dealer Defendants had favorable reactions to the

CMDX proposal and expressed interest in becoming involved.  These dealers recognized that the

CMDX proposal would be in their independent economic self-interest.

118.    As one example, CME and Citadel considered offering equity in the trading side

of the venture to Barclays – a prospect which interested Barclays because it could lead to

substantial growth in its relatively small CDS market share.  Barclays noted in a broker report to

investors during this period that:

> We believe that **CME's clearing house is well positioned in the markets given its
> size and amount of collateral, and therefore it lends itself to be the natural
> solution for clearing CDS**, which a "new" clearing house would likely have to be
> funded from the ground up.  **CME/Citadel are willing to share the economics by**

*offering 30% of the equity in the JV to market participants and offering member rates, which could help get the system off the ground* \*\*\*

We believe that certain segments of the market, such as indices, already lend themselves to trade in an exchange-like fashion.[6]

119.     Throughout mid to late 2008, Citadel and CME held a series of meetings and communications with Defendants Markit and ISDA regarding obtaining licenses that would facilitate CMDX's successful launch.

120.     Citadel and CME sought licenses to Markit's CDS indices, among other intellectual property. CMDX planned to launch with all major CDX and iTraxx indices, which Markit owns, as well as single-name constituents, covering more than 90% of the CDS market. The ability to offer exchange trading of the CDX and iTraxx indices was important because index CDS constituted approximately 50% of the market trading activity. Markit claims it has intellectual property rights over the makeup of its CDS indices.

121.     Citadel and CME also sought Markit's reference entity database ("RED") codes. A RED code is a CUSIP-linked code (a 9-character alphanumeric code) widely used in the CDS market to identify the reference entity of a CDS. Markit also claims intellectual property rights in its RED codes.

122.     These licenses were important because a trading platform without Markit indices or RED codes would have had significantly less potential for market adoption because these indices and codes were already being widely used in the market.

123.     Markit recognized that it was in its independent economic self-interest to license its CDS indices and RED codes to CMDX because Markit stood to gain significant revenues from licensing both products. Markit was interested in licensing the RED codes because it

---

[6]     Barclays Capital Equity Research, *Exchange-Traded CDS Has Several Hurdles* (Oct. 8, 2008).

would assure greater market adoption (and minimize the possibility of market adoption of an alternative CUSIP-linked code systems).

124.     In addition, a functioning exchange would have created transaction data for every single trade.  Markit was the recipient and publisher of dealer mark data in the over-the-counter market, and Markit was potentially in a position to sell the exchange's real-time transaction data, and to reap large revenues as a result.  It was thus no surprise that Markit indicated it was interested in proceeding with the licensing of its CDS indices and RED codes.

125.     Throughout the fall of 2008, Markit and CMDX entered into a series of negotiations and exchanged multiple term sheets contemplating the licensing of Markit's indices and RED codes to CMDX for use in a CDS exchange and clearinghouse.  The term sheets provided that Markit would receive royalty payments for the licensing of its products and that it could collect data obtained from CMDX, comingle it with its own data, and sell all of it as the exclusive provider of that data.  These term sheets also made reference to the fact that the licenses would be used for CDS trading over an exchange.

126.     From ISDA, Citadel and CME sought a license for use of the ISDA Master Agreement.  As noted above, by 2008, the vast majority of CDS trades were covered by standard ISDA documentation.  ISDA claims intellectual property rights over the Master Agreement and the accompanying definitions and processes.  Thus, an ISDA license was important to ensure that exchange-traded CDS would mirror the conventions of over-the-counter CDS, including use of the ISDA Credit Derivatives definitions, the ISDA Determinations Committee, and the ISDA auction process.

127.     It was in ISDA's own interest to license to CMDX.  Licensing to CMDX was, first and foremost, consistent with ISDA's stated goals – as an industry trade association – of

"reducing counterparty credit risk, increasing transparency, and improving the industry's operational infrastructure."[7]  As discussed below, however, ISDA ultimately agreed with the Dealer Defendants to take actions that flatly contradicted each of these avowed goals.

128.    It was also in ISDA's independent economic self-interest to gain increased licensing revenues for its industry-standard contracts and protocols as a result of the increased volume of transactions and market participants the exchange would induce.  ISDA would also have been interested in broader market adoption of its Master Agreement and definitions, and adoption by the exchange would accomplish just that.  After meeting with CME and Citadel, ISDA too indicated that it was interested in licensing to CMDX.

129.    Thus, by approximately October 2008, CMDX was poised to enter the market to provide a much needed solution to the dealer-controlled opaqueness, lack of transparency, and inflated transaction costs.  It had support from buy-side firms and sell-side market participants, including the Dealer Defendants interested in gaining larger CDS market share.  It also had made substantial progress with Markit and ISDA to obtain necessary licenses.

130.    On October 7, 2008, in a joint press release, CME and Citadel stated that CMDX was operational and would launch within 30 days, subject to completion of definitive licensing agreements and finalization of certain regulatory approvals (which were soon after granted).  The day before, a spokesperson for CME had stated that the exchange "can be operationally ready to clear CDS in a few weeks."[8]

131.    The CMDX trading platform was widely recognized as a natural next step in, and solution for, the market.  In fact, CMDX was not the only proposal for moving CDS from the

[7]  International Swaps and Derivatives Association, *About ISDA*, available at http://www2.isda.org/about-isda/.

[8]  Ciara Linnane & Karen Brettell, *NY Federal Reserve Pushes for Central CDS Counterparty*, Reuters (Oct. 6, 2008).