**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                 :

IN RE:  CREDIT DEFAULT SWAPS         :
ANTITRUST LITIGATION             :     Master Docket No.:  13 MD 2476 (DLC)
                                 :
This Document Relates To:  All Actions   :
                                 :
                                 :
                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEALER-DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR**
**<u>JOINT MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT</u>**

March 14, 2014

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......................................................................................... iii

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND ...........................................................................................................7

    A.    Credit Default Swaps ..........................................................................7

    B.    The Parties ...........................................................................................8

    C.    The Financial Crisis and Regulators' Efforts
          To Establish a Central CDS Clearinghouse .........................................8

    D.    The Enactment of Dodd-Frank ...........................................................12

    E.    Plaintiffs' Claims ...............................................................................12

ARGUMENT ...............................................................................................................14

I.      Plaintiffs Lack Standing To Pursue Their Antitrust Claims. ...........................14

    A.    Plaintiffs' Claimed Injuries Are Indirect. ..........................................15

    B.    Other More Efficient Enforcers of the Antitrust Laws Exist. ...........16

    C.    Plaintiffs' Claimed Injuries Rest on a Highly
          Speculative Chain of Causation. .........................................................18

    D.    Plaintiffs' Claims Raise Complex and Difficult
          Problems of Quantifying and Apportioning Damages. ........................21

II.     Plaintiffs Fail Plausibly To Allege Each Defendant's Participation
       in a Conspiracy To Restrain Trade in Violation of Section 1 ..........................22

    A.    Plaintiffs' Generic References to the
          "Dealer Defendants" Are Insufficient. ...............................................24

    B.    The Mere Opportunity To Conspire Is Insufficient. ..........................26

    C.    Allegations of Parallel Conduct Are Insufficient. ..............................28

III.    Plaintiffs Cannot State a "Conspiracy to Monopolize"
        Claim Based on a "Shared Monopoly" Theory. ..............................................32

IV.     Plaintiffs Cannot Assert an Antitrust Claim Predicated on
        Conduct Before May 3, 2009..............................................................................34

        A.      Plaintiffs Cannot Allege Injury-in-Fact for the Period Before
                CMDX Allegedly Could Have Begun Exchange Trading of CDS.....................34

        B.      Plaintiffs' Claims Based on Conduct Before May 3, 2009 Are
                Barred in Any Event by the Applicable Statute of Limitations. ...........................36

                1.      Plaintiffs Do Not Adequately Plead Fraudulent Concealment. ................37

                2.      Plaintiffs Do Not Adequately Plead That Any Concealment
                        "Actively Prevented" Them from Discovering Their Claims...................40

                3.      Plaintiffs Do Not Adequately Plead That They
                        Exercised the Necessary Diligence. ..........................................................40

V.      Congress' Enactment of Title VII of Dodd-Frank Precludes Application
        of the Antitrust Laws to Alleged Conduct After July 21, 2011. ........................................42

        A.      Dodd-Frank Precludes Application of the Antitrust Laws to
                Plaintiffs' Allegations. .............................................................................................44

        B.      Dodd-Frank's Savings Clause Does Not Preserve Plaintiffs' Claims. .................48

VI.     Plaintiffs' Duplicative Unjust Enrichment Claim Should Be Dismissed. .........................49

CONCLUSION.................................................................................................................................50

# TABLE OF AUTHORITIES

Page(s)

CASES

*131 Main St. Assocs. v. Manko*,
   179 F. Supp. 2d 339 (S.D.N.Y.), *aff'd*,
   54 F. App'x 507 (2d Cir. 2002) ........................................................ 40, 41

*AD/SAT, Div. of Skylight, Inc. v. Associated Press*,
   181 F.3d 216 (2d Cir. 1999) ............................................................ 24, 25

*Arista Records LLC v. Lime Grp. LLC*,
   532 F. Supp. 2d 556 (S.D.N.Y. 2007) ..................................................... 33

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ....................................................... 5, 22, 27, 29

*Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*,
   459 U.S. 519 (1983) ................................................................... *passim*

*Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*,
   155 F.3d 59 (2d Cir. 1998) .................................................................. 8

*Balaklaw v. Lovell*,
   14 F.3d 793 (2d Cir. 1994) ................................................................ 14

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .................................................................. *passim*

*Blue Shield of Va. v. McCready*,
   457 U.S. 465 (1982) ....................................................................... 22

*Boyd v. AWB Ltd.*,
   544 F. Supp. 2d 236 (S.D.N.Y. 2008) ................................................. 16, 22

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.*,
   996 F.2d 537 (2d Cir. 1993) ............................................................ 26, 27

*Corsello v. Verizon N.Y., Inc.*,
   967 N.E.2d 1177 (N.Y. 2012) .............................................................. 49

*Credit Suisse Sec. (USA) LLC v. Billing*,
   551 U.S. 264 (2007) ................................................................ 43, 44, 47

*Daniel v. Am. Bd. of Emergency Med.*,
   428 F.3d 408 (2d Cir. 2005) ............................................................ 14, 17

*Dodds v. Cigna Sec., Inc.*,
    12 F.3d 346 (2d Cir. 1993).................................................................. 40

*Elec. Trading Grp., LLC v. Banc of Am. Sec. LLC*,
    588 F.3d 128 (2d Cir. 2009).............................................................. 42

*Fidenas AG v. Honeywell Inc.*,
    501 F. Supp. 1029 (S.D.N.Y. 1980)................................................... 40

*Friedman v. Salomon/Smith Barney, Inc.*,
    313 F.3d 796 (2d Cir. 2002)......................................................... 43, 46

*Gatt Commc'ns, Inc. v. PMC Assocs. L.L.C.*,
    711 F.3d 68 (2d Cir. 2013)........................................................... 14, 17

*Geller v. Cnty. Line Auto Sales, Inc.*,
    86 F.3d 18 (2d Cir. 1996)................................................................. 50

*Gross v. New Balance Athletic Shoe, Inc.*,
    955 F. Supp. 242 (S.D.N.Y. 1997) ................................................... 21

*H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*,
    879 F.2d 1005 (2d Cir. 1989).......................................................... 34

*Higgins v. N.Y. Stock Exch., Inc.*,
    942 F.2d 829 (2d Cir. 1991)............................................................ 36

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*,
    620 F. Supp. 2d 499 (S.D.N.Y. 2009).............................................. 26

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*,
    708 F. Supp. 2d 348 (S.D.N.Y. 2010).............................................. 37

*IBM Corp. v. Platform Solutions, Inc.*,
    658 F. Supp. 2d 603 (S.D.N.Y. 2009)........................................ 16, 22

*In re Buspirone Patent Litig.*,
    185 F. Supp. 2d 363 (S.D.N.Y. 2002).............................................. 40

*In re Crude Oil Commodity Futures Litig.*,
    913 F. Supp. 2d 41 (S.D.N.Y. 2012)................................................ 41

*In re DDAVP Direct Purchaser Antitrust Litig.*,
    585 F.3d 677 (2d Cir. 2009).................................................. 20, 21, 22

*In re Digital Music Antitrust Litig.*,
    812 F. Supp. 2d 390 (S.D.N.Y. 2011).............................................. 50

*In re Electronic Books Antitrust Litig.*,
859 F. Supp. 2d 671 (S.D.N.Y. 2012) ................................................... 31

*In re Elevator Antitrust Litig.*,
502 F.3d 47 (2d Cir. 2007) ........................................................... 24, 25

*In re Merrill Lynch Ltd. P'ships Litig.*,
154 F.3d 56 (2d Cir. 1998) ................................................................. 41

*In re Stock Exchs. Options Trading Antitrust Litig.*,
317 F.3d 134 (2d Cir. 2003) .............................................................. 46

*In re Parcel Tanker Shipping Servs. Antitrust Litig.*,
541 F. Supp. 2d 487 (D. Conn. 2008) ...................................... 24, 25, 27

*Ingrami v. Rovner*,
45 A.D.3d 806 (N.Y. App. Div. 2007) ................................................. 50

*Int'l Distribution Ctrs., Inc. v. Walsh Trucking Co.*,
812 F.2d 786 (2d Cir. 1987) .............................................................. 33

*Kendall v. Visa U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008) ........................................................... 26

*Klehr v. A.O. Smith Corp.*,
521 U.S. 179 (1997) ........................................................................ 36

*Koch v. Christie's Int'l PLC*,
699 F.3d 141 (2d Cir. 2012) .............................................................. 37

*Kramer v. Pollock-Krasner Found.*,
890 F. Supp. 250 (S.D.N.Y. 1995) ..................................................... 50

*La. Mun. Police Emps. Ret. Sys. v. JPMorgan Chase & Co.*,
No. 12 Civ. 6659 (DLC), 2013 WL 3357173 (S.D.N.Y. July 3, 2013) ................................ 49

*Mayor & City Council of Balt., Md. v. Citigroup, Inc.*,
709 F.3d 129 (2d Cir. 2013) .............................................................. 23

*Oreck Corp. v. WhirlPool Corp.*,
639 F.2d 75 (2d Cir. 1980) ............................................................... 27

*Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co.*,
926 F. Supp. 2d 36 (D.D.C. 2013) ..................................................... 33

*Paycom Billings Servs. v. MasterCard Int'l, Inc.*,
467 F.3d 283 (2d Cir. 2006) .................................................... *passim*

*Reading Indus., Inc. v. Kennecott Copper Corp.*,
631 F.2d 10 (2d Cir. 1980)...................................................................... 18

*RxUSA Wholesale, Inc., v. Alcon Labs., Inc.*,
661 F. Supp. 2d 218 (E.D.N.Y. 2009) ...................................... 33

*Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*,
947 F. Supp. 2d 88 (D.D.C. 2013)....................................... 26, 34

*Statistical Phone Philly v. NYNEX Corp.*,
116 F. Supp. 2d 468 (S.D.N.Y. 2000)................................... 39, 40

*Sun Dun, Inc. of Wash. v. Coca-Cola Co.*,
740 F. Supp. 2d 381 (D. Md. 1990) .......................................... 33

*Town of Poughkeepsie v. Espie*,
402 F. Supp. 2d 443 (S.D.N.Y. 2005)........................................ 41

*Town of Wallkill v. Rosenstein*,
40 A.D.3d 972 (N.Y. App. Div. 2007) ...................................... 50

*Two Old Hippies, LLC v. Catch the Bus, LLC*,
784 F. Supp. 2d 1200 (D.N.M. 2011) .................................... 24, 25

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)...................................................... 30, 31, 49

*World Wrest. Entm't, Inc. v. Jakks Pac., Inc.*,
328 F. App'x 695 (2d Cir. 2009) ............................................... 41

*Zola v. Gordon*,
685 F. Supp. 354 (S.D.N.Y. 1988) ........................................... 41

## STATUTES, RULES AND LEGISLATIVE MATERIALS

7 U.S.C. § 1a.................................................................................. 45

7 U.S.C. § 2................................................................................ 45, 47

7 U.S.C. § 24a ................................................................................ 48

7 U.S.C. § 6s ........................................................................ 45, 48, 49

7 U.S.C. § 7.................................................................................... 48

7 U.S.C. § 7a-1 .............................................................................. 48

7 U.S.C. § 7b-3 ........................................................................ 45, 48

12 U.S.C. § 5303 ...................................................................... 48

15 U.S.C. § 15b ........................................................................ 36

15 U.S.C. § 77 .......................................................................... 49

15 U.S.C. § 78c ........................................................................ 44

15 U.S.C. § 78c-3 ..................................................................... 45, 47

15 U.S.C. § 78o-10 ................................................................... 48, 49

15 U.S.C. § 78bb ...................................................................... 49

15 U.S.C. 8302 ......................................................................... 44

17 C.F.R. pt. 23H (2013) .......................................................... 46

17 C.F.R. §§ 23.431-23.433 (2013) ........................................... 46

17 C.F.R. § 39.12 (2013) ........................................................... 45

17 C.F.R. §§ 43.1-43.4 (2013) ................................................... 45

17 C.F.R. § 43.5 (2013) ............................................................. 46, 47

17 C.F.R. § 50.4 (2013) ............................................................. 45

74 Fed. Reg. 11,781 (Mar. 19, 2009) ........................................ 35

78 Fed. Reg. 33,476 (June 4, 2013)
    (to be codified at 17 C.F.R. pt. 37) .................................... 46

FED. R. CIV. P. 8 ..................................................................... 23

FED. R. CIV. P. 9 ..................................................................... 37

*Building the New Derivatives Regulatory Framework:*
    *Oversight of Title VII of the Dodd-Frank Act:*
    *Hearing Before the Comm. On Banking,*
    *Housing, and Urban Affairs,* 112th Cong. (2011)
    (statement of Gary Gensler, Chairman, CFTC) ..................... 44

*Hearing To Review the Role of Credit Derivatives in the U.S. Economy:*
   *Hearing Before the H. Comm. on Agric.*, 110th Cong. 6-7 (2008)
   (statement of Walter Lukken, Acting Chairman, CFTC) ..................... 10

*Hearing To Review the Role of Credit Derivatives in the U.S. Economy:*
   *Hearing Before the H. Comm. on Agric.*, 110th Cong. 15 (2008)
   (statement of Eric R. Sirri, Director, Division of Trading and Markets, SEC) ..................... 10


TREATISES

ABA Section of Antitrust Law,
   *Antitrust Law Developments* (7th ed. 2012) ........................ 32

Phillip Areeda & Herbert Hovenkamp,
   *Fundamentals of Antitrust Law* (4th ed. Supp. 2013) ..................... 17, 18


OTHER AUTHORITY

*About ISDA*, ISDA,
   http://www2.isda.org/about-isda/ ................................. 8

Barclays Capital Equity Research,
   *Exchange-Traded CDS Has Several Hurdles* (Oct. 8, 2008)................. 20

Dow Jones Wire, *CME Sees Up to Six Dealers
   Backing Credit Swaps Platform*, Fin. News (Dec. 23, 2008) ................ 11

Chris Kentouris, *CME and Citadel Partner to Trade and Clear OTC Derivatives*,
   SEC. TECH. MONITOR (Oct. 8, 2008),
   http://www.securitiestechnologymonitor.com/news/22882-1.html................. 35, 36

Ciara Linnane & Karen Brettell,
   *Update 2 - NY Federal Reserve Pushes for
   Central CDS Counterparty*, REUTERS (Oct. 6, 2008) ..................... 10, 38

Robert E. Litan, *The Derivative Dealers' Club and
   Derivatives Markets Reform: A Guide for Policy Makers,
   Citizens and Other Interested Parties*, , BROOKINGS INST. (Apr. 7, 2010)................. 9, 11, 12

Peter Madigan, *Abuse of Power?*, RISK MAG. (Sept. 2013) ................ 11, 36

Serena Ng & Aaron Lucchetti, *Street Seeks Credit-Default Safety Net*,
   WALL ST. J. (Apr. 24, 2008)................................. 37

PETER NORMAN, THE RISK CONTROLLERS (2011) ...................................................... 30

Colin Packham, *ICE To Buy CCorp, Cementing Alliance for CDS Clearing*,
Futures & Options Intelligence (Oct. 30, 2008) ...................................................... 38

Colin Packham, *Market Speculates That LCH.Clearnet Owners Might Prefer Icap*,
Futures & Options Intelligence (Feb. 5, 2009) ...................................................... 37

Press Release, CME Group, *CME Group Opens Credit Default Swaps
Initiative to Additional Partners and Focuses
Solution on Clearing Services* (Sept. 18, 2009),
http://investor.cmegroup.com/investor-
relations/releasedetail.cfm?ReleaseID=410137) .................................................. 12

Press Release, CME Group, *SEC Grants CME Group and
CMDX Special Exemption to Clear and Trade
Credit Default Swaps* (Mar. 13, 2009),
http://cmegroup.mediaroom.com/index.php?s=
43&item=2824&pagetemplate=article ................................................................. 36

Press Release, FRBNY, *New York Fed Welcomes New Industry
Commitments on Credit Derivatives* (Mar. 27, 2008),
http://www.newyorkfed.org/newsevents/news/markets/2008/an080327.html ...................... 38

Press Release, FRBNY, *Statement Regarding June 9 Meeting on
Over-the-Counter Derivatives* (June 9, 2008),
http://www.newyorkfed.org/newsevents/news/markets/2008/ma080609.html ...................... 38

Press Release, ICE, *Intercontinental Exchange, the Clearing Corporation and
Nine Major Dealers Announce New Developments in
Global CDS Clearing Solution* (Oct. 30, 2008), http://ir.theice.com/investors-and-
media/press/press-releases/press-release-details/2008/IntercontinentalExchange-
The-Clearing-Corporation-and-Nine-Major-Dealers-Announce-New-
Developments-in-Global-CDS-Clearing-Solution/default.aspx ........................................... 38

Louise Story, *House Advantage; A Secretive Banking Elite Rules
Trading in Derivatives*, N.Y. TIMES (Dec. 12, 2010) .................................................... *passim*

The dealer-defendants[1] respectfully submit this memorandum in support of their joint motion to dismiss the Consolidated Amended Class Action Complaint ("CAC").

