**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE CREDIT DEFAULT SWAPS ANTITRUST LITIGATION<br><br>This Document Relates To: All Actions | 13 MD 2476  (DLC)<br><br>**JURY TRIAL DEMANDED** |

## SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

OVERVIEW OF THE ACTION ..................................................................................1

JURISDICTION AND VENUE ..................................................................................7

THE PARTIES.............................................................................................................8

    A.    Plaintiffs...................................................................................................8

    B.    Defendants .............................................................................................13

FACTUAL ALLEGATIONS ....................................................................................22

I.    STARTING BEFORE 2008, DEFENDANTS JOINTLY EXPLOITED AND
MAINTAINED AN INEFFICIENT MARKET STRUCTURE FOR CDS. ....................22

    A.    CDS Contracts Generally......................................................................22

    B.    Origins of the CDS Market ...................................................................24

    C.    Increased Volume, the Inter-Dealer Market, and Standardization of the
CDS Market Created Conditions That Supported Exchange Trading and
Threatened the Dealer Defendants' Profits............................................25

    D.    Defendants Limited *Pre*-Transaction Price Transparency.....................28

    E.    Defendants Also Restricted *Post*-Transaction Price Information. .........29

    F.    Defendants Secured Additional Information Advantages Through the
Inter-Dealer Broker Market. .................................................................31

    G.    Defendants' Control of the CDS Market Yields Supracompetitive Bid/Ask
Spreads. .................................................................................................32

II.    DEFENDANTS CONSPIRED TO BLOCK COMPETITION AND MARKET
ENTRY IN THE U.S. CDS MARKET. ..........................................................34

    A.    CDS Exchanges and Clearinghouses Emerged As Threats to Defendants'
Oligopoly in the United States...............................................................34

    B.    Defendants Conspired to Block the Exchange Trading of CDS.............44

    C.    Defendants Conspired to Block Clearinghouses with Exchange-Trading
DNA.......................................................................................................49

D.        Defendants Jointly Drove Clearing Business to ICE Clear. ..................................55

E.        Defendants Prevented the Emergence of New Exchanges. ...................................59

III.     ABSENT DEFENDANTS' COLLUSION, EXCHANGE TRADING WOULD HAVE DRAMATICALLY REDUCED BID/ASK SPREADS FOR INVESTORS....................................................................................................................61

A.        Exchange Trading Would Have Been Adopted Quickly. ......................................61

B.        Exchange Trading Would Have Increased Transparency and Reduced Bid/Ask Spreads...............................................................................................63

IV.     THE DEALER DEFENDANTS HAVE SUBSTANTIAL MARKET POWER. .............69

EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS DUE TO DEFENDANTS' CONCEALMENT OF THE CONSPIRACY ........................................72

A.        Defendants' Conspiracy Was Concealed From Plaintiffs. ...................................72

B.        The *New York Times* First Uncovered the Existence of Defendants' Secret Meetings in December 2010. .................................................................77

C.        Plaintiffs' Inability to Discovery The Conspiracy Did Not Result From A Lack of Diligence...................................................................................80

CLASS ACTION ALLEGATIONS ....................................................................................82

CAUSES OF ACTION .......................................................................................................85

FIRST CAUSE OF ACTION .....................................................................................85

SECOND CAUSE OF ACTION ................................................................................86

THIRD CAUSE OF ACTION ....................................................................................87

PRAYER FOR RELIEF .....................................................................................................88

JURY DEMAND ................................................................................................................89

Plaintiffs Los Angeles County Employees Retirement Association; Salix Capital US Inc.; Value Recovery Fund LLC; Delta Institutional, LP; Delta Onshore, Ltd.; Delta Offshore, Ltd.; Delta Pleiades, LP; Essex Regional Retirement System; Unipension Fondsmaeglerselskab A/S; Arkitekternes Pensionskasse; MP Pension - Pensionskassen for Magistre & Psykologer; and Pensionskassen for Jordbrugsakademikere & Dyrlæger (collectively, "Plaintiffs"), individually and on behalf of all persons and entities who, during the period of January 1, 2008 through December 31, 2013, directly purchased credit default swaps from or sold credit default swaps to the Defendant banks in the United States, bring this antitrust class action for treble damages and injunctive relief and allege as follows:

## OVERVIEW OF THE ACTION

1.      This case seeks to redress an anticompetitive scheme through which the Defendant banks conspired to prevent price transparency and competition in the market for credit default swaps ("CDS"), so they could make tremendous profits at the expense of U.S. investors. Defendants implemented this scheme through, among other means, secret face-to-face meetings among senior personnel at the Defendant banks during the period of the worst financial crisis since the Great Depression of the 1930s.  In addition to cheating investors out of billions of dollars, Defendants' conduct corrupted a critical derivatives market and undermined the stability of U.S. financial markets at a time when those markets were particularly vulnerable.

2.      CDS offer participants in financial markets the ability to hedge credit risk and to shift that risk to the market participants best able to hold it.  CDS are contracts that transfer a credit exposure on a specific "reference entity" (such as a debt instrument issued by a corporate or governmental entity) or a "reference portfolio" (bundles of those instruments).  The buyer of the CDS (and the protection that comes with it) makes a periodic payment to the seller of the

CDS in exchange for the seller's agreement to make a payment to the buyer if a "credit event" occurs – such as a reference entity's bankruptcy or default. Thus, CDS are often used as a hedge by investors to protect themselves from their exposure to a particular reference entity. More generally, CDS investors can take a "long" or "short" position on credit risk as part of an investment strategy.

3.      Plaintiffs and the Class Members here – pension funds, university endowment funds, hedge funds, insurance companies, corporate treasuries, fiduciary and depository institutions, small banks, and money managers – invested in CDS in the United States during the period of January 1, 2008 through December 31, 2013 (the "Relevant Period" or "Class Period"). CDS investors occupy what is known as the "buy-side" of the CDS market. In the CDS market, buy-side participants, whether they are buying credit protection or selling it, must transact with sell-side "dealers" – *i.e.*, the "Dealer Defendants."[1]

4.      The Dealer Defendants are the large investment banks that have dominated the CDS market for over a decade, accounting for approximately 95% of CDS trading. During the Relevant Period, the Dealer Defendants enjoyed huge profits from CDS trading at the expense of the Class due to CDS being traded in a highly inefficient fashion. Virtually all CDS were traded "over-the-counter" in a way that kept the relevant price information in the hands of the Dealer Defendants, who ensured they were on one side of, and thus profited from, virtually every CDS transaction.

5.      During the Relevant Period, a CDS transaction could begin in one of two ways. An investor could request a quote directly from a Dealer Defendant through a Bloomberg terminal, e-mail message, or telephone call, and the Dealer Defendant would generally provide a

---

[1]   The "Dealer Defendants" are Bank of America, Barclays, BNP, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JP Morgan, Morgan Stanley, RBS, and UBS.

private, non-binding quote in response. Or a dealer would send out a "run" to the market – essentially a non-binding form of advertising – that lists price quotes on a select group of CDS (those that a dealer is interested in trading), and then a buy-side participant would respond to one of these runs. In just one of the ways this market was rigged in the Dealer Defendants' favor, even these "runs" were non-binding and often used by dealers for purposes of a bait-and-switch: customer interest would often be solicited at one price, but when the buyer contacted the dealer, the actual offer was another price.

6.     Investors had limited information to evaluate these offers because Dealer Defendants structured the CDS market to be highly opaque. Despite large volume and standardization across CDS transactions, the Dealer Defendants imposed a number of restrictions on the sharing of quotes and post-trade prices that limit both pre- and post-transaction transparency. While the Dealer Defendants had exclusive access to real-time price data, the Class Members, on the buy-side, were forced to rely largely on aggregated pricing data with limited utility.

7.     The Dealer Defendants made billions of dollars in supracompetitive profits at the expense of the Class by taking advantage of price opacity in the CDS market. These profits primarily came from the "bid/ask spread" the Dealer Defendants enjoy on transactions with investors. For every CDS, a Dealer Defendant has a "bid" price, at which the dealer will purchase the CDS, and an "ask" price, at which it will sell the CDS. When the dealer purchases a CDS at a lower bid price, and then sells a CDS with the same terms at a higher ask price, the dealer realizes a profit on the difference between the lower and higher prices at which the dealer transacted. In the over-the-counter CDS market, where critical trading information is known only to the parties to the specific transaction, these bid/ask spreads are grossly inflated.

8. This rigged structure would be patently intolerable in most settings. As observed in a *New York Times* article that first revealed the existence of some of the secret meetings at issue in this case,[2] it would be like a real estate agent selling a house where the buyer knows only what she paid and the seller knows only what she received. The agent would pocket the difference as her fee, rather than disclose it. Moreover, only the real estate agent – and neither the buyer nor seller – would have easy access to the prices paid recently for other homes on the same block.

9. By 2008, there was tremendous demand in the CDS market for greater transparency, efficiency, and competition. In particular, there was demand for a way to trade CDS on an exchange, just as many other financial instruments (like stocks and futures) are traded. Exchange-based trading would more efficiently match CDS buyers and sellers, disclose prices in a transparent way, and thus significantly reduce the inflated bid/ask spreads that CDS investors pay. It would also displace the Dealer Defendants as the exclusive market makers in CDS, since buy-side participants could beat the dealers' bid and undercut the dealers' ask in a market where dealers were demanding supracompetitive spreads.

10. To meet this demand, Citadel LLC ("Citadel") – a market leader from the buy-side – and CME Group Inc. ("CME") – the operator of the world's leading derivatives marketplace, with exchanges offering an unparalleled diversity of products across all major asset classes, as well as one of the largest clearinghouses in the world – developed the Credit Market Derivatives Exchange ("CMDX"), an electronic exchange and clearinghouse for CDS.

11. CMDX was built as an open access trading facility, where all participants could disseminate firm bids and offers on CDS anonymously to the marketplace, thereby increasing

---

[2] Louise Story, *A Secretive Banking Elite Rules Trading in Derivatives*, N.Y. Times (Dec. 11, 2010), *available at* http://www.nytimes.com/2010/12/12/business/12advantage.html.

pre- and post-trade transparency and overall CDS market efficiency. The exchange platform would reduce credit risk inherent in over-the-counter trading and substantially reduce the transaction costs paid by buy-side market participants – *i.e.,* Plaintiffs and the Class. CMDX, which was ready for market and fully operational by at least late 2008, would have saved the Class a tremendous amount of money.

12. The Dealer Defendants, however, secretly conspired to squash this threat. Meeting in secret on at least a monthly, and sometimes a weekly, basis in the fall of 2008 and thereafter, representatives of the Dealer Defendants agreed to ensure that the inefficient market structure they had cultivated would continue. All Dealer Defendants joined this conspiracy, even though some of them had been planning to join CMDX in order to gain a first-mover advantage in the marketplace for exchange-traded CDS, where they recognized clear demand from the buy-side. Defendants met under the guise of boards or committees on which they had planted themselves, as well as in settings entirely unconnected to any legitimate ventures, in order to discuss, agree to, and maintain their anticompetitive scheme. Although the specific identities of those attending the meetings have in many cases been kept secret, the fact that these meetings occurred is undeniable.

13. Pursuant to their agreement, beginning in the fall of 2008 and continuing through at least 2013, the Dealer Defendants jointly blocked CMDX from entering the market by, among other things, securing an agreement from co-conspirators International Swaps and Derivatives Association and Markit Group Ltd. to deny CMDX the licenses it needed to operate. The Dealer Defendants also jointly agreed to boycott CMDX so long as it operated as a trading platform, *and* so long as Citadel remained involved with the venture in any way. The Dealer Defendants believed that, as long as Citadel had a stake in the venture, it would always be a threat to

introduce exchange trading. By these actions, the Dealer Defendants killed off the CDS exchange-trading platform that would otherwise have become operational in 2008.

14.     Then, to ensure other potentially competitive ventures would not emerge, the Dealer Defendants conspired further to prevent any CDS clearinghouse from becoming a threat to their market dominance. A clearinghouse is an entity designed to step in the middle of a bilateral trade, significantly reducing counterparty risk. A clearinghouse becomes the counterparty to both buyer and seller, and turns the transaction into two separate trades: a sale from the seller to the clearinghouse, and then a sale from the clearinghouse to the buyer. A major advantage of cleared trades is that every trade participant faces the same counterparty – the clearinghouse. As a result, traders do not need to evaluate the creditworthiness of their counterparty before every deal. A clearinghouse lays the groundwork for a full-blown exchange by bringing buyers and sellers to a centralized platform, creating the infrastructure for the processing of trades, and removing the necessity of case-by-case creditworthiness assessments.

15.     Wherever the Dealer Defendants observed a possibility that a nascent clearinghouse could lead to an exchange, they jointly refused to deal with the entity. When the Dealer Defendants did involve themselves in clearinghouses, they jointly took control of the key committees and used that control to set rules that prevented a transition to exchange trading.

16.     As a result, throughout the Relevant Period, the Dealer Defendants successfully maintained an inefficient and opaque market structure that yielded for them exorbitant profits at the direct expense of the Class of investors here.

17.     Defendants' conduct offends the very core of the antitrust laws. Their actions directly led to supracompetitive bid/ask spreads, the inefficient allocation of capital, and the

reduction of output. The role of the antitrust laws is particularly critical here, given that, for most of the Relevant Period, Defendants were free from regulation of their CDS activities.

18.     U.S. and European antitrust enforcement agencies have investigated Defendants' conduct, with the European authorities recently taking the lead role. In April 2011, the European Commission stated it was also investigating Defendants' anticompetitive conduct in the CDS market. Since then, the European Commission has stepped up to take the lead on this investigation, with U.S. antitrust authorities focusing their resources on still other well-publicized cartel activities by financial institutions, while continuing to monitor the progress of the European investigation.

19.     In July 2013, the European Commission announced it had issued a "Statement of Objections," asserting that the Defendants here had infringed antitrust rules "by colluding to prevent exchanges from entering the credit derivatives business." Although the Statement of Objections is not public, all public disclosures indicate that the European Commission has found evidence that supports the allegations in this complaint.

## JURISDICTION AND VENUE

20.     Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries to Plaintiffs and the Class, alleged herein, arising from Defendants' violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

21.     This Court has subject matter jurisdiction over this action pursuant Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, as well as pursuant to 28 U.S.C. §§ 1331 and 1337(a).

22.     On October 22, 2013, this matter was transferred to this District for consolidated proceedings by the Judicial Panel on Multidistrict Litigation.  Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391(b), (c), and (d) because during the Relevant Period, all the Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

23.     Each Defendant is subject to personal jurisdiction in this Court because each transacted business throughout the United States, including in this District, including by buying and selling CDS to Class Members throughout the United States and in this District.

24.     In addition, Defendants' activities, and those of their co-conspirators, were within the flow of, were intended to, and had a substantial effect on foreign and interstate commerce.

## THE PARTIES

### A.     Plaintiffs

25.     Plaintiff **Los Angeles County Employees Retirement Association** ("**LACERA**") is a public pension fund organized under the laws of the State of California with its principal place of business in Pasadena, California.  LACERA has provided retirement, disability, and death benefits to eligible County employees, retirees, and their beneficiaries since 1938.  As of June 30, 2013, LACERA had over 157,000 members and held net assets in trust for pension benefits totaling $41.7 billion.  During the Class Period, LACERA was a significant participant in the CDS market.  LACERA purchased CDS from and sold CDS to all of the Dealer Defendants including Bank of America, Barclays, BNP Paribas, Citibank, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JP Morgan, Morgan Stanley, Royal Bank of Scotland, and UBS with trades made in the United States.

26. Plaintiff **Salix Capital US Inc.** ("**Salix**") is a corporation organized under the laws of the State of Delaware with its principal place of business in New York, New York. Salix brings claims as assignee of the FrontPoint Funds pursuant to the terms of an Amended and Restated Assignment of Claim Agreement between Salix Capital US and the FrontPoint Funds:

    (a) FrontPoint Relative Value Opportunities Fund, L.P., formerly known as FrontPoint Fixed Income Opportunities Fund, L.P., is a limited partnership organized under the laws of Delaware with its principal place of business in Greenwich, Connecticut. Its general partner is FrontPoint Relative Value Opportunities Fund GP, LLC, a limited liability company organized under the laws of Delaware.

    (b) FrontPoint Volatility Opportunities Fund, L.P. was a limited partnership organized under the laws of the Cayman Islands with its principal place of business in Greenwich, Connecticut. Its general partner was FrontPoint Volatility Opportunities Fund GP, LLC, a limited liability company organized under the laws of Delaware.

    (c) FrontPoint Volatility Opportunities Fund GP, L.P. was a limited partnership organized under the laws of Delaware with its principal place of business in Greenwich, Connecticut. Its general partner was FrontPoint Volatility Opportunities Fund GP, LLC, a limited liability company organized under the laws of Delaware.

    (d) FrontPoint Partners, L.P. was a limited partnership organized under the laws of Delaware with its principal place of business in Greenwich, Connecticut. Its general partner was FrontPoint Partners LLC, a limited liability company organized under the laws of Delaware.

27. Salix is owned by three individuals who during the Class Period served as advisors to the FrontPoint Funds pursuant to investment management agreements. These

individuals negotiated, executed, and carried out the CDS transactions at issue here on behalf of the FrontPoint Funds. Plaintiff Salix is thus not a stranger to FrontPoint, but is instead a company whose owners advised FrontPoint and carried out the CDS trades at issue. As noted, during the Class Period, the FrontPoint Funds were significant players in the CDS market. They purchased CDS from and sold CDS to many of the Dealer Defendants including Bank of America, Barclays, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, JP Morgan, and UBS with trades made in the United States.

28. Plaintiff **Value Recovery Fund LLC** ("**VRF**") is a Delaware limited liability company with its principal place of business in Connecticut. VRF brings claims as assignee of Camulos Master Fund L.P. ("Camulos"), a Cayman Islands limited partnership located in Stamford, Connecticut, pursuant to the terms of an assignment agreement between VRF and Camulos. During the Class Period, Camulos was a significant participant in the CDS market. Camulos purchased CDS from and sold CDS to most, if not all, of the Dealer Defendants including Bank of America, Barclays, BNP Paribas, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, JP Morgan, Morgan Stanley, Royal Bank of Scotland, and UBS with trades made in the United States.

