**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                              :
                                                              :
                                                              :
IN RE:  CREDIT DEFAULT SWAPS                                   :
ANTITRUST LITIGATION                                           :      Master Docket No.:  13 MD 2476 (DLC)
                                                              :
This Document Relates To:  All Actions                        :
                                                              :
                                                              :
                                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**DEALER-DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR JOINT**
**MOTION TO DISMISS THE SECOND CONSOLIDATED AMENDED COMPLAINT**

May 23, 2014

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................... iii

TABLE OF ABBREVIATIONS ...................................................................................x

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND ..........................................................................................................6

    A.    Credit Default Swaps ...............................................................................6

    B.    The Parties ...............................................................................................7

    C.    The Financial Crisis and Regulators' Efforts To Establish
           a Central CDS Clearinghouse ..................................................................8

    D.    CMDX ....................................................................................................10

    E.    The Enactment of Dodd-Frank ..............................................................12

    F.    Plaintiffs' Claims ..................................................................................12

ARGUMENT ..............................................................................................................13

I.    Plaintiffs Cannot Assert Antitrust Claims Because Their Alleged Injuries Are
    Too Indirect and They Are Too Remote from the Challenged Conduct. ..........13

    A.    Plaintiffs' Claimed Injuries Are Too Indirect. .....................................15

    B.    Plaintiffs Are Too Remote from the Alleged Misconduct. ...................16

    C.    The Other Two Factors Also Favor Dismissal. .....................................18

           1.    Plaintiffs' Alleged Injuries Are Entirely Speculative. ..............18

           2.    Plaintiffs' Claims Raise Complex and Difficult Problems of
                 Quantifying and Apportioning Damages. ..................................21

II.    Plaintiffs Fail Plausibly To Allege Each Defendant's Participation in a
    Conspiracy To Restrain Trade in Violation of Section 1 ..................................22

    A.    Plaintiffs' Generic References to the "Dealer Defendants"
           Are Insufficient. ....................................................................................23

    B.    The Mere Opportunity To Conspire Is Insufficient. .............................26

C.      Plaintiffs' Allegations Do Not Tend To Exclude Independent
Self-Interested Conduct as an Explanation for Each Dealer's Actions. ...............27

III.    Plaintiffs Cannot State a "Conspiracy to Monopolize" Claim Based
on a "Shared Monopoly." ...................................................................................32

IV.     Plaintiffs Cannot Allege Any Injury-in-Fact for the Period Before
CMDX Allegedly Could Have Begun Exchange Trading of CDS...................................34

V.      Plaintiffs' Claims Based on Conduct Before May 3, 2009 Are Barred by the
Four-Year Statute of Limitations. ...................................................................36

A.      Plaintiffs Do Not Adequately Plead Fraudulent Concealment. ............................38

B.      Plaintiffs Do Not Adequately Plead That Any Concealment
"Actively Prevented" Them from Discovering Their Claims...............................40

C.      Plaintiffs Do Not Adequately Plead That They Exercised the
Necessary Diligence.......................................................................................40

VI.     Congress' Enactment of Title VII of Dodd-Frank Precludes Application
of the Antitrust Laws to Alleged Conduct After July 21, 2011. .......................42

A.      Dodd-Frank Precludes Application of the Antitrust Laws to
Plaintiffs' Allegations. ...................................................................................43

B.      Dodd-Frank's Savings Clause Does Not Preserve Plaintiffs' Claims. .................47

VII.    Plaintiffs' Vague and Duplicative Unjust Enrichment Claim
Should Be Dismissed. .....................................................................................49

CONCLUSION....................................................................................................50

# TABLE OF AUTHORITIES

Page(s)

CASES

*131 Main St. Assocs. v. Manko*,
   179 F. Supp. 2d 339 (S.D.N.Y.), *aff'd*,
   54 F. App'x 507 (2d Cir. 2002) ...............................................................................40, 41

*AD/SAT v. Associated Press*,
   181 F.3d 216 (2d Cir. 1999)...................................................................................23, 25

*Arista Records LLC v. Lime Grp. LLC*,
   532 F. Supp. 2d 556 (S.D.N.Y. 2007)...........................................................................33

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..................................................................................23, 24, 25, 28

*Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*,
   459 U.S. 519 (1983)............................................................................................. *passim*

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)............................................................................................. *passim*

*Boyd v. AWB Ltd.*,
   544 F. Supp. 2d 236 (S.D.N.Y. 2008)...........................................................................16

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.*,
   996 F.2d 537 (2d Cir. 1993)...................................................................................26, 27

*Corsello v. Verizon N.Y., Inc.*,
   967 N.E.2d 1177 (N.Y. 2012)........................................................................................49

*Credit Suisse Sec. (USA) LLC v. Billing*,
   551 U.S. 264 (2007)...........................................................................................43, 44, 46, 49

*Daniel v. Am. Bd. of Emergency Med.*,
   428 F.3d 408 (2d Cir. 2005)...................................................................................13, 17

*Dodds v. Cigna Sec., Inc.*,
   12 F.3d 346 (2d Cir. 1993).............................................................................................40

*Elec. Trading Grp., LLC v. Banc of Am. Sec. LLC*,
   588 F.3d 128 (2d Cir. 2009)...............................................................................42, 43, 47

*Fidenas AG v. Honeywell Inc.*,
   501 F. Supp. 1029 (S.D.N.Y. 1980)........................................................................39, 40

Page(s)

*Friedman v. Salomon/Smith Barney, Inc.*,
  313 F.3d 796 (2d Cir. 2002)........................................................................43

*Gatt Commc'ns, Inc. v. PMC Assocs. L.L.C.*,
  711 F.3d 68 (2d Cir. 2013)..............................................................13, 14, 17

*Geller v. Cnty. Line Auto Sales, Inc.*,
  86 F.3d 18 (2d Cir. 1996)...........................................................................49

*Gross v. New Balance Athletic Shoe, Inc.*,
  955 F. Supp. 242 (S.D.N.Y. 1997) ..............................................................21

*H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*,
  879 F.2d 1005 (2d Cir. 1989).......................................................................33

*Higgins v. N.Y. Stock Exch., Inc.*,
  942 F.2d 829 (2d Cir. 1991).........................................................................36

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*,
  620 F. Supp. 2d 499 (S.D.N.Y. 2009)..........................................................37

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*,
  708 F. Supp. 2d 348 (S.D.N.Y. 2010)..........................................................26

*IBM Corp. v. Platform Solutions, Inc.*,
  658 F. Supp. 2d 603 (S.D.N.Y. 2009).....................................................16, 22

*In re Buspirone Patent Litig.*,
  185 F. Supp. 2d 363 (S.D.N.Y. 2002)..........................................................40

*In re Chocolate Confectionary Antitrust Litig.*,
  602 F. Supp. 2d 538 (M.D. Pa. 2009)..........................................................50

*In re DDAVP Direct Purchaser Antitrust Litig.*,
  585 F.3d 677 (2d Cir. 2009).........................................................................21

*In re Digital Music Antitrust Litig.*,
  812 F. Supp. 2d 390 (S.D.N.Y. 2011)..........................................................50

*In re Elec. Books Antitrust Litig.*,
  859 F. Supp. 2d 671 (S.D.N.Y. 2012)..........................................................31

*In re Elevator Antitrust Litig.*,
  502 F.3d 47 (2d Cir. 2007).....................................................................23, 25

*In re Merrill Lynch Ltd. P'ships Litig.*,
  154 F.3d 56 (2d Cir. 1998).........................................................................41

Page(s)

*In re Packaged Ice Antitrust Litig.*,
    779 F. Supp. 2d 642 (E.D. Mich. 2011)................................................................50

*In re Parcel Tanker Shipping Servs. Antitrust Litig.*,
    541 F. Supp. 2d 487 (D. Conn. 2008)..................................................23, 24, 27

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    586 F. Supp. 2d 1109 (N.D. Cal. 2008) ..............................................................50

*Int'l Distribution Ctrs., Inc. v. Walsh Trucking Co.*,
    812 F.2d 786 (2d Cir. 1987).................................................................................33

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) .............................................................................26

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997)............................................................................................36

*Koch v. Christie's Int'l PLC*,
    699 F.3d 141 (2d Cir. 2012).................................................................................37

*Kramer v. Pollock-Krasner Found.*,
    890 F. Supp. 250 (S.D.N.Y. 1995) ......................................................................50

*La. Mun. Police Emps. Ret. Sys. v. JPMorgan Chase & Co.*,
    No. 12 Civ. 6659 (DLC), 2013 WL 3357173 (S.D.N.Y. July 3, 2013)............49, 50

*Laydon v. Mizuho Bank, Ltd.*,
    No. 12-cv-3419 (GBD), 2014 WL 1280464 (Mar. 28, 2014)...........................16, 21

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    134 S. Ct. 1377 (2014).........................................................14, 15, 18, 34

*Mayor & City Council of Balt., Md. v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013).................................................................................23

*Oreck Corp. v. Whirlpool Corp.*,
    639 F.2d 75 (2d Cir. 1980)...................................................................................27

*Oxbow Carbon & Minerals LLC v. Union Pac. R.R.*,
    926 F. Supp. 2d 36 (D.D.C. 2013) ......................................................................33

*Paycom Billing Servs. v. MasterCard Int'l, Inc.*,
    467 F.3d 283 (2d Cir. 2006)........................................................... *passim*

*Reading Indus., Inc. v. Kennecott Copper Corp.*,
    631 F.2d 10 (2d Cir. 1980).............................................................................18, 20

Page(s)

*Rothman v. Gregor*,
220 F.3d 81 (2d Cir. 2000)..........................................................................................8

*RxUSA Wholesale, Inc., v. Alcon Labs., Inc.*,
661 F. Supp. 2d 218 (E.D.N.Y. 2009) ......................................................................33

*Salinger v. Projectavision, Inc.*,
972 F. Supp. 222 (S.D.N.Y. 1997) ...........................................................................40

*Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*,
947 F. Supp. 2d 88 (D.D.C. 2013) ......................................................................26, 34

*Statistical Phone Philly v. NYNEX Corp.*,
116 F. Supp. 2d 468 (S.D.N.Y. 2000).......................................................................39

*Sun Dun, Inc. of Wash. v. Coca-Cola Co.*,
740 F. Supp. 2d 381 (D. Md. 1990)......................................................................33, 34

*Town of Poughkeepsie v. Espie*,
402 F. Supp. 2d 443 (S.D.N.Y. 2005).......................................................................41

*Town of Wallkill v. Rosenstein*,
40 A.D.3d 972 (N.Y. App. Div. 2007) ......................................................................49

*Two Old Hippies, LLC v. Catch the Bus, LLC*,
784 F. Supp. 2d 1200 (D.N.M. 2011)....................................................................24, 35

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)...............................................................................................30, 49

*World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*,
328 F. App'x 695 (2d Cir. 2009) ...............................................................................41

*Zola v. Gordon*,
685 F. Supp. 354 (S.D.N.Y. 1988) ............................................................................41


**STATUTES, RULES, LEGISLATIVE AND REGULATORY MATERIALS**

7 U.S.C. § 1a .............................................................................................................44

7 U.S.C. § 2 ..................................................................................................44, 45, 46

7 U.S.C. § 24a ............................................................................................................48

7 U.S.C. § 6s .........................................................................................................45, 48

Page(s)

7 U.S.C. § 7a-1 ...................................................................................................48

7 U.S.C. § 7b-3 ............................................................................................44, 48

12 U.S.C. § 5303 .......................................................................................47, 48

15 U.S.C. § 15b ...................................................................................................36

15 U.S.C. § 77 .....................................................................................................49

15 U.S.C. § 78c ..................................................................................................44

15 U.S.C. § 78c-3 .........................................................................................46, 45

15 U.S.C. § 78o-10 .............................................................................................48

15 U.S.C. § 78bb ................................................................................................49

15 U.S.C. § 8302 ................................................................................................44

17 C.F.R. pt. 23H (2014) ....................................................................................45

17 C.F.R. §§ 23.431-23.433 (2014) ...................................................................45

17 C.F.R. § 37.9 (2014) ......................................................................................45

17 C.F.R. § 39.12 (2014) ....................................................................................45

17 C.F.R. §§ 43.1-43.4 (2014) ...........................................................................45

17 C.F.R. § 43.5 (2014) .................................................................................45, 46

17 C.F.R. § 50.4 (2014) ......................................................................................45

*Order Granting Temporary Exemptions under the Securities Exchange
Act of 1934 in Connection with the Request of Chicago Mercantile
Exchange Inc. and Citadel Investment Group, L.L.C. Related to
Central Clearing of Credit Default Swaps, and Request for
Comment*, 74 Fed. Reg. 11,781 (Mar. 19, 2009) ....................................35

*Core Principles and Other Requirements for Swap Execution Facilities*,
78 Fed. Reg. 33,476 (June 4, 2013) .........................................................45

FED. R. CIV. P. 8 ..................................................................................................23

FED. R. CIV. P. 9 .......................................................................................37, 39, 41

Page(s)

*Building the New Derivatives Regulatory Framework:*
  *Oversight of Title VII of the Dodd-Frank Act:*
  *Hearing Before the S. Comm. on Banking,*
  *Housing, & Urban Affairs*, 112th Cong. (2011)
  (statement of Gary Gensler, Chairman, CFTC) ...................................................44

Comments of the United States Department of Justice (Dec. 28, 2010),
  *available at* www.justice.gov/atr/public/comments/265620.pdf...........................47

Comments of the United States Department of Justice (Dec. 28, 2010),
  *available at* www.justice.gov/atr/public/comments/265618.pdf...........................47

*Hearing To Review the Role of Credit Derivatives in the U.S. Economy:*
  *Hearing Before the H. Comm. on Agric.*, 110th Cong. (2008)
  (statements of Eric R. Sirri, Director, Division of Trading and
  Markets, SEC, and Walter Lukken, Acting Chairman, CFTC) .................................9


TREATISES

ABA Section of Antitrust Law,
  *Antitrust Law Developments* (7th ed. 2012) ..........................................................33

Phillip Areeda & Herbert Hovenkamp,
  *Fundamentals of Antitrust Law* (4th ed. Supp. 2013).............................................17


OTHER AUTHORITY

Barclays Capital Equity Research,
  *Exchange-Traded CDS Has Several Hurdles* (Oct. 8, 2008)...........................19, 20

Karen Brettell, *Bank 'Oligopoly' Slows CDS Clearing—BlueMountain*,
  REUTERS (June 1, 2009)...........................................................................................37

Dow Jones Newswires, *CME Sees Up to Six Dealers*
  *Backing Credit Swaps Platform*, FIN. NEWS (Dec. 23, 2008)....................................9

Ciara Linnane & Karen Brettell,
  *NY Federal Reserve Pushes for*
  *Central CDS Counterparty*, REUTERS (Oct. 6, 2008) ................................................9

Robert E. Litan, *The Derivative Dealers' Club and*
  *Derivatives Markets Reform:  A Guide for Policy Makers,*
  *Citizens and Other Interested Parties*, BROOKINGS INST. (Apr. 7, 2010)....................8, 10, 42

Page(s)

Peter Madigan, *Abuse of Power?*,
RISK MAG. (Sept. 2013) ...........................................................................11, 35

