# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                :

|  |  |
|---|---|
| IN RE:  CREDIT DEFAULT SWAPS ANTITRUST LITIGATION | :  Master Docket No.:  13 MD 2476 (DLC) |
|  | :  (Oral Argument Requested) |
| This Document Relates To:  All Actions | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM IN SUPPORT OF MARKIT'S MOTION TO DISMISS
## THE SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Colin R. Kass (admitted *pro hac vice*)
Scott M. Abeles (admitted *pro hac vice*)
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., NW
Washington, D.C. 20004
T: (202) 416-6800
F: (202) 416-6899

Alan R. Kusinitz
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036-8299
T: (212) 969-3000
F: (212) 969-2900

*Attorneys for Markit Group Ltd.*

# TABLE OF CONTENTS

I.      INTRODUCTION. ................................................................................................... 1

II.     THE ALLEGED FACTS. .......................................................................................... 4

        A.      Overview of Over-the-Counter CDS Trading. ............................................. 4

        B.      The Role of Dealer-Defendant-Collaborations in Supporting Over-the-
                Counter CDS Trading. ................................................................................. 6

        C.      Plaintiffs' Information Services Allegations. ............................................... 7

        D.      Plaintiffs' Exchange-Trading-Related IP Licensing Allegations. ............... 9

III.    PLAINTIFFS HAVE NOT ALLEGED A SHERMAN ACT AGREEMENT. ............... 10

        A.      Shareholder Participation in Firm Decision-Making Does Not Give Rise to
                a Sherman Act "Agreement." ..................................................................... 10

                1.      A Firm Cannot "Conspire" with Its Controlling Shareholders. ............... 10

                2.      The "Controlling Shareholder Rule" Applies Regardless of the
                        Interests Supposedly Animating Markit or Its Shareholders. .................. 13

        B.      The Acts of a Lawful, Integrative, Product-Creating Venture Are Those of
                a "Single Entity," Not a "Walking Conspiracy." .................................... 16

                1.      Conspiracy Law Does Not Apply to Industry Collaborations That
                        Do Not Displace Competition Among the Collaborators. ........................ 16

                2.      Conspiracy Law Does Not Apply to the Core Activities of
                        Lawfully-Formed Integrative Collaborations. ......................................... 19

IV.     PLAINTIFFS HAVE NOT ALLEGED AN UNREASONABLE RESTRAINT. ............. 21

V.      PLAINTIFFS LACK ANTITRUST STANDING. ......................................................... 24

        A.      Plaintiffs Lack Standing to Assert Their Information Opacity Claims. ................ 24

                1.      Deprivation of the Fruits of a Competitor Collaboration Cannot
                        Give Rise to Antitrust Injury. ................................................................. 24

                2.      Plaintiffs Are Not "Efficient Enforcers" of Antitrust Regulations
                        Governing Defendants' Information Services Collaboration. .................. 28

        B.      Plaintiffs Lack Standing to Challenge Markit's Alleged OTC-Only
                Licensing Practices. ................................................................................... 30

VI.     CONCLUSION. ........................................................................................................ 30

## <u>TABLE OF AUTHORITIES</u>[1]

**Cases**                                                                                                        **Page(s)**

*AD/SAT v. Associated Press,*
  181 F.3d 216 (2nd Cir. 1999) ........................................................................... 3, 16

*American Motor Inns, Inc. v. Holiday Inns, Inc.,*
  521 F.2d 1230 (3rd Cir. 1975) ........................................................................... 1, 21

*American Needle, Inc. v. Nat'l Football League,*
  560 U.S. 183 (2010) ............................................................................................ *passim*

*Arizona v. Maricopa Cnty. Med. Soc.,*
  457 U.S. 332 (1982) ............................................................................................ 19

*Atlantic Richfield Co. v. USA Petroleum Co.,*
  495 U.S. 328 (1990) ............................................................................................ 25

*Bell v. Dow Chem. Co.,*
  847 F.2d 1179 (5th Cir. 1988) ........................................................................... 28

*Bhan v. NME Hosps., Inc.,*
  772 F.2d 1467 (9th Cir. 1985) ........................................................................... 28

*Blue Shield of Va. v. McCready,*
  457 U.S. 465 (1982) ............................................................................................ 28

*Brown v. Calamos,*
  664 F.3d 123 (7th Cir. 2011) ............................................................................... 2

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
  429 U.S. 477 (1977) ............................................................................................ 25, 26

*Capital Imaging Assoc., P.C. v. Mohawk Valley Med. Assocs., Inc.,*
  996 F.2d 537 (2nd Cir. 1993) ............................................................................. 17

*Carpet Group Int'l v. Oriental Rug Imps. Ass'n,*
  227 F.3d 62 (3rd Cir. 2000) ............................................................................... 28

*Chicago Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n,*
  95 F.3d 593 (7th Cir. 1996) ............................................................................... 15

---

[1] Unless otherwise noted, all emphasis added and internal citations and quotation marks omitted.

*City of Mt. Pleasant v. Associated Elec. Coop.*,
    838 F.2d 268 (8th Cir. 1988) ............................................................ 18

*Clorox Co. v. Sterling Winthrop, Inc.*,
    117 F.3d 50 (2nd Cir. 1997) ............................................................. 22

*Copperweld Corp. v. Indep. Tube Corp.*,
    467 U.S. 752 (1984) .................................................................. *passim*

*Daniel v. American Bd. of Emergency Med.*,
    428 F.3d 408 (2nd Cir. 2005) ..................................................... 26, 27

*Fla. Seed v. Monsanto Co.*,
    105 F.3d 1372 (11th Cir. 1997) ........................................................ 28

*Fraser v. Major League Soccer, L.L.C.*,
    284 F.3d 47 (1st Cir. 2002) .............................................................. 12

*Freeman v. San Diego Ass'n of Realtors*,
    322 F.3d 1133 (9th Cir. 2003) .............................................. 15, 18, 20

*Gatt Communications, Inc. v. PMC Assocs., L.L.C.*,
    711 F.3d 68 (2nd Cir. 2013) ............................................................. 25

*Gen. Indus. Corp. v. Hartz Mountain Corp.*,
    810 F.2d 795 (8th Cir. 1987) ........................................................... 28

*Gucci v. Gucci Shops, Inc.*,
    651 F. Supp. 194 (S.D.N.Y. 1986) .................................................. 11

*Illinois ex rel. Ryan v. Brown*,
    227 F.3d 1042 (7th Cir. 2000) ........................................................ 28

*In re Libor-Based Financial Instruments Antitrust Litig.*,
    935 F. Supp. 2d 666 (S.D.N.Y. 2013) ......................................... *passim*

*MiniFrame Ltd. v. Microsoft Corp.*,
    2013 WL 1385704 (S.D.N.Y. 2013) ............................................... 22

*Novatel Commc'ns., Inc. v. Cellular Tel. Supply, Inc.*,
    1986 WL 15507 (N.D.Ga. 1986) .................................................... 12

*Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*,
    467 F.3d 283 (2nd Cir. 2006) .......................................................... 29

*Polk Bros., Inc. v. Forest City Enters., Inc.*,
   776 F.2d 185 (7th Cir. 1985) ............................................................................. 1

*Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*,
   2006 WL 2786882 (E.D.N.Y. 2006) ................................................................. 28

*Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*,
   507 F.3d 117 (2nd Cir. 2007) ..................................................................... 25, 26

*Precision CPAP, Inc. v. Jackson Hosp.*,
   2010 WL 797170 (M.D. Ala. 2010) ................................................................. 22

*REA Express, Inc. v. Alabama Great Southern R. Co.*,
   427 F. Supp. 1157 (S.D.N.Y. 1976)................................................................. 14

*SCFC ILC, Inc. v. Visa USA Inc.*,
   36 F.3d 958 (10th Cir. 1994) ....................................................................... 3, 23

*Schachar v. American Acad. of Ophthalmology, Inc.*,
   870 F.2d 397 (7th Cir. 1989) ...................................................................... 21, 24

*Serpa Corp. v. McWane, Inc.*,
   199 F.3d 6 (1st Cir. 1999)............................................................................... 28

*Standard Oil Co. v. Humble Oil & Refining Co.*,
   363 F.2d 945 (5th Cir. 1966) .......................................................................... 24

