**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                        :
                                                        :
IN RE: CREDIT DEFAULT SWAPS                             :
ANTITRUST LITIGATION                                    :     Master Docket No.:  13 MD 2476 (DLC)
                                                        :
This Document Relates To: All Actions                  :
                                                        :
                                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT INTERNATIONAL**
**SWAPS AND DERIVATIVES ASSOCIATION'S MOTION TO DISMISS THE SECOND**
**CONSOLIDATED AMENDED COMPLAINT**

Matthew J. Reilly (admitted *pro hac vice*)
Abram J. Ellis
SIMPSON THACHER & BARTLETT LLP
1155 F Street, NW
Washington, DC 20004
Tel: (202) 636-5500
Fax: (202) 636-5502
matt.reilly@stblaw.com
aellis@stblaw.com

Michael J. Garvey
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Tel: (212) 455-2000
Fax: (212) 455-2502
mgarvey@stblaw.com

*Attorneys for Defendant International Swaps and*
*Derivatives Association*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ………………………………………………………………ii

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND .............................................................................................................. 4

    A.    ISDA Is a Financial Trade Association Whose Mission Is to Promote Stability and Efficiency .................................................................................................................. 4

    B.    ISDA Allegedly Declines to License Its Products for Use in Exchange Trading .. 5

    C.    The Dealer Defendants' Alleged Bid/Ask Conspiracy ......................................... 7

LEGAL STANDARD...................................................................................................... 7

ARGUMENT .................................................................................................................. 9

I.    THE COMPLAINT DOES NOT PLEAD ISDA'S PARTICIPATION IN ANY SUPPOSED BID/ASK CONSPIRACY ................................................................ 9

    A.    Plaintiffs' Conclusory Allegation that ISDA "Agreed" With the Dealer Defendants Not to License Its Products Is Unsupported by Well-Pled Facts....... 10

    B.    The Complaint Also Fails To Plausibly Suggest ISDA's Participation in the Broad Bid/Ask Conspiracy ................................................................................. 13

      1.    ISDA Gains Nothing From a Conspiracy to Protect Bid/Ask Spreads................. 14

      2.    Markit's Alleged Contemporaneous Decision to Deny CMDX Licenses Is Not Sufficient to Suggest that ISDA Was Consciously Committed to the Bid/Ask Conspiracy ......................................................................................................... 14

CONCLUSION................................................................................................................ 16

**Cases**                                                      **Page**

*Abraham v. Intermountain Health Care Inc., 461 F.3d 1249 (10th Cir.
(2006)*……………………………………………………………………….10

*AD/SAT, Div of Skylight, Inc. v. Associated Press,* 181 F.3d 216 (2d Cir.
1999) ............................................................................................. 13, 14

*Agilent Technologies, Inc. v. Micromuse, Inc.*, No. 04 Civ. 3090, 2004 WL
2346152 (S.D.N.Y. Oct. 19, 2004) ...................................................... 6

*Alvord-Pork, Inc. v. F Schumacher & Co.*, 37 F.3d 996 (3d Cir. 1994)...................................... 12

*Am. Needle, Inc. v. NFL*, 538 F.3d 736 (7th Cir. 2008).............................................. 10

*Anderson News, LLC v. American Media, Inc.*, 680 F.3d 162 (2d Cir.
2013) ...................................................................................................... 8

*Ashcroft v. Iqbal*, 556 U.S. 662................................................................... 8, 10

*Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*, 155
F.3d 59 (2d Cir. 1998)............................................................................. 4

*Bel Canto Design, Ltd. v. MSS HiFi, Inc.*, No. 11 CIV. 6353 CM, 2012
WL 2376466 (S.D.N.Y. June 20, 2012) ............................................ 7, 8

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544  (2007) ............................................ 8, 15, 16

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.,* No. 13 Civ.
1111, 2013 WL 6311202 (S.D.N.Y. Dec. 5, 2013) ............................. 14

*Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177 (N.Y. 2012).................................... 16

*First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253 (1968)............................................ 14

*Garvin v. Sony Music Entm't*, No. 11 Civ. 0003, 2011 WL 4582429
(S.D.N.Y. Oct. 4, 2011) ........................................................................ 6

*Gemini Concerts, Inc. v. Triple-A Baseball Club Assocs.*, 664 F. Supp. 24
(D. Me. 1987)......................................................................................... 5

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499 (S.D.N.Y.
2009) ................................................................................................ 9, 14

*In re Insurance Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010) .............................. 9, 10

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666
(S.D.N.Y. 2013), *reconsideration denied*, 11 MD 2262 NRB, 2013
WL 4504769 (S.D.N.Y. Aug. 23, 2013) ............................................................. 8

*In re Online Travel Co. (OTC)/Hotel Booking Antitrust Litig.*, No. 3:12-
cv-3515-B, 2014 WL 626555 (N.D. Tex. Feb. 18, 2014) ................................. 12, 16

*In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709 (E.D. Pa.
2011) ......................................................................................................................... 9, 11

*Jung v. Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119 (D.D.C. 2004) ....................... 9

