UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x
                                                :

IN RE CREDIT DEFAULT SWAPS ANTITRUST
LITIGATION                                       :     13 Md. 2476 (DLC)

This Document Relates To: All Actions        :

------------------------------------------------------------------ x

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY
APPROVAL OF SETTLEMENT WITH ALL DEFENDANTS AND
<u>PRELIMINARY CERTIFICATION OF A SETTLEMENT CLASS</u>**

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ..........................................................................................................1

II.     PROCEDURAL HISTORY...........................................................................................5

      A.      Litigation to Date ...........................................................................................5

      B.      Settlement Negotiations .................................................................................6

III.    THE PROPOSED SETTLEMENT ...............................................................................8

      A.      The Settlement Class......................................................................................8

      B.      The Settlement Fund ......................................................................................8

      C.      Injunctive Relief.............................................................................................9

      D.      The Release ...................................................................................................10

      E.      Attorneys' Fees, Expenses, and Incentive Awards ...............................10

      F.      Termination Provision .................................................................................11

IV.     THE PROPOSED SETTLEMENT MEETS THE REQUIREMENTS FOR
      PRELIMINARY APPROVAL ....................................................................................12

      A.      The Proposed Settlement Was the Result of Extensive Arm's-Length
               Negotiations Facilitated by an Experienced and Well-Respected Mediator .........14

      B.      The Proposed Settlement Is Substantively Fair Under the *Grinnell* Factors .........16

           1.      The Complexity, Expense, and Likely Duration of the Litigation
                 Support Preliminary Approval of the Proposed Settlement.....................16

           2.      Named Plaintiffs Support the Proposed Settlement...................................18

           3.      The Stage of the Proceedings and Amount of Discovery
                 Completed Allowed for Informed Settlement............................................18

           4.      Both Parties Faced Significant Risks Regarding Liability,
                 Damages, Class Certification, and Trial ....................................................19

                (a)      Liability Risks...............................................................................19

                (b)      Damages Risks...............................................................................20

                 (c)      Class Risks .....................................................................................21

                 (d)      Trial Risks ......................................................................................21

           5.      The Proposed Settlement Is Reasonable in Light of Risks and the
                 Potential Range of Recovery ......................................................................22

V.      THE CLASS SHOULD BE PRELIMINARILY CERTIFIED .......................................22

      A.      The Settlement Class Satisfies the Requirements of Rule 23(a)...........................23

           1.      The Class Is So Numerous That Joinder Is Impractical............................23

i

|  |  | 2. | There Are Many Questions Common to All Class Members | 23 |
|  |  | 3. | Class Plaintiffs' Claims Are Typical of Those of All Class Members | 24 |
|  |  | 4. | The Settlement Class Is Fairly and Adequately Represented | 25 |
|  | B. | | The Settlement Class Satisfies the Requirements of Rule 23(b)(3) | 25 |
|  |  | 1. | Common Questions of Law and Fact Predominate | 26 |
|  |  | 2. | A Class Action is the Superior Method for Resolving this Case | 27 |
| VI. | | | THE PROPOSED FORM AND METHOD OF NOTICE SHOULD BE APPROVED | 28 |
| VII. | | | THE PLAN OF DISTRIBUTION SHOULD BE PRELIMINARILY APPROVED | 29 |
| VIII. | | | NAMED CLASS PLAINTIFFS SHOULD BE CERTIFIED AS SETTLEMENT CLASS REPRESENTATIVES, AND QUINN EMANUEL URQUHART & SULLIVAN, LLP AND PEARSON, SIMON & WARSHAW, LLP APPOINTED AS LEAD AND CO-LEAD COUNSEL FOR THE SETTLEMENT CLASS | 31 |
| IX. | | | GARDEN CITY GROUP SHOULD BE APPOINTED AS CLAIMS ADMINISTRATOR AND SIGNATURE BANK AS ESCROW AGENT | 32 |
| X. | | | CONCLUSION | 33 |

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>Cases</u>

*In re "Agent Orange" Prod. Liab. Litig.*,
    597 F. Supp. 740 (E.D.N.Y. 1984) ..................................................................22

*In re Air Cargo Shipping Servs. Antitrust Litig. ("Air Cargo I")*,
    No. 06 Md. 1775 (JG), 2009 WL 3077396 (E.D.N.Y. Sept. 25, 2009)...........14, 20

*In re Air Cargo Shipping Servs. Antitrust Litig. ("Air Cargo II")*,
    No. 06 Md. 1775 (JG), 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) ..................27

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
    689 F.3d 229 (2d Cir. 2012)........................................................................26, 27

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)....................................................................................26, 27

*Amgen v. Conn. Ret. Plans & Tr. Funds*,
    133 S. Ct. 1184 (2013).................................................................................26, 27

*Bano v. Union Carbide Corp*,
    273 F.3d 120 (2d Cir. 2001).............................................................................13

*Beckman v. KeyBank, N.A.*,
    293 F.R.D. 467 (S.D.N.Y. 2013) ......................................................................13

*Brown v. Kelly*,
    609 F.3d 467 (2d Cir. 2010).............................................................................26

*Charron v. Wiener*,
    731 F.3d 241 (2d Cir. 2013).............................................................................25

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
    502 F.3d 91 (2d Cir. 2007)...................................................................23, 24, 27

*In re Currency Conversion Antitrust Litig.*,
    No. 01 Md. 1409 (WHP), 2006 WL 3247396 (S.D.N.Y. Nov. 8, 2006) ..............12

*In re Currency Conversion Fee Antitrust Litig.*,
    263 F.R.D. 110 (S.D.N.Y. 2009) ......................................................................14

*In re Currency Conversion Fee Antitrust Litig.*,
    264 F.R.D. 100 (S.D.N.Y. 2010) ......................................................................24

*In re Credit Default Swaps Antitrust Litigation*,
    MDL No. 2476 (S.D.N.Y.) ................................................................................5

*Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974)..............................................................................16

*Dial Corp. v. News Corp.*,
  13 Civ. 6802, 2015 WL 4104624 (S.D.N.Y. June 18, 2015)................................26

*In re Elec. Books Antitrust Litig.*,
  11 Md. 2293 (DLC), 2014 WL 3798764 (S.D.N.Y. Aug. 1, 2014)......................15

*In re Elec. Books Antitrust Litig.*,
  11 Md. 2293 (DLC), 2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014).....................23

*Engel v. Scully & Scully, Inc.*,
  279 F.R.D. 117 (S.D.N.Y. 2011) ......................................................................23

*Essex Reg'l Ret. Sys. v. Bank of Am. Corp., et al.*,
  13-cv-05725 (N.D. Ill.) ......................................................................................5

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  574 F.3d 29 (2d Cir. 2009)................................................................................24

*In re Glob. Crossing Sec. & ERISA Litig.*,
  225 F.R.D. 436 (S.D.N.Y. 2004)...............................................................13, 18

*In re Gulf Oil/Cities Servs. Tender Offer Litig.*,
  142 F.R.D. 588 (S.D.N.Y. 1992)........................................................................2

*In re IndyMac Mortgage-Backed Sec. Litig.*,
  286 F.R.D. 226 (S.D.N.Y. 2012) ......................................................................23

*In re Initial Pub. Offering Sec. Litig.*,
  226 F.R.D. 186 (S.D.N.Y. 2005)......................................................................15

*In re Initial Pub. Offering Sec. Litig.*,
  243 F.R.D. 79 (S.D.N.Y. 2007) ..................................................................17, 18

*LBBW Asset Mgmt. Investmentgesellschaft mbH v. Citibank, N.A., et al.*
  13-cv-05413 (N.D. Ill.) ......................................................................................5

*Los Angeles County Employees Retirement Association v. JPMorgan Chase & Co., et al.*,
  13-CV-7634 (S.D.N.Y.).......................................................................................5

*MacNamara v. City of New York*,
  275 F.R.D. 125 (S.D.N.Y. 2011) ......................................................................23

*Menkes v. Stolt Nielsen S.A.*,
  270 F.R.D. 80 (D. Conn. 2010).........................................................................13

*Meredith Corp. v. SESAC LLC*
  87 F. Supp. 3d 650 (S.D.N.Y. 2015) ...............................................17, 20, 21, 22

*MF Glob. Capital LLC v. Bank of Am. Corp., et al.*,
  13-cv-05417 (N.D. Ill.) ......................................................................................5

*In re NASDAQ Market-Makers Antitrust Litig.*,
  187 F.R.D. 465 (S.D.N.Y. 1998) ......................................................................19

*In re Nasdaq Market-Makers Antitrust Litig.*,
    176 F.R.D. 99 (S.D.N.Y. 1997) ..................................................................................12

*Nieves v. Cmty. Choice Health Plan of Westchester, Inc.*,
    No. 08 Civ. 321 (VB), 2012 WL 857891 (S.D.N.Y. Feb. 24, 2012) ..........................12

*In re PaineWebber Ltd. P'ship Litig.*,
    171 F.R.D. 104 (S.D.N.Y. 1997) ..........................................................................14, 20

