UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
                                                                   :
                                                                   :
                                                                   :
IN RE CREDIT DEFAULT SWAPS ANTITRUST                               :
LITIGATION                                                         :    13 Md. 2476 (DLC)
                                                                   :
This Document Relates To: All Actions                              :
                                                                   :
                                                                   :
                                                                   :
                                                                   :
------------------------------------------------------------------ x

**DECLARATION OF DARRELL DUFFIE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT WITH ALL DEFENDANTS AND PRELIMINARY CERTIFICATION OF A SETTLEMENT CLASS**

I, Darrell Duffie, hereby declare as follows:

1. Counsel for the plaintiff class in the above-captioned matter retained me in late 2014 as a testifying expert in *In re Credit Default Swaps Antitrust Litigation*, No. 13 MD 2476 (DLC) (S.D.N.Y.). I submit this declaration to explain why, in my view, this case was important; how its aggressive advancement and the publication of the proposed settlement has fostered beneficial changes in the Credit Default Swap ("CDS") market; and the relevance of the behavioral remedies agreed to by Defendant International Swaps and Derivatives Association ("ISDA") as part of the proposed settlement of this action.

**Background**

2. I am the Dean Witter Distinguished Professor of Finance at the Graduate School of Business, Stanford University, and Professor by Courtesy, Department of Economics, Stanford University. A substantial focus of my research, teaching, and policy-related work is the market for CDS, and more generally how alternative market structures and developments affect the CDS market.

1

3.	In addition to a wide range of consulting work performed for regulators and market participants, I have written research papers, policy reports, and books that address CDS markets, swap markets, and the central clearing of swaps.  My most recent books are: *Dark Markets: Asset Pricing and Information Transmission in Over-the-Counter Markets* (Princeton University Press, 2012), *Measuring Corporate Default Risk* (Oxford University Press, 2011) and *How Big Banks Fail* (Princeton University Press, 2010).

4.	Among other appointments and activities, I serve on the Financial Advisory Roundtable of the Federal Reserve Bank of New York.  I was elected the 2009 President of the American Finance Association, the leading U.S. and international academic organization of financial economists.  In 2013-2014, I chaired the Market Participants Group (MPG), charged by the Financial Stability Board with recommending reforms to LIBOR, EURIBOR, and other interest-rate benchmarks used in over-the-counter swap markets.

5.	My CV, which includes other relevant qualifications, is attached as Appendix A.

6.	In this action, I analyzed the viability of CDS exchange trading in or around 2008 and the predominance of common issues and injury among class members in this action.  In connection with my work, I examined, among other materials, hundreds of documents produced by Defendants and third parties, as well as dozens of deposition transcripts of current and former employees of Defendants and third parties.

## Exchange Trading of CDS

7.	I have written extensively about the migration of CDS from the over-the-counter ("OTC") market to electronic and exchange trading and have long publicly stated that exchange trading would result in increased price transparency, more efficient pricing, and enhanced competition among dealers, and would thereby improve the efficiency of the CDS market.

8.      Because this action sought to address the historical lack of price transparency and competition in the CDS market, I agreed to serve as an expert witness for the plaintiff class. Indeed, I believe that this action, and the aggressive manner in which the counsel for Plaintiffs have litigated it, has spurred important beneficial changes in the CDS market.

9.      As a notable example, on August 31, shortly after I became aware that Plaintiffs and Defendants had reached a preliminary agreement to settle this case, the Intercontinental Exchange ("ICE") announced that it plans to begin offering an anonymous, all-to-all trading platform for single-name CDS.[1]  This platform was described as "exchange-like" and will feature many of the beneficial aspects of exchange trading that I have identified in my published works and describe above.[2]

10.     That ICE has now announced an anonymous, all-to-all exchange trading platform—a transparent platform that Plaintiffs alleged in this action to have been blocked by Defendants—is a remarkable shift that I attribute, in part, to this litigation and its favorable resolution.

11.     It is also my opinion that the licensing and related changes agreed to by ISDA as part of the proposed settlement will improve the CDS marketplace and benefit class members.

12.     ISDA owns certain intellectual property, including the rights to the settlement prices generated by CDS auctions administered by ISDA (the "Final Price"), that are necessary for the operation of a viable CDS exchange trading platform.  Plaintiffs alleged that ISDA, in collusion with Defendants, refused to grant such licenses to any exchange trading platforms.  The changes to its licensing practices that ISDA has now agreed to adopt under the proposed

---

[1]  *See* Mike Kentz, *ICE plans single-name CDS platform*, Reuters (Aug. 31, 2015), http://www.reuters.com/article/2015/08/31/markets-derivatives-cds-idUKL1N1161A520150831.

[2]  *Id.*

settlement will make it much easier for parties to license ISDA's intellectual property for the exchange trading of CDS.

13.     ISDA has also agreed to a number of measures that will make its licensing process more transparent and inclusive of class members. For example, as part of the proposed settlement, ISDA will ensure that its licensing decisions are made by a committee with equal buy-side representation. In addition, ISDA has agreed to broadcast its licensing meetings to the public via the internet and to publish licensing decisions related to CDS on its website, unless a proposed licensee objects. These measures should help ensure that ISDA's licensing process is fair and transparent.

14.     Finally, ISDA has agreed to formally consider and vote on a proposal to make an official statement discouraging the post-trade disclosure of the identities of the counterparties to a CDS transaction—what is termed "name give-up"—and to support the implementation of Commodity Futures Trading Commission ("CFTC") guidance related to the elimination of or placement of limitations on name give-up.[3]

15.     I consider these and other terms of the proposed settlement agreement to be important changes that should make the CDS market more transparent, efficient, and competitive, and thereby benefit class members.

---

[3]   Anonymity is a critical component of exchange trading platforms because it allows entities to transact without disclosing their trading strategies to the wider market. The practice of name give-up, accordingly, deters buy-side firms from trading on platforms with exchange-like features. The elimination of the practice of name give-up would thus, in my view, significantly increase incentives for participation on new or existing CDS trading platforms with exchange-like features.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 13TH date of October, 2015, at Lausanne, Switzerland.

Darrell Duffie