UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE CREDIT DEFAULT SWAPS ANTITRUST LITIGATION<br><br>This Document Relates to: All Actions | 13 Md. 2476 (DLC) |

**DECLARATION OF BRUCE L. SIMON IN SUPPORT OF MOTION FOR AWARD OF ATTORNEYS' FEES REIMBURSEMENT OF EXPENSES, AND INCENTIVE AWARDS FOR CLASS REPRESENTATIVES**

I, Bruce L. Simon, declare under penalty of perjury as follows:

1. I am a member of the California Bar and am admitted *pro hac vice* to the Bar of this Court. I am a partner in the firm of Pearson, Simon & Warshaw, LLP ("Pearson Simon"), attorneys of record for the Los Angeles County Retirement Association ("LACERA") and Co-Lead Counsel for Plaintiffs. I submit this declaration in support of Class Counsel's Motion for Award of Attorney's Fees, Reimbursement of Expenses, and Incentive Awards for Class Representatives

2. I am personally familiar with the facts set forth in this declaration. If called as a witness, I could and would competently testify to the matters stated herein.

3. My firm, along with our Co-Lead Counsel, Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel"), has been involved in all aspects of this litigation. Pearson Simon has worked side by side with Quinn Emanuel in performing and coordinating the work necessary at each phase of the litigation, including investigating the potential claims of the plaintiff class, drafting the initial and consolidated amended complaints, responding to the motions to dismiss, discovery, class certification, settlement negotiations, and claims administration.

### Pearson Simon's Investigation of Anticompetitive Practices in the CDS Trading Market

4. In 2011, Pearson Simon commenced an investigation of trading of Credit Default Swaps ("CDS"). That investigation revealed an opaque trading market with information on CDS prices tightly controlled by the Defendant banks in conjunction with Markit Group ("Markit") and the International Swaps and Derivatives Association ("ISDA"). As a result of its investigations, Pearson Simon concluded that there was a basis to allege the Defendant banks had obtained and maintained their control over the CDS trading market through anticompetitive practices and agreements.

5. During its initial investigation of the CDS trading market, Pearson Simon attorneys reviewed several hundred articles, research reports, United States government reports and international reports on the CDS trading, the operation of that market, and the effect that the

1

lack of price transparency had on trading spreads by persons who bought or sold CDS. Pearson Simon also consulted with economic experts and institutional investors in CDS.

6. Pearson Simon also received and analyzed confidential CDS trading data from several large public pension funds including LACERA. During this time, Pearson Simon worked with their co-counsel (Wayne Lamprey and Jeffery Lawrence) in making a presentation to LACERA which resulted in LACERA issuing a request for proposal ("RFP") to determine if LACERA would file suit. Pearson Simon, with its co-counsel, submitted a RFP in September 2013. The RFP process with LACERA is described in detail in the Declaration of Michael Herrera ("Herrera Declaration") at Paragraphs 5-9. The negotiations with LACERA on the fee structure commenced after LACERA had selected Pearson Simon as its counsel for the CDS Antitrust Litigation. The fee award requested by Class Counsel herein is the same as the fee schedule negotiated between Pearson Simon and LACERA before suit was filed.

### Drafting Complaint and Opposing Defendants' Motions to Dismiss

7. By 2012, Pearson Simon had prepared a detailed complaint laying out the Defendant banks' conspiracy to inflate CDS transaction costs and prevent exchange trading of CDS. In May of 2013, the first of several other plaintiffs filed complaints alleging similar antitrust violations. Pearson Simon continued to work with several public pension funds and on October 29, 2013 filed a complaint on behalf of LACERA. That complaint was the product of Pearson Simon and LACERA's investment and legal staff's over two-year investigation and legal analysis of CDS trading.

8. On October 22, 2013, the United States Judicial Panel on Multidistrict Litigation transferred all CDS related class actions to the Southern District of New York. On December 13, 2013, the Court appointed Quinn Emanuel Lead Counsel and Pearson Simon as Co-Lead Counsel for the proposed class. LACERA and Salix Capital U.S., Inc. were appointed as "Lead Plaintiffs." Immediately thereafter Pearson Simon and Quinn Emanuel began work on a consolidated amended complaint. Without the benefit of any government indictments or guilty pleas, Co-Lead Counsel searched the public record for facts evidencing collusion and worked

with experts to develop theories that were consistent with the economic evidence. Co-Lead Counsel also worked to identify potential witnesses with knowledge of the underlying facts and met with numerous industry insiders who provided valuable insight into the operations of the industry.

9. The above-described investigation resulted in filing of the Second Consolidated Amended Complaint (the "Complaint"), on April 14, 2014. The Complaint detailed, in nearly 90 pages, an alleged conspiracy by defendants to stifle competition and thwart price transparency in the CDS market, including an agreement by Defendants to boycott "CMDX," a proposed CDS exchange trading platform developed jointly by the Chicago Mercantile Exchange ("CME") and Citadel Investment Group ("Citadel").

10. Defendants filed four separate motions to dismiss. The Defendants argued, *inter alia*, that the alleged injuries to class members were too remote to provide a basis for an antitrust claim, the conspiracy allegations were implausible, the statute of limitations barred certain claims, and the Dodd-Frank Wall Street Reform and Consumer Protection Act preempted the application of the antitrust laws. ISDA argued that its participation in the conspiracy was implausible because, as a non-profit industry association, it would not have benefitted from bid-ask spreads caused by the boycott of CDS exchange trading platforms. Markit argued that Plaintiffs lacked antitrust standing, it was legally incapable of conspiring with its bank shareholders, and Plaintiffs had not alleged an unreasonable restraint of trade. BNP Paribas argued that Plaintiffs had failed to sufficiently allege its role on the conspiracy.

11. Pearson Simon worked closely with Quinn Emanuel in the research and drafting of the opposition briefs. The arguments presented were complex and well researched by Defendants. On September 4, 2014, the Court denied Defendants' motions in most part, dismissing a single count for conspiracy to monopolize.

## Discovery

12. Discovery began in earnest following the Court's order on Defendants' motions to dismiss. Co-Lead Counsel served extensive discovery requests on Defendants in September and

3

October of 2014, and negotiated the production of documents previously provided by Defendants to the DOJ and the European Commission ("EC"). Pearson Simon and Quinn Emanuel jointly drafted this discovery and both participated in the negotiations related to the DOJ and EC document production. Procedures were also implemented by the firms to ensure coordination between them. Weekly conference calls were conducted between senior attorneys from both firms to make sure work proceeded in a timely and efficient manner, which it did.

13. After lengthy negotiations, in some cases with 14 different Defendants, the parties agreed to search terms and custodians for additional document productions, and Defendants eventually produced over 50 million pages of documents. Faced with this large volume of documents, both firms trained large teams to analyze the documents in an effective way, even before they started arriving. Knowing that all documents we would receive could not be reviewed immediately, if ever, Co-Lead Counsel tested and then used cutting-edge analytical tools to identify which categories of documents to review first. Critical documents were circulated and analyzed daily by the attorneys on the case.

14. As threads of the conspiracy were uncovered, responsibility for mastering them was assigned to team members, and they were developed in narrative form using tools accessible to all team members. Indeed, some of the knowledge-sharing tools we used in this case are, we believe, ground-breaking approaches that contributed greatly to the speed and efficiency by which Co-Lead Counsel were able to master key elements of the case. Pearson Simon assisted Quinn Emanuel in the development of an online (secured) "wiki" page that enabled attorneys to organize and digest the massive amounts of information revealed in Defendants' documents.

15. Pearson Simon lawyers were actively involved in all aspects of the document review in conjunction with Quinn Emanuel and spent a very significant amount of time reviewing documents in order to take depositions and be in a position to prove Plaintiffs' case. To ensure that each firm's efforts were not duplicative, the defendant banks were divided between the two firms as to document review, meet and confers as necessary and ultimately depositions. The firms made a similar division of labor as to third party document subpoenas

and responding to defendants' discovery of plaintiffs.

16. Plaintiffs began serving interrogatories on November 21, 2014, including requests for information about the dates and attendees of potentially conspiratorial meetings. It took months of extensive negotiations (and threats of motion practice) before Defendants provided meaningful answers listing dates, times, and names. Knowing exactly who met who and when helped the attorneys to further target their searches of Defendants' massive document productions and piece together detailed summaries of key conspiratorial meetings. Pearson Simon was actively involved with Quinn Emanuel in the drafting the interrogatories and in the meet and confer efforts after Defendants' initial responses to the interrogatories.

17. Co-Lead Counsel also served subpoenas on approximately two dozen third parties. For example, Co-Lead Counsel sought and obtained data for tens of millions of CDS transactions from the Depository Trust & Clearing Corporation ("DTCC"), which became the backbone for the damages model Co-Lead Counsel built with their experts. When the initial trade data productions by DTCC were deemed inadequate for constructing a robust damages model, Pearson Simon attorneys conducted numerous meet and confers with DTCC's counsel, and DTCC agreed to reproduce the CDS trade data including all data fields. That new production was made on July 1, 2015. At the time DTCC's counsel described the production as the largest production of data DTCC had ever made to an outside party. Because of its sheer volume and complexity, processing the DTCC data required a dedicated, team of experts. *See* Declaration of Elizabeth Kroger Davis.

18. Plaintiffs also obtained expedited document productions from key third parties, including CME, Citadel and Intercontinental Exchange ("ICE"), which, like defendants, had previously produced documents to the DOJ. Pearson Simon and Quinn Emanuel worked diligently to draft, serve and negotiate the scope of the documents to be produced by third parties pursuant to subpoenas.

19. Co-Lead Counsel, assisted by two law firms representing other named plaintiffs, also produced hundreds of thousands of pages of trading data and responsive emails, and

5

responded to interrogatories served by defendants on January 12, 2015.  LACERA worked with its investment managers to produce detailed CDS trading records.  Pearson Simon worked with LACERA to ensure that it complied with its discovery obligations.  The production of ESI data from LACERA's electronic devices was extensive with millions of records reviewed and hundreds of thousands electronic documents produced to Defendants.

20. At a January 2015 hearing, the Court requested that the parties expedite the schedule for class certification, and the deadline for Plaintiffs' motion was advanced by six months.  Plaintiffs considered this accelerated schedule a benefit because Co-Lead Counsel had already created a chronology of Defendants' conspiracy, had identified the key witnesses and the types of admissions to secure, and were eager to present Plaintiffs' case for class certification.

21. Even without a complete production of documents by Defendants, Co-Lead Counsel noticed 21 fact depositions on May 27, 2015.  Depositions began on June 10, 2015, and continued through August, with as many as four depositions being taken on a single day (sometimes in multiple countries).  These depositions were largely of senior personnel at the Banks, Markit and ISDA.

22. The depositions taken by Co-Lead Counsel were generally taken by seasoned examiners with experience in this complex subject matter.  Depositions taken by Pearson Simon were by me or George Trevor, senior counsel for the firm with over 28 years of experience in complex financial litigation.  As a result of these cumulative efforts, we believe that virtually every deposition led to damaging admissions and blows to the credibility of Defendants' witnesses.  This was despite the fact that Defendants' witnesses were, uniformly well-prepared by their able counsel.

23. Co-Lead Counsel ultimately served 34 formal deposition notices on Defendants, requested dates for dozens more, and took 27 depositions of Defendants' witnesses.  Co-Lead Counsel also noticed depositions of third parties Bloomberg, CME, Citadel and the CEO of ICE, Jeffrey Sprecher.

24. During the same period that depositions were proceeding, Co-Lead Counsel

engaged in extensive efforts with multiple experts to build a rigorous class-wide approach to proving injury and quantifying damages. These included working with experts at Berkeley Research Group ("BRG"), a world renowned data and analytics firm with expertise in derivatives and financial markets; Professor Darrel Duffie, a professor of finance at Stanford University, who is widely recognized as one of the leading experts on over-the-counter markets for financial products, including CDS, in the world; and a number of other industry experts. Pearson Simon and Quinn Emanuel worked closely with these experts to develop a class wide approach to proving injury and damages, develop a robust damages model, and prepare expert reports to show how the conspiracy had a common adverse effect on class members. The work performed by BRG is set forth in the Declaration of Elizabeth Kroger Davis filed herewith.

25. Co-Lead Counsel retained Professor Duffie to testify on, among other things, the viability of a CDS exchange, the compression of bid/ask spreads on an exchange, and the impact of blocking exchange trading on CDS investors. Co-Lead Counsel worked closely with Professor Duffie to develop theories on the compression of bid/ask spreads and the viability of a CDS exchange.

## Mediations and Settlement

26. Co-Lead Counsel also engaged in extensive mediation efforts which ultimately led to the settlement of this matter. While Co-Lead Counsel were confident in their ability to take this case to trial, they began settlement negotiations early in the case by jointly retaining with Defendants the Honorable Daniel Weinstein (Ret.) in December 2014 to act as a mediator. While discovery and expert analysis proceeded simultaneously, Co-Lead Counsel worked through Judge Weinstein to see if it was possible to achieve significant compensation for the class without further risk or delay. A full description of the mediation and settlement process was described in Plaintiffs' Motion for Preliminary Approval (*see* Dkt. No. 444, 14-16). Pearson Simon, along with its client LACERA, worked closely with Quinn Emanuel throughout the mediation process.

27. For most of the settlement process, Plaintiffs and Defendants were unable to reach

agreement.  Co-Lead Counsel, with the support of the named Plaintiffs, concluded that the key to a successful settlement was to press forward aggressively with discovery and toward class certification.  Ultimately, in Plaintiffs' view, this strategy worked, and Plaintiffs reached agreements in principle with all Defendants to settle this case by August 13, 2015.

28.    The proposed settlement totaling $1.86 billion, along with meaningful injunctive relief, is an excellent result for Settlement Class Members.  With respect to injunctive relief, Defendant ISDA has agreed to make changes in its licensing process that should make it easier for new market entrants to launch CDS trading platforms, as well as new transparency-promoting measures for its meetings and decision-making processes.

29.    The settlement with Defendants was preliminarily approved by the Court on October 29, 2015.  In the Court's order, Quinn Emanuel and Pearson Simon were appointed by the Court as Co-Lead Counsel for the Settlement Class.

## Pearson Simon's Professional Time

30.    This action presented substantial risks for the Class and Co-Lead Counsel.  Here, the government did not bring criminal charges; thus, we could not rely on the government securing settlements, fines or guilty pleas.  No Defendant has been indicted for the alleged conduct.  This was not a case where plaintiffs' counsel piggybacked on the work of government regulators.

31.    Co-Lead Counsel faced Defendants represented by some of the top lawyers from 17 firms representing 14 defendants, with nearly all of the defendants being extremely well financed.

32.    Pearson Simon's professional time in the CDS Antitrust Litigation as of January 1, 2016 by lawyer or paralegal is attached to this declaration as Exhibit A.  Pearson Simon undertook the prosecution of this case with the risk of getting nothing.  We dedicated a substantial portion of the firm's resources and advanced millions in litigation costs for the benefit of the Class.

33.    For Pearson Simon attorneys and paralegals, the attached table is based on the

then-current hourly rates the firm charges in both contingent and non-contingent matters.  This time was recorded on a contemporaneous basis and has been reviewed by my partners to ensure that all time is appropriately billed.  All work reported by attorneys and paralegals on behalf of the Class in this matter was performed on a wholly contingent basis.  Moreover, Pearson Simon's then-current hourly rates have been found to be reasonable in numerous other cases.[1]

34.     Pearson Simon has also paid millions of dollars in unreimbursed litigation expenses in prosecuting this case.  These litigation expenses have been audited by my partners as well.  We have adjusted air travel to "coach fares"; hotel rooms not to exceed $500 per night; and eliminated most meal expenses.  The detail of such expenses is set forth in the Declaration of Daniel Brockett filed herewith.  Pearson Simon paid to Quinn Emanuel $2,016,695.57 as its partial share of litigation expenses and paid directly $695,890.97 in litigation expenses.  These amounts are included in the listing of expenses by category at Appendix B to the Declaration of Daniel Brockett.  Total litigation expenses paid by Pearson Simon for which it seeks reimbursement as of the date of my declaration is $2,712,586.54.  To the extent additional expenses are incurred prior to April 15, 2016, I will submit a further declaration in support of reimbursement.

35.     I understand the Court's views on incentive awards, however, I would respectfully suggest that such awards are merited in this particular case.  As set forth in the

---

[1] *See* Order Granting Direct Purchaser Plaintiffs' Motion for an Award of Attorney Fees, Reimbursement of Expenses, and Class Representative Incentive Awards, *In re Optical Disk Drive Antitrust Litigation*, No. 3:10-md-02143 RS (N.D. Cal. July 23, 2015) (ECF No. 1658) (When conducting lodestar cross-check Court finds Class Counsel' loadstar reasonable based on historical hourly rates—which included fees of Executive Committee member Pearson Simon); Order as Modified by the Court Granting Plaintiffs' Motion for Attorneys' Fees, Litigation Costs, and Incentive Awards, *In re Warner Music Group Corp. Digital Downloads Litigation*, No. CV 12-0559-RS (N.D. Cal. Jan. 12, 2015) (ECF No. 116) (Court conducts lodestar cross-check using historical hourly rates of Plaintiffs' counsel, including Co-Lead Pearson Simon, and confirms reasonableness of fee request); *Colin Higgins Productions, Ltd. v. Universal City Studios, LLC*, No. BC499180 (Cal. Sup. Ct. Dec. 28, 2015) (Court finds that Pearson Simon' lodestar is reasonable based on historical hourly rates).

Herrera Declaration, he and other LACERA professionals devoted substantial amounts of time assisting in the prosecution of this case. LACERA's help was essential to the success of this case. LACERA participated in this action, including reviewing and approving pleadings before they were filed with the Court, responding to discovery requests and producing hundreds of thousands of pages of trading data and other documents. Mr. Herrera also attended and actively participated in the mediation sessions in this matter. This required tremendous effort to protect the interests of the class members which took time away from other business at hand. *See* Herrera Declaration, ¶¶ 11-16. Mr. Herrera participated in nearly all of the mediation sessions held and gave an oral presentation at a pivotal mediation session that helped demonstrate the power of LACERA' s potential testimony at trial.

36. As established by Mr. Herrera's declaration, this is a case where the class representatives made invaluable contributions to the litigation which was a driving force behind the successful resolution of this case and justifies financial compensation.

### Pearson Simon's CDS Litigation Team

37. Pearson Simon is a client-focused litigation firm with extensive experience in complex antitrust and securities litigation. Pearson Simon's willingness to see large complex cases through to the end is illustrated by its role as lead counsel other complex class actions. This has been demonstrated in cases such as *In re TFT-LCD (Flat Panel) Antitrust Litigation*, MDL No. 1827 (N.D. Cal.) ("*TFT-LCD*"), which after more than five years of litigation proceeded to trial and resulted in a jury verdict of $87 million before trebling. The total amount recovered for Direct Purchaser Plaintiffs ("DPPs") was over $473 million, including a post-trial settlement. I was co-lead counsel and trial counsel for DPPs and was the principal attorney from our office handling the case from the beginning. The case proceeded to trial before the Honorable Susan Illston in the Northern District of California, and is believed by many to be one of the largest antitrust price-fixing cases in the United States. In 2013, *California Lawyer*

*Magazine* awarded me a California Lawyer of the Year Award for my work in *TFT-LCD*.[2] The jury verdict in that case was cited by the *Los Angeles Daily Journal* as one of the top 10 verdicts of the year.[3]

38. Pearson Simon currently serves as interim co-lead class counsel in the following cases: *In re Lithium Ion Batteries Antitrust Litigation*, MDL No. 2420 (N.D. Cal.),(multidistrict case arising from the price-fixing of lithium ion batteries brought on behalf of a direct purchaser class); *In re National Collegiate Athletic Association Athletic Grant-in-Aid Cap Antitrust Litigation*, MDL No. 2451 (N.D. Cal.), (NCAA and its member conferences alleged to have violate the antitrust laws by capping the value of grant-in-aid athletic scholarships at far below the actual cost of attending school, and far below what the free market would bear); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litigation*, MDL No. 2542 (S.D.N.Y.), (alleging unlawful monopolization of the United States market for single-serve coffee packs by Keurig Green Mountain, Inc.); and *Senne, et al. v. Office of the Commissioner of Baseball*, *et al.*, Case No. 14-cv-00608 (N.D. Cal.), (challenging an allegedly illegal wage scheme forced upon minor league baseball players by Major League Baseball ("MLB"), its member franchises, and the Commissioner of MLB, Bud Selig).

39. The lead attorneys from Pearson Simon in the CDS Litigation were myself, Clifford H. Pearson, George S. Trevor and Aaron M. Sheanin.

40. In over 35 years of practice I have served as lead or co-lead counsel in number of nationwide antitrust class actions, both at my current firm and as a partner at my prior firm, including the cases discussed above. I also served as co-lead counsel for the direct purchaser plaintiffs in a highly influential case involving the Foreign Trade Antitrust Improvements Act, *In re Potash Antitrust Litigation (II)*, MDL No. 1996 (N.D. Ill.). In that case, we defeated a motion to dismiss, but a panel of the United States Court of Appeals for the Seventh Circuit reversed the

---

[2] http://www.callawyer.com/Clstory.cfm?eid=927417.

[3] http://www.pswplaw.com/Pearson-Simon-Warshaw-DJ-Top-Verdicts-LCD.pdf.

11

decision. We continued the fight and obtained an *en banc* review, which I argued before the Seventh Circuit. On June 27, 2012, the Seventh Circuit unanimously reversed the panel's decision 8-0, and affirmed the district court's denial of defendants' motion to dismiss. *Minn-Chem, Inc. v. Agrium, Inc.,* 683 F.3d 845 (7th Cir. 2012). Significantly, the court took a broad view of the power of federal courts to hear antitrust cases concerning alleged foreign cartel activity that plaintiffs contend has effects in the United States. The case ultimately resulted in settlements for the direct purchasers totaling $90 million. Other significant cases in which I have been the senior attorney include: *In re Sodium Gluconate Antitrust Litigation*, MDL No. 1226 (N.D. Cal.) (Wilken, J.), an antitrust case involving a food additive product; *In re Methionine Antitrust Litigation*, MDL No. 1311 (N.D. Cal.) (Breyer, J.), an antitrust class action that resulted in over $100 million in settlements; and *In re Citric Acid Antitrust Litigation*, MDL No. 1092 (N.D. Cal.)) (Legge, J.), an antitrust class action that resulted in over $80 million in settlements for direct purchasers.

41. Clifford H. Pearson is a civil litigator and business lawyer who specializes in complex litigation, class actions, and business law. Mr. Pearson is the founding partner of Pearson Simon. Mr. Pearson was instrumental in negotiating the substantial settlements that totaled $473 million in *TFT-LCD* and over $90 million in *In re Potash Antitrust Litigation (II)*, MDL No. 1996 (N.D. Ill.) on behalf of direct purchaser plaintiffs. In 2013, Mr. Pearson was recognized for his work in these major antitrust cases by being named in the *Daily Journal* as one of the Top 100 lawyers in California.

42. George S. Trevor is Senior Counsel at Pearson Simon. Mr. Trevor has focused his practice for the past 28 years representing investors in securities class actions, securities arbitrations, and complex business litigation. Since joining Pearson Simon, Mr. Trevor has been the senior attorney on a number of the firm's important cases, including *In re Lehman Securities and ERISA Litigation,* No. 09-md-02017 LAK (S.D.N.Y.), where Pearson Simon represented California public entities that purchased Lehman securities prior to its bankruptcy. At his prior firm, Mr. Trevor worked for nearly five years as one of the chief attorneys representing a class of

shareholders in the Pacific Lumber Company. That case was transferred to the SDNY as part of the *In re Ivan F. Boesky Securities Litigation* MDL before Judge Milton Pollack. On the night before trial, the remaining defendants settled with the Pacific Lumber class. Combined with settlements obtained from Michael Milken, Drexel Burnham Lambert, Ivan Boesky and others, the Pacific Lumber shareholders received over $144 million in additional compensation for their shares, one of the largest recoveries in securities litigation at the time. Mr. Trevor has litigated cases against investment banking firms, hedge funds, real estate limited partnerships, software and hardware companies, alternative energy companies, and accounting firms.

43. Aaron M. Sheanin has extensive experience in complex litigation matters in federal and state courts, including the prosecution of antitrust and complex consumer class actions. He has litigated numerous securities fraud and corporate governance cases on behalf of individual and institutional investors, and has advised state pension funds and private institutions with respect to securities matters. Mr. Sheanin was a member of Pearson Simon's trial team in *TFT-LCD*. He was actively involved in the trial of that case at all stages. Mr. Sheanin is currently a senior Pearson Simon attorney in the *In re Lithium Ion Batteries Antitrust Litigation*, MDL No. 2420 (N.D. Cal.). Mr. Sheanin served as co-lead counsel in *In re American Express Financial Advisors Securities Litigation* ($100 million settlement), as co-lead counsel on behalf of lead plaintiff the Kansas Public Employees' Retirement System in the securities class action *Scheiner v. i2 Technologies* ($84.85 million in settlements), and as co-chair of the discovery committee in *In re Natural Gas Antitrust Cases* ($160 million in settlements).

44. Many other highly qualified Pearson Simon attorneys--whose details can be provided upon request—also worked on the CDS Litigation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 28, 2016, at San Francisco, California.

_____
Bruce L. Simon

13

# EXHIBIT A

# EXHIBIT A

**PEARSON, SIMON & WARSHAW, LLP**
**Breakdown by Attorney Inception through 12/31/2015**

| Timekeeper | Position | Billed Hours | Weighted Average Rate | Total Fee |
|---|---|---|---|---|
| Clifford H. Pearson | Partner | 839.90 | $958.07 | $804,684.50 |
| Bruce L. Simon | Partner | 1173.10 | $935.17 | $1,097,042.50 |
| Daniel L. Warshaw | Partner | 253.60 | $827.40 | $209,828.00 |
| George S. Trevor | Senior Counsel | 3763.30 | $795.55 | $2,993,886.00 |
| Aaron M. Sheanin | Attorney | 802.30 | $775.95 | $622,548.50 |
| Robert G. Retana | Attorney | 616.75 | $805.19 | $496,603.25 |
| Michael H. Pearson | Attorney | 2227.90 | $440.80 | $982,068.50 |
| Alexander R. Safyan | Attorney | 544.70 | $436.90 | $237,979.50 |
| Bobby Pouya | Attorney | 238.40 | $615.98 | $146,850.00 |
| Alan Cyrlin | Attorney | 2937.70 | $430.32 | $1,264,155.00 |
| Veronica W. Glaze | Attorney | 1447.90 | $472.75 | $684,490.50 |
| R. Clay Stockton | Attorney | 1082.10 | $417.45 | $451,722.00 |
| Matthew A. Pearson | Attorney | 531.80 | $385.00 | $204,743.00 |
| S. Michael Madadi | Attorney | 1538.50 | $350.00 | $538,475.00 |
| Hakop Stepanyan | Attorney | 709.30 | $350.00 | $248,255.00 |
| Amee Choi | Attorney | 1001.50 | $350.00 | $350,525.00 |
| Brittany R. Gibson | Attorney | 1477.10 | $350.00 | $516,985.00 |
| Meredith C. Doyle | Attorney | 1395.40 | $333.61 | $465,517.50 |
| Lauren DeGirolamo | Attorney | 1661.70 | $350.00 | $581,595.00 |
| Ryan E. Mowry | Attorney | 1792.40 | $350.00 | $627,340.00 |
| Jason J. Rudolph | Attorney | 1015.50 | $350.00 | $355,425.00 |
| Kenneth L. Tate | Attorney | 328.00 | $350.00 | $114,800.00 |
| Leslie A. Razo | Attorney | 1350.00 | $350.00 | $472,500.00 |
| Kelsey L. Halverson | Attorney | 1191.40 | $350.00 | $416,990.00 |
| Thomas K. Boardman | Attorney | 391.90 | $380.10 | $148,959.50 |
| Andrew P. Stashefsky | Attorney | 494.00 | $350.00 | $172,900.00 |
| William J. Newsom | Attorney | 70.20 | $375.00 | $26,325.00 |
| Matt Lusich | Law Clerk | 0.40 | $175.00 | $70.00 |
| Alexander L. Simon | Law Clerk | 21.20 | $175.00 | $3,710.00 |
| Gregory Sonstein | Law Clerk | 0.70 | $225.00 | $157.50 |
| Steve Simon | Paralegal | 3.50 | $125.00 | $437.50 |
| Ellowene Grant | Paralegal | 67.60 | $204.22 | $13,805.00 |
| Amanda Lunzer | Paralegal | 542.55 | $206.54 | $112,056.25 |
| **TOTAL** | | 31,551.60 | | $15,367,359.50 |

867796.1