UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------- x
:
:
IN RE CREDIT DEFAULT SWAPS ANTITRUST :
LITIGATION : 13 Md. 2476 (DLC)
:
This Document Relates To: All Actions :
:
:
:
:
----------------------------------------------------------------- x

**DECLARATION OF THOMAS FELGNER IN SUPPORT OF**
**INCENTIVE AWARD FOR SALIX CAPITAL US INC.**

I, Thomas Felgner, hereby declare as follows:

1. Along with Eric Grannan, I am a co-owner of Salix Capital US Inc. ("Salix").

2. Since graduating from Fuqua School of Business at Duke University in 1995, I have worked in two main roles in the financial industry. From 1995 until 2002, I was a convertible bond trader, first at Lehman Brothers, then at Banc of America Securities. From 2002 through 2009, I served as a hedge fund manager for FrontPoint Partners, L.P. ("FPP") pursuant to an investment management agreement.

3. Salix is the assignee of certain claims relating to credit default swaps ("CDS") from FrontPoint Relative Value Opportunities Fund, L.P. ("FRV"), FrontPoint Volatility Opportunities Fund, L.P. ("FVO"), FrontPoint Volatility Opportunities Fund GP, L.P. ("FVO GP"), and FPP (collectively, the "FrontPoint Funds"). Salix has brought the claims in this case in its capacity as assignee of the FrontPoint Funds.

4. FRV, FVO, and FVO GP were sponsored by FPP, whose subsidiaries at all relevant times acted as an advisor to FRV, FVO, and FVO GP. As a hedge fund manager at FPP, I conducted trades, including CDS trades, for the FrontPoint Funds.

5. In addition, an entity named GDG Asset Management ("GDG") served as an investment manager for the FrontPoint Funds. Daniel Donovan and Richard Grinden were the principals of GDG. Under a revenue sharing agreement, Eric Grannan and I received certain profits from GDG's operations. GDG served as an investment manager only for the FrontPoint Funds.

6. In 2009, the FrontPoint Funds sustained heavy losses and began winding down. At this point, GDG changed its name to Salix Capital Ltd. and began to engage in different investment activities, such as high-frequency trading.

1

7. In light of the dissolution of the FrontPoint Funds and GDG's changing investment strategies, Daniel Donovan, Eric Grannan, and I formed Salix Capital US Inc., a separate entity, in March of 2010.

8. When Salix decided to pursue the CDS case in May 2013, I was working at Wedbush Securities ("Wedbush") as a proprietary trader of exchange-traded funds ("ETFs"). Wedbush is a small, retail broker-dealer, and does not trade over-the-counter derivatives such as CDS. This was different from my former roles as a convertible bond trader and hedge fund manager where I was dependent on the Dealer Defendants for a number of critical services, including day-to-day liquidity and trading activities.

9. It is generally perceived in the financial industry that those who cross the major Wall Street banks face potential retaliation, including denial of employment opportunities or refusals to provide trading or other services. I knew that if Salix agreed to act as a named plaintiff in this case, I risked my ability ever to return to a dealer bank or to work again as a hedge fund manager. This placed a real constraint on my future career options, as Wedbush faces increasing challenges due to the changing nature of the financial industry, and may ultimately be forced out of business by recent federal regulations.

10. On October 9, 2014, I was identified to Defendants as an individual likely to possess documents and information concerning this case in Plaintiffs' Initial Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(1). Subsequently, in the fall of 2014 and again in August of 2015, I interviewed for jobs with one of the Dealer Defendants. I believe that my participation in this case may have played a role in my being denied these positions.

11. Despite my awareness of the professional risks and consequences that were likely to result from taking a public role in this case, I decided (along with Daniel Donovan and Eric

Grannan) to serve as a class representative. I believed that this was an important case. It was clear from my experience, which included trading CDS while at the FrontPoint Funds, that the CDS market would benefit from exchange trading, price transparency, and enhanced competition.

12. After deciding to act as a class representative, I worked closely with Quinn Emanuel to develop and prosecute this lawsuit. Initially, I consulted with Quinn Emanuel about Plaintiffs' theory of liability and reviewed and commented upon numerous draft complaints. Quinn Emanuel had retained a consulting firm to develop a preliminary theory of how Defendants' conspiracy harmed class members, and I worked with Quinn Emanuel to integrate this economic analysis into pleadings.[1] I also discussed Defendants' motions to dismiss with Plaintiffs' counsel, and assisted in developing responses to Defendants' arguments.

13. After discovery began, I collected documents I had retained from the FrontPoint Funds, including CDS trading records, and worked with Quinn Emanuel to produce them to Defendants. I also discussed Defendants' interrogatories, which focused on the CDS trading activities of the FrontPoint Funds, with Quinn Emanuel, and offered guidance on responses.

14. Defendants' interrogatories and other discovery requests suggested that Defendants were likely to argue that, contrary to our allegations, the CDS market was *already* transparent, and that buy-side firms had access to accurate, real-time information regarding CDS pricing (and, therefore, exchange trading would have a minimal impact on CDS bid-ask spreads). Based on my trading background, I believed this was not the case and worked with Quinn Emanuel to develop rebuttal points and arguments.

---

[1] *See, e.g., Salix Capital US Inc. v. Bank of America Corp., et al.*, No. 13 Civ. 6116 (S.D.N.Y.), Dkts. 1, 8.

15. In addition, I participated in multiple teleconferences with Quinn Emanuel to discuss Plaintiffs' damages model and the defenses that were raised by Defendants during mediation sessions. Due to my experience trading over-the-counter financial products, I was able to assist in the development of responses to some of the complex causation and damages-related arguments raised by Defendants.

16. When Defendants began settling, I discussed the implications and terms of the settlements with Quinn Emanuel, including injunctive relief agreed to by ISDA. After the Court granted preliminary approval of the Settlements, I participated in several teleconferences with Quinn Emanuel regarding Plaintiffs' damages model, providing advice regarding which CDS transactions by class members were eligible for claims.

17. Drawing upon my experience trading CDS, I helped decipher the complex trading data being used by Plaintiffs' damages model and subsequently helped Class Counsel understand and resolve issues raised by the adaption of the damages model for use in the claims administration process. For example, I helped the Berkeley Research Group ("BRG") identify and determine how to analyze certain types of CDS transactions in the DTCC data, a necessary prerequisite to calculating Class members' claims.

18. As noted, Salix brought claims as an assignee of the FrontPoint Funds. Under Salix's assignment agreement, all money received under the Settlements will go to investors in the FrontPoint Funds, rather than Salix, until a "high water" mark is reached.

19. While I understand that Salix's claim will not be determined until after final approval of the Settlements, I understand that preliminary estimates indicate that Salix's claim will fall well below this high water mark. As a result, all of the monies claimed by Salix (which I expect to be in the hundreds of thousands of dollars range), will be transferred to investors in

the FrontPoint Funds. I have retained a small ownership stake of 0.40% in one of the FrontPoint Funds, and accordingly may receive some amount of any *pro rata* claim paid to Salix, but such amount is likely to be small given the size of my ownership stake. Thus, absent an incentive award, Salix itself will not receive any compensation for its service as a class representative, and I will receive little to no reimbursement of my time and expenses.

20. A description of the time I spent on this case is below. In total, I spent approximately 120 hours assisting with this lawsuit. I have not received any compensation for my work undertaken in connection with this matter.

| Task | Hours |
|---|---|
| Pre-suit investigation. Discuss merits of lawsuit and consequences of joining with Quinn Emanuel. Provide information to Quinn Emanuel regarding CDS market and framing of complaint. | 20 |
| Drafting of complaint. Review drafts of complaint and provide comments on feedback to Quinn Emanuel. | 20 |
| Motion to dismiss briefing. Discuss arguments raised by Defendants with Quinn Emanuel and comment on draft of amended complaint. | 10 |
| Document discovery. Retrieve and review relevant files retained from FrontPoint Funds and send to Quinn Emanuel. | 30 |
| Interrogatories. Discuss Defendants' interrogatories with Quinn Emanuel, and provide responses to Defendants' interrogatories. | 10 |
| Damages model. Discuss damages model, and damages-related issues raised by Defendants, with Quinn Emanuel. Provide advice regarding construction of damages model and thoughts on how to rebut Defendants' damages-related arguments. | 20 |
| Settlement negotiations. Discuss settlement progress and strategy with Quinn Emanuel. Provide feedback on damages model for settlement purposes. | 10 |
| **Total** | **120** |

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 28 day of January of 2016, at South Pasadena, CA

_____
Thomas Felgner