## PRELIMINARY STATEMENT

Plaintiffs assert that, from January 1, 2008 through today, twelve dealer-defendants and two non-dealer organizations—Markit Group Ltd. ("Markit") and the International Swaps and Derivatives Association ("ISDA")—have engaged in an anticompetitive scheme to make "tremendous profits" in trading credit default swaps ("CDS"). (CAC ¶ 1.) CDS are bilateral contracts that provide investors with a means to hedge exposure to or speculate on a wide variety of credit risks. (*Id.* ¶ 2.) Unlike common stock, buyers and sellers of CDS frequently tailor their contracts to their individual needs and retain continuing obligations to one another, thereby giving rise to counterparty risk—*i.e.*, the risk that the other party to the contract may default. (*Id.* ¶¶ 70-72.) CDS contracts thus have historically been negotiated bilaterally and traded in over-the-counter ("OTC") transactions between sophisticated parties that know each other, and the preference for creditworthy counterparties logically has motivated CDS participants to seek out trading partners, including the dealer-defendants, that have both the ability and the willingness to commit capital to such trading. (*Id.* ¶ 85.)

According to the complaint, the "price opacity" of OTC trading has allowed the dealer-defendants, in their role as market-makers, to maintain inflated "bid/ask spread[s]" on CDS trades, and the dealers allegedly have attempted to protect these "supracompetitive profits" (*id.* ¶ 7) by conspiring to block the emergence of exchange trading of CDS (*id.* ¶ 11). Ignoring the

---

[1] The dealer-defendants are Bank of America Corporation; Bank of America N.A.; Barclays Bank PLC; BNP Paribas; Citigroup Inc.; Citibank N.A.; Citigroup Global Markets Inc.; Credit Suisse AG; Deutsche Bank AG; Goldman, Sachs & Co.; HSBC Bank plc; HSBC Bank USA, N.A.; JPMorgan Chase & Co.; JPMorgan Chase Bank, N.A.; Morgan Stanley & Co. LLC; Royal Bank of Scotland PLC; Royal Bank of Scotland N.V.; UBS AG; and UBS Securities LLC.

challenges of structuring and implementing a viable exchange encompassing the diverse range of CDS contracts, plaintiffs contend that defendants collectively hindered several third parties—none of which are plaintiffs here—from introducing central clearing and later exchange trading of CDS starting in the fall of 2008, a period of tumultuous financial upheaval and intense regulatory scrutiny of CDS.

Plaintiffs' focus on an alleged conspiracy to maintain an existing market structure—OTC trading of CDS—distinguishes this action from typical Section 1 cases. Plaintiffs do not allege that the dealer-defendants agreed to fix the prices of the CDS they bought or sold. Nor do they allege that the dealers agreed somehow to allocate CDS customers among themselves. Such allegations would not be plausible given that the dealers' customers, including plaintiffs themselves, are highly sophisticated hedge funds, pension funds and other institutions that play dealers off against each other in a cutthroat marketplace. Plaintiffs instead argue that the dealer-defendants carried out their supposed six-year conspiracy in two ways.

- First, plaintiffs assert that the dealers collusively directed defendants Markit and ISDA, through certain dealers' participation on the boards and internal committees of those entities, not to grant intellectual property licenses that would have permitted exchange trading of certain CDS indices when Credit Market Derivatives Exchange ("CMDX"), a joint venture between CME Group Inc. ("CME") and Citadel Investment Group, LLC ("Citadel"), supposedly requested such licenses in late 2008. According to plaintiffs, had those licenses been issued, CMDX would have successfully launched a platform facilitating anonymous exchange trading of certain types of CDS at the end of 2008.

- Second, plaintiffs challenge certain dealers' willingness, at the government's urging, to support a CDS clearing proposal—ultimately the proposal of IntercontinentalExchange,

Inc. ("ICE")—at the height of the 2008 financial crisis. According to plaintiffs, the development of a central clearing counterparty for CDS transactions was a necessary predicate for exchange trading of CDS, and the dealers declined to support competing clearing proposals, including CMDX's proposal, because those other clearinghouses might have evolved from a central clearing counterparty into an exchange.

Plaintiffs speculate that, absent these alleged acts of collusion, the marketplace at the end of 2008 would have developed "alternative mechanisms for trading CDS, including trading through an electronic exchange," that would have caused plaintiffs to obtain better net prices in their purchases and sales of CDS over a six-year period. (*Id*. ¶ 84.)

Notably, the complaint briefly mentions (*id*. ¶ 1), but then disregards, the context in which exchange trading of CDS supposedly would have emerged: In 2008 and 2009—the focus of plaintiffs' allegations—the financial markets were in a state of crisis. During this tumultuous time, the dealer-defendants—which were all differently situated and, in some cases, concerned about their very survival—hardly could be expected to devote substantial attention and resources to developing a new and untested method of trading highly tailored CDS products for which there was, at best, uncertain investor demand. From 2009 onward, legislative efforts were underway that culminated in the imposition of substantial regulatory oversight of the entire CDS marketplace, including the clearing and trading of CDS. The complaint does not account for these incontrovertibly historic events.

Nor do plaintiffs attempt to reconcile their allegations with the following facts: (i) the well-publicized efforts of various dealers and other industry participants to develop a CDS clearinghouse in 2008 and 2009 proceeded with the active participation and oversight of government regulators in both the United States and Europe, none of which objected to certain

dealers' support of ICE's clearinghouse proposal (*see id*. ¶ 131); (ii) many of the dealer-defendants ultimately supported multiple clearing proposals in an effort to foster competition among clearinghouses that might lead to lower clearing fees (*id.* ¶ 155); (iii) in the fall of 2008, CMDX ultimately requested licenses to use the intellectual property of Markit and ISDA only for clearing and request-for-quote ("RFQ") OTC trading, and Markit and ISDA granted both of those licenses (*see id*. ¶ 143); and (iv) even though CDS contracts have been centrally cleared now for five years (*id*. ¶ 65)—and an exchange-traded CDS futures product was introduced last year—the marketplace has shown almost no demand for exchange trading of CDS. Although the complaint ignores the facts belying its antitrust conspiracy theories, defendants need not go outside the pleadings to support this motion. Based on plaintiffs' own allegations and the public sources *cited in the complaint itself*, there are multiple reasons why this case should be dismissed now under well-settled antitrust precedent, before expensive and protracted discovery begins:

1.      Plaintiffs lack antitrust standing under *Associated General Contractors of California v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"), and *Paycom Billing Services, Inc. v. MasterCard International, Inc.*, 467 F.3d 283 (2d Cir. 2006). Under those controlling precedents, plaintiffs' antitrust claims fail because (i) their alleged injuries are indirect and depend entirely on injury to others, (ii) there are others with superior incentives to detect the alleged violations and seek relief, (iii) plaintiffs' alleged injuries are highly speculative, and (iv) plaintiffs' claims would require the fact finder to struggle to quantify and apportion damages among different groups of alleged victims. As explained below, the extent of any indirect injuries plaintiffs may have incurred because of defendants' alleged failure to support CMDX or various clearinghouses is highly speculative, resting on a long list of uncertain predictions about future market developments. Denying plaintiffs standing also is unlikely to

leave a significant antitrust violation undetected or unaddressed.  Not only did the Antitrust Division of the U.S. Department of Justice ("DOJ") commence an investigation of the same allegations in July 2009 (CAC ¶¶ 17, 207), but the complaint also identifies numerous private parties (most notably, CME and Citadel) that supposedly were injured directly and that had the sophistication, resources and incentives to sue if they believed antitrust violations had occurred.  Under these circumstances, the fact that no other lawsuits have been filed under U.S. antitrust law underscores the weakness of plaintiffs' claims.  *See infra* Part I.

2.      Plaintiffs fail to plead facts sufficient to support an inference of an anticompetitive agreement in violation of Section 1 of the Sherman Act, particularly a "scheme" that supposedly has spanned more than six years, involved each of the defendants and encompassed all of the miscellaneous conduct described in the complaint.  Under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and their progeny, plaintiffs must allege facts—not simply labels and legal conclusions—that tend to exclude the possibility that the alleged conspirators acted independently.  Plaintiffs cannot satisfy that pleading burden by making generalized allegations directed at the twelve "Dealer Defendants" as an undifferentiated and indistinguishable group or by alleging that the dealer-defendants had an opportunity to conspire at various non-public board and risk committee meetings.  Where, as here, all of the alleged conduct is more consistent with lawful individual decisions by firms acting in their own self-interests than with plaintiffs' conclusory assertions of unlawful conspiratorial behavior, a Section 1 claim cannot survive.  *See infra* Part II.

3.      Plaintiffs cannot state a "conspiracy to monopolize" claim under Section 2 of the Sherman Act by pointing to the dealer-defendants' "collective market shares" and arguing that they conspired to create a "shared monopoly."  Such a claim arises only from concerted action

intended to produce an unlawful monopoly by a *single* firm. Plaintiffs do not allege that the dealer-defendants' alleged conduct was intended to result in a single firm's acquisition of monopoly power. *See infra* Part III.

4.      Plaintiffs cannot proceed with antitrust claims based on alleged conduct that occurred before May 3, 2009. Even under plaintiffs' own theory of the case, no exchange trading of CDS could have occurred until some point *after* March 13, 2009—the date on which CMDX completed the U.S. regulatory review process of its clearing and RFQ proposals, precursors to any exchange platform. As a result, plaintiffs cannot allege injury-in-fact before that date. Moreover, any claims based on conduct alleged to have occurred before May 3, 2009 are barred by the Clayton Act's four-year statute of limitations. Plaintiffs' contention that this statute of limitations was tolled for more than five years based on defendants' alleged fraudulent concealment of their conspiracy is implausible and non-particularized under Federal Rule of Civil Procedure 9(b). *See infra* Part IV.

5.      In enacting Title VII of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank")—which governs the conduct of CDS dealers and mandates rules for CDS trading and clearing—Congress implicitly precluded application of the antitrust laws to the conduct challenged by plaintiffs after the July 21, 2011 effective date of that statute. Congress gave the Securities and Exchange Commission ("SEC") and Commodity Futures Trading Commission ("CFTC") comprehensive and discretionary regulatory authority over CDS trading and clearing, including *whether and under what circumstances CDS may be traded on exchanges*. Consistent with Congress' aim to give those two agencies plenary authority, plaintiffs' claims based on conduct after July 21, 2011 should be dismissed. *See infra* Part V.

6. Plaintiffs' two-paragraph unjust enrichment claim simply duplicates their legal causes of action under federal antitrust law and should be dismissed. *See infra* Part VI.

## BACKGROUND

### A. Credit Default Swaps

CDS contracts transfer credit exposure on a specific reference entity (such as a debt instrument issued by a corporation or a government entity) or a reference portfolio (a bundle of such debt instruments), and thus offer financial-market participants the ability to, among other things, hedge their credit risks. (CAC ¶ 2.) There are two general categories of CDS: (i) single-name CDS contracts based on debt instruments issued by a single corporate or government entity, and (ii) CDS indices based on a portfolio, or index, of debt issuers. (*Id.* ¶ 82.) The two families of CDS indices at issue in this case—the iTraxx and CDX indices—were created in 2004 by many of the dealer-defendants and later sold to Markit. (*Id.*)

At first, CDS trading was ad hoc, and CDS contracts were negotiated bilaterally by the parties, resulting in highly tailored contracts. (*Id.* ¶ 74.) One of the transaction costs of CDS trading was "the cost of searching for a counterparty willing to take the other side of a trade—that is, a party willing to buy the protection the investor wanted to sell (or *vice versa*)." (*Id.*) The complaint alleges that "[i]n response to this 'matching' problem, 'market makers' emerged to match buyers and sellers of CDS." (*Id.*) Referred to as the "sell-side," market makers "sell to buyers, buy from sellers, and hold inventory until a matching offer emerges." (*Id.* ¶¶ 74-75.)

The complaint alleges that CDS investors, referred to as the "buy-side," desire "liquidity"—*i.e.*, "the ability (ideally) to trade at the market bid or offer without having to wait for a counterparty to come along who is willing to transact." (*Id.* ¶ 75.) Market makers provide that liquidity by agreeing to transact immediately with investors and to bear market risk by holding CDS in inventory until a matching counterparty emerges. (*Id.*) As late as the early

2000s, the lack of many buyers and sellers of CDS created "an acute need" for such market makers. (*Id.* ¶ 78.)

## B. The Parties

According to the complaint, the twelve dealer-defendants are "the primary market makers for CDS." (*Id.* ¶ 75.) Defendant ISDA is an industry trade association that "represent[s] hundreds of financial institutions involved in the derivatives market." (*Id.* ¶ 58.) ISDA's "members include a broad range of OTC derivatives market participants including corporations, investment managers, government and supranational entities, insurance companies, energy and commodities firms, and international and regional banks." (ISDA, *About ISDA*, http://www2.isda.org/about-isda/ (cited at CAC ¶ 127 n.7).)[2] Defendant Markit is a private financial information company, partially owned by certain of the dealer-defendants, that owns the iTraxx and CDX CDS indices and the Reference Entity Database or "RED" codes. (CAC ¶¶ 61, 120, 121.)[3] Plaintiffs allege that they are "buy-side" investors—including several "significant participants in the CDS market"—that entered into CDS transactions with one or more of the dealer-defendants since January 1, 2008. (*See id.* ¶¶ 3, 24, 26, 27, 33, 34, 40.)

## C. The Financial Crisis and Regulators' Efforts To Establish a Central CDS Clearinghouse

Because CDS contracts require the protection buyer to "make[] periodic payments" to the protection seller and obligate the protection seller to "make the buyer whole" if a "credit event"

---

[2] In deciding a motion to dismiss, the Court may consider "documents appended to the complaint or incorporated in the complaint by reference, as well as matters [subject to] judicial notice.'" *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.,* 155 F.3d 59, 67 (2d Cir. 1998). For the Court's convenience, copies of congressional testimony, corporate press releases and publicly-available books and articles cited herein are included as exhibits to the Declaration of Richard C. Pepperman II, which is being filed contemporaneously with this brief.

[3] RED codes are unique alphanumeric identifiers, analogous to CUSIP numbers for other securities, that are "widely used in the CDS market to identify the reference entity" for single-name CDS. (CAC ¶ 121.)

occurs (*id.* ¶ 70), the parties to a CDS trade have continuing obligations to one another during the term of the contract. This subjects each party to "counterparty risk"—the risk that the other party to the contract will not make a payment when due.

Counterparty risk can be somewhat mitigated in bilaterally negotiated OTC transactions because each party knows the identity of its counterparty and thus can assess that party's creditworthiness. By 2008, however, many industry participants, including certain of the dealer-defendants, had begun to consider ways to reduce counterparty risk further by creating a central clearinghouse for CDS transactions. Such a central counterparty would stand between the parties to a CDS trade, being the buyer to the CDS seller and the seller to the CDS buyer. By standing in the middle, a clearinghouse can "reduce the risks to the financial system from the failure of any of the parties to these trades." (Robert E. Litan, *The Derivative Dealers' Club and Derivatives Markets Reform: A Guide for Policy Makers, Citizens and Other Interested Parties* at 12, BROOKINGS INST. (Apr. 7, 2010) (cited at CAC ¶ 179 n.31).) Moreover, if parties have multiple offsetting trades, a clearinghouse is "able to 'net' the different positions against each other" and thus "reduce[] the overall 'gross' exposure of the clearinghouse relative to the total of the gross bilateral exposures of the parties to each other in the absence of a central clearinghouse." (*Id.*)

After the collapse of Bear Stearns in March 2008, the Federal Reserve Bank of New York ("FRBNY") intensified its efforts to encourage the leading CDS dealers to establish a central clearinghouse to reduce systemic risk in the CDS marketplace. (CAC ¶ 114.) The concern about systemic risk took on even greater urgency after Lehman Brothers, another large CDS dealer, filed for bankruptcy on September 15, 2008. "In the midst of the turmoil, regulators ordered banks to speed up plans—long in the making—to set up a clearinghouse to handle derivatives

trading." (Louise Story, *House Advantage; A Secretive Banking Elite Rules Trading in Derivatives*, N.Y. TIMES at 4 (Dec. 12, 2010) (cited at CAC ¶ 8 n.2).)

The FRBNY convened two widely attended meetings in October 2008 to urge industry participants, particularly dealers, to accelerate efforts to create a central CDS clearinghouse. (*See* CAC ¶ 131.) The FRBNY publicly announced that it was meeting "with banks and institutional investors . . . to discuss establishing a central counterparty for the global credit default swap market." (Ciara Linnane & Karen Brettell, *Update 2 - NY Federal Reserve Pushes for Central CDS Counterparty*, REUTERS (Oct. 6, 2008) (cited at CAC ¶ 130 n.8).) Representatives of the SEC and CFTC also attended these meetings. The SEC announced that it was "participating in discussions . . . to create a central counterparty (CCP) for credit default swaps." *Hearing To Review the Role of Credit Derivatives in the U.S. Economy: Hearing Before the H. Comm. on Agric.*, 110th Cong. 15 (2008) (statement of Eric R. Sirri, Director, Division of Trading and Markets, SEC) (cited at CAC ¶ 106 n.3). The CFTC stated that it, "in conjunction with other financial regulators, will continue to seek ways to provide clearing solutions for OTC derivatives." *Hearing To Review the Role of Credit Derivatives in the U.S. Economy: Hearing Before the H. Comm. on Agric.*, 110th Cong. 6-7 (2008) (statement of Walter Lukken, Acting Chairman, CFTC) (cited at CAC ¶ 106 n.4).

These efforts culminated in a meeting on October 10, 2008, at which the assembled regulators heard presentations from four potential CDS clearinghouses: Eurex, NYSE Euronext, CME/Citadel and ICE/The Clearing Corporation ("TCC"). (*See* CAC ¶ 131.) TCC was "a dealer-owned clearing house" that "expect[ed] to have the required regulatory approvals and systems in place to launch a clearing platform by the end of the year." (Linnane & Brettell, *supra* at 2.) Because of concern that dealer ownership of the central clearinghouse would

increase systemic risk, the FRBNY encouraged the dealers to dispose of their interest in TCC. The dealers addressed this concern by selling TCC to ICE, a publicly traded "operator of regulated futures exchanges and over-the-counter markets and derivatives clearing houses." (CAC ¶ 66.) Over the next several months, "in responding to the New York Fed's entreaties to work for a better derivatives world, the dealers . . . necessarily met and worked together." (Litan, *supra* at 30.) As a result of those efforts, "ICE Clear began operating as a central counterparty clearing facility for CDS" in March 2009. (CAC ¶ 65.)

"The New York Fed and the [CFTC] completed their pre-launch reviews of CMDX and CME Clearing on December 23, 2008." (Peter Madigan, *Abuse of Power?*, RISK MAG. (Sept. 2013) (cited *sub nom. SEFs and Exchanges Echo EC's CDS License Complaints*, at CAC ¶ 150 n.17).) And CMDX received licenses from ISDA and Markit in early March 2009 for both clearing and RFQ trading (*see* CAC ¶ 143), the only licenses CMDX had requested.[4] "In September of 2009, CME restructured CMDX into a clearing-only platform called CME Clearing." (*Id.* ¶ 154.) As the *New York Times* later reported, "Kim Taylor, the president of [CME's] clearing division, said 'the market' simply wasn't interested in [Citadel's] idea" of a CDS exchange. (Story, *supra* at 7.) CME's press release announcing the September 2009 restructuring similarly emphasized the widespread lack of marketplace demand for a trading platform, including a lack of demand from "buy-side" entities included in plaintiffs' putative class:

> Over the past several months, we have been working closely with all market participants. As a result of this collaborative process, we have refocused our offering to provide clearing-only services. *Both buy-side and sell-side participants have expressed an interest in continuing to execute their CDS*

---

[4] Citadel expected "that initial trading on the platform would see CDS traders negotiating deals via CMDX's 'request for quote' model." (Dow Jones Wire, *CME Sees Up to Six Dealers Backing Credit Swaps Platform*, FIN. NEWS (Dec. 23, 2008) (cited at CAC ¶ 132 n.9).) Citadel envisioned that CMDX later would offer exchange trading. (*See* CAC ¶ 110.)

*transactions the same as they do today*, but with the added benefit of central counterparty clearing.[5]

Three months after this restructuring, "CME Clearing cleared its first trade in December 2009." (CAC ¶ 162.) When it launched, CME's clearing venture included "Barclays, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, JP Morgan, Morgan Stanley and UBS." (*Id*. ¶ 155.)

### D.    The Enactment of Dodd-Frank

The financial crisis also prompted Congress to consider legislation, among other things, to regulate CDS clearing and trading. In June 2009, the President sent a series of proposed bills to Congress. A version of the legislation was introduced in the House of Representatives in July 2009, and revised versions were introduced in the House and Senate Banking Committee in December 2009. Dodd-Frank was signed into law on July 21, 2010, and became effective, in relevant part, on July 21, 2011. (CAC ¶ 176.) Among other things, Dodd-Frank established a comprehensive regulatory framework for derivatives transactions, including the clearing and trading of CDS and the oversight of CDS dealers.

### E.    Plaintiffs' Claims

Plaintiffs assert three causes of action: (i) a conspiracy to restrain trade in violation of Section 1 of the Sherman Act (*id*. ¶¶ 230-233), (ii) a conspiracy to monopolize in violation of Section 2 (*id*. ¶¶ 234-239), and (iii) unjust enrichment in violation of state law (*id*. ¶¶ 240-242).

The complaint alleges that defendants violated federal antitrust law by collectively blocking the efforts of CMDX to introduce "an open, anonymous exchange for the trading of CDS indices and some single-name CDS using, like most exchanges," a central limit order book or "CLOB." (*Id*. ¶ 110.) Because anonymous CLOB *trading* does not allow transacting parties

---

[5] Press Release, CME Group, *CME Group Opens Credit Default Swaps Initiative to Additional Partners and Focuses Solution on Clearing Services* (Sept. 18, 2009), http://investor.cmegroup.com/investor-relations/releasedetail.cfm?ReleaseID=410137 (emphasis added) (quotations omitted).

to evaluate each other's credit risk, plaintiffs acknowledge that central CDS *clearing*—which did not exist in 2008—was a necessary "first step leading to exchange . . . trading of OTC products." (*Id*. ¶ 148 (citation omitted).) Although a central clearinghouse does not by itself permit anonymous trading, plaintiffs allege that a clearinghouse was necessary to "lay[] the groundwork for a full-blown exchange by bringing buyers and sellers to a centralized platform, creating the infrastructure for the processing of trades, and removing the necessity of case-by-case creditworthiness assessments." (*Id*. ¶ 13.)

Plaintiffs contend that the dealer-defendants effectuated their alleged conspiracy by directing Markit and ISDA to deny CMDX intellectual property licenses that would have authorized CMDX to trade the iTraxx and CDX indices on a CLOB (*id*. ¶ 140) and by favoring ICE's clearinghouse over that of CMDX and its co-owner CME (*id*. ¶ 162). Plaintiffs also assert that the dealer-defendants failed to support other potential CDS clearinghouses, which plaintiffs say might have laid "the infrastructure and create[d] a platform that would lead to exchange trading" of CDS. (*Id*. ¶ 148.)

In claiming that they suffered injury, plaintiffs speculate that if the dealer-defendants had supported the clearinghouse proposal of CMDX—and if Markit and ISDA had granted licenses to CMDX that authorized CLOB trading—then CMDX would have become a full-blown clearinghouse and exchange by the end of 2008, resulting in a cascading series of market developments that would have enabled plaintiffs to receive better net prices on their CDS trades than they actually negotiated with the dealer-defendants over a more than six-year period. (*Id.* ¶¶ 10, 108, 120, 158, 221.)

# ARGUMENT

## I. Plaintiffs Lack Standing To Pursue Their Antitrust Claims.

Even when it is likely that a plaintiff has not stated a claim, a "threshold" question in any antitrust case is whether the plaintiff has "antitrust standing" to bring the action. *Gatt Commc'ns, Inc. v. PMC Assocs. L.L.C.*, 711 F.3d 68, 75-80 (2d Cir. 2013) (dismissing case on "threshold question of antitrust standing" even though "it [was] not clear" that plaintiffs had stated a claim). To have standing, a plaintiff must be "an 'efficient enforcer' of the antitrust laws" that is "suitable . . . to pursue the alleged antitrust violations." *Id.* at 78. "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *AGC*, 459 U.S. at 534. As a result, "[e]ven if a plaintiff adequately alleges an antitrust injury, it may still be held to lack standing." *Paycom*, 467 F.3d at 290; *see also Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 443 (2d Cir. 2005) ("A showing of antitrust injury is necessary, but not always sufficient, to establish standing.") (internal quotation marks omitted).

The Second Circuit has identified four factors to be applied in determining whether a particular plaintiff is an "efficient enforcer" of the antitrust laws:

> "(1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries."

*Gatt*, 771 F.3d at 78 (quoting *Paycom*, 467 F.3d at 290-91). A plaintiff's failure to satisfy "any of [these] factors" can be fatal to antitrust standing. *Balaklaw v. Lovell*, 14 F.3d 793, 797 n.9 (2d Cir. 1994); *see also Daniel*, 428 F.3d at 443 ("[T]he weight to be given the various factors will necessarily vary with the circumstances of particular cases.").

In *Paycom*, the Second Circuit held that the plaintiff lacked antitrust standing in circumstances similar to those here. In that case, the merchant plaintiff (Paycom) challenged MasterCard's competitive programs policy ("CPP"), which prohibited MasterCard's member banks from issuing any competing credit cards other than Visa cards. 467 F.3d at 288. Paycom complained that the CPP foreclosed competition from rival credit card networks Discover and American Express and thus permitted MasterCard to impose higher interchange fees and more onerous rules on merchants. *Id*. In earlier litigation brought by the DOJ, the CPP was found to violate Section 1 by unreasonably restraining potential competition from Discover and American Express. *Id*. at 288-89. Despite this ruling, the Second Circuit held that Paycom lacked antitrust standing because (i) any injury suffered by Paycom was indirect and flowed from the injuries suffered by Discover and American Express, (ii) the other more direct victims—Discover and American Express—and the DOJ could remedy any antitrust violation, (iii) Paycom's alleged damages were highly speculative, and (iv) it would be difficult to apportion damages between the more direct victims and Paycom, which might have been harmed indirectly. *Id*. at 293-94. The Second Circuit held that "Paycom [was] not an 'efficient enforcer'" of the antitrust laws "[e]ven though [it] recognize[d] that Paycom, as a consumer of payment card network services, [was] a participant in the relevant market." *Id*. at 293.

Applying the four "efficient enforcer" factors in the instant action, it is clear that plaintiffs here, like Paycom, lack standing to assert their antitrust claims.

### A.    Plaintiffs' Claimed Injuries Are Indirect.

In applying the first factor, the question is not whether plaintiffs and defendants interacted directly with each other, but whether plaintiffs' alleged "injuries were only an indirect result of whatever harm may have been suffered" by others. *AGC*, 459 U.S. at 541. The complaint ties plaintiffs' alleged injuries solely to what supposedly would have happened "if

CDS had been traded on an exchange." (CAC ¶ 190.) As in *Paycom*, where "any injury suffered by Paycom was indirect and flowed from the injuries suffered by Discover and American Express," 467 F.3d 293, the injury plaintiffs claim here also was indirect and flowed from the injuries allegedly suffered by CMDX and various potential clearinghouses that the dealer-defendants supposedly excluded from the marketplace. Because plaintiffs' alleged injuries are "at best, merely 'derivative' of the direct injury suffered by" CMDX and the other potential CDS clearinghouses, those injuries do not satisfy the first element of antitrust standing. *Boyd v. AWB Ltd.*, 544 F. Supp. 2d 236, 250 (S.D.N.Y. 2008) (quoting *AGC*, 549 U.S. at 541 n.46); *see also IBM Corp. v. Platform Solutions, Inc.*, 658 F. Supp. 2d 603, 612 (S.D.N.Y. 2009) (holding that computer seller's injuries from IBM's denial of software licenses to mainframe and server manufacturers were too indirect for standing).

### B. Other More Efficient Enforcers of the Antitrust Laws Exist.

"The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party . . . to perform the office of a private attorney general." *AGC*, 459 U.S. at 542. As in *Paycom*, denying standing to plaintiffs here is "'not likely to leave a significant antitrust violation undetected or unremedied.'" 467 F.3d at 294 (quoting *AGC*, 459 U.S. at 542).

The complaint identifies multiple private parties whose own economic self-interest clearly would have motivated them to bring an antitrust action if they believed that they were victims of a Sherman Act violation. According to plaintiffs, Citadel and CME invested millions of dollars to develop, build and test CMDX, and they projected that CMDX would earn close to $500 million in revenues annually. (*Id.* ¶¶ 113, 132.) As far back as December 2010, Citadel's CEO spoke with the press about the demise of CMDX and his belief that key players in the CDS

marketplace were resistant to change. (Story, *supra* at 9.) If Citadel or CME believed that defendants had unlawfully impeded CMDX's launch of a CDS exchange or clearing platform, they surely would have been motivated to commence an antitrust action. Likewise, if Eurex Clearing, NYSE Euronext or any other potential CDS clearinghouse believed that defendants had unlawfully hindered their potential entry into the marketplace, they, too, would have had a powerful incentive to sue. (*See id*. ¶¶ 161, 165, 166.) Finally, plaintiffs acknowledge that the DOJ publicly announced in July 2009 that it was investigating defendants' conduct in the CDS marketplace. (*Id*. ¶ 17.).[6]

The fact that the alleged *direct* victims of defendants' purported restraint have not commenced litigation is telling. As the Supreme Court observed, "if there is substance to [plaintiff's] claims, it is difficult to understand why [the] direct victims of the conspiracy have not asserted any claim in their own right." *AGC*, 459 U.S. at 542 n.47. The Second Circuit similarly has stressed that a direct victim's silence suggests that "the facts were other than as alleged by plaintiff." *Gatt*, 711 F.3d at 79; *see also Daniel*, 428 F.3d at 444 (absence of action by direct victims "reinforces the conclusion that no public interest is sacrificed by dismissing this action"). Given their legal sophistication, substantial resources and clear economic self-interest, firms like Citadel, CME, Eurex Clearing and NYSE Euronext would have had ample incentive to pursue an antitrust claim and potential treble damages if a viable claim existed. *See* Phillip Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law*, § 3.01[C], at 3-10 (4th ed. Supp.

---

[6] Plaintiffs note that the European Commission filed a Statement of Objections in July 2013. (CAC ¶ 18.) But they do not assert, nor can they, that European competition law is relevant to the analysis of antitrust claims under the Sherman Act. Plaintiffs also fail to acknowledge that the Statement of Objections represents nothing more than the Commission's initial position, not a final decision. The addressees of the Statement of Objections have an opportunity to respond, and then the Commission may conduct further proceedings before issuing a ruling, which then would be appealable.

2013) ("If the 'superior' plaintiff has not sued, one may doubt the existence of any antitrust violation at all.").

### C. Plaintiffs' Claimed Injuries Rest on a Highly Speculative Chain of Causation.

The extent of any losses that plaintiffs claim they have incurred as a result of defendants' alleged failure to support CMDX and various clearinghouses is "also highly speculative," resting on a long and conclusory list of predictions about future marketplace developments that plaintiffs posit "would have" occurred but for defendants' alleged conduct. *Paycom*, 467 F.3d at 293. Plaintiffs allege:

> But for the Dealer Defendants' conduct in preventing CMDX from opening as planned in 2008, CDS trade volume *would have* increased and spreads *would have* narrowed for CDS. Plaintiffs and the Class *would have* traded CDS with narrower spreads, and the exchange *would have* provided them more CDS trading partners and greater CDS liquidity—which, in turn, *would have* narrowed spreads further.

(CAC ¶ 158 (emphasis added).)

As in *Paycom*, where the Second Circuit rejected similarly attenuated allegations about what "would have" happened in the absence of the challenged conduct as too speculative to confer standing, 467 F.3d at 293, plaintiffs' theory of injury here is also highly speculative. It depends on a complicated series of market interactions involving the actions of innumerable individual decision-makers, including defendants, other CDS dealers, large "buy-side" firms, the nascent exchanges and clearinghouses, and various regulatory authorities. *See Reading Indus., Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 13 (2d Cir. 1980) (denying antitrust standing in light of plaintiff's speculative injuries); *see also AGC*, 459 U.S. at 543 (denying standing when alleged injury "rests at bottom on some abstract conception or speculative measure of harm").

As the complaint makes clear, plaintiffs rely on a wholly speculative chain of causation about what "would have" happened if the dealer-defendants had supported every proposed

clearinghouse other than ICE or if Markit and ISDA had granted CMDX intellectual property

licenses that would have enabled CMDX to attempt CLOB trading of CDS:

- *If* the dealer-defendants had supported clearinghouse proposals other than ICE in the fall of 2008, then plaintiffs hypothesize that those proposals *would have* developed into successful CDS clearinghouses;

- *If* other successful CDS clearinghouses had emerged, then plaintiffs hypothesize that those clearinghouses *would have* laid "the groundwork for a full-blown exchange by bringing buyers and sellers to a centralized platform, creating infrastructure for the processing of trades, and removing the necessity of case-by-case creditworthiness assessments" (CAC ¶ 13);

- *If* that groundwork had been laid, then plaintiffs hypothesize that a CDS exchange such as the one proposed by CMDX *would have* launched successfully at the end of 2008 during the height "of the worst financial crisis since the Great Depression of the 1930s" (*id.* ¶ 1);

- *If* a CDS exchange had launched at the end of 2008, then plaintiffs hypothesize that that exchange immediately *would have* expanded to cover all CDS purchased or sold by plaintiffs and members of the putative class, even though the complaint alleges that CMDX planned to launch CLOB trading of only the major CDX and iTraxx indices and some specific single-name CDS (*id.* ¶¶ 115, 120);

- *If* a CDS exchange had expanded to cover all CDS, then plaintiffs hypothesize that CDS trading through the exchange *would have* created greater competition on all CDS bid/ask spreads (*id.* ¶ 108);

- *If* the CDS exchange had created greater competition on all CDS bid/ask spreads, then plaintiffs hypothesize that CDS trade volume *would have* increased, and all CDS spreads *would have* narrowed (*id.* ¶ 158);

- *If* CDS trade volume had increased and all CDS spreads had narrowed, then plaintiffs hypothesize that the CDS exchange *would have* provided plaintiffs and putative class members with more CDS trading partners and greater CDS liquidity (*id.*); and

- *If* the CDS exchange had provided greater CDS liquidity, then plaintiffs hypothesize that the exchange *would have* reduced credit risk inherent in OTC trading, *would have* substantially reduced the transaction costs paid by plaintiffs and *would have* provided plaintiffs with better net prices than they actually negotiated in individual transactions with twelve different dealers over a more-than-six-year proposed class period, starting a year before the CDS exchange supposedly was ready to launch (*id.* ¶¶ 10, 221).

Plaintiffs advance this speculative chain of causation even though a contemporaneous

analyst report on which they rely observed in October 2008 that "a full-fledged exchange model

will likely generate little enthusiasm in the industry" and that "many CDS are illiquid or customized and might be challenging to move to an exchange-like environment." (Barclays Capital Equity Research, *Exchange-Traded CDS Has Several Hurdles* at 2 (Oct. 8, 2008) (cited at CAC ¶ 118 n.6).) Given the untested nature of exchange trading of CDS at a time when the financial markets were in extreme distress, it is impossible to predict what "would have" happened to CDS pricing if the dealer-defendants had supported a clearinghouse other than ICE or if Markit and ISDA had granted intellectual property licenses that permitted CMDX to introduce CLOB trading of CDS. *See Paycom*, 467 F.3d at 293 ("No one can state that, absent the CPP, increased competition from Discover and American Express would have forced MasterCard to adopt policies more favorable to Paycom.").

The speculative injuries alleged here differ greatly from the overcharge alleged in *In re DDAVP Direct Purchaser Antitrust Litigation*, 585 F.3d 677 (2d Cir. 2009), a case in which the Second Circuit found antitrust standing. Plaintiffs there alleged that defendants "abused the patent system to unlawfully maintain a monopoly over DDAVP," a patented prescription medication. *Id*. at 682. They asserted that this conduct "inflated the price of DDAVP by suppressing generic competition for the tablets in violation of the antitrust laws." *Id*. In holding that plaintiffs, purchasers of defendants' product who allegedly were forced to pay supra-competitive prices as a result of defendants' elimination of generic competition, had standing, the Second Circuit rejected defendants' argument that "plaintiffs' allegations rest upon tenuous assumptions about the beneficial effects of generic competition." *Id*. at 689. The court held:

> [T]hat generic manufacturers would have decided to compete for DDAVP sales is self-evident: manufacturers sought approval for generic DDAVP when the [relevant] patent was still enforceable. It may be difficult to account precisely for the likely effects of generic competition, but we have little doubt that those effects can be sufficiently estimated and measured here.

*Id*. Unlike this case, *DDAVP* involved a common form of potential competition between a single drug and a "generic version of the compound." *Id*. at 682. Plaintiffs here do not advance such a simple theory of harm. Their claimed injury rests on highly speculative competition from an entirely new and untested method of trading CDS that supposedly was poised to launch "during the period of the worst financial crisis since the Great Depression." (CAC ¶ 1.) The sheer amount of guesswork and conjecture required to assess the claimed injury and quantify the damages supposedly suffered by plaintiffs and the putative class strongly weighs against conferring standing upon them. *See Gross v. New Balance Athletic Shoe, Inc.*, 955 F. Supp. 242, 246 (S.D.N.Y. 1997) ("Plaintiffs' attempt to seek recovery for all consumers of New Balance athletic shoes during the alleged class period places their claim in the category of the type of indirect injury that is incapable of being quantified with any degree of economic certainty.").

## D. Plaintiffs' Claims Raise Complex and Difficult Problems of Quantifying and Apportioning Damages.

The fourth factor similarly weighs against conferring antitrust standing on plaintiffs. As in *Paycom*, "quantifying [plaintiffs'] damages would require wholesale speculation," and "it would be virtually impossible to apportion damages" between clearinghouses and exchanges, "which [allegedly] suffered direct injuries," and plaintiffs, which "might have been indirectly harmed." 467 F.3d at 294. Plaintiffs concede that "the market price for a given CDS product can change from one minute to the next." (CAC ¶ 95.) Accordingly, the fact finder would need to determine what the price would have been for each of the thousands of different single-name and index CDS trades between putative class members and the twelve dealer-defendants over a six-year period, if an exchange for CDS trading had emerged at the end of 2008.

To the extent that such damages even could be quantified, the fact finder then would need to deduct, in order to avoid duplicative recoveries, any fees or other charges that the

clearinghouses and exchanges would have imposed in plaintiffs' but-for world, such as clearing

fees, exchange fees, initial and daily margin requirements, potential connectivity fees and, at

least for non-members, brokerage fees. *See Gross*, 955 F. Supp. at 246-47 (dismissing

complaint, in part, because "independent pricing decisions of non-conspiring retailers" made

damages apportionment too difficult.)[7]  "[S]uch a damages inquiry would involve 'massive

evidence and complicated theories' of causation that strongly weigh against a finding of antitrust

standing." *Boyd*, 544 F. Supp. 2d at 251 (S.D.N.Y. 2008) (quoting *Blue Shield of Va. v.

McCready*, 457 U.S. 465, 475 n.11 (1982)); *see also IBM*, 658 F. Supp. 2d at 613 (noting

difficulty in apportioning damages between parties directly denied license and customers of

those parties).

## II.     Plaintiffs Fail Plausibly To Allege Each Defendant's Participation in a Conspiracy To Restrain Trade in Violation of Section 1.

In addition to plaintiffs' lack of antitrust standing, their Section 1 claim should be

dismissed for failure adequately to plead a plausible conspiracy among twelve differently

situated dealer-defendants over a six-year period encompassing a variety of supposedly

anticompetitive conduct.  In *Twombly*, the Supreme Court held that a plaintiff's obligation under

Rule 8 "requires more than labels and conclusions, and [that] a formulaic recitation of the

elements of a cause of action will not do."  550 U.S. at 555.  The Court also stated that Rule 8

"requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Id*. at 555 n.3.  As

the Court later reaffirmed in *Iqbal*, "only a complaint that states a *plausible* claim for relief

survives a motion to dismiss."  556 U.S. at 679 (emphasis added).  "[W]here the well-pleaded

facts do not permit the court to infer more than the mere possibility of misconduct, the complaint

---

[7] Again, the complexity in this case stands in stark contrast to *DDAVP*, which involved a single prescription drug, the certainty of generic competition and what the Second Circuit viewed as a need only to allocate damages "between lost profits and overcharges" relating to that drug.  585 F.3d at 689.

has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). The Court emphasized that dismissal of complaints that fail to meet these requirements promotes judicial economy and eliminates the unwarranted burden and expense of discovery. *Id.* (Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

These fundamental pleading principles require dismissal of plaintiffs' Section 1 claim. The complaint fails to provide each dealer-defendant with fair notice as to the "anticompetitive agreement(s)" into which each is alleged to have entered, including when it supposedly did so, how and with whom. The complaint also fails to plead sufficient facts that, if true, would plausibly tie any particular dealer to the alleged long-running conspiracy. Plaintiffs instead offer only conclusory allegations that the "Dealer Defendants" as an undifferentiated collective attended various board and committee meetings, did not support CMDX's clearing and exchange proposals in the fall of 2008, and later acted in parallel in clearing trades through ICE. But the mere opportunity to conspire is insufficient to withstand a motion to dismiss, and any parallel conduct by any of the dealers just as plausibly could have been the product of legitimate business decisions made in the context of the 2008 financial crisis and the attendant regulatory developments at that time. Because plaintiffs have not sufficiently pleaded each dealer-defendant's participation in an unlawful conspiracy, their Section 1 claim should be dismissed now, before discovery begins. *Mayor & City Council of Balt., Md. v. Citigroup, Inc.*, 709 F.3d 129, 137 (2d Cir. 2013) ("*Citigroup*") (declining to "propel[] defendants into expensive antitrust discovery on the basis of acts that could just as easily turn out to have been rational business behavior as they could a proscribed antitrust conspiracy").

**A.      Plaintiffs' Generic References to the "Dealer Defendants" Are Insufficient.**

A complaint that describes a conspiracy in "general terms without any specification of any particular activities by any particular defendant" is "nothing more than a list of theoretical possibilities, which one could postulate without knowing any facts whatever."  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50-51 (2d Cir. 2007) (citation omitted).  Thus, to survive a motion to dismiss, a plaintiff must plausibly allege that each of the defendants, "*in their individual capacities*, consciously committed themselves to a common scheme designed to achieve an unlawful objective."  *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999) (emphasis added).  A complaint must offer "specifics with respect to the acts of [each] particular defendant," *In re Parcel Tanker Shipping Servs. Antitrust Litig.*, 541 F. Supp. 2d 487, 491 (D. Conn. 2008), including the "specific time, place, or person involved in the alleged conspiracies," *Twombly*, 550 U.S. at 565 n.10.  A plaintiff may not "attribut[e] all actions to the Defendants collectively," while failing "to differentiate among [them]" and failing "to identify" how each "particular Defendant [is] alleged to have acted."  *Two Old Hippies, LLC v. Catch the Bus, LLC*, 784 F. Supp. 2d 1200, 1218 (D.N.M. 2011).

Rather than attempting to plead facts establishing each dealer's conscious commitment to the alleged anticompetitive scheme, the complaint here improperly lumps all twelve dealer-defendants together as a single monolith and accuses them collectively of exactly the same conspiratorial conduct, performed with exactly the same intent, notwithstanding their widely varying sizes as CDS market-makers and their widely varying circumstances during the financial crisis.  Plaintiffs allege, for example, that all of the "Dealer Defendants" "discussed how to prevent CMDX from entering the market and agreed to do so" (CAC ¶ 138), "secretly conspired to squash th[e] threat" posed by an electronic exchange (*id.* ¶ 11) and "conspired to defend the inefficient market structure they had cultivated" (*id.*).  Putting aside that such allegations are

naked legal conclusions "disentitle[d] . . . to the presumption of truth," *Iqbal*, 556 U.S. at 681, they also omit "any specification of any particular activities by any particular defendant" and, as such, are "nothing more than a list of theoretical possibilities" that "could [have been] postulate[d] without knowing any facts whatever." *Elevator Antitrust Litig.*, 502 F.3d at 50-51; *see also Parcel Tanker Shipping Servs.*, 541 F. Supp. 2d at 491-92 (the "lack of specifics with respect to the acts of a particular defendant or defendants renders the complaint inadequate [under *Twombly*]").

While such "group pleading" is inadequate in any case, it is especially so here. Plaintiffs' failure to distinguish among the twelve dealer-defendants masks important differences among them that render plaintiffs' allegations of a common anticompetitive "scheme" over a six-year period inherently implausible. Plaintiffs cannot satisfy their pleading burden merely by listing which dealer-defendants were Markit or ICE shareholders or had representatives on various boards or committees, and thereafter referring to the "Dealer Defendants" indistinguishably as a group. Even based on the complaint's allegations, differences among the dealer-defendants abound. For example, some were represented on ICE's risk committee; others were not. (CAC ¶ 65.) Some were represented on DTCC's board; others were not. (*Id.* ¶ 92.) Some owned equity in ICE; others did not. (*Id.* ¶ 64.) Some became founding members of CME's clearinghouse; others did not. (*Id.* ¶ 155.)

The complaint also lacks any non-conclusory allegations regarding the "specific time, place, or person involved," *Twombly*, 550 U.S. at 565 n.10, or the remotest suggestion of how each "particular Defendant [is] alleged to have acted" at any meetings, *Two Old Hippies*, 784 F. Supp. 2d at 1218. Plaintiffs bear the burden of putting each of the dealer-defendants on notice as to how they, "in their individual capacities, consciously committed themselves to a common

scheme designed to achieve an unlawful objective." *AD/SAT*, 181 F.3d at 234. Plaintiffs have

not done so here. *See Twombly*, 550 U.S. at 565 n.10 ("[T]he complaint here furnishes no clue

as to which of the four [defendants] (much less which of their employees) supposedly agreed, or

when and where the illicit agreement took place.").

### B. The Mere Opportunity To Conspire Is Insufficient.

Plaintiffs' Section 1 claim is not advanced by allegations that certain dealers were

members of ISDA or shareholders of Markit and that therefore representatives of those dealers

"likely" attended meetings "under the auspices" of those organizations at which unspecified

anticompetitive agreements supposedly were reached. (CAC ¶¶ 138-39.) The "mere opportunity

to conspire" at such meetings "does not by itself support the inference that . . . an illegal

combination actually occurred." *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.,*

*Inc.*, 996 F.2d 537, 545 (2d Cir. 1993). Courts thus routinely hold that membership in a trade

association and participation on a board of directors are insufficient alone to create a plausible

inference of a conspiracy. *Twombly*, 550 U.S. at 567 n.12 (merely "belong[ing] to the same

trade guild as one['s] . . . competitors" does not render conspiracy plausible); *Sky Angel U.S.,*

*LLC v. Nat'l Cable Satellite Corp.*, 947 F. Supp. 2d 88, 102 (D.D.C. 2013) ("[M]erely pleading

that multiple entities hold positions on a board of directors does not establish a horizontal

agreement for purposes of Section 1."); *see also Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042,

1048 (9th Cir. 2008) (membership in association and participation on its board do not establish

horizontal agreement in violation of Section 1); *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 708

F. Supp. 2d 348, 362 (S.D.N.Y. 2010) ("mere presence at industry associations and meetings"

does not plausibly suggest an agreement).

Nor can plaintiffs save their Section 1 claim by asserting that some "Dealer Defendants"

(but not others) met in "secret" on the "third Wednesday of every month" under the "auspices"

of the obviously non-secret ICE clearinghouse's risk committee. (CAC ¶ 205.) To plead each individual dealer's participation in the alleged six-year conspiracy, *Twombly* and *Iqbal* require plaintiffs to do more than assert that unnamed individuals from certain dealers met in a non-public setting. *See Twombly*, 550 U.S. at 557; *Parcel Tanker Shipping Servs.*, 541 F. Supp. 2d at 491 (granting motion to dismiss where complaint referred to "clandestine meetings" among defendants but provided "no specific examples of the defendants' conduct in the meetings, other than general allegations of conspiracy"). What is required are well-pleaded facts establishing more than the "mere opportunity to conspire," because an opportunity "does not by itself support the inference that such an illegal combination actually occurred." *Capital Imaging Assocs.*, 996 F.2d at 545. "[C]lose relations or frequent meetings between the alleged conspirators" will not sustain a plaintiff's pleading burden absent factual allegations that "would permit the inference that those close ties led to an illegal agreement." *Oreck Corp. v. Whirlpool Corp.*, 639 F.2d 75, 79 (2d Cir. 1980).

Plaintiffs also allege that unspecified "Dealer Defendants" conspired to "channel almost all of the CDS they cleared through ICE Clear," the successor clearinghouse to the dealer-owned TCC, rather than to CME. (CAC ¶ 162.) The complaint's allegations regarding this supposed "agreement" are even more threadbare. Plaintiffs fail to identify, as they must, the dealer-defendants that supposedly entered into this alleged agreement, when and where it purportedly was formed, and how any dealer-defendant expressed its assent. Indeed, plaintiffs affirmatively allege that several dealer-defendants joined CME's clearinghouse as founding members and became members of its risk committee (*id.* ¶ 155), conduct inconsistent with a pre-existing agreement among all dealers to torpedo CME's clearing initiative by steering all clearing business to ICE.

### C. Allegations of Parallel Conduct Are Insufficient.

"Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Twombly*, 550 U.S. at 556-57. Parallel conduct is not sufficient to plead a conspiracy because such behavior may be "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Id*. at 554. A plaintiff thus must plead facts that "ten[d] to exclude independent self-interested conduct as an explanation for defendants' parallel behavior." *Id*. at 552 (internal quotation marks omitted).

Here, there are no factual allegations that the twelve dealer-defendants failed to compete with each other in their OTC trading of CDS (to the contrary, they compete fiercely). Nor is there any allegation that the dealer-defendants suddenly altered their prior conduct in any fashion. Instead, the complaint boils down to the assertion that at the height of the financial crisis, the "Dealer Defendants" as an undifferentiated group (i) failed to support CMDX's new, untested exchange platform for CDS trading that supposedly would have reduced their profitability, and (ii) promoted the CDS clearing proposal of ICE—the company that had purchased TCC, the clearinghouse developed by the dealers themselves—over other competing clearing proposals in response to the FRBNY's demand that the industry develop a central clearinghouse for CDS by the end of 2008. (*See* CAC ¶¶ 107-178.)[8]

---

[8] The complaint purports to describe certain dealer-defendant conduct related to the dissemination of various types of CDS pricing information (CAC ¶¶ 69-106), including that the dealers "do not publicly announce the prices at which they are willing to buy and sell CDS" (*id.* ¶ 88). But plaintiffs do not allege any specific agreement among the dealer-defendants in this area. Moreover, plaintiffs do not—and could not—allege that it would be in the unilateral self-interest of any dealer-defendant to disclose publicly its own real-time CDS prices. Plaintiffs concede that the buy-side in CDS trades "tend[s] not to want their trading and hedging strategies exposed." (*Id.* ¶ 170.) The same, of course, is true of the sell-side. As a result, there would be no basis to infer a conspiracy based on the dealer-defendants' alleged efforts to keep their pricing information confidential, even if plaintiffs had tried to allege such a conspiracy.

Plaintiffs fail plausibly to explain why collusion, as opposed to self-interested independent conduct, accounts for the challenged conduct. "[J]udicial experience and common sense" suggest that it does not. *Iqbal*, 556 U.S. at 679. Indeed, if plaintiffs' allegations about the profitability of OTC trading of CDS are accepted as true, there would be no reason for any dealer-defendant to support CMDX's exchange proposal. It also should come as no surprise that a dealer might independently decide not to embrace exchange trading of CDS during "the worst financial crisis since the Great Depression" (CAC ¶ 1), in the absence of substantial investor demand (Story, *supra* at 9), and in the face of legislative and regulatory developments that would materially alter the CDS marketplace. A host of independent self-interested reasons exist for such a business decision, including (i) a desire by CDS customers for OTC trading and the benefits of bilaterally negotiated transactions with known counterparties (CAC ¶¶ 74-78), (ii) the lack of a central clearing counterparty in 2008 (*id.* ¶ 150), (iii) the focus by regulators, such as the FRBNY, SEC and CFTC, on clearing, not execution, in 2008 and 2009 (*id.* ¶ 114), and (iv) the uncertain legal environment following the introduction and subsequent enactment of legislation overhauling the CDS industry in ways that no one could predict (*id.* ¶ 176).

Plaintiffs nowhere account for the impact of the financial crisis on investor appetite for credit risk, the willingness of investors to commit capital to new ventures in 2008 and 2009, the uncertainty created by multiple competing calls for legislative and regulatory restructuring of the derivatives markets, or a raft of other uncertainties. Plaintiffs allege that as of October 2008, just weeks after Lehman Brothers' collapse and the government's bailout of AIG—with several global financial institutions (including several dealer-defendants) rumored to be at risk of failure—CMDX's proposed CDS exchange somehow had "momentum." (CAC ¶ 132.) Plaintiffs therefore assert that it was contrary to the economic self-interest of any dealer-

defendant, especially those with small market shares, not to support CMDX. (*Id.* ¶¶ 116-118, 150-152.) In fact, the timing could not have been worse. There is no plausible basis for concluding that, at a time of unprecedented worry about counterparty credit risk, each dealer-defendant reasonably would have expected a groundswell of investor enthusiasm for anonymous exchange trading of CDS. Nor was late 2008 a propitious time for each dealer-defendant to assume the financial, reputational and operational risks—much less commit the time and resources—associated with participating in a speculative business venture such as CMDX's proposed CDS exchange. None of the dealer-defendants was required to support a CDS exchange, and it is far-fetched to hypothesize a fourteen-firm conspiracy lasting for more than six years as the more plausible explanation for their alleged lack of support.[9]

Similar independent reasons plausibly explain the dealer-defendants' alleged support for ICE's clearing proposal following the dealers' sale to ICE of TCC, the futures clearing company the dealers originally had intended to use as a CDS clearinghouse. Having invested time, money and effort in TCC's development, and having knowledge of and confidence in TCC's "infrastructure for clearing operations and risk management," it is not at all surprising that many dealers supported ICE's clearinghouse proposal. (PETER NORMAN, THE RISK CONTROLLERS 300 (2011) (cited at CAC ¶ 148 n.16).) Nothing in the antitrust laws required any dealer-defendant to invest its resources in one proposal over another. *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) ("[A]s a general matter, the Sherman Act does

---

[9] Plaintiffs' allegation that certain dealers could have obtained a "first-mover advantage" by taking an equity interest in CMDX is conclusory and makes no effort to balance this alleged "advantage" against the "supracompetitive profits" that plaintiffs assert each dealer obtained through OTC trading. (CAC ¶¶ 7, 116.) As such, neither this purported first-mover advantage nor the alleged "favorable reactions" by some dealers to CMDX provide a plausible basis for plaintiffs' conclusory allegation that "it was in each of the Dealer Defendants' independent economic self-interest to participate in the CMDX exchange." (CAC ¶¶ 117, 132.)

not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.") (internal quotation marks omitted).

The Second Circuit's decision in *Citigroup* is instructive. Plaintiffs there contended that defendants' virtually simultaneous decisions to stop buying auction rate securities were the product of an unlawful conspiracy. 709 F.3d at 138. In affirming the dismissal of the action, the Second Circuit recognized that defendants' "*en masse* flight from a collapsing market in which they had significant downside exposure . . . made perfect business sense." *Id.* As discussed above, plaintiffs ignore the most obvious explanations both for the supposed decisions of the dealers not to support CMDX's proposed exchange and for their alleged support for ICE's clearinghouse proposal, at least initially, over other competing clearinghouse proposals.

This case is very different from *In re Electronic Books Antitrust Litigation*, 859 F. Supp. 2d 671, 673 (S.D.N.Y. 2012), in which this Court considered allegations that certain publishers conspired with Apple to set prices for electronic books. In that case, plaintiffs alleged "a rapid and simultaneous switch" by defendants to a pricing model "heretofore unknown in the publishing industry" and a "collective action problem" that purportedly could not have been solved absent an illegal price-fixing agreement. *Id.* at 683-84. By contrast, the essence of the complaint here is that the dealer-defendants did *not* support a rapid switch to a new trading platform heretofore unknown in the CDS industry, but rather competed in the OTC marketplace as they had since the creation of CDS in the 1990s. Such a continuation of an established way of business does not raise an inference that defendants acted pursuant to a preceding conspiracy.

Under plaintiffs' contrasting antitrust theory, the dealer-defendants collectively were required to (i) support CMDX's proposed CDS exchange regardless of each dealer's view of the

merits of the proposal, its perception of the demand for exchange trading, its appetite for risk, and its ability to commit capital to a new venture at the darkest hours of the financial crisis, (ii) support CMDX's requests to Markit and ISDA to license their valuable intellectual property to enable CLOB trading of CDS—if such requests had been made—regardless of the views of Markit, ISDA or each dealer regarding the riskiness of such trading at the time, and (iii) support other clearing proposals in addition to or instead of ICE's clearing proposal regardless of each dealer's view of the relative superiority of ICE's risk management profile over those of the other potential clearinghouses. But Section 1 does not require competitors like the dealer-defendants to have engaged in a form of concerted conduct that plaintiffs would have preferred.

Because none of the complaint's factual allegations—as opposed to plaintiffs' conclusory rhetoric—supports a claim of a fourteen-defendant unlawful conspiracy extending over six years, plaintiffs' Section 1 claim should be dismissed.

## III. Plaintiffs Cannot State a "Conspiracy to Monopolize" Claim Based on a "Shared Monopoly" Theory.

Plaintiffs base their Section 2 claim for "conspiracy to monopolize the CDS market" on the alleged market shares "held *collectively*" by the dealer-defendants. (CAC ¶¶ 235-236 (emphasis added).) Plaintiffs do not allege that the dealers conspired to confer monopoly power on a single firm, or even that they have restricted competition among themselves within the OTC CDS marketplace. Rather, they allege that the twelve dealer-defendants "collectively" sought to continue to share the majority of domestic OTC CDS trades. (*Id.* ¶ 236.) Such a Section 2 claim fails as a matter of law. In fact, "[t]he 'shared monopoly' or 'joint monopolization' theory— under which a group of firms that collectively possess monopoly power can be found liable for joint monopolization—generally has been rejected by the courts." ABA Section of Antitrust Law, *Antitrust Law Developments* 328 (7th ed. 2012).

The elements of a claim for conspiracy to monopolize are "(1) proof of a concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly, and (2) the commission of an overt act in furtherance of the conspiracy." *Int'l Distribution Ctrs., Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 795 (2d Cir. 1987) (internal quotation marks omitted). Plaintiffs cannot plead that the dealer-defendants acted with the "specific intent to achieve an unlawful monopoly" unless they allege that the dealers' conduct was intended to result in the possession of monopoly power by a *single* firm. The complaint makes no such allegations here.

Indeed, the entire notion of a "'shared monopoly' is paradoxical" and cannot form the basis for a Section 2 claim. *Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co.*, 926 F. Supp. 2d 36, 46 (D.D.C. 2013). "An examination of the history of the Sherman Act reveals that Congress' concept of 'monopoly' did not include 'shared monopolies' or 'oligopolies' at all, but rather the complete domination of a market by a *single* economic entity." *Sun Dun, Inc. of Wash. v. Coca-Cola Co.*, 740 F. Supp. 381, 391 (D. Md. 1990) (emphasis in original); *accord RxUSA Wholesale, Inc., v. Alcon Labs., Inc.*, 661 F. Supp. 2d 218, 235 (E.D.N.Y. 2009) ("[D]istrict courts in this and other districts have uniformly held or approved the view that allegations of a 'shared monopoly' do not state a claim under Section 2 of the Sherman Act.") (internal quotation marks omitted), *aff'd*, 391 F. App'x 59, 61 (2d Cir. 2010) (complaint's "allegations of a 'shared monopoly' under Section 2 merely repeat its failed arguments under Section 1"); *Oxbow Carbon & Minerals*, 926 F. Supp. 2d at 45 ("Because the complaint alleges that defendants conspired to share monopoly power, the next question is whether a 'shared monopoly' can support a Section 2 claim. This Court agrees with the vast majority of other courts and concludes that it cannot."); *see also Arista Records LLC v. Lime Grp. LLC*, 532 F. Supp. 2d 556, 580 (S.D.N.Y. 2007) (dismissing Section 2 claims premised on "shared

monopoly" theory); *H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1018 (2d Cir. 1989) ("market shares of [defendants] could not be aggregated to establish an attempt to monopolize").

Where, as here, "the alleged monopoly is held by multiple separate companies within a market, there is no 'monopoly' at all. Section 1—not Section 2—serves the purpose of prohibiting agreements unreasonably restraining trade in a shared market." *Sky Angel*, 947 F. Supp. 2d at 104. In the absence of an allegation that the dealer-defendants intended to confer monopoly power on a single firm, Section 2 simply does not apply. That is the case here. Plaintiffs' Section 2 claim therefore should be dismissed as a matter of law.

## IV. Plaintiffs Cannot Assert an Antitrust Claim Predicated on Conduct Before May 3, 2009.

Plaintiffs seek to recover damages on behalf of themselves and a putative class covering a six-year period extending from January 1, 2008 to the present. (CAC ¶¶ 3, 221, 231.) But they cannot assert an antitrust claim based on the bulk of the conduct challenged in the complaint for two independent reasons: (i) CMDX could not have launched its proposed exchange for trading CDS until some point *after* March 13, 2009, thus precluding plaintiffs and putative class members from suffering any injury-in-fact before that time; and (ii) the four-year statute of limitations applicable to federal antitrust claims bars plaintiffs from asserting claims based on conduct occurring before May 3, 2009, four years before the filing of the first complaint in these consolidated actions on May 3, 2013.

### A. Plaintiffs Cannot Allege Injury-in-Fact for the Period Before CMDX Allegedly Could Have Begun Exchange Trading of CDS.

An antitrust plaintiff must allege that it suffered injury-in-fact as a result of the claimed antitrust violation. *See*, *e.g.*, *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931). Plaintiffs here contend that they would have obtained better net CDS prices if

CMDX or some other potential clearinghouse had offered exchange trading of CDS. But plaintiffs concede, as they must, that CMDX—allegedly the "most imminent" exchange platform (CAC ¶ 146)—was not prepared to offer exchange trading of CDS on January 1, 2008, the date on which plaintiffs seek to begin recovering damages on behalf of themselves and the putative class. (*See id*. ¶ 113.) Indeed, although plaintiffs acknowledge that central counterparty clearing is a prerequisite for exchange trading of CDS (*id*. ¶ 13), they do not allege that any clearinghouse was ready to launch a CDS clearing platform until late 2008 or early 2009.

Plaintiffs allege that "exchange trading and central clearing through CMDX was *operationally* ready by at least the fall of 2008." (*Id*. ¶ 113 (emphasis added).) Plaintiffs assert that "[o]n October 7, 2008, in a joint press release, CME and Citadel stated that CMDX was operational and would launch within 30 days, subject to completion of definitive licensing agreements and finalization of certain regulatory approvals (which were soon after granted)." (*Id*. ¶ 130.) But that press release related to CMDX's proposal to begin *clearing* CDS transactions and operate an electronic RFQ trading platform, *not* to CMDX's longer-term goal to offer CLOB trading of certain CDS. As plaintiffs assert in the next sentence of their complaint, "[t]he day before [the October 7, 2008 press release], a spokesperson for CME had stated that the exchange 'can be operationally ready *to clear CDS* in a few weeks." (*Id*. (emphasis added).) A news article published the following day reported: "*Eventually*, Citadel's request-for-quote system will include a central order book for the most liquid issues." (Chris Kentouris, *CME and Citadel Partner to Trade and Clear OTC Derivatives*, Sec. Tech. Monitor (Oct. 8, 2008), http://www.securitiestechnologymonitor.com/news/22882-1.html (emphasis added).)

Despite CMDX's supposed "operational" readiness, the FRBNY and CFTC did not complete their pre-launch review of CMDX's clearing and RFQ proposals until December 23,

2008. (Madigan, *supra*.) And CMDX did not receive approval from the SEC until March 13, 2009. *See* 74 Fed. Reg. 11,781 (Mar. 19, 2009). Only then did CME announce: "We are pleased to have successfully completed the U.S. regulatory review process."[10] As a result, the complaint is devoid of factual allegations that would support a claim that exchange trading of CDS would have begun on January 1, 2008 but-for defendants' alleged conduct. CMDX could not have even begun *clearing* CDS transactions until some point *after* March 13, 2009 when it successfully completed the U.S. regulatory review process. The exchange *trading* of CDS through a CLOB (and then only of the most liquid products) was predicted to come only "[e]ventually" thereafter. (Kentouris, *supra*.) Plaintiffs thus cannot plead any injury-in-fact until some point *after* March 13, 2009. This fundamental flaw eliminates more than one year of plaintiffs' proposed damages period.

> **B.   Plaintiffs' Claims Based on Conduct Before May 3, 2009 Are Barred in Any Event by the Applicable Statute of Limitations.**

Private antitrust claims are "forever barred unless commenced within four years after the cause of action accrued." 15 U.S.C. § 15b. An antitrust claim "ordinarily accrues as soon as there is an injury to competition," *Higgins v. N.Y. Stock Exch., Inc.*, 942 F.2d 829, 832 (2d Cir. 1991), and "the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period," *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997). Because the initial complaint in these consolidated actions was filed on May 3, 2013, claims for damages arising from conduct occurring before May 3, 2009 are time-barred.

---

[10] Press Release, CME Group, *SEC Grants CME Group and CMDX Special Exemption to Clear and Trade Credit Default Swaps* (Mar. 13, 2009), http://cmegroup.mediaroom.com/index.php?s= 43&item=2824&pagetemplate=article.

Plaintiffs seek to overcome the statute of limitations by asserting that defendants fraudulently concealed "facts indicating that Defendants were colluding to prevent the entry of exchanges into the market until March 2013, when the European Commission first disclosed that it had found 'preliminary indications' that this had occurred." (CAC ¶ 202.) To plead fraud-based tolling, however, plaintiffs must allege that (i) defendants fraudulently concealed material facts relating to their purported wrongdoing, (ii) the concealment prevented plaintiffs from discovering the nature of their claims within the limitations period, and (iii) plaintiffs exercised due diligence in pursuing the discovery of the claims during the entire period they seek to have tolled. *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 157 (2d Cir. 2012). Plaintiffs have not alleged fraudulent concealment with the particularity required by Rule 9(b) or otherwise adequately pled these three elements. *See Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 520 (S.D.N.Y. 2009); Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, the party must state with particularity the circumstances constituting fraud or mistake."). In fact, plaintiffs' own allegations—and the documents on which they rely—suggest neither that fraudulent efforts to conceal were made nor that such efforts could have succeeded.

1. **Plaintiffs Do Not Adequately Plead Fraudulent Concealment.**

As a threshold matter, plaintiffs—experienced participants in CDS trading—do not allege that defendants concealed the fact that CDS contracts were traded OTC throughout the putative class period, and much earlier, or that the dealer-defendants had an economic interest in continued OTC trading of CDS.[11] Nor do plaintiffs allege that defendants concealed:

---

[11] *See, e.g.*, Colin Packham, *Market Speculates That LCH.Clearnet Owners Might Prefer Icap*, Futures & Options Intelligence (Feb. 5, 2009); Serena Ng & Aaron Lucchetti, *Street Seeks Credit-Default Safety Net*, WALL ST. J. (Apr. 24, 2008) (noting that "Wall Street firms" have for years preferred OTC trading of CDS as a way to foster innovation and profits and that, despite the development of centralized clearinghouses for CDS, they will remain intent on maintaining a vibrant OTC market for CDS).

- their attendance at meetings with the FRBNY, other regulators and third parties like ICE, Citadel and CME to discuss central clearing of CDS transactions—meetings that were reported in the press and that ultimately led to the development of ICE's central clearinghouse;[12]

- the sale of TCC to ICE in the fall of 2008—a transaction that was reported to the DOJ before it was consummated—or their support for ICE's clearinghouse proposal following that sale;[13]

- the terms of the licenses obtained by CMDX in "early March 2009," which "expressly precluded use of licensed intellectual property for a CLOB or exchange trading platform" (CAC ¶ 143);

- CMDX's widely touted promotion of a CLOB trading platform for CDS that never materialized and the ultimate dissolution of CMDX (*id.* ¶ 154);[14] or

- their membership in ISDA, their status as shareholders of Markit or their participation on the boards or in committees of those entities.

These deficiencies in the complaint are no accident. Given the involvement of third parties like CME and Citadel, as well as the high level of press attention that the events central to plaintiffs' claims received in 2008 and 2009, the complaint cannot credibly allege fraudulent concealment. Although plaintiffs assert that the alleged conspiracy "was by its nature secretive and self-concealing" (CAC ¶ 203), they plead no factual support for that conclusory assertion. Nor can they, because the exclusions and refusals alleged here were not secretive or self-concealing at all. If they actually occurred, the direct victims (CME, Citadel and the other

---

[12] *See*, *e.g.*, Linnane & Brettell, *supra* ("The New York Federal Reserve will host a meeting with banks and institutional investors on Tuesday to discuss establishing a central counterparty for the global credit default swap market."); Press Release, FRBNY, *Statement Regarding June 9 Meeting on Over-the-Counter Derivatives* (June 9, 2008), http://www.newyorkfed.org/newsevents/news/markets/2008/ma080609.html; Press Release, FRBNY, *New York Fed Welcomes New Industry Commitments on Credit Derivatives* (Mar. 27, 2008), http://www.newyorkfed.org/newsevents/news/markets/2008/an080327.html.

[13] *See*, *e.g.*, Press Release, ICE, *Intercontinental Exchange, the Clearing Corporation and Nine Major Dealers Announce New Developments in Global CDS Clearing Solution* (Oct. 30, 2008), http://ir.theice.com/investors-and-media/press/press-releases/press-release-details/2008/IntercontinentalExchange-The-Clearing-Corporation-and-Nine-Major-Dealers-Announce-New-Developments-in-Global-CDS-Clearing-Solution/default.aspx; Colin Packham, *ICE To Buy CCorp, Cementing Alliance for CDS Clearing*, Futures & Options Intelligence (Oct. 30, 2008).

[14] *See*, *e.g.*, Press Release, CME Group, *supra* note 5.

clearinghouses) would have been fully aware that they were excluded, would have had no incentive to keep it secret and presumably were available points of inquiry for diligent plaintiffs.

Plaintiffs attempt to manufacture a fraudulent concealment claim by asserting that the dealer-defendants held "secret meetings" (albeit as part of non-secret and regularly-scheduled board and committee meetings) (*id.* ¶¶ 202-205); that certain defendants allegedly misled the public by issuing declarations of support for "greater competition and price transparency in the CDS market" and for reforming CDS trading to "reduc[e] both systemic and counterparty risk" (*id.* ¶¶ 208-209); that Markit declined in 2013 to confirm its licensing practices to a press reporter and publicly stated that it was "unaware of any collusion by other market participants" (*id.* ¶ 210); and that certain dealer-defendants declined to disclose their financial stake in ICE or to reveal the identities of the members of ICE's risk committee (*id.* ¶ 211). Those allegations are not sufficient to plead fraudulent concealment under Rule 9(b).

Plaintiffs cannot satisfy Rule 9(b) by making generalized allegations of "secret meetings" (*id.* ¶ 205), without any particularity as to who attended such meetings, when such meetings were held or what was discussed (let alone agreed to). Similarly, alleged statements of support for increased market transparency and reduced market risk do not plead fraudulent concealment. (*Id.* ¶ 208.) Plaintiffs plead no facts (much less particularized facts) showing that the statements were false when made or that plaintiffs relied on them in delaying their lawsuits. Moreover, plaintiffs' contentions that Markit declined in 2013 to discuss publicly its licensing practices, that ICE did not disclose the identity of the members of its risk committee, and that Markit stated that it was unaware of any collusion by CDS industry participants do not suffice to plead fraudulent concealment. (*Id.* ¶¶ 210-11.) "Mere denials of wrongdoing" do not evidence "fraud" and "will not of themselves toll the statute of limitations." *Statistical Phone Philly v. NYNEX Corp.*, 116

F. Supp. 2d 468, 483 (S.D.N.Y. 2000) (internal quotation marks omitted); *see also Fidenas AG v. Honeywell Inc.*, 501 F. Supp. 1029, 1039 (S.D.N.Y. 1980) (dismissing fraudulent concealment claims pursuant to Rule 9(b) because "mere silence" is "not fraud" and fraudulent concealment requires particularized allegations of "duty to disclose").

### 2. Plaintiffs Do Not Adequately Plead That Any Concealment "Actively Prevented" Them from Discovering Their Claims.

Nor can plaintiffs plead that any alleged fraud "actively prevented" them from discovering their claims within the limitations period. *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 352 (2d Cir. 1993). Fraud-based tolling does not apply if plaintiffs had "[n]otice of a potential claim" or "reason to suspect the probability of any manner of wrongdoing." *131 Main St. Assocs. v. Manko*, 179 F. Supp. 2d 339, 348 (S.D.N.Y.) (citation omitted), *aff'd*, 54 F. App'x 507 (2d Cir. 2002). And "facts that *should arouse suspicion* . . . are equated with actual knowledge of the claim." *In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363, 380 (S.D.N.Y. 2002) (alteration in original, emphasis added, citation omitted). The public events and media sources outlined above gave plaintiffs more than sufficient reason to inquire why certain proposed clearing and trading platforms did not launch as publicly announced. *131 Main St.*, 179 F. Supp. 2d at 348. Plaintiffs do not allege how any particular fraudulent acts by defendants "prevented or discouraged" them from investigating these events or from timely pleading what they belatedly allege now: that defendants collectively agreed with one another beginning in 2008 to oppose CMDX's plans and to support only the ICE CDS clearinghouse. (CAC ¶¶ 10-14.)

### 3. Plaintiffs Do Not Adequately Plead That They Exercised the Necessary Diligence.

Plaintiffs similarly do not adequately plead that they undertook the necessary diligence to warrant their proposed tolling period. Even when a plaintiff pleads "active concealment" by the defendant, the plaintiff still must demonstrate due diligence in trying to discover the fraud by

alleging the "specific inquiries" made to relevant entities and "detail[ing] *when such inquiries were made, to whom, regarding what, and with what response*." *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998) (emphasis added). Plaintiffs must have exercised such due diligence "throughout the period to be tolled." *World Wrest. Entm't, Inc. v. Jakks Pac., Inc.*, 328 F. App'x 695, 698 (2d Cir. 2009) (internal quotation marks omitted).

Although plaintiffs allege that they "regularly monitored their investments" (CAC ¶ 216) as well as "news and financial reports and other information in the public domain about CDS and the market for CDS trading" (*id.* ¶ 217), that is not enough to toll the statute of limitations. "Monitor[ing]" public data is insufficient to show the diligence required for tolling. *131 Main St. Assocs.*, 179 F. Supp. 2d at 349-50. The public reports discussed above "cried out loudly for explicit inquiry." *Zola v. Gordon*, 685 F. Supp. 354, 368 (S.D.N.Y. 1988). Yet plaintiffs plead none. They do not identify when they made any specific "inquiries," much less "to whom, regarding what, and with what response." *Merrill Lynch*, 154 F.3d at 60. Instead, they offer only the bare allegations of impossibility (CAC ¶ 202) that are insufficient to plead "that due diligence was exercised." *Town of Poughkeepsie v. Espie*, 402 F. Supp. 2d 443, 453 (S.D.N.Y. 2005); *see also In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 59 (S.D.N.Y. 2012) (rejecting "conclusory statement that [plaintiffs] 'neither knew, nor, in the exercise of reasonable diligence, could have known of the violations'" as insufficient for tolling).

In sum, plaintiffs have not alleged fraudulent concealment with the particularity required by Rule 9(b) or plausibly alleged the other elements of equitable tolling. Accordingly, they are bound by the four-year statute of limitations applicable to their antitrust claims, and any claim for damages arising from conduct that occurred before May 3, 2009 should be dismissed.

## V.  Congress' Enactment of Title VII of Dodd-Frank Precludes Application of the Antitrust Laws to Alleged Conduct After July 21, 2011.

Dodd-Frank was enacted in 2010 and became effective, in relevant part, on July 21, 2011. (CAC ¶ 176.)  Plaintiffs seek to downplay Dodd-Frank as nothing more than a statute authorizing "some limited regulations pertaining to CDS and other derivatives." (*Id*.)  But in enacting Title VII of Dodd-Frank, Congress undeniably vested the SEC and CFTC with comprehensive and discretionary regulatory authority over CDS, including the conduct of CDS dealers and the rules for CDS trading and clearing.  Notwithstanding plaintiffs' assertion, Congress did not expressly provide that CDS trading "would remain fully subject to the antitrust laws." (*Id*. ¶ 177.)  Rather, Congress implicitly has precluded application of the antitrust laws to the sphere of conduct challenged here through its decision to place plenary regulatory authority over CDS with the SEC and CFTC.  Plaintiffs' claims thus should be dismissed to the extent they challenge conduct that occurred after the July 21, 2011 effective date of Dodd-Frank.[15]

Four considerations trigger implied preclusion of the antitrust laws.  *See Elec. Trading Grp., LLC v. Banc of Am. Sec. LLC*, 588 F.3d 128, 133-38 (2d Cir. 2009) ("*ETG*").  First, the challenged conduct must be within an area of activity regulated by the law that precludes the application of the antitrust laws.  *Id*. at 133.  Second, a federal regulatory agency must be granted authority "to supervise the activities in question."  *Id*. at 134 (citation omitted).  Third, the federal regulatory agency must have taken some action in the exercise of that authority.  *Id*.

---

[15] The dealer-defendants do not concede that July 21, 2011 necessarily is the limit of any implied repeal, and are reserving their rights to assert an implied repeal defense concerning conduct before that date.  Even before the effective date of Dodd-Frank, a number of federal agencies directly supervised the evolving infrastructure for CDS clearing and trading.  Indeed, materials cited by plaintiffs confirm that the FRBNY, acting "as the primary safety and soundness regulator of the holding companies of the major dealer banks," actively supervised the progress of initiatives for the clearing of OTC derivatives and their trading on exchanges before Dodd-Frank became effective.  (Litan, *supra* at 33-34 (emphasis omitted).)

at 135.[16]  Fourth, there must be a risk that the antitrust laws and the specific statute at issue, "if both applicable, would produce conflicting guidance, requirements, duties, privileges, or standards of conduct." *Credit Suisse Sec. (USA) LLC v. Billing*, 551 U.S. 264, 275-76 (2007). The conflict need not be "actual and immediate." *ETG*, 588 F.3d at 138.  In evaluating such a conflict, "the proper focus is not on the Commission's current regulatory position but rather on the Commission's authority to permit conduct that the antitrust laws would prohibit."  *Id.* (citation omitted).

Conflict is particularly likely where the regulatory agency "must consider the competitive effects of its regulations," but also must balance them with other considerations. *Friedman*, 313 F.3d at 802.  Where, as here, analysis of any particular conduct requires extensive industry-specific expertise, permitting antitrust plaintiffs to pursue claims before different courts will create an "unusually high risk" of inconsistency or error.  *Billing*, 551 U.S. at 281-82.  Such uncertainty will cause industry participants to avoid not only conduct forbidden by the governing laws and regulations, "but also a wide range of joint conduct" that those laws and regulations permit or encourage, "but which [industry participants] fear could lead to an antitrust lawsuit and the risk of treble damages."  *Id.* at 282.  As the Supreme Court explained, "therein lies the problem" of applying the antitrust laws to conduct already governed by such complex regulatory schemes as the securities laws (in *Billing*) or Dodd-Frank here.  *Id.*

---

[16] The agency's exercise of authority need not take the form of rulemaking; it may consist of informal actions such as "roundtables" that signal the agency's "monitoring" of relevant industry conduct, *ETG*, 588 F.3d at 135-36, or a decision not to regulate, *see, e.g.*, *Friedman v. Salomon/Smith Barney, Inc.*, 313 F.3d 796, 801 (2d Cir. 2002).

## A. Dodd-Frank Precludes Application of the Antitrust Laws to Plaintiffs' Allegations.

According to the complaint, defendants "conspired to squash" the threat of exchange-traded CDS. (CAC ¶ 11.) But Dodd-Frank has placed exclusive jurisdiction to regulate both the clearing and trading of CDS—as well as other CDS-related conduct—with the SEC and CFTC, making "any enforcement-related need for an antitrust lawsuit . . . unusually small." *Billing*, 551 U.S. at 283.

First, the clearing and trading of CDS, as well as the disclosure of CDS pricing and trade data, are squarely within the area of activity Dodd-Frank seeks to regulate. In Title VII, Congress established a comprehensive regulatory framework for derivatives transactions that subjects OTC dealers to robust oversight. Congress intended Title VII "to reduce risk, increase transparency and promote market integrity within the financial system" by, among other things, (i) providing for the registration and comprehensive regulation of CDS dealers; (ii) imposing clearing and trading execution requirements on standardized derivative products; (iii) creating robust recordkeeping and real-time reporting regimes; and (iv) enhancing the rulemaking and enforcement authority of the SEC and CFTC with respect to all registered entities and intermediaries subject to those agencies' oversight.[17]

Second, Congress granted the SEC and CFTC the authority to supervise CDS clearing and trading, as well as the transparency of transaction information.[18] For instance, Congress

---

[17] *Building the New Derivatives Regulatory Framework: Oversight of Title VII of the Dodd-Frank Act: Hearing Before the Comm. On Banking, Housing, and Urban Affairs*, 112th Cong. (2011) (statement of Gary Gensler, Chairman, CFTC).

[18] Generally speaking, CDS indices with ten or more underlying reference entities fall within the definition of "swaps" under the statute, and thus are regulated by the CFTC. By contrast, single-name CDS and any narrow-based CDS index with nine or fewer underlying reference entities fall within the definition of "securities-based swaps" under the statute, and thus are regulated by the SEC. *See* 15 U.S.C. §§ 8302(b), 78c(55B), 78c(68), 78c(69).

granted the CFTC the authority to determine which CDS index transactions should be cleared through a registered derivatives clearinghouse, 7 U.S.C. § 2(h)(2)(A)-(B), and mandated that such transactions be executed on a registered swap execution facility ("SEF") or designated contract market, 7 U.S.C. § 2(h)(8)(A).[19]  In considering whether these mandates apply to particular CDS contracts, the CFTC must "take into account" not only the "effect on competition," but also a number of other considerations, including "trading liquidity" and effects on systemic risk.  7 U.S.C. § 2(h)(2)(D)(ii); *see also* 15 U.S.C. § 78c-3(b)(4)(B) (providing analogous authority to SEC for CDS within its jurisdiction).  Moreover, Congress granted the CFTC *exclusive* regulatory authority to prescribe rules governing the duties of swap dealers generally to ensure the achievement of the goals of Dodd-Frank.  7 U.S.C. § 6s(j)(7).

Third, the SEC and CFTC already have exercised the authority conferred by Congress over CDS clearing and trading and, in so doing, were required to strike a balance between promoting competition and advancing other statutory objectives.  *See ETG*, 588 F.3d at 135.  As an initial matter, the CFTC has issued regulations concerning appropriate admission and continuing participation requirements for clearing membership.  17 C.F.R. § 39.12 (2013).  The CFTC also has issued regulations requiring that certain classes of CDS indices, including certain of the CDX and iTraxx indices, be cleared by a derivatives clearing organization registered with the CFTC.  17 C.F.R. § 50.4 (2013).  Moreover, while the CFTC has mandated the real-time public reporting of swap transaction and pricing data for certain swap transactions, 17 C.F.R. §§ 43.1-43.4 (2013) (requiring public reporting of swap data "as soon as technologically practicable"), the regulations impose time delays for the public dissemination of such data for

---

[19] A SEF is "a trading system or platform in which multiple participants have the ability to execute or trade swaps by accepting bids and offers made by multiple participants." 7 U.S.C. § 1a(50).  It must "make public timely information on price, trading volume, and other trading data on swaps to the extent prescribed by" the CFTC.  *Id*. § 7b-3(f)(9)(A).

certain large transactions and block trades, 17 C.F.R. § 43.5 (2013). The CFTC also has prescribed external business conduct standards for swap dealers, *see* 17 C.F.R. pt. 23H (2013), such as issuing regulations that require swap dealers to provide a counterparty with certain information before entering into a trade, 17 C.F.R. §§ 23.431-23.433 (2013). And the CFTC has announced a rule requiring a SEF to obtain quotes from only two dealers (which will later be expanded to three dealers), reflecting concern that any broader dissemination of quotes could have the counterproductive effect of increasing price and reducing market liquidity. 78 Fed. Reg. 33,476 (June 4, 2013) (to be codified at 17 C.F.R. pt. 37).

Finally, a clear risk exists that Dodd-Frank (together with the regulations promulgated thereunder) and the antitrust laws, if both applicable, would produce conflicting guidance, requirements, duties, privileges or standards of conduct. In evaluating whether such a risk exists, "the proper focus is not on the Commission's current regulatory position but rather on the Commission's authority to permit conduct that the antitrust laws would prohibit." *ETG*, 588 F.3d at 138 (quoting *In re Stock Exchs. Options Trading Antitrust Litig.*, 317 F.3d 134, 149 (2d Cir. 2003)). The risk of conflict is particularly keen where the regulatory agency must balance the competitive effects of its regulations with other policy considerations, yielding decisions that may not conform to the comparatively narrower focus of the antitrust laws on competition. *See Friedman*, 313 F.3d at 802. Through their authority to mandate clearing of CDS transactions, the SEC and CFTC are authorized to decide whether to mandate that a single-name CDS or CDS index be cleared or electronically traded. Conversely, those agencies have the statutory authority to determine that, in light of the policy considerations underlying Dodd-Frank—which include not only competition, but also the reduction of systemic risk, the maintenance and improvement of marketplace liquidity and the promotion of market integrity and stability within the financial

system—any particular single-name CDS or CDS index need not be cleared or electronically traded. *See* 7 U.S.C. § 2(h); 15 U.S.C. § 78c-3. Any antitrust action that seeks to compel broad-based CDS clearing or electronic trading could conflict, and thus be incompatible, with the exclusive regulatory authority that Congress vested in the SEC and CFTC under Dodd-Frank. Similarly, the SEC and CFTC retain the statutory authority to require—or not require—real-time public reporting of CDS transaction data, and any antitrust action that seeks to compel such disclosure may conflict, and thus be incompatible, with that authority.

These conflicts are exacerbated because "only a fine, complex, detailed line separates" the activities that the SEC and CFTC permit from those that they prohibit, and navigating that line creates "an unusually high risk that different courts will evaluate similar factual circumstances differently." *Billing*, 551 U.S. at 279, 281-82. For example, plaintiffs complain that the dissemination of CDS pricing data is delayed by ten to twenty minutes. (CAC ¶ 94.) While CFTC regulations generally require real-time public reporting of swap transaction and pricing data, the CFTC has instituted time delays for the public dissemination of such information for certain block trades and large notional off-facility swaps. In particular, the CFTC has mandated a 30-minute delay after execution for public dissemination of swap transaction and pricing data for all publicly reportable block-trade swap transactions for the first year after the compliance date of the regulation, and a 15-minute delay thereafter. 17 C.F.R. § 43.5 (2013).

The potential for conflict is further exacerbated because CDS transactions are subject to the separate jurisdictions of the SEC (single-name CDS) and CFTC (most CDS indices). In light of their distinct authority and expertise, those agencies may promulgate different rules for financial instruments within their jurisdiction. Plaintiffs in this case, however, allege claims

based on trading in both "single-name and index CDS" (CAC ¶ 82), thus increasing the difficulty in applying the antitrust laws in a manner that would be consistent with the regulations and guidance of both the SEC and CFTC.

**B.      Dodd-Frank's Savings Clause Does Not Preserve Plaintiffs' Claims.**

Plaintiffs improperly seek to diminish the significance of Title VII's regulatory scheme by pointing to a general savings clause that applies to the entire Dodd-Frank Act, which covers such disparate topics as bank liquidation, credit card fees and the establishment of new consumer finance agencies.  (CAC ¶ 177.)  That savings clause provides that "[n]othing in this Act, or any amendment made by this Act, shall be construed to modify, impair, or supersede the operation of any of the antitrust laws, *unless otherwise specified*."  12 U.S.C. § 5303 (emphasis added).

The complaint's reliance on the general savings clause is misplaced because Congress expressly and repeatedly "otherwise specified" *in Title VII* of Dodd-Frank, which focuses in detail on the regulation of single-name CDS and CDS indices.  Multiple provisions of Title VII state that general prohibitions on "unreasonable restraint[s] of trade" and "material anticompetitive burden on trading or clearing" would apply "*[u]nless*" those practices are "necessary or appropriate to achieve the purposes" of Dodd-Frank.   7 U.S.C. § 6s(j)(6); 15 U.S.C. § 78o-10(j)(6) (emphasis added).[20]   These provisions expressly circumscribe the antitrust law's general restrictions on anticompetitive conduct.  And, immediately following each of these provisions, Congress stated that the authority to "prescribe rules under this subsection governing duties" of dealers—that is, the authority to determine what conduct in the CDS

---

[20] Congress also authorized the SEC and CFTC to permit other registered entities to engage in conduct that may result in an "unreasonable restraint of trade" or impose a "material anticompetitive burden on trading or clearing" where such conduct is "necessary or appropriate to achieve the purpose" of the Commodities Exchange Act or the Securities Exchange Act.  *See* 7 U.S.C. § 7a-1(c)(2)(N) (derivatives clearing organizations); 7 U.S.C. § 24a(f)(1) (swap data repositories); 7 U.S.C. § 7b-3(f)(11) (SEFs); 7 U.S.C. § 7(d)(19) (boards of trade).

marketplace is "necessary or appropriate" for achieving the statute's purpose—rests with the SEC and CFTC. 7 U.S.C. § 6s(j)(7); 15 U.S.C. § 78o-10(j)(7). Thus, in the provisions of Dodd-Frank that are relevant here, Congress has done exactly what the "unless otherwise specified" provision in the general Dodd-Frank-wide savings clause anticipated: Congress has made clear that, when it comes to conduct in the CDS marketplace, it is the expert regulatory agencies—*not* courts applying general antitrust principles—that must balance pro-competitive policies against other statutory objectives.

The "unless otherwise specified" provision of the Dodd-Frank savings clause renders that clause far more limited than the expansive savings clauses in the Securities Act of 1933 and the Securities Exchange Act of 1934, which provide simply that the rights extended in those laws are in addition to any other rights that may exist. *See* 15 U.S.C. §§ 77p(a), 78bb(a)(2). Yet the Supreme Court in *Billing* held that even those much broader savings clauses were insufficient to preserve antitrust actions where, as here, the four conditions for the implied repeal of the antitrust laws are satisfied. *See* 551 U.S. at 275, 285. The "unless otherwise specified" provision of the Dodd-Frank savings clause also renders that clause far more limited than the savings clause addressed in *Trinko*, 540 U.S. at 406. To the extent that plaintiffs' claims challenge conduct occurring after the effective date of Dodd-Frank, they should be dismissed.

## VI.    Plaintiffs' Duplicative Unjust Enrichment Claim Should Be Dismissed.

This Court recently reaffirmed that "'[u]njust enrichment is not a catchall cause of action to be used when others fail'" and that it is "'not available where it simply duplicates, or replaces, a conventional [legal] claim.'" *La. Mun. Police Emps. Ret. Sys. v. JPMorgan Chase & Co.*, No. 12 Civ. 6659 (DLC), 2013 WL 3357173, at *16 (S.D.N.Y. July 3, 2013) (Cote, J.) ("*LAMPERS*") (quoting *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012)). That is the case here. Plaintiffs' unjust enrichment count consists of two paragraphs in which

plaintiffs assert that "Defendants have been unjustly enriched" as a result of "the acts of Defendants and their co-conspirators *as alleged herein*," and that plaintiffs are entitled to "restoration of the monies of which they were unfairly and improperly deprived, *as described herein*." (CAC ¶¶ 241-242 (emphasis added).) These allegations make clear that plaintiffs' unjust enrichment claim arises "from the same facts" as their antitrust claims, and does "not allege distinct and different damages." *Town of Wallkill v. Rosenstein*, 40 A.D.3d 972, 974 (N.Y. App. Div. 2007).

If plaintiffs were to prevail on their antitrust counts, there would be no need for restitution because their statutory damages claims would cover the purportedly "unjust" profits the alleged conspiracy supposedly allowed defendants to reap at "the expense of Plaintiffs and members of the Class." (CAC ¶ 241.) If they were to lose on their antitrust claims, there also would be no need for restitution because plaintiffs could not show that defendants were unjustly enriched. *See Geller v. Cnty. Line Auto Sales, Inc.*, 86 F.3d 18, 22 (2d Cir. 1996). Because plaintiffs' unjust enrichment claim "simply duplicates" their legal causes of action, the claim should be dismissed. *LAMPERS*, 2013 WL 3357173, at *16 (citation omitted); *see also In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 412 (S.D.N.Y. 2011) (dismissing unjust enrichment claim insofar as it was premised solely on alleged antitrust violations); *Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250, 257 (S.D.N.Y. 1995) (same).[21]

## CONCLUSION

For the foregoing reasons, all claims asserted against the dealer-defendants should be dismissed in their entirety with prejudice.

---

[21] Plaintiffs' unjust enrichment claim also is untimely to the extent it seeks restitution of profits from anticompetitive acts committed prior to May 3, 2009. *See, e.g.*, *Ingrami v. Rovner*, 45 A.D.3d 806, 808 (N.Y. App. Div. 2007) (New York's three-year "statute of limitations on an unjust enrichment claim begins to run upon the occurrence of the wrongful act giving rise to the duty of restitution").

Dated: New York, New York
     March 14, 2014

  /s/ Robert F. Wise, Jr.          
Robert F. Wise, Jr.
Arthur J. Burke
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Tel: (212) 450-4000
Fax: (212) 701-5800
robert.wise@davispolk.com
arthur.burke@davispolk.com

*Attorneys for Bank of America Corporation
and Bank of America N.A.*

  /s/ Todd S. Fishman          
Todd S. Fishman
Michael S. Feldberg
M. Elaine Johnston
ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, NY 10020
Tel: (212) 610-6300
Fax: (212) 610-6399
todd.fishman@allenovery.com
michael.feldberg@allenovery.com
elaine.johnston@allenovery.com

*Attorneys for Barclays Bank PLC*

  /s/ David Esseks          
David Esseks
Brian de Haan
ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, NY 10020
Tel: (212) 610-6300
Fax: (212) 610-6399
david.esseks@allenovery.com
brian.dehaan@allenovery.com

John Terzaken
Molly Kelley
ALLEN & OVERY LLP
1101 New York Avenue, N.W.
Washington, DC 20005
john.terzaken@allenovery.com
molly.kelley@allenovery.com

*Attorneys for BNP Paribas*

/s/ David F. Graham

Benjamin R. Nagin
Eamon P. Joyce
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
Tel: (212) 839-5300
Fax: (212) 839-5599
bnagin@sidley.com
ejoyce@sidley.com

David F. Graham*
David C. Giardina*
Jennifer E. Novoselsky
*admitted *pro hac vice*
SIDLEY AUSTIN LLP
1 S Dearborn St
Chicago, IL 60603
Tel: (312) 853-7000
Fax: (312) 853-7036
dgraham@sidley.com
dgiardina@sidley.com
jnovoselsky@sidley.com

*Attorneys for Citigroup Inc., Citibank N.A. and Citigroup Global Markets Inc.*

/s/ J. Robert Robertson

J. Robert Robertson
Benjamin Holt*
HOGAN LOVELLS US LLP
*admitted *pro hac vice*
Columbia Square
555 Thirteenth Street, N.W.
Washington, DC 20004
Tel: (202) 637-5600
Fax: (202) 637-5910
robby.robertson@hoganlovells.com
benjamin.holt@hoganlovells.com

*Attorneys for Credit Suisse AG*

  /s/ Paula W. Render
David P. Wales*
*admitted pro hac vice
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Tel:  (202) 879-3939
Fax:  (202) 626-1700
dpwales@jonesday.com

Tracy V. Schaffer
Eric P. Stephens
JONES DAY
222 East 41st Street
New York, NY 10017
Tel:  (212) 326-3939
Fax:  (212) 755-7306
tschaffer@jonesday.com
epstephens@jonesday.com

Paula W. Render*
Alex P. Middleton*
*admitted *pro hac vice*
JONES DAY
77 West Wacker
Chicago, IL 60601
Tel:  (312) 782-3939
Fax:  (312) 782-8585
prender@jonesday.com
apmiddleton@jonesday.com

*Attorneys for Deutsche Bank AG*

   /s/ Richard C. Pepperman II
Richard C. Pepperman II
Bradley P. Smith
Mark S. Geiger
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Tel:  (212) 558-4000
Fax:  (212) 558-3588
peppermanr@sullcrom.com
smithbr@sullcrom.com
geigerm@sullcrom.com

Robert Y. Sperling*
WINSTON & STRAWN LLP
*admitted *pro hac vice*
35 West Wacker Drive
Chicago, IL 60601
Tel:  (313) 558-7941
Fax:  (312) 558-5700
rsperling@winston.com

Seth Farber
Winston & Strawn LLP
200 Park Avenue
New York, NY  10166-4193
Tel:  (212) 294-4611
Fax:  (212) 294-4700
sfarber@winston.com

Elizabeth P. Papez*
WINSTON & STRAWN LLP
*admitted *pro hac vice*
1700 K Street, N.W.
Washington, DC 20006
Tel:  (202) 282-5000
Fax:  (202) 282-5100
epapez@winston.com

*Attorneys for Goldman, Sachs & Co.*

  /s/ Andrew S. Marovitz
Richard A. Spehr
Michael O. Ware
MAYER BROWN LLP
1675 Broadway
New York, NY 10019
Tel:  (212) 506-2500
Fax:  (212) 262-1910
rspehr@mayerbrown.com
mware@mayerbrown.com

Andrew S. Marovitz*
Britt M. Miller*
MAYER BROWN LLP
*admitted *pro hac vice*
71 South Wacker Drive
Chicago, IL 60606
Tel:  (312) 782-0600
Fax:  (312) 701-7711
amarovitz@mayerbrown.com
bmiller@mayerbrown.com

*Attorneys for HSBC Bank plc and HSBC
Bank USA, N.A.*

  /s/ Peter E. Greene
Peter E. Greene
Peter S. Julian
Boris Bershteyn
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
New York, NY 10036
Tel:  (212) 735-3000
Fax:  (212) 735-2000
peter.greene@skadden.com
peter.julian@skadden.com
boris.bershteyn@skadden.com

Patrick J. Fitzgerald
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
155 N. Wacker Drive
Suite 2700
Chicago, IL 60606
Tel:  (312) 407-0508
Fax:  (312) 407-0411
patrick.fitzgerald@skadden.com

*Attorneys for JPMorgan Chase & Co. and
JPMorgan Chase Bank, N.A.*

/s/ Evan R. Chesler
Evan R. Chesler
Daniel Slifkin
Michael A. Paskin
Vanessa A. Lavely
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Tel:  (212) 474-1000
Fax:  (212) 474-3700
echesler@cravath.com
dslifkin@cravath.com
mpaskin@cravath.com
vlavely@cravath.com

*Attorneys for Morgan Stanley & Co. LLC*


  /s/ David C. Bohan
David C. Bohan
KATTEN MUCHIN ROSENMAN, LLP
525 W. Monroe St.
Chicago 60661
Tel:  (312) 902-5200
Fax:  (312) 902-1061
david.bohan@kattenlaw.com

James J. Calder
KATTEN MUCHIN ROSENMAN, LLP
575 Madison Avenue
New York, NY 10022
Tel:  (212) 940-8800
Fax:  (212) 940-8776
james.calder@kattenlaw.com

*Attorneys for UBS AG and UBS Securities LLC*

  /s/ Charles F. Rule
Charles F. Rule
Joseph J. Bial
Amy W. Ray
CADWALADER, WICKERSHAM &
TAFT LLP
700 6th Street, N.W.
Washington, DC 20001
Tel:  (202) 862-2200
Fax:  (202) 862-2400
rick.rule@cwt.com
joseph.bial@cwt.com
amy.ray@cwt.com

*Attorneys for Royal Bank of Scotland PLC
and Royal Bank of Scotland N.V.*