29. Plaintiff **Delta Institutional, LP** is a Delaware limited partnership with its principal place of business in New York, New York.

30. Plaintiff **Delta Offshore, Ltd.** is a Cayman Islands exempted company with its principal place of business in Grand Cayman, Cayman Islands.

31. Plaintiff **Delta Onshore, Ltd.** is a Delaware limited partnership with its principal place of business in New York, New York.

32.     Plaintiff **Delta Pleiades, LP** is a Delaware limited partnership with its principal place of business in New York, New York.

33.     Plaintiffs Delta Institutional, LP, Delta Offshore, Ltd., Delta Onshore, Ltd., and Delta Pleiadas, LP are collectively referred to as the "**Delta Funds**."

34.     During the Class Period, the Delta Funds were significant participants in the CDS market.  The Delta Funds purchased CDS from and sold CDS to several of the Dealer Defendants including Goldman Sachs, Credit Suisse, and Morgan Stanley with trades made in the United States.

35.     Plaintiff **Essex Regional Retirement System** ("**Essex**") is a public pension fund organized under the laws of the State of Massachusetts with its principal place of business in Essex County, Massachusetts.  Essex administers the public pension system for 48 local entities, including 19 towns, six school districts, 17 housing authorities and six special districts throughout Essex County, Massachusetts.  As of December 2013, Essex managed over $294 million of retirement assets for its member government entities.  During the Class Period, Essex was a significant participant in the CDS market.  Essex purchased CDS from and/or sold CDS to the Dealer Defendants, including Barclays, Credit Suisse, Deutsche Bank, Goldman Sachs, and Morgan Stanley with trades made in the United States.

36.     Plaintiff **Unipension Fondsmaeglerselskab A/S** ("**Unipension**") is a pension fund management company located in Denmark.  Unipension manages investments only for specific pension funds and does not have private investors.  Unipension is owned by Plaintiffs Arkitekternes Pensionskasse ("**Architects' Pension Fund**"); the MP Pension - Pensionskassen for Magistre & Psykologer ("**MP Pension**"); and Pensionskassen for Jordbrugsakademikere & Dyrlæger ("**Pension Fund for Agricultural Academics and Veterinary Surgeons**")

(collectively the "**Unipension Pension Funds**"). The Unipension Pension Funds have almost 100,000 members and have more than DKK100bn under management.

37. Unipension manages the assets of the Unipension Pension Funds. Unipension brings these claims on behalf of itself and as assignee of EMD Invest F.M.B.A. ("EMD Invest") pursuant to an Agreement for Assignment of Claims between Unipension and EMD Invest. EMD Invest is a Denmark-based company that is owned, in part, by the Unipension Pension Funds. During the Class Period, EMD Invest entered into CDS transactions on behalf of and for the sole benefit of the Unipension Pension Funds, at the direction of Unipension.

38. Plaintiff **Architects' Pension Fund** is a pension fund located in Denmark and managed by Unipension. Architects' Pension Fund purchased CDS directly from and sold CDS directly to one or more of the Dealer Defendants during the Class Period.

39. Plaintiff **MP Pension** is a pension fund located in Denmark and managed by Unipension. MP Pension purchased CDS directly from and sold CDS directly to one or more of the Dealer Defendants during the Class Period.

40. Plaintiff **Pension Fund for Agricultural Academics and Veterinary Surgeons** is a pension fund located in Denmark and managed by Unipension. Pension Fund for Agricultural Academics and Veterinary Surgeons purchased CDS directly from and sold CDS directly to one or more of the Dealer Defendants during the Class Period.

41. During the Class Period, Unipension and EMD Invest were significant participants in the CDS market. Unipension and EMD Invest purchased CDS from and sold CDS to several of the Dealer Defendants including Bank of America, Barclays, Deutsche Bank, and Morgan Stanley with trades made in the United States.

42. Collectively, Plaintiffs purchased CDS from or sold CDS to the Dealer

Defendants during the Class Period in an amount in excess of $13.5 billion in notional value of CDS.

**B.** **Defendants**

43.     Whenever in this Complaint reference is made to any act, deed, or transaction of any entity, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the entity's business or affairs.

44.     Defendant **Bank of America Corporation** ("**BAC**") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Charlotte, North Carolina and branch locations in New York, New York. Defendant **Bank of America, N.A.** ("**BANA**") is a federally chartered national banking association with its principal place of business in Charlotte, North Carolina, and is a wholly owned subsidiary of BAC.

45.     On January 1, 2009, Bank of America merged with Merrill Lynch & Co., Inc., assuming its assets and liabilities. Before the acquisition, Merrill Lynch Bank USA, a wholly owned subsidiary of Merrill Lynch & Co., Inc., was a CDS dealer and acted as a counterparty in CDS transactions.

46.     As used herein, the term "**Bank of America**" includes Defendants BAC and BANA and their broker-dealer subsidiaries and affiliates, including Merrill Lynch & Co. and Merrill Lynch Bank USA, that entered into CDS contracts with the Class, including as a dealer. During the Class Period, Bank of America directly sold CDS to and bought CDS from Class Members. During the Class Period, Bank of America was a shareholder of Markit and a member of ISDA and ICE Clear. Representatives of Bank of America sat on the boards of ISDA and Markit as well as on ICE Clear's risk committee.

47.    Defendant **Barclays Bank plc** is a corporation organized and existing under the laws of the United Kingdom with its principal place of business in London, England and branch locations in New York, New York.  As used herein, the term "**Barclays**" includes Defendant Barclays Bank plc and its broker-dealer subsidiaries and affiliates, including Barclays Capital, that entered into CDS contracts with the Class, including as a dealer.  During the Class Period, Barclays directly sold CDS to and bought CDS from Class Members.  During the Class Period, Barclays was a shareholder of Markit and a member of ISDA and ICE Clear.  Representatives of Barclays sat on the boards of ISDA and Markit as well as on ICE Clear's risk committee.

48.    Defendant **BNP Paribas** is a company organized and existing under the laws of France with its principal place of business in Paris, France and with branch locations in New York, New York.  As used herein, the term "**BNP**" includes Defendant BNP Paribas and its broker-dealer subsidiaries and affiliates that entered into CDS contracts with the Class, including as a dealer.  During the Class Period, BNP directly sold CDS to and bought CDS from Class Members.  During the Class Period, BNP was a shareholder of Markit and a member of ISDA and ICE Clear.  Representatives of BNP sat on the boards of ISDA and Markit.

49.    Defendant **Citigroup, Inc.** ("**Citigroup**") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  Defendant **Citibank N.A.** ("**Citibank**") is a federally chartered national banking association with its principal place of business in New York, New York, and is a wholly owned subsidiary of Citigroup.  Defendant **Citigroup Global Markets Inc.** ("**CGMI**") is the brokerage and securities arm of Citigroup Inc.  As used herein, the term "**Citi**" includes Defendants Citigroup, Citibank, and CGMI and their broker-dealer subsidiaries and affiliates that entered into CDS contracts with the Class, including as a dealer.  During the Class Period, Citi directly

sold CDS to and bought CDS from Class Members. During the Class Period, Citi was a shareholder of Markit and a member of ISDA and ICE Clear. Representatives of Citi sat on the boards of ISDA and Markit as well as on ICE Clear's risk committee.

50. Defendant **Credit Suisse AG** is a corporation organized and existing under the laws of Switzerland with its principal place of business in Zurich, Switzerland and branch locations in New York, New York. As used herein, the term "**Credit Suisse**" includes Defendant Credit Suisse AG and its broker-dealer subsidiaries and affiliates, including Credit Suisse Securities (USA) LLC, that entered into CDS contracts with the Class, including as a dealer. During the Class Period, Credit Suisse directly sold CDS to and bought CDS from Class Members. During the Class Period, Credit Suisse was a shareholder of Markit and a member of ISDA and ICE Clear. Representatives of Credit Suisse sat on the boards of ISDA and Markit as well as on ICE Clear's risk committee.

51. Defendant **Deutsche Bank AG** is a corporation organized and existing under the laws of Germany with its principal place of business in Frankfurt, Germany and branch locations in New York, New York. As used herein, the term "**Deutsche Bank**" includes Defendant Deutsche Bank AG and its broker-dealer subsidiaries and affiliates, including Deutsche Bank AG, London Branch and Deutsche Bank Securities, Inc., that entered into CDS contracts with the Class, including as a dealer. During the Class Period, Deutsche Bank directly sold CDS to and bought CDS from Class Members. During the Class Period, Deutsche Bank was a shareholder of Markit and a member of ISDA and ICE Clear. Representatives of Deutsche Bank sat on the boards of ISDA and Markit as well as on ICE Clear's risk committee.

52. Defendant **Goldman Sachs & Co**. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.

As used herein, the term "**Goldman Sachs**" includes Defendant Goldman Sachs & Co. and its broker-dealer subsidiaries and affiliates, including Goldman Sachs International, that entered into CDS contracts with the Class, including as a dealer. During the Class Period, Goldman Sachs directly sold CDS to and bought CDS from Class Members. During the Class Period, Goldman Sachs was a shareholder of Markit and a member of ISDA and ICE Clear. Representatives of Goldman Sachs sat on the boards of ISDA and Markit as well as on ICE Clear's risk committee.

53. Defendant **HSBC Bank plc** ("**HSBC Bank**") is a company organized and existing under the laws of the United Kingdom with its principal place of business in London, England. Defendant **HSBC Bank USA, N.A.** ("**HSBC Bank USA**") is a federally chartered national banking association with its principal place of business in McLean, Virginia. As used herein, the term "**HSBC**" includes Defendants HSBC Bank and HSBC Bank USA and their broker-dealer subsidiaries and affiliates that entered into CDS contracts with the Class, including as a dealer. HSBC maintains offices and transacts business in New York, New York. During the Class Period, HSBC directly sold CDS to and bought CDS from Class Members. During the Class Period, HSBC was a shareholder of Markit and a member of ISDA and ICE Clear. Representatives of HSBC sat on the boards of ISDA and Markit.

54. Defendant **J.P. Morgan Chase & Co**. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. Defendant **J.P. Morgan Chase Bank, N.A.** is a federally chartered national banking association with its principal place of business in New York, New York. On May 29, 2008, JPMorgan Chase & Co. merged with Bear Stearns & Co., assuming its assets and liabilities. Before the acquisition, Bear Stearns & Co. was a CDS dealer and acted as a counterparty in CDS transactions. As used herein, the term "**JP Morgan**" includes Defendants J.P. Morgan Chase &

Co. and J.P. Morgan Chase Bank, N.A. and their broker-dealer subsidiaries and affiliates, including Bear Stearns & Co., that entered into CDS contracts with the Class, including as a dealer. During the Class Period, JP Morgan directly sold CDS to and bought CDS from Class Members. During the Class Period, JP Morgan was a shareholder of Markit and a member of ISDA and ICE Clear. Representatives of JP Morgan sat on the boards of ISDA and Markit as well as on ICE Clear's risk committee.

55. Defendant **Morgan Stanley & Co., LLC** ("**Morgan Stanley Co.**") is a United States investment banking firm headquartered in New York, New York. As used herein, the term "**Morgan Stanley**" includes Defendant Morgan Stanley Co. and its broker-dealer subsidiaries and affiliates, including Morgan Stanley Capital Services LLC, that entered into CDS contracts with the Class, including as a dealer. During the Class Period, Morgan Stanley directly sold CDS to and bought CDS from Class Members. During the Class Period, Morgan Stanley was a shareholder of Markit and a member of ISDA and ICE Clear. Representatives of Morgan Stanley sat on the boards of ISDA and Markit as well as on ICE Clear's risk committee.

56. Defendant **Royal Bank of Scotland PLC** ("**RBS plc**") is the primary operating bank of the Royal Bank of Scotland Group PLC, a corporation organized and existing under the laws of the United Kingdom with its principal place of business in Edinburgh, Scotland. Defendant Royal Bank of Scotland, N.V. operates as a subsidiary of RBS Holdings N.V. As used herein, the term "**RBS**" includes Defendants RBS plc and RBS N.V. and their broker-dealers subsidiaries and affiliates, including RBS Securities Inc., that entered into CDS contracts with the Class, including as a dealer. RBS maintains offices and transacts business in New York, New York. During the Class Period, RBS directly sold CDS to and bought CDS from Class Members. During the Class Period, RBS was a shareholder of Markit and a member of ISDA

and ICE Clear. Representatives of RBS sat on the boards of ISDA and Markit.

57. Defendant **UBS AG** ("**UBS AG**") is a corporation organized and existing under the laws of Switzerland with its principal places of business in Basel and Zurich, Switzerland and regional offices in New York, New York and Stamford, Connecticut. Defendant **UBS Securities LLC** ("**UBS Securities**") is a subsidiary of UBS AG and is a registered broker-dealer and futures commission merchant in the United States. As used herein, the term "**UBS**" includes Defendants UBS AG, UBS Securities, and their broker-dealer subsidiaries and affiliates that entered into CDS contracts with the Class, including as a dealer/market maker. During the Class Period, UBS directly sold CDS to and bought CDS from Class Members. During the Class Period, UBS was a shareholder of Markit and a member of ISDA and ICE Clear. Representatives of Bank of America sat on the boards of ISDA and Markit as well as on ICE Clear's risk committee.

58. Bank of America, Barclays, BNP, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JP Morgan, Morgan Stanley, RBS, and UBS are referred to collectively herein as the "**Dealer Defendants**."

59. Defendant **International Swaps and Derivatives Association** ("**ISDA**") is a financial trade association representing hundreds of financial institutions involved in the derivatives market. ISDA operates from seven worldwide offices, including its headquarters located in New York, New York. ISDA has long provided a "Master Agreement" and other documents used in nearly every CDS transaction.

60. ISDA's members include the Dealer Defendants, which occupy seats on its board of directors. ISDA's board is chaired by Stephen O'Connor, a former managing director of Defendant Morgan Stanley, and its treasurer is Diane Genova of JP Morgan. Eleven of ISDA's

directors are executives of one of the Defendants: Gerhard Seebacher of Bank of America, Harry Harrison of Barclays, Guillaume Amblard of BNP, Brian Archer of Citi, Eraj Shirvani of Credit Suisse, Richard Herman of Deutsche Bank, R. Martin Chavez of Goldman Sachs, Elie El Hayek of HSBC, Diane Genova of JP Morgan, Jeroen Krens of RBS, and Christopher Murphy of UBS. In 2008 and 2009, Dealer Defendants constituted a majority of ISDA's board, occupying eleven of its nineteen seats, as well as all three of the board's officer positions – chairman, vice chairman, and treasurer.

61.     During this period, those board members included Jonathan Moulds (president, Europe, the Middle East, Africa and Asia at Bank of America), Dixit Joshi (managing director, head of Equity-Linked Products at Barclays), Frederic Janbon (global head of Fixed Income at BNP), Joseph Elmlinger (managing director, head of Global Equity Derivatives at Citigroup), Eraj Shirvani (managing director, head of European and Pacific Credit Sales and Trading at Credit Suisse), Michele Faissola (managing director and global head of Rates, Global Markets Division at Deutsche Bank), Thomas Riggs (managing director at Goldman Sachs), Thibaut de Roux (global head of Structured Rate Products and head of Interest Rate Options for Europe & Americas at HSBC), Diane Genova (managing director & general counsel at JP Morgan)**,** Stephen O'Connor (global head of Counterparty Portfolio Management at Morgan Stanley), Riccardo Rebonato (global head of CBFM Market Risk and head of Quantitative Research & Quantitative Sales at RBS), and Peter Healey (chief operating officer, Fixed Income, Currencies and Commodities at UBS).

62.     Defendants **Markit Group Holdings Ltd.** ("**Markit Group Holdings**") and **Markit Group Ltd.** ("**Markit Group**") are private financial information companies organized and existing under the laws of the United Kingdom with their principal places of business in

London, England and with branch locations in New York, New York. Markit Group is a subsidiary of Markit Group Holdings. As used herein, the term "**Markit**" includes Defendants Markit Group Holdings and Markit Group and their subsidiaries, affiliates, and assigns that owned any interest in or negotiated the licensing of any CDS indices.

63. Markit Group Holdings is owned by the company's employees, the investment firm Temasek, the private equity group General Atlantic, and sixteen investment banks including Dealer Defendants Bank of America (and its subsidiary Merrill Lynch), Barclays, BNP, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JP Morgan, Morgan Stanley, RBS, and UBS. During the Class Period, these sixteen investment banks owned between 50% and 70% of Markit. In February 2014, Markit confidentially filed for an initial public offering.

64. The Dealer Defendants also occupy seats on Markit Group Holdings' board of directors. During the Class Period, these board members included Richard S. Cohen (director at Bank of America), Dexter Emory Senft (director at Barclays), Eric Dumas (head of US Credit Trading and global head of Flow Credit Trading at BNP), Arne Groes (global head of Flow Credit Trading at BNP), William John Hartnett (managing director at Citigroup), Simon Andrew Harvey Davidson (director, head of the Securities Markets Group at Credit Suisse), Lawrence Shaw (chief operating officer for the Global Markets Equity at Deutsche Bank), Bradford Levy (managing director in Principal Strategic Investments Group at Goldman Sachs), Niall Cameron (managing director and Global Head of Credit at HSBC), Jon Pliner (managing director at Merrill Lynch), Michael Davie (managing director at JP Morgan), Thomas Mosimann (executive director and global head of Strategic Investments for Interest Rates, Currency, and Credit Division at Morgan Stanley), Michelle Neal (head of Fixed-income Electronic Commerce, Rates and

Credit, and Head of Debt Markets Electronic Commerce at RBS), and Philip Alexander Olesen (Head of Credit Trading for the Americas at UBS).

65. Co-conspirator ICE Clear Credit LLC ("ICE Clear"), formerly known as ICE Trust U.S. LLC (and before that as ICE US Trust, LLC), is wholly owned by ICE US Holding Company L.P. ("ICE LP") and is organized under the laws of the State of Delaware, with its principal place of business in New York. ICE LP is a Cayman Islands exempted limited partnership. ICE US Holding Company GP LLC ("ICE GP") owns 50 percent of and is the general partner of ICE LP. ICE GP is a Delaware limited liability corporation that is wholly owned by co-conspirator IntercontinentalExchange Inc. Other owners of ICE LP include Dealer Defendants Bank of America, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, JP Morgan, Morgan Stanley, and UBS. These Dealer Defendants share in ICE Trust's profits. Dealer Defendants Barclays, BNP, HSBC and RBS are also members of ICE Clear.

66. In March 2009, ICE Clear began operating as a central counterparty clearing facility for CDS contracts, clearing CDS transactions between Defendants as well as between Defendants and other dealers. (As discussed below, however, Defendants ensured that ICE Clear would operate in a way that retained the inefficiencies of the over-the-counter trading that yielded them inflated profits.) ICE Clear is also an affiliate of Creditex, which jointly administers the Credit Event Fixing Product with Defendant Markit. Dealer Defendants control ICE Clear's membership and rules through seats on ICE Clear's risk committee, which writes or approves ICE Clear's clearing rules. The membership of ICE Clear's risk committee is not publicly disclosed, but during the Relevant Period was reported to include senior personnel of Dealer Defendants, including Ali Balali of Bank of America, Paul Mitrokostas of Barclays, Biswarup Chatterjee of Citi, Andy Hubbard of Credit Suisse, Athanassios Diplas of Deutsche

Bank, Oliver Frankel of Goldman Sachs, Thomas J. Benison of JPMorgan, James Hill of Morgan Stanley, and Paul Hamill of UBS.

67. Co-Conspirator IntercontinentalExchange Inc. ("ICE") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Atlanta, Georgia and offices in New York, New York. ICE is an operator of regulated futures exchanges and over-the-counter markets and derivatives clearing houses. In March 2009, through its subsidiary ICE Clear Credit, ICE became the first clearinghouse to process CDS transactions in the United States, and to this day processes the vast majority of CDS clearing, including all cleared dealer-to-dealer CDS transactions, in the United States.

68. Various other non-parties also participated as co-conspirators, performed acts, and made statements in furtherance of the conspiracy. Plaintiffs reserve the right to identify other co-conspirators and to name subsequently some or all co-conspirators, whether identified here or not, as defendants.

69. Defendants are jointly and severally liable for the act of their co-conspirators whether named or not named as Defendants in this complaint. Each Defendant acted as the agent or joint-venturer of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

**FACTUAL ALLEGATIONS**

I. **STARTING BEFORE 2008, DEFENDANTS JOINTLY EXPLOITED AND MAINTAINED AN INEFFICIENT MARKET STRUCTURE FOR CDS.**

A. **CDS Contracts Generally**

70. A CDS is a type of credit derivative. A derivative is a financial instrument, the value of which depends on the value of some other underlying asset, such as a stock, bond, or commodity. Derivatives permit market participants to manage and transfer risk by allowing

them to separate out and trade individual risk components, such as credit risk. Derivatives also have informational value – they can signal current market sentiment regarding contingent future events, such as the risk of a company defaulting on its debts.

71. A CDS operates like insurance: one party (the protection buyer) makes periodic payments to the other party (the protection seller) in exchange for the seller's promise to make the buyer whole on an agreed amount in the event of some "credit event," such as bankruptcy, by a third party, known as the "reference entity."

72. The payments made by the buyer in exchange for protection are known as the "premium" (or, in industry lingo, the "CDS spread" or "CDS rate"). These payments are typically expressed in basis points, *i.e.*, one-hundredths of a percent of the notional amount of protection being sold, and are paid annually or quarterly, until the maturity of the CDS contract or until a default (or other credit event) of a referenced entity. Generally speaking, there is a positive correlation between the CDS premium and the riskiness of the reference entity, meaning that a higher CDS premium generally indicates a higher perceived risk of a credit event on the reference entity.

73. An investor can buy a CDS to hedge its credit exposure on a particular liability, such as a bond or loan issued by the reference entity. Thus, an investor may, for example, choose to "buy protection" through the CDS market in order to hedge its risk of default on an outstanding bond held on its books. If the underlying bond defaults, the investor loses its principal (or some portion of its principal) on that bond, but will recover approximately the amount of the loss through a CDS protection payment triggered by the bond's default. The CDS market, like almost any financial market, also allows participants to speculate on the value of credit protection by buying protection with CDS (and betting that credit protection will become

more valuable) or selling protection with CDS (and betting that credit protection will become less valuable).

**B.** **Origins of the CDS Market**

74. CDS originated in the 1990s as a means to transfer credit exposure. In the early days, there were few participants in the market, and in many cases, the protection buyer owned the underlying asset.

75. Initially, CDS trading was largely ad hoc. Because CDS instruments were not standardized, the various terms of a CDS contract were individually negotiated, resulting in high transaction costs. One of those transaction costs was the cost of searching for a counterparty willing to take the other side of a trade – that is, a party willing to buy the protection the investor wanted to sell (or vice versa). In response to this "matching" problem, "market makers" emerged to match buyers and sellers of CDS. Market makers sell to buyers, buy from sellers, and hold inventory until a matching offer emerges.

76. The Dealer Defendants are the primary market makers for CDS, also known as the "sell-side." Their customers, the buyers and sellers of CDS who take the price quoted by the dealer, are known as the "buy-side" of the market. The buy-side purchases liquidity, also known as "immediacy" – the ability (ideally) to trade at the market bid or offer without having to wait for a counterparty to come along who is willing to transact. The sell-side sells this liquidity.

77. The Dealer Defendants supply liquidity by providing a "bid" price, at which the dealer will purchase, and an "ask" price, at which the dealer will sell. The dealers generally keep their ask price higher than their bid price, and capture the difference, which is known as the "bid/ask spread."

78. By way of illustration, assume a dealer purchases and sells an equal volume of credit protection on the same underlying asset with the same transaction documentation and no

transaction costs.  Under these circumstances, the dealer makes an annual profit equivalent to the difference between the price it bought at (its bid) and the price it sold at (its ask), expressed in terms of basis points – or $1/100^{th}$ of a percent – of the total notional value of credit protection bought and sold multiplied by that total notional value.  For example, if a dealer purchases protection for 100 basis points on $100 million of XYZ and sells protection for 150 basis points on $100 million of XYZ, the dealer makes a profit of 0.5% * $100 million, or $500,000 per year.

79.     By the early 2000s, the Dealer Defendants had established themselves as over-the-counter CDS dealers.  At that time, a dealer's role as market maker was valuable because there were not many buyers and sellers in the market, so there was a need for the provision of liquidity.  In addition, there were substantial barriers to entry in the over-the-counter dealer market.  With low trading volume and a lack of standardized products, a potential dealer would need to address the risk of being left with unwanted CDS exposure, which only large financial institutions could manage.  As such, the dealers were able to charge extremely high prices (in the form of bid/ask spreads) for their services – resulting in windfall revenues and profits for the Dealer Defendants.  Having created that market structure, the Dealer Defendants conspired to maintain it.

C.     **Increased Volume, the Inter-Dealer Market, and Standardization of the CDS Market Created Conditions That Supported Exchange Trading and Threatened the Dealer Defendants' Profits.**

80.     By the mid 2000s, several changes had occurred in the CDS market that fundamentally altered the market's structure, significantly increased liquidity and thus substantially reduced the value of the liquidity offered by the Dealer Defendants.

81.     First, the volume of CDS transactions increased significantly from the 1990s to the mid 2000s.  In 2001, the outstanding notional amount of CDS was $918 billion.  By 2007, the market had ballooned by a factor of 60 to $62.2 trillion.

82.     Second, the structure of CDS transactions was standardized under the ISDA Master Agreement in the late 1990s and early 2000s. The ISDA Master Agreement is a master service agreement designed by ISDA to create standard terms, confirmations, and credit definitions for CDS transactions. As a standardized document, most of the terms of the Master Agreement do not need to be re-negotiated for each transaction and instead apply automatically.

83.     Third, and perhaps most importantly, CDS products themselves became highly standardized. As the CDS market grew, two categories of CDS – single-name and index CDS – emerged as highly liquid products.

> a. Single-name CDS are CDS based on a single debt instrument issued by an underlying reference entity. The vast majority of single-name CDS are standardized contracts based on the ISDA 2003 Credit Default Swap Definitions. By November 2004, 50-60% of single-name CDS complied with the 2003 ISDA definitions. As of 2011, approximately 92% of all CDS trades include a standard coupon, while 97% of all CDS trades have fixed quarterly payment dates.

> b. A CDS index is a credit derivative that references a basket of reference-entities. It is generally used to hedge macro credit risk rather than take a position on a particular entity's credit profile. In 2003, the first major families of CDS indices, Trac-x and iBoxx, became available for trading, and in 2004 they were merged to form iTraxx for the European and Asian markets and CDX for the United States market. At that time, iTraxx was owned by the International Index Company, which was owned by eleven banks including Defendants Barclays, BNP, Deutsche Bank, Goldman Sachs, HSBC, JP Morgan, Morgan Stanley, and UBS. CDX was owned by CDS IndexCo, which in turn was owned by 16 banks

including Defendants Bank of America, Barclays, BNP, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JP Morgan, Morgan Stanley, and UBS. In November 2007, in two separate transactions, Defendant Markit purchased the CDX index from CDS IndexCo and the iTraxx index from the International Index Company.

84. The contract terms of the CDX and iTraxx indices such as maturity are (and always have been) standardized, with the only variable being price. These contract terms are set by Defendant Markit. The indices themselves are also standardized, covering a basket of reference entities selected by Markit.

85. With so many CDS trading in standardized form, the market was able to support alternative mechanisms for trading CDS, including trading through an electronic exchange. Had the market been permitted to develop in response to customer demand for these alternative execution mechanisms, the buy-side's dependence on over-the-counter trading services offered by the Dealer Defendants would have significantly diminished.

86. Additionally, increased volume meant increased liquidity for the Dealer Defendants, which allowed them to offset their positions more efficiently. Increased volume also created economies of scale and scope for the Dealer Defendants, particularly through netting of counterparty risk, resulting in reduced per-trade risk management and processing costs. The Dealer Defendants were also able to mitigate risk through an inter-dealer broker market, through which the Dealer Defendants were able to enter into offsetting transactions with other dealers and gain insights into market supply and demand — insights they used for their own advantage while hiding them from their customers.

87. As a result of these developments, the Dealer Defendants faced two threats to

their lucrative profits on the bid/ask spread. First, they faced the threat of competition from alternative methods for conducting CDS transactions, especially electronic exchanges, which would put downward pressure on CDS bid/ask spreads. Second, they faced the threat of increased price competition amongst themselves because of increased volume and standardization. These threats were unacceptable to the Dealer Defendants, and they conspired to neutralize them.

### D. Defendants Limited *Pre*-Transaction Price Transparency.

88. In order to protect their market power and to block the entry of more efficient alternatives that could be used, the Dealer Defendants went to great lengths to keep investors in the dark – both in terms of the volume of supply and demand at any given moment and the real price at which products were bought and sold in the market.

89. When the Dealer Defendants would solicit bids and offers from the market, their solicitations were private, so they could not be seen by the market generally. The Dealer Defendants did not publicly announce the prices at which they are willing to buy and sell CDS. Instead, they would periodically send "runs" in electronic messages on Bloomberg financial terminals to select customers with whom they have transacted in the past. The runs contained only "indications" of the prices at which the Dealer Defendants would buy and sell CDS. Thus, the Dealer Defendants did not commit to trade at their indicated prices. Rather, customers had to make a "reverse inquiry" via telephone or a return Bloomberg message to find out whether and at what price the dealer was actually willing to transact.

90. The Dealer Defendants' prices routinely varied from their indicated prices, especially when a customer would not make a reverse inquiry almost immediately upon receiving the run. The Dealer Defendants used their knowledge of their customers' interest to adjust their prices. The Dealer Defendants also sent runs out simply to mislead the market about

their intentions. For example, the Dealer Defendants would use an investor's response as a way to "front run" the investor – *i.e.*, betting in the same direction as the investor, but before the investor is able to secure a trade, and thereby profiting from the price impact of increased supply (or demand) caused by the investor's subsequent purchase while simultaneously causing the market to move against the investor.

### E.    Defendants Also Restricted *Post*-Transaction Price Information.

91.    The Dealer Defendants also erected barriers to meaningful post-transaction transparency. Virtually no CDS data could be shared without the Dealer Defendants' express consent. Where data was shared, the Dealer Defendants ensured that the terms were such that the disclosure did not threaten the information asymmetry status quo.

92.    ***Defendants prevented publication of real-time transaction data***. Once a Dealer Defendant consummated a CDS trade, the terms, payments, and parties to that transaction had to be formally processed and confirmed. Those tasks were generally accomplished by the Depository Trust & Clearing Corporation (DTCC) which, through its subsidiaries Warehouse Trust Company, LLC and DTCC Derv/SERV, LLC, handled the settling of the Dealer Defendants' CDS trades. As the central repository of CDS settlement data, DTCC was able to derive transaction prices from the data. That information could have been disseminated widely on a real-time basis to data vendors or other service providers.

93.    The Dealer Defendants used their role on the DTCC board of directors to promulgate rules to prevent the release of such information. These board members – including Lori Hricik and Paul H. Compton of JP Morgan, Suni Harford of Citi, Robin A. Vince of Goldman Sachs, Stephen Duffron of Morgan Stanley, Darryll Hendricks of UBS, Jason Hitchon of Deutsche Bank and Mark D. Linsz of Bank of America – met during the Relevant Period to discuss limiting the dissemination of CDS trading data maintained by DTCC.

94.    ***Defendants restricted Markit from providing pricing information***.  At all times during the Relevant Period, DTCC provided real-time post-trade data only to the DTCC's members (which include all of the Dealer Defendants) and, importantly, to Defendant Markit. When Markit was first founded in 2003, it wanted to obtain submissions of daily price data from dealers.  In exchange for providing that data, Markit offered the Dealer Defendants options to buy shares in Markit and agreed to the Dealer Defendants' condition that it would place limits on the dissemination of CDS pricing information to others in the market.

95.    As a result, Markit did not provide real-time pricing information to its subscribers. Instead, Markit built in a delay before sending out data to its subscribers so as to permit the Dealer Defendants to quote prices different from the price indications from Markit.

96.    This delay rendered the data substantially less valuable to investors, as the market price for a given CDS product can change from one minute to the next.  It also allowed the Dealer Defendants to disavow the prices quoted in their runs as stale, permitting them to adjust their prices advantageously in response to the investor's intended position.

97.    In addition, rather than providing data about specific trades closed that day, the end-of-the day information published by Markit was essentially only an *average* of the "marks" data provided to it by the Dealer Defendants.  "Marks" are prices ascribed by the traders, at their discretion, to the value of the positions on the dealer's books.  Markit did not provide information revealing whether the marks data are based on recent transactions.  Thus, an investor would have difficulty knowing whether the execution price received on a new trade is at variance with recent execution prices, which in turn made it difficult for an investor to discriminate among dealers based on their reputation for execution price quality.  That, in turn, reduced the

pressure on the Dealer Defendants to compete with each other by offering good execution to their customers.

98.     Markit's agreement to withhold this real-time information was contrary to its own economic interests.  If Markit were acting in its independent interest instead of pursuant to an agreement with the Dealer Defendants, it would have sold real-time price information to investors, and other market participants, because such information is conspicuously lacking from the CDS market and would be extremely valuable to many market participants.

> **F.     Defendants Secured Additional Information Advantages Through the Inter-Dealer Broker Market.**

99.     In addition to the informational advantages the Dealer Defendants enjoy as a result of the above restrictions on real-time price information, they have also enjoyed informational advantages by virtue of their exclusive participation in the inter-dealer market.

100.     When dealers trade CDS with each other, they use intermediaries called inter-dealer brokers ("IDBs").  Dealers submit the prices at which they are willing to buy or sell CDS with another dealer to the IDBs.  These brokers in turn solicit interest from other dealers and attempt to match bids and offers.  Dealers see each other's quotes, but not each other's identity (to maintain anonymity), and can choose to enter CDS transactions at the quoted prices without negotiation or inquiry and without submitting their own quotes.

101.     This system has provided the Dealer Defendants with the benefits they deny to non-dealers:  the ability to quote bid and ask prices anonymously, the ability to accept quoted bid and ask prices without further inquiry, and ready knowledge of a larger array of bid and ask prices.  Thus, the IDB system itself possessed some of the key attributes of an electronic exchange and demonstrates that CDS have been suitable and ripe for exchange trading since before 2008.

102.     The Dealer Defendants, however, have prevented non-dealers from participating in that system.  Among other things, the Dealer Defendants have threatened the IDBs with losing their business – which would effectively destroy them – if they facilitate CDS transactions with non-dealers.  For example, GFI Group, Inc. – a leading IDB – was threatened with being boycotted for giving non-dealers access to pricing information.

103.     The Dealer Defendants have also forbidden the IDBs from trading with non-dealers out of fear the IDBs would begin brokering trades between non-dealers, thereby shutting out the Dealer Defendants.  No Dealer Defendant has partnered with an IDB to facilitate additional trades between non-dealers.  Nor has any Defendant broken ranks with the other Dealer Defendants in their joint efforts to ensure that all CDS transactions include at least one dealer.  In this way, the Dealer Defendants acted as a cartel to ensure and preserve their continued control over CDS pricing and other relevant critical CDS pricing information.

G.     **Defendants' Control of the CDS Market Yields Supracompetitive Bid/Ask Spreads.**

104.     Generally, in any over-the-counter market, increased liquidity and standardization of trades should result in lower prices to consumers – here, a reduction in bid/ask spreads for the benefit of the Class.  But, because of the Dealer Defendants' control over real-time pricing information, and the other conduct alleged herein, the Dealer Defendants were able to maintain supracompetitive bid/ask spreads throughout the Relevant Period.

105.     Thus, by the beginning of 2008, the Dealer Defendants, with the active assistance of Markit and ISDA, had complete control over CDS trading including the setting of artificially inflated bid/ask spreads.  The Dealer Defendants had intentionally structured the CDS market in this manner so that it was extremely profitable to them and unnecessarily costly to investors.  By keeping prices opaque even when trading volume increased and CDS products became

standardized, the Dealer Defendants kept CDS spreads artificially inflated and obtained monopoly profits on their CDS trades.

106.    During this period, the Dealer Defendants also enjoyed freedom from any regulation of the CDS market.  After the passage of the Commodity Futures Modernization Act of 2000 ("CFMA"), CDS did not qualify as "swap agreements," and were therefore not regulated by the Commodity Exchange Act.  The CFMA also exempted CDS from the definition of "securities" and prohibited the U.S. Securities and Exchange Commission ("SEC") from, among other things, imposing reporting, recordkeeping, or disclosure requirements on swaps transactions.  While the SEC retained limited authority to enforce certain anti-fraud and anti-manipulation clauses of the securities laws, it could not even promulgate prophylactic measures designed to prevent fraud with respect to security-based swap agreements.

107.    As the SEC's Director of the Division of Trading and Markets testified to a House of Representatives Committee in 2008, referring expressly to CDS:  "the tools necessary to oversee this market effectively and efficiently do not exist."[3]  Walter Lukken, acting chairman of the Commodity Futures Trading Commission ("CFTC"), told the same House Committee: "With respect to the CFTC, the Commodity Exchange Act (CEA) excludes most OTC financial derivatives, including CDS, from its regulatory and enforcement jurisdiction."[4]  Christopher Cox, chairman of the SEC, characterized the CDS market as a "regulatory hole," which is "regulated by no one" as "[n]either the SEC nor any regulator has authority over the CDS

---

[3]   Erik Sirri, *Testimony Concerning Credit Default Swaps* (Oct. 15, 2008), *available at* http://www.sec.gov/news/testimony/2008/ts101508ers.htm.

[4]   Walter Lukken, *Review of Credit Derivatives* (Oct. 15, 2008), *available at* http://www.cftc.gov/ucm/groups/public/@newsroom/documents/speechandtestimony/opalukken-49.pdf.

market, even to require minimal disclosure to the market."[5]

## II.     DEFENDANTS CONSPIRED TO BLOCK COMPETITION AND MARKET ENTRY IN THE U.S. CDS MARKET.

### A.     CDS Exchanges and Clearinghouses Emerged As Threats to Defendants' Oligopoly in the United States.

108.    By no later than early 2008, the CDS market was ripe for increased transparency and competition.  This provided a major business opportunity for entry into this market.

109.    As a result, potential market entrants – specifically, CDS exchanges and clearinghouses – emerged in 2008 to bring transparency and competition to the market and to reduce investors' costs of doing business.  While considerable barriers to entry prevented direct buy-side competition with the major dealers in the over-the-counter market, CDS trading through exchanges would have forced direct competition on bid/ask spreads.

110.    One such exchange platform was CMDX, a joint venture by the hedge fund Citadel and the derivatives exchange CME.  Together Citadel and CME had the capital, industry experience and credibility, trading and clearing platform, and technological sophistication to launch a successful CDS exchange and central clearinghouse.

111.    CME was and is the world's largest and most diverse derivatives exchange.  CME Group owns and operates numerous exchanges including the CME, the Chicago Board of Trade, the New York Mercantile Exchange, and the Commodity Exchange.  According to Defendant JP Morgan, CME is "a great franchise with an industry-leading management team."[6]  It "has among the best if not the best trading technology globally in terms of speed and reliability" and it

---

    [5]    Christopher Cox, *Testimony Concerning Turmoil in U.S. Credit Markets* (Sept. 23, 2008), *available at* http://www.sec.gov/news/testimony/2008/ts092308cc.htm.

    [6]    J.P. Morgan North American Equity Research, *CME Group Inc.* at 5 (Jan. 23, 2009).

"operates a top-tier clearing house (in terms of both technology and risk management)."[7] Defendant Credit Suisse has described CME "as a best-in-class global financial exchange" which "has been at the forefront in the adoption of electronic trading" and "has continually invested in its trading technology infrastructure over the past two decades."[8]

112.     Citadel's CDS product knowledge, proprietary market data and analytics, technology, and investment also stood behind CMDX. Citadel is one of the largest hedge funds in the world. As of 2008, it had established itself as a market maker in numerous securities and over-the-counter markets worldwide and was one of the five largest buy-side CDS traders in the nation. Citadel had also developed proprietary CDS technology it was prepared to use to establish a CDS trading and clearing platform.

113.     Citadel and CME made huge investments in CMDX and conducted extensive modeling – working with both buy-side and sell-side participants – to ensure that CMDX would deliver to the market a tested and fully viable electronic trading platform for CDS.

114.     CMDX was an electronic trading, booking, and migration platform for CDS, paired with straight-through processing to CME's clearing facilitates. CMDX was designed as an open-architecture electronic trading and migration platform for CDS, meaning it would serve as a platform for the execution or booking of trades through a number of different venues. CMDX's open architecture would enable market participants to execute or book CDS trades through Central Limit Order Booking ("CLOB"), which is a trading method that matches customers' orders (*e.g.*, bids and offers) on a "price time priority" basis whereby the highest (or best) bid order and the lowest (or cheapest) offer order constitute the best market in a given

---

[7]     *Id.* at 3, 6.

[8]     Credit Suisse Equity Research, *CME Group Inc.* at 4-5 (Sept. 28, 2011).

swap.  In a CLOB model, customers can trade directly with dealers, dealers can trade with other

dealers, and customers can trade directly with other customers anonymously.

115.    CMDX also had a Request-for-Quote ("RFQ") platform, which enabled a

customer to query market participants who quote bids and offers to the customer.  The customer

could "hit the bid" (sell to the highest bidder) or "lift the offer" (buy from the cheapest seller).

CMDX also facilitated IDB-brokered transactions or direct party-to-party negotiation.

116.    CMDX would not only transition existing trading methods onto an exchange and

clearing platform, but it also would allow, through CLOB, fully transparent, real-time,

anonymous, and low cost CDS trading.  Thus, CMDX using CLOB would cut out the Dealer

Defendants as the middlemen in most CDS transactions and make CDS pricing information

readily available to investors in real time.  And the exchange-based RFQ platform would provide

customers with more (and more accurate) quotes than on the over-the-counter market.

117.    Extensive modeling showed that CMDX would support "the trading and clearing

of the most extensive CDS product set in the industry, covering 75% of index and single name

notional value on day 1"[9] including "the highest-volume CDX and iTraxx indices and their

single-name constituents."[10]  CMDX would then add "single-name CDS that are not included

within indices," "other index products (e.g., CDX Emerging Markets)," "single-name

constituents of these indices," and "CDX and iTraxx Index Tranche products."[11]  Thus, CMDX

would cover more than 90 percent of the CDS index and single-name market.  Membership

would generally be open to dealers, banks, and institutional investors.

---

[9]    *About CMDX – Overview*, CMDX.com (Feb. 15, 2009), *available at*
http://web.archive.org/web/20090215203639/http://cmdx.com/about-us-overview.html.

[10]    *CMDX Products – Overview*, CMDX.com (Feb. 15, 2009), *available at*
http://web.archive.org/web/20090215203912/http://cmdx.com/products-overview.html.

[11]    *Id.*

118.    CMDX also provided a migration utility to migrate existing bilateral over-the-counter contracts to standardized, centrally cleared contracts:

> For index contracts the Migration Utility simply replaces each side of a bilateral contract with one standard contract facing CME Clearing. For single-name contracts, the Migration Utility takes an existing bilateral position with a non-standard coupon and converts it into one or two contracts with standard coupons (e.g., one at 100 bps and one at 500 bps). The two new contracts have the same net notional value and cash flows as the original non-standard bilateral position. Participants can easily migrate their existing book from non-standard OTC contracts to the standard centrally cleared contracts.[12]

119.    By the time CMDX was ready to launch, it had tested this migration utility with leading sell-side and buy-side market participants. Modeling showed that migration would increase liquidity and netting opportunities for contract holders, which would in turn further facilitate rapid customer adoption of CMDX.

120.    Trades executed, booked, or migrated through CMDX would be processed directly to CME Clearing (the clearing component of the venture) using straight-through processing. Thus, whenever a transaction was executed or booked through CMDX, it would be cleared electronically without the need for manual entry of the trade or subsequent confirmation from a trading desk. This allows trade processing to occur quickly and efficiently while also minimizing settlement risk.

121.    By serving as the buyer to every seller and seller to every buyer for all CDS trades executed, booked or migrated via CMDX, CME Clearing would have virtually eliminated the risk of counterparty default. CME Clearing guaranteed the performance of both sides of every trade and would settle accounts, clear trades, collect and maintain performance bonds, regulate delivery, and report data. As CMDX stated:

---

[12]    *Migration Overview*, CMDX.com (Feb. 17, 2009), *available at* http://web.archive.org/web/20090217070614/http://cmdx.com/migration-overview.html.

CMDX leverages the CME Clearing infrastructure, which handles approximately $1.2 quadrillion in notional value traded per year, approximately $39 trillion in open interest, and approximately $111 billion in collateral. As the world's largest derivatives clearing facility, CME Clearing is unmatched in its ability to manage risk effectively across a wide range of market stresses and a diverse set of products.[13]

122. Citadel and CME invested millions of dollars to develop, build, and test CMDX, such that exchange trading through CMDX and clearing through CME Clearing were operationally ready by no later than the fall of 2008. Based on modeling conducted by Citadel and CME, the exchange would be operating by late 2008 and would be adopted by the market. This modeling showed, for example, that CDS investors (*i.e.*, members of the Class) would quickly begin executing their CDS trades on CMDX while enjoying significant savings on execution costs in the form of bid/ask spreads.

123. Defendant JP Morgan projected in a January 2009 analyst report that CMDX was "very well positioned to generate earnings as the OTC market migrates on-exchange," as "CME has an ideal business mix to win in the OTC market because it is already a leader in listed derivatives in the largest OTC markets" and "is the global leader in fixed income derivatives, foreign exchange, and equities."[14] The report further noted that the "existing market environment is ideal for CME and other exchanges to build their on-exchange businesses," pushing trading from over-the-counter to on exchange.[15]

124. On June 9, 2008, CMDX was presented to the dealer community and the buy-side market. At the time, the Federal Reserve Bank of New York had become interested in encouraging central counterparty clearing and other infrastructure improvements in the CDS

---

[13] *CME Clearing – Overview*, CMDX.com (Feb. 17, 2009), *available at* http://web.archive.org/web/20090217070557/http://cmdx.com/clearing-overview.html.

[14] *See* J.P. Morgan North American Equity Research, *supra* note 6, at 21.

[15] *Id.* at 19.

market, and it hosted a meeting with CDS market participants to discuss these topics. At that meeting, CME and Citadel made a presentation regarding CMDX, its exchange trading capabilities, and straight-through processing of its trades to CME Clearing.

125. Soon after, CME and Citadel began to pitch CMDX to the market. Market participants expressed significant interest. Citadel and CME met with buy-side firms with substantial CDS trading volume – including Blackrock, Inc., AllianceBernstein LP, D.E. Shaw Group, and BlueMountain Capital Management – about initial participation in CMDX. Citadel and CME promoted CMDX as having clearing capabilities through CME Clearing, proprietary trading through a CLOB mechanism, trading of major CDS indices and some single-name CDS, and a launch by late 2008.

126. Citadel and CME also made targeted pitches to certain sell-side participants in the CDS market, including some of the Dealer Defendants. Citadel and CME generally engaged in discussions with banks with smaller CDS market shares, a willingness to embrace market reforms, or a history of working with CME. At least six banks – including Bank of America, Barclays, Citi, Deutsche Bank, Morgan Stanley, and UBS – were offered equity in CMDX. Term sheets reflected between a 30 to 50 percent equity stake for those sell-side participants who became involved. As a result, there was a sizeable first-mover advantage for early sell-side participants signing on to CMDX, including substantial trading and clearing revenues. While the exchange would reduce customers' transaction costs, its economies were still weighted toward the sell side.

127. As a result, certain of the Dealer Defendants had favorable reactions to the CMDX proposal and expressed interest in becoming involved. These dealers recognized that the

CMDX proposal would be in their independent economic self-interest. It would allow them to achieve growth in the market that they had not otherwise been able to achieve.

128. As one example, CME and Citadel offered equity in the trading side of the venture to Barclays – a prospect which interested Barclays because it could lead to substantial growth in its relatively small CDS market share. Barclays noted in a broker report to investors during this period that:

> We believe that **CME's clearing house is well positioned in the markets given its size and amount of collateral, and therefore it lends itself to be the natural solution for clearing CDS**, which a "new" clearing house would likely have to be funded from the ground up. **CME/Citadel are willing to share the economics by offering 30% of the equity in the JV to market participants and offering member rates, which could help get the system off the ground** ***
>
> We believe that certain segments of the market, such as indices, **already lend themselves to trade in an exchange-like fashion**.[16]

129. BNP also had a favorable reaction to CMDX. For example, Chris Adams, global products head, alternative funds at BNP, praised the venture in an interview with the *Financial Times*.[17]

130. Throughout mid to late 2008, Citadel and CME held a series of meetings and communications with Defendants Markit and ISDA regarding obtaining licenses that would facilitate CMDX's successful launch. Citadel and CME sought licenses to Markit's CDS indices, among other intellectual property. Markit claims intellectual property rights over the makeup of its CDS indices. As noted, CMDX planned to launch with all major CDX and iTraxx indices, which Markit owns, as well as single-name constituents. The ability to offer exchange

---

[16] Barclays Capital Equity Research, *Exchange-Traded CDS Has Several Hurdles* (Oct. 8, 2008) (emphasis added).

[17] Hal Weitzman & Jeremy Grant, *CME-Citadel Form Clearing Facility*, Financial Times (Oct. 7, 2008), *available at* http://on.ft.com/1lQEfNs.

trading of the CDX and iTraxx indices was important because index CDS constituted approximately 50% of the market trading activity.

131.    Citadel and CME also sought a license for use of Markit's reference entity database ("RED") codes.  A RED code is a CUSIP-linked code (a 9-character alphanumeric code) widely used in the CDS market to identify the reference entity of a CDS and the specific financial instrument issued by the reference entity.  Markit also claims intellectual property rights in its RED codes.

132.    These licenses were important because a trading platform without Markit indices or RED codes would have had significantly less potential for market adoption because these indices and codes were already being widely used in the market.

133.    Markit recognized that it was in its independent economic self-interest to license its CDS indices and RED codes to CMDX because Markit stood to gain significant revenues from licensing both products.  Markit was interested in licensing the RED codes because it would assure greater market adoption (and minimize the possibility of market adoption of an alternative CUSIP-linked code systems).

134.    In addition, a functioning exchange would have created transaction data for every single trade.  Markit was the recipient and publisher of dealer mark data in the over-the-counter market, and Markit was potentially in a position to sell the exchange's real-time transaction data, and to reap large revenues as a result.  Markit recognized these benefits.  It was thus no surprise that, Markit directors indicated that Markit was interested in proceeding with the licensing of its CDS indices and RED codes.

135.    During the fall of 2008, Markit and CMDX entered into a series of negotiations and exchanged multiple term sheets contemplating the licensing of Markit's indices and RED

codes to CMDX for use in a CDS exchange and clearinghouse. These term sheets provided that Markit would receive royalty payments for the licensing of its products and that it could collect data obtained from CMDX, commingle it with its own data, and sell all of it as the exclusive provider of that data. These term sheets also expressly referenced the fact that the licenses would be used for CDS trading over an exchange.

136. From ISDA, Citadel and CME sought a license for use of the ISDA Master Agreement. As noted above, by 2008, the vast majority of CDS trades were covered by standard ISDA documentation. ISDA claims a copyright over the Master Agreement and the accompanying definitions and processes. ISDA aggressively asserts its copyright over the Master Agreement and has litigated to prevent the production of unlicensed Master Agreements and to obtain lost revenues.[18] Thus, an ISDA license was important to ensure that exchange-traded CDS would mirror the conventions of over-the-counter CDS, including use of the ISDA Credit Derivatives definitions, the ISDA Determinations Committee, and the ISDA auction process.

137. It was in ISDA's own interest to license to CMDX. Licensing to CMDX was, first and foremost, consistent with ISDA's stated goals – as an industry trade association – of "reducing counterparty credit risk, increasing transparency, and improving the industry's operational infrastructure."[19] As discussed below, however, ISDA ultimately agreed with the Dealer Defendants to take actions that flatly contradicted each of these avowed goals.

138. It was also in ISDA's independent economic self-interest to gain increased licensing revenues for its industry-standard contracts and protocols as a result of the increased

---

[18] *See, e.g., International Swaps and Derivatives Association, Inc. v. Socratek, L.L.C.*, No. 09-CV-8033 (S.D.N.Y. 2009).

[19] International Swaps and Derivatives Association, *About ISDA*, *available at* http://www2.isda.org/about-isda/.

volume of transactions and market participants the exchange would induce. ISDA was interested in broader market adoption of its Master Agreement and definitions, and adoption by the exchange would accomplish just that. Thus, after CME and Citadel met with representatives of ISDA on October 7, 2008, representatives of ISDA indicated that it was interested in providing a license to CMDX, including for exchange trading.

139. Thus, by approximately October 2008, CMDX was poised to enter the market to provide a much needed solution to the dealer-controlled opaqueness, lack of transparency, and inflated transaction costs. It had support from buy-side firms and sell-side market participants, including the Dealer Defendants interested in gaining larger CDS market share. It also had made substantial progress with Markit and ISDA to obtain the appropriate licenses.

140. On October 7, 2008, in a joint press release, CME and Citadel stated that CMDX was operational and would launch within 30 days, subject to completion of definitive licensing agreements and finalization of certain regulatory approvals. The day before, a spokesperson for CME had stated that the exchange "can be operationally ready to clear CDS in a few weeks."[20]

141. The CMDX trading platform was widely recognized as a natural next step in, and solution for, the market. In fact, CMDX was not the only proposal for moving CDS from the inefficient over-the-counter market. At a meeting convened by the Federal Reserve Bank of New York on October 10, 2008, CDS trading and clearing proposals were also presented by Eurex Clearing (which is owned by European exchange providers Deutsche Börse AG and SIX Swiss Exchange), Liffe (which is owned by exchange owner NYSE Euronext), and ICE / The Clearing Corporation – although this latter entity, at the time, had only a very preliminary

---

[20] Ciara Linnane & Karen Brettell, *NY Federal Reserve Pushes for Central CDS Counterparty*, Reuters (Oct. 6, 2008), *available at* http://www.reuters.com/article/2008/10/06/cds-regulation-idUSN0655208920081006.

clearing proposal. Liffe and Eurex Clearing were both poised to be up and running by the end of 2008 or early 2009.

142.    Given CMDX's readiness and the momentum in its favor, it was in each of the Dealer Defendants' independent economic self-interest to participate in the CMDX exchange – and this was especially true for those entities that could be first movers. Banks that participated as first movers would be poised to profit most, and gain market share, from the advent of exchange trading, particularly given the attractive economic terms available. CMDX was "in advanced discussions with six dealers to take equity stakes in its credit-default swap trading and clearing platform."[21] According to one reporter, Thomas Miglis of Citadel "noted that the equity stakes available to partners in the CMDX venture may be greater than those offered by [ICE], as CMDX is expected to launch with fewer founding members."[22] With projected revenue of close to $500 million and an open offer of at least 30% of the economics to the first movers from the sell-side, each of the Dealer Defendants could have profited substantially by being one of the first to pair with CMDX. And some were preparing to do so.

### B.    Defendants Conspired to Block the Exchange Trading of CDS.

143.    Just as CMDX was poised to bring much needed transparency and competition to the CDS market, however, the Dealer Defendants secretly agreed to act in concert to shut the exchange down. The Dealer Defendants' agreements were reached at face-to-face meetings during this period, as well as through telephonic and electronic communications, in which senior-level employees of each participated.

---

[21]    Dow Jones Newswire, *CME Sees Up to Six Dealers Backing Credit Swaps Platform* (Dec. 23, 2008), *available at* http://www.efinancialnews.com/story/2008-12-23/cme-sees-up-to-six-dealers-backing-credit-swaps-platform-1?ea9c8a2de0ee111045601ab04d673622.

[22]    *Id.*

144.    Representatives from the Dealer Defendants met in secret throughout the fall of 2008 in order to eliminate the exchange trading component of CMDX.  The Dealer Defendants, for example, held secret meetings in midtown New York and other locations.  Although these meetings were sometimes (but not always) held under the imprimatur of board or committee meetings, they were in fact not connected to any legitimate joint venture activity.  At these meetings, the participants expressly discussed their desire and efforts to block market entry and to thwart the licensing of intellectual property to CMDX.

145.    To this day, the Dealer Defendants have sought to keep secret the fact and contents of these meetings.  As noted by the *New York Times* article that first uncovered the existence of secret meetings among the Dealer Defendants' personnel: "The details of their meetings, even their identities, have been strictly confidential."[23]  Nonetheless, it is believed that among those individuals involved in these meetings were Ali Balali (managing director at Bank of America), Thomas Benison (managing director at JPMorgan), Biswarup Chatterjee (head of CDS trading at Citi), Athanassios Diplas (managing director at Deutsche Bank), Oliver Frankel (managing director at Goldman Sachs), Paul Hamill (managing director at UBS), James Hill (managing director and global credit derivatives officer at Morgan Stanley), Andy Hubbard (head of structured credit derivatives at Credit Suisse), and Paul Mitrokostas (chief operating officer of credit trading at Barclays).

146.    As a direct result of their meetings, Defendants abruptly changed course in the fall of 2008 – over a very short period of time – on the eve of the launch of CMDX and clearing platforms such as Liffe and Eurex Clearing.  The Dealer Defendants agreed that none of the Dealer Defendants would deal with CMDX or any of the nascent clearinghouses so long as there

---

[23]    Story, *supra* note 2.

was a possibility those platforms would allow CDS trading.  The Dealer Defendants also agreed they would work together to eliminate the imminent threat presented by CMDX's trading platform by conspiring with Markit and ISDA.

147.    To prevent the launch of CMDX, Dealer Defendants secured an agreement from Markit and ISDA that these entities would not grant any license that made reference to a CLOB or exchange trading platform.  The Dealer Defendants secured these agreements by leveraging the fact that the Dealer Defendants are Markit's and ISDA's largest customers.  The Dealer Defendants, as noted above, are the primary source of data provided to Markit and are the largest users of Markit's indices.  ISDA, similarly, generates revenues from the licensing of its Master Agreement and sale of membership to the Dealer Defendants.  As the largest users of the ISDA Master Agreement, the Dealer Defendants pay the largest annual fees.

148.    The Dealer Defendants also used their influence as members of the boards of Markit and ISDA to pressure both entities to agree not to grant licenses for exchange trading to CMDX.  As the European Commission has preliminarily found, by wielding this pressure and influence, the Dealer Defendants secured Markit's and ISDA's agreement "to license only for 'over-the-counter' (OTC) trading purposes and not for exchange trading."[24]  As discussed below, this agreement remained in place through the filing of the original complaint in this matter, and no entity withdrew from the conspiracy at any time before then.

149.    Accordingly, in an abrupt change in course that was displayed by these two separate entities over a short period of time in the fall of 2008, Markit and ISDA separately informed CME and Citadel in a strikingly similar fashion that they would not permit licensing

---

[24]    European Commission, *Press Release: Antitrust – Commission Sends Statement of Objections to 13 Investment Banks, ISDA and Markit in Credit Default Swaps Investigation* (July 1, 2013), *available at* http://europa.eu/rapid/press-release_IP-13-630_en.htm.

for the exchange trading of CDS.  Beginning in early November 2008, in a radical departure from prior conduct, and despite ISDA's and Markit's prior willingness to enter into licensing arrangements with CMDX, representatives of Markit and ISDA stated to CME and Citadel, for the first time, that more formal approvals by representatives of the Dealer Defendants would be required.  During this period, ISDA and Markit also separately sent CMDX draft licensing agreements that removed any provision for the licensing for use in exchange trading of CDS.

150.    Markit and ISDA engaged in this change of course, and then began making parallel demands, at virtually the same time (including often on the same day), which reflects the fact that this behavior was the result of their agreement with the Dealer Defendants.

151.    This dramatic change, and the new refusal to license for exchange trading, was contrary to Markit's and ISDA's independent self-interests.  Markit forfeited the possibility of greater licensing royalties and an enormous amount of real-time transaction data which the exchange would have created and which Markit could have monetized.  ISDA lost both the opportunity to generate revenue through licensing and the broader market adoption of its standardized form.  Both of these Defendants abandoned licensing for exchange trading only after the Dealer Defendants jointly pressured ISDA and Markit to agree not to proceed any further and even reprimanded them for allowing licensing negotiations to progress so far.

152.    CMDX continued to negotiate with ISDA and Markit through March of 2009, but neither ISDA nor Markit was willing to consider reintroducing a license for exchange trading into the licensing agreements.  Even with the restricted licenses they were now willing to offer, Markit and ISDA drew out the negotiation process and delayed it on numerous occasions – pursuant to their agreement to do so with the Dealer Defendants.

153.     Finally, in early March 2009, ISDA and Markit granted licenses to CMDX.  But, in furtherance of their agreement with the Dealer Defendants, the licenses were for clearing only, and they expressly precluded use of licensed intellectual property for a CLOB or exchange trading platform.

154.     Both licenses also required that one of the Dealer Defendants be on at least one side of the transaction, which effectively gave the Dealer Defendants control over which transactions would be cleared.  According to two sources interviewed by the *New York Times*, "Markit put [Citadel and CME] in a tough spot by basically insisting that every trade involve at least one bank, since the banks are the main parties that have licenses with Markit.  This demand from Markit effectively secured a permanent role for the big derivatives banks since Citadel and C.M.E. could not move forward without Markit's agreement.  And so, essentially boxed in, they agreed to the terms."[25]  This "demand" was also not in Markit's own independent economic self interest.  Rather, Markit made this demand only pursuant to its agreement with the Dealer Defendants.

155.     The terms to which Markit and ISDA each ultimately agreed were considerably less favorable than those initially proposed by CMDX in 2008.  Had Markit and ISDA agreed to grant intellectual property licenses for exchange trading, both entities would have reaped substantially more revenues.  Markit would have had the ability to access and distribute real-time CDS pricing data.  ISDA could have obtained greater licensing revenues and membership fees.  ISDA would also have fulfilled its avowed goals as an industry trade association.

156.     The licensing agreement for clearing was ultimately announced on March 11, 2009.  The very next day, on March 12, CME and Citadel submitted a standard request to the

---

[25]     Story, *supra* note 2.

SEC for an exemption from registration as a broker dealer and clearing organization. While there was never a question the SEC would grant the request – as the exemption process itself was pro forma – submission of that request had been delayed by Markit's and ISDA's refusals and delays in licensing to CMDX. The day after CME and Citadel submitted their request, the SEC granted it. Had Defendants not conspired to refuse and delay the licensing of indices to CMDX, the SEC's approval would have been obtained considerably earlier.

### C. Defendants Conspired to Block Clearinghouses with Exchange-Trading DNA.

157. Defendants' collusion thus squashed the most imminent threat to their CDS trading profits – exchange trading via CMDX. Yet, the Dealer Defendants were not satisfied. As noted by the European Commission, the "investment banks also sought to shut out exchanges . . . by coordinating the choice of their preferred clearing house."[26]

158. Thus, even after CMDX received licenses from Markit and ISDA with terms restricting those licenses to be used for clearing only, the Dealer Defendants jointly refused to deal with CMDX as a clearinghouse. Despite CME's renewed offer to the Dealer Defendants of an equity stake in CMDX in March of 2009, the Dealer Defendants refused to do business.

159. The Dealer Defendants did so because they recognized that clearing, if done outside of their control, could lay the infrastructure and create a platform that would lead to exchange trading. As a JP Morgan report stated: "the main concern for the Investment Banking industry is that clearing is the first step leading to exchange/SEF trading for OTC products."[27]

---

[26] European Commission, *supra* note 24.

[27] J.P. Morgan Cazenove (Kian Abouhossein and Delphine Lee), *Global Investment Banks: Investment Banking Wallet Outlook – All Eyes on Equity Derivatives*, Global Equity Research (Sept. 8, 2010), *available at* http://www.scribd.com/doc/37253557/JPMorgan-Global-Investment-Banks-20100908.

The Dealer Defendants perceived clearinghouses "as representing the thin end of a wedge that would end with contracts being put on exchanges for trading."[28]

160.    The Dealer Defendants recognized they needed to work together to snuff out any threats from clearinghouses.  Thus, the Dealer Defendants – including Defendants Bank of America, BNP, Citi, Credit Suisse, Goldman Sachs, HSBC, JP Morgan, Morgan Stanley and RBS – refused to involve themselves in any of the clearinghouses that had emerged, such as CMDX, Eurex Clearing, or Liffe.  Instead, the Dealer Defendants jointly committed only to clear CDS transactions through the clearinghouse they knew they could control – ICE Clear.  ICE Clear had been the least developed clearing solution when the Dealer Defendants met with the Federal Reserve Bank in 2008.  But because of ISDA's and Markit's stall tactics, and the Dealer Defendants' refusal to deal with rival clearinghouses, Defendants were able to launch ICE Clear two days before CMDX received licenses from ISDA and Markit.

161.    As one former dealer involved in the negotiations stated:  "CMDX was pretty much ready in October 2008 – all it needed was regulatory approval and the licenses.  In the five months that CME waited, between the Fed meeting on October 10 and the licenses being granted by Markit on March 11, the dealers and ICE were able to acquire [The Clearing Corporation], build a clearing house pretty much from scratch, secure the necessary regulatory approvals, get the license permissions from Markit and just happen to be ready to launch on the following Monday."[29]

---

[28]    Peter Norman, *The Risk Controllers: Central Counterparty Clearing in Globalised Financial Markets* 302 (2011).

[29]    Peter Madigan, *Sefs and Exchanges Echo EC's CDS Licence Complaints*, Risk Magazine (Aug. 22, 2013), *available at* http://www.risk.net/risk-magazine/feature/2289782/sefs-and-exchanges-echo-ecs-cds-licence-complaints.

162.     Once ICE Clear was clearing CDS trades, Defendants jointly agreed not to participate in CMDX/CME Clearing or any of the other clearing ventures.  This agreement was reached as part of the same series of meetings, referenced above, that continued to take place during this period, as Defendants continued to meet to implement and fine-tune their conspiracy, as well as other meetings among the Dealer Defendants that took place during this period.

163.     As noted above, representatives of the Dealer Defendants sit on the board of Markit's holding company, Markit Group Holdings.  Under the guise of board meetings of Markit Group Holdings, the Dealer Defendants discussed how to prevent CMDX from entering the market and how to deal with threats from clearinghouses.  These meetings were attended by senior executives, likely including, among others, Richard S. Cohen (director at Bank of America), Simon Andrew Harvey Davidson (director, head of the Securities Markets Group at Credit Suisse), Michael Davie (managing director at JP Morgan), Eric Dumas (head of US Credit Trading and global head of Flow Credit Trading at BNP), Arne Groes (global head of Flow Credit Trading at BNP), William John Hartnett (managing director at Citigroup), Bradford Levy (managing director in Principal Strategic Investments Group at Goldman Sachs), Thomas Mosimann (executive director and global head of Strategic Investments for Interest Rates, Currency, and Credit Division at Morgan Stanley), Michelle Neal (head of Fixed-income Electronic Commerce, Rates and Credit, and Head of Debt Markets Electronic Commerce at Royal Bank of Scotland), Jon Pliner (managing director at Merrill Lynch), Dexter Emory Senft (director at Barclays), and Lawrence Shaw (chief operating officer for the Global Markets Equity at Deutsche Bank).

164.     The following representatives of the Dealer Defendants also met under the auspices of the ISDA board during this period:  Thibaut de Roux (global head of Structured Rate

Products and head of Interest Rate Options for Europe & Americas at HSBC Bank Plc), Joseph Elmlinger (managing director, head of Global Equity Derivatives at Citigroup), Michele Faissola (managing director and global head of Rates, Global Markets Division at Deutsche Bank), Diane Genova (managing director & general counsel at JP Morgan), Frederic Janbon (global head of Fixed Income at BNP Paribas), Dixit Joshi (managing director, head of Equity-Linked Products at Barclays), Jonathan Moulds (president, Europe, the Middle East, Africa (EMEA) and Asia at Bank of America), Stephen O'Connor (global head of Counterparty Portfolio Management at Morgan Stanley), Riccardo Rebonato (global head of CBFM Market Risk and head of Quantitative Research & Quantitative Sales at the Royal Bank of Scotland), Thomas Riggs (managing director at Goldman Sachs), and Eraj Shirvani (managing director, head of European and Pacific Credit Sales and Trading at Credit Suisse).

165.    When CME pitched some of the Dealer Defendants with smaller market shares about joining CME Clearing, those Defendants expressed interest but indicated they would need to speak with the "dealer community" before moving forward.  This requirement that any sell-side participant confer with the "dealer community" before becoming involved in a clearinghouse "gave the market a notably tribal quality that appeared to militate against any offering with exchange trading in its DNA."[30]

166.    Because the Dealer Defendants jointly agreed to refuse to deal with any of the CDS clearinghouses besides ICE Clear, including CME Clearing, CME was forced to put the launch of CME Clearing – the remaining component of CMDX – on hold in late March 2009.

167.    In June of 2009, the Dealer Defendants agreed to meet with CME and CMDX's buy-side participants about clearing through CMDX, but only on the condition that Citadel could

---

[30]    Norman, *supra* note 28.

not attend the meeting or be involved in the negotiations.  At that meeting on June 17, 2009, the

Dealer Defendants indicated they would only clear through CMDX if it did not have any

exchange trading component.  The Dealer Defendants also stated they would not take equity

positions in CMDX as long as Citadel was involved, believing that Citadel's inclusion left

exchange trading as an open possibility.  As the *New York Times* reported:  "Two people with

knowledge of the Chicago Mercantile Exchange's clearinghouse said the banks refused to get

involved unless the exchange dropped Citadel and the entire plan for electronic trading."[31]

168.    As a result of the Defendants' scheme, in September of 2009, CME restructured

CMDX into a clearing-only platform.  As part of that restructuring, Citadel's involvement was

substantially reduced:  it retained its founding member status but was otherwise uninvolved in

the venture going forward.  Thus: "Although the clearinghouse remained, the trading platform

was quietly killed because, as one trader put it, Citadel wanted 'to trade within the current market

spreads.'"[32]

169.    Two weeks after Citadel was dropped from CMDX and the platform was

converted to a clearing-only platform, the Dealer Defendants quickly began to sign on to CME

Clearing.  By December of 2009, Defendants Barclays, Citi, Credit Suisse, Deutsche Bank,

Goldman Sachs, JP Morgan, Morgan Stanley and UBS had joined CME Clearing as founding

members.  Others, including BNP, joined later.  As a condition of the Dealer Defendants joining

CME Clearing, CME was forced to give control of its risk committee to the Dealer Defendants.

Working through that risk committee, the Dealer Defendants met to discuss their joint conduct

and then acted to freeze CME Clearing's ability to clear by imposing an extremely low "open

---

[31]    Story, *supra* note 2.

[32]    Suzanne Miller, *CDS Clearinghouses Challenge Wall Street's Rules*, MarketWatch
(June 9, 2010), *available at* http://www.marketwatch.com/story/cds-clearinghouses-challenging-
wall-street-2010-06-09.

interest" or "daily clearing" cap, claiming that more work needed to be done on CME Clearing's margin methodology. The open interest cap imposed a limitation on the net notional amount per contract outstanding. The Dealer Defendants also used their positions on the risk committee to promulgate rules that artificially limited the number of members that could join the clearinghouse.

170. Additionally, as an express condition of joining CME Clearing, the Dealer Defendants required CME to commit to a multi-year agreement that CME Clearing would not offer CDS trading in any form until, at the earliest, December 2012. As with the other collusive conduct alleged herein, there was absolutely nothing procompetitive about this restriction; it was simply a naked effort to prevent competition.

171. As a result of the Defendants' concerted action and agreements to refuse to license necessary intellectual property to CMDX, and the Dealer Defendants' refusal to deal with any exchange trading platform or even CDS clearinghouse that could pave the way for an exchange, and the other conduct alleged herein, Defendants blocked the emergence of electronic exchange trading of CDS. The Dealer Defendants did this for one simple reason: so they could keep charging the Class artificially inflated bid/ask spreads. As the European Commission concluded, "the banks acted collectively to shut out exchanges from the market because they feared that exchange trading would have reduced their revenues from acting as intermediaries in the OTC market."[33]

172. But for the Dealer Defendants' conduct in preventing CMDX from opening as planned in 2008, Plaintiffs and the Class would have traded CDS with narrower spreads, and the exchange would have provided them more CDS trading partners and greater CDS liquidity –

---

[33] European Commission, *supra* note 24.

which, in turn, would have narrowed spreads further.  As Kenneth Griffin, Citadel's founder and Chief Executive Officer, was quoted in the *New York Times* as stating in December 2010, CDS investors – that is, the members of the Class – were forced to pay "a stunning amount of money" as "economic rent" to the Dealer Defendants resulting from the lack of the electronic exchange trading that CMDX would have brought to the market.[34]

### D. Defendants Jointly Drove Clearing Business to ICE Clear.

173.    The Dealer Defendants also sought to ensure that ICE Clear, and not CME Clearing or other clearinghouses, became the dominant clearinghouse in the market, since ICE Clear was under their control.

174.    By securing Markit and ISDA's agreement to delay providing licenses to CME on any terms and refusing to deal or participate in CMDX for months, the Dealer Defendants were able to delay CME Clearing's launch date.  This allowed ICE Clear to launch first before CME Clearing or any other rival, thus securing a first-mover advantage.

175.    The Dealer Defendants also agreed to channel almost all of the CDS they cleared through ICE Clear.  This left CME Clearing with a minimal role in the CDS market, a small amount of price data, and little ability to promote the rise of alternative dealers or a CDS exchange trading platform.  By the time CME Clearing cleared its first trade in December 2009, ICE Clear had already cleared over $4 trillion.  As of July 2013, CME Clearing had cleared CDS contracts with an aggregate open interest of only $40.5 billion, compared to an aggregate open interest of $1.43 trillion cleared through ICE Clear.  The vast majority of cleared CDS transactions were and still are cleared through ICE Clear, which allows the Dealer Defendants to maintain their control of the CDS market.

---

[34]    Story, *supra* note 2.

176.    The Dealer Defendants' strategy lurks behind concerns expressed in an e-mail written by Samuel Cole, then chief operating officer of buy-side firm BlueMountain, which followed a conference call between ISDA's steering committee and a collection of buy-side firms.  As reported in the press, Mr. Cole lamented the Dealer Defendants' "liberal use of dissembling and obfuscation" about CME in order to retain their "oligopolistic dominance" of most major market structures in the credit markets.[35]  He also noted that the "Dealers suggested more than once that there is room for only one solution in the market and that they are building that one solution [ICE Clear] right now."  Mr. Cole expressed concern that "the Dealer community may be filibustering to protect its oligopoly and not seriously engaged in working with the Buyside to develop a clearing solution."[36]

177.    The Defendants similarly marginalized Eurex Clearing, another clearinghouse with exchange trading in its "DNA."  Eurex Clearing was a CDS clearinghouse formed as a subsidiary of Eurex, a joint venture of SIX Swiss Exchange ("SIX") and Deutsche Börse AG ("Deutsche Börse").  SIX operates Switzerland's principal stock exchange and Deutsche Börse operates a number of exchange platforms, including a credit derivatives exchange in Europe. Like CMDX, Eurex Clearing was announced in the summer of 2008, was presented to the Federal Reserve Board in October 2008, and was operational by the end of 2008 or early 2009.

178.    Just as the Dealer Defendants had done with CME Clearing, the Dealer Defendants marginalized Eurex Clearing by jointly driving clearing volume to ICE Clear.  By January 2010, Eurex Clearing had only cleared 5 trades worth $123 million.  In September 2010,

---

[35]    Serena Ng, *Friction on Swaps Response*, Wall. St. J. (Jun. 3, 2009), *available at* http://online.wsj.com/news/articles/SB124390301244674747.

[36]    Karen Brettell, *Bank 'Oligopoly' Slows CDS Clearing—BlueMountain*, Reuters (Jun. 1, 2009), *available at* http://www.reuters.com/article/2009/06/01/credit-clearing-idUSN0113168020090601.

Eurex Clearing halted marketing of its CDS clearing operation and has since ceased actively looking for new CDS clearing business.

179.    The Dealer Defendants also perceived that the other clearinghouse that had been presented to the Federal Reserve Bank in 2008 – Liffe (later renamed NYSE Liffe) – had exchange trading in its "DNA."  At the time, Liffe was owned by NYSE Euronext, which is a group owning several exchanges including the New York Stock Exchange, Euronext, and NYSE Asia.  Despite the fact that Liffe was the first company to clear CDS, beginning on December 22, 2008, because of the Dealer Defendants' concerted refusal to use Liffe, it shuttered its business in August 2009.

180.    As noted, when the Dealer Defendants took an ownership stake in ICE Clear, they refused to become involved unless they were able to place their employees on ICE Clear's risk committee.  ICE Clear's rules require that the Dealer Defendants together hold at least nine seats on the twelve-member risk committee.  Under the guise of ICE Clear's risk committee, the Dealer Defendants' representatives had meetings and discussions that extended well beyond the legitimate business of ICE Clear's risk committee and concerned instead limiting the movement of CDS away from the over-the-counter market.

181.    Beginning in the fall of 2008, these representatives conducted secret monthly meetings in New York.  Acting through ICE Clear's risk committee, the Dealer Defendants imposed rules artificially to restrict participant eligibility and membership in ICE Clear for the purpose of preventing competition.  The Dealer Defendants, acting through the risk committee, imposed high minimum capital, sophistication, and default management upon liquidation requirements in order to limit those entities that could become members.

182.     Under the minimum capital requirement, prospective members were originally required to show that they had at least $5 billion in net capital in order to be a clearing member, and that they could post a deposit into a default fund.  Pursuant to the so-called "sophistication" requirement, a prospective member needed to show it had a sufficiently large swaps portfolio and evidence it had the requisite expertise to perform the duties of a clearing member.  ICE Clear's default management and liquidation rule requires that a member be able to use its own execution desk to participate in the auction process and liquidate assets in case of a clearing member's default.  This rule effectively required that all clearing members have trading desks (which the Dealer Defendants have, but most investors do not).

183.     These rules had the effect of excluding small brokers and even many large buy-side firms.  For instance, the Bank of New York Mellon, State Street Corporation, MF Global, and Newedge all tried to join ICE Clear but were denied on the basis of the excess net capital requirement.  This outcome was the express purpose of the concerted conduct alleged above.  As Marcus Katz, a senior vice president at Newedge told the *New York Times*, "It appears that the membership criteria were set so that a certain group of market participants could meet that, and everyone else would have to jump through hoops."[37]

184.     The Dealer Defendants also used the risk committee to promulgate a series of rules covering non-clearing members that were designed to inhibit competition and prevent a transition to exchange trading.  For example, the risk committee implemented a rule that does not protect the anonymity of end users that execute CDS trades through non-member firms.  As end users tend not to want their trading and hedging strategies exposed, this practice, again, deters them from conducting trades with smaller firms.

---

[37]     Story, *supra* note 2.

185. The risk committee also imposed relatively high fees as compared to the prevailing terms in the over-the-counter market. Such fees do not deter the Dealer Defendants from clearing trades through ICE Clear since they also share the revenue of ICE Clear. Nonetheless, these terms discourage end-users and smaller dealers from clearing CDS trades through ICE Clear.

186. The Dealer Defendants also used the risk committee to define which derivatives should be cleared and which should be exempt from clearing through ICE Clear. This gave Defendants control over the types of CDS contracts being processed through ICE Clear and the total volume of clearing.

187. Through their joint agreement and control of the ICE Clear risk committee, the Dealer Defendants have discouraged trading with non-dealers, inhibited volume, and kept some types of CDS out of the clearinghouse. All of this was intended by the Dealer Defendants to prevent movement toward exchange trading. As the Swaps and Derivatives Market Association has explained: "The effort to protect clearing . . . is actually a proxy war to limit competition to the incumbent dealers' $100 billion in profits for derivatives execution."[38]

**E.     Defendants Prevented the Emergence of New Exchanges.**

188. The Dealer Defendants' misconduct had a severe and far-reaching effect on the CDS market: it deterred existing clearinghouses from initiating electronic exchange trading and deterred potential new entrants from setting up exchange trading platforms.

189. At the Dealer Defendants' instruction, ISDA and Markit continued to decline to license necessary intellectual property such as CDS indices to ventures that could possibly lead

---

[38] Swaps and Derivatives Market Association, *Lessening Systemic Risk: Removing Final Hurdles to Clearing OTC Derivatives* (Sept. 16, 2010), *available at* http://thesdma.org/pdf/skirmish_paper_ 091610.pdf.

to the exchange trading of CDS. As one market participant told *Risk Magazine*: "I know of one venue that was unsuccessful in negotiating any kind of license agreement with Markit to trade the CDX or iTraxx indexes and simply gave up. And we are not talking about 2006 or 2009 – we are talking about the start of 2013."[39]

190.    In 2010, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), which became effective July 21, 2011. In passing Dodd-Frank, Congress expressly provided that the CDS market would remain fully subject to the antitrust laws: "Nothing in this Act, or any amendment made by this Act, shall be construed to modify, impair, or supersede the operation of any of the antitrust laws, unless otherwise specified."[40]

191.    Dodd-Frank requires the CFTC and SEC to implement certain regulations pertaining to CDS and other derivatives, including the clearing and electronic trading of certain derivative products on "swap execution facilities" or "SEFs." Those regulations did not become effective until August 5, 2013.

192.    Consistent with the requirement in Dodd-Frank that the CDS market would remain fully the subject of the antitrust laws, in drafting the aforementioned regulations, the CFTC sought the guidance of the DOJ to ensure that the regulations promulgated pursuant to Dodd-Frank were consistent with the antitrust laws.

193.    Nonetheless, Markit, pursuant to its agreement with the Dealer Defendants, has continued its anticompetitive conduct and declined or delayed licensing to SEFs to prevent and delay their emergence as exchange-like platforms. For instance, in 2013, two SEFs told *Risk Magazine* that "they have been trying for months to obtain a licence from Markit" and "[a]nother

---

[39]    Madigan, *supra* note 29.

[40]    12 U.S.C. § 5303.

market participant says one trading venue had to wait so long it eventually gave up."[41]  Another market participant noted, as of August 2013, that "To my knowledge, Markit has not granted licences to list index CDS or Red codes to offer single-name CDSs to any of the new trading venues as yet, even though some of them submitted applications months ago."[42]  Markit first announced that it had provided licenses for the major CDS indices to four SEFs on October 3, 2013 – that is, only *after* these lawsuits had been filed.

### III. ABSENT DEFENDANTS' COLLUSION, EXCHANGE TRADING WOULD HAVE DRAMATICALLY REDUCED BID/ASK SPREADS FOR INVESTORS.

194.    Defendants' conduct, including their collusive efforts to shut down exchange trading, harmed Class Members by preventing competition, keeping the market opaque, and yielding inflated bid/ask spreads that Class Members would not have paid absent Defendants' collusion.

195.    There is a consensus, based on empirical evidence, that when financial products are introduced onto exchange-trading platforms, there is rapid market migration onto the exchange followed by dramatic reductions in bid/ask spreads.

196.    But for Defendants' anticompetitive acts, Class members – instead of being forced to trade in the opaque over-the-counter market controlled by the Dealer Defendants – would have traded CDS on an electronic exchange, with far greater transparency and substantially reduced bid-ask spreads.

#### A. Exchange Trading Would Have Been Adopted Quickly.

197.    As noted above, CMDX was built to be a fully viable platform for exchange trading of CDS on day one.

---

[41]  Madigan, *supra* note 29.

[42]  *Id.*

198.    CME has a long track-record of creating successful new exchanges from the ground up, and having them quickly adopted by the market.  For instance, CME, in a joint venture with three other entities, launched OneChicago, an exchange for the trading and clearing of single-stock futures.  Following its launch, OneChicago experienced massive growth in trade volume and has been considered a success throughout the industry.

199.    Similarly, in mid-October 2012, CME began transitioning its energy derivatives from over-the-counter swaps to exchange-traded futures.  Approximately 500 contracts were relisted as futures and made available for trading on CME's Globex platform.  By January 2013, because of market demand, 88% of former over-the-counter energy swaps were traded as futures on an exchange.

200.    CMDX would have experienced similar growth and market adoption.  At the time of CMDX's expected launch there was substantial market interest on the buy-side in exchange trading of CDS, and CME was well positioned to offer such a platform.  In 2009, JP Morgan stated in an analyst report that it "see[s] the existing market environment ideal for CME and other exchanges to build their on-exchange businesses."[43]  JP Morgan projected adoption of such exchanges by the buy-side, as "traders will seek the ability to trade the securities they demand, even when dealers are unwilling to make markets."[44]

201.    The experience of other exchanges also confirms that the market would have quickly moved CDS trading to an exchange.  For example, ICE also began transitioning its energy derivatives in October 2012 from over-the-counter swaps to exchange-traded futures.  By January 2013, again because of market demand for exchange trading, approximately 97 percent of former over-the-counter swaps were traded on exchange.  Similarly, in 2010 a start-up called

---

[43]   J.P. Morgan North American Equity Research, *supra* note 6, at 19.

[44]   *Id.*

Eris Exchange was founded to migrate over-the-counter interest rate swaps to electronic trading. Since the fourth quarter of 2012, exchange-trading of interest rate swaps has grown by 293% and bid/ask spreads have significantly tightened.

202.     Given CME's size and experience launching exchanges, and the state-of-the-art technology and clout that Citadel brought to the venture, modeling and empirical evidence confirm that the market would have quickly migrated to the trading of standardized CDS on CMDX.

**B.      Exchange Trading Would Have Increased Transparency and Reduced Bid/Ask Spreads.**

203.     There is a virtual consensus among academics, regulators, and industry experts that the movement of CDS trading to an exchange would yield increased pre- and post-transaction transparency and a substantial reduction in bid/ask spreads, both for the CDS products being traded on the exchange as well as any products remaining in the over-the-counter market.

204.     There are several reasons why exchange trading increases transparency and efficiency and generally reduces costs for investors.  First, exchange trading lowers barriers to entry and increases liquidity, creating downward pressure on transaction costs like the bid/ask spread.  On an exchange, any participant can post limit orders, improving market depth and allowing non-traditional players (including buy-side firms) to enter and capture the spread when it is set at supra-competitive levels.  Also, because all market participants, rather than just dealer participants, can see real-time pricing and demand on an exchange, non-dealers are more able to compete with dealers and face less risk from the information asymmetry associated with the over-the-counter marketplace.

205.     Second, increased liquidity lowers the inventory costs of the dealer banks because there is less risk that their positions will become unbalanced, since they can more easily trade in and out of their positions.  Lower costs to the market makers translates to lower costs for their customers, assuming the market is competitive.  Third, increased transparency in an exchange traded environment allows customers to discipline their dealers for out-sized extraction of rents.  Because customers can see the prices where products are being bought and sold, they can identify when their dealer is giving them an unfair price and go elsewhere for future deals.  This is not possible in the over-the-counter market, where customers may not know "the going price" in the market when they trade, nor where the banks are buying and selling.

206.     In short, moving to a more transparent system would substantially reduce bid/ask spreads of CDS transactions, and also would expand the set of dealers who were well positioned to receive this bid/ask spread.  This is confirmed by CME's modeling and reports to the SEC, analyses by the Dealer Defendants, the opinions of leading regulators, and the consensus of academic literature.

207.     CME and Citadel's own modeling and internal projections, which were reported to the SEC, found that CMDX would have substantially increased transparency in the CDS market and decreased bid/ask spreads.  CME and Citadel reported that CMDX would "enhance significantly the transparency of the CDS market, through reporting of CDS prices, trading volumes, aggregate open interest and provide a complete audit trail for regulators." [45]  CME and

---

[45]     *Request for Order Exempting Certain Persons from Broker-Dealer Registration and Related Requirements, and from Clearing Agency Registration and Related Requirements by the CME Group*, Securities and Exchange Commission (Mar. 12, 2009).

Citadel concluded that the "availability of such information will improve the fairness, efficiency, and competitiveness of CDS markets[.]"[46]

208.    Defendant JP Morgan's own research found in analyzing the impact of exchange trading on bid/ask spreads, "bid/ask spreads for OTC equity derivatives would decline further when traded on exchange/SEF, based on margin compression experienced in the dividend swap market on switching to exchange trading in July 2008."  According to JP Morgan's analysis – as shown in the below diagram from its research – the bid/ask-spread on dividend swaps dropped by 75% when they began trading on the Eurex exchange in July 2008.[47]



209.    The report also found that there would likely be "an increase in overall market volumes due to increased market access and reduced transaction costs," and a significant reduction in the cost of trading CDS as a result of increased volume due to exchange trading.[48]

210.    Numerous observers at the time of the proposed launch of CMDX also confirmed that exchange trading would increase pre- and post-trade transparency and reduce costs in the CDS market.  James A. Overdahl, the SEC's Chief Economist in 2008, testified: "Exchange trading of credit derivatives would add both pre- and post-trade transparency to the market which

---

[46]    *Id.*

[47]    J.P. Morgan, *supra* note 27, at 65.

[48]    *Id.*

could add credibility to the pricing of credit derivatives. Exchange trading could also reduce liquidity risk by providing a centralized market, which would allow participants to better initiate and close out positions efficiently and at the best available prices."[49]

211. Erik Sirri, then a director at the SEC, testified: "Exchange trading of credit derivatives could add both pre- and post-trade transparency to the market that would enhance efficient pricing of credit derivatives."[50] Robert E. Litan, who helped oversee the DOJ's NASDAQ investigation as deputy assistant attorney general, concluded: "exchange trading, coupled with true pre-trade and post-trade transparency, would narrow trading 'spreads' (the difference between offers to buy and sell), and thus benefit the ultimate end-users of derivatives or investors."[51] Similarly, Joaquín Alumina, the European Commission Vice President responsible for competition policy, has stated that "if banks collectively blocked exchanges to protect their revenues from over-the-counter trading of credit derivatives" it would be considerably "more expensive for investors than exchange trading."[52]

212. There is also a consensus in the academic literature, based on studies of exchange-based markets, that exchange trading significantly narrows bid/ask spreads and reduces the economic rent imposed by dealers on buy-side institutions:

    a. In 1999 and 2000, three major futures exchanges – the London International Financial Futures and Options Exchange, the Sydney Futures Exchange, and the

---

[49] James A. Overdahl, *Testimony Regarding Reducing Risks and Improving Oversight in the OTC Credit Derivatives Market* (Jul. 9, 2008), *available at* http://www.sec.gov/news/testimony/2008/ts070908jao.htm.

[50] Sirri, *supra* note 3.

[51] Robert E. Litan, *The Derivatives Dealers' Club and Derivatives Markets Reform: A Guide for Policy Makers, Citizens and Other Interested Parties*, The Brookings Institution (2010).

[52] European Commission, *supra* note 24.

Hong Kong Futures Exchange − transferred stock index futures trading from open outcry to electronic markets, operating with a limit order book and automatic order matching.  Studies of these transitions confirm that, after controlling for volume and volatility, bid/ask spreads on all three exchanges narrowed substantially.

b. In the early 1990s, NASDAQ market makers enforced a minimum spread of $0.25 in an over-the-counter system by choosing not to post odd-eighth quotes for most large NASDAQ stocks.  Subsequent litigation and SEC trading rules resulted in more opportunity for additional players to enter the market and a decline in quoted and effective spreads of roughly 30%.  While transaction costs decreased, volume of shares traded increased.

c. In 2002, the SEC and NASD introduced some post-trade transparency into the corporate bond market through the adoption of TRACE, a program that required public reporting of corporate bond trades, including the date and time of execution, size (within certain limits), trade price, yield, and whether the dealer bought or sold in the transaction.  TRACE mimics – albeit to a lesser degree – the type of post-trade price transparency that is available on an electronic exchange, which is among the many advantages of exchange trading.  Published studies of TRACE conclude that the increased transparency provided by TRACE is associated with a substantial decline in investor trading costs.  One study has concluded that spreads have fallen by as much as 38 basis points.

d. The NYSE Bonds trading system is a transparent electronic limit-order market which provides participants with a complete quotation at each buy and sell price

for corporate bonds traded on exchange.  By contrast, for corporate bonds traded over-the-counter, there is little pre-trade information.  A study comparing electronic-traded corporate bonds with bonds traded over-the-counter has found that pre-trade information enhances the competitive position of traders in their bargaining with dealers.  Greater pre-trade transparency refines traders' information sets and increases the value of search, making traders more patient in over-the-counter trading.  Consequently, when a trader meets an over-the-counter dealer, the dealer has to lower its ask price or increase its bid price to stop the customer from shopping around.  Thus, electronic trading not only reduces bid/ask spreads on the exchange, but also for bonds traded in the over-the-counter market.

213.    In addition, an economic analysis commissioned by Plaintiffs' counsel confirms that exchange trading of CDS would have reduced bid/ask spreads.  The study analyzed the behavior and statistical properties of the bid/ask spreads in the CDS market and compared the findings to:  (i) characteristics of bid/ask spreads in other over-the-counter markets which have a higher degree of competition and liquidity than the CDS market; and (ii) dynamics of bid/ask spreads in the market for certain exchange-traded and centrally-cleared financial products.  These markets are characterized by high transparency and efficient management of counterparty credit risk – both of which were absent from the CDS market during the Class Period.

214.    A key conclusion of the study is that over-the-counter markets that lack price transparency and in which the majority of the transactions are executed through a small group of dealers generally show wider bid/ask spreads than comparable exchange-traded markets or over-the-counter markets with high levels of price transparency and less dependency on a limited

number of dealers. Additionally, the presence of exchanges and central clearinghouses with appropriately open membership requirements and governance generally improve the efficiency of financial markets. Efficiency gains come from the reduction of counterparty credit risk, the standardization of the traded financial instruments and their documentation, the reduction in operational and administrative costs, and the increase in the number of participants. Also, securities traded on an exchange with centralized counterparty clearing also generally respond much better to market volatility than do securities that are traded over-the-counter.

215. Overall, the analysis confirms that bid/ask spreads for CDS during the Class Period have been significantly higher than they would have been if CDS had been traded on an exchange and centrally cleared. As a result of Defendants' collusion, bid/ask spreads were artificially large during the Class Period, increasing the transaction costs paid by buy-side participants. Had Defendants not blocked efforts to move CDS to an exchange-traded platform, bid/ask spreads for CDS during the Class Period would have been substantially reduced.

216. Accordingly, Defendants' anticompetitive acts harmed investors such as Plaintiffs and the Class in their business and property and resulted in supracompetitive profits for Defendants.

## IV. THE DEALER DEFENDANTS HAVE SUBSTANTIAL MARKET POWER.

217. As set forth above, the Dealer Defendants dominate CDS trading and inserted themselves through concerted conduct into virtually every CDS transaction. The Dealer Defendants' domination of CDS trading is well known, and their power in this market is reflected in their power over price, as demonstrated by their ability to maintain grossly inflated bid/ask spreads that bear no rational relationship to cost and to sustain those supracompetitive bid/ask spreads over a long period of time.

218.     To the extent a relevant market needs to be identified in this action, there is a distinct financial market for the purchase and sale of CDS in the United States by non-dealers.

219.     CDS are, and are widely perceived by those in the industry to be, a unique financial product.  The market for the purchase and sale of CDS in the United States by non-dealers is treated as a distinct financial market by market participants, government actors, and in economic literature.

220.     Other derivative or credit products are not substitutable for CDS.  The rapid rise in CDS volume following their inception in the mid-1990s demonstrates that investors turned to CDS to secure the unique and critical function of credit protection.  CDS serve a unique role in the financial markets in a number of ways.  For purchasers of credit protection, CDS are a unique financial product because, unlike the purchase of traditional credit insurance, purchasing protection under a CDS does not require providing proof of loss in order to receive compensation in the case of credit loss.

221.     For investors interested in "shorting" a credit risk or speculating that a "reference entity" will experience a credit event, CDS allows them to make "naked shorts," that is, take a position without owning the underlying credit risk.  There is no market substitute for such shorting and the shorting of CDS is not interchangeable with a short position in the underlying bond because of search costs and the risk of maintaining a "borrow" position in the bond.  Due to these differences and many others, there is little cross-elasticity of demand between transactions involving CDS and transactions involving other financial products.

222.     The transactions that involve the purchase and sale of CDS by non-dealers are not interchangeable with transactions involving only Dealer Defendants, which take place on the

inter-dealer market. Buy-side market participants are prohibited from trading on inter-dealer market, based on the collective action of the Dealer Defendants.

223. The relevant geographic market is the United States. The Dealer Defendants, however, dominate any more broadly defined geographic markets as well, including any global market.

224. The Dealer Defendants dominate this market, and they dominate every component, including with regard to single-name and index CDS, or purported variations of the market defined above. The market is highly concentrated, and the Dealer Defendants here account for approximately 95% of the CDS dealing. A CDS exchange would increase competition in this market by enabling the purchase and sale of both domestic and foreign CDS by non-dealers located in the United States. However, no CDS exchange of the type proposed by CME and Citadel is in existence, due to the Defendants' unlawful collusion, as alleged herein.

225. The market also has high barriers to entry, which facilitated the collusion that occurred, as alleged herein. The CDS market is structured in a way that makes it infeasible for potential entrants to become over-the-counter dealers. A potential over-the-counter dealer must generate enough trading volume to achieve economies of scale. A large trading volume not only aids the entrant in mitigating fixed costs of entry, but also helps dissipate the risk the dealer incurs on any given trade, through the effect of being positioned to more quickly lay off positions with other customers, and also through the effect of netting counterparty risk over many positions. The infeasibility of starting an over-the-counter CDS trading business, or lack of an ability to gain market share, is a major source of market power for the Dealer Defendants.

## EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS DUE TO DEFENDANTS' CONCEALMENT OF THE CONSPIRACY

226.     Plaintiffs did not discover and could not have discovered through the exercise of reasonable due diligence that they were injured by Defendants' conspiracy to prevent the entry of exchanges into the CDS market, much less who caused that injury, until at the earliest December 2010, when the *New York Times* revealed elements of Defendants' conspiracy as described above.  Prior to that time, Plaintiffs could not have identified facts plausibly suggesting a concerted and conspiratorial effort to block the entrance of exchange trading.

### A.     **Defendants' Conspiracy Was Concealed From Plaintiffs**.

227.     By its very nature, Defendants' conspiracy to boycott exchange trading of CDS and refuse to deal with any entity that could facilitate exchange trading was self-concealing.

228.     Defendants executed their conspiracy, in part, through a series of secret meetings.  These meetings were often, although not exclusively, as alleged above, held on the third Wednesday of every month in midtown Manhattan.  Defendants kept the very existence of these meetings a secret until they were uncovered in December 2010.  Even then, they kept the details of their meetings secret.  They kept the identities of those attending the meetings a secret.  And they did all of this jointly, by mutual agreement.  Defendants' internal communications and communications among each other were not public information, rendering impossible any ascertainment of the misconduct of individual Defendants or the fact of the conspiracy as a whole.

229.     The Dealer Defendants also used false pretenses to meet and to discuss the agreements alleged in this Complaint.  At times, they used the cover of their membership on certain committees or boards to meet and reach these agreements, as alleged above, even though their discussions were not connected in any way to the legitimate work of those committees.  At

other times, the Dealer Defendants met under the guise of phony entities that had no legitimacy whatsoever. By deliberately meeting under such false pretenses, the Dealer Defendants concealed their conspiracy from Plaintiffs and the Class.

230. Additionally, the nature and structure of the CDS market that Defendants had fostered kept Defendants' conspiracy concealed from the public. As a direct result of the opaque, over-the-counter market that Defendants sought to maintain, the Dealer Defendants' actual quotes and prices for CDS were not public information, making any comparison of quotes among competitors, or scrutiny of bid/ask spreads by a Dealer Defendant an impossibility.

231. As a result of the self-concealing nature of the Defendants' collusive scheme, no reasonable person would have discovered Defendants' conspiracy to block the emergence of exchange trading of CDS before that conspiracy became publicly known in 2010 and later.

232. In addition, beginning in early 2009, Defendants began offering affirmative, public explanations for their conduct, which were intended to conceal the true reasons for Defendants' refusal to deal with CMDX. Because of Defendants' affirmative efforts to mislead, Plaintiffs' continuing ignorance as to Defendants' conspiracy was not a result of a lack of due diligence.

233. In January 2009, if not before, the Dealer Defendants began publicly stating that while exchange trading could be helpful to the CDS market, it would be difficult to achieve because of difficulties in pricing CDS contracts. For instance, Gunter Heiland, managing director and co-head of emerging markets cash and CDS trading at JP Morgan, stated in an interview with *Wall Street & Technology* that while exchange trading of CDS "would be helpful," "it will be difficult to trade CDSs electronically because of the complexity in valuating

them and the lack of access to published prices."[53]  Unbeknownst to Plaintiffs, these statements were intended to conceal Defendants' ongoing conspiracy to block the emergence of exchange trading.  Defendant JP Morgan and others had no interest in exchange trading – despite Mr. Heiland's lip service to the contrary – and, in fact, the claimed impediment to the implementation of exchange trading – difficulty in pricing CDS – is a direct result of Defendants' concerted efforts to keep the CDS market opaque.

234.    The Dealer Defendants also repeatedly made statements designed to give the false impression that they supported greater competition and price transparency in the CDS market. Defendant JP Morgan, for example, publicly averred that "[a]ll market participants can benefit from greater CDS standardisation and transparency," and that its work with ISDA would "facilitate industry-wide initiatives such as electronic trading and central CDS clearing."[54]  Jeff Gooch, now Markit's chief operating officer, stated in a letter to the SEC on April 4, 2011:  "As a service and infrastructure provider to the domestic and international swaps markets, MarkitSERV [a trade processing service of Markit] supports the Commission's objective of increasing transparency and efficiency in these markets, of detecting market abuse or manipulation, and of reducing both systemic and counterparty risk."[55]  The purpose and effect of these and other similar public statements was to mislead the market about what the Defendants were secretly doing.

---

[53]    Ivy Schmerken, *Transforming Credit Derivatives: The Debate Over Trading Models*, Wall Street & Technology (Jan. 1, 2009), *available at* http://business.highbeam.com/137285/article-1G1-192999395/transforming-credit-derivatives-debate-over-trading.

[54]    Christopher Whittall, *JP Morgan CDS Pricing Model to be Made Available via ISDA*, Risk Magazine, (Feb. 4, 2009), *available at* http://www.risk.net/print_article/risk-magazine/news/1505899/jp-morgan-cds-pricing-model-isda.

[55]    Markit, SEC Comment Letter (April 4, 2011), *available at* http://www.sec.gov/comments/s7-06-11/s70611-34.pdf.

235. The Dealer Defendants also took steps to keep hidden the financial interest and other points of influence they had with relevant entities, including ISDA and ICE Clear. For example, the amount of the Dealer Defendants' financial stake in ICE Clear and DTCC is not publicly available and remains unknown to Plaintiffs. Moreover, the Dealer Defendants also instructed entities like ICE Clear not to reveal the identities of their membership on certain committees, such as the risk committee, in order to obscure the nature of the Dealer Defendants' meetings. Such acts were intended to prevent inquiry into the Dealer Defendants' influence within the CDS market.

236. Defendants' success in hiding their collusion was facilitated by their tremendous clout in the financial markets, above and beyond the CDS market. The Dealer Defendants have the power to make investment firms thrive or perish. Market participants are acutely aware that they cannot afford to make enemies of the Dealer Defendants, and there is a great fear of retaliation in the industry. Market participants are well aware that, even if they were to make tentative suggestions that the Dealer Defendants might be engaging in anticompetitive behavior, such suggestions could be met with retaliation that could cause severe financial harm. This helps explain why the first key disclosures of secretive collusive conduct were made by confidential sources to journalists – in a setting involving First Amendment protections – rather than in a manner that could have led back to the identities of those disclosing the conduct.

237. Even after the announcement of the DOJ investigation, described below, and subsequent media inquiries, Defendants did not break ranks, but instead engaged in ongoing efforts to keep their collusion hidden. In response to inquiries from the reporter, the banks refused even to admit the identities of those who were meeting or the membership of the clearinghouse risk committees under whose auspices the Dealer Defendants had met. The only

reason to hide this basic information was to stifle and impede the revelation of further information about these meetings.

238. In contrast to their earlier media campaign of offering innocent (but false) explanations for the failure of the CDS market to move toward exchange trading, Defendants began declining to comment to the media. For example, on May 2, 2011, representatives of Bank of America, Barclays, BNP, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JP Morgan, Morgan Stanley, and UBS specifically declined to comment in response to inquiries from *Bloomberg* concerning whether the Dealer Defendants colluded in violation of the antitrust laws.[56]

239. Defendants Markit and ISDA went a step further, and affirmatively stated that there was no collusion in the CDS market. In response to an inquiry from *Bloomberg*, Michael Gormley, a spokesman for Markit, stated that Markit is "unaware of any collusion by other market participants," that it "does not believe it has engaged in any inappropriate conduct," and that it "has no exclusive arrangements" with any data provider.[57] In 2013, when one journalist tried to confirm his anonymous sources' claims that Markit had refused to license its CDS indices first to CMDX and later to SEFs, "Markit refused repeated requests to discuss its CDS licensing practices" and even "declined to supply basic information about how the licensing process works."[58] Defendant ISDA similarly denied wrongdoing. Steven Kennedy, a

---

[56] Mary Childs, *Bank Margins at Risk as EU Probes Credit-Default Swaps Market*, Bloomberg (May 2, 2011), *available at* http://www.bloomberg.com/news/2011-05-02/bank-margins-at-risk-as-eu-probes-credit-default-swaps-market.html.

[57] *Id.*

[58] Madigan, *supra* note 29.

spokesman for ISDA, told the *New York Times* that "ISDA is confident that it has acted properly at all times and has not infringed E.U. competition rules."[59]

240.     These actions and statements by Defendants, individually and in the aggregate, affirmatively concealed Defendants' conspiracy.  These affirmative representations, acts of concealment, and the inherently self-concealing nature of the conduct at issue made it impossible for Plaintiffs to discovery Defendants' conspiracy prior to the details of the conspiracy being reported in the *New York Times*, as described below.

**B.      The *New York Times* First Uncovered the Existence of Defendants' Secret Meetings in December 2010.**

241.     No investor would have had any reason to suspect, and much less to know, that the Dealer Defendants were secretly meeting to coordinate their boycott of exchange trading in the CDS market until, at the earliest, the *New York Times* first exposed the existence of their secret meetings in a December 11, 2010, article titled *A Secretive Banking Elite Rules Trading in Derivatives*.  Prior to that time, facts did not exist that alerted or could have alerted Plaintiffs about the concrete possibility that Defendants were conspiring to block the emergence of exchange trading.

242.     The December 2010 *New York Times* article provided the first meaningful and significant disclosure of the fact that Defendants were engaging in secret meetings related to the CDS market.  Notably, however, even that disclosure did not disclose the fact that Defendants had conspired to prevent CMDX from introducing exchange trading to the U.S. market.  Rather,

---

[59]     Gretchen Morgenson, *Fair Game: Trying to Pierce a Wall Street Fog*, N.Y. Times (Jul. 20, 2013), *available at* http://www.nytimes.com/2013/07/21/business/trying-to-pierce-a-wall-street-fog.html.

the journalist who wrote the article noted that, as of that time, "It remains unclear why the C.M.E. ended its electronic trading initiative."[60]

243.    The limited disclosure of the existence of a DOJ investigation on July 14, 2009, did not notify Plaintiffs of the fact that Defendants were colluding to prevent the emergence of exchange trading in the CDS market.  That disclosure was very general, and the investigation was said to focus on whether Markit had "unfair access to price information."[61]  The DOJ never disclosed or confirmed it was investigating the principal subject of this complaint – collusion among the Dealer Defendants and Markit to prevent entry from electronic exchanges and to otherwise boycott rivals.  Rather, the DOJ consistently declined to provide any significant information about its investigation.

244.    It was not until the December 2010 *New York Times* article that the DOJ indicated it was investigating "the possibility of anticompetitive practices in the credit derivatives clearing, trading and information services industries."[62]  But even then the DOJ never disclosed *what* practices it was investigating or *why* it was investigating these practices; nor did the DOJ indicate it had found any evidence, even preliminarily, of collusive activity among the Dealer Defendants.  This is consistent with DOJ protecting its investigative processes and preserving potential grand jury secrecy.

245.    The first significant disclosure of the fact that the Dealer Defendants may have conspired with Markit was in April 2011, when the European Commission disclosed that it was

---

[60]    Story, *supra* note 2.

[61]    Matthew Leising, *Credit Swaps Investigated by U.S. Justice Department*, Bloomberg (July 14, 2009), *available at* http://www.bloomberg.com/apps/news?pid=newsarchive&sid=a3mU4TmtYCww.

[62]    Story, *supra* note 2.

probing the CDS market. The European Commission also noted it was probing whether certain banks conspired with ICE Clear Europe.

246. The first significant disclosure of the possibility that the Dealer Defendants had colluded with each other and others to delay or prevent CDS *exchanges* from entering the market was not until March 26, 2013, when the European Commission disclosed that its "inquiry had found preliminary indications that ISDA may have been involved in a coordinated effort of investment banks to delay or prevent exchanges from entering the credit derivatives business."[63]

247. Subsequently, on July 1, 2013, the European Commission disclosed that it had issued a Statement of Objections – a formal complaint – based on its preliminary conclusion that the Dealer Defendants, ISDA, and Markit had acted "collectively to shut out exchanges from the market because they feared that exchange trading would have reduced their revenues from acting as intermediaries in the OTC market."[64] In the European Commission's disclosure of its Statement of Objections, it identified each of the Dealer Defendants named here as having "instructed [ISDA and Markit] to license only for 'over-the-counter' (OTC) trading purposes and not for exchange trading" and "coordinat[ed] the choice of their preferred clearing house" in order "to shut out exchanges in other ways[.]"[65]

248. To this day, Plaintiffs do not know what specific disclosures prompted the European Commission's investigation or what led that investigation to focus, beginning in 2013, on collusive efforts by the banks to prevent exchanges from entering the credit derivatives

---

[63] European Commission, *Press Release: Antitrust – Commission Extends CDS Information Market Investigation to International Swaps and Derivatives Association (ISDA)*, (Mar. 26, 2013), *available at* http://europa.eu/rapid/press-release_IP-13-286_en.htm.

[64] European Commission, *supra* note 24.

[65] *Id.*

business.  Plaintiffs believe, however, that these disclosures were non-public.  This is also consistent with the strict secrecy afforded to European Commission investigations.

249.    Plaintiffs and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or of any facts that could or would have led to the discovery thereof, until, at the very earliest the publication of the aforementioned article in the *New York Times*.  In fact, the first Plaintiffs and members of the Class learned about *any* investigation into Defendants concerning the CDS market was not until July 14, 2009, and at that time Plaintiffs had no knowledge of the substance or scope of that investigation.

C.    **Plaintiffs' Inability to Discovery The Conspiracy Did Not Result From A Lack of Diligence.**

250.    Because Defendants employed acts and techniques that were calculated to conceal the existence of such illegal conduct, Plaintiffs and the Class could not have discovered the existence of this unlawful conduct through their exercise of due diligence any earlier than the publication of the aforementioned *New York Times* article in December 2010.

251.    Nonetheless, Plaintiffs and members of the Class regularly monitored their investments and conducted due diligence to try to avoid being harmed by financial misconduct throughout the Class Period.

252.    Throughout the Class Period, Plaintiffs and members of the Class regularly monitored news reports concerning the financial industry and the CDS market.  Plaintiffs undertook such activity in order to invest wisely and maximize the returns on their investments. Throughout the Class Period, Plaintiffs also regularly monitored prices within the CDS market, to the extent such monitoring was possible.  In particular, Plaintiffs, directly or through their investment managers, regularly monitored available CDS pricing data through electronic databases and other sources including Bloomberg.  Practically speaking, there were limits to

what could be done, given that so much of the CDS market was shrouded in secrecy due to Defendants' conduct. As described above, the pricing data that were available to Plaintiffs were averages from quotes that were stale and did not reflect real-time market pricing. Plaintiffs' inability to obtain real-time pricing data was a direct result of the agreements Defendants reached to keep the CDS market opaque.

253. Plaintiffs and members of the Class also retained and consulted with sophisticated investment managers to manage their investments, including their CDS investments, monitor the financial markets, including the CDS market and their CDS investments, and obtain the best possible CDS pricing. Plaintiffs LACERA, VRF, Essex, Unipension, and the Delta Funds all retained investment managers to monitor news, financial reports, and other information in the public domain about CDS and the market for CDS trading. Each of these Plaintiffs established standing procedures for use by the investment managers in managing their financial portfolios. These instructions included obtaining the most favorable executions and best prices possible. These investment managers were also required to advise Plaintiffs LACERA, VRF, Essex, Unipension, and the Delta Funds of all significant matters that could affect assets and returns. None of these Plaintiffs were informed by their investment managers of facts that would have put a reasonable person on notice of the fact that Defendants were colluding to prevent exchange trading in the CDS market. These Plaintiffs relied on the advice, monitoring, and diligence of their investment managers.

254. Plaintiff Salix and other members of the Class also conducted their own due diligence into the pricing of CDS. These members of the Class, such as Salix, attempted to obtain the best price possible on CDS investments. On occasion, Plaintiffs made inquiries regarding CDS price movements, and were always provided with a market-based explanation for

the movement. For instance, on numerous occasions, Salix contacted the Dealer Defendants directly and asked for explanations about certain CDS price movements. On each occasion, Salix was provided with a market-based explanation. Salix relied on these explanations in conducting CDS transactions.

255. Thus, at no time prior to the public disclosures identified above did any of the Plaintiffs believe or have reason to believe that the Dealer Defendants' pricing of CDS was a result of or affected by a secret and unlawful conspiracy among the Dealer Defendants to block competition from exchanges and to keep bid/ask spreads artificially inflated.

256. Because of Defendants' concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiffs or members of the Class have been tolled during the period of concealment.

257. Moreover, any applicable statute of limitations affecting or limiting the rights of action by Plaintiffs or the Class was also tolled by the filing of an antitrust action on behalf of the Class on May 3, 2013.

## **CLASS ACTION ALLEGATIONS**

258. Plaintiffs, on behalf of themselves and those similarly situated, seek damages against Defendants based on the allegations contained of herein.

259. Plaintiffs bring this action on behalf of themselves and, under Federal Rule of Civil Procedure 23(a) and (b)(3), as representatives of a Class defined as follows:

> All persons or entities who, during the period of January 1, 2008 through December 31, 2013, directly purchased CDS from or sold CDS to the Dealer Defendants, or their respective affiliates, in the United States and its territories. Excluded from the Class are Defendants, their co-conspirators identified herein, and their officers, directors, management, employees, current subsidiaries or affiliates, and all federal governmental entities (the "Class").

260. **Numerosity.** Members of the Class are so numerous that joinder is impracticable. Plaintiffs do not know the exact size of the Class, but believe that there are thousands of Class Members geographically dispersed throughout the United States.

261. **Typicality.** Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Defendants. Specifically, Defendants' wrongdoing caused Plaintiffs and members of the Class to pay inflated prices when they bought CDS and to receive lower premiums when they sold CDS.

262. Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiffs are coincident with, and not antagonistic to, those of the Class. Accordingly, by proving its own claims, Plaintiffs will prove other Class Members' claims as well.

263. **Adequacy of Representation.** Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation. Plaintiffs and its counsel have the necessary financial resources to adequately and vigorously litigate this class action. Plaintiffs can and will fairly and adequately represent the interests of the Class and has no interests that are adverse to, conflict with, or are antagonistic to the interests of the Class.

264. **Commonality**. There are questions of law and fact common to the Class, which questions relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

(a)     Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices associated with the purchase and sale of CDS in the United States;

(b)     The identity of the participants in the conspiracy;

(c)     The duration of the conspiracy alleged and the nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)     Whether the alleged conspiracy violated Section 1 of the Sherman Act;

(e)     Whether the Defendants monopolized or conspired to monopolize the United States CDS market in violation of Section 2 of the Sherman Act;

(f)     Whether Defendants collectively had the power to exclude competition to trade CDS with non-dealer market participants and to obtain supra-competitive bid/ask spreads when trading CDS with non-dealers;

(g)     Whether the conduct of Defendants and their co-conspirators, as alleged, caused injury to the business and property of Plaintiffs and other members of the Class;

(h)     The effect of Defendants' alleged conspiracy on the prices Associated with the purchase and sale of CDS sold in the United States during the Class Period;

(i)     The appropriate measure of damages sustained by Plaintiffs and other members of the Class;

(j)     Whether Plaintiffs and other Class Members are entitled to, injunctive relief; and

(k)     The appropriate injunction needed to restore competition.

265.    ***Predominance.***  Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class Members because Defendants have acted on grounds generally applicable to the entire Class, thereby making a common methodology for determining class damages as a whole appropriate.  Such generally applicable conduct is inherent in Defendants' wrongful conduct.

266.    ***Superiority.***  Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated,

geographically dispersed persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.  The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.

267.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION
**(Conspiracy to Restrain Trade in Violation of Section 1 of the Sherman Act)**

268.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

269.    As alleged above, beginning at least as early as January 1, 2008, and continuing thereafter, Defendants and their co-conspirators entered into and engaged in a horizontal contract, combination or conspiracy in restraint of trade to (1) artificially raise, fix, maintain, and/or stabilize bid/ask spreads associated with the trading of CDS with non-dealer market participants, and (2) jointly boycott entities that would introduce competition on CDS bid/ask spreads in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Such contract, combination or conspiracy constitutes a naked, per se violation of the federal antitrust laws and is, moreover, an unreasonable and unlawful restraint of trade that lacks any countervailing procompetitive rationale.

270. Defendants and their co-conspirators' contract, combination, agreement, understanding, or concerted action was without procompetitive justification and occurred within the flow of, and substantially affected, interstate commerce.

271. As a direct and proximate result of Defendants' scheme and concrete acts undertaken in the furtherance thereof, competition in CDS trades between Defendants and their non-dealer customers has been severely decreased. Plaintiffs and Class Members have been injured and financially damaged in their respective businesses and property, in amounts that are presently undetermined. Plaintiffs and each Class Member's damages are directly attributable to Defendants' conduct which resulted in all Class Members paying artificially inflated bid/ask spreads on every CDS they purchased or sold during the Class Period. Plaintiffs' injuries consist of artificially inflated costs associated with the purchase and sale of CDS in the United States caused by Defendants' misconduct. Plaintiffs' injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

## SECOND CAUSE OF ACTION
### (Conspiracy to Monopolize in Violation of Section 2 of the Sherman Act)

272. Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

273. As alleged herein, Defendants and their co-conspirators entered into and engaged in a conspiracy to monopolize the CDS market in the United States described herein in violation of Section 2 of the Sherman Act. Defendants exercised their market power in the CDS market with the specific intent to monopolize that market in furtherance of their conspiracy.

274. The conspiracy had a strong likelihood of success, given the market shares held collectively by the Dealer Defendants.

275.     Alternatively, the conspiracy resulted in substantial anticompetitive effects in the CDS market, as set forth above.  There is no legitimate business justification for, or procompetitive benefits caused by, Defendants' conduct.

276.     Defendants' and their co-conspirators' contract, combination, agreement, understanding, or concerted action occurred within the flow of, and substantially affected, interstate commerce.

277.     As a direct and proximate result of Defendants' scheme, Plaintiffs and the members of the Class have been injured and financially damaged in their respective businesses and property, in amounts which are presently undetermined.  Plaintiffs and each Class Member's damages are directly attributable to Defendants' conduct which resulted in all Class Members paying artificially inflated bid/ask spreads on every CDS they purchased or sold during the Class Period.  Plaintiffs' injuries consist of inflated transaction costs associated with the purchase and sale of CDS in the United States caused by Defendants' misconduct. Plaintiffs' injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

### THIRD CAUSE OF ACTION
#### (Unjust Enrichment)

278.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

279.     Because of the acts of Defendants and their co-conspirators as alleged herein, Defendants have been unjustly enriched at the expense of Plaintiffs and members of the Class.

280.     Plaintiffs and members of the Class seek restoration of the monies of which they were unfairly and improperly deprived, as described herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class of similarly situated entities, respectfully requests that the Court:

A.      Determine that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class, and declare Plaintiffs as the representatives of the Class;

B.      Find Defendants jointly and severally liable for the damages incurred by Plaintiffs and the Class;

C.      Award the Class treble damages;

D.      Award reasonable attorneys' fees and costs;

E.      Award all available pre-judgment and post-judgment interest, to the fullest extent available under law or equity from the date of service of the initial complaint in this action;

F.      Decree that Defendants and their co-conspirators have unlawfully conspired to block the emergence of exchange trading of CDS in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

G.      Decree that the Defendants and their co-conspirators have unlawfully conspired to monopolize the United States CDS market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

H.      Decree that Defendants have been unjustly enriched by their wrongful conduct and award restitution to Plaintiffs;

I.      Permanently enjoin Defendants from continuing their unlawful conduct, which has prevented competition from entering the CDS market, a market valuable to not only

Plaintiffs and Class Members but to the nation's financial system and broader economy for the risk management and liquidity benefits it can provide; and

J.     Order such other, further and general relief as is just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs, on behalf of themselves and the proposed Class, demand a trial by jury on all issues so triable.

DATED:     New York, New York        QUINN EMANUEL URQUHART &
               April 11, 2014                         SULLIVAN, LLP

                                                  By:   /s/  Daniel L. Brockett
                                                          Daniel L. Brockett
                                                          Stephen R. Neuwirth
                                                          Steig D. Olson
                                                          51 Madison Avenue, 22nd Floor
                                                          New York, New York 10010-1601
                                                          Telephone:  (212) 849-7000
                                                          Fax:  (212) 849-7100
                                                          danbrockett@quinnemanuel.com
                                                          stephenneuwirth@quinnemanuel.com
                                                          steigolson@quinnemanuel.com

                                                          PEARSON, SIMON & WARSHAW, LLP
                                                          Bruce L. Simon
                                                          George S. Trevor
                                                          Aaron M. Sheanin
                                                          Thomas K. Boardman
                                                          44 Montgomery Street, Suite 2450
                                                          San Francisco, California 94104
                                                          Telephone:  (415) 433-9000
                                                          Fax:  (415) 433-9008
                                                          bsimon@pswlaw.com
                                                          gtrevor@pswlaw.com
                                                          asheanin@pswlaw.com
                                                          tboardman@pswlaw.com

                                                          *Interim Co-Lead Class Counsel*

*Counsel for Additional Named Plaintiffs*

ENTWISTLE & CAPPUCCI, LP
Andrew J. Entwistle
Vincent R. Cappucci
Robert N. Cappucci
280 Park Avenue, 26th Floor
New York, New York 10017
Telephone: (212) 894-7200
Fax: (212) 894-7272
aentwistle@entwistle-law.com
vcappucci@entwistle-law.com
rcappucci@entwistle-law.com

LABATON SUCHAROW LLP
Lawrence A. Sucharow
Gregory S. Asciolla
Jay L. Himes
Matthew J. Perez
140 Broadway Avenue
New York, New York 10005
Telephone: (212) 907-0700
Fax: (212) 818-0477
lsucharow@labaton.com
gasciolla@labaton.com
jhimes@labaton.com
mperez@labaton.com

THE MEHDI FIRM, PC
Azra Mehdi
One Market
Spear Tower, Suite 3600
San Francisco, CA 94105
Telephone: (415) 293-8039
Fax: (415) 293-8001
azram@themehdifirm.com

*Counsel for Value Recovery Fund LLC and the Delta Funds*

*Counsel for Essex Regional Retirement System*

*Counsel for Fondsmaeglerselskab A/S, Arkitekternes Pensionskasse, MP Pension - Pensionskassen for Magistre & Psykologer, and Pensionskassen for Jordbrugsakademikere & Dyrlæger*

## CERTIFICATE OF SERVICE

I hereby certify that on April 11, 2014, I filed and therefore caused the foregoing document to be served via the CM/ECF system in the United States District Court for the Southern District of New York on all parties registered for CM/ECF in the above-captioned matter.

/s/ Daniel L. Brockett
Daniel L. Brockett