Peter Norman, THE RISK CONTROLLERS (2011) ........................................30

Press Release, CME Group, *CME Group and Citadel to Launch the*
*First Integrated Credit Default Swaps Trading Platform and*
*Central Counterparty Facility, Linked to CME Clearing* (Oct. 7, 2008),
http://investor.cmegroup.com/investor-relations/releasedetail.cfm?ReleaseID=338884 ........20

Press Release, CME Group, *CME Group Opens Credit Default Swaps*
*Initiative to Additional Partners and Focuses*
*Solution on Clearing Services* (Sept. 18, 2009),
http://investor.cmegroup.com/investor-
relations/releasedetail.cfm?ReleaseID=410137..............................................11, 38

Press Release, FRBNY, *Statement Regarding June 9 Meeting on*
*Over-the-Counter Derivatives* (June 9, 2008),
www.newyorkfed.org/newsevents/news/markets/2008/ma080609.html ..................................9

Press Release, FRBNY, *New York Fed to Host Meeting*
*Regarding Central Counterparty for CDS* (Oct. 10, 2008),
www.newyorkfed.org/newsevents/news/markets/2008/an081010.html ..................................9

Ivy Schmerken, *Transforming Credit Derivatives:*
*The Debate Over Trading Models*,
WALL ST. & TECH. (Jan. 1, 2009) ...........................................................10, 35, 37

Louise Story, *House Advantage; A Secretive Banking Elite Rules*
*Derivatives Trading*, N.Y. TIMES (Dec. 12, 2010) ....................................... *passim*

Kenneth B. Worthington, *CME Group*, J.P. Morgan North American
Equity Research (Jan. 23, 2009) ...................................................................20, 34

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| CDS | credit default swaps |
| CFTC | Commodity Futures Trading Commission |
| Citadel | Citadel Investment Group, LLC |
| CLOB | central limit order book |
| CMDX | Credit Market Derivatives Exchange |
| CME | CME Group Inc. |
| CPP | competitive programs policy |
| DCM | designated contract market |
| Dodd-Frank | Dodd-Frank Wall Street Reform and Consumer Protection Act |
| DOJ | Antitrust Division of the U.S. Department of Justice |
| FRBNY | Federal Reserve Bank of New York |
| ICE | IntercontinentalExchange, Inc. |
| ISDA | International Swaps and Derivatives Association |
| Markit | Markit Group Ltd. |
| OTC | over-the-counter |
| RFQ | request-for-quote |
| SCAC | Second Consolidated Amended Class Action Complaint |
| SEC | Securities and Exchange Commission |
| SEF | swap execution facility |
| TCC | The Clearing Corporation |

The dealer-defendants[1] respectfully submit this memorandum in support of their joint motion to dismiss the Second Consolidated Amended Class Action Complaint ("SCAC").

## PRELIMINARY STATEMENT

Plaintiffs assert that from January 1, 2008 through December 31, 2013, twelve dealers and two other organizations—Markit Group Ltd. ("Markit") and the International Swaps and Derivatives Association ("ISDA")—engaged in a massive anticompetitive scheme to make "tremendous profits" in trading credit default swaps ("CDS").  (SCAC ¶ 1.)  Instead of opposing defendants' initial motions to dismiss, plaintiffs elected to amend their complaint once again. These amendments included references to additional media reports—several of which *contradict* plaintiffs' theory of liability—but there are no new allegations of substance.  Plaintiffs thus have failed to cure their numerous pleading deficiencies, even though defendants specifically identified them.  Plaintiffs' inability to satisfy their pleading burden is not surprising, as there was no antitrust conspiracy here.  Repeated conclusory assertions that there was a conspiracy do not make it so, and plaintiffs' complaint should be dismissed.

CDS are bilateral contracts that provide investors with a means to hedge exposure to or speculate on a wide variety of credit risks.  (*Id.* ¶ 2.)  Unlike common stock, buyers and sellers of CDS frequently tailor their contracts to their individual needs and retain continuing obligations to one another, thereby creating counterparty risk—*i.e.*, the risk that the other party to the contract may default.  (*Id.* ¶¶ 71-73.)  CDS contracts thus have historically been negotiated bilaterally and traded in over-the-counter ("OTC") transactions between sophisticated parties that

---

[1] The dealer-defendants are Bank of America Corporation; Bank of America N.A.; Barclays Bank PLC; BNP Paribas; Citigroup Inc.; Citibank, N.A.; Citigroup Global Markets Inc.; Credit Suisse AG; Deutsche Bank AG; Goldman, Sachs & Co.; HSBC Bank plc; HSBC Bank USA, N.A.; JPMorgan Chase & Co.; JPMorgan Chase Bank, N.A.; Morgan Stanley & Co. LLC; Royal Bank of Scotland PLC; Royal Bank of Scotland N.V.; UBS AG; and UBS Securities LLC.

know each other, and the preference for creditworthy counterparties has motivated CDS participants to seek out trading partners (including the dealer-defendants) that have both the ability and the willingness to commit capital to such trading.  (*Id.* ¶ 75.)

According to the complaint, the "price opacity" of OTC trading has allowed the dealer-defendants, in their role as market-makers, to maintain inflated "bid/ask spread[s]" on CDS trades, and the dealers allegedly have attempted to protect those "supracompetitive profits" (*id.* ¶ 7) by conspiring to block the emergence of exchange trading of CDS (*id.* ¶ 12).  Ignoring the challenges of creating a viable exchange encompassing the diverse range of CDS contracts, plaintiffs contend that defendants collectively hindered several third parties—none of which ever brought suit—from introducing central clearing and later exchange trading of CDS in the fall of 2008, a period of tumultuous financial upheaval and intense regulatory scrutiny of CDS.

This is not a typical antitrust case.  Plaintiffs do not allege that the dealer-defendants agreed to fix the prices of the CDS they bought or sold or agreed to allocate CDS customers among themselves.   Plaintiffs instead allege a conspiracy to maintain an existing market structure—OTC trading of CDS—and argue that the dealer-defendants carried out their supposed six-year conspiracy in two ways.

- First, plaintiffs assert that in late 2008 the dealers collusively directed Markit and ISDA, through their participation on those entities' boards, to limit the scope of certain intellectual property licenses given to Credit Market Derivatives Exchange ("CMDX"), a joint venture between CME Group Inc. ("CME") and Citadel Investment Group, LLC ("Citadel").  According to plaintiffs, had the scope of those licenses not been limited, CMDX would have successfully launched a platform facilitating anonymous exchange trading of certain types of CDS at the end of 2008.

- Second, plaintiffs challenge certain dealers' support in late 2008, at the government's urging, of the CDS clearing proposal of IntercontinentalExchange, Inc. ("ICE"). According to plaintiffs, the development of a central clearing counterparty for CDS transactions was a necessary predicate for exchange trading of CDS, and the dealers supposedly agreed to decline to support competing clearing proposals, including CME's clearing proposal, because those other clearinghouses ultimately might have evolved from a central clearing counterparty into an exchange.

Plaintiffs speculate that, absent those alleged acts of collusion, the marketplace at the end of 2008 would have developed "alternative mechanisms for trading CDS, including trading through an electronic exchange," that would have caused plaintiffs to obtain better net prices in their purchases and sales of CDS over a six-year period.  (*Id*. ¶ 85.)

The complaint briefly mentions (*id*. ¶ 1), but then disregards, the context in which exchange trading of CDS supposedly would have emerged:  In 2008 and 2009—the focus of plaintiffs' allegations—the financial markets were in a state of crisis.  During that tumultuous time, the dealer-defendants—which were all differently situated and, in some cases, concerned about their very survival—hardly could be expected to devote attention and resources to an untested method of trading highly tailored CDS products for which there was, at best, uncertain investor demand.  From 2009 onward, legislative efforts also were underway that, after a period of uncertainty, now have culminated in substantial new regulatory oversight of the CDS marketplace, including the clearing and trading of CDS.  The complaint does not account for those historic events.

Nor do plaintiffs attempt to reconcile their allegations with the following facts:  (i) the well-publicized efforts of various dealers and other industry participants to develop a CDS

clearinghouse in 2008 and 2009 proceeded with the active participation and oversight of government regulators, none of which objected to certain dealers' support of ICE's proposed clearinghouse (*see id*. ¶¶ 124, 141); (ii) many of the dealer-defendants ultimately supported multiple clearing proposals in an effort to foster competition among clearinghouses that might lead to lower clearing fees (*id*. ¶ 169); (iii) in the fall of 2008, CMDX did not pursue its alleged request for licenses to use the intellectual property of Markit and ISDA for exchange trading, instead requesting only licenses for clearing and request-for-quote ("RFQ") trading, which Markit and ISDA granted (*see id*. ¶¶ 148, 153); and (iv) while CDS contracts have been centrally cleared now for five years (*id*. ¶ 66)—and an exchange-traded CDS futures product was introduced last year—the marketplace even now shows little demand for exchange trading of CDS.  Plaintiffs' amendments to their complaint have not remedied its deficiencies.  It should be dismissed for multiple reasons based on plaintiffs' own allegations and the public sources cited in the complaint itself:

   1. Under *Associated General Contractors of California v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"), and its progeny, plaintiffs' antitrust claims fail because (i) their alleged injuries are indirect and depend entirely on injury to others, and (ii) there are other less remote parties that had superior incentives to detect the alleged violations and seek relief.  At most, only an indirect and speculative connection exists between defendants' alleged agreement not to support CMDX or various clearinghouses and plaintiffs' alleged injuries.  The complaint also identifies numerous private parties—most notably, CME and Citadel—that were closer to the alleged wrongdoing and had the sophistication, resources and incentives to have sued if they had believed antitrust violations had occurred.  *See infra* Part I.

2.     Plaintiffs fail to plead facts that support a plausible inference of a hidden but sweeping anticompetitive agreement supposedly spanning six years, involving fourteen different defendants and encompassing all of the miscellaneous conduct described in the complaint. Under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and its progeny, plaintiffs must allege facts—not simply labels and legal conclusions—to support an inference that a conspiracy actually existed.  Plaintiffs cannot satisfy that pleading burden by making generalized allegations directed at the twelve "Dealer Defendants" as an undifferentiated and indistinguishable group or by alleging that certain dealers had an opportunity to conspire at legitimately constituted board and risk committee meetings merely because those meetings were not open to the public. Where, as here, all of the alleged conduct just as easily could have resulted from individual decisions by firms acting in their own economic self-interests as from an unlawful conspiracy, a Section 1 claim cannot survive.  *See infra* Part II.

3.     Plaintiffs cannot state a "conspiracy to monopolize" claim under Section 2 of the Sherman Act by alleging that the dealer-defendants, based on their "collective market shares," conspired to create a "shared monopoly."  A conspiracy to monopolize claim arises only from action intended to produce an unlawful *single*-firm monopoly.  Plaintiffs do not allege any conduct here intended to enable a single firm to obtain monopoly power.  *See infra* Part III.

4.     Even under plaintiffs' theory of the case, no exchange trading of CDS could have occurred until some point *after* December 23, 2008—the date on which CMDX obtained regulatory approval for its clearing and RFQ proposals, precursors to any exchange.  As a result, plaintiffs cannot allege injury-in-fact in any circumstance before that date.  *See infra* Part IV.

5.     Any claims based on conduct alleged to have occurred before May 3, 2009, the bulk of the conduct at issue, are barred by the Clayton Act's four-year statute of limitations.

Plaintiffs' contention that the limitations period was tolled based on defendants' alleged fraudulent concealment of their conspiracy is implausible and non-particularized under Federal Rule of Civil Procedure 9(b).  *See infra* Part V.

6.      In enacting Title VII of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank")—which governs the conduct of CDS dealers and mandates rules for CDS trading and clearing—Congress implicitly precluded application of the antitrust laws to the conduct challenged by plaintiffs after the July 21, 2011 effective date of that statute. Congress instead gave the Securities and Exchange Commission ("SEC") and Commodity Futures Trading Commission ("CFTC") comprehensive and discretionary regulatory authority over CDS trading and clearing, including *whether and under what circumstances CDS may be traded on exchanges*.  *See infra* Part VI.

7.      Plaintiffs' unjust enrichment claim should be dismissed because it simply duplicates their antitrust claims and fails to specify the applicable state law.  *See infra* Part VII.

## BACKGROUND

### A.      Credit Default Swaps

CDS contracts transfer credit exposure on a specific reference entity (such as a debt instrument issued by a corporation or a government entity) or a reference portfolio (a bundle of such debt instruments), and thus offer financial-market participants the ability to, among other things, hedge their credit risks.   (SCAC ¶ 2.)   There are two general categories of CDS: (i) single-name CDS contracts based on debt instruments issued by a single corporate or government entity, and (ii) CDS indices based on a portfolio, or index, of debt issuers.   (*Id.* ¶ 83.)  The two families of CDS indices at issue in this case—the iTraxx and CDX indices—were created in 2004 by many of the dealer-defendants and later sold to Markit.  (*Id.*)

At first, CDS trading was ad hoc, and CDS contracts were negotiated bilaterally by the parties, resulting in highly tailored contracts.  (*Id.* ¶ 75.)  One of the transaction costs of CDS trading was "the cost of searching for a counterparty willing to take the other side of a trade—that is, a party willing to buy the protection the investor wanted to sell (or vice versa)."  (*Id.*)  The complaint alleges that "[i]n response to this 'matching' problem, 'market makers' emerged to match buyers and sellers of CDS."  (*Id.*)  Referred to as the "sell-side," market makers "sell to buyers, buy from sellers, and hold inventory until a matching offer emerges."  (*Id.* ¶¶ 75-76.)  The complaint alleges that CDS investors, referred to as the "buy-side," desire "liquidity"—*i.e.*, "the ability (ideally) to trade at the market bid or offer without having to wait for a counterparty to come along who is willing to transact."  (*Id.* ¶ 76.)  Market makers provide liquidity by agreeing to transact immediately and bear market risk by holding CDS in inventory until a matching counterparty emerges.  (*Id.* ¶¶ 75-76.)

B.     **The Parties**

The twelve dealer-defendants are "the primary market makers for CDS."  (*Id.* ¶ 76.)  Defendant ISDA, an industry trade association, "represent[s] hundreds of financial institutions involved in the derivatives market."  (*Id.* ¶ 59.)  Defendant Markit is a private financial information company, of which certain of the dealer-defendants are shareholders; it owns the iTraxx and CDX CDS indices and the Reference Entity Database or "RED" codes.[2]  (*Id.* ¶¶ 62-63, 130-131.)  Plaintiffs allege that they are "buy-side" investors—including several "significant participants in the CDS market"—that entered into CDS transactions with one or more of the dealer-defendants since January 1, 2008.  (*See id.* ¶¶ 25-26, 28, 35-36, 40-41.)

---

[2]  RED codes are unique alphanumeric identifiers, analogous to CUSIP numbers for other securities, that are "widely used in the CDS market to identify the reference entity" for single-name CDS.  (SCAC ¶ 131.)

### C.   The Financial Crisis and Regulators' Efforts To Establish a Central CDS Clearinghouse

Because CDS contracts require the protection buyer to "make[] periodic payments" to the protection seller and obligate the protection seller to "make the buyer whole" if a "credit event" occurs (*id*. ¶ 71), the parties to a CDS trade have continuing obligations to one another during the term of the contract.  This subjects each party to counterparty risk.

Counterparty risk can be somewhat mitigated in bilaterally negotiated OTC transactions because each party knows the identity of its counterparty and can assess that party's creditworthiness.  By 2008, however, many industry participants, including certain of the dealer-defendants, had begun to consider ways to reduce counterparty risk further by creating a central clearinghouse for CDS transactions.  Such a central counterparty would stand between the parties to a CDS trade, as the buyer to the CDS seller and the seller to the CDS buyer.  A clearinghouse thus can "reduce the risks to the financial system from the failure of any of the parties to these trades."  (Robert E. Litan, *The Derivative Dealers' Club and Derivatives Markets Reform:  A Guide for Policy Makers, Citizens and Other Interested Parties*, BROOKINGS INST. at 12 (Apr. 7, 2010) (cited at SCAC ¶ 211 n.51).)[3]  Moreover, if parties have multiple offsetting trades, a clearinghouse is "able to 'net' the different positions against each other" and thus "reduce[] the overall 'gross' exposure of the clearinghouse relative to the total of the bilateral gross exposures of the parties to each other in the absence of a central clearinghouse."  (*Id*.)

After the collapse of Bear Stearns in March 2008, the Federal Reserve Bank of New York ("FRBNY") intensified its efforts to encourage the leading CDS dealers to establish a central

---

[3] In deciding a motion to dismiss, the Court may consider "any statements or documents incorporated" into the complaint "and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit."  *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000).  For the Court's convenience, copies of the publications cited herein are included as exhibits to the Declaration of Richard C. Pepperman II, filed contemporaneously with this brief.

clearinghouse to reduce systemic risk in the CDS marketplace.  (SCAC ¶ 124.)  The FRBNY convened widely attended meetings in June and October 2008 to urge industry participants, particularly dealers, to transition to a central CDS clearinghouse.  (*Id*. ¶ 141.)[4]  Regulatory involvement increased substantially after Lehman Brothers, another large CDS dealer, filed for bankruptcy on September 15, 2008.  "In the midst of the turmoil, regulators ordered banks to speed up plans—long in the making—to set up a clearinghouse to handle derivatives trading." (Louise Story, *House Advantage; A Secretive Banking Elite Rules Derivatives Trading*, N.Y. TIMES at 4 (Dec. 12, 2010) (cited at SCAC ¶ 8 n.2).)  In addition to the FRBNY, both the SEC and CFTC were actively involved.  The SEC announced that it was "participating in discussions . . . to create a central counterparty (CCP) for credit default swaps."  (*Hearing To Review the Role of Credit Derivatives in the U.S. Economy:  Hearing Before the H. Comm. on Agric.*, 110th Cong. 15 (2008) (statement of Eric R. Sirri) (cited at SCAC ¶ 107 n.3).)  Likewise, the CFTC stated that it, "in conjunction with other financial regulators, will continue to seek ways to provide clearing solutions for OTC derivatives."  (*Id.* at 6-7 (statement of Walter Lukken) (cited at SCAC ¶ 107 n.4).)

These efforts culminated in a meeting on October 10, 2008, at which the regulators heard presentations from four potential CDS clearinghouses:  Eurex, Liffe, CME/Citadel and ICE/The Clearing Corporation ("TCC").  (SCAC ¶ 141.)  TCC was "a dealer-owned clearing house" that "expect[ed] to have the required regulatory approvals and systems in place to launch a clearing platform by the end of the year."  (Ciara Linnane & Karen Brettell, *NY Federal Reserve Pushes for Central CDS Counterparty*, REUTERS at 2 (Oct. 6, 2008) (cited at SCAC ¶ 140 n.20).)

---

[4]  *See* Press Release, FRBNY, *Statement Regarding June 9 Meeting on Over-the-Counter Derivatives* (June 9, 2008), www.newyorkfed.org/newsevents/news/markets/2008/ma080609.html; Press Release, FRBNY, *New York Fed to Host Meeting Regarding Central Counterparty for CDS* (Oct. 10, 2008), www.newyorkfed.org/newsevents/news/markets/2008/an081010.html.

Because of concern that dealer ownership of the clearinghouse would increase systemic risk, the FRBNY encouraged the dealers to dispose of their interest in TCC, which they did by selling TCC to ICE, a publicly traded "operator of regulated futures exchanges and over-the-counter markets and derivatives clearing houses."  (SCAC ¶ 67.)  Over the next several months, "in responding to the New York Fed's entreaties to work for a better derivatives world, the dealers . . . necessarily met and worked together."  (Litan, *supra* at 30.)  Based on those efforts, "ICE Clear began operating as a central counterparty clearing facility for CDS" in March 2009. (SCAC ¶ 66.)

  **D.**  **CMDX**

  In the fall of 2008, CME and Citadel envisioned that CMDX would include both CDS clearing and trading platforms.  But this could not happen all at once.  CME and Citadel expected that CDS traders initially would "negotiat[e] deals via CMDX's 'request for quote' model" (Dow Jones Newswires, *CME Sees Up to Six Dealers Backing Credit Swaps Platform*, FIN. NEWS (Dec. 23, 2008) (cited at SCAC ¶ 142 n.21)), and only later might CMDX offer exchange trading for certain CDS through a central limit order book ("CLOB").  (SCAC ¶¶ 114-117.)  A January 1, 2009 article that plaintiffs cite summarizes the plan of CME and Citadel at the time:

> Initially, according to news reports, CME and Citadel planned to launch an electronic platform to enable banks, hedge funds and other institutional investors to anonymously trade CDS indexes and swaps on individual companies, similar to the way stocks, futures and options are traded on an exchange.  *Since credit derivatives have never traded on an exchange, however, Citadel instead developed a request-for-quote (RFQ) platform, which allows parties to negotiate in an OTC-like fashion, so the market can ease into electronic trading.*

(Ivy Schmerken, *Transforming Credit Derivatives:  The Debate Over Trading Models*, WALL ST. & TECH. at 3 (Jan. 1, 2009) (cited at SCAC ¶ 233 n.53) (emphasis added).)

Consistent with this plan, "[t]he New York Fed and the [CFTC] completed their pre-launch reviews of CMDX and CME Clearing on December 23, 2008." (Peter Madigan, *Abuse of Power?*, RISK MAG. at 48-49 (Sept. 2013) (cited *sub nom. SEFs and Exchanges Echo EC's CDS License Complaints*, at SCAC ¶ 161 n.29).)   Three months later, ISDA and Markit granted CMDX licenses to use their intellectual property for *both* clearing and RFQ trading—the only licenses CMDX had requested.  (SCAC ¶ 153; *see also id.* ¶ 115.)

"[I]n September of 2009, CME restructured CMDX into a clearing-only platform" called CME Clearing (*id*. ¶ 168), abandoning its RFQ platform even though CMDX had received the necessary licenses from both ISDA and Markit.  As the *New York Times* later reported, "Kim Taylor, the president of [CME's] clearing division, said 'the market' simply wasn't interested in [Citadel's] idea" of a CDS exchange.  (Story, *supra* at 7.)  CME's press release announcing the restructuring similarly emphasized the lack of demand for a trading platform, including a lack of demand from "buy-side" entities included in plaintiffs' putative class:

> Over the past several months, we have been working closely with all market participants.  As a result of this collaborative process, we have refocused our offering to provide clearing-only services.  *Both buy-side and sell-side participants have expressed an interest in continuing to execute their CDS transactions the same as they do today* [OTC], but with the added benefit of central counterparty clearing.[5]

Three months after this restructuring, "CME Clearing cleared its first trade in December 2009." (SCAC ¶ 175.)  When it launched, CME's clearing venture included "Barclays, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, JP Morgan, Morgan Stanley and UBS."  (*Id*. ¶ 169.)

---

[5] Press Release, CME Group, *CME Group Opens Credit Default Swaps Initiative to Additional Partners and Focuses Solution on Clearing Services* (Sept. 18, 2009), http://investor.cmegroup.com/investor-relations/releasedetail.cfm?ReleaseID=410137 (emphasis added & quotations omitted).

### E.    The Enactment of Dodd-Frank

The financial crisis also precipitated a period of legal uncertainty, as Congress considered regulating CDS clearing and trading.  In June 2009, the President sent a series of proposed bills to Congress.  A version of the legislation was introduced in the House of Representatives in July 2009, and revised versions were introduced in the House and Senate Banking Committee in December 2009.  Dodd-Frank was signed into law on July 21, 2010, and became effective, in relevant part, on July 21, 2011.  (*Id*. ¶ 190.)  Dodd-Frank established a comprehensive regulatory framework for derivatives transactions, including the clearing and trading of CDS.

### F.    Plaintiffs' Claims

Plaintiffs assert three causes of action:  (i) a conspiracy to restrain trade in violation of Section 1 of the Sherman Act (*id*. ¶¶ 268-271), (ii) a conspiracy to monopolize in violation of Section 2 (*id*. ¶¶ 272-277), and (iii) unjust enrichment in violation of state law (*id*. ¶¶ 278-280).

The complaint alleges that defendants violated the Sherman Act by collectively blocking the efforts of CMDX to introduce "an electronic trading, booking and migration platform for CDS" that allegedly "would enable market participants to execute or book CDS trades through Central Limit Order Booking ('CLOB')."  (*Id*. ¶ 114.)  Plaintiffs acknowledge that central CDS *clearing*—which did not exist in 2008—was a necessary "first step leading to exchange[] trading for OTC products."  (*Id*. ¶ 159 (citation omitted).)  Although a central clearinghouse does not by itself permit anonymous trading, plaintiffs admit that a clearinghouse was necessary to "lay[] the groundwork for a full-blown exchange by bringing buyers and sellers to a centralized platform, creating the infrastructure for the processing of trades, and removing the necessity of case-by-case creditworthiness assessments."  (*Id*. ¶ 14.)

Plaintiffs contend that the dealer-defendants effectuated their alleged conspiracy by directing Markit and ISDA to make an "abrupt" decision to limit their intellectual property

licenses such that CMDX could not trade the iTraxx and CDX indices on a CLOB.  (*Id*. ¶ 149.) Plaintiffs also assert that the dealer-defendants favored ICE's clearinghouse over other potential CDS clearinghouses, which plaintiffs say might have laid "the infrastructure and create[d] a platform that would lead to exchange trading" of CDS.  (*Id*. ¶ 159.)

In claiming that they suffered injury, plaintiffs speculate that if the dealer-defendants had supported the clearinghouse proposal of CMDX—and if Markit and ISDA had granted licenses to CMDX that authorized CLOB trading—then CMDX would have become a full-blown clearinghouse and exchange by the end of 2008, resulting in a cascading series of market developments that would have enabled plaintiffs to receive better net prices on their CDS trades than they actually negotiated with the dealer-defendants.  (*Id.* ¶¶ 11, 109, 121, 172.)

## ARGUMENT

**I.      Plaintiffs Cannot Assert Antitrust Claims Because Their Alleged Injuries Are Too Indirect and They Are Too Remote from the Challenged Conduct.**

A threshold question in any case seeking damages under the Sherman Act is "whether the plaintiff is a proper party to bring a private antitrust action."  *AGC*, 459 U.S. at 535 n.31. "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation."  *Id*. at 534.  "Even if a plaintiff adequately alleges an antitrust injury," it still may not be a proper plaintiff.  *Paycom Billing Servs. v. MasterCard Int'l, Inc.*, 467 F.3d 283, 290 (2d Cir. 2006); *see also Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 443 (2d Cir. 2005) ("[A]ntitrust injury is necessary, but not always sufficient.").

The Second Circuit has identified four relevant considerations to assess whether a particular plaintiff can assert a damages claim under the antitrust laws:

"(1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to

vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries."

*Gatt Commc'ns, Inc. v. PMC Assocs. L.L.C.*, 711 F.3d 68, 78 (2d Cir. 2013) (quoting *Paycom*, 467 F.3d at 290-91).   Although courts have referred to these factors as the test for "antitrust standing," *see id*. at 75, the Supreme Court recently recast the question as whether a plaintiff "falls within the class of plaintiffs whom Congress has authorized to sue."   *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 (2014).   The Supreme Court also clarified that the considerations relevant to this analysis are not "a multifactor balancing test." *Id.* at 1391-92.   Instead, the first two factors—the "directness or indirectness of the asserted injury" and the "proximity or remoteness of the party to the alleged injurious conduct"—"must be met in every case" and are not "mere factors to be weighed in a balance."   *Id.* at 1392.   Under *Lexmark*, a plaintiff's failure to satisfy either of those two factors alone is fatal to asserting a "statutory cause of action" under the Sherman Act.   *Id.* at 1390.

In *Paycom*, the Second Circuit held that the plaintiff could not pursue antitrust claims in circumstances similar to those here.   In that case, the merchant plaintiff (Paycom) challenged MasterCard's competitive programs policy ("CPP"), which prohibited MasterCard's member banks from issuing any competing credit cards other than Visa cards.   467 F.3d at 288.   Paycom complained that the CPP foreclosed competition from rival credit card networks Discover and American Express and thus permitted MasterCard to impose higher interchange fees and more onerous rules on merchants.   *Id*.   In earlier litigation brought by the Antitrust Division of the U.S. Department of Justice ("DOJ"), the CPP was found to violate Section 1 by unreasonably restraining potential competition from Discover and American Express.   *Id*. at 288-89.   Despite this ruling, the Second Circuit held that Paycom was an improper plaintiff because (i) any injury to Paycom was indirect and flowed from the injuries suffered by Discover and American

Express, (ii) more direct victims—Discover and American Express—could remedy any antitrust violation, (iii) Paycom's damages were speculative, and (iv) it would be difficult to apportion damages between the more direct victims and Paycom.  *Id*. at 293-94.  The court so ruled "[e]ven though [it] recognize[d] that Paycom, as a consumer of payment card network services, [was] a participant in the relevant market."  *Id*. at 293.

Plaintiffs here likewise cannot assert antitrust claims.  Despite amending their pleading in response to defendants' initial motions, plaintiffs' allegations still do not satisfy either factor that *Lexmark* held must be met in every case—or the other two factors courts in this Circuit consider.

### A.    Plaintiffs' Claimed Injuries Are Too Indirect.

The directness factor looks at whether plaintiffs' alleged "injuries were only an indirect result of whatever harm may have been suffered" by others.  *AGC*, 459 U.S. at 541.  Plaintiffs' alleged injuries here are predicated on what supposedly would have happened "if CDS had been traded on an exchange."  (SCAC ¶ 215.)  Their theory of harm depends entirely on the alleged interests and conduct of nonparties, and their claimed injuries flow indirectly from (i) the issuance to CMDX of licenses from Markit and ISDA limited to clearing and RFQ trading and (ii) certain dealer-defendants' initial support for ICE over other proposed CDS clearinghouses. (*Id*. ¶¶ 108-193.)

As in *Paycom*, where "any injury suffered by Paycom was indirect and flowed from the injuries suffered by Discover and American Express," 467 F.3d 293, the injury plaintiffs claim here also would be indirect and merely flow from the injuries allegedly suffered by CMDX and various potential clearinghouses.  Moreover, given the speculativeness of plaintiffs' claimed injury, which is discussed below, it would not "follow more or less automatically that" plaintiffs suffered injury from the licensing decisions of ISDA and Markit or from certain dealers' initial support for ICE's clearinghouse.  *Lexmark*, 134 S. Ct. at 1394; *see infra* pp. 18-19.  Because

plaintiffs' alleged injuries are "at best, merely 'derivative' of the direct injury suffered by" CMDX and the other potential CDS clearinghouses, those injuries do not satisfy a necessary precondition to allowing plaintiffs to pursue their antitrust claims.  *Boyd v. AWB Ltd.*, 544 F. Supp. 2d 236, 250 (S.D.N.Y. 2008) (quoting *AGC*, 459 U.S. at 541 n.46); *see also Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419, 2014 WL 1280464, at *9 (S.D.N.Y. Mar. 28, 2014) ("[W]here the causal relationship between the Defendants' actions and the Plaintiff's injury is too attenuated, the claim is too indirect to support an antitrust claim."); *IBM Corp. v. Platform Solutions, Inc.*, 658 F. Supp. 2d 603, 611-12 (S.D.N.Y. 2009) (dismissing antitrust claims when computer seller's claimed injuries from IBM's denial of software licenses to computer manufacturers were too indirect).

Plaintiffs' alleged injuries also are indirect because they do not assert that they ever sought to license *anything* from Markit or ISDA.  They instead contend that they would have obtained better net prices on their CDS trades had CMDX obtained broader intellectual property licenses and launched a successful exchange.  (SCAC ¶ 172.)  The fact that plaintiffs' injuries are, at most, "derived from" the scope of CMDX's licenses further undermines plaintiffs' ability to assert antitrust claims.  *Paycom*, 467 F.3d at 293.

### B.     Plaintiffs Are Too Remote from the Alleged Misconduct.

"The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party . . . to perform the office of a private attorney general."  *AGC*, 459 U.S. at 542.  The complaint identifies multiple less remote private parties whose own economic self-interest would have motivated them to bring an antitrust action if they believed that they were victims of a Sherman Act violation.  According to plaintiffs, Citadel and CME invested millions of dollars to develop, build and test CMDX, and they projected that CMDX

would earn close to $500 million in revenues annually.  (SCAC ¶¶ 113, 122, 142.)  As far back as December 2010, Citadel's CEO spoke with the press about the demise of CMDX and his belief that key players in the CDS marketplace were resistant to change.  (Story, *supra* at 8.)  If Citadel or CME believed that defendants had unlawfully impeded CMDX's launch of a CDS exchange or clearing platform in 2008 or 2009, they surely would have been motivated to commence an antitrust action.  If the owners of Eurex Clearing, Liffe or any other potential CDS clearinghouse believed that defendants had unlawfully hindered their entry into the marketplace, they, too, would have had a powerful incentive to sue.  (*See* SCAC ¶¶ 177, 179, 183.)

The fact that the alleged *direct* victims of defendants' purported restraint never sued is telling.[6]  As the Supreme Court observed, "if there is substance to [plaintiff's] claims, it is difficult to understand why [the] direct victims of the conspiracy have not asserted any claim." *AGC*, 459 U.S. at 542 n.47.  The Second Circuit similarly stressed that an alleged direct victim's silence suggests that "the facts were other than as alleged by plaintiff."  *Gatt*, 711 F.3d at 79; *see also Daniel*, 428 F.3d at 444 (absence of action by supposed direct victims "reinforces the conclusion that no public interest is sacrificed by dismissing this action").  Given their legal sophistication, substantial resources and self-interest, firms like Citadel, CME, Deutsche Börse AG, SIX Swiss Exchange, and NYSE Euronext would have had ample incentive to seek treble damages under the antitrust laws if a viable claim had existed.  *See* Phillip Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law*, § 3.01[C], at 3-10 (4th ed. Supp. 2013) ("If the 'superior' plaintiff has not sued, one may doubt the existence of any antitrust violation at all.").

---

[6] Plaintiffs note that the European Commission filed a Statement of Objections in July 2013. (SCAC ¶ 19.)  But they do not assert, nor can they, that European competition law is relevant to the analysis of claims under the Sherman Act.  Plaintiffs also fail to acknowledge that the Statement of Objections represents nothing more than the Commission's initial position, not a final decision.  The addressees of the Statement of Objections have opportunities to respond, and then the Commission may conduct further proceedings before issuing a ruling, which then would be appealable.

### C.     The Other Two Factors Also Favor Dismissal.

Although the above two factors are dispositive under *Lexmark*, the other two factors considered in this Circuit confirm that plaintiffs are not entitled to pursue their antitrust claims.

### 1.     Plaintiffs' Alleged Injuries Are Entirely Speculative.

Any injuries to plaintiffs supposedly resulting from defendants' alleged failure to support CMDX and various clearinghouses are "also highly speculative," resting on a conclusory list of predictions about future marketplace developments that plaintiffs posit "would have" occurred but for defendants' alleged conduct. *Paycom*, 467 F.3d at 293.[7]  As in *Paycom*, where the court rejected similarly attenuated allegations about what "would have" happened in the absence of the challenged conduct, *id.*, plaintiffs' putative injuries here "depend[] upon a complicated series of market interactions" involving the actions of "innumerable individual decision-makers," including defendants, other CDS dealers, large buy-side firms, the nascent exchanges and clearinghouses, and various regulatory authorities.  *Reading Indus., Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 13 (2d Cir. 1980).

The complaint itself makes clear that plaintiffs' claimed injuries are premised on a wholly speculative chain of causation about what "would have" happened if the dealer-defendants had supported every proposed clearinghouse and Markit and ISDA had granted CMDX broader licenses that would have enabled it to attempt CLOB trading of CDS:

- *If* the dealer-defendants had "involve[d] themselves in" clearinghouse proposals other than ICE in the fall of 2008, then plaintiffs hypothesize that those proposals *would have* developed into successful CDS clearinghouses (SCAC ¶ 160);

- *If* other successful CDS clearinghouses had emerged, then plaintiffs hypothesize that those clearinghouses *would have* laid "the groundwork for a full-blown exchange by bringing buyers and sellers to a centralized platform, creating infrastructure for the

---

[7] Following *Lexmark*, the speculative nature of plaintiffs' claimed injuries further demonstrates that they have not adequately alleged that their "injuries were proximately caused by" defendants' conduct.  134 S. Ct. at 1386.

processing of trades, and removing the necessity of case-by-case creditworthiness assessments" (*id.* ¶ 14);

- *If* that groundwork had been laid, then plaintiffs hypothesize that a CDS exchange such as the one proposed by CMDX *would have* launched successfully at the end of 2008 during the height "of the worst financial crisis since the Great Depression" (*id.* ¶ 1);

- *If* a CDS exchange had launched at the end of 2008, then plaintiffs hypothesize that that exchange immediately *would have* expanded to cover all CDS purchased or sold by plaintiffs, even though the complaint alleges that CMDX planned to launch CLOB trading of only the major CDX and iTraxx indices and some specific single-name CDS (*id.* ¶¶ 117, 125);

- *If* a CDS exchange had expanded to cover all CDS, then plaintiffs hypothesize that CDS trading through the exchange *would have* created greater competition on all CDS bid/ask spreads (*id.* ¶ 109);

- *If* the CDS exchange had created greater competition on all CDS bid/ask spreads, then plaintiffs hypothesize that CDS trade volume *would have* increased, and all CDS spreads *would have* narrowed (*id.* ¶ 172);

- *If* CDS trade volume had increased and all CDS spreads had narrowed, then plaintiffs hypothesize that the CDS exchange *would have* provided plaintiffs and putative class members with more CDS trading partners and greater CDS liquidity (*id.*); and

- *If* the CDS exchange had provided greater CDS liquidity, then plaintiffs hypothesize that the exchange *would have* reduced credit risk inherent in OTC trading, *would have* substantially reduced the transaction costs paid by plaintiffs and *would have* provided plaintiffs with better net prices than they actually negotiated in individual transactions with twelve different dealers over a six-year proposed class period, starting a year before the CDS exchange supposedly was ready to launch (*id.* ¶¶ 11, 259).

Plaintiffs advance this speculative chain of causation even though their underlying factual allegations and the articles on which they rely undercut their theory of liability. For example, plaintiffs attempt to buttress their claims with conclusory allegations that "there was substantial market interest on the buy-side in exchange trading of CDS" and that "the market would have quickly moved CDS trading to an exchange." (*Id.* ¶¶ 200, 201.) But an October 2008 analyst report on which they rely observed that "a full-fledged exchange model will likely generate little enthusiasm in the industry" and that "many CDS are illiquid or customized and might be challenging to move to an exchange-like environment." (Barclays Capital Equity Research,

*Exchange-Traded CDS Has Several Hurdles* at 2 (Oct. 8, 2008) (cited at SCAC ¶ 128 n.16).)  To create the illusion of "readiness," plaintiffs cite a CME and Citadel press release and allege that "CMDX was operational and would launch within 30 days [of October 7, 2008]."  (SCAC ¶ 140.)  Yet the press release that plaintiffs cite says nothing about CMDX being "operational"—rather, it states that CME and Citadel merely had "executed a *non-binding term sheet*," with any actual "launch" of their joint venture being "subject to completion of definitive agreements" between CME and Citadel, as well as "any necessary regulatory approvals."[8]  Plaintiffs further point to a January 2009 JPMorgan analyst report stating that CME was "very well positioned to generate earnings as the OTC market migrates on-exchange."  (SCAC ¶ 123.)  But that statement is *not even about CDS*, but rather OTC markets generally, and plaintiffs fail to mention that the same report states that "[t]he trend is taking time to get up and running with setbacks in FX, CDS and interest rate swaps."  (Kenneth B. Worthington, *CME Group*, J.P. Morgan North American Equity Research at 3, 6 (Jan. 23, 2009) (cited at SCAC ¶ 123 n.14).)

Given the untested nature of and uncertain demand for exchange trading of CDS at a time when the financial markets were in extreme distress, it is impossible to predict what "would have" happened to CDS pricing if all dealer-defendants had supported a clearinghouse other than ICE or if Markit and ISDA had granted licenses that permitted CMDX to attempt CLOB trading of CDS.  *See Paycom*, 467 F.3d at 293 ("No one can state that, absent the CPP, increased competition from Discover and American Express would have forced MasterCard to adopt policies more favorable to Paycom."); *Reading*, 631 F.2d at 14 ("[The antitrust laws] exclude claims based on conjectural theories of injury and attenuated economic causality that would mire

---

[8] Press Release, *CME Group, CME Group and Citadel to Launch the First Integrated Credit Default Swaps Trading Platform and Central Counterparty Facility, Linked to CME Clearing* (Oct. 7, 2008),  http://investor.cmegroup.com/investor-relations/releasedetail.cfm?ReleaseID=338884   (emphasis added) (cited at SCAC ¶ 140).

the courts in intricate efforts to recreate the possible permutations in the causes and effects of a

price change."); *Laydon*, 2014 WL 1280464, at *10 ("Analysis of Plaintiff's injury would require

the reconstruction of hypothetical 'but-for' Euroyen TIBOR and Yen-LIBOR benchmark rates

during the period Plaintiff held his positions.").  The assumptions and conjecture required to link

defendants' alleged conduct to any injury to plaintiffs further supports dismissal of plaintiffs'

antitrust claims.  *See Gross v. New Balance Athletic Shoe, Inc.*, 955 F. Supp. 242, 246 (S.D.N.Y.

1997) ("Plaintiffs' attempt to seek recovery for all consumers of New Balance athletic shoes

during the alleged class period places their claim in the category of the type of indirect injury

that is incapable of being quantified with any degree of economic certainty.").[9]

### 2. Plaintiffs' Claims Raise Complex and Difficult Problems of Quantifying and Apportioning Damages.

The final factor also supports dismissal of plaintiffs' antitrust claims.  As in *Paycom*, it

"would be virtually impossible to apportion damages" between various clearinghouses and

exchanges, "which [allegedly] suffered direct injuries," and plaintiffs, which "might have been

indirectly harmed."  467 F.3d at 294.  Because "the market price for a given CDS product can

change from one minute to the next" (SCAC ¶ 96), the fact finder would need to determine what

the price would have been for each of the thousands of different single-name and index CDS

---

[9] The speculative injuries alleged here differ greatly from the overcharge alleged in *In re DDAVP Direct Purchaser Antitrust Litigation*, 585 F.3d 677 (2d Cir. 2009).  Plaintiffs there alleged that defendants "abused the patent system to unlawfully maintain a monopoly over DDAVP," a patented prescription medication.  *Id.* at 682.  They asserted that this conduct "inflated the price of DDAVP by suppressing generic competition for the tablets in violation of the antitrust laws."  *Id.*  In holding that purchasers of defendants' product who allegedly were forced to pay supracompetitive prices could pursue their claims, the Second Circuit rejected defendants' argument that "plaintiffs' allegations rest upon tenuous assumptions about the beneficial effects of generic competition."  *Id.* at 689.  The court held that although "[i]t may be difficult to account precisely for the likely effects of generic competition, . . . we have little doubt that those effects can be sufficiently estimated and measured here."  *Id.*  In contrast to *DDAVP*—which involved a common form of competition between a single drug and a "generic version of the compound," *id.* at 682—plaintiffs' claimed injuries here rest on speculative competition from an entirely new and untested method of trading highly customized CDS.

trades between class members and the twelve dealer-defendants over a six-year period, if an exchange for CDS trading had emerged at the end of 2008.  To avoid duplicative recoveries, the fact finder then would need to deduct any fees or other charges that the clearinghouses and exchanges would have imposed in plaintiffs' but-for world, such as clearing fees, exchange fees, initial and daily margin requirements, potential connectivity fees and, at least for non-members, brokerage fees.  *See IBM*, 658 F. Supp. 2d at 613 (noting difficulty in apportioning damages between parties denied license and their customers).

II.    **Plaintiffs Fail Plausibly To Allege Each Defendant's Participation in a Conspiracy To Restrain Trade in Violation of Section 1.**

Plaintiffs' Section 1 claim also should be dismissed for failure to plead a plausible broad-based conspiracy encompassing a variety of supposedly anticompetitive conduct by twelve differently situated dealers over a six-year period.  Even with the benefit of seeing defendants' initial motions to dismiss, plaintiffs fail to remedy the deficiencies in their prior complaint.  Plaintiffs still do not provide any specific allegations concerning conduct of the *individual* dealer-defendants, instead continuing to rely on blanket allegations that treat the dealers as an undifferentiated collective for purposes of alleging a conspiracy.  Plaintiffs thus fail to provide each defendant with fair notice as to the anticompetitive agreements into which each is alleged to have entered, including when it supposedly did so, how and with whom.

Although plaintiffs allege that the purported conspiracy was formed at "secret meetings" (SCAC ¶ 144), they do not particularize *what happened* at any meeting or otherwise provide a plausible basis for inferring that the "meetings" involved illicit conduct.  Bald allegations that meetings occurred are insufficient where the act of meeting itself is not unlawful.  It is not illegal for representatives of certain dealers to sit on and attend meetings of various industry boards and risk committees.  The mere opportunity to conspire is insufficient to withstand a motion to

dismiss.  The alleged agreements here—that the dealer-defendants (i) did not support CMDX's clearing and exchange proposal in the fall of 2008 and (ii) chose at least initially to clear trades through ICE—just as plausibly could have been the product of independent business decisions made in the context of the 2008 financial crisis and the attendant regulatory developments.

Rule 8 "requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do."  *Twombly*, 550 U.S. at 555; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'") (quoting Fed. R. Civ. P. 8(a)(2) (second alteration in original)).  Dismissal of complaints that fail to meet these requirements promotes judicial economy and eliminates the unwarranted burden and expense of "unlock[ing] the doors of discovery."  *Iqbal*, 556 U.S. at 678.  Plaintiffs' repeated failure to plead each dealer-defendant's participation in an unlawful conspiracy requires that their Section 1 claim be dismissed.  *Mayor & City Council of Balt., Md. v. Citigroup, Inc.*, 709 F.3d 129, 137-40 (2d Cir. 2013) ("*Citigroup*") (declining to "propel[] defendants into expensive antitrust discovery on the basis of acts that could just as easily turn out to have been rational business behavior as they could a proscribed antitrust conspiracy").

## A.    Plaintiffs' Generic References to the "Dealer Defendants" Are Insufficient.

Plaintiffs cannot merely describe the alleged antitrust conspiracy in "general terms without any specification of any particular activities by any particular defendant."  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50-51 (2d Cir. 2007).  To survive a motion to dismiss, a plaintiff must plausibly allege that each of the defendants, "*in their individual capacities*, consciously committed themselves to a common scheme designed to achieve an unlawful objective."  *AD/SAT v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999) (emphasis added).  A complaint

must offer "specifics with respect to the acts of [each] particular defendant." *In re Parcel Tanker Shipping Servs. Antitrust Litig.*, 541 F. Supp. 2d 487, 491 (D. Conn. 2008).  A plaintiff may not "attribut[e] all actions to the Defendants collectively," while failing "to differentiate among [them]" and "failing to identify" how each "particular Defendant [is] alleged to have acted." *Two Old Hippies, LLC v. Catch the Bus, LLC*, 784 F. Supp. 2d 1200, 1218 (D.N.M. 2011); *see also Iqbal*, 556 U.S. at 676 (holding that complaint must include allegations about each defendant's "individual actions").

Rather than attempting to plead facts establishing each dealer's conscious commitment to the alleged anticompetitive scheme, the complaint improperly lumps together all twelve dealer-defendants.  Like its predecessors, plaintiffs' new complaint accuses the dealer-defendants collectively of exactly the same conspiratorial conduct, performed with exactly the same intent, notwithstanding the wide variation in each dealer's size as a CDS market-maker and each dealer's different circumstances during the financial crisis.  The dealer-defendants raised these precise deficiencies in their initial motions to dismiss, but plaintiffs' new complaint merely repeats the same conclusory allegations.

Plaintiffs allege, for example, that the "Dealer Defendants" used their positions as Markit and ISDA board members and as "Markit's and ISDA's largest customers" to secure agreement from Markit and ISDA to deny licenses to CMDX that would have permitted CLOB trading of CDS.  (SCAC ¶¶ 147-148.)  They also allege that all of the "Dealer Defendants" "discussed how to prevent CMDX from entering the market and how to deal with threats from clearinghouses" (*id.* ¶ 163), "secretly conspired to squash th[e] threat" posed by an electronic exchange (*id.* ¶ 12), and "agreed to ensure the inefficient market structure they had cultivated would continue" (*id.*).  Such allegations of agreements are naked legal conclusions "disentitle[d] . . . to the presumption

of truth." *Iqbal*, 556 U.S. at 681. Because they fail to specify any particular conduct by any particular defendant, plaintiffs' allegations amount to "nothing more than a list of theoretical possibilities" that "could [have been] postulate[d] without knowing any facts whatever." *Elevator Antitrust Litig.*, 502 F.3d at 50-51.

While such "group pleading" is inadequate in any case, it is especially so here. Plaintiffs' failure to distinguish among the twelve dealer-defendants masks important differences among them that render allegations of a common anticompetitive "scheme" over a six-year period inherently implausible. Plaintiffs cannot satisfy their pleading burden merely by listing which dealers were Markit or ICE shareholders or had representatives on various boards or committees, and thereafter referring to the "Dealer Defendants" as a group. Even based on the complaint's allegations, differences among the dealer-defendants abound. For example, some were represented on ICE's risk committee; others were not. (SCAC ¶ 66.) Some were represented on the board of the Depository Trust & Clearing Corporation; others were not. (*Id.* ¶ 93.) Some owned equity in ICE; others did not. (*Id.* ¶ 65.) Some became founding members of CME's clearinghouse; others did not. (*Id.* ¶ 169.)

The complaint also lacks any non-conclusory allegations (even at the "group" level) regarding the "specific time, place, or person involved," *Twombly*, 550 U.S. at 565 n.10, or the remotest suggestion of how each "particular Defendant [is] alleged to have acted" at any meetings, *Two Old Hippies*, 784 F. Supp. 2d at 1218. Plaintiffs bear the burden of putting each of the dealer-defendants on notice as to how they, "in their individual capacities, consciously committed themselves to a common scheme designed to achieve an unlawful objective." *AD/SAT*, 181 F.3d at 234. Plaintiffs have not done so. *See Twombly*, 550 U.S. at 565 n.10

("[T]he complaint here furnishes no clue as to which of the four [defendants] (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place.").

### B.   The Mere Opportunity To Conspire Is Insufficient.

Plaintiffs' Section 1 claim is not advanced by allegations that certain dealer-defendants were members of ISDA or shareholders of Markit and that representatives of those defendants "likely" attended meetings "under the auspices" of those organizations at which unspecified anticompetitive agreements supposedly were reached.   (SCAC ¶¶ 163-164.)   The "mere opportunity to conspire" at such meetings "does not by itself support the inference that . . . an illegal combination actually occurred."   *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993).   Courts routinely hold that membership in a trade association and participation on a board of directors are insufficient alone to create a plausible inference of a conspiracy.   *Twombly*, 550 U.S. at 567 n.12 (merely "belong[ing] to the same trade guild as one['s] . . . competitors" does not render conspiracy plausible); *Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*, 947 F. Supp. 2d 88, 102 (D.D.C. 2013) ("[M]erely pleading that multiple entities hold positions on a board of directors does not establish a horizontal agreement for purposes of Section 1."); *see also Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) (membership in association and participation on its board do not establish horizontal agreement in violation of Section 1); *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 708 F. Supp. 2d 348, 362 (S.D.N.Y. 2010) ("mere presence at industry associations and meetings" does not plausibly suggest an agreement).

Nor can plaintiffs save their Section 1 claim by asserting that some "Dealer Defendants" (but not others) met in "secret" on the "third Wednesday of every month" as members of the obviously non-secret ICE clearinghouse's risk committee.   (SCAC ¶ 228.)   To plead each individual dealer's participation in the alleged conspiracy, plaintiffs must do more than assert

that individuals from certain defendants met in a non-public setting.  *Twombly*, 550 U.S. at 557; *Parcel Tanker*, 541 F. Supp. 2d at 491 (granting motion to dismiss where complaint referred to "clandestine meetings" among defendants but provided "no specific examples of the defendants' conduct in the meetings, other than general allegations of conspiracy").  Because "an opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred," plaintiffs must plead facts raising a plausible inference that defendants reached an anticompetitive agreement at such meetings.  *Capital Imaging*, 996 F.2d at 545.   "[C]lose relations or frequent meetings between the alleged conspirators" will not sustain a plaintiff's pleading burden absent factual allegations that "would permit the inference that those close ties led to an illegal agreement."  *Oreck Corp. v. Whirlpool Corp.*, 639 F.2d 75, 79 (2d Cir. 1980).

Plaintiffs also allege that unspecified "Dealer Defendants" conspired to "channel almost all of the CDS they cleared through ICE Clear," the successor clearinghouse to the dealer-owned TCC, rather than to CME.  (SCAC ¶ 175.)  The allegations regarding this supposed "agreement" are even more threadbare.  Plaintiffs fail to identify, as they must, the dealer-defendants that supposedly entered into this alleged agreement, when and where it purportedly was formed, and how any dealer-defendant expressed its assent.  Indeed, plaintiffs affirmatively allege that several dealer-defendants joined CME's clearinghouse as founding members and became members of its risk committee (*id.* ¶ 169), conduct inconsistent with a pre-existing agreement among all dealers to torpedo CME's clearing initiative by steering all clearing business to ICE.

### C.   Plaintiffs' Allegations Do Not Tend To Exclude Independent Self-Interested Conduct as an Explanation for Each Dealer's Actions.

Assertions of collusive conduct are insufficient to state a claim when such conduct is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market."  *Twombly*, 550 U.S. at 554.  A plaintiff thus

must plead facts that "ten[d] to exclude independent self-interested conduct as an explanation for" the challenged behavior.  *Id.* at 552 (internal quotation marks omitted).

Here, there are no factual allegations that the twelve dealer-defendants failed to compete with each other in their OTC trading of CDS (to the contrary, they compete fiercely).  Nor is there any allegation that the dealer-defendants suddenly altered their prior conduct in parallel fashion.  Instead, plaintiffs' allegations boil down to the assertion that at the height of the financial crisis, the "Dealer Defendants" as an undifferentiated group (i) failed to support CMDX's new, untested exchange platform for CDS trading that supposedly would have reduced their profitability, and (ii) in response to the FRBNY's demand that the industry develop a central clearinghouse for CDS by the end of 2008, promoted the CDS clearing proposal of ICE— the company that had purchased TCC, the clearinghouse developed by a number of the dealers themselves—over alternative clearing proposals.[10]  (SCAC ¶¶ 108-193.)

Plaintiffs fail to explain why collusion—as opposed to independent self-interested conduct, including a reasonable reaction to the global economic crisis—more plausibly accounts for the challenged conduct.  "[J]udicial experience and common sense" suggest that collusion is not the better explanation.  *Iqbal*, 556 U.S. at 679.  Indeed, if plaintiffs' allegations about the "tremendous profits" of OTC trading of CDS are accepted as true (SCAC ¶ 1), there would be no reason for any dealer-defendant to support CMDX's exchange proposal.  It also should come as no surprise that any number of dealers might *independently* decide not to embrace a dramatic

---

[10] The complaint purports to describe certain conduct related to the dissemination of various types of CDS pricing information (SCAC ¶¶ 70-107), including that the dealer-defendants "did not publicly announce the prices at which they are willing to buy and sell CDS" (*id.* ¶ 89).  But plaintiffs do not allege any agreement among the dealers in this area.  Moreover, plaintiffs do not—and cannot—allege that it would be in the unilateral self-interest of any dealer to disclose publicly its own real-time CDS prices. Plaintiffs concede that the buy-side in CDS trades "tend[s] not to want their trading and hedging strategies exposed."  (*Id.* ¶ 184.)  The same, of course, is true of the sell-side.

switch to exchange trading of CDS during "the worst financial crisis since the Great Depression" (*id.*), in the absence of substantial investor demand (Story, *supra* at 7) and in the face of legislative and regulatory developments that would materially alter the CDS marketplace.  A host of independent self-interested reasons exist for such a business decision, including (i) a desire by CDS customers for OTC trading and the benefits of bilaterally negotiated transactions with known counterparties (SCAC ¶¶ 75-79), (ii) the lack of a central clearing counterparty in 2008 (*id.* ¶ 161), (iii) the focus by regulators, such as the FRBNY, SEC and CFTC, on clearing, not on trading, in 2008 and 2009 (*id.* ¶ 124), and (iv) the uncertain legal environment following the introduction and subsequent enactment of legislation overhauling the CDS industry in ways that no one could predict (*id.* ¶ 190).

In advancing their conspiracy theory, plaintiffs nowhere account for the impact of the financial crisis.  Plaintiffs allege that as of October 2008, just weeks after Lehman Brothers' collapse and the government's bailout of AIG—with several global financial institutions (including several defendants) rumored to be at risk of failure—CMDX's proposed CDS exchange somehow had "momentum."  (*Id.* ¶ 142.)  Plaintiffs assert that it was contrary to the economic self-interest of any dealer, especially those with small market shares, not to support CMDX.  (*Id.* ¶¶ 126-127, 142, 151.)  But in fact, the timing could not have been worse.  There is no plausible basis for concluding that, at a time of unprecedented concern about counterparty credit risk, each dealer-defendant reasonably would have expected a groundswell of investor enthusiasm for anonymous exchange trading of CDS.  Nor was late 2008 a propitious time for each dealer to assume the financial, reputational and operational risks—much less commit the time and resources—associated with participating in a speculative business venture such as CMDX's proposed CDS exchange.  None of the dealer-defendants was required to support a

CDS exchange, and it is far-fetched to hypothesize a fourteen-firm conspiracy lasting for six years as the more plausible explanation for their alleged lack of support.[11]

Similar independent reasons plausibly explain the dealer-defendants' support for ICE's clearing proposal following the dealers' sale of TCC to ICE, given that the dealers originally had intended to use TCC as a CDS clearinghouse.  Having invested time, money and effort in TCC's development, and having knowledge of and confidence in TCC's "infrastructure for clearing operations and risk management," it is not surprising that many dealers initially supported ICE's clearinghouse proposal.  (Peter Norman, THE RISK CONTROLLERS 300 (2011) (cited at SCAC ¶ 159 n.28).)  Nothing in the antitrust laws required any dealer to invest its resources in one proposal over another.  *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) ("[A]s a general matter, the Sherman Act does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.") (internal quotation marks omitted) (second alteration in original).

The Second Circuit's decision in *Citigroup* is instructive.  Plaintiffs there contended that defendants' virtually simultaneous decisions to stop buying auction rate securities were the product of an unlawful conspiracy.  709 F.3d at 138.  The Second Circuit disagreed, holding that defendants' "*en masse* flight from a collapsing market in which they had significant downside exposure . . . made perfect business sense."  *Id*.  Plaintiffs here likewise ignore the most obvious

---

[11] Plaintiffs' allegation that certain dealers could have obtained a "first-mover advantage" by taking an equity interest in CMDX is conclusory and makes no effort to balance this alleged "advantage" against the "tremendous profits" that each dealer supposedly obtained through OTC trading.  (SCAC ¶¶ 1, 12, 126.)  As such, neither this purported first-mover advantage nor the alleged "favorable reactions" by some dealers to CMDX provide a plausible basis for plaintiffs' conclusory allegation that "it was in each of the Dealer Defendants' independent economic self-interest to participate in the CMDX exchange."  (*Id*. ¶¶ 127, 142.)

explanations both for the supposed decisions of dealer-defendants not to support CMDX's proposed exchange and for their alleged support for ICE's clearinghouse proposal, at least initially, over other competing clearinghouse proposals.  Both made perfect business sense.

This case is very different from *In re Electronic Books Antitrust Litigation*, 859 F. Supp. 2d 671 (S.D.N.Y. 2012).  Plaintiffs there alleged that certain publishers conspired with Apple to set prices for electronic books, pointing to "a rapid and simultaneous switch" by defendants to a pricing model "heretofore unknown in the publishing industry" and a "collective action problem" that purportedly could not have been solved absent an illegal price-fixing agreement.  *Id.* at 683-84.  The essence of the complaint here, however, is that the dealer-defendants did *not* support a rapid switch to a new trading platform heretofore unknown in the CDS industry, but rather continued to compete in the OTC marketplace as they had since the creation of CDS in the 1990s.  Such a continuation of an established way of business does not raise an inference that defendants acted pursuant to a preceding conspiracy.

Plaintiffs cannot save their conclusory claim by making new allegations that Markit and ISDA "informed CME and Citadel in a strikingly similar fashion that they would not permit licensing for the exchange trading of CDS" and made "parallel demands, at virtually the same time (including often on the same day)."  (SCAC ¶¶ 149-150.)  To start, plaintiffs allege no facts regarding the purported demands, such as the dates on which they were made, to whom they were made, or even what was demanded.  Moreover, unlike in *Electronic Books*—where there was no alternative explanation for why Apple would have "negotiated nearly identical contracts with each of the Publisher Defendants" and signed those contracts "within days of each other . . . prompt[ing] an industry-wide switch to the agency model," 859 F. Supp. 2d at 676—the complaint here fails to account for non-collusive factors that could have caused Markit and ISDA

to act on or about the same day, such as the fact that CMDX itself approached ISDA and Markit for licenses around the same time.  (SCAC ¶ 130.)  It is also not surprising that ISDA and Markit would proceed cautiously in licensing their intellectual property for a new, untested use in the midst of the financial crisis when the industry and regulators were focused on central clearing.

Under plaintiffs' antitrust theory, the dealer-defendants collectively were required to (i) support CMDX's proposed CDS exchange regardless of each dealer's view of the merits of the proposal, its perception of the demand for exchange trading, its appetite for risk, and its ability to commit capital to a new venture at the darkest hours of the financial crisis, (ii) support CMDX's requests to Markit and ISDA to license their valuable intellectual property to enable untested CLOB trading of CDS—if such requests had been made—regardless of the views of Markit, ISDA or each dealer regarding the riskiness of such trading at the time, and (iii) support other clearing proposals in addition to, or instead of, ICE's clearing proposal regardless of each dealer's view of the relative superiority of ICE's risk management profile over those of the other potential clearinghouses.  But such conduct would not have made economic sense.  Section 1 does not require competitors like the dealer-defendants to rally behind a change in market structure even if plaintiffs might have preferred such change.  Because none of plaintiffs' factual allegations—as opposed to their conclusory rhetoric—supports a claim of a fourteen-defendant unlawful conspiracy extending over six years, plaintiffs' Section 1 claim should be dismissed.

### III.  Plaintiffs Cannot State a "Conspiracy to Monopolize" Claim Based on a "Shared Monopoly."

Plaintiffs continue to base their Section 2 claim for "conspiracy to monopolize the CDS market" on the alleged market shares "held *collectively*" by the dealer-defendants.  (SCAC ¶¶ 272-277 (emphasis added).)  Despite having the opportunity to amend their pleading, plaintiffs still have not alleged that the dealers conspired to confer monopoly power on a single

firm.  Rather, they allege that the twelve dealer-defendants "collectively" sought to continue to share the majority of domestic OTC CDS trades.  (*Id.* ¶ 274.)  Such a Section 2 claim fails as a matter of law.  "The 'shared monopoly' or 'joint monopolization' theory—under which a group of firms that collectively possess monopoly power can be found liable for joint monopolization—generally has been rejected by the courts."  ABA Section of Antitrust Law, *Antitrust Law Developments* 328 (7th ed. 2012).  Plaintiffs' new allegation—that defendants allegedly "exercised *their* market power" (SCAC ¶ 273 (emphasis added))—merely confirms that plaintiffs are pursuing a flawed "shared monopoly" claim that should be dismissed.

The elements of a claim for conspiracy to monopolize are "(1) proof of a concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly, and (2) the commission of an overt act in furtherance of the conspiracy."  *Int'l Distribution Ctrs., Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 795 (2d Cir. 1987) (internal quotation marks omitted). Plaintiffs cannot plead that the dealer-defendants acted with the "specific intent to achieve an unlawful monopoly" unless they allege that the dealers' conduct was intended to result in the possession of monopoly power by a *single* firm.  The complaint makes no such allegations here.

The entire notion of a "'shared monopoly' is paradoxical" and cannot "support a Section 2 claim."  *Oxbow Carbon & Minerals LLC v. Union Pac. R.R.*, 926 F. Supp. 2d 36, 45-46 (D.D.C. 2013).[12]  "[T]he history of the Sherman Act reveals that Congress' concept of 'monopoly' did not include 'shared monopolies' or 'oligopolies' at all, but rather the complete

---

[12] *See also H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1018 (2d Cir. 1989) ("[M]arket shares of [defendants] could not be aggregated to establish an attempt to monopolize."); *RxUSA Wholesale, Inc., v. Alcon Labs., Inc.*, 661 F. Supp. 2d 218, 235 (E.D.N.Y. 2009) ("[A]llegations of a 'shared monopoly' do not state a claim under Section 2 of the Sherman Act.") (internal quotation marks omitted), *aff'd*, 391 F. App'x 59, 61 (2d Cir. 2010) (complaint's "allegations of a 'shared monopoly' under Section 2 merely repeat its failed arguments under Section 1"); *Arista Records LLC v. Lime Grp. LLC*, 532 F. Supp. 2d 556, 580 (S.D.N.Y. 2007) (dismissing "shared monopoly" claims under Section 2).

domination of a market by a *single* economic entity." *Sun Dun, Inc. of Wash. v. Coca-Cola Co.*, 740 F. Supp. 381, 391 (D. Md. 1990).  Where, as here, "the alleged monopoly is held by multiple separate companies within a market, there is no 'monopoly' at all.  Section 1—not Section 2— serves the purpose of prohibiting agreements unreasonably restraining trade in a shared market." *Sky Angel*, 947 F. Supp. 2d at 105.  Absent an allegation that the dealers intended to confer monopoly power on a single firm, Section 2 simply does not apply, and plaintiffs' Section 2 claim should be dismissed.

## IV. Plaintiffs Cannot Allege Any Injury-in-Fact for the Period Before CMDX Allegedly Could Have Begun Exchange Trading of CDS.

An antitrust plaintiff must allege that it suffered "a concrete and particularized 'injury in fact' that is fairly traceable to" the claimed violation.  *Lexmark*, 134 S. Ct. at 1386; *see also Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 220 (2d Cir. 2004) (antitrust plaintiff must establish "injury-in-fact").  Plaintiffs seek to recover damages starting on January 1, 2008.  (SCAC ¶ 259.)  But they cannot allege any injury-in-fact before December 23, 2008, the earliest date on which CMDX possibly could have launched its proposed exchange for trading CDS and thus had an arguable effect on CDS prices.

Plaintiffs contend that they would have obtained better net CDS prices if CMDX or some other potential clearinghouse had offered exchange trading of CDS.  Yet, plaintiffs concede that CMDX—allegedly the "most imminent" exchange (*id*. ¶ 157)—was not ready to offer exchange trading of CDS on January 1, 2008, the date on which plaintiffs seek to begin recovering damages.  (*See id*. ¶ 122.)  Indeed, although plaintiffs acknowledge that central clearing is a prerequisite for exchange trading (*id*. ¶ 14), they do not allege that any clearinghouse was ready to launch a CDS clearing platform at the beginning of 2008.  (*See* Worthington, *supra* at 3 ("clearing is an essential step in the process of migrating OTC trades on-exchange").)

Despite plaintiffs' conclusory assertion that "exchange trading through CMDX and clearing through CME Clearing were operationally ready by no later than the fall of 2008" (SCAC ¶ 122), their allegations, and the documents on which they rely, contradict any suggestion that CMDX was ready to offer exchange trading of CDS.  Plaintiffs' reference to an October 7, 2008 joint press release in which CME and Citadel announced their execution of a "non-binding term sheet" to establish CMDX belies any assertion of readiness.  (Press Release, CME Group, *supra*.)  Moreover, that press release related to CMDX's potential to begin *clearing* CDS transactions and to operate an electronic RFQ trading platform, *not* CMDX's readiness to offer CLOB trading.  As plaintiffs assert, the day before the CME/Citadel press release, a CME spokesperson stated that CME "'can be operationally ready *to clear CDS* in a few weeks.'" (SCAC ¶ 140 (emphasis added).)  In January 2009, an article on which plaintiffs themselves rely confirmed that Citadel had only "developed a request-for-quote (RFQ) platform . . . so the market can ease into electronic trading."  (Schmerken, *supra* at 3.)

Moreover, regardless of CMDX's supposed "operational" readiness, the FRBNY and CFTC did not complete their pre-launch review of CMDX's clearing and RFQ proposals until December 23, 2008.[13]  (Madigan, *supra*.)  The complaint thus is devoid of allegations that would support a claim that exchange trading of CDS would have begun on January 1, 2008, but-for defendants' alleged conduct.  CMDX could not have even begun *clearing* CDS transactions until some point *after* December 23, 2008, when it obtained necessary approvals from the FRBNY and CFTC.  The exchange *trading* of CDS through a CLOB (and then only certain CDS with sufficient liquidity) could not have come until later.  Plaintiffs thus cannot plead any injury-in-

---

[13] CMDX did not receive approval from the SEC until March 13, 2009.  *See* 74 Fed. Reg. 11,781 (Mar. 19, 2009).  Although plaintiffs assert that CMDX's request to the SEC was "delayed by Markit's and ISDA's refusals and delays in licensing to CMDX" (SCAC ¶ 156), they make no similar allegations about CMDX's submissions to the FRBNY or CFTC.

fact based on purchases or sales of CDS until some point *after* December 23, 2008, which eliminates at least one year of plaintiffs' proposed damages period.

## V. Plaintiffs' Claims Based on Conduct Before May 3, 2009 Are Barred by the Four-Year Statute of Limitations.

Private antitrust claims are "forever barred unless commenced within four years after the cause of action accrued." 15 U.S.C. § 15b. An antitrust claim "ordinarily accrues as soon as there is an injury to competition," *Higgins v. N.Y. Stock Exch., Inc.*, 942 F.2d 829, 832 (2d Cir. 1991), and "the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period," *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997). Because the initial complaint in this action was filed on May 3, 2013, claims arising from conduct occurring before May 3, 2009, the bulk of the challenged conduct, are time-barred.

In an effort to avoid this conclusion, plaintiffs' repeated amendments to their complaints have offered increasingly complex assertions of fraud-based tolling. (*See* Sheet Metal Compl. ¶¶ 118-124 (May 3, 2013); Salix Compl. ¶¶ 134-140 (Aug. 29, 2013); CAC ¶¶ 201-219; SCAC ¶¶ 226-257.) Their current complaint asserts not only that defendants fraudulently concealed until March 2013 facts revealing that defendants had colluded with each other "to delay or prevent CDS exchanges from entering the market" (SCAC ¶ 246 (emphasis omitted)), but also that plaintiffs "could not have discovered" that they were "injured by Defendants' conspiracy" until "at the earliest December 2010, when the *New York Times* revealed elements of" defendants' purported collusion (*id.* ¶ 226). The notion that these sophisticated plaintiffs had to wait for a newspaper article to discover their alleged injuries is implausible, and their fraudulent concealment claim is foreclosed by their own allegations and the public sources they cite.

The complaint cites a host of public sources to support the illusion that CMDX was ready to launch a CDS exchange by late 2008.  (*See id*. ¶¶ 108-123.)  Plaintiffs allege that they "regularly monitored" those sources.  (*Id.* ¶ 252.)  Although CMDX was far from ready, as discussed above, if plaintiffs actually believed the hype in the sources they cite, then they should have inquired in late 2008 or early 2009 why CDMX had failed to launch its CDS exchange, as publicly reported.  (Schmerken, *supra* at 3.)  Plaintiffs could have inquired directly with CME or Citadel regarding CMDX's failure to launch an exchange.  Plaintiffs' assertion that defendants' "clout" might have inhibited an investigation of potential antitrust claims (*id*. ¶ 236) is both speculative and contradicted by their allegation that the dealer-defendants' alleged scheme "lurks behind concerns" publicly attributed to buy-side firm BlueMountain (*id.* ¶ 176).  Indeed, the news article on which plaintiffs rely states that BlueMountain had sent its written concerns "to *more than 200* market participants or representatives, including large dealers, buyside firms, trade groups and regulators."  (Karen Brettell, *Bank 'Oligopoly' Slows CDS Clearing— BlueMountain*, REUTERS (June 1, 2009) (emphasis added) (cited at SCAC ¶ 176 n.36).)

Even if plaintiffs needed to know more to prompt an inquiry and file a timely complaint, they fail to allege that relevant facts were *fraudulently* concealed.  To plead fraud-based tolling, plaintiffs must allege that (i) defendants fraudulently concealed material facts relating to their purported wrongdoing, (ii) the concealment prevented plaintiffs from discovering the nature of their claims within the limitations period, and (iii) plaintiffs exercised due diligence in pursuing the discovery of the claims during the entire period they seek to have tolled.  *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 157 (2d Cir. 2012).  Plaintiffs have not alleged fraudulent concealment with the particularity required by Rule 9(b) or otherwise adequately pled these three elements. *See Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 520 (S.D.N.Y. 2009).

### A.    Plaintiffs Do Not Adequately Plead Fraudulent Concealment.

Plaintiffs' tolling claim fails, first and foremost, because the complaint does not adequately plead that the facts needed to investigate and timely bring suit were fraudulently concealed.  Plaintiffs do not assert that the dealer-defendants concealed their alleged economic interest in continued OTC trading of CDS.  Nor do plaintiffs allege that defendants concealed:

- their attendance at meetings with the FRBNY, other regulators and third parties like ICE, Citadel and CME to discuss central clearing of CDS transactions—meetings that were reported in the press and that ultimately led to the development of ICE's central clearinghouse (*see supra* pp. 8-10);

- the sale of TCC to ICE in the fall of 2008—a transaction that was reported to the DOJ before it was consummated—or their support for ICE's clearinghouse proposal following that sale, or ICE's success in clearing CDS in 2009 (SCAC ¶¶ 160-161);

- the terms of the licenses obtained by CMDX in "early March 2009" (*id.* ¶ 153), even though the scope of those licenses is the central focus of plaintiffs' claims (*id.* ¶¶ 13, 130-156, 158, 160-161, 171, 174);

- CMDX's widely touted promotion of a CLOB trading platform for CDS that never materialized and the ultimate dissolution of CMDX (*id.* ¶ 168; CME Press Release (Sept. 18, 2009), *supra*); or

- their membership in ISDA, their equity interest in Markit or their participation on the boards or in committees of those entities.

These pleading deficiencies are no accident.  Plaintiffs cannot allege concealment of the foregoing developments because they were publicly disclosed.  (SCAC ¶¶ 112-126, 139-142, 161.)  Nor can plaintiffs sidestep this problem by asserting that the alleged conspiracy was of an "inherently self-concealing nature."  (*Id.* ¶ 240.)  That conclusory assertion is affirmatively contradicted by the complaint's references to the public reports of the above developments that would have enabled plaintiffs timely to develop their claims.  Moreover, plaintiffs allege that certain dealer-defendants "with smaller market shares" actually told CME "they would need to speak with the 'dealer community' before" supporting CME's clearing proposal.  (*Id.* ¶ 165.)  If true, those are hardly acts of concealment.  Plaintiffs' own allegations thus reveal that by early

2009 they had access to enough information that "could have alerted" them to the "possibility that Defendants were conspiring to block the emergence of exchange trading." (*Id.* ¶ 241.)

According to plaintiffs, the limitations period was tolled until at least December 2010 because (i) certain (unidentified) dealer-defendants held "secret meetings" (*id.* ¶¶ 228-229); (ii) certain (largely unidentified) defendants allegedly misled the public by issuing declarations of support for "greater competition and price transparency in the CDS market" and for reforming CDS trading to "reduc[e] both systemic and counterparty risk" (*id.* ¶¶ 232-234); (iii) certain defendants "declined to comment" on questions about "collusion" "in response to [press] inquiries" (*id.* ¶ 238); (iv) Markit declined in 2013 to confirm its licensing practices to a press reporter and publicly stated that it was "unaware of any collusion by other market participants" (*id.* ¶ 239); and (v) certain dealer-defendants declined to disclose their financial stake in ICE or reveal the identities of the members of ICE's risk committee (*id.* ¶ 235). None of these allegations pleads fraudulent concealment under Rule 9(b) and settled tolling law.

Plaintiffs cannot satisfy Rule 9(b) by making generalized allegations of "secret meetings" (*id.* ¶ 228), without any particularity as to who attended such meetings, when such meetings were held or what was discussed (let alone agreed). Similarly, alleged statements of support for increased market transparency and reduced market risk do not plead fraudulent concealment. (*Id.* ¶ 234.) Plaintiffs plead no facts (much less particularized facts) showing that the statements were knowingly false when made, or that plaintiffs relied on them in delaying their lawsuits. Moreover, "[m]ere denials of wrongdoing" do not evidence "fraud" and "will not of themselves toll the statute of limitations." *Statistical Phone Philly v. NYNEX Corp.*, 116 F. Supp. 2d 468, 483 (S.D.N.Y. 2000) (internal quotation marks omitted); *see also Fidenas AG v. Honeywell Inc.*, 501 F. Supp. 1029, 1039 (S.D.N.Y. 1980) (dismissing fraudulent concealment claims because

"mere silence" is "not fraud"). Nor does any defendant's decision to "declin[e] to comment" on the DOJ's investigation or the European Commission's later investigation provide any excuse for plaintiffs' failure to investigate their own claims before May 2009. (SCAC ¶ 238.)

**B.    Plaintiffs Do Not Adequately Plead That Any Concealment "Actively Prevented" Them from Discovering Their Claims.**

Plaintiffs fail to plead that the alleged fraud "actively prevented" them from discovering their claims within the limitations period. *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 352 (2d Cir. 1993). Fraud-based tolling does not apply if plaintiffs had "[n]otice of a potential claim" or "reason to suspect the probability of any manner of wrongdoing." *131 Main St. Assocs. v. Manko*, 179 F. Supp. 2d 339, 348 (S.D.N.Y.), *aff'd*, 54 F. App'x 507 (2d Cir. 2002). "[F]acts that *should arouse suspicion* . . . are equated with actual knowledge of the claim." *In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363, 380 (S.D.N.Y. 2002) (second alteration in original, emphasis added). The public events and media sources outlined above gave plaintiffs more than sufficient reason to inquire why certain proposed clearing and trading platforms did not launch as publicly announced. Plaintiffs' allegations that CMDX (and other potential clearinghouses) publicly stated that they were ready to launch in late 2008—but failed to do so—should have prompted plaintiffs to inquire. Plaintiffs' vague allegation that the dealer-defendants had the "power to make investment firms thrive or perish" (SCAC ¶ 236) does not come close to pleading that any defendant engaged in acts that "affirmative[ly] . . . prevented or discouraged" plaintiffs from timely investigating defendants' conduct, *Salinger v. Projectavision, Inc.*, 972 F. Supp. 222, 232 (S.D.N.Y. 1997), or from timely pleading what they belatedly allege now.

**C.    Plaintiffs Do Not Adequately Plead That They Exercised the Necessary Diligence.**

Plaintiffs likewise fail adequately to plead that they engaged in the sustained and diligent inquiry required for tolling. Even when a plaintiff pleads "active concealment" by the defendant,

the plaintiff still must demonstrate due diligence in trying to discover the fraud by alleging the "specific inquiries" made to relevant entities and "detail[ing] *when such inquiries were made, to whom, regarding what, and with what response*." *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998) (emphasis added).  This due diligence must have been exercised "throughout the period to be tolled." *World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 328 F. App'x 695, 698 (2d Cir. 2009) (internal quotation marks omitted).

Plaintiffs' allegations that they "regularly monitored their investments," "news reports concerning the financial industry and the CDS market," and "CDS pricing data" are not enough to toll the statute of limitations.  (SCAC ¶¶ 251-252.)  Monitoring public data is insufficient to show the diligence required for tolling.  *131 Main St. Assocs.*, 179 F. Supp. 2d at 349-51.  If plaintiffs truly believed that CMDX was ready to launch an exchange in 2008, then its failure to launch "cried out loudly for explicit inquiry." *Zola v. Gordon*, 685 F. Supp. 354, 368 (S.D.N.Y. 1988).  Yet plaintiffs plead only that they made some unidentified general queries as to CDS *pricing*.  (SCAC ¶ 254.)  Their inquiries thus had nothing to do with "investigat[ing] the Defendant[s'] possible wrongdoing." *131 Main St. Assocs.*, 179 F. Supp. 2d at 350.  Nor do they identify when they made these supposed "inquiries," much less "to whom, regarding what, and with what response." *Merrill Lynch*, 154 F.3d at 60.  Plaintiffs offer only bare allegations of "impossibil[ity]" (SCAC ¶ 228) that have been held insufficient to plead "that due diligence was exercised." *Town of Poughkeepsie v. Espie*, 402 F. Supp. 2d 443, 452 (S.D.N.Y. 2005).

In sum, plaintiffs have not alleged fraudulent concealment with the particularity required by Rule 9(b) or plausibly alleged the other elements of equitable tolling.  Accordingly, they are bound by the four-year statute of limitations applicable to their antitrust claims, and any claim arising from conduct that occurred before May 3, 2009 should be dismissed.

VI.   **Congress' Enactment of Title VII of Dodd-Frank Precludes Application of the Antitrust Laws to Alleged Conduct After July 21, 2011.**

Dodd-Frank was enacted in 2010 and became effective, in relevant part, on July 21, 2011. (SCAC ¶ 190.)   Plaintiffs seek to downplay Dodd-Frank as nothing more than a statute authorizing "certain regulations pertaining to CDS and other derivatives." (*Id*. ¶ 191)   But in enacting Title VII of Dodd-Frank, Congress undeniably vested the SEC and CFTC with comprehensive and discretionary regulatory authority over CDS, including the conduct of CDS dealers and the rules for CDS trading and clearing.   Contrary to plaintiffs' assertion, Congress did not expressly provide that CDS trading "would remain fully subject to the antitrust laws." (*Id*. ¶ 190.)   Rather, Congress implicitly has precluded application of the antitrust laws to the sphere of conduct challenged here through its decision to place plenary regulatory authority over CDS with the SEC and CFTC.   Plaintiffs' claims thus should be dismissed to the extent they challenge conduct that occurred after the July 21, 2011 effective date of Dodd-Frank.[14]

Four considerations trigger implied preclusion of the antitrust laws.   *See Elec. Trading Grp., LLC v. Banc of Am. Sec. LLC*, 588 F.3d 128, 133-38 (2d Cir. 2009) ("*ETG*").   First, the challenged conduct must be within an area of activity regulated by the law that precludes the application of the antitrust laws.   *Id*. at 133.   Second, a federal regulatory agency must be granted authority "to supervise the activities in question." *Id*. at 134.   Third, the federal regulatory agency must have taken some action in the exercise of that authority.   *Id*. at 135.   This action need not take the form of rulemaking; it may consist of informal actions such as "roundtable[s]"

---

[14] The dealer-defendants do not concede that July 21, 2011 is the limit of any implied repeal and reserve their rights to assert such a defense for conduct before that date.   Even before Dodd-Frank's effective date, several federal agencies supervised developments in CDS clearing and trading.   Plaintiffs' own sources confirm that the FRBNY, acting "as the primary safety and soundness regulator of the holding companies of the major dealer banks," supervised the initiatives for OTC derivatives clearing and trading before Dodd-Frank became effective.   (Litan, *supra* at 33-34 (emphasis omitted).)

that signal the agency's "monitoring" of relevant industry conduct, *id*. at 135-36, or a decision not to regulate, *see*, *e.g.*, *Friedman v. Salomon/Smith Barney, Inc*., 313 F.3d 796, 801 (2d Cir. 2002). Fourth, there must be a risk that the antitrust laws and the specific statute at issue, "if both applicable, would produce conflicting guidance, requirements, duties, privileges, or standards of conduct." *Credit Suisse Sec. (USA) LLC v. Billing*, 551 U.S. 264, 275-76 (2007). The conflict need not be "actual and immediate." *ETG*, 588 F.3d at 138. In evaluating such a conflict, "the proper focus is not on the Commission's current regulatory position but rather on the Commission's authority to permit conduct that the antitrust laws would prohibit." *Id.*

Conflict is particularly likely where the regulatory agency "must consider the competitive effects of its regulations" and balance them with other considerations. *Friedman*, 313 F.3d at 802. Where, as here, analysis of any particular conduct requires extensive industry-specific expertise, permitting antitrust plaintiffs to pursue claims before different courts will create an "unusually high risk" of inconsistency or error. *Billing*, 551 U.S. at 281-82. Such uncertainty will cause industry participants to avoid not only conduct forbidden by the governing laws and regulations, "but also a wide range of joint conduct" that those laws and regulations permit or encourage, "but which [industry participants] fear could lead to an antitrust lawsuit and the risk of treble damages." *Id*. at 282. As the Supreme Court explained, "therein lies the problem" of applying the antitrust laws to conduct already governed by such complex regulatory schemes as the securities laws (in *Billing*) or Dodd-Frank here. *Id*.

A.     **Dodd-Frank Precludes Application of the Antitrust Laws to Plaintiffs' Allegations.**

According to the complaint, defendants "conspired to squash" the threat of exchange-traded CDS. (SCAC ¶ 12.) But Dodd-Frank has placed exclusive jurisdiction to regulate both

the clearing and trading of CDS—as well as other CDS-related conduct—with the SEC and CFTC, making the "need for an antitrust lawsuit . . . unusually small." *Billing*, 551 U.S. at 283.

First, the clearing and trading of CDS, as well as the disclosure of CDS pricing and trade data, are squarely within Dodd-Frank's purview.  In Title VII, Congress chose to subject OTC derivatives transactions to comprehensive oversight to "reduce risk, increase transparency and promote market integrity within the financial system" by, among other things, (i) providing for comprehensive regulation of CDS dealers, (ii) imposing clearing and trading execution requirements on standardized OTC derivatives, (iii) creating robust recordkeeping and real-time reporting regimes, and (iv) enhancing the rulemaking and enforcement authority of the SEC and CFTC over all registered entities and intermediaries subject to those agencies' oversight.[15]

Second, Congress gave the SEC and CFTC authority to supervise CDS clearing and trading, as well as the transparency of transaction information.  For instance, Congress granted the CFTC the authority to determine which CDS index transactions should be cleared through a registered derivatives clearinghouse, 7 U.S.C. § 2(h)(2)(A)-(B), and mandated that such transactions be executed on a registered swap execution facility ("SEF")[16] or designated contract market ("DCM"), 7 U.S.C. § 2(h)(8)(A).[17]  In considering whether those mandates apply to particular CDS contracts, the CFTC must "take into account" both the "effect on competition"

---

[15] *Building the New Derivatives Regulatory Framework:  Oversight of Title VII of the Dodd-Frank Act:  Hearing Before the S. Comm. on Banking, Housing, & Urban Affairs*, 112th Cong. (2011) (statement of Gary Gensler, Chairman, CFTC).

[16] A SEF is "a trading system or platform in which multiple participants have the ability to execute or trade swaps by accepting bids and offers made by multiple participants."  7 U.S.C. § 1a(50).  It must "make public timely information on price, trading volume, and other trading data on swaps to the extent prescribed by" the CFTC.  *Id*. § 7b-3(f)(9)(A).

[17] Generally speaking, CDS indices with ten or more underlying reference entities fall within the definition of "swaps" under the statute, and thus are regulated by the CFTC.  By contrast, single-name CDS and any narrow-based CDS index with nine or fewer underlying reference entities fall within the definition of "security-based swaps" under the statute, and thus are regulated by the SEC.  *See* 15 U.S.C. §§ 8302(b), 78c(55)(B), 78c(68)-(69).

and other considerations, such as "trading liquidity" and systemic risk. 7 U.S.C. § 2(h)(2)(D)(ii).[18]   Moreover, Congress granted the CFTC *exclusive* regulatory authority to prescribe rules governing the duties of swap dealers generally to ensure the achievement of the goals of Dodd-Frank. 7 U.S.C. § 6s(j)(7).

Third, the SEC and CFTC have exercised the authority conferred by Congress over CDS clearing and trading and, in so doing, struck a balance between promoting competition and advancing other statutory objectives. The CFTC has issued regulations concerning appropriate admission and continuing participation requirements for clearing membership. 17 C.F.R. § 39.12 (2014). It also has issued regulations requiring that certain classes of CDS indices be cleared by a derivatives clearing organization registered with the CFTC. *Id*. § 50.4. While the CFTC has mandated the real-time public reporting of swap transaction and pricing data for certain swap transactions, *id*. §§ 43.1-43.4 (requiring public reporting of swap data "as soon as technologically practicable"), the regulations impose time delays for the public dissemination of such data for certain large transactions and block trades, *id*. § 43.5. The CFTC also has prescribed external business conduct standards for swap dealers, *see id*. pt. 23H, such as requiring swap dealers to provide a counterparty with certain information before entering into a trade, *id*. §§ 23.431-23.433. And the CFTC has announced a rule only requiring market participants to obtain quotes from three dealers, *id.* § 37.9(a)(3), reflecting concern that broader dissemination of quotes could have the counterproductive effect of increasing price and reducing market liquidity, 78 Fed. Reg. 33,476, 33,497 (June 4, 2013).

Finally, a clear risk exists that applying both Dodd-Frank (and its regulations) and the antitrust laws together will produce conflicting guidance, requirements, duties, privileges or

---

[18] *See also* 15 U.S.C. § 78c-3(b)(4)(B) (providing analogous authority to SEC).

standards of conduct.   Conflict is particularly likely when a regulator must balance "the competitive effects of its regulations" with other considerations, yielding decisions that may not conform to the comparatively narrower focus of the antitrust laws on competition.  *Friedman*, 313 F.3d at 802.  Through their authority to mandate central clearing of CDS transactions, the SEC and CFTC are authorized to decide whether to mandate that a single-name CDS or CDS index be cleared or electronically traded.  Conversely, those agencies have the statutory authority to determine that, in light of the policy considerations underlying Dodd-Frank—which include not only competition, but also the reduction of systemic risk, the maintenance and improvement of liquidity and the promotion of market integrity and stability within the financial system—any particular single-name CDS or CDS index need not be centrally cleared or electronically traded. *See* 7 U.S.C. § 2(h); 15 U.S.C. § 78c-3.  Any antitrust action that seeks to compel broad-based CDS clearing or electronic trading could conflict, and thus be incompatible, with the exclusive regulatory authority that Congress vested in the SEC and CFTC under Dodd-Frank.

These conflicts are exacerbated because "only a fine, complex, detailed line separates" permitted activities from prohibited ones, and navigating that line creates "an unusually high risk that different courts will evaluate similar factual circumstances differently."  *Billing*, 551 U.S. at 279, 281-82.  For example, plaintiffs complain that the dissemination of CDS pricing data is delayed.  (SCAC ¶ 95.)  Although CFTC regulations generally require real-time public reporting of swap transaction and pricing data, the CFTC has mandated a 30-minute delay after execution for public dissemination of swap transaction and pricing data for all publicly reportable block-trade swap transactions for the first year after the compliance date of the regulation, and a 15-minute delay thereafter.  17 C.F.R. § 43.5.  The potential for conflict is further exacerbated because CDS transactions are subject to the separate jurisdictions of the SEC (single-name CDS)

and CFTC (most CDS indices). In light of their distinct authority and expertise, those agencies may promulgate different rules for financial instruments within their jurisdiction.

Plaintiffs' assertion that "the CFTC sought the guidance of the DOJ" (SCAC ¶ 192) does not eliminate the risk of conflict. In fact, comments by the DOJ on proposed regulations concerning the ownership of SEFs and DCMs provide a clear example of the potential for conflict. The SEC and CFTC both proposed to limit to 20% the voting equity that any individual dealer could hold in a SEF or DCM, but not to limit the aggregate voting equity that dealers *collectively* could hold.[19] In its comment letters, the DOJ expressed concern that the absence of aggregate limits on dealer ownership in the proposed rules would "not sufficiently protect and promote competition."[20] This illustrates how the DOJ, on the one hand, and the SEC and CFTC, on the other, may have conflicting views about the regulation of CDS trading and clearing. Even if, on any particular rule at any given time, the agencies take consistent views, the risk of conflict is not eliminated because the "proper focus" is the authority of the SEC and CFTC "to permit conduct that the antitrust laws would prohibit." *ETG*, 588 F.3d at 138.

### B. Dodd-Frank's Savings Clause Does Not Preserve Plaintiffs' Claims.

Plaintiffs improperly seek to diminish the significance of Title VII's regulatory scheme by pointing to a general savings clause that applies to the entire Dodd-Frank Act, which covers such disparate topics as bank liquidation, credit card fees and the establishment of new consumer finance agencies. (SCAC ¶ 190.) That savings clause provides that "[n]othing in this Act, or any

---

[19] *See* Comments of the United States Department of Justice at 3 (Dec. 28, 2010), *available at* www.justice.gov/atr/public/comments/265620.pdf; Comments of the United States Department of Justice, at 3 (Dec. 28, 2010), *available at* www.justice.gov/atr/public/comments/265618.pdf.

[20] *See* Comments of the United States Department of Justice at 2 (Dec. 28, 2010), *available at* www.justice.gov/atr/public/comments/265620.pdf; Comments of the United States Department of Justice, at 2 (Dec. 28, 2010), *available at* www.justice.gov/atr/public/comments/265618.pdf.

amendment made by this Act, shall be construed to modify, impair, or supersede the operation of any of the antitrust laws, *unless otherwise specified*." 12 U.S.C. § 5303 (emphasis added).

The complaint's reliance on the general savings clause is misplaced because Congress expressly and repeatedly "otherwise specified" *in Title VII* of Dodd-Frank, which focuses on the regulation of single-name CDS and CDS indices.  Multiple provisions of Title VII state that general prohibitions on "unreasonable restraint[s] of trade" and "material anticompetitive burden[s] on trading or clearing" would apply "*[u]nless*" those practices are "necessary or appropriate to achieve the purposes" of Dodd-Frank.  7 U.S.C. § 6s(j)(6); 15 U.S.C. § 78o-10(j)(6) (emphasis added).[21]  These provisions expressly circumscribe the antitrust law's general restrictions on anticompetitive conduct.  And, immediately following each of these provisions, Congress stated that the authority to "prescribe rules under this subsection governing duties" of dealers—that is, the authority to determine what conduct in the CDS marketplace is "necessary or appropriate" for achieving the statute's purpose—rests with the SEC and CFTC.  7 U.S.C. § 6s(j)(7); 15 U.S.C. § 78o-10(j)(7).  Thus, in the provisions of Dodd-Frank that are relevant here, Congress has done exactly what the "unless otherwise specified" provision in the general Dodd-Frank-wide savings clause anticipated:  Congress has made clear that for the CDS

---

[21] Congress also authorized the SEC and CFTC to permit other registered entities to engage in conduct that may result in an "unreasonable restraint of trade" or impose a "material anticompetitive burden on trading or clearing" if such conduct is "necessary or appropriate to achieve the purposes" of the Commodity Exchange Act or the Securities Exchange Act of 1934.  *See* 7 U.S.C. §§ 7a-1(c)(2)(N) (derivatives clearing organizations), 24a(f)(1) (swap data repositories), 7b-3(f)(11) (SEFs), 7(d)(19) (boards of trade).

marketplace, the expert regulatory agencies—*not* courts applying general antitrust principles—must balance pro-competitive policies against other statutory objectives.[22]

## VII.   Plaintiffs' Vague and Duplicative Unjust Enrichment Claim Should Be Dismissed.

Plaintiffs assert that "Defendants have been unjustly enriched" as a result of the conduct "alleged herein," and that plaintiffs are entitled to "restoration of the monies of which they were unfairly and improperly deprived, as described herein."  (SCAC ¶¶ 279-280.)  This bare-bones unjust enrichment claim should be dismissed for two reasons.

First, plaintiffs' unjust enrichment claim arises "from the same facts" as their antitrust claims and thus fails to "allege distinct and different damages."  *Town of Wallkill v. Rosenstein*, 40 A.D.3d 972, 974 (N.Y. App. Div. 2007).  This Court recently held that "'[u]njust enrichment is not a catchall cause of action to be used when others fail'" and that it is "'not available where it simply duplicates, or replaces, a conventional [legal] claim.'"  *La. Mun. Police Emps. Ret. Sys. v. JPMorgan Chase & Co.*, No. 12 Civ. 6659 (DLC), 2013 WL 3357173, at *16 (S.D.N.Y. July 3, 2013) ("*LAMPERS*") (quoting *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012)).  That is the case here.  If plaintiffs were to prevail on their antitrust counts, there would be no need for restitution because their statutory damages claims would cover defendants' "unjustly" earned profits.  (SCAC ¶ 279.)  If plaintiffs were to lose on their antitrust claims, there would be no need for restitution because plaintiffs could not show that defendants were unjustly enriched.  *See Geller v. Cnty. Line Auto Sales, Inc.*, 86 F.3d 18, 22 (2d Cir. 1996).  Because the

---

[22] The "unless otherwise specified" provision makes the Dodd-Frank savings clause far more limited than the savings clauses in the Securities Act of 1933 and the Securities Exchange Act of 1934, which provide that the rights extended in those laws are in addition to any other rights that may exist.  *See* 15 U.S.C. §§ 77p(a), 78bb(a)(2).  Yet the Supreme Court in *Billing* held that even those broader savings clauses were insufficient to preserve antitrust actions where, as here, the four conditions for the implied repeal of the antitrust laws are satisfied.  *See* 551 U.S. at 275, 285.  For the same reason, the Dodd-Frank savings clause also is far more limited than the savings clause addressed in *Trinko*, 540 U.S. at 406.

unjust enrichment claim "simply duplicates" their legal causes of action, it should be dismissed. *LAMPERS*, 2013 WL 3357173, at *16; *see also In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 412 (S.D.N.Y. 2011) (dismissing unjust enrichment claim premised on antitrust violations); *Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250, 257 (S.D.N.Y. 1995) (same).

Second, the unjust enrichment claim fails because plaintiffs do not "identif[y] the state jurisdictions upon whose law" the claim is predicated. *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 587 (M.D. Pa. 2009). Because plaintiffs have given the Court no basis to "analyze the[ir] . . . undifferentiated unjust enrichment claim[]," it should be dismissed. *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 667-68 (E.D. Mich. 2011) (dismissing unjust enrichment claim); *Chocolate Confectionary*, 602 F. Supp. 2d at 587 (same); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1124 (N.D. Cal. 2008) (same).

## CONCLUSION

For the foregoing reasons, all claims asserted against the dealer-defendants should be dismissed in their entirety with prejudice.

Dated: New York, New York
     May 23, 2014

    /s/ Robert F. Wise, Jr.
Robert F. Wise, Jr.
Arthur J. Burke
Jeremy T. Adler
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Tel:  (212) 450-4000
Fax:  (212) 701-5800
robert.wise@davispolk.com
arthur.burke@davispolk.com
jeremy.adler@davispolk.com

*Attorneys for Bank of America Corporation and Bank of America N.A.*

 /s/ Todd S. Fishman

Todd S. Fishman
Michael S. Feldberg
M. Elaine Johnston
ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, NY 10020
Tel:  (212) 610-6300
Fax:  (212) 610-6399
todd.fishman@allenovery.com
michael.feldberg@allenovery.com
elaine.johnston@allenovery.com

*Attorneys for Barclays Bank PLC*

 /s/ David Esseks

David Esseks
Brian de Haan
ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, NY 10020
Tel:  (212) 610-6300
Fax:  (212) 610-6399
david.esseks@allenovery.com
brian.dehaan@allenovery.com

John Terzaken
Molly Kelley
ALLEN & OVERY LLP
1101 New York Avenue, N.W.
Washington, DC 20005
john.terzaken@allenovery.com
molly.kelley@allenovery.com

*Attorneys for BNP Paribas*

 /s/ David F. Graham
Benjamin R. Nagin
Eamon P. Joyce
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
Tel:  (212) 839-5300
Fax:  (212) 839-5599
bnagin@sidley.com
ejoyce@sidley.com

David F. Graham*
David C. Giardina*
Jennifer E. Novoselsky
*admitted *pro hac vice*
SIDLEY AUSTIN LLP
1 S Dearborn St
Chicago, IL 60603
Tel:  (312) 853-7000
Fax:  (312) 853-7036
dgraham@sidley.com
dgiardina@sidley.com
jnovoselsky@sidley.com

*Attorneys for Citigroup Inc., Citibank, N.A.*
*and Citigroup Global Markets Inc.*

 /s/ J. Robert Robertson
J. Robert Robertson
Benjamin Holt*
*admitted *pro hac vice*
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, N.W.
Washington, DC 20004
Tel:  (202) 637-5600
Fax:  (202) 637-5910
robby.robertson@hoganlovells.com
benjamin.holt@hoganlovells.com

*Attorneys for Credit Suisse AG*

/s/ Paula W. Render
David P. Wales*
*admitted *pro hac vice*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Tel:  (202) 879-3939
Fax:  (202) 626-1700
dpwales@jonesday.com

Tracy V. Schaffer
Eric P. Stephens
JONES DAY
222 East 41st Street
New York, NY 10017
Tel:  (212) 326-3939
Fax:  (212) 755-7306
tschaffer@jonesday.com
epstephens@jonesday.com

Paula W. Render*
Alex P. Middleton*
*admitted *pro hac vice*
JONES DAY
77 West Wacker
Chicago, IL 60601
Tel:  (312) 782-3939
Fax:  (312) 782-8585
prender@jonesday.com
apmiddleton@jonesday.com

*Attorneys for Deutsche Bank AG*

/s/ Richard C. Pepperman II
Richard C. Pepperman II
Bradley P. Smith
Mark S. Geiger
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Tel:  (212) 558-4000
Fax:  (212) 558-3588
peppermanr@sullcrom.com
smithbr@sullcrom.com
geigerm@sullcrom.com

Robert Y. Sperling*
*admitted *pro hac vice*
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
Tel:  (313) 558-7941
Fax:  (312) 558-5700
rsperling@winston.com

Seth Farber
Winston & Strawn LLP
200 Park Avenue
New York, NY  10166-4193
Tel:  (212) 294-4611
Fax:  (212) 294-4700
sfarber@winston.com

Elizabeth P. Papez*
*admitted *pro hac vice*
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, DC 20006
Tel:  (202) 282-5000
Fax:  (202) 282-5100
epapez@winston.com

*Attorneys for Goldman, Sachs & Co.*

 /s/ Andrew S. Marovitz
Richard A. Spehr
Michael O. Ware
MAYER BROWN LLP
1675 Broadway
New York, NY 10019
Tel:  (212) 506-2500
Fax:  (212) 262-1910
rspehr@mayerbrown.com
mware@mayerbrown.com

Andrew S. Marovitz*
Britt M. Miller*
*admitted pro hac vice
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Tel:  (312) 782-0600
Fax:  (312) 701-7711
amarovitz@mayerbrown.com
bmiller@mayerbrown.com

Attorneys for HSBC Bank plc and HSBC
Bank USA, N.A.

 /s/ Peter E. Greene
Peter E. Greene
Peter S. Julian
Boris Bershteyn
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
New York, NY 10036
Tel:  (212) 735-3000
Fax:  (212) 735-2000
peter.greene@skadden.com
peter.julian@skadden.com
boris.bershteyn@skadden.com

Patrick J. Fitzgerald
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
155 N. Wacker Drive
Suite 2700
Chicago, IL 60606
Tel:  (312) 407-0508
Fax:  (312) 407-0411
patrick.fitzgerald@skadden.com

Attorneys for JPMorgan Chase & Co. and
JPMorgan Chase Bank, N.A.

/s/ Evan R. Chesler
Evan R. Chesler
Daniel Slifkin
Michael A. Paskin
Vanessa A. Lavely
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Tel:  (212) 474-1000
Fax:  (212) 474-3700
echesler@cravath.com
dslifkin@cravath.com
mpaskin@cravath.com
vlavely@cravath.com

*Attorneys for Morgan Stanley & Co. LLC*

/s/ Charles F. Rule
Charles F. Rule*
Joseph J. Bial
Amy W. Ray
*admitted pro hac vice*
CADWALADER, WICKERSHAM &
TAFT LLP
700 6th Street, N.W.
Washington, DC 20001
Tel:  (202) 862-2200
Fax:  (202) 862-2400
rick.rule@cwt.com
joseph.bial@cwt.com
amy.ray@cwt.com

*Attorneys for Royal Bank of Scotland PLC
and Royal Bank of Scotland N.V.*

/s/ David C. Bohan
David C. Bohan
KATTEN MUCHIN ROSENMAN, LLP
525 W. Monroe St.
Chicago, IL 60661
Tel:  (312) 902-5200
Fax:  (312) 902-1061
david.bohan@kattenlaw.com

James J. Calder
KATTEN MUCHIN ROSENMAN, LLP
575 Madison Avenue
New York, NY 10022
Tel:  (212) 940-8800
Fax:  (212) 940-8776
james.calder@kattenlaw.com

*Attorneys for UBS AG and UBS Securities LLC*