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
   2010 WL 3521979 (E.D. Cal. 2010) ................................................................ 20

*Texaco Inc. v. Dagher*,
   547 U.S. 1 (2006)............................................................................... 3, 19, 20

*Todorov v. DCH Healthcare Auth.*,
   921 F.2d 1438 (11th Cir. 1991) ...................................................................... 28

*United States v. Colgate & Co.*,
   250 U.S. 300 (1919)....................................................................................... 11

*United States v. Joint–Traffic Ass'n*,
   171 U.S. 505 (1898)....................................................................................... 17

*Verizon Comm'ns Inc. v. Trinko*,
   540 U.S. 398 (2004).............................................................................. 3, 11, 22

*Washington v. Nat'l Football League*,
   880 F. Supp. 2d 1004 (D. Minn. 2012) ................................................................................... 22

*Yankees Entm't and Sports Network, LLC v. Cablevision Sys. Corp.*,
   224 F. Supp. 2d 657 (S.D.N.Y. 2002) .................................................................................... 11

## Other Authorities

ABA SECTION OF ANTITRUST LAW,
   *Antitrust Law Developments*, (6th ed. 2007)…………………………………..………12

Areeda, Phillip, et al.,
   *Antitrust Law*, (2nd ed. 2000 and 2003)……………………………...............19, 21, 27

Areeda, Phillip, et al.,
   *Antitrust Law*, (3rd ed. 2007)…………………………………………………………..12

*DOJ/FTC Report on Antitrust Enforcement and Intellectual Property Rights*……………... 20, 23

*DOJ/FTC Antitrust Guidelines for the Licensing of Intellectual Property*………………..…..23

# I.   INTRODUCTION.

This motion turns on whether cooperation is permissible when competitors must work together to develop the "support services" that enable their competition.  Plaintiffs do not deny that some cooperation is necessary to make the complex credit default swaps market function. Plaintiffs simply imagine a "better" style of trading that might have arisen had the Dealer Defendants cooperated *differently* through the entities, like Markit, they allegedly "own and control."  The antitrust laws, however, do not convert entrepreneurs into "guarantors that the imaginations of lawyers could not conjure" up a more idyllic world in which cooperation takes a different form.  *American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1249 (3rd Cir. 1975).  For this fundamental reason, plaintiffs' claims against Markit must be dismissed.

Courts recognize that it is often "necessary for people to cooperate in some respects before they may compete in others."  *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 188 (7th Cir. 1985).  This is so common that a business school term, "coopetition," has been coined to describe it.  Coopetition is particularly pervasive in financial sectors.  For CDSs, for example, dealers compete in the *trading* market.  But they also cooperate through jointly-owned entities in various ancillary *service* markets to build supporting infrastructure.  The question for this Court is not whether such coopetition is lawful – plaintiffs do not deny that it is – but whether the Sherman Act imposes **common carrier** obligations on these ventures.  It does not.

We focus on the claims relating to Markit, an information services company the Dealer Defendants allegedly "own and control."  Directing attention to three distinct services lines – Markit's pricing information services, its reference codes, and its index business – plaintiffs argue that Markit's licensing decisions were not its own, but were those of a "walking conspiracy" of the dealers.

This raises the threshold *legal* question in this case.  What Sherman Act standard applies when competing firms collaborate *outside the zone* of their competition to create services to support their respective businesses:  does single-entity law govern their ensuing ventures, or are these collaborations unlawful conspiracies subject to forced sharing?  The answer is critical both to this motion and to whether future, unambiguously procompetitive and socially desirable ventures will ever see the light of day.[2]

This question is not new – it was thoroughly addressed during the lengthy Department of Justice investigation.  Then, as now, three legal principals came to the fore.

*First*, to protect the sanctity of a firm's internal decision-making process, courts will not divine a Sherman Act conspiracy from mere shareholder involvement in that process.  *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984).  The principle is narrow – it does not apply to a defendant's initial *acquisition* of control, or to the firm's subsequent commercial agreements with others, each of which remain subject to challenge.  But it disposes of this case because plaintiffs allege only that the Dealer Defendants, through their exercise of ownership and control, "instructed" Markit to support over-the-counter trading.

*Second*, conspiracy law does not apply to a collaboration that is deemed a "single entity," rather than a "walking conspiracy."  Single-entity treatment applies if either (i) the collaboration does not eliminate competition among the collaborators; *or* (ii) the acts complained of concern the "core activities" of a lawfully-formed, integrative venture.  *American Needle, Inc. v. Nat'l*

---

[2] In an attempt to avoid this legal issue, plaintiffs' latest complaint deletes or waters down many of the allegations focused on the dealers' alleged "ownership and control" of Markit, their alleged "domination" of Markit's board, and their use of such corporate governance rights to "restrict" Markit's licensing decisions.  Plaintiffs' artful pleading is improper.  *See, e.g., Brown v. Calamos*, 664 F.3d 123, 131 (7th Cir. 2011) (Posner, J.) ("deletion[s]" of allegations from amended complaint geared toward "pulling the rug out from under your adversary's feet" are not "credible" and may be ignored).  Nor can the whitewashed allegations save plaintiffs' fundamentally flawed *legal* theory that a joint venture – lawful in its formation and displacing of no competition among the venturers – is a walking conspiracy subject to forced sharing.  To the extent plaintiffs wish to rely on such pleading games in their opposition rather than address the heart of the matter, we will address those games on reply.

*Football League*, 560 U.S. 183, 194 (2010); *Texaco Inc. v. Dagher*, 547 U.S. 1, 6-8 (2006).  In such cases, collaborative ventures "can fairly be regarded as single entities" whose "decisions are not price-fixing conspiracies" or "boycott conspiracies."  *AD/SAT v. Associated Press*, 181 F.3d 216, 234 (2nd Cir. 1999).  This principle is fatal to any attempt to "look behind" Markit's actions and attribute them to a conspiracy of dealers.  Plaintiffs have not alleged the elimination of dealer-to-dealer competition; they limit their challenge to Markit's core product offerings and licensing decisions.  Conspiracy law does not apply.

*Third*, a limited-purpose, product-creating collaboration does not *unreasonably* restrain trade merely by developing products for its owners' exclusive use or benefit.  It does not matter that would-be rivals could make "better" use of the venture's output.  There is "no duty to aid competitors."  *Verizon Comm'ns Inc. v. Trinko*, 540 U.S. 398, 411 (2004).  The antitrust laws guard only against unreasonable restraints.  There can be no "restraint of trade," however, unless the collaboration reduces competition that would exist *in its absence*.  Because a product-creating enterprise inherently promotes, rather than destroys, competition, it has no duty to act as a "common carrier."  *SCFC ILC, Inc. v. Visa USA Inc.*, 36 F.3d 958 (10th Cir. 1994) (industry consortium to create Visa cards did not act unlawfully by excluding Discover).

These three principles defeat plaintiffs' claims on the merits.  But their claims also fail because plaintiffs lack antitrust standing to bring them.  Most importantly, plaintiffs have not alleged an "antitrust injury" because their claims flow from an alleged *imperfect* or *too-limited collaboration*, not the elimination of *competition*.  They do not seek to disband the collaboration; they seek access to its fruits.  Their unfulfilled desire is not "antitrust injury."  *See In re Libor-Based Financial Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 688-92 (S.D.N.Y. 2013).  Finally, for the reasons described below and in the joint Dealer Defendant brief, plaintiffs also

cannot satisfy the four efficient enforcer standards, primarily because they are neither consumers nor competitors in the ancillary services markets allegedly restrained.

Accordingly, plaintiffs' claims against Markit should be dismissed.

## II.   THE ALLEGED FACTS.[3]

Plaintiffs contend that Markit participated in a conspiracy to restrain trade and to monopolize the CDS trading market in two ways.  First, they claim that Markit failed to offer real-time pricing services that might assist buyside traders in negotiating pricing with the Dealer Defendants.  Second, they claim that Markit failed to license its intellectual property to potential exchanges and clearinghouses that might present an alternative to OTC trading.

Before we discuss these allegations in detail, it is important to consider the marketplace in which they are said to have arisen.  The Complaint, though glancing over many salient points, demonstrates why the marketplace necessarily coalesced around over-the-counter trading, and why it necessarily required some cooperation among CDS dealers (including through their mutual investments in Markit) to function and flourish.  Through this lens, the allegations are revealed for what they are: concessions that a collaboration fulfilled its lawful and unchallenged mission to foster over-the-counter trading, and complaints that the collaborators allegedly declined to donate their fruits for use on other platforms.

### A.   Overview of Over-the-Counter CDS Trading.

CDSs are "like insurance."  Cmplt. ¶ 71.  They protect against financial disasters, rather than natural ones, by allocating the risk of a borrower's default from the CDS buyer to the seller. *Id*. ¶ 72.  As with insurance, when disaster strikes, or a "credit event" occurs, the seller's obligation may dwarf the premiums collected.  A seller receiving $1 million in annual premiums,

---

[3] The Complaint contains many factual inaccuracies. While we base this motion, as we must, on the Complaint's allegations, nothing herein should be construed as an admission that such "facts" are true or undisputed.

for example, may suddenly be on the hook for $100 million.  *Id.* ¶ 78.   Because of this so-called "cliff risk," traders need assurances that their counterparties can stand behind their obligations if the market crashes.  And because many buyside traders engage in financial *speculation* by "betting" on the future value of CDS contracts (instead of using them to insure or hedge against an actual loss), this risk is particularly acute.  *Id.* ¶ 73.

In insurance markets, this risk is managed by regulating the insurers who must pay upon disaster.  For CDSs, however, the market evolved privately, with counterparty risk historically managed through a system of over-the-counter trading.  *Id.* ¶¶ 17, 106-107.  This OTC system managed counter-party risk because, *by definition*, a dealer is on one side of every trade.  By standing behind every trade, the dealer becomes the primary bearer of all buyside counterparty risk, which it then seeks to "dissipate" through diversification and scale.  *Id.* ¶ 225.

The OTC process starts out as it does in many markets.  Just as a consumer may, after seeing ads from Allstate and Geico, reach out to one or both to compare terms and select an insurer, buyside traders will, after comparing dealer "runs," negotiate terms with one or more dealers.  *Id.* ¶ 5.  Once a trader enters into a CDS contract, the dealer becomes forever obligated to that buyside trader to fulfil the contract terms.  If the dealer is a buyer, it pays premiums; if it is a seller, it must stand ready to pay the face value of the contract upon a credit event.

Because there is no contractual privity between buyside traders, there is no need for one buyside trader to evaluate the "creditworthiness" of any other buyside trader.  *See id.* ¶14.  Even when there is an "offsetting trade," the dealer becomes liable for *two* trades (with opposite exposures) instead of *none*.  Thus, each dealer must satisfy itself of the creditworthiness of its trading partners, while each buyside trader relies on the fact that each dealer is "too-big-to-fail."

5

For that reason, only extremely "large financial institutions [can] manage" the risk associated with providing liquidity and certainty in the OTC CDS market.  *Id.* ¶¶ 79, 225.

As a market-maker tasked with providing "liquidity," each dealer must also stand ready to enter into CDS contracts with any qualified buyside trader.  *Id.* ¶ 76.  This creates significant "risk."  *Id.* ¶ 79.  If a dealer's portfolio skews too far in any direction – such as if it holds too many "sell" positions and not enough "buy" ones – the dealer faces not just counter-party risk, but also credit event risk.  Dealers manage these risks primarily by entering into offsetting transactions with other buyside traders, or with other dealers through the interdealer market.  *Id.* ¶¶ 76, 225.

The movement and allocation of credit and counter-party risk through the financial system gives rise to a vibrant and *competitive* CDS trading market.  Plaintiffs do not claim otherwise.  They do not allege price-fixing or collusion in connection with the purchase, sale, offer, or pricing of CDSs among the dealers.  Instead they focus on the defendants' *cooperative* efforts to develop or maintain supporting services that facilitate OTC trading.

> **B.      The Role of Dealer-Defendant-Collaborations in Supporting Over-the-Counter CDS Trading.**

There is nothing unusual about the notion that, before two people can compete, they sometimes have to cooperate.  If Macy's and Nordstrom's are in the same shopping mall, they compete.  But as anchor tenants they may also cooperate to support common services, like clearing snow from parking lots.  The same type of "cooperation" is present here.

To support the complex ecosystem of over-the-counter trading, a number of ancillary services – relating to execution, processing, confirmation, clearing, and settlement – have developed to ensure seamless operation throughout the lifecycle of a CDS trade, ensuring security, transparency, and certainty.  The Dealer Defendants, among others, support these

services through the creation and ownership of various service providers, membership in industry associations, and similar cooperative activities. *See id.* ¶¶ 59-68, 93 (noting involvement with CMDX, ICE, ISDA, DTCC, Markit, and others). In doing so, each defendant "acted as the agent or joint-venturer of or for the other Defendants with respect" to this "course of conduct." *Id.* ¶ 69.

Plaintiffs do not challenge the formation of any of these joint ventures or collaborations, or the acquisition of corporate governance rights in them. They do not claim that any of them are anticompetitive in principal purpose. Nor do they claim that in forming them, the Dealer Defendants eliminated *competition* amongst themselves, either within the scope of their venture or beyond. To the contrary, plaintiffs concede that the dealers played a "valuable" role, which led to an explosion of output, as these services contributed to the transition from "ad hoc" trading to an orderly market worth trillions in notional value. *Id.* ¶¶ 75, 79, 81.

Plaintiffs contend, however, that when collaborating through the entities they jointly "own and control," the Dealer Defendants placed ring fences around the use of collaborative property, mandating that it be used only in service of the current system of OTC trading. As it relates to Markit, plaintiffs identify two collaborative practices where they say the Dealer Defendants exercised "too much" control, relating to Markit's information services and its trading-related intellectual property. We discuss each in turn.

### C.   *Plaintiffs' Information Services Allegations.*

Plaintiffs do not deny the procompetitive benefits of the information services Markit provides. They nonetheless blame the Dealer Defendants for what they perceive as suboptimal price transparency, claiming that the dealers exercised their ownership of voting shares in Markit to "restric[t] Markit from providing pricing information." *Id.* ¶¶ 6, 91-95.

These alleged limits arise against the backdrop of a market plaintiffs characterize as informationally "opaque."  The problem, they say, is that currently buyside traders have access to *different* pricing data than dealers.  As in most bilateral negotiation markets, "critical trading information is known only to the parties to the specific transaction."  *Id*. ¶ 7.  While buyside traders, as recipients of "runs" from many dealers, have access to *broader* information about offering prices, each dealer has a *deeper* view of its only ***own*** transactional prices.  Plaintiffs argue that if they just had access to *all* dealers' confidential prices – data that cannot be obtained without each Dealer's "express consent" – they could negotiate better deals.  *Id*. ¶ 91.

Plaintiffs claim that Markit could provide this data if the Dealers so consented.  Absent this consent, they say they are stuck with Markit's current offerings, which they believe are of "limited utility" in price negotiations.  *Id*. ¶¶ 6, 96-97.  As to Markit's "end-of-day" service, plaintiffs claim that the "marks" the Dealer Defendants provide to Markit (to help subscribers evaluate the value and riskiness of their portfolios) are no substitute for the confidential "real-time" prices plaintiffs want.  *Id.* ¶ 97-98.  They also point to a different Markit information service, claiming Markit "built in a delay" before disseminating real-time prices, rendering the information "less valuable" to plaintiffs.  *Id*. ¶ 95-96.  Their solution is to force Markit to obtain data it does not have to create a new information service more to their liking.

But more important than what plaintiffs have alleged is what they have not.  They do not allege that CDS dealers are unlawfully sharing pricing information with one another; that is, they do not allege that Markit is the "hub" of a price fixing conspiracy.  They do not allege an agreement among the dealers to refrain from *independently* commercializing their own data.  Nor do they allege that the Dealer Defendants would have competed in commercializing data in the absence of their collaboration.  They also do not challenge Markit's formation, the Dealer

8

Defendants' acquisition of ownership in Markit, or the procompetitive nature of the services Markit *does* provide. They simply allege that Markit would have offered "real-time price information to investors" had it not been instructed by its *owners* not to do so. *Id.* ¶ 94, 98.

### D.    *Plaintiffs' Exchange-Trading-Related IP Licensing Allegations.*

Plaintiffs also claim that the Dealer Defendants "instructed [Markit] to license" its intellectual property "only for 'over-the-counter' (OTC) trading purposes and not for exchange trading" and "pressured" and "reprimanded" Markit for even discussing exchange licensing. *Id.* ¶¶ 247, 151; ¶ 189 ("[a]t the Dealer Defendants' instruction … Markit continued to decline to license necessary intellectual property such as CDS indices to" potential exchanges).

By "early 2008," the market had ostensibly evolved to the point where an alternative to over-the-counter trading might have been feasible. *Id.* ¶ 108. Focusing primarily on CMDX, this alternative would involve an "exchange," which handles trade execution through a "central limit order book," and a clearinghouse, which would manage counterparty risk. Plaintiffs claim CMDX sought, but was denied, intellectual property licenses to Markit's indices and reference codes (called "RED Codes") that might "facilitate CMDX's successful launch." *Id.* ¶ 130-31.

But plaintiffs do not allege that Dealer Defendants possessed any competing intellectual property. Thus, the dealers are not accused of limiting competition among themselves. And, as above, plaintiffs do not challenge Markit's formation or its intellectual property rights, or the dealers' acquisition of voting control in Markit. They assert only that, during "board meetings," the "Dealer Defendants discussed how to prevent CMDX from entering the market," and then jointly "instructed" Markit not to license CMDX. *Id.* ¶¶ 163, 151, 189, 247.

Thus, these allegations also boil down to one simple claim: When acting collaboratively, the Dealer Defendants allegedly exercised their lawfully-obtained corporate governance rights in a manner that promoted their interests in over-the-counter trading.

### III.    PLAINTIFFS HAVE NOT ALLEGED A SHERMAN ACT AGREEMENT.

Plaintiffs allege that the Dealer Defendants directed Markit – a firm they legally "control" and into which they integrated certain index licensing, reference code, and information services businesses – to maintain those businesses for their own benefit.   They call this a Sherman Act conspiracy.   The courts do not.

Some people see shadows around every corner. Others see conspiracies. But the Sherman Act is more discerning.   The mere exercise of lawfully-acquired corporate governance rights is not a Sherman Act conspiracy, for two reasons.   *First*, shareholders, acting in that capacity, are not Sherman Act conspirators.   *Second*, the core activities of a lawfully-formed venture are those of a "single entity," not those of a "walking conspiracy."

### A.    *Shareholder Participation in Firm Decision-Making Does Not Give Rise to a Sherman Act "Agreement."*

A firm's shareholders are entitled to participate in its decision-making. If the shareholders marshal enough shares, they may control the firm's actions.   When they do, they are not "conspiring" with the controlled firm, they are operating it.   Because Markit stands accused only of implementing the directives of a controlling block of shareholders, it has not "agreed" with them for Sherman Act purposes.

### 1.    A Firm Cannot "Conspire" with Its Controlling Shareholders.

Plaintiffs make no bones about who they believe controls Markit.   They allege that the Dealer Defendants collectively owned up to "70% of Markit" and dominate its Board of Directors.  Cmplt. ¶¶ 63, 163.   Nor do they equivocate regarding who they believe directed the two Markit-related actions they say inhibited competition.   As to the first, they claim that "the banks controlling [Markit] instructed [it] to license only for 'over-the-counter' trading purposes and not for exchange trading."   *Id.* ¶ 247; ¶ 189.   As to the second, they say through their

ownership of voting shares and presence on Markit's board, the dealers "restricted" and "prevented" Markit from providing the pricing information plaintiffs wanted.  *Id.* ¶ 92, 94.

It is black letter law that shareholders who "own," "control," and "dominate" another entity do not "conspire" with it merely by setting its policy.  As the Supreme Court explained, "it is perfectly plain that an internal 'agreement' to implement a single, unitary firm's policies does not raise the antitrust dangers that § 1 was designed to police," and does not constitute a "contract, combination ... or conspiracy."  *Copperweld*, 467 U.S. at 769.

As "the *Magna Carta* of free enterprise," the Sherman Act preserves the independence of single firms as much as it guards against conspiracies against the public weal.  *Trinko*, 540 U.S. at 415.  Courts therefore take great pains to differentiate unilateral activities from conspiratorial ones – affording great berth to the former while subjecting the latter to a judicial reasonableness review – even where the conduct is "indistinguishable in economic effect."  *Copperweld*, 467 U.S. at 775; *see also United States v. Colgate & Co.*, 250 U.S. 300 (1919), *and progeny*.

This sacred distinction would be eviscerated if a conspiracy charge could be fabricated from shareholders' mere involvement in corporate decision-making.  Consequently, courts have expanded the rule first articulated in *Copperweld* to all forms of corporate control, giving rise to the "controlling shareholder rule."  Where there is control, the company is compelled to follow shareholder directives; it has not "agreed" or "conspired" to do so.  *See Yankees Entm't and Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657, 678 (S.D.N.Y. 2002) ("the *Copperweld* inquiry is more substantively about determining whether there existed ***control***" not about "any magic number percentage of ownership"); *Gucci v. Gucci Shops, Inc.*, 651 F. Supp. 194, 198 (S.D.N.Y. 1986) (rejecting conspiracy claim against two Gucci companies, and the "actual or beneficial owner of 50% of the shares" of both, since the owner's "effective[]

control[]" over both rendered him "legally incapable of conspiring with" the other defendants); *Novatel Commc'ns, Inc. v. Cellular Tel. Supply, Inc.*, 1986 WL 15507, *6 (N.D. Ga. 1986) (parent cannot conspire with 51% owned subsidiary); *see also* ABA SECTION OF ANTITRUST LAW, *Antitrust Law Developments*, at 29 (6th ed. 2007) (collecting cases).[4]

There are weighty reasons why "antitrust law is not the appropriate vehicle for regulating the relationships between a corporation and its shareholders or officers." Areeda & Hovenkamp, *Antitrust Law*, ¶ 353 at p. 268 (3rd ed. 2007). As a purely practical matter, imposing an antitrust collar on shareholder rights would make it impossible to conduct the company's affairs. Must each shareholder decide when to abstain from exercising its lawfully-acquired rights, on pain of subjecting itself, the company, and every other shareholder to treble damages if it gets it wrong? Must the company close the board room door to certain shareholders and directors in violation of the corporate charter? The answers are self-evident. Corporate governance law governs shareholder relations, antitrust law does not.

The alternative would also be counter-productive. Shareholders create and invest in firms for a variety of reasons, including to pursue their own strategic interests. If forming a firm (or acquiring control in one) to pursue those interests is lawful, then so is subsequent shareholder involvement to ensure faithful adherence to the mission. Any other rule would "discourage the competitive enthusiasm that the antitrust laws seek to promote." *Copperweld*, 467 U.S. at 775.

The controlling shareholder rule is simple and vital, but narrow. It does not excuse the unlawful *acquisition* of shareholder control, which remains subject to Section 1 of the Sherman

---

[4] In fact, *Copperweld* articulates a broader rule than the "controlling shareholder" rule. Under *Copperweld*, both the parent's involvement in its subsidiary's decision-making *and* any subsequent commercial agreement between the two are beyond Section 1 challenge. The controlling shareholder rule, in contrast, protects only the former and does not speak to the latter. *See Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47, 57 (1st Cir. 2002) ("That a stockholder may be insulated by *Copperweld* when making ordinary governance decisions does not mean automatic protection when the stockholder is also an entrepreneur **separately contracting with the company**.").

Act or Section 7 of the Clayton Act.  Nor does it immunize agreements among shareholders to restrict competition among themselves, which are also subject to Section 1.  And the acts of a dominant corporation, if exclusionary or predatory, are always subject to Section 2.

But the rule does dispose of "conspiracy" cases such as this, where the allegations turn on the implementation of shareholder directives by corporate officers.  Plaintiffs do not challenge Markit's formation, or the Dealer Defendants' acquisition of corporate governance rights in Markit.  They do not claim that Markit entered into any commercial agreement with Dealer Defendants or others that restrict competition among the dealers.  They accuse Markit of engaging in only the most mundane of corporate acts – listening to its shareholders.   That is neither a "conspiracy" nor an "agreement."  That is business.

### 2.     The "Controlling Shareholder Rule" Applies Regardless of the Interests Supposedly Animating Markit or Its Shareholders.

Plaintiffs seek to avoid the controlling shareholder rule by asserting a diversity of interests either between Markit and its shareholders, or among the shareholders themselves.  But the rule cannot be so easily evaded.

Allegations that Markit acted against its self-interest by foregoing certain licensing revenues are of no moment.  Cmplt. ¶¶ 98, 133.  Profit-maximization is, of course, a lofty goal; it is one of the foundations on which our nation is built.  But it is not the only lawful one.  And a firm does not suddenly mutate into a shareholder "conspiracy" when it pursues other aspirations.

Indeed, the contention that controlling shareholders somehow caused their company to act against its self-interest is a *non-sequitor*.  A company's interests are *defined* by its controlling shareholders in accordance with corporate governance law.  As *Copperweld* explained, "[w]ith or without a formal 'agreement,' the subsidiary acts for the benefit of the parent," making "the very notion of an 'agreement' in Sherman Act terms" one that "lacks meaning."  *See* 467 U.S. at

771.  Because a "subsidiary has no right to economic independence of all its parents, … no antitrust claims may be founded upon the absence of such independence."  *REA Express, Inc. v. Alabama Great Southern R. Co.,* 427 F. Supp. 1157, 1166 (S.D.N.Y. 1976).

A simple example illustrates.  Harkening back, suppose Macy's and Nordstrom's jointly invest in a mall to create a new shopping oasis.  Extracting every last cent of leasing revenues may be the furthest thing from their minds.  Maybe they want to charge below-market-rents to attract more desirable retailers, which may in turn drive more customers to their own stores.  Or maybe they want to operate the mall on a "cost-plus" basis, to lower their own leasing costs.  Whatever rental rate the mall sets, however, it is not acting contrary to its self-interests; it is carrying out its fundamental mission as defined by its owners.  That mission can be scrutinized by challenging the initial acquisition of control.  But whether the mall is lawfully owned by Macy's and Nordstrom's, or instead by the local bank and a mall operator, the owners' involvement in leasing decisions, whatever their choice, is not a conspiratorial act.

This lack of a conspiracy does not turn on the number of shareholders that control the firm's activities.  Most firms are controlled by many shareholders under majority rule.  Are they walking conspiracies?  Clearly not.  Macy's is not a walking conspiracy just because it has tens of thousands of shareholders.  It does not matter whether those shareholders share a "unity of interest" or whether they have different ones.  Some shareholders may be interested in profits, others in activism, and yet others in strategic growth.  But that does not render the *firm's* actions conspiratorial when either of the latter two constituencies prevails in a battle of the shareholders.

A conspiracy simply cannot be conjured from the internal debate and consensus-forming activities that form the heart and soul of every company on earth. "[A]ntitrust law permits, indeed encourages, cooperation inside a business organization the better to facilitate competition

between that organization and other producers." *Chicago Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 95 F.3d 593, 598 (7th Cir. 1996) (Easterbrook, J.).  But it also recognizes that the best decisions often arise from "violent" internal "wrangles," which would be chilled if every corporate squabble was subject to "scrutiny under the Rule of Reason." *Id.*  A contrary view "would be silly," because "[e]ven a single firm contains many competing interests," and "*Copperweld* does not hold that only conflict-free enterprises may be treated as single entities." *Id.*

Nor does it matter that, in reaching consensus or exercising control, certain shareholders agree among themselves – during a Board meeting, in advance of it, or otherwise – as to how to vote their shares and implement their vision for their venture. Were it otherwise, no two shareholders could ever talk in advance of a vote.  Shareholder coalitions may or may not violate corporate governance law, but they do not beget a Sherman Act conspiracy.  Because they do not displace *marketplace* competition among the shareholders, they do not raise the "antitrust dangers" that accompany the "sudden joining of two independent sources of economic power previously pursuing separate interests." *Copperweld*, 467 U.S. at 769, 771.

For this reason, the controlling shareholder rule also does not turn on whether the shareholders compete outside the scope of their venture.  Macy's and Nordstrom's may compete in the retail clothing market.  But when they control the acts of their joint venture in the mall leasing market, they are acting as single venturers, not as conspirators.  The public interest in eradicating conspiratorial conduct is fully protected by permitting challenges to the *initial* acquisition of control.  If that acquisition is lawful, then so is its exercise. *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1147 (9th Cir. 2003) (if "erstwhile competitors combine to

become a single economic entity" the "combination may violate the antitrust laws, but their subsequent relations are generally immune from section 1").

###### B.   The Acts of a Lawful, Integrative, Product-Creating Venture Are Those of a "Single Entity," Not a "Walking Conspiracy."

Shareholder control suffices to defeat plaintiffs' claims.  But it is not the only reason why there is no Sherman Act conspiracy.  Plaintiffs attack the subsequent acts of the *limited-purpose, product-creating* enterprises the Dealer Defendants formed to support over-the-counter trading.  But the antitrust laws do not prohibit defendants from creating an OTC-only business.  The acts of these enterprises – Markit's licensing decisions among them – are not those of a "walking conspiracy," but of a legitimate industry collaboration entitled to single-entity treatment.

As the Second Circuit explained in casting doubt on the "walking conspiracy" theory, not "every action" of an association is "concerted action by the association's members."  *AD/SAT,* 181 F.3d at 234.  If the limited-purpose venture creates trade without *displacing* it, or if the challenged conduct relates to a lawfully integrated venture's "*core activities*," the conduct is evaluated under the standards governing single entities.  Plaintiffs have alleged nothing more.

###### 1.   Conspiracy Law Does Not Apply to Industry Collaborations That Do Not Displace Competition Among the Collaborators.

The antitrust laws do not subject "the entire body of private contract" to their scope.  *Am. Needle*, 560 U.S. at 189.  Antitrust conspiracy law does not preclude industry participants from marshalling *complementary* resources to develop and direct the commercialization of new services.  When they do so, these ventures "can fairly be regarded as single entities, whose ... decisions are not [considered] price-fixing conspiracies [or] boycott conspiracies."  *AD/SAT*, 181 F.3d at 234 (quoting 7 Areeda, *Antitrust Law*, ¶ 1477, at 348).

The principle that some collaborative agreements are not subject to Section 1 is nearly as old as the Sherman Act itself.  Eight years after its enactment, in 1898, the Supreme Court held

that "[a]n agreement entered into for the purpose of promoting the legitimate business of [a] corporation, with no purpose to thereby *affect or restrain* interstate commerce, and which does not directly restrain [such] commerce, is not ... covered by the act, although the agreement may indirectly and remotely affect that commerce." *United States v. Joint–Traffic Ass'n*, 171 U.S. 505, 568 (1898). More than one hundred years later, the Court reaffirmed this bedrock principle. *Am. Needle,* 560 U.S. at 189-90 ("Not every instance of cooperation between two people is a potential contract, combination ... or conspiracy, in restraint of trade.").

Conspiracies require the joining together of "separate economic actors pursuing separate economic interests." *Id.* at 195. Without it, an industry collaboration does not "depriv[e] the marketplace of *independent* centers of decision-making … and thus of *actual or potential competition*." *Id*. When collaborators join hands *outside their field* of competition, they create a new "single aggregation of economic power," with no competitive displacement. *Id*. at 194. Because such a collaboration does not destroy competition, but rather promotes it, the venture does "not constitute a … conspiracy" in restraint of trade. *Id.*; *see also Capital Imaging Assoc., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2ⁿᵈ Cir. 1993) ("overarching question" is whether "the challenged action purports to promote or to destroy competition").

A simple example illustrates. If a firm hires several employees, none of whom would independently participate in the relevant market but for these job offers, the resulting firm is not a conspiracy of its employees, but a single entity for Sherman Act purposes. In contrast, if the same employees would otherwise compete against each other as independent contractors, the employment contracts aggregate independent sources of economic power, and the collective's decisions may be considered the product of an ongoing Sherman Act agreement. Thus "single-entity" analysis depends on the role the collaborators would play absent their collaboration. As

Judge Kozinski explained, single entity treatment follows when "the constituent entities be neither actual nor potential competitors" within the area of the economy encompassed by venture.  *Freeman*, 322 F.3d at 1149.

*American Needle* drives this point home.  There, the Court held that the separate NFL teams were subject to Section 1, "at least with regards to its marketing of property owned by the separate teams."  *Am. Needle*, 560 U.S. at 200.  That is because when the teams combined their intellectual property under the common control of NFLP in 1963, each team had "its own name, colors, and logo, [and] related intellectual property," and each "made their own arrangements for licensing" it.  *Id.* at 187.  Thus, when they formed the venture, the teams were independent actors – indeed, direct competitors – with respect to this property.

The allegations here are the antithesis of *American Needle's.*  Unlike in *American Needle*, where the defendants placed their *pre-existing, independently-owned, competing* intellectual property under common control, here, the collaboration generated trade by creating new services. By creating a standardized tradable index, the dealers were able to compete with each other in offering swaps based on it to their customers in the CDS *trading* market.  By sharing end-of-day marks and other data, they were better able to assess the riskiness and value of their portfolios. There is no allegation that, but for these collaborative efforts, the dealers would have successfully operated their own mini-index businesses, or sought to commercialize their limited data in competition with each other.  Thus, unlike in *American Needle*, the conduct here erected a new single center of economic power out of whole cloth.

This may be an agreement to create trade, but it is not concerted action to displace it.  *See City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 274-76 (8th Cir. 1988) (joint venture consisting of some fifty separate cooperatives deemed a "single entity" because the

"coordination … does not represent a sudden joining of two independent sources of economic power previously pursuing separate interests," but was "a single enterprise pursuing a common goal – the provision of low-cost electricity to its rural consumer-members.").

> ### 2.   Conspiracy Law Does Not Apply to the Core Activities of Lawfully-Formed Integrative Collaborations.

While allegations of competitive displacement are necessary to allege a Sherman Act agreement, they are not sufficient.  The law also treats product-creating collaborations as "single-entities" when there is sufficient economic integration among the collaborators.  In such circumstances (as in merger cases), the formation itself may be challenged according to conspiracy law, but the collaboration's ***post-formation*** "core activities" may not.

When "persons who would otherwise be competitors pool their capital and share the risks of loss as well as the opportunities for profit ... such joint ventures [are] regarded as a ***single firm*** competing with other sellers in the market."  *Dagher*, 547 U.S. at 6 (*quoting Arizona v. Maricopa Cnty. Med. Soc.*, 457 U.S. 332, 356 (1982)).  Such collaborations are entitled to approach the marketplace as "single entities" just "like any other firm."  *Id.* at 7.  Thus, "[o]nce a venture is judged to have been lawful at its inception and currently, decisions that do not affect the behavior of the participants in their nonventure business should generally be regarded as those of a single entity rather than the parents' daily conspiracy."  Areeda & Hovenkamp, *Antitrust Law* ¶ 1478c, at 325 (2nd ed. 2003).

*Dagher* and *American Needle* illuminate the dividing line between those practices that warrant single entity treatment, and those that do not.  Each involved the combination of independent sources of economic power, and displacement of existing competition:  Thirty-two teams combining competing intellectual property in *American Needle*, and two of the nation's

largest oil companies combining their western marketing operations in *Dagher*. But different treatment was accorded to each. Why?

*Dagher* involved a challenge to the core decisions of an integrated joint venture, and *American Needle* did not. *See Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 2010 WL 3521979, *19-20 (E.D. Cal. 2010) (reconciling *American Needle* and *Dagher* on this basis, and concluding that an "economically integrated joint venture" must be treated as a "single entity"). Specifically, in *Dagher*, the significant integration of resources between Shell and Texaco justified treating the joint venture as a "single entity" with respect to the "core activity of the joint venture itself," setting prices. *Dagher*, 547 U.S. at 7. In contrast, in *American Needle*, the NFL teams did not sufficiently integrate their independent resources, and the activity challenged – the licensing of team trademarks for use on hats – was not "necessary to produce football," the venture's core activity. *Am. Needle,* 560 U.S. at 199 n.7.[5]

The Markit collaborations fall easily on the *Dagher* side of the line. There is no challenge to the lawfulness of Markit's formation, or to the sufficiency of integration in the relevant indices, reference codes, and trade information service lines. The challenge is limited to Markit's post-formation decisions concerning which services to offer and which licenses to grant. These product-offering decisions are the "core activities" of Markit itself. *See, e.g., DOJ/FTC Report on Antitrust Enforcement and Intellectual Property Rights*, at 6 (April 2007) ("*DOJ/FTC Antitrust and IP Rpt.*") ("Statements in Supreme Court jurisprudence support the traditional understanding that the unilateral right to refuse to grant a … license is a ***core part*** of the [intellectual property] grant."). They are not governed by conspiracy law. *Dagher*, 547 U.S.

---

[5] *Freeman* rests on the same distinction, applying Section 1 since the competitors did "not function as an economic unit in providing support services." 322 F.3d at 1149. Plaintiffs do not deny that the venture here functioned as a single economic unit in providing support services for OTC trading, without displacing existing competition.

at 6 (parents of a venture are treated as "*investors, not competitors*" in challenges to the venture's core activities).

## IV. PLAINTIFFS HAVE NOT ALLEGED AN UNREASONABLE RESTRAINT.

Plaintiffs' claims must also be dismissed because, agreement or not, the conduct alleged is not an "unreasonable restraint."  The Complaint alleges only that the Dealer Defendants collaborated to create, or invest in, services that they intended to use for their own benefit.  There is nothing unreasonable about that.

The fact that plaintiffs can envision an idyllic world in which the dealers collaborated, innovated, and donated the fruits of their investment to their theoretical competitors does not render their claim cognizable under the Sherman Act.  As the Third Circuit explained, the antitrust laws do not convert "[e]ntrepreneurs" into "guarantors that the imaginations of lawyers could not conjure up some" more procompetitive world.  *Am. Motor,* 521 F.2d at 1249.  Nor do they obligate collaborators to promote competition to the greatest extent conceivable.  They simply prohibit collaborations from unreasonably reducing existing competition.

"There can be no restraint of trade without a restraint."  *Schachar v. American Acad. of Ophthalmology, Inc.*, 870 F.2d 397 (7th Cir. 1989) (Easterbrook, J.).  Because the "central evil" addressed by the Sherman Act is the "elimination of competition that would *otherwise* exist," the critical question here is whether the defendants' collaboration restricted trade that would have occurred *but for* the collaboration.  *See Am. Needle*, 560 U.S. at 195 (*quoting* Areeda, *Antitrust Law* ¶ 1462(b) (2d ed. 2003)).  As may be obvious, when comparing two worlds, one with a new product and one without, the latter rarely, if ever, presents a *more* competitive landscape.

Hark back to our earlier example. Macy's and Nordstrom's have now built a shopping oasis.  In searching for a third anchor tenant, they choose Sears, rather than Saks Fifth Avenue.  Have they somehow restrained trade by *creating* a mall that offers a mix of retailers, rather than

an enclave of high-end clothing retailers?  No.  Macy's and Nordstrom's were not *competing* mall owners before they decided to join forces.  So their decision to lease their property to Sears did not *restrain* pre-existing trade, even if Saks would have been a more formidable competitor.

Plaintiffs argue the opposite.  But in doing so, they advocate for a rule of enforced sharing – where collaborators must share the fruits of their labor with their rivals – that is anathema to our system of free enterprise. The antitrust law imposes "no duty to aid competitors." *Trinko*, 540 U.S. at 411.  This rule is no different in the competitor collaboration context.  *See Precision CPAP, Inc. v. Jackson Hosp.*, 2010 WL 797170, *10 (M.D. Ala. 2010) (applying *Trinko*'s rejection of "enforced sharing" to a Section 1 challenge involving exclusion of rival by joint venture's parents).  And it applies with special force where, as here, the alleged restraint is nothing more than a mere refusal to license lawfully-obtained intellectual property rights.  *See Washington v. Nat'l Football League*, 880 F. Supp. 2d 1004, 1007 (D. Minn. 2012) (rejecting claim that because IP "is owned collectively, the antitrust laws somehow prescribe how the collective can" license, since "this is ***precisely*** what the antitrust laws do not prohibit"); *Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50, 56 (2nd Cir. 1997) ("trademarks are by their nature ***non-exclusionary***" since they "confe[r] rights to a name only"); *MiniFrame Ltd. v. Microsoft Corp.,* 2013 WL 1385704, *3 (S.D.N.Y. 2013) ("a refusal to deal claim predicated upon copyrighted materials fails as a matter of law").

The settled law of joint ventures, and the well-recognized interplay between antitrust and property law, compels the conclusion that collaborators, like single firms, may choose with whom they do business.  The principle unifying these bodies of law is simple: the antitrust laws guard against the *formation* of anticompetitive combinations, but they do not negate the

*traditional property rights* possessed by a lawfully formed combination.  As the federal antitrust agencies have recognized, these bodies of laws are not antagonistic, but are:

> "properly perceived as complementary bodies of law that work together to bring innovation to consumers: antitrust laws protect robust competition in the marketplace, while intellectual property laws protect the ability to earn a return on the investments necessary to innovate.  Both spur competition among rivals to be the first to enter the marketplace with a desirable technology, product, or service."

*DOJ/FTC Antitrust and IP Rpt.*, at 2; *see also DOJ/FTC Antitrust Guidelines for the Licensing of Intellectual Property* § 2.3 (restrictions that "protect[] the licensor from competition in the licensor's own technology … that it prefers to keep to itself" are generally procompetitive).

This principle was amply illustrated in *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958 (10th Cir. 1994).  There, as here, a group of banks formed a joint venture – Visa – and developed a trading standard – Visa cards – through which each bank competed vigorously for customers. After Visa forbade entry into its system by any entity issuing "competitive" cards, a competitor (Discover) sued, claiming that the denial of access was a concerted refusal by competitor-banks motivated by a desire to protect their issuing profits.

The court took to heart the innovators' "concern about protecting the property it has created over the years and preventing" competitors "from profiting by a free ride."  *Id.* at 970.  In its view, the denial of access did not "represent a refusal to deal or group boycott but [was] reasonably necessary to ensure the effective operation of its credit card services."  *Id.*  Enforced sharing in such circumstances, the court held, would run counter to the purposes of the Sherman Act and "suck[] the judiciary into an economic riptide of contrived market forces."  *Id.* at 972.

The same analysis applies here. Like Discover, nothing stopped CMDX, any other exchange, or even the plaintiffs themselves, from developing their own index, codes, and trademarks.  That Markit's intellectual property was purportedly "important" because without it "a trading platform … would have had significantly less potential for market adoption" is

irrelevant.  Free-riding is not required just because it is easier.  "The antitrust laws require competition, not piracy."  *Standard Oil Co. v. Humble Oil & Refining Co.,* 363 F.2d 945, 954 (5th Cir. 1966).  Because plaintiffs have alleged only a refusal to permit a free ride, and not a restriction on competition that would have existed absent the collaboration, "there is not even the beginning of an antitrust case." *Schachar*, 870 F.2d at 400.

## V.   PLAINTIFFS LACK ANTITRUST STANDING.

We have gone this far addressing the legal merits of plaintiffs' claims.  But plaintiffs should not even be knocking on this Court's door.  They lack standing to challenge defendants' information-services, index, and reference code collaborations.

### A.   *Plaintiffs Lack Standing to Assert Their Information Opacity Claims.*

Plaintiffs present an interesting theory – perhaps the first in the annals of antitrust law in which competitors are accused of ***not*** sharing competitively sensitive information.  They claim that if Markit would provide more information, they would negotiate better CDS trade pricing. To proceed they must allege (1) "antitrust injury," and (2) facts sufficient to show they are "proper plaintiff[s] in light of four 'efficient enforcer' factors derived from the Supreme Court's decision in *Associated General Contractors v. California State Council of Carpenters*." *In re Libor,* 935 F. Supp. 2d at 686.  Here, plaintiffs have not alleged "antitrust injury" because their claimed harm does not flow from any elimination of competition, and they are not efficient enforcers because they do not participate in the information services market.

#### 1.   Deprivation of the Fruits of a Competitor Collaboration Cannot Give Rise to Antitrust Injury.

Plaintiffs' information-opacity injuries flow from the inability to access the fruits of defendants' *collaboration,* not from the elimination of defendants' *competition*. Cognizable

antitrust injuries in the competitor collaboration context, however, flow only from competitive

destruction, not "imperfect" cooperation.

A court can "ascertain antitrust injury only by identifying the *anticipated* anticompetitive

effect of the specific practice at issue and comparing it to the *actual* injury the plaintiff alleges."

*Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 122 (2nd Cir. 2007).  This

requires a "three-step process," in which courts identify:  (i) the specific practice at issue; (ii) the

anticipated anticompetitive effect that flows from it; and (iii) the plaintiffs' actual injury.  *See*

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2nd Cir. 2013).  If the injury

alleged does not "reflect" or "flow from" the "anticipated anticompetitive effect" of the practice

identified, there is no antitrust injury. *Id.*; *Port Dock*, 507 F.3d at 122; *Brunswick Corp. v.*

*Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) ("the injury should reflect the

anticompetitive effect").

Application of the test to the alleged facts yields the following results.  At **step one**,

plaintiffs challenge an alleged agreement to limit commercialization of the defendants' collective

data through Markit.  Cmplt. ¶¶ 91-98.  Notably, the challenged practice involves the defendants'

*collaborative* activities "in an arena in which defendants never did and never were intended to

*compete*."  *In re Libor*, 935 F. Supp. 2d at 689.

At **step two**, the court must separate the anticompetitive effects of the identified practices

from their "often interwoven" procompetitive or competitively-neutral ones.  *Atlantic Richfield*

*Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990).  This is necessary because, as the Supreme

Court explained, "a plaintiff can recover only if the loss stems from a **competition-reducing**

aspect or effect of the defendant's behavior."  *Id*.  In the competitor collaboration context,

competition is reduced only if the collaboration eliminates rivalry that would exist in its absence,

25

not from the mere deprivation of the collaborations' fruits. *See Daniel v. American Bd. of Emergency Med.*, 428 F.3d 408, 440 (2nd Cir. 2005) ("plaintiffs cannot themselves state an antitrust injury when their purpose is to join the [collaboration] rather than disband it").

At **step three,** the court must compare the plaintiffs' claimed injury to the anticipated anticompetitive effects. Now it is easy to see why plaintiffs have not suffered an antitrust injury. They claim deprivation – not of *competitive* data – but of *collaborative* data. Cmplt. ¶¶ 94, 98. That plaintiffs' alleged injuries could have been avoided if the defendants expanded the scope of their collaboration is irrelevant because those injuries do not flow from reduced *competition*.

The absence of antitrust injury is "further confirmed by inquiring, as courts previously have," as to whether the plaintiff would have "suffered the same harm under normal circumstances of free competition." *In re Libor*, 935 F. Supp. 2d at 689. If plaintiffs would have suffered the same injury even if the identified practice was devoid of the anticompetitive effects that normally attend to it, their injury cannot *reflect* any anticompetitive effect of that practice.

That is simple logic. But this test also has an enviable pedigree, having been established by the Supreme Court and embraced by the Second Circuit. In *Brunswick*, plaintiffs claimed they were harmed by the defendants' horizontal merger, which created a monolith *with* market power. Such injury was not "antitrust injury" however, because the plaintiffs – competitors concerned about competition with a "deep-pocketed" rival – would have been equally harmed if the merger created a monolith *without* market power. Likewise, in *Port Dock*, the defendants merged to create a market-power-amassing monolith, and then – as part of the consolidation of their combined distribution chain – terminated certain customer/distributors, including the plaintiff. But the Second Circuit noted that the anticipated anticompetitive effect of horizontal mergers is higher selling prices. Plaintiffs' injury – termination – would have occurred

regardless of whether the merger raised or lowered prices.  It did not flow from or reflect the anticipated anticompetitive effect of the identified conduct, and so was not antitrust injury.

This Court recently addressed a nearly identical issue.  In the *Libor* case, buyside traders alleged that the dealer defendants conspired to set the LIBOR interest rate index "at an artificial level."  Judge Buchwald held that the plaintiffs pled an injury-in-fact, but not an antitrust injury.  Why?  Because the LIBOR rate was set through a *collaborative* process, not a competitive one:

> "As plaintiffs rightly acknowledged … the process of setting LIBOR was never intended to be competitive….   Rather it was a cooperative endeavor.… Thus, even if we were to credit plaintiffs' allegation that defendants subverted this cooperative process by conspiring to submit artificial estimates…, it would not follow that plaintiffs have suffered an antitrust injury."  *In re Libor*, 935 F. Supp. 2d at 688.

The key again was the comparison of the challenged practices, anticipated effects, and claimed injury. The plaintiffs did "not argue that the *collaborative* LIBOR-setting process itself violates the antitrust laws."  *Id*. at 688.   And they were not envisioning a "but for" world in which each dealer competed for the adoption of its own LIBOR-like rate.  The injury instead flowed from the failure to produce a **collaborative good** free from manipulation.  This was a collaborative injury, not a competition-reducing antitrust injury.

The same is true here.  The process of commercializing data was never intended to be competitive, but collaborative. That plaintiffs want more of the collaboration's fruits, not less, is sufficient itself to defeat standing.  Plaintiffs would have suffered the same injury – denial of those fruits – regardless of whether the collaboration was anticompetitive, neutral, or procompetitive.  Thus, even if the enterprise could have commercialized the data in a way more favorable to the plaintiffs, a failure to do so cannot impose antitrust injury. *See Daniel*, 428 F.3d at 440 (no standing where prayer for relief sought to benefit from the defendants' collaboration, not to "end" it); Areeda, *Antitrust Law* ¶ 348e, at 401 (2nd ed. 2000) (plaintiff who "seeks to join

the exclusive arrangement" of which he complains "while leaving [it] otherwise intact" is "not a victim of antitrust injury"); *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438 (11th Cir. 1991).

        **2.**      **Plaintiffs Are Not "Efficient Enforcers" of Antitrust Regulations Governing Defendants' Information Services Collaboration.**

Plaintiffs also lack standing to challenge the nature of the defendants' information-services collaboration because they are not "efficient enforcers" of antitrust regulations governing such collaborations. They are neither consumers nor competitors in the information services market – the market allegedly restrained. Their injuries as buyside traders in the CDS *trading* market are simply too remote.[6]

The antitrust laws are not concerned with the *ripple effects* of conduct in areas outside the immediate market in which the restraints occur. *See Blue Shield of Va. v. McCready*, 457 U.S. 465, 476-77 (1982) ("An antitrust violation may be expected to cause ripples of harm … but … there is a point beyond which the wrongdoer should not be held liable."). Accordingly, "courts have typically limited" standing to "direct competitors and consumers" in the market restrained. *Port Dock*, 2006 WL 2786882, at *3 (collecting cases).[7]

A simple example illustrates why buyers of goods lack standing to challenge information services. Suppose car dealers agree to withhold data to providers of "real time" auto pricing services. Would every car buyer in America have standing to challenge that agreement? Clearly not. The agreement impacts neither supply nor demand for cars, making the impact on car prices

---

[6] In *Port Dock*, the district court made clear that, in evaluating standing, focus must be on the market in which the restraints occurred, even if the complaint studiously avoids referencing that market. *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 2006 WL 2786882, at *5 and n.2 (E.D.N.Y. 2006) (denying standing, and discussing the mismatch between the market where the *restraints* arose, *i.e.*, the manufacturing market, and the market in which the *effects* allegedly occurred, *i.e.*, the distribution market), *aff'd* 507 F.3d. 117 (2007).

[7] Legions of cases hold that standing is "normally" or "generally" restricted to consumers or competitors. *See, e.g.*, *Illinois ex rel. Ryan v. Brown*, 227 F.3d 1042, 1046 (7th Cir. 2000); *Carpet Group Int'l v. Oriental Rug Imps. Ass'n*, 227 F.3d 62, 76–77 (3rd Cir. 2000); *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 10-11 (1st Cir. 1999); *Fla. Seed v. Monsanto Co.*, 105 F.3d 1372, 1374 (11th Cir. 1997); *Bell v. Dow Chem. Co.*, 847 F.2d 1179, 1183 (5th Cir. 1988); *Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 809 (8th Cir. 1987); *Bhan v. NME Hosps., Inc.*, 772 F.2d 1467, 1470 (9th Cir. 1985).

speculative.  Indeed, if dealers provide the data demanded, prices might go ***up***, instead of down, as dealers might be reluctant to make a low-ball offer to capture a sale if other customers might later use that information against them.  Even if there were an adverse price effect, would all car buyers be injured?  What about those who did not purchase the "real-time" data feed?  And what of consumers who claim they would have bought the data indirectly from the "foreclosed" data service provider?  In each case, foreclosed providers would be better positioned to enforce any license agreement they may have with dealers, and be motivated to wield the antitrust laws to achieve their ends.  In a consumer case, in addition, it would be impossible to apportion damages between the direct purchasing information service provider and the indirect purchasing car buyer.  For this reason, goods purchases are not "efficient enforcers" of restraints occurring in information services markets.

Each *AGC* factor bolsters this conclusion.   Under *AGC*, courts consider "(1) the directness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims…."   *Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*, 467 F.3d 283, 290-91 (2nd Cir. 2006).

The Complaint fails the first and third factors because plaintiffs' "information-opacity-related" injuries are indirect and speculative.  As in the car example, the Court would have to trace the ripple effects of the defendants' conduct across *two* markets to determine the relationship between information restraints and CDS trading prices. The link is inherently tenuous, requiring speculation as to the impact of more information on the outcome of every negotiation between a CDS buyer and seller, even though the conduct does not impact the supply

or demand of CDSs.  The second factor cannot be satisfied because the people most qualified to challenge unlawful restraints in the information services market are the customers and competitors subject to them.  *That* class consists of information service providers who would have directly purchased the data from the Dealer Defendants and competed against the defendants' collaboration.  The fourth factor – apportionment – cannot be satisfied since apportioning damages between direct "victims" (the alleged foreclosed direct-buying information service providers), indirect "victims" (indirect purchasers of data who may, or may not, trade CDSs), and remote "victims," like the plaintiffs, is impossible.

      **B.**     **Plaintiffs Lack Standing to Challenge Markit's Alleged OTC-Only Licensing Practices.**

Plaintiffs lack standing to challenge Markit's index and reference code licensing practices for many of the same reasons they lack standing to challenge its information services offerings.  As to antitrust injury, the injury claimed flows from the denial of access of the collaborations' fruits – the CDS indices and RED codes it owns – not the reduction of competition among the defendants.  Because the relevant intellectual property stems from a single *collaborative* source "in an arena in which defendants never did and never were intended to compete," there is no antitrust injury.  *In re Libor*, 935 F. Supp. 2d at 689.  The "efficient enforcer factors" also favor dismissal of this claim for reasons that are thoroughly discussed in the Dealer Defendants' joint brief, which Markit joins in full.

**VI.**    **CONCLUSION.**

For these reasons, the claims against Markit should be dismissed.

May 23, 2014

Respectfully submitted,

/s/ *Colin R. Kass*

Colin R. Kass (admitted *pro hac vice*)
Scott M. Abeles (admitted *pro hac vice*)
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., NW
Washington, D.C. 20004
T: (202) 416-6800
F: (202) 416-6899
ckass@proskauer.com
sabeles@proskauer.com

Alan R. Kusinitz
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036-8299
T: (212) 969-3000
F: (212) 969-2900
akusinitz@proskauer.com

*Attorneys for Markit Group Ltd.*

## CERTIFICATE OF SERVICE

I hereby certify that on May 23, 2014, I filed and therefore caused the foregoing document to be served via the CM/ECF system in the United States District Court for the Southern District of New York on all parties registered for CM/ECF in the above-captioned matter.

/s/ *Colin R. Kass*

Colin R. Kass (admitted *pro hac vice*)
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., NW
Washington, D.C. 20004
T: (202) 416-6800
F: (202) 416-6899

*Attorney for Defendant Markit Group Ltd.*