*Kissing Camels Surgery Ctr., LLC v. Centura Health Corp.*, No. 12-CV-
3012, 2014 WL 560462 (D. Colo. Feb. 13, 2014) ........................................... 9, 11

*La. Mun. Police Emps. Ret. Sys. v. JPMorgan Chase & Co.*, No. 12 Civ.
6659, 2013 WL 3357173 (S.D.N.Y. July 3, 2013) ................................................ 16

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129
(2d Cir. 2013) ................................................................................. 8, 12, 14, 15, 16

*MiniFrame Ltd. v. Microsoft Corp.*, No. 11 Civ. 7419, 2013 WL 1385704
(S.D.N.Y. March 28, 2013), *aff'd*, No. 13-1607, 2013 WL 6726974
(2d Cir. 2013) ......................................................................................................... 11

*Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984) ............................... 11, 13

*Wellnx Life Sciences Inc. v. Iovate Health Sciences Research Inc.*, 516 F.
Supp. 2d 270 (S.D.N.Y. 2007) ...................................................................... 8, 15, 16

**Federal Statutes**

15 U.S.C. § 1 ............................................................................................................. 7, 16

15 U.S.C. § 2 ................................................................................................................. 16

**Federal Rules**

FED. R. CIV. P. 12 ...................................................................................................... 1, 6

**Other Authorities**

7 P. Areeda, *Antitrust Law* (1986) ............................................................................. 5

*About ISDA*, ISDA, http://www2.isda.org/about-isda/ .............................................. 4

*Archive of April 2008 Newsletter*, ISDA,
https://www.isdadocs.org/newsletters/april2008/_access/april2008print
.html ...................................................................................................................... 4, 5

Dow Jones Wire, *CME Sees Up to Six Dealers Backing Credit Swaps Platform,* Fin. News (Dec. 23, 2008) ........................................................................ 6

Mission Statement, ISDA, https://www2.isda.org/about-isda/mission-statement/ ............................................................................................................ 5

Press Release, ISDA, *ISDA Announces Successful Implementation of 'Big Bang' CDS Protocol* (April 8, 2009), http://www.isda.org/press/press040809.html .......................................................... 5

Press Release, ISDA, *ISDA Publishes Credit Default Swap Index Protocol* (May 26, 2005), http://www.isda.org/press/press062605.html ................................ 5

*Product Descriptions and Frequently Asked Questions*, ISDA, http://www.isda.org/educat/faqs.html ....................................................................... 4

Robert E. Litan, *The Derivative Dealers' Club and Derivatives Market Reform:  A Guide for Policy Makers, Citizens and Other Interested Parties*, Brookings Institution (Apr. 7, 2010), http://www.brookings.edu/~/media/research/files/papers/2010/4/07%20derivatives%20litan/0407_derivatives_litan.pdf .................................................. 6

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendant

International Swaps and Derivatives Association ("ISDA") respectfully submits this

memorandum in support of its motion to dismiss the Second Consolidated Amended Complaint

("SCAC").[1]

## **PRELIMINARY STATEMENT**

ISDA is a non-profit trade association.  Its membership includes financial institutions,

including members of the putative class, that buy and sell credit default swaps ("CDS") and large

banks or "dealers," like the Dealer Defendants, that make a market for CDS transactions.

ISDA's mission is to foster safe and efficient derivatives markets.  To that end, ISDA developed

a standardized contract, called the "Master Agreement,"[2] and applicable definitions, called the

"Credit Default Swap Definitions," that provide a legal framework for all over-the-counter

("OTC") CDS transactions.  Similarly, ISDA established "Determinations Committees" that

determine when a credit event has occurred, triggering obligations under the CDS.  ISDA also

developed a proprietary methodology for setting the cash payment owed the buyer of CDS

protection in the event of default that obviates the need for the seller and buyer of CDS

protection to "physically settle" the transaction, *i.e.*, for the buyer to tender to the seller the

underlying credit obligation in exchange for payment to the buyer of the notional value of the

CDS.  Through the development of these products, ISDA *facilitates* competition among dealers

and increases the number of OTC CDS transactions because these products reduce transaction

costs, reduce execution risk, and increase legal certainty.

---

[1] ISDA supports dismissal of the Complaint as to all Defendants and incorporates by reference herein all of the reasons for dismissal contained in the briefs filed by the other Defendants in support of their motions to dismiss. ISDA's basis for dismissal in the instant motion is independent from any other defenses or arguments Defendants have for dismissal of all claims.

[2] For purposes of this memorandum, unless otherwise indicated, capitalized terms reflect the definitions ascribed to them by Plaintiffs in the SCAC.

The thrust of the Complaint is that the Dealer Defendants conspired to perpetuate OTC trading of CDS and discourage exchange trading of CDS in order to protect profits the Dealer Defendants allegedly derived from the bid/ask spreads associated with OTC trading—this is the supposed "Bid/Ask Conspiracy." The Complaint names ISDA as a co-conspirator based solely on the allegation that, in furtherance of the alleged Bid/Ask Conspiracy, the Dealer Defendants "secured from" ISDA in Fall 2008 "an agreement" not to grant a joint venture called CMDX licenses for ISDA's products that were allegedly "needed" to establish exchange trading for CDS through the CMDX platform. The Complaint, however, fails to plead ISDA's participation in the alleged Bid/Ask Conspiracy.

First, the Complaint fails to plead facts plausibly suggesting that ISDA's alleged refusal to grant CMDX licenses for exchange trading was pursuant to an "agreement" between ISDA and the Dealer Defendants. Allegations that Dealer Defendants' representatives populated ISDA's Board of Directors at the time of ISDA's alleged licensing decision and that Dealer Defendants were among ISDA's "largest customers" do not give rise to an inference of an "agreement" between ISDA and the Dealer Defendants for purposes of Section 1 of the Sherman Act. The facts, as pled, are equally consistent with an independent, rational judgment by ISDA not to authorize use of its intellectual property for a new and untested method of CDS trading amid the worst financial crisis this country had seen since the Great Depression, a CDS market under stress, and a period of intense regulatory and legislative oversight. As for the Complaint's allegation that, absent a conspiracy, denying licenses was contrary to ISDA's financial self-interest because it reduced licensing revenues, ISDA is a non-profit organization. Rather than maximizing licensing revenue, ISDA's self-interest is to maintain the integrity and stability of the CDS market, which was under stress in 2008 and 2009.

Second, the Complaint does not articulate any factual basis to extrapolate from ISDA's supposed "agreement" with the Dealer Defendants to deny CMDX licenses any "conscious commitment" by ISDA to participate in a broader Bid/Ask Conspiracy, which supposedly spanned six years, and included at least a dozen dealers, an information services company, and a CDS clearing house. There are simply no allegations tying ISDA to such a grandiose conspiracy. The Complaint does not and cannot allege any financial benefit ISDA would derive from participating in the Bid/Ask Conspiracy. ISDA is a non-profit corporation. Allegedly inflated bid/ask spreads on OTC CDS trades would not benefit ISDA. Conversely, taking part in an alleged conspiracy that, according to Plaintiffs, was calculated to impair the efficiency of the CDS market would be antithetical to ISDA's interests and those of its members, which include both buy-side and sell-side market participants. The allegation that, in Fall 2008, Markit, an information services company, denied CMDX licenses to Markit's intellectual property, also does not create a plausible inference that ISDA was colluding with Markit and/or the Dealer Defendants. ISDA and Markit do not compete with one another. Each organization owns and licenses different types of intellectual property. In Fall 2008, each organization received separate licensing requests regarding CMDX. And each provided separate responses to those requests at "virtually the same time." This allegation does not arguably suggest ISDA's agreement with Markit or the Dealer Defendants to participate in the alleged Bid/Ask Conspiracy.

In the end, ISDA promotes stability and efficiency in the OTC CDS industry. As such, it is the facilitator of growth, not decline, in the OTC CDS market. This growth necessarily leads to reduced bid/ask spreads. ISDA's role in this industry and its alleged conduct is inherently at odds with any participation by ISDA in a purported Bid/Ask Conspiracy.

## A. ISDA Is a Financial Trade Association Whose Mission Is to Promote Stability and Efficiency

ISDA is a financial trade association, operating from seven worldwide offices and representing "hundreds of financial institutions" involved in the derivatives market, including buyers and sellers of CDS as well as banks or "dealers" who create a market for those transactions. (SCAC ¶¶ 59-60.) ISDA's "members include a broad range of OTC derivatives market participants including corporations, investment managers, government and supranational entities, insurance companies, energy and commodities firms, and international and regional banks." (Ex. 1, *About ISDA*, ISDA, http://www2.isda.org/about-isda/ (cited at SCAC ¶ 137 n. 19).)[4] As part of its mission to promote stability and efficiency in derivatives markets, ISDA has developed a number of products—such as standardized contractual documentation (*e.g.*, the Master Agreement and the Credit Default Swaps Definitions), a mechanism for determining when obligations under a CDS arise following a credit event (*e.g.*, Determinations Committees), and mechanisms to more efficiently settle OTC CDS transactions (*e.g.*, the Final Price auction methodology)[5]—intended to facilitate OTC CDS transactions. (SCAC ¶¶ 59, 82, 136.) The

---

[3] ISDA refers the Court to Dealer Defendants' Memorandum in Support of Their Joint Motion to Dismiss the Second Consolidated Amended Complaint for a general description of Plaintiffs' allegations.

[4] Citations to "Ex. __" reference Exhibits to the Michael J. Garvey Declaration ("Garvey Decl."), dated May 23, 2014, submitted herewith. In deciding a motion to dismiss, the Court may consider "documents appended to the complaint or incorporated in the complaint by reference, as well as to matters [subject to] judicial notice." *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc*., 155 F.3d 59, 67 (2d Cir. 1998). For the Court's convenience, copies of corporate press releases and publicly-available sources cited herein are included as exhibits to the Garvey Decl.

[5] When CDS were first created, if a default occurred on the underlying credit obligation, the buyer of CDS protection was required to surrender to the seller of the CDS protection the underlying credit instrument and, in return, received the notional value of the corresponding CDS. (*See* Ex. 3, *Product Descriptions and Frequently Asked Questions*, ISDA, http://www.isda.org/educat/faqs.html.) This is known as "physical settlement" of the CDS. (*See id.*) Relying on physical settlements to settle CDS transactions became problematic as the notional value of OTC CDS' greatly exceeded the value of the underlying credit obligations. (*See* Ex. 4, *Archive of April 2008 Newsletter*, ISDA, https://www.isdadocs.org/newsletters/april2008/_access/april2008print.html.) As a result, ISDA spearheaded a shift to cash settlement of OTC CDS transactions, which relied on an auction

"structure of CDS transactions was standardized" by ISDA products, and this standardization decreased transaction costs for OTC CDS transactions. (*Id.* ¶¶ 75, 82.) As the Complaint acknowledges, ISDA contributes to the proper functioning of the CDS market in three key areas: "reducing counterparty credit risk, increasing transparency, and improving the industry's operational infrastructure." (*Id.* ¶ 137; *see also* Ex. 2, *Mission Statement*, ISDA, https://www2.isda.org/about-isda/mission-statement/.)

ISDA's products were designed at a time when OTC was the only method for trading CDS. In no small part because of ISDA's efforts, the volume of OTC CDS transactions "ballooned" between 2001 and 2007 (SCAC ¶ 81), which necessarily increased competition between and among the Dealer Defendants and precipitated *lower* bid/ask spreads. *See, e.g.*, *Gemini Concerts, Inc. v. Triple-A Baseball Club Assocs.*, 664 F. Supp. 24, 26 (D. Me. 1987) ("A collaboration that increases output and that 'makes possible the very activity that is allegedly restrained' is procompetitive and reasonable under the antitrust laws." (quoting 7 P. Areeda, *Antitrust Law* ¶ 1503(b), at 375; ¶ 1504, at 379 (1986))).

## B. ISDA Allegedly Declines to License Its Products for Use in Exchange Trading

According to the Complaint, in Fall 2008, at the outset of the financial crisis, Citadel and CME, the co-venturers that were starting CMDX, approached ISDA for "a license for use of the ISDA Master Agreement," which the Complaint argues was "important to ensure that exchange-traded CDS would mirror the conventions of over-the-counter CDS, including use of the ISDA

---

mechanism to determine the "Final Price" of such a settlement—the Final Price auction methodology. (*See id.*) The mechanism allows parties to agree to settle their trades on a multilateral basis based on a final price established at auction. (*Id.*) Starting in 2005 with the Collins & Aikman auction, ISDA published *ad hoc* protocols for specific defaulted cases. (*See* Ex. 5, Press Release, ISDA, *ISDA Publishes Credit Default Swap Index Protocol* (May 26, 2005), http://www.isda.org/press/press062605.html.) It was not until the spring of 2009 that ISDA incorporated the auction settlement terms into standard CDS documentation. (*See* Ex. 6, Press Release, ISDA, *ISDA Announces Successful Implementation of 'Big Bang' CDS Protocol* (April 8, 2009), http://www.isda.org/press/press040809.html.)

Credit [Default Swap] Derivatives definitions, the ISDA Determinations Committee, and the ISDA [Final Price] auction process." (SCAC ¶ 136.) The Complaint alleges that CMDX sought a license of ISDA's "intellectual property" for "clearing"[6] OTC CDS transactions as well as in connection with a new exchange trading platform. (*Id.* ¶ 153; *see also* Ex. 7, Dow Jones Wire, *CME Sees Up to Six Dealers Backing Credit Swaps Platform,* Fin. News (Dec. 23, 2008) (cited at SCAC ¶ 142 n. 21).)

The Complaint alleges that ISDA granted CMDX a license for its "intellectual property" for clearing in early March 2009, however, ISDA "expressly precluded" CMDX from using ISDA's "intellectual property" for an exchange trading platform. (*Id.* ¶ 153.) According to the Complaint, ISDA's refusal to license its "intellectual property" in connection with exchange trading coincided with a refusal by Defendant Markit to license its CDS indices and reference entity database. (*Id.* ¶¶ 130-131.) While the Complaint references multiple ISDA products—including ISDA's Master Agreement, ISDA's Credit Default Swap Definitions, and ISDA's Final Price auction methodology—the Complaint does not articulate which of those products ISDA allegedly refused to license or which were "necessary" for exchange trading.[7]

---

[6] By standing in the "middle" of a CDS transaction—*i.e.*, by acting as the counterparty to both the buyer and seller of protection—a clearinghouse can "reduce the risks to the financial system from the failure of any of the parties to these trades." (Ex. 8, Robert E. Litan, *The Derivative Dealers' Club and Derivatives Market Reform:  A Guide for Policy Makers, Citizens and Other Interested Parties*, Brookings Institution at 12 (Apr. 7, 2010), http://www.brookings.edu/~/media/research/files/papers/2010/4/07%20derivatives%20litan/0407_derivatives_litan.pdf  (cited at SCAC ¶ 211 n. 51).)

[7] At a minimum, ISDA is entitled to a more definite statement under Rule 12(e) of the Rules of Civil Procedure. FED. R. CIV. P. 12(e); *see also Agilent Technologies, Inc. v. Micromuse, Inc.*, No. 04 Civ. 3090, 2004 WL 2346152, at *6 (S.D.N.Y. Oct. 19, 2004) (granting defendant's motion for a more definite statement because the complaint "does not specify *which products* infringed plaintiff's patents; it merely states that the alleged infringements occurred as a result of the fact that [defendant] 'makes, sells, or offers products for sale'" that infringe plaintiff's patents and the defendant "is entitled to know which of its products or services are alleged to have infringed [plaintiff's] patents")  (emphasis added); *accord Garvin v. Sony Music Entm't*, No. 11 Civ. 0003, 2011 WL 4582429, at *6 (S.D.N.Y. Oct. 4, 2011).

### C. The Dealer Defendants' Alleged Bid/Ask Conspiracy

According to the Complaint, ISDA's licensing denial was part of a conspiracy among Defendants, including ISDA, to perpetuate OTC trading, block the emergence of electronic exchange trading, and thereby artificially raise, fix, maintain, and stabilize bid/ask spreads allegedly associated with OTC trading of CDS. (SCAC ¶ 269; *id* ¶ 171.) According to the Complaint, the "bid/ask" spread reflects the difference between the purchase price for a particular CDS, on the one hand, and sale of that same CDS, on the other—Dealer Defendants capture this difference by acting as market maker between purchasers and sellers. (*Id.* ¶ 77.)

The Complaint includes three allegations to support the notion that ISDA "agreed" with the Dealer Defendants not to license ISDA's products as part of the broader Bid/Ask Conspiracy. First, it alleges that the Dealer Defendants were among ISDA's "largest customers" that paid the "largest annual fees" and the Dealer Defendants had representatives sitting on ISDA's Board. (*Id.* ¶¶ 147-48, 164.) Second, it alleges that ISDA acted against its self-interest in narrowing licenses that it granted CMDX to exclude exchange trading because broader licenses would have increased licensing revenues and furthered market adoption of ISDA's products. (*Id.* ¶¶ 137-38, 151.) Third, it alleges that, after signaling a willingness to license their respective products for exchange trading, ISDA and Markit "at virtually the same time" each reversed course and refused to grant the licenses, which according to the Complaint "reflects the fact that this behavior was the result of their agreement with the Dealer Defendants." (*Id.* ¶¶ 147-51.)

## LEGAL STANDARD

To state a claim for a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, the Complaint must allege facts from which the Court may infer that (1) ISDA entered into an agreement (2) with at least one other person or entity, that (3) "unreasonably" restrains trade in the relevant market. *Bel Canto Design, Ltd. v. MSS HiFi, Inc*., No. 11 Civ. 6353 CM, 2012 WL

2376466, at *5 (S.D.N.Y. June 20, 2012). The Complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ("*Twombly*"). A claim has "facial plausibility" when the "plaintiff pleads ***factual content*** that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("*Iqbal*") (emphasis added). Although the court must accept all ***factual*** allegations in the complaint as true and draw all reasonable inferences in the nonmoving party's favor, *see In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 685 (S.D.N.Y. 2013), *reconsideration denied*, No. 11 MD 2262, 2013 WL 4504769 (S.D.N.Y. Aug. 23, 2013), the court is "not bound to accept as true a ***legal conclusion*** couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (emphasis added) (internal quotation marks omitted).

The Complaint cannot plead ISDA's participation in an unlawful conspiracy under the Sherman Act based on an "allegation of parallel conduct" and a "bare assertion of an agreement." The Complaint must plead factual enhancements from which the court can infer the existence of a "preceding agreement, not merely parallel conduct that could just as well be independent action." *Wellnx Life Sciences Inc. v. Iovate Health Sciences Research Inc.*, 516 F. Supp. 2d 270, 290 (S.D.N.Y. 2007) ("*Wellnx*") (citing and quoting *Twombly*, 550 U.S. at 556-57); *see also Mayor & City Council of Balt., Md. v. Citigroup, Inc.*, 709 F.3d 129, 137 (2d Cir. 2013) ("*Mayor*") (declining to "propel[] defendants into expensive antitrust discovery on the basis of acts that could just as easily turn out to have been rational business behavior as they could a proscribed antitrust conspiracy"); *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 186 (2d Cir. 2012), *cert. denied sub nom. Curtis Circulation Co. v. Anderson News, LLC*, 133 S. Ct. 846 (2013) (citing and quoting *Twombly*, 550 U.S. at 556-57).

# ARGUMENT

## I.     THE COMPLAINT DOES NOT PLEAD ISDA'S PARTICIPATION IN ANY SUPPOSED BID/ASK CONSPIRACY

The *facts* alleged by Plaintiffs do not raise a plausible inference that *ISDA* "knowingly joined or agreed to participate" in the alleged Bid/Ask Conspiracy. *Jung v. Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119, 161 (D.D.C. 2004). Because the Complaint does not "sufficiently allege[] . . . that [ISDA] joined the alleged agreement, conspiracy, or concerted action," claims against ISDA must be dismissed. *See In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 718, 720-21, 755 (E.D. Pa. 2011) ("*Processed Egg*") (dismissing antitrust complaint against trade association alleged to have conspired with certain of its members because the complaint had not specific facts "that plausibly suggest that particular [trade association's] embrace of that overarching conspiracy") (emphasis added); *see also Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 504 (S.D.N.Y. 2009) (dismissing complaint as against certain defendants because plaintiffs "failed to plead facts plausibly suggesting a 'meeting of the minds' among any of these [defendants].") (internal quotation marks omitted); *Kissing Camels Surgery Ctr., LLC v. Centura Health Corp.*, No. 12-cv-3012, 2014 WL 560462, at *6-7 (D. Colo. Feb. 13, 2014) ("*Kissing Camels*") (dismissing Sherman Act claim against trade association predicated on allegations that the trade association was controlled by the other defendants, facilitated the conspiracy by inviting all of the relevant insurers and healthcare providers to a conspiracy-forming meeting, and encouraged government action against the plaintiffs because the allegations suggested nothing more than that the trade association "provided passive facilitation of the conspiracy, not that it agreed to participate, tacitly or expressly"); *In re Insurance Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010) (affirming dismissal of conspiracy claims against certain defendants given the absence of well-

pled allegations plausibly suggesting that those defendants acted with a "unity of purpose or a common design and understanding or a meeting of minds or a conscious commitment to a common scheme") (internal quotation marks omitted).

### A. Plaintiffs' Conclusory Allegation that ISDA "Agreed" With the Dealer Defendants Not to License Its Products Is Unsupported by Well-Pled Facts[8]

The Complaint lacks factual allegations supporting a plausible inference that ISDA's alleged licensing decision was pursuant to an "agreement" between ISDA and the Dealer Defendants as opposed to ISDA's independent determination that licensing its intellectual property to CMDX for use in exchange trading was not in the best interests of ISDA. Plaintiffs' bald assertion that ISDA entered an "agreement" with the Dealer Defendants not to license its products to CMDX (SCAC ¶ 147) is a legal conclusion and does not plead an actionable agreement for purposes of a Sherman Act claim. *See Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to *legal* conclusions.") (emphasis added).

The Complaint speculates that the Dealer Defendants, which comprise a subset of ISDA's membership, secured ISDA's "agreement" to deny CMDX licenses for exchange trading by "leveraging the fact" that they were ISDA's "largest customers" that pay the "largest fees" and by causing their representatives on ISDA's Board to "pressure" ISDA to deny exchange trading licenses. (SCAC ¶¶ 147-48). A conclusory allegation that one defendant "pressured" another defendant to act does not plausibly suggest the latter defendant "consciously committed" to an anticompetitive agreement. *See*, *e.g.*, *Abraham v. Intermountain Health Care Inc.*, 461

---

[8] Plaintiffs do not challenge ISDA's licensing decision on a stand-alone basis as violative of antitrust laws. *Compare Am. Needle, Inc. v. NFL*, 538 F.3d 736 (7th Cir. 2008), *rev'd* 560 U.S. 183 (2010) (challenging the decision of the NFL to grant an exclusive license rather than multiple non-exclusive licenses). Rather, Plaintiffs challenge ISDA's licensing decision solely to the extent it allegedly suggests ISDA's participation in the Bid/Ask Conspiracy.

F.3d 1249, 1259 (10th Cir. 2006) (noting that as a matter of law exclusionary conduct "in response to" other competitors' complaints "is not enough to establish the concerted action requirement" under the Sherman Act) (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 763 (1984)).  A trade association does not become subject to co-conspirator liability under the Sherman Act based on allegations that it was a "passive facilitator" of a conspiracy among certain of its members.  *Kissing Camels*, 2014 WL 560462 at *6 ("Indeed, Plaintiffs apparently concede that [the defendant trade association] was a tool of the conspiracy, rather than a co-conspirator, when they state in their Response that '[defendant trade association] has been used as a conduit for bringing about actions detrimental to Plaintiffs.'"); s*ee also Processed Egg*, 821 F. Supp. 2d at 753 ("[T]he Court will not impute the activities of [an] organization's members to the organization itself absent allegations that the entity participated in the conspiracy.") (internal quotation marks omitted).

The Complaint also asserts that, absent an agreement, such denials would have been against ISDA's self-interest.  According to the Complaint, by denying licenses, ISDA was forgoing potential licensing revenues and the broader market adoption of its products.  (SCAC ¶¶ 137-38, 151).  This too does not plausibly suggest an agreement between ISDA and the Dealer Defendants.[9]

First, ISDA is a non-profit organization whose "self-interest" is not, by definition, *"profits"* but rather the stability and efficiency of the CDS market.

---

[9]  Plaintiffs attempt to support their conclusory allegation that ISDA acted contrary to self-interest because it forewent licensing review based on the allegation that ISDA "aggressively asserts its copyright" of the Master Agreement and has "litigated to prevent the production of unlicensed Master Agreements."  (SCAC ¶ 136).  It is not only natural, but appropriate, that ISDA would enforce its intellectual property rights, and the court cannot infer anticompetitive intent from this lawful, protected behavior.  *MiniFrame Ltd. v. Microsoft Corp.*, No. 11 Civ. 7419, 2013 WL 1385704, at *3 (S.D.N.Y. March 28, 2013), *aff'd*, No. 13-1607, 2013 WL 6726974 (2d Cir. 2013) (patent holders have "broad authority to enforce their intellectual property rights without violating the antitrust laws" and have "no obligation to license [their] technology to [their] rivals"; they "may freely impose conditions or limitation on the use of their technology").

Second, even if ISDA were a profit-seeking organization, the Complaint does not posit how or why ISDA stood to benefit economically by entering an agreement with the Dealer Defendants not to license ISDA's intellectual property for exchange trading. *See infra* Section I.B.1.

Third, courts have recognized that forgoing short-term licensing revenues does not suffice to show an organization acted contrary to its self-interest when its actions manifestly would benefit the organization economically in the long term—such as is the case with ISDA promoting stability of the OTC CDS market. *See Alvord-Pork, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1014 (3d Cir. 1994) (affirming grant of summary judgment because an allegation that defendants "may have foregone some short-term opportunity for sales to 800-number dealers does not suffice to show it acted contrary to its self-interests when its actions clearly would benefit it economically in the long term.").

There is nothing in the Complaint to suggest that ISDA's alleged licensing decision was not simply ISDA's independent, rational judgment against use of its products in a new and untested way during a period of enormous uncertainty. *See Mayor*, 709 F.3d at 135-37 (2d Cir. 2013) (dismissing complaint where alleged conspiratorial conduct was consistent with independent judgment in light of economic climate); *In re Online Travel Co. (OTC)/Hotel Booking Antitrust Litig.*, No. 3:12-cv-3515-B, 2014 WL 626555, at *12 (N.D. Tex. Feb. 18, 2014) ("*Hotel Booking*") (allegations of an unprecedented change in business practice in a new and developing industry are not a plus factor from which an agreement can be inferred). The Complaint acknowledges that ISDA's licensing decision occurred during the "worst financial crisis since the Great Depression of the 1930s" and admits that U.S. financial markets "were particularly vulnerable." (SCAC ¶ 1.) The year 2007 saw the subprime mortgage crisis infecting

the credit markets and 2008 brought AIG (the world's largest insurer) accepting a federal bailout, the federal government taking over Fannie Mae and Freddie Mac, the biggest U.S. bank failure in history with the closing of Washington Mutual Bank, and the passage of the Troubled Asset Relief Program, a Wall Street financial rescue package, among other events. At the same time, the Complaint acknowledges that the exchange platform being developed by CMDX was new and untested. (SCAC ¶ 10.) ISDA's alleged decisions would make perfect sense in the context of (1) a tumultuous economic climate, (2) ISDA's fear that licensing products for use in exchange trading might lead to negative outcomes for ISDA, its members and other participants in the CDS industry (such as legal exposure from unforeseen and unintended consequences), (3) the focus by regulators and legislators on clearing, not exchange trading, and (4) the need to develop, test and roll out products in harmony with all of these market conditions. (SCAC ¶¶ 75-79, 124, 161, & 190.)

Accordingly, the mere allegation that ISDA made a licensing decision to deny CMDX licenses does not create a plausible inference of an agreement between ISDA and the Dealer Defendants regarding that decision.

**B.    The Complaint Also Fails To Plausibly Suggest ISDA's Participation in the Broad Bid/Ask Conspiracy**

Nor does the Complaint support the inference that any supposed agreement between ISDA and the Dealer Defendants regarding ISDA's licensing decision reflects a "conscious commitment" by ISDA to participate in the larger supposed Bid/Ask Conspiracy. *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984) ("there must be direct or circumstantial evidence that reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective."); *AD/SAT, Div. of Skylight, Inc. v. Associated Press,* 181 F.3d 216, 234 (2d Cir. 1999) (a plaintiff must allege that

each of the defendants, "in their individual capacities, consciously committed themselves to a common scheme designed to achieve an unlawful objective"); *Hinds County*, 620 F. Supp. 2d at 513, 515-16 (dismissing complaint as to individual defendants because plaintiffs must "make allegations that plausibly suggest that each [d]efendant participated in the alleged conspiracy") (citations and quotations omitted).

### 1. ISDA Gains Nothing From a Conspiracy to Protect Bid/Ask Spreads

Other than conclusory statements that ISDA was susceptible to "influence" and "pressure" from Dealer Defendants, SCAC ¶¶ 148, 151, Plaintiffs have assigned no independent motive to ISDA for its alleged participation in the purported Bid/Ask Conspiracy. This is because ISDA had no economic incentive to agree to maintain bid/ask spreads or prevent the emergence of exchange platforms. Nor does the Complaint suggest any mechanism by which ISDA would have shared in any profits generated by such a conspiracy. This makes Plaintiffs' claims against ISDA facially implausible. *See e.g., Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.,* No. 13 Civ. 1111, 2013 WL 6311202, at *4, *6 (S.D.N.Y. Dec. 5, 2013) (dismissing Sherman Act claim predicated on "threadbare allegations" of an agreement without any explanation as to why the defendants would even want to enter into the restrictive agreement alleged); *see also First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 287 (1968) (in the absence of any common motivation, there are no grounds for inferring a conspiracy); *Mayor*, 709 F.3d at 139-40.

### 2. Markit's Alleged Contemporaneous Decision to Deny CMDX Licenses Is Not Sufficient to Suggest that ISDA Was Consciously Committed to the Bid/Ask Conspiracy

The Complaint alleges that ISDA and Markit refused CMDX licenses for exchange-trading at "virtually the same time," which the Complaint contends reflects the fact that this behavior was the result of ISDA's and Markit's agreement with the Dealer Defendants. (SCAC

¶¶ 149-51.)  First, this allegation is insufficient because ISDA and Markit are not competitors.

They each own different types of intellectual property.  Their alleged contemporaneous refusal to

grant licenses to their intellectual property – in response to parallel licensing requests by Citadel

and CME – is not the sort of parallel conduct *among competitors* that could raise an inference of

an agreement to participate in the Bid/Ask Conspiracy.  *See*, *e.g.*, *Todorov v. DCH Healthcare

Auth.*, 921 F.2d 1438, 1456 n. 30 (11th Cir. 1991) (theory of conscious parallelism is not

available where defendants are not competitors in any market).

Second, even if they were competitors engaging in parallel conduct, parallel conduct of

two competitors "without further factual enhancement [] stops short of the line between

possibility and plausibility."  *Twombly*, 550 U.S. at 557; *see also Mayor*, 709 F.3d at 137-38

(dismissing complaint because the defendants' alleged anticompetitive conduct—their "*en masse

flight from a collapsing market in which they had significant downside exposure—made perfect

business sense*" and explaining that parallel conduct allegations are only sufficient to withstand a

motion to dismiss if the conduct "would probably not result from chance, coincidence,

independent responses to common stimuli . . . .") (quoting *Twombly*, 550 U.S. at 556 n. 4).

Plaintiffs have not alleged "further factual enhancement" to support the inference that

ISDA's and Markit's decisions were anything other than independent decisions reached by two

organizations, in response to contemporaneous licensing requests by CMDX.  Both decisions,

notably, came against the backdrop of severe market dislocation caused by the Financial Crisis.

It is well settled that parallel conduct that can be attributable to common stimuli does not create a

plausible inference of collusion.  *See Wellnx Life Sciences Inc.*,  516 F. Supp. 2d at 289-91

(publishers' parallel decision to allegedly boycott plaintiff did not constitute "plausible grounds

to infer an agreement among the publishers" because each publisher had received a

contemporaneous request from plaintiff's competitor to deal with plaintiff's competitor exclusively); *Mayor*, 709 F.3d at 138-39 (dismissing complaint for failure to plead an "agreement" based on allegations of "virtually simultaneous" parallel conduct by competitors in the face of the same economic pressures (the failing ARS market)); *Hotel Booking*, 2014 WL 626555, at *1,*8 (allegation that hotels and online travel companies developed similar agreements at the same time did not constitute a "factual enhancement" because the hotels and online travel companies were all responding to common stimulus: the internet as a new distribution channel).

In sum, the timing of ISDA's and Markit's alleged licensing decisions does not "nudge[] [Plaintiffs'] claims across the line from conceivable to plausible" and thus the SCAC "must be dismissed." *Twombly*, 550 U.S. at 570.

## CONCLUSION

For the foregoing reasons, ISDA respectfully requests dismissal with prejudice as to all three counts: Conspiracy to Restrain Trade in Violation of 15 U.S.C. § 1 (Count I), a Conspiracy to Monopolize in Violation of 15 U.S.C. § 2 (Count II), and claims of Unjust Enrichment (Count III).[10]

---

[10] Dismissal of Counts II and III is appropriate for the same reasons articulated in the Dealer Defendants' briefs. Further, as outlined herein, Plaintiffs have failed to plead the participation by ISDA in a conspiracy and thus Count II must be dismissed. Finally, because ISDA is not alleged to have engaged in any unjust conduct, Count III must be dismissed. *See La. Mun. Police Emps. Ret. Sys. v. JPMorgan Chase & Co*., No. 12 Civ. 6659, 2013 WL 3357173, at *16 (S.D.N.Y. July 3, 2013) ("'[u]njust enrichment is not a catchall cause of action to be used when others fail . . .[and] is not available where it simply duplicates, or replaces, a conventional [legal] claim.'" (quoting *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012))).

Dated:  May 23, 2014

Respectfully submitted,

**International Swaps and Derivatives Association**

By its attorneys,

/s/ Matthew J. Reilly
Matthew J. Reilly (admitted *pro hac vice*)
Abram J. Ellis
SIMPSON THACHER & BARTLETT LLP
1155 F Street, NW
Washington, DC 20004
Tel: (202) 636-5500
Fax: (202) 636-5502
matt.reilly@stblaw.com
aellis@stblaw.com

Michael J. Garvey
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Tel: (212) 455-2000
Fax: (212) 455-2502
mgarvey@stblaw.com