*Park v. The Thomson Corp.*,
    No. 05 Civ. 2931 (WHP), 2008 WL 4684232 (S.D.N.Y. Oct. 22, 2008) ..............17, 19

*Reade-Alvarez v. Eltman, Eltman & Cooper, P.C.*,
    237 F.R.D. 26 (E.D.N.Y. 2006) ................................................................................16

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015) .....................................................................................26

*Salix Capital US Inc. v. Bank of America Corp., et al.*,
    No. 13-CV-6116 (S.D.N.Y.) .......................................................................................5

*Sheet Metal Workers Local No. 33 Cleveland District Pension Plan v. Bank of America Corp., et al.*,
    13-CV-03357 (N.D. Ill.) ..............................................................................................5

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    267 F.R.D. 583 (N.D. Cal. 2010) ..............................................................................26

*Toure v. Amerigroup Corp.*,
    No. 10 Civ. 5391 (RLM), 2012 WL 3240461 (E.D.N.Y. Aug. 6, 2012) ..................15

*Tsereteli v. Residential Asset Securitization Tr. 2006-A8*,
    283 F.R.D. 199 (S.D.N.Y. 2012) ..............................................................................24

*U.S. Football League v. Nat'l Football League*,
    644 F. Supp. 1040 (S.D.N.Y. 1986), *aff'd*, 842 F.2d 1335, 1377 (2d Cir. 1988) .............21, 22

*Unipension Fondsmaeglerselskab A/S v. Bank of America Corp., et al.*,
    13-cv-04979 (N.D. Ill.) ................................................................................................5

*Value Recovery Fund LLC v. JPMorgan Chase & Co., et al.*,
    13-cv-04928-DLC (S.D.N.Y.) (July 15, 2013) ...........................................................5

*In re Vitamin C Antitrust Litig.*,
    No. 06-MD-1738 (BMC) (JO), 2012 WL 5289514 (E.D.N.Y. Oct. 23, 2012) ...............16, 17

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011) ........................................................................................23, 24

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005) ........................................................................................29

*In re Warner Chilcott Ltd. Sec. Litig.*,
    No. 06 Civ. 11515 (WHP), 2008 WL 5110904 (S.D.N.Y. Nov. 20, 2008) ..............16

## Statutes and Rules

Fed. R. Civ. P. 23(a) ................................................................................................22

Fed. R. Civ. P. 23(a)(1) ...........................................................................................23

Fed. R. Civ. P. 23(a)(2) ......................................................................................23, 24

Fed. R. Civ. P. 23(a)(3) ...........................................................................................24

Fed. R. Civ. P. 23(a)(4) ...........................................................................................25

Fed. R. Civ. P. 23(b)(3) ................................................................................1, 22, 25, 27

Fed. R. Civ. P. 23(c)(2)(B) .......................................................................................28

Fed. R. Civ. P. 23(e) ...............................................................................................12

Fed. R. Civ. P. 23(e)(1) ...........................................................................................28

Fed. R. Civ. P. 23(f) ...............................................................................................21

Plaintiffs respectfully submit this Memorandum in Support of their Motion for Preliminary Approval of their settlements with all Defendants (together, the "Proposed Settlement") and preliminary certification of a settlement class under Rule 23(b)(3).

## I.     **INTRODUCTION**

Plaintiffs have achieved an extraordinary result for the proposed class of buy-side investors who traded credit default swaps ("CDS") during the class period.  The operative Complaint alleges that, in and around 2008 and 2009, Defendants conspired to prevent new entrants from successfully introducing exchange trading venues and electronic platforms that would have increased competition and transparency in the CDS market.  In resolving these claims, the Proposed Settlement will make available to class members a common fund totaling $1,864,650,000, one of the largest antitrust class action settlements in history.  The Settlement will also require Defendant International Swaps and Derivatives Association ("ISDA") to take steps, including making changes to its licensing practices, that are designed to increase transparency and competition in the CDS market going forward.

Plaintiffs obtained this substantial relief despite facing formidable odds.  Two separate governmental agencies – the U.S. Department of Justice ("DOJ") and the European Commission ("EC") – investigated the alleged conduct at issue for years and have not, to this day, been able to make a case against Defendants.[1]  No Defendant has been indicted for the alleged conduct. Defendants have not paid a single dollar in fines to any regulator.  Indeed, it does not appear that even a single employee lost his or her job because of the alleged conduct.  This was not a case

---

[1]   The DOJ reportedly opened its investigation in 2009, and reportedly decided in 2013 not to seek any penalties.  *See* Katy Burne, *No Penalties Planned in Swaps Probe*, Wall St. J. (Dec. 1, 2013), http://www.wsj.com/articles/SB10001424052702303332904579224863412391886.  The European Commission's ongoing investigation has yielded no results to date.  *See* Gaspard Sebag & Aoife White, *Goldman, BofA Among Banks Said to Face Fresh Swaps Scrutiny*, Bloomberg (May 13, 2015), http://www.bloomberg.com/news/articles/2015-05-13/swaps-probe-reviewed-as-eu-said-to-weigh-new-antitrust-complaint.

where plaintiffs' counsel piggybacked on the work of governmental regulators.  To the contrary,
facing the perception that Defendants' actions had potentially been exonerated by the
governmental investigations, here Plaintiffs "did all the work on their own."  *See In re Gulf
Oil/Cities Servs. Tender Offer Litig.*, 142 F.R.D. 588, 597 (S.D.N.Y. 1992).

Achieving this result took significant experience and skill and an enormous amount of
resources.  Defendants trotted out an array of defenses that were, apparently, strong enough to
give governmental regulators on two continents serious pause.  Defendants were prepared to
argue that the new entrants into the CDS space failed for a number of reasons unrelated to any
alleged industry boycott, including because they were untested and unproven and because of the
severe market turmoil.  Defendants had engaged a number of highly-credentialed experts and
were prepared to fight vigorously against any effort to quantify damages and against class
certification.  Defendants are well-financed and are represented by an array of the top firms and
antitrust litigators in the defense bar.

Plaintiffs were able to overcome these hurdles by implementing an aggressive strategy
that required a focused and massive effort.  In the past year, Plaintiffs served hundreds of
discovery requests, numerous third-party subpoenas, obtained, reviewed, and synthesized over
50 million pages of documents from Defendants (and millions more from third parties), collected
and analyzed hundreds of millions of trading records, and took 27 critical depositions in the
condensed time period from June 8 to July 29, 2015 (while preparing to take many more).
Plaintiffs' strategy required counsel fully to digest Defendants' documents, to develop their
factual and expert case, and to notice and take the depositions of high-level bank executives at
the core of the alleged conduct even before Defendants finished collecting and producing
relevant documents.  This required a large, experienced, and well-organized team of skilled and

experienced lawyers with sufficient mastery of the factual record and expert issues to go toe-to-toe at deposition with executives at the world's largest banks on complex financial issues central to their job responsibilities.  Plaintiffs' preparation and ability to strike quickly at deposition was, we believe, a driving force in obtaining settlements with all Defendants.  Co-Lead Counsel were able to cut-to-the-chase quickly and build a case before the Defendants had deposed a single witness.

While Plaintiffs were confident in their ability to take this case to trial, they began settlement negotiations early in the case, at the Court's request, by jointly retaining with Defendants the Honorable Daniel Weinstein (Ret.) to act as Mediator.  While depositions, document discovery, and expert analysis proceeded, Co-Lead Counsel simultaneously worked through Judge Weinstein (Ret.) to see if it was possible to achieve significant compensation for the class without further risk and delay.  That goal has now been realized.  Following approval of the settlement, buy-side class members will be able to submit claims to their *pro rata* share of the settlement fund that will, finally, provide significant compensation for misconduct that happened years ago.  Given the size of the fund, many of these claims are expected to be quite large.

In addition, Defendant ISDA has agreed to injunctive relief that will make it easier for new entrants to compete in the CDS market and ensure that class members are represented in ISDA's licensing decisions going forward.  As explained more fully in the attached Declaration of Darrell Duffie, one of the world's leading experts on CDS and derivatives markets, the ISDA settlement is expected to bolster competition and transparency in the CDS marketplace, and help prevent conduct similar to the alleged misconduct.  As Professor Duffie also notes, "this action, and the aggressive manner in which the counsel for Plaintiffs have litigated it, has spurred important beneficial changes in the CDS market," including, it appears, the recent announcement

by the Intercontinental Exchange ("ICE"), that it intends to launch an anonymous, all-to-all, exchange-like CDS trading platform.[2]

The achievement of these results, on this timeline, is truly remarkable.  As one of the nation's leading mediators, Judge Weinstein (Ret.), states in the declaration submitted herewith: "In fact, I would go so far as to say that, in 30-plus years of mediating high-stakes disputes, this was one of the finest examples of efficient and effective lawyering by plaintiffs' counsel that I have ever witnessed.  I have rarely, if ever, observed a Plaintiff in a case of this complexity and size, achieve a result of this magnitude with the speed that Plaintiffs achieved here."[3]

While Plaintiffs respectfully submit that the terms of the settlements are reasonable under even the searching inquiry required before final approval, what matters most for preliminary approval is that the settlements were the product of months of hard-fought and arm's-length negotiations facilitated by a respected mediator.  The process by which the Proposed Settlement was reached was zealous but forthright, and left all Parties well-informed of the risks and costs associated with the continued litigation of this matter.

The Proposed Settlement, thus, fully meets the requirements for preliminary approval. Accordingly, Plaintiffs respectfully request that the Court preliminarily approve the Proposed Settlement and put in place a process, described below, by which class members can collect their share of the settlement fund as soon as that can be achieved.

---

[2]  See Declaration of Darrell Duffie ("Duffie Decl.") ¶¶ 8-10.

[3]  See Declaration of the Hon. Daniel Weinstein (Ret.) ("Weinstein Decl.") ¶ 4.

## II.   PROCEDURAL HISTORY

### A.   Litigation to Date

The first Complaint in these coordinated and consolidated matters was filed on May 3, 2013 in the Northern District of Illinois.[4]  Class counsel filed suit in this district on August 29, 2013, and October 29, 2013 as *Salix Capital US Inc. v. Bank of America Corp., et al.*, No. 13-CV-6116 (S.D.N.Y.) and *Los Angeles County Employees Retirement Association v. JPMorgan Chase & Co., et al.*, 13-CV-7634 (S.D.N.Y.).[5]  On October 22, 2013, the United States Judicial Panel on Multidistrict Litigation transferred all related class actions to the Southern District of New York as *In re: Credit Default Swaps Antitrust Litigation*, MDL No. 2476 (S.D.N.Y.).  On December 12, 2013, the Court appointed Quinn Emanuel Urquhart & Sullivan LLP ("Quinn Emanuel") as Lead Counsel and Pearson, Simon & Warshaw LLP ("Pearson Simon") Co-Lead Counsel for the proposed class.

Plaintiffs' Second Consolidated Amended Class Action Complaint (the "Complaint") alleged that Defendants conspired to suppress price transparency and competition in the trading market for CDS and boycott the exchange trading of CDS.  The Complaint alleged, among other things, that Defendants conspired to block "CMDX," a proposed CDS exchange trading platform which the Chicago Mercantile Exchange ("CME") and Citadel Investment Group ("Citadel") partnered to launch in the United States in the fall of 2008.

---

[4]   *See Sheet Metal Workers Local No. 33 Cleveland Dist. Pension Plan v. Bank of Am. Corp., et al.*, 13-CV-03357 (N.D. Ill.)

[5]   In addition, several other parties, including the other class representatives, filed similar cases against the Defendants.  *See, e.g., Essex Reg'l Ret. Sys. v. Bank of Am. Corp. et al.*, 13-cv-05725 (N.D. Ill.); *MF Glob. Capital LLC v. Bank of Am. Corp., et al.*, 13-cv-05417 (N.D. Ill.); *LBBW Asset Mgmt. Investmentgesellschaft mbH v. Citibank, N.A., et al.*, 13-cv-05413 (N.D. Ill.); *Value Recovery Fund LLC v. JPMorgan Chase & Co., et al.*, 13-cv-04928-DLC (S.D.N.Y.) (July 15, 2013); *Unipension Fondsmaeglerselskab A/S v. Bank of Am. Corp., et al.*, 13-cv-04979 (N.D. Ill.).

On September 4, 2014, the Court largely denied Defendants' motions to dismiss with respect to Plaintiffs' claims under Section 1 of the Sherman Act and unjust enrichment. Thereafter, the parties promptly began extensive discovery.  In relatively short order, Plaintiffs obtained over 50 million pages of documents from Defendants and millions more from third parties, using sophisticated search methodologies to identify the most crucial documents among them.  Plaintiffs also obtained data for tens of millions of CDS transactions from third-party Depository Trust & Clearing Corporation ("DTCC"), and engaged top economists, at significant expense, to analyze this data and build a model capable of calculating damages for class members.  At the time the Parties settled, Plaintiffs had noticed over 50 depositions, of which 27 were taken.  The Parties had also served and responded to detailed interrogatories.

**B.** **Settlement Negotiations**

In December 2014, the Parties jointly engaged a highly respected and experienced mediator, the Hon. Daniel Weinstein (Ret.), a co-founder of JAMS, Inc.[6]  Under Judge Weinstein's (Ret.) supervision, the Parties engaged in a series of mediation sessions beginning on January 22, 2015.[7]  At the first session, Plaintiffs presented an overview of their liability case, distilling some of the key evidence discovery had revealed to date.  The Parties also submitted detailed Mediation Statements summarizing the evidence supporting their respective positions.  On March 31, 2015, Defendants made a rebuttal presentation, outlining the evidence supporting their liability defenses.[8]

The parties engaged in a similar process regarding damages.  Plaintiffs presented their preliminary damages model to Defendants, also on March 31, 2015, and provided an overview of

---

[6] *See* Weinstein Decl. ¶ 9.

[7] *Id.* ¶¶ 15-16.

[8] *Id.* ¶ 17.

their experts' methodology and an estimate of class-wide damages.[9]  In the interest of good-faith negotiation, and at Defendants' request and with Judge Weinstein's (Ret.) recommendation, Plaintiffs provided Defendants with access to the data used in their damages model.[10]  After analyzing this data with the assistance of their own experts, on June 8, 2015, Defendants delivered a rebuttal to Plaintiffs' damages model.[11]  Defendants' presentation explained how they intended to attack Plaintiffs' model and calculation of damages.  Through the summer the Parties continued those discussions, with the assistance of the mediator, exchanging information developed by their respective experts.  In parallel, Plaintiffs continued aggressively to advance and litigate their claims.

At various points in this process, Plaintiffs engaged in (at the time, confidential) one-on-one settlement discussions with certain individual defendants.  Beginning in April 2015, Plaintiffs had multiple meetings with individual Defendants on specific issues unique to those Defendants.  On these occasions, Plaintiffs presented their liability case against each particular Defendant and the evidence as to that Defendant's culpability in the conspiracy, and addressed individual damages issues.

For most of the settlement process, Plaintiffs and Defendants were unable to reach agreement.  Co-Lead Counsel, with the support of the named Plaintiffs, concluded that the key to a successful settlement was to press forward aggressively with discovery and toward class certification.  Ultimately, in Plaintiffs' view, this strategy worked, and Plaintiffs reached agreements in principle with all Defendants to settle the case by August 13, 2015.  As Judge Weinstein (Ret.) explains:  "In the end, [Plaintiffs'] strategy, timing, and execution resulted in

---

[9]  *Id.* ¶ 19.

[10]  *Id.* ¶ 20.

[11]  *Id.* ¶ 23.

one of the best settlements I have witnessed in more than 30 years of mediating, particularly

given the challenges they would have faced in litigating this complex case."[12]

## III.   THE PROPOSED SETTLEMENT

Each Defendant has now executed a Settlement Agreement which are largely identical.[13]

### A.      The Settlement Class

The Settlement Agreements define the Settlement Class as follows at ¶ 3(a):

All Persons who, during the period of January 1, 2008 through September 25, 2015, purchased CDS from or sold CDS to the Dealer Defendants, a Released Party, or any purported co-conspirator, in any Covered Transaction.[14]  Excluded from the Settlement Class are Defendants (as identified in Paragraph 2(j) of the Agreement) and all of their respective officers, directors, management, employees, current subsidiaries, or affiliates, as well as any Person whose exclusion is mandated by law, provided that the foregoing exclusions shall not cover Investment Vehicles.

### B.      The Settlement Fund

Within ten business days following entry of the Preliminary Approval Order each

Defendant will pay their individual Settlement Amount into an account established by Signature

Bank, the proposed Escrow Agent selected by Co-Lead Counsel.  (¶ 5(a).)  Collectively, these

amounts will total over $1.86 billion ($1,864,650,000).

Costs incurred in preparing and providing the Settlement Class Notice and paying other

administrative expenses (other than attorneys' fees), including expenses of and incurred by the

---

[12]   *Id.* ¶ 28.

[13]   The 14 Settlement Agreements are attached to the Declaration of Daniel L. Brockett as Exhibits 1 to 14 ("Settlement Agreements").  Unless otherwise defined herein, definitions in the Settlement Agreements are adopted and incorporated herein.  The Settlement Agreements are virtually identical, with the exception that ISDA agreed to certain injunctive relief as part of its Settlement Agreement.  Markit's agreement includes a clause whereby Plaintiffs represented that no Defendants save HSBC, ISDA, and RBS had paid a lower Settlement Amount than Markit.  All citations to the Settlement Agreements are abbreviated "(¶ )."

[14]   Under the Settlement Agreements, a purchase or sale of CDS shall be deemed to be a "Covered Transaction" in each of the following circumstances:  (i) if the purchase or sale was by or on behalf of a Person either domiciled or located (*e.g.*, had a principal place of business) in the United States or its territories at the time of such purchase or sale; (ii) if the Person was domiciled and located outside the United States and its territories at the time of any such purchase or sale, where such purchase or sale was in United States commerce; or (iii) where such purchase or sale otherwise falls within the scope of the U.S. antitrust laws.  (¶ 3(i).)

Claims administrator, will be paid by the Escrow Agent through disbursements from the Settlement Fund, but will not exceed $10 million in the aggregate prior to the entry of the Final Judgment and Order of Dismissal, and will not exceed $15 million in the aggregate after entry of the Final Judgment and Order of Dismissal but prior to the Effective Date.  (¶ 9(a).)

      **C.**    **Injunctive Relief**

ISDA is a trade association with significant influence in the industry but a limited budget. Accordingly, Co-Lead Counsel focused negotiations with ISDA on reforms that could bring greater transparency and competition to the market in a manner that will benefit all members of the class.  As a result of extensive negotiations, ISDA has agreed to:  (1) adopt a new Licensing Framework, under which ISDA will offer to negotiate a license of its intellectual property for use in connection with an exchange-traded credit derivatives product in compliance with its Settlement Agreement; (2) create a new independent Licensing Sub-Committee, which will consist of an equal number of buy- and sell-side members, and delegate full authority to that new Sub-Committee to decide whether to grant a requested license; (3) implement a Dispute Resolution Mechanism in the event that ISDA's Licensing Sub-Committee and a proposed licensee cannot come to agreement on fair, reasonable and non-discriminatory ("FRAND") terms and conditions for an ISDA license within the scope of the Settlement Agreement; (4) publicize decisions of the Licensing Sub-Committee on ISDA's website, unless a proposed licensee objects, and make meetings of the Licensing Sub-Committee open to the public by broadcasting them on ISDA's website, unless a proposed licensee objects; and (5) have the ISDA Board of Directors formally consider and vote on a proposal for ISDA to make an official statement in favor of abolishing the practice of post-trade name disclosure ("Name Give-Up") in the CDS market, and have ISDA staff support implementation of any guidance from the U.S. Commodity

Futures Trading Commission related to the elimination of or limitations on Name Give-Up.  *See* ISDA Settlement Agreement Appendix A (Ex. 9 to the Declaration of Daniel L. Brockett).

### D.       The Release

In exchange for the monetary and other consideration from Defendants, Settlement Class Members will release all claims arising from or relating in any way to any conduct (i) occurring prior to June 30, 2014, that are alleged or that could have been alleged in the Action relating to any CDS Transactions or Potential CDS Transactions; and (ii) occurring prior to the Preliminary Approval Order, relating to the litigation or settlement of this Action.  (¶ 4(d).)  Examples of such claims include any joint conduct by any of the Defendants that has been or could be alleged to have unfairly increased the price or widened or otherwise manipulated the spread of any CDS Transaction or Potential CDS Transaction, and joint conduct relating to potential or actual clearinghouses, exchanges, trading platforms and/or other entities directly or indirectly involved or potentially involved with any CDS Transaction or Potential CDS Transaction, including, without limitation, CMDX LLC.  (¶ 4(e).)

Excluded from the release are claims based on CDS Transactions or Potential CDS Transactions by Settlement Class Members not domiciled or located in the United States at the relevant time, to the extent those transactions were not in or would not have been in United States commerce, and which are or would have been subject only to foreign law.  (¶ 4(d).)

### E.       Attorneys' Fees, Expenses, and Incentive Awards

Prior to the final approval hearing and prior to the objection and exclusion deadline, Co-Lead Counsel will file a motion with the Court seeking attorneys' fees in an amount that is a reasonable proportion of the settlement fund and consistent with the fee agreement negotiated with counsel by named Plaintiff LACERA, and which will not exceed 14% of the Settlement Fund, as well as reimbursement of outstanding litigation expenses.  Co-Lead Counsel will also

file a motion seeking incentive awards for the Class Representatives because of their unique

efforts and expense taken on behalf of the class.  These motion papers will be made available to

Settlement Class Members on the docket and on a dedicated website established by the Claims

Administrator.

      **F.**      **Termination Provision**

      Co-Lead Counsel and each Defendant have the right to terminate the Settlement

Agreement to which they are parties by providing written notice to each other within 30 days

following any of the following events:  (i) the Court enters an order declining to enter the

Preliminary Approval Order in any material respect; (ii) the Court enters an order refusing to

approve this Agreement or any material part of it; (iii) the Court enters an order declining to

enter the Final Judgment and Order of Dismissal in any material respect; or (iv) the Final

Judgment and Order of Dismissal is modified in any material respect or reversed by a court of

appeal or any higher court.

      In addition, the Parties have agreed upon a common mechanism to resolve any disputes

that occur following the Opt-Out process.  This provision, which reflects a negotiated

compromise reached with the assistance of the mediator, was demanded by Defendants to ensure

that the settlement peace they negotiated for is not derailed by Settlement Class Members

choosing to exclude a material portion of Covered Transactions from the Settlement.  The

mechanism provides that, if a Settling Defendant believes the total Requests for Exclusion from

the Settlement Class represent a material portion of the Covered Transactions and their exclusion

would materially reduce the value of Settlement to that Defendant, it shall have the option to

present the issue to the mediator, Judge Daniel Weinstein (Ret.), for a potential reduction of its

settlement amount.  (¶ 11(b).)

Although Judge Weinstein (Ret.) is vested with discretion to reduce the Settlement Amount in certain narrow circumstances, he cannot reduce the Settlement Amount by an amount greater than a one-to-one ratio.  Thus, the amount paid to a Settlement Class member who chooses to remain and submit a claim as part of the Settlement Class will never be diminished as the result of any decision by other class members to opt out or as a result of any reduction directed by Judge Weinstein (Ret.).  Finally, upon application of a Settling Defendant, if the number of exclusion requests is deemed by Judge Weinstein (Ret.) to deny that Defendant the essential benefits of the Settlement, Judge Weinstein (Ret.) may grant that Defendant's application to terminate the settlement only as to that Defendant.

## IV.   THE PROPOSED SETTLEMENT MEETS THE REQUIREMENTS FOR PRELIMINARY APPROVAL

Under Federal Rule 23(e), the settlement of a class action requires court approval. Courts' assessment of a class settlement proceeds in two steps.  First, the Court considers preliminary approval, which is granted "[w]here the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the reasonable range of approval."  *In re Currency Conversion Fee Antitrust Litig.*, No. 01 Md. 1409 (WHP), 2006 WL 3247396, at *5 (S.D.N.Y. Nov. 8, 2006) (quoting *In re Nasdaq Market-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997)).  Second, if preliminarily approved, notice of the proposed settlement and its terms are provided to all class members and a fairness hearing is held prior to final approval.  *See Nieves v. Cmty. Choice Health Plan of Westchester, Inc.*, No. 08 Civ. 321 (VB), 2012 WL 857891, at *4 (S.D.N.Y. Feb. 24, 2012) ("Preliminary approval of a class action settlement, in contrast to final approval, 'is at most a determination that there is what might be termed 'probable cause' to submit the proposal

12

to class members and hold a full-scale hearing as to its fairness.'") (quoting *Menkes v. Stolt Nielsen S.A.*, 270 F.R.D. 80, 101 (D. Conn. 2010)).

Plaintiffs respectfully submit that the requirements for preliminary approval are satisfied here.[15]  As Judge Weinstein (Ret.) explains in his Declaration:  "the mediation and settlement negotiations that resulted in the comprehensive settlement of this case were complicated, exhaustive, and conducted at arm's-length by sophisticated, knowledgeable, and fully-informed counsel who consulted directly with senior client representatives throughout the process."[16]  The parties have had numerous opportunities to articulate and refine their positions, and Plaintiffs have engaged in several one-on-one negotiations with individual Defendants in order to address specific arguments related to liability and damages.  Throughout this process, the parties have exchanged extensive information, including detailed presentations, written briefs, and functioning damages models months before the deadline for class certification.  With fact discovery due to close in January 2016, the parties have collectively produced over 50 million pages of documents, and Plaintiffs have noticed over 50 depositions, 27 of which were taken before settlements were reached.

By securing more than $1.864 billion in cash compensation as well as injunctive relief that includes meaningful changes to ISDA's licensing procedures, the Proposed Settlement falls well within the reasonable range of approval.

---

[15]   Public policy favors the resolution of class actions through settlement.  *See Bano v. Union Carbide Corp.*, 273 F.3d 120, 129-30 (2d Cir. 2001); *see also In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 455 (S.D.N.Y. 2004).  "[C]ourts encourage early settlement of class actions, when warranted, because early settlement allows class members to recover without unnecessary delay and allows the judicial system to focus resources elsewhere."  *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 474-75 (S.D.N.Y. 2013).

[16]   Weinstein Decl. ¶ 27.

### A.    The Proposed Settlement Was the Result of Extensive Arm's-Length Negotiations Facilitated by an Experienced and Well-Respected Mediator

Courts generally find settlements procedurally fair where they are "the product of arm's length negotiations between experienced and able counsel on all sides." *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06 Md. 1775 (JG), 2009 WL 3077396, at *7 (E.D.N.Y. Sept. 25, 2009) (*"Air Cargo I"*).  As detailed more fully in the Declaration of Judge Weinstein (Ret.), the Proposed Settlement was reached only after extensive arm's-length negotiations between able counsel experienced in class action, antitrust, and trial practice.[17]

As the Court has noted, Quinn Emanuel possesses a "knowledge of the CDS market and antitrust litigation," is "well equipped with trial lawyers who can actually go into court and try a case," and is "familiar litigating against" the bank Defendants.[18]  Pearson Simon similarly possesses extensive experience litigating complex antitrust class actions.[19]  Notably, Defendants were represented not only by some of the most experienced antitrust defense counsel in the country, but also by some of the same lawyers who defended them in the DOJ and EC investigations.  The involvement of experienced counsel, on both sides, is strong evidence that the Proposed Settlement is procedurally fair.  *See In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 122 (S.D.N.Y. 2009) (noting the "extensive" experience of counsel in granting final approval of settlement); *In re PaineWebber Ltd. P'ship Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997) (stating that "great weight" is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation) (citation omitted).

---

[17]    *See* Weinstein Decl. ¶¶ 9-12 (noting that both Parties "were represented by very able and experienced attorneys who specialize in complex antitrust, class action and financial litigation").

[18]    Transcript of Oral Argument at 37-38, 13-MD-2476 (Dec. 5, 2013).

[19]    Pearson, Simon & Warshaw was co-lead counsel for a direct purchaser plaintiff class in *In re TFT-LCD (Flat Panel) Antitrust Litigation* (N.D. Cal. MDL No. 1827) ("*TFT-LCD*").  Bruce Simon headed up the trial team that conducted a six week jury trial against one of the defendants resulting in an $87 million verdict before trebling.  A total of $473 million was recovered for the plaintiff class through Pearson, Simon's efforts.  In 2013, *California Lawyer Magazine* named Mr. Simon California Lawyer of the Year for his work in the TFT-LCD trial.

Further, these negotiations were facilitated by Judge Weinstein (Ret.), "a pioneer in the development of mediation"[20] with decades of experience in resolving complex cases.[21]  As this Court has noted, "[t]he assistance of a well-known mediator … reinforces the conclusion that the Settlement Agreement is non-collusive."  *In re Elec. Books Antitrust Litig.*, 11 Md. 2293 (DLC), 2014 WL 3798764, at *2 (S.D.N.Y. Aug. 1, 2014); *see also Toure v. Amerigroup Corp.*, No. 10 Civ. 5391 (RLM), 2012 WL 3240461, at *3 (E.D.N.Y. Aug. 6, 2012) (noting that involvement of a mediator "raise[s] a presumption that the settlement achieved meets the requirements of due process"); *In re Initial Pub. Offering Sec. Litig*, 226 F.R.D. 186, 194 (S.D.N.Y. 2005) (approving preliminary settlement and noting that participation of a former judge weighed in favor of approval).

The Proposed Settlement resulted from lengthy, arm's-length negotiations.  Settlement did not always (or even usually) appear likely, and at certain points the process nearly broke down.  Judge Weinstein (Ret.), however, encouraged the parties to continue exchanging information regarding their respective positions in parallel with the ongoing litigation.  The Parties had every incentive to—and did—put forward their strongest case at every stage of the mediation process.

As a result, Plaintiffs were able to appreciate and take seriously the risks Defendants identified during the numerous mediation sessions.[22]  Representatives from many Defendants attended sessions, as did Michael Herrera, Senior Staff Counsel for class representative Los Angeles County Employees Retirement Association ("LACERA").  Other class representatives,

---

[20]   JAMS, Hon. Daniel Weinstein (Ret.), http://www.jamsadr.com/weinstein/ (last accessed Oct. 15, 2015).

[21]   *See* Weinstein Decl. ¶¶ 5-8 (describing Judge Weinstein's (Ret.) 28 years of experience mediating "over 3,000 complex disputes").

[22]   *See id.* ¶ 3 (noting that both Plaintiffs and Defendants "developed a very clear understanding of their respective theories and risks through detailed mediation presentations and other information exchanges").

15

including Dan Donovan of plaintiff Salix Capital US Inc., provided valuable input throughout

the process.  By August, after nine months of negotiations, all Defendants had determined it was

in their interest to settle, and Plaintiffs had determined the settlements were an extremely

favorable result for the class.

> **B.      The Proposed Settlement Is Substantively Fair Under the *Grinnell* Factors**

Although the ultimate determination of preliminary approval is whether the settlement

falls within the range of reasonable approval, *In re Warner Chilcott Ltd. Sec. Litig.*, No. 06 Civ.

11515 (WHP), 2008 WL 5110904, at *2 (S.D.N.Y. Nov. 20, 2008), final approval of the

Settlement will require analysis of the nine factors outlined in *Detroit v. Grinnell Corp.*, 495

F.2d 448, 463 (2d Cir. 1974) (citations omitted), *abrogated on other grounds by Goldberger v.

Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000):

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction
> of the class to the settlement; (3) the stage of the proceedings and the amount of
> discovery completed; (4) the risks of establishing liability; (5) the risks of
> establishing damages; (6) the risks of maintaining the class action through the
> trial; (7) the ability of the defendants to withstand a greater judgment; (8) the
> range of reasonableness of the settlement fund in light of the best possible
> recovery; (9) the range of reasonableness of the settlement fund to a possible
> recovery in light of all the attendant risks of litigation.

While certain of these factors are relevant only to final approval, they may provide a

useful guidepost for preliminary approval as well.  *See In re Initial Pub. Offering Sec. Litig.*, 243

F.R.D. 79, 83 (S.D.N.Y. 2007) (*Grinnell* factors considered when assessing preliminary

approval); *Reade-Alvarez v. Eltman, Eltman & Cooper, P.C.*, 237 F.R.D. 26, 34 (E.D.N.Y. 2006)

(same).  Each of these factors weighs in favor of preliminary approval here.

> **1.      The Complexity, Expense, and Likely Duration of the Litigation
>           Support Preliminary Approval of the Proposed Settlement**

"[F]ederal antitrust cases are complicated, lengthy . . . bitterly fought, as well as costly."

*In re Vitamin C Antitrust Litig.*, No. 06-MD-1738 (BMC) (JO), 2012 WL 5289514, at *4

(E.D.N.Y. Oct. 23, 2012) (citations and internal quotes omitted).  With 14 Defendants, numerous third parties, over 50 million pages of produced documents, and 27 depositions taken with five months remaining in fact discovery, the record for class certification alone would have been massive.  Litigating this case through summary judgment and to a full trial on liability and damages would have been an enormous and complex undertaking, likely requiring many tens of millions of dollars in fees and expenses on the part of Plaintiffs and Defendants.

The expert work alone in this complex financial market case was extremely costly. Beyond that, the case presents an inherent level of risk and uncertainty because it involves a market of considerable complexity and unfamiliarity to the average juror.  *Park v. The Thomson Corp.*, No. 05 Civ. 2931 (WHP), 2008 WL 4684232, at *4 (S.D.N.Y. Oct. 22, 2008) ("The complexity of Plaintiff s claims *ipso facto* creates uncertainty.").  Settlement provides a far more efficient resolution to this sprawling litigation.  *See Meredith Corp v. SESAC, LLC.*, 87 F. Supp. 3d 650, 663 (S.D.N.Y. 2015) ("The greater the complexity, expense and likely duration of the litigation, the stronger the basis for approving a settlement.") (citations and internal quotation marks omitted).

If the Court had certified the class, trial would have been all but inevitable because Defendants were determined to create genuine issues of material fact unfit for resolution on summary judgment.  Defendants also undoubtedly possessed the resources to appeal any adverse ruling or verdict if the case progressed to such an advanced stage.  In short, the possibility of protracted litigation with its attendant uncertainty was virtually guaranteed.  By contrast, the Proposed Settlement provides class members with substantial monetary and structural relief now. The first *Grinnell* factor thus supports approval of the Proposed Settlement.  *See In re Initial Public Offering Sec. Litig.*, 243 F.R.D. at 93 ("The prospect of an immediate monetary gain may

be more preferable to class members than the uncertain prospect of a greater recovery some years hence.").

### 2.      Named Plaintiffs Support the Proposed Settlement

Named Plaintiffs LACERA and Salix Capital US Inc. actively participated throughout the prosecution of the case, were consulted in connection with the decisions to enter into the Proposed Settlement, and fully support the Proposed Settlement.  The other named Plaintiffs – Value Recovery Fund LLC, Delta Institutional, LP, Delta Onshore, LP, Delta Offshore, Ltd., Delta Pleiades, LP, and Essex Regional Retirement System – which were kept fully apprised of the status of negotiations, also fully support the settlement.

### 3.      The Stage of the Proceedings and Amount of Discovery Completed Allowed for Informed Settlement

The depth of Plaintiffs' and Co-Lead Counsel's knowledge of the strengths and potential weaknesses of their claims are more than adequate to support the Proposed Settlement.  This knowledge is based on the extensive discovery conducted to date, additional factual information learned in connection with the mediation process, as well as consultation with numerous sophisticated experts, who themselves had done extensive work.  All of this work allowed Co-Lead Counsel to be well-informed of the strengths and weaknesses of Plaintiffs' case and to engage in effective settlement discussions with Defendants.  *See In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 458 (S.D.N.Y. 2004) ("[T]he question is whether the parties had adequate information about their claims.").  This factor, too, strongly supports preliminary approval of the Proposed Settlement.

### 4.    Both Parties Faced Significant Risks Regarding Liability, Damages, Class Certification, and Trial

(a)    Liability Risks

Plaintiffs built a strong liability case as early as their first mediation session in January 2015 and continued to build upon their case over the following months.  Nonetheless, "[l]iability is never automatic."  *Park*, 2008 WL 4684232, at *4.  As noted, both the DOJ and EC have not assessed any penalties against Defendants after years of investigation, an indication that litigating the case further would entail risk and uncertainty.  *See In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 475 (S.D.N.Y. 1998) (noting that the lack of a prior conviction or an admissible civil judgment may suggest the difficulty of establishing antitrust liability). This concern is particularly acute when litigating against top-flight defense counsel,[23] many of whom represented Defendants during the DOJ and EC investigations, and are essentially litigating this case for the third time.

During the mediation process, Plaintiffs became well-informed as to the liability defenses Defendants could be expected to raise.  Among other things, Defendants were likely to argue that:  (1) CME and Citadel bore the responsibility for not seeking a license for exchange trading; (2) any denial of a license to CMDX was the result of independent decision-making by Markit and ISDA rather than the product of collusion; (3) CMDX was not viable for a number of reasons, including technological issues and a dysfunctional relationship between CME and Citadel; (4) there was little demand for exchange trading of CDS in 2008 and after; and (5) CME and Citadel decided to abandon their trading platform because clearing was the sole priority of the buy-side and regulators, and the best clearing platform at the time was The Clearing Corporation ("TCC"), which was owned by the dealers.

---

[23]    *See* Weinstein Decl. ¶ 12 (noting that Defendants were "represented by counsel with decades of relevant experience").

19

Plaintiffs vigorously disputed all of these arguments at mediation and were prepared to refute them at trial.  Nonetheless, Plaintiffs are aware that, while they can adduce substantial evidence in support of their liability case, Defendants' arguments are colorable and have some basis in evidence.

(b)   <u>Damages Risks</u>

"[T]he history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal."  *Air Cargo I*, 2009 WL 3077396, at *8 (internal citations omitted).  As in any antitrust case, such a risk is acutely present.

The expert work required here to build a viable damages model was tremendous. Plaintiffs' experts needed to process over 100 million individual CDS transactions in less than a year, and to provide Defendants with a functioning (and defensible) damages model months before class certification.  Given the sheer number of the CDS transactions at issue and the number of assumptions Plaintiffs' experts needed to make to arrive at class-wide damages, it is clear that causation and damages would be hotly contested and these issues would inevitably become a battle of the experts.  As courts have routinely noted, "[i]t is impossible to predict which party's model of damages—if either—the jury would credit."  *See Meredith Corp.*, 87 F. Supp. 3d at 665 (citations and internal quotation marks omitted); *see also In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 129 (S.D.N.Y. 1997) ("[D]amages are a matter for the jury, whose determinations can never be predicted with certainty.").  The certainty of the Proposed Settlement, compared to the (extremely costly) risks associated with trial, further supports settlement as the best outcome for the Parties.

20

(c)     Class Risks

While Plaintiffs believe they would win a contested motion for class certification, "it is at least possible that variations among the [plaintiffs] or other factors might have complicated plaintiffs' class-certification bid." *Meredith Corp.*, 87 F. Supp. 3d at 666. If the Court certified the proposed class, Defendants made clear that they would almost certainly seek interlocutory appeal pursuant to Fed. R. Civ. P. 23(f), which would have the potential to delay the resolution of this action substantially. *See id.* The inherent "uncertainty of maintaining a class through trial" weighs in favor of settlement. *Id.*

(d)     Trial Risks

Given Defendants' stated strategy to defeat any motion Plaintiffs might make for summary judgment, the risk and uncertainty of a jury trial could arise. Litigation of these factual issues would consume substantial resources and jeopardize the settlements that the Plaintiffs have obtained for the class. While Plaintiffs believe that their claims would be borne out by the evidence, they also recognize the difficulties of proving liability at trial. Defendants have articulated defenses to Plaintiffs' allegations that may have been accepted by the jury.[24]

Although Plaintiffs are confident that they would have been able to support their claims with qualified and persuasive expert testimony, jury reactions to competing experts are inherently difficult to predict, and Defendants would have presented well credentialed experts to support their various defenses to liability and damages. Given the requirement of a unanimous verdict in federal court, it is not unusual for juries in antitrust cases to award minimal damages even where liability is established. *See, e.g.*, *U.S. Football League v. Nat'l Football League*, 644

---

[24]     *See* Weinstein Decl. ¶ 4 ("Plaintiffs faced significant factual and legal hurdles in proving liability, damages, and causation.  Given the legal and factual risks Plaintiffs faced, the monetary result achieved for the Class is, in my judgment, exceptional.").

F. Supp. 1040, 1042 (S.D.N.Y. 1986) (noting that jury found defendant liable for monopolization but awarded only nominal damages), *aff'd,* 842 F.2d 1335, 1377 (2d Cir. 1988).

### 5. The Proposed Settlement Is Reasonable in Light of Risks and the Potential Range of Recovery

"The adequacy of the amount achieved in settlement is not to be judged in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case." *Meredith Corp.*, 87 F. Supp. 3d at 665-66 (quoting *In re "Agent Orange" Prod. Liab. Litig.,* 597 F. Supp. 740, 762 (E.D.N.Y. 1984)). Here, the monetary relief that Defendants will pay is very significant. ISDA's proposed changes to its licensing procedures will additionally ensure that, going forward, the CDS market is more competitive and transparent.[25] Given the acknowledged risks Plaintiffs face in proving their case, the recovery for class members is more than reasonable – it is an exceptional result that few believed possible at the outset of this litigation,[26] and which has already had a procompetitive impact on the CDS market.[27]

## V. THE CLASS SHOULD BE PRELIMINARILY CERTIFIED

This case meets all the requirements of Rule 23(a) – numerosity, commonality, typicality, and adequacy – as well as the predominance and superiority requirements of Rule 23(b)(3). Thus the proposed class may be certified for settlement purposes.

---

[25]  *See* Duffie Decl. ¶¶ 8-10.

[26]  *See* Weinstein Decl. ¶ 29 ("Based on all the knowledge I gained about the case and its potential strengths and weaknesses, it is my view that the $1,864,650,000 settlement achieved by Plaintiffs is not only fair and adequate to the class, but exceedingly favorable and reflects a recovery well beyond what I expected could be achieved during much of the mediation process.").

[27]  *See* Duffie Decl. ¶¶ 8-10.

### A.     The Settlement Class Satisfies the Requirements of Rule 23(a)

#### 1.     The Class Is So Numerous That Joinder Is Impractical

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable."  "[I]impracticability exists where . . . joinder of all claims into one proceeding would be expensive, time-consuming, and logistically unfeasible."  *MacNamara v. City of New York*, 275 F.R.D. 125, 137 (S.D.N.Y. 2011) (citations and internal quotes omitted).  It is widely recognized by courts in the Second Circuit that "[n]umerosity is presumed when a class consists of forty or more members."  *In re Elec. Books Antitrust Litig. ("E-Books")*, 11 Md. 2293 (DLC), 2014 WL 1282293, at *11 (S.D.N.Y. Mar. 28, 2014).  CDS trading data analyzed by Plaintiffs' experts shows that the proposed class is comprised of over 10,000 entities.  The class is thus sufficiently numerous to make joinder impracticable.[28]

#### 2.     There Are Many Questions Common to All Class Members

Rule 23(a)(2) requires that there "be questions of law or fact common to the class." Commonality is established where a class-wide proceeding may "generate common answers apt to drive the resolution of the litigation."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (citation omitted).  The commonality requirement poses "a low hurdle."  *In re Sumitomo Copper Litig.*, 194 F.R.D. 480, 482 (S.D.N.Y. 2000) (citation omitted).  Indeed, "even a single common question will do."  *Dukes*, 131 S. Ct. at 2551 (citation omitted); *see In re IndyMac Mortgage-Backed Sec. Litig.*, 286 F.R.D. 226, 233 n.50 (S.D.N.Y. 2012) (same).

Direct purchaser actions in antitrust conspiracy cases readily satisfy the commonality requirement.  *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 105 (2d

---

[28]   Some courts have imposed an additional requirement that the class must also be ascertainable.  *See, e.g.*, *Engel v. Scully & Scully, Inc.*, 279 F.R.D. 117, 128 (S.D.N.Y. 2011).  "To be ascertainable, the class must be readily identifiable, such that the court can determine who is in the class and, thus, bound by the ruling."  *E-Books*, 2014 WL 1282293, *24.  Here, the members of the class are readily identifiable from CDS transaction records from the DTCC database produced to Plaintiffs.

Cir. 2007) ("[A]llegations of the existence of . . . conspiracy are susceptible to common proof"). Here, the existence and effect of Defendants' conspiracy to suppress competition and transparency in the CDS market poses common factual and legal questions, the determination of which will resolve "in one stroke" issues that are "central to the validity . . . of [the class's] claims." *Dukes*, 131 S. Ct. at 2551. Commonality exists here because all class members allegedly suffered antitrust injury from Defendants' conspiracy, which inflated bid-ask spreads for all class members. The relevant facts all focus on Defendants' conduct and its impact on price competition and transparency in the CDS market. The settlement class thus satisfies Rule 23(a)(2).

### 3.      Class Plaintiffs' Claims Are Typical of Those of All Class Members

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." The typicality requirement is "not demanding." *Tsereteli v. Residential Asset Securitization Tr. 2006-A8*, 283 F.R.D. 199, 208 (S.D.N.Y. 2012) (citation omitted). It only requires showing that "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (citation omitted).

Courts recognize that antitrust conspiracy claims by direct purchasers routinely meet the typicality requirement. *See, e.g.*, *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 111 (S.D.N.Y. 2010) ("In this case, the named Plaintiffs' claims are typical because Plaintiffs must prove a conspiracy, its effectuation, and damages therefrom—precisely what the absent class members must prove to recover."). This case is no different. The class representatives' and class members' claims arise from the same alleged conspiracy, carried out

by the same Defendants, giving rise to the same legal theories of antitrust liability. Nothing more is required to demonstrate typicality.

### 4.    The Settlement Class Is Fairly and Adequately Represented

Rule 23(a)(4) requires a determination that "the representative parties will fairly and adequately protect the interests of the class." This element asks whether "the members of the class possess the same interests, and that no fundamental conflicts exist among the members." *Charron v. Wiener*, 731 F.3d 241, 249 (2d Cir. 2013) (citations omitted).

Here, there is no fundamental conflict that would bar certification on adequacy grounds. The class representatives and members of the class share the same interest in maximizing their recovery from Defendants. Because class representatives are both purchasers and sellers of CDS who were harmed by the same anticompetitive conduct as every other class member, they have every interest in securing a result that is in the best interests of all class members.

As recognized by the Court's order appointing Quinn Emanuel lead and Pearson Simon co- lead counsel, Plaintiffs' counsel have significant expertise in complex class actions and antitrust litigation, have served in leadership roles in numerous class actions throughout the country, did extensive work in identifying and investigating plaintiffs' claims, and have vigorously represented plaintiffs thus far in this litigation. LACERA has proven itself to be a sophisticated and dedicated class representative which actively participated in the prosecution of the case. Salix made substantial contributions through its deep knowledge of the market. Accordingly, Rule 23(a)(4) is satisfied.

### B.    The Settlement Class Satisfies the Requirements of Rule 23(b)(3)

Rule 23(b)(3) requires that common questions must predominate over any questions affecting only individual members of the class and that class resolution be superior to other methods for the adjudication of the controversy. Plaintiffs meet both requirements.

1.     **Common Questions of Law and Fact Predominate**

Rule 23(b)(3)'s predominance requirement tests whether "proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amgen v. Conn. Ret. Plans & Tr. Funds*, 133 S. Ct. 1184, 1196 (2013) (citation omitted). Predominance is satisfied where the questions that are capable of proof by generalized evidence "are more substantial than the issues subject only to individualized proof." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015); *see also Brown v. Kelly*, 609 F.3d 467, 484 (2d Cir. 2010) (Rule 23 requires that common issues "predominate," not that action includes "only common questions"). In the settlement context, "the predominance inquiry will sometimes be easier to satisfy" because settlement eliminates manageability problems related to trial. *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 240 (2d Cir. 2012).

As the Supreme Court has noted, "[p]redominance is a test readily met in certain cases alleging … violations of the antitrust laws," *Amchem v. Windsor Prods., Inc.*, 521 U.S. 591, 625 (1997). This case is no exception. Courts routinely recognize that the type of evidence that Plaintiffs have painstakingly developed here presents "common" or "generalized" issues for a class, because it focuses by definition on *defendants'* common activities. *Dial Corp. v. News Corp.*, 13 Civ. 6802 (WHP), 2015 WL 4104624, at *5 (S.D.N.Y. June 18, 2015) ("[I]ssues relevant to proving a violation of the antitrust laws . . . can be proven through class-wide, common evidence because they focus on [defendants'] conduct, not on the actions of putative class members."); *In re TFT–LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 593 (N.D. Cal. 2010) ("Where an antitrust conspiracy has been alleged, courts have consistently held that the very nature of a conspiracy antitrust action compels a finding that common questions of law and fact exist.") (citations and internal quotes omitted). The question of whether Defendants

engaged in an anticompetitive conspiracy is common to all class members and, therefore, the class "will prevail or fail in unison" on this issue. *Amgen*, 133 S. Ct. at 1191.

The centrality of the question of whether Defendants engaged in an unlawful conspiracy, combined with the fact that this issue is the very paradigm of a "common" issue, leads courts to recognize that this issue *alone* can suffice to establish that common issues predominate. *See, e.g.*, *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06 Md. 1775, 2014 WL 7882100, at *40 (E.D.N.Y. Oct. 15, 2014) ("*Air Cargo II*"). In addition, all class members would have suffered a common antitrust impact from the alleged conspiracy, which deprived all class members of new trading venues that would have yielded greater competition and transparency in this CDS market – and thus forced them to pay artificially inflated bid-ask spreads on CDS transactions. *See Cordes,* 502 F.3d at 107 (finding that legal and factual questions of antitrust impact were common to class members in case alleging horizontal price-fixing conspiracy).

Thus, common questions predominate over any conceivable individualized issues here.

### 2.    A Class Action is the Superior Method for Resolving this Case

Rule 23(b)(3) also requires a finding that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." The superiority requirement ensures "that the class will be certified only when it would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Cordes*, 502 F.3d at 104 (citation and internal quotes omitted). Where certification is sought in the settlement context, the superiority requirement is applied more leniently because the court "need not inquire whether the case, if tried, would present intractable management problems." *Amchem*, 521 U.S. at 620; *In re Am. Int'l Grp.*, 689 F.3d at 239-40.

Here, the class members have no substantial interest in proceeding individually rather than collectively, especially given the complexity and expense of this case.  It would be manifestly inefficient for each class member to litigate claims against Defendants individually.  Class-wide settlement is the superior means of resolving these consolidated lawsuits.

## VI.    THE PROPOSED FORM AND METHOD OF NOTICE SHOULD BE APPROVED

Rule 23(e)(1) provides that "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the [proposed settlement]."  For actions certified under Rule 23(b)(3), "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Rule 23(c)(2)(B).  Notice must clearly state:  (1) the nature of the action; (2) the class definition; (3) the claims, issues, or defenses; (4) that a class member may enter an appearance through an attorney if the member so desires; (5) that the court will exclude any member from the class who so requests; (6) the time and manner for requesting exclusion; and (7) the binding effect of a class judgment.  *Id.*

Through CDS trade data produced by third party DTCC, Plaintiffs have identified by name all potential class members.  Plaintiffs propose providing individual, mailed notice ("Notice") to each of these class members in the form as attached as Exhibit 16 to the Declaration of Daniel L. Brockett.[29]  The Claims Administrator will mail the Notice First Class, postage prepaid, to the class members.  The mailed Notice shall also contain a proof of claim for class members to return, as discussed further below.  The Summary Notice (attached to the

---

[29]   The Parties have agreed upon the material terms of the [Proposed] Order Preliminarily Approving Settlements and Providing for Notice to the Settlement Class, the Notice of Proposed Settlement of Class Action ("Notice"), the Summary Notice, and the [Proposed] Final Judgment and Order of Dismissal as part of the settlement process.  Because these documents are referenced within each Settlement Agreement, Plaintiffs have submitted copies attached to each Settlement Agreement.  For the Court's convenience, Plaintiffs have also submitted individual copies of these documents as exhibits to the Declaration of Daniel L. Brockett.

Declaration of Daniel L. Brockett as Exhibit 17) will be published once in national and global

(Europe and Asia) editions of the *Wall Street Journal*, once in *Investor's Business Daily*, and

once over the *PR Newswire*.

The Notice, a blank proof of claim form, the summary notice, each Stipulation and

Agreement of Settlement with all 14 Defendants, and key pleadings, such as the Complaint,

orders and this motion, will also be posted on the Settlement Website, and a toll-free telephone

number will be set up to answer class members' questions and to facilitate filing of claims.

The standard for the adequacy of notice to the class is ultimately one of reasonableness.

"There are no rigid rules to determine whether a settlement notice to the class satisfies

constitutional or Rule 23(e) requirements; the settlement notice must 'fairly apprise the

prospective members of the class of the terms of the proposed settlement and of the options that

are open to them in connection with the proceedings.'"  *Wal-Mart Stores, Inc. v. Visa U.S.A.,

Inc.*, 396 F.3d 96, 114 (2d Cir. 2005) (citation and internal quotes omitted).

Here, with a large but manageable class of over 10,000 sophisticated class members

consisting of pension funds, investment firms, and insurance companies for the most part, and

Plaintiffs' ability to identify individual class members by name, the notice procedures outlined

above clearly satisfy any due process concerns.  Accordingly, Plaintiffs request that the notices

and the notice plan be approved.

## VII.    THE PLAN OF DISTRIBUTION SHOULD BE PRELIMINARILY APPROVED

By returning the claim form mailed to them, class members will be able to receive their

share of the Proposed Settlement once it is finally approved.  Under the proposed Plan of

Distribution, *all* of the Net Settlement Fund (the amount remaining after attorneys' fees,

litigation costs and claims administration costs have been deducted) will be divided *pro rata*

among the class members submitting valid proofs of claim.  The Plan of Distribution uses as a

29

basis the damage model constructed by Plaintiffs' experts to determine the amount of each class member's allowed claim.  The model uses the database of CDS transactions maintained by the DTCC which all market participants accept as the legal record of a CDS transaction.  The data identify CDS transactions executed between January 1, 2008 and September 25, 2015 which may be eligible to receive distributions from the Net Settlement Fund under the Settlement Class definition upon proper and timely submission of a claim.

To the extent possible, each Settlement Class Member will be able to review on a secured website the following information about that member's qualifying trades, as recorded in the DTCC database:  (i) the name of the CDS purchased or sold with the unique identification number (RED Code); (ii) the date of the transaction; (iii) the notional amount of the transaction; (iv) the tenor of the transaction (number of years, typically 5 years); and (v) for CDS indices, the series.  To the extent a Settlement Class Member believes that the DTCC information understates its Covered Transactions, it may submit additional trade information with its claim form.

Plaintiffs' experts have identified a uniform spread compression percentage that will be applied to each Covered Transaction to generate the amount of each Settlement Class Member's potential allowed claim.  The model assumes that, but for Defendants' wrongful conduct, some CDS transactions would have migrated from over-the-counter trading to exchanges with a central limit order book, which would have resulted in greater pre- and post-trade transparency and other market efficiencies, thus compressing the artificially-inflated spreads on CDS traded on an exchange as well as any of those that would have continued to trade over the counter.  A Settlement Class Member's allowed claim will be the total spread inflation it paid on all Covered Transactions.  The Net Settlement Fund will be distributed to all Settlement Class Members who submit claims based on the percentage of each Settlement Class Member's allowed claim as

compared to the sum of all valid, allowed claims that are filed.  *All* of the Net Settlement Fund will be paid out to Settlement Class Members who make proper and timely claims.  No monies will revert to Defendants.

A more detailed description of the Plan of Distribution will be posted on the settlement website prior to notice being mailed to the Settlement Class.  Plaintiffs will request at the time of the fairness hearing that the Court approve the Plan of Distribution as providing a fair and equitable procedure for distributing settlement proceeds to the Settlement Class.

## VIII.   NAMED CLASS PLAINTIFFS SHOULD BE CERTIFIED AS SETTLEMENT CLASS REPRESENTATIVES, AND QUINN EMANUEL URQUHART & SULLIVAN, LLP AND PEARSON, SIMON & WARSHAW, LLP APPOINTED AS LEAD AND CO-LEAD COUNSEL FOR THE SETTLEMENT CLASS

Plaintiffs have vigorously and competently represented the interests of the proposed Settlement Class.  Plaintiff LACERA, one of the largest public pension funds in the United States, committed significant staff time and resources throughout this litigation.  At all times it has had meaningful input into Co-Lead Counsel's litigation strategy.  Michael Herrera, Senior Staff Counsel for LACERA, participated in numerous mediation sessions and made a presentation to counsel for Defendants at the March 31, 2015 mediation session.

Representatives of Salix Capital US Inc. have also played a major role throughout this litigation.  Among other things, Salix principals with broad experience in CDS trading provided insight and expertise to Co-Lead Counsel and Plaintiffs' economic experts on the structure and operations of CDS trading markets.

The remaining named plaintiffs, Value Recovery Fund LLC, Delta Institutional, LP, Delta Onshore, LP, Delta Offshore, Ltd., Delta Pleiades, LP and Essex Regional Retirement System, have fully participated in discovery and fulfilled their duties to the Class.  These

plaintiffs hereby request that they be preliminarily certified, solely for purposes of effecting the Settlements, as Settlement Class representatives.

On December 13, 2013, the Court appointed Quinn Emanuel as Lead Counsel and Pearson Simon as Co-Lead Counsel.  As set forth above and noted in the Declaration of Judge Weinstein (Ret.), these firms have committed massive time, resources, and skills to the successful representation of Plaintiffs and at all times have acted in the best interests of the proposed Settlement Class.  Plaintiffs, accordingly, respectfully request that the Court preliminarily appoint Quinn Emanuel as Lead Counsel and Pearson Simon as Co-Lead Counsel for the Settlement Class.

## IX.   GARDEN CITY GROUP SHOULD BE APPOINTED AS CLAIMS ADMINISTRATOR AND SIGNATURE BANK AS ESCROW AGENT

Following the preliminary settlements being reached with Defendants, Co-Lead Counsel requested written proposals from a number of the leading class actions claims administration firms.  After reviewing those proposals two firms were selected as finalists including Garden City Group ("GCG").  Co-Lead Counsel conducted extensive interviews of the two finalists and requested and received revised proposals from each.  Although estimated costs of administration was an important consideration, Co-Lead Counsel also considered qualitative factors.  In light of the size of the settlement and the complexity of the claims process, it was important that the firm selected have broad experience in handling complex antitrust class actions involving financial trading markets.  GCG's final proposal met both criteria.

GCG has handled a number of the largest antitrust and securities class actions over the past twenty years.  For example, it acted as claims administrator for the *In re Worldcom Securities Litigation* $6.15 billion settlement.  That case, familiar to this Court, involved notice to nearly four million potential class members and processing of nearly one million claims.

32

Attached as Exhibit 18 to the Declaration of Daniel L. Brockett is the firm resume of GCG showing its extensive experience in administration of complex class actions.  Plaintiffs hereby request that GCG be appointed as the claims administrator.

Plaintiffs further request that Signature Bank be appointed as escrow agent for the purpose of holding the settlement funds during administration through final distribution to eligible members of the Settlement Class.  Co-Lead Counsel conducted independent due diligence of Signature Bank including a telephonic interview with its Chief Executive Officer, Joseph DePaolo.  Signature Bank has repeatedly been recognized as among the top banks in providing attorney escrow services and was named best business bank in 2014 by the New York Law Journal.  Moreover, Signature Bank and GCG have a close working relationship that will encourage efficiency in the administration process.  Exhibit 19 to the Declaration of Daniel L. Brockett provides further information on Signature Bank.

## X.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court (i) grant Plaintiffs' Motion for Preliminary Approval, (ii) preliminarily certify the Settlement Class, (iii) approve the Notices and Notice Plan authorizing the dissemination of notice, (iv) preliminarily approve the Plan of Distribution, (v) appoint Plaintiffs as representatives of the Settlement Class, (vi) appoint Quinn Emanuel as Lead Counsel  and Pearson Simon as Co-Lead Counsel for the Settlement Class, and (vii) appoint Garden City Group as claims administrator and Signature Bank as escrow agent.  A Proposed Preliminary Approval Order is attached.

Respectfully Submitted,


/s/ Daniel L. Brockett
_____

Daniel L. Brockett
Steig D. Olson
Sascha N. Rand
Jonathan Oblak
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000
Fax:  (212) 849-7100
danbrockett@quinnemanuel.com
steigolson@quinnemanuel.com
sascharand@quinnemanuel.com
jonoblak@quinnemanuel.com

*Lead Counsel for Plaintiffs*

Bruce L. Simon
Clifford Pearson
George S. Trevor
Pearson, Simon, & Warshaw, LLP
44 Montgomery Street, Suite 2450
San Francisco, California 94104
Telephone: (415) 433-9000
Fax: (415) 433-9008
bsimon@pswlaw.com
cpearson@pswlaw.com
gtrevor@pswlaw.com

*Co-Lead Counsel for Plaintiffs*