G4F3CREC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

IN RE:  CREDIT DEFAULT SWAPS
ANTITRUST LITIGATION,
                                     13 MD 2476 (DLC)
------------------------------x
                                     New York, N.Y.
                                     April 15, 2016
                                     2:00 p.m.

Before:

                    HON. DENISE COTE

                                          District Judge

                         APPEARANCES

QUINN EMANUEL URQUHART & SULLIVAN, LLP
     Attorneys for Plaintiffs
BY:  DANIEL L. BROCKETT
     SASCHA N. RAND
     STEIG OLSON
     -and-
PEARSON SIMON WARSHAW LLP
     Attorneys for Plaintiffs
BY:  BRUCE L. SIMON
     GEORGE S. TREVOR
     CLIFFORD PEARSON
          -and-
MICHAEL D. HERRERA
     Senior Staff Counsel, LACERA

DAVIS POLK
     Attorneys for Defendant Bank of America
BY:  ARTHUR J. BURKE
     OLGA COGAN

KATTEN MUCHIN ROSENMANN LLP
     Attorneys for Defendant UBS AG, UBS Securities LLC
BY:  DAVID C. BOHAN

ALLEN & OVERY
     Attorneys for Defendant BNP Paribas
BY:  DAVID ESSEX
     LAURA RITTELL

G4F3CREC

                    A P P E A R A N C E S
                         (continued)

CRAVATH, SWAINE & MOORE LLP
     Attorneys for Defendant Morgan Stanley Co.
BY:  DANIEL SLIFKIN
     VANESSA LAVELY

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP (NYC)
     Attorneys for Defendant JPMorgan Chase & Co.
BY:  PETER E. GREENE
     BORIS BERSHTEYN

WINSTON & STRAWN LLP
     Attorneys for Defendant The Goldman Sachs Group, Inc.
BY:   ELIZABETH PAPEZ
            -and-
SULLIVAN & CROMWELL
     Attorneys for Defendant The Goldman Sachs Group, Inc.
BY:    RICHARD PEPPERMAN

JONES DAY
     Attorneys for Defendant Deutsche Bank
BY:  TRACY V. SCHAFFER
         PAULA RENDER

SIMPSON THACHER & BARTLETT LLP (NY)
     Attorneys for Defendant The International Swaps and
Derivatives Association, Inc.
BY:  ABRAM ELLIS
         MICHAEL GARVEY

CADWALADER, WICKERSHAM & TAFT LLP
     Attorneys for Defendant Royal Bank of Scotland PLC
BY:  AMY W. RAY

SIDLEY AUSTIN LLP
     Attorneys for Citi Defendants
BY:  KATHERINE S. ENGLANDER
     BEN NAGIN

MAYER BROWN LLP
     Attorneys for HSBC Defendants
BY:  ANDREW S. MAROVITZ

PROSKAUER ROSE LLP
     Attorneys for Defendants Markit Group LTD
BY:  STEPHEN CHUK

G4F3CREC

1    CAHILL GORDON & REINDEL, LLP
          Attorneys for Defendant Barclays Bank PLC
2    BY:  DAVID G. JANUSZEWSKI

3

4    WILMER CUTLER PICKERING HALE and DORR, LLP
          Attorneys for Defendant Credit Suisse AG
     BY:  DAVID LESSER
5         –and–
     HOGAN LOVELLS
6         Attorneys for Defendant Credit Suisse AG
     BY:  BENJAMIN HOLT
7

8    KOREIN TILLERY
          Attorneys for Objector MF Global and Saba
9    BY:  GEORGE A. ZELCS

10   REID COLLINS TSAI, LLP
          Attorneys for Objector Silver Point Capital Entities
11   BY:  J. BENJAMIN KING

12

13

14

15

16

17

18

19

20

21

22

23

24

25

G4F3CREC

1          THE DEPUTY CLERK:  This is the matter of In Re Credit

2     Default Swaps Antitrust Litigation.  Judge Cote will take the

3     appearances.

4          THE COURT:  For the plaintiffs, we'll start with

5     Mr. Brockett, is it?

6          MR. BROCKETT:  Yes.  Dan Brockett from Quinn Emanuel

7     on behalf of the plaintiffs.

8          MR. OLSON:  Steig Olson with Quinn Emanuel.

9          MR. RAND:  Sascha Rand, Quinn Emanuel.

10          MR. HERRERA:  Michael Herrera, lead plaintiff, Los

11     Angeles County Employees Retirement Association.

12          THE COURT:  Thank you for traveling here, Mr. Herrera.

13     I have some questions for you.  I appreciate it very much.

14          MR. SIMON:  Bruce Simon on behalf of plaintiffs.

15          MR. TREVOR:  George Trevor on behalf of plaintiffs.

16          MR. PEARSON:  Clifford Pearson.

17          THE COURT:  Thank you.  Any other appearances for

18     plaintiffs?  We'll take appearances for the defendants Bank of

19     America.

20          MR. BURKE:  Arthur Burke, Davis Polk, your Honor.

21          THE COURT:  Are you accompanied by a colleague,

22     Mr. Burke, or not?

23          MR. BURKE:  Olga Kagen as well.

24          THE COURT:  Olga Kagen?

25          MR. BURKE:  Cogan, I apologize.  C-O-G-A-N.

G4F3CREC

 1              THE COURT:  Barclays?

 2              MR. JANUSZEWSKI:  David Januszewski from Cahill Gordon

 3    & Reindel.

 4              THE COURT:  Bank Paribas?

 5              MR. ESSEX:  David Essex and Laura Rittell, Allen &

 6    Overy.

 7              THE COURT:  For Citigroup?

 8              MR. NAGIN:  Benjamin Nagin from Sidley Austin, and

 9    Katherine Englander.

10              THE COURT:  For Credit Swiss?

11              MR. HOLT:  Benjamin Holt from Hogan Lovells.

12              MR. LESSER:  And David Lesser from Wilmer Hale.

13              THE COURT:  For Deutsche Bank?

14              MS. RENDER:  Paula Render and Tracy Schaffer from

15    Jones Day.  Thank you.

16              THE COURT:  For Goldman Sachs?

17              MR. PEPPERMAN:  Richard Pepperman from Sullivan &

18    Cromwell.  With me is Elizabeth Papez from Winston & Strawn.

19              THE COURT:  So Mr. Pepperman, we didn't have your name

20    on the appearance sheet.  Did I have that right, Pepperman?

21              MR. PEPPERMAN:  Yes, your Honor.

22              THE COURT:  Thank you.  For ISDA.

23              MR. GARVEY:  Michael Garvey and Abram Ellis from

24    Simpson Thacher.

25              THE COURT:  For Chase?

G4F3CREC

1          MR. GREENE:  Peter Greene from Skadden Arps and Boris

2     Bershteyn.

3          THE COURT:  For Markit?

4          MR. CHUK:  Steven Chuk, Proskauer Rose.

5          THE COURT:  For Morgan Stanley?

6          MR. SLIFKIN:  Daniel Slifkin and Vanessa Lavely from

7     Cravath, Swaine & Moore.

8          THE COURT:  For HSBC?

9          MR. MAROVITZ:  Andy Marovitz from Mayer Brown.

10          THE COURT:  For RBS?

11          MS. RAY:  Amy Ray, Cadwalader Wickersham & Taft.

12          THE COURT:  For UBS?

13          MR. BOHAN:  David Bohan, Katten Muchin Rosenmann.

14          THE COURT:  And I think that completes the appearances

15    for the defendants.  Is there anyone I missed?  No.

16          Let's go to the objectors then for MF Global.

17          MR. ZELCS:  George Zelcs from Korein Tillery.

18          THE COURT:  For SABA.  Am I pronouncing that right,

19    Mr. Zelcs?

20          MR. ZELCS:  Yes, you are, your Honor.

21          THE COURT:  For Silver Point?

22          MR. KING:  I'm Ben King from Reid Collins & Tsai.

23          THE COURT:  We have two other objectors.  I'll just

24    make sure that they aren't here in the courtroom, I don't

25    expect them to appear given the letters I received this week.

G4F3CREC

1    But I'll just take their appearances for the record.

2              Anchorage.  Is anywhere here for Anchorage?  Anyone

3    here for FFI?  I believe we have, ah-ha, a class member from

4    Blue Mountain.

5              MR. RUBENSTEIN:  David Rubenstein from Blue Mountain.

6              THE COURT:  Mr. Rubenstein, Blue Mountain was

7    mentioned prominently in the papers submitted to me.  You're

8    one of two big blue entities that was mentioned.

9              Anyone else who has appeared and would like to have

10   their appearance noted on the record?  Good.

11             Well, thank you all for being here at this fairness

12   hearing.  I thought I'd outline the schedule for this

13   afternoon's proceeding, at least my proposed schedule for how

14   we deal with the various issues that have been presented to me.

15             I thought I'd deal with the fairness of the settlement

16   first.  There have been two issues raised about the release,

17   then I'd move to attorneys' fees.  After that, we'd address

18   issues related to the plan of allocation, and in connection

19   with that, I've addressed the Dodd-Frank issue first.  The

20   issue about covered transactions and whether there should be

21   appeal rights from a denial, index rolls, and the proper

22   adjustment for the spreads.  And then any other objections.

23             And with respect to other objections, I have three

24   objectors who are present and two counsel on behalf of the

25   three.  Happy to hear from those three objectors who are

G4F3CREC

1    represented in court today, and we'll just see how we are on

2    timing, whether or not it's important for me to impose some

3    kind of time limits.  I'll give you advance notice if I do.

4            But I'd ask you to think, as we work our way down this

5    agenda to get to your oral argument, should you wish to make

6    any regarding your written objections, that you prioritize your

7    objections so that I'm sure to reach those which you still wish

8    to make and you believe are the most important.

9            Then I want to leave time at the end for a description

10   of what I think the governing law will be on any Rule 7 bond,

11   should I have an application in the future for such a bond.

12           So, that's the outline I thought I'd pursue.

13   Obviously, everyone in this courtroom no doubt realizes there

14   is no objection to the fairness of the settlement or to the

15   attorneys' fees request.  So, I'm not anticipating that those

16   will eat up all our afternoon, but obviously we'll take these

17   in order and make sure we get through the agenda.  I'm ready to

18   rule on the fairness of the settlement.  But I don't want

19   anyone to be deprived of an opportunity to be heard if they

20   would like to be heard.

21           Sorry if anyone can't hear me.  Please, let me know

22   and I'll keep my voice up.

23           Is there anyone who would like to be heard on the

24   issue of the fairness of the settlement?

25           MR. BROCKETT:  Your Honor, I'm prepared to address the

G4F3CREC

1    question of the scope of the release, if the Court would like.

2    Beyond that, I have no intention of addressing any other aspect

3    of the overall fairness of the settlement.

4                THE COURT:  Thank you, Mr. Brockett.  Let me proceed

5    then to discuss the issue of the fairness of the settlement and

6    then we'll turn to the release separately.

7                The first antitrust action in this litigation was

8    filed on May 3, 2013.  At the core of this litigation is a

9    desire to address the historical absence of price transparency

10   and competition in the CDS market.  After the MDL transfer all

11   related actions to this court, Quinn Emanuel and Pearson Simon

12   were appointed co-lead counsel on December 13, 2013, and in the

13   week that followed.  LACERA and Salix have functioned as lead

14   plaintiffs.  In less than two years following that appointment,

15   the class had achieved a remarkable settlement with the

16   defendants.  The defendants are 12 banks that sold credit

17   default swaps, as well as ISDA, and the two Markit entities.

18               By the fall of 2015, the defendants had agreed to

19   settlement payments collectively of $1,864,650,000 or almost

20   $1.9 billion.  Defendant ISDA also agreed to changes to its

21   licensing practices in a way that is intended to increase

22   transparency and competition in the CDS market.  This

23   settlement, reached in the midst of fact discovery and with the

24   plaintiffs' class certification motion due to be filed, is all

25   the more impressive because the two separate government

G4F3CREC

1    investigations into the practices at issue here were closed

2    without any charges being filed, at least against the dealer

3    defendants.  The DoJ investigation is reported to have closed

4    sometime in 2013; the European Commission's investigation

5    closed on December 4, 2015, just months after this settlement

6    was reached.

7              This settlement, particularly its size, is

8    attributable in no small measure to the skill of class counsel

9    and the litigation strategy it employed.  Class counsel worked

10   with lightning speed.  The decision on the motions to dismiss

11   was issued in September 2014.  Because the first wave of

12   document production by defendants were those documents produced

13   in the government investigations, it was a massive production.

14   Class counsel developed and utilized research tools that

15   allowed it to quickly locate critical documents, prepare a

16   draft narrative of key events, and identify key witnesses.

17   Accordingly, they were able to present a detailed mediation

18   brief and PowerPoint presentation in the first mediation

19   session held with Daniel Weinstein on January 22, 2015, and to

20   present a preliminary damage model at the March 31, 2015,

21   mediation session.  By July 29, class counsel had taken 27 of

22   the 46 depositions noticed by that date.

23             The motion for class certification was initially due

24   on August 31.  Before that date, the tentative individual

25   settlements had been reached.  The settlements had been

G4F3CREC

1    finalized by the end of September.  The motion for preliminary

2    approval was submitted on October 16, the new day on which the

3    motion for class certification was due.

4            Essential to this settlement was the work class

5    counsel did with its experts to prepare a damages model.  That

6    same work is the basis for the plan of allocation proposed for

7    this settlement, and it deserves to be described.

8            Class counsel collected data on CDS transactions from

9    January 2008 to September 2015 in each of the major categories

10   of CDS transactions, including single name, index, tranche

11   index, structured credit, and CDS options, which I've come to

12   be learned are called "swaptions."  The data spanned thousands

13   of contracts and millions of transactions.  It included

14   corresponding data on the bid-ask spreads quoted in these

15   instruments each day or virtually every day.

16           The information on the executed transactions came from

17   the Depository Trust & Clearing Corporation (DTCC).  Its

18   reports capture over 90 percent of all CDS transactions.  DTCC

19   provided over 159 million transaction records.  These included

20   data on 3,500 distinct reference entities.

21           While the DTCC data captures payment information, it

22   does not capture the bid and ask prices quoted by the dealer

23   pursuant to which the transaction was executed.  To infer the

24   bid-ask spreads incurred by buy-side entities on CDS

25   transactions, class counsel obtained data from Markit Group

G4F3CREC

Limited, which is a defendant and also the leading source of

such data.  Markit gathers information on the bid-ask spreads

quoted by dealers during the course of a trading day by parsing

electronic messages conveyed by dealers to market participants

and extracting the relevant quote information from the

messages.  The Markit database produced here contained almost

3.2 billion records of bid-ask spreads for the period.

Because DTCC's data only reflect the day of the trade,

and not the time during the day at which the trade occurred,

class counsel constructed an average bid-ask spread for the day

using the Markit data.  The Markit data provides specific times

for each bid-ask quote.  Class counsel took the inside spread,

that is the tightest spread, during each trading hour to

calculate an average spread for each day.  This average spread

was used to estimate the bid-ask spread for each transaction

involving the specific CDS reference contract on that day.

Plaintiffs' expert Dr. Sanjay Unni describes this process in

detail in his declaration of April 1.  He describes as well

substitute calculations that were made when the data was

insufficient or sparse.

At the urging of the mediator, the plaintiff produced

a copy of its damages model as well as the dataset used to

calculate damages to the defendants.  While the defendants had

a critique of that model, which they presented to the

plaintiffs on June 8 of last year, this exchange of detailed

G4F3CREC

1    information reinforces the judgment that the settlement reached

2    here followed extensive investigation of the underlying facts

3    and theories being litigated.

4        The reaction of the class to the settlement has been

5    overwhelmingly positive.  While the reaction of a class to a

6    settlement is always important, here it is especially

7    significant it is an especially significant comment on the

8    quality of the settlement, since the class is composed of

9    sophisticated parties who participate in buy-side trading of

10   credit default swaps.

11       Because of the access to trading record, it was

12   possible to identify and reach most potential class members.

13   Almost 14,000 settlement class members were identified.  They

14   were mailed notice packets on January 11, 2016.  While some of

15   the mailings were returned as undeliverable, reasonable efforts

16   were made to locate every identified class member.

17       I wonder if class counsel were able to give me an

18   estimate of how many class members they were not able

19   ultimately to reach by mail, Mr. Brockett?

20       MR. BROCKETT:  Yes, your Honor.  Without going through

21   all of the steps, there were 13,923 mailings sent out.  And we

22   believe through identifying alternative addresses and other due

23   diligence that the claims administrator was able to reach

24   13,375, which is approximately a little over 90 percent of the

25   class members.  And when I say we reached them, there were

G4F3CREC

1    13,375 mailings for which we did not receive a delivery failure

2    notice.  So it is 13,375 out of a total of 13,923.

3              THE COURT:  Thank you very much.

4              In addition, of course, given its magnitude, the

5    settlement received widespread publicity.  Notice was also

6    published on January 11 in several important business

7    publications.

8              By January 28 class members were able, by visiting the

9    claimant portal on the settlement website, to review their own

10   covered transactions, that is, those transactions that class

11   counsel had identified as eligible for compensation from the

12   settlement fund.  Close to 10,000 distinct visitors have

13   visited that website.  In addition, the claims administrator

14   has received almost 1,000 calls, and as of April 1, 585 claim

15   forms.

16             That number has probably increased since that date.

17   Do we have a current number, Mr. Brockett?

18             MR. BROCKETT:  Yes.  Approximately 700, a little short

19   of 700 claims have been filed, covering approximately $2

20   trillion in no-show trading.

21             THE COURT:  Thank you.

22             The last date for submission for claims is May 27.

23   Therefore, the class has received effective and sufficient

24   notice of the settlement.

25             Against this backdrop, it is telling that only 21

G4F3CREC

1    requests for exclusion were timely submitted by February 29.

2    Many of those were made on behalf of related entities.

3    Therefore, it appears that there are effectively five

4    independent requests for exclusion.  There have been only five,

5    now four, objections filed to the settlement.  None of these

6    objections question the fairness or adequacy of the settlement.

7    They do not criticize either the amount contributed by the

8    defendants to the settlement fund or the terms of the

9    injunctive relief, nor do they object to the amount sought in

10   attorneys' fees.  The bulk of the objection goes to the plan of

11   allocation, and I will address that separately later this

12   afternoon.

13           In an October 15 declaration, the mediator praised the

14   settlement result here as exceptional.  The mediator worked

15   with the parties for nine months and invested over 400 hours of

16   his own time.  He describes the work of class counsel as one of

17   the finest examples of efficient and effective lawyering by

18   plaintiffs' counsel that he had ever witnessed.  In making this

19   judgment, he took note of the complexity and size of the

20   litigation, and the speed with which class counsel achieved a

21   result of this magnitude.  He reports that settlement

22   negotiations were exhaustive and conducted at arm's length by

23   sophisticated, knowledgeable, and fully-informed counsel.  In

24   his opinion, the settlement is not just fair and adequate, but

25   exceedingly favorable to the class, reflecting a recovery well

G4F3CREC

beyond what he expected could be achieved.

To place this judgment in context, the preliminary damages estimates of the plaintiffs forecast damages at roughly $8 to $12 billion.  The recovery here, therefore, reflects 15 to 23 percent of the amount which plaintiffs may have sought at trial.

LACERA, which is one of the largest county retirement systems in the U.S. with investment assess of over $48 billion, was one of the lead plaintiffs for the class and fully supports the settlement.  Its lead in-house counsel for this litigation considers the settlement an excellent result for the class.  While it appears that LACERA does not have the largest stake in the settlement fund, it has a very substantial one.  At the time its counsel applied to be appointed as class counsel, LACERA reported that it had purchased and sold over 2.8 billion of CDS between January 1, 2008, and filing of its initial complaint on October 28, 2013.  This substantial stake gives LACERA strong incentive to examine the settlement and the performance of class counsel with care.

Let me turn to the *Grinnell* factors to the extent I have not already covered them.  The first is of course the complexity, expense, and likely duration of the litigation.  This is highly complex litigation, it's been extremely expensive to litigate, and no doubt for the defendants as well as the plaintiffs.  And the plaintiffs predict that if the

G4F3CREC

1    class had been certified, the case would not have ended at a

2    summary judgment stage, but instead would have required a trial

3    and of course an expectation of an appeal to follow.

4            The second factor is the reaction of the class to the

5    settlement.  I've described that already.  It's been extremely

6    positive.

7            The third factor is the stage of the proceedings and

8    the amount of discovery completed.  Document production was

9    very substantially completed.  Many depositions were taken

10   between June 8 and July 29 as described.

11           The fourth factor is the risk of establishing

12   liability.  Here, I'd say that is a little hard for me to

13   weigh.  On the one hand, we have two government investigations

14   that were closed.  On the other hand, we have a very

15   substantial payment.  There were, of course, a number of

16   defenses that have been outlined in the papers to me that there

17   was no illegal agreement among the defendants, that the CMDX

18   would not have been a viable exchange platform, among many

19   others.

20           So, I'm going to say that the risk of establishing

21   liability might have been very high, except for the aggressive

22   conduct of discovery by class counsel.  That's my best

23   evaluation of that factor.

24           The fifth factor is the risk of establishing damages.

25   Well, I think causation and the methodology for establishing

G4F3CREC

1    damages were hotly contested, and I expect they would have been

2    through trial.

3           The sixth factor is the risk of maintaining the class

4    action through trial.  It is hard to weigh.  I didn't get a

5    motion.  My guess is that it would have been certified and

6    maintained through trial.

7           The seventh factor is the ability of the defendants to

8    withstand a greater judgment.  Yes, they could have paid more,

9    but this is a very substantial amount.

10          The eighth factor is the range of reasonableness of

11   the settlement fund, in light of the best possible recovery.  I

12   have estimates here that over 1,300 class members will receive

13   payments of over $100,000, and that over 230 class members will

14   receive payments of over $1 million.  This is a substantial

15   settlement.  I find it is entitled to a judgment that it is

16   reasonable in the circumstances, if not generous.

17          The last factor is the range of reasonableness of the

18   settlement fund to a possible recovery in light of all of the

19   attendant risks of litigation.  I again find that factor to be

20   excellent.

21          Therefore, I find the settlement here, both the

22   monetary and injunctive terms of the settlement, to be fair,

23   adequate and reasonable.

24          The next issue to address I believe is the scope of

25   release issue.  Let me describe the standards that I'll apply.

1          Parties may "reach broad settlement agreements

2   encompassing claims not presented in the complaint in order to

3   achieve comprehensive settlement of class actions, particularly

4   when a defendant's ability to limit his future liability is an

5   important factor in his willingness to settle." *In re Literary*

6   *Works*, 654 F.3d at 247-248.  Accordingly, "class action

7   releases may include claims not presented and even those which

8   could not have been presented, as long as the released conduct

9   arises out of the identical factual predicate as the settled

10  conduct." *In re American Express*, 672 F.3d at 135.

11         The determination of whether a claim pleaded in a

12  separate lawsuit is predicated on sufficiently similar facts as

13  the class action claim to be barred by a class action

14  settlement release "is inherently an individualized,

15  fact-specific one." *WorldCom*, 388 F. Supp. 2d, 342 n.36.

16         The scope of a release is also limited by the adequacy

17  of representation doctrine.  "Adequate representation of a

18  particular claim is determined by the alignment of interests of

19  class members, not proof of vigorous pursuit of that claim."

20  *Walmart*, 396 F.3d, 113.  Because a settlement may bar future

21  claims, it is essential that there be adequate notice of the

22  effect of the release and compensation for released claims.

23  *WorldCom*, 2004 WL 2591402, at *12.

24         It's not clear to me that the two objections based on

25  the scope of the release are still at play here.  There have

G4F3CREC

been subsequent submissions that haven't made reference to them.  But out of an excess of caution, I want to address them and make sure we cover those issues.

Silver Point and MF Global both make complaints related to the scope of the release.  MF Global is concerned that the defendants' efforts to prevent MF Global from launching its own clearing and market making business may be barred by the scope of the release.  Silver Point was concerned about releasing claims based on trading after September 2015.

I've looked at the release again with care.  I looked at it at the time of the preliminary approval here.  I think it gave adequate notice to class members of what was being covered by its terms, so they could make the decision in a reasonably informed way whether to opt out or not, if they were unhappy about its breadth or its effect on any lawsuit they were contemplating.

I think it's fair to find that it's precise and reasonable and appropriate to the circumstances of this case.

My current view is that beyond making the observations I just have and a few more I'll make now, that it would be premature for me to rule on whether any claim that might be brought in the future by some party would or would not be barred by the terms of this release.  If another lawsuit is brought and an application is made to me to enforce the release, I'll be happy to consider that application, and give

G4F3CREC

1    everyone an opportunity to be heard at that time.

2            I must say, and this is of course just a summary of

3    some of the key terms of the release, but in paragraph 4(d),

4    the settlement agreements that I'm being asked to sign release

5    claims arising from or relating to conduct occurring prior to

6    June 30, 2014, relating in any way to CDS transactions.

7            Now, if I get an application at some later date,

8    obviously I'll look with care not just at this language, but

9    with all the language in the release, the rest of the language

10   in paragraph 4(d), all the terms of the release beyond that.

11   But, I want to give anybody an opportunity to be heard on the

12   release issue, beyond what I've said.

13           Is there anyone who wishes to address the release

14   issues?

15           MR. ZELCS:  May I?  George Zelcs.  The only point I'd

16   like to make is I think it is fairly clear that the factual --

17   the factual predicate here for a clearing claim is not the same

18   that's been at issue in this case.  Since this case has been

19   limited to bid-ask spreads on CDS trades.  That simply is the

20   only comment I'd have for you.

21           THE COURT:  I'm not going to rule on that.  If and

22   when you bring a lawsuit, if that was your position, you

23   probably should have opted out.  But if and when you bring

24   another lawsuit, or bring a lawsuit, and if and when I have an

25   application to enforce the release, I'll be happy to consider

G4F3CREC

1    your arguments at that time, and give anyone else who wishes to

2    be heard an opportunity to address me.

3              MR. ZELCS:  Thank you, your Honor.

4              THE COURT:  You're welcome.

5              That takes us to attorneys' fees.

6              Attorneys whose work created a common fund for the

7    benefit of a group of plaintiffs may receive reasonable

8    attorneys' fees from the fund.  Courts may award attorneys'

9    fees in common fund cases under either the lodestar method or

10   the percentage of fund method, although the trend in this

11   circuit is toward the percentage method.

12             The six *Goldberger* factors are applicable to the

13   court's reasonableness determination under either method.

14             Under the PSLRA, there is a well-recognized rebuttable

15   presumption of correctness given to the terms of an ex ante fee

16   agreement between class counsel and lead plaintiff.  *Flanagan*,

17   814 F.3d, 659; *Cendant*, 264 F.3d, 282.  But the District Court

18   must be mindful that it must act as guardian in the rights of

19   absent class members in assessing whether a presumption of

20   correctness has been properly refuted and then, if indeed it

21   has, determining on its own the appropriate fee allocation.

22   *Flanagan*, 814 F.3d at 659.

23             I believe there is no reason not to apply such a

24   rebuttable presumption to the examination of an ex ante fee

25   arrangement in a common fund antitrust case, at least where it

G4F3CREC

1    has been negotiated with a sophisticated benefits fund with

2    fiduciary obligations to its members, and a sizable stake in

3    the litigation, as is true here.

4           So, before I move to the factors, the six factors I'm

5    going to evaluate or weigh in ruling on this fee request, I

6    have a few questions about the agreement, the LACERA agreement

7    with counsel.  And again, Mr. Herrera, I want to thank you for

8    being here.

9           I issued an order earlier this week giving notice of

10   the *WorldCom* fee agreement which provides a quite different

11   scale or grid than LACERA used.  And if for no other purpose

12   than to help me, help bring me up to speed 10 years later, I'd

13   like to understand it to the extent, Mr. Herrera, you're able

14   to explain to me, why these two grids are so different.

15          MR. HERRERA:  May I approach the podium?

16          Thank you, your Honor.  Good afternoon again.  I

17   appreciate the opportunity to address the Court.  It reflects

18   your Honor's diligence in this matter.  I believe it also

19   reflects the seriousness and the importance that my client

20   LACERA attaches to our involvement and its seriousness in

21   fulfilling its fiduciary duties, both to its own members and

22   the class.

23          So, to address your specific question.  If I may

24   provide some background by way of context to help your Honor as

25   for the last 10 years.

G4F3CREC

1          So I joined our fund as counsel, I joined the fund in

2     1999, and I have been counsel since 2001.  In 2001, our board

3     of investments adopted a securities litigation policy by which

4     our legal office would evaluate and identify securities cases

5     and claims that the fund may have, and to, through that policy,

6     evaluate cases in which the fund may have lost on money on its

7     securities as a result of wrongdoing.  I have been doing that

8     for the fund since 2001.

9          So, my primary responsibility is to oversee that

10     policy, which I've been doing.  So I've looked at and assisted

11     our fund in several cases and taken an active role.  We were

12     involved in *WorldCom* as an optout plaintiff.

13          THE COURT:  I had the pleasure of coordinating or

14     helping to coordinate over 100 such actions, individual actions

15     as well as the *WorldCom* class action.

16          MR. HERRERA:  Yes, your Honor.  You did an excellent

17     job.

18          THE COURT:  Well, thank you.  Yes, I was familiar with

19     the optout strategy.

20          MR. HERRERA:  Right.  And I was in the courtroom here

21     for those, so I witnessed first hand.

22          I also can speak to the comparison that your Honor

23     asked about.  And speaking candidly, I do see those, having

24     looked at that case and my experience in this case when I

25     initially evaluated both cases, I did see those as much

G4F3CREC

1    different cases, so I'm not surprised that the fee schedules in

2    both are very different, which they are.

3            I think our fee agreement, because we had an

4    individual action was different than the class action which was

5    I believe lower and your Honor is referring to.  And I think if

6    by way of observation, because I was very confident in the fee

7    agreement that we have in that case as I am in here, I think it

8    took into account the type of action and the claims and the

9    risks of prosecution in those cases.

10           *WorldCom*, as I saw it, it wasn't a matter of whether

11   you would prevail in that case.  It was can we do better by way

12   of opting out.  You know, your Honor, better than I do there

13   were government actions there, there was serious wrongdoing,

14   and which was established, and it was just a matter of how to

15   prosecute it in the best possible way.  And for my fund's

16   perspective, how to recover the best that we could.

17           This case was, in my view, your Honor, very different.

18   There were, as your Honor noted, government actions that didn't

19   have people lining up to bring this case or to get involved.

20           And also by way of background, under the policy, one

21   of the procedures that we have in our office as counsel for our

22   fund is to go through a selective bidding and selection

23   process, and we did that here, we sent out requests for

24   proposals when we found out about this case.  And those

25   proposals that we did receive, and if my memory serves me

G4F3CREC

correctly, we received 67 responses to our proposals.  And that

helps us evaluate, it helped us -- I'm not a securities or

antitrust lawyer, your Honor, and is neither is my chief

counsel.  It helps us evaluate the merits and strengths and

weaknesses of the case.  It helps us evaluate counsel that we

may retain to represent us, and it helps us evaluate the market

for the types of fees that we would reasonably pay for a case

like this.

          In our view, we are the client looking for a lawyer,

and we're only going to, A, get involved if is we can find the

best possible deal.

          So in this case, when we received those proposed fees

which we asked for, there were some higher than what we

ultimately ended up with here and some lower.  My job, because

my board is very sophisticated, ultimately when I take a

recommendation on whether to get involved in a case and a fee,

they are very tough on me, and did I do the best possible job.

In the back of my mind I thought one day I may be called before

the Court to explain whether I did my job.

          So, in this case, I negotiated with counsel using the

fee proposals that I received.  I believed, as I mentioned, I

received fee schedules that were higher, and some that were

lower.  I did the best I could on behalf of our fund and the

class to get the best possible fee that I could here.

          And I could tell you that having negotiated about 15

G4F3CREC

1    prior fee schedules in securities class actions under PSLRA, I

2    went through the same process, and that's usually how it works

3    for us.  I look at the highest, I look at the lowest, and

4    really what I want is the best attorney for the fund and the

5    class, and hope that I can get that attorney to the fee

6    schedule that I want.  We were able to do that here.

7         Fees are a very important part of my evaluation, but

8    not the only one.  Kind of like when I just remodeled my

9    kitchen, right, there were some contractors that were higher, I

10   didn't go with the higher one, I didn't go with the cheaper

11   one.  And that's what we did here, your Honor.  I'm very

12   comfortable where we ended up based on all the information I

13   had at the time.

14        I presented it to our board, as I always do, and we do

15   that in closed session.  They grill me a little bit, ask me a

16   lot of questions about it.  Ultimately they approved our

17   recommendation on moving forward.  They approved our

18   recommendation by way of the attorneys that we wanted to

19   represent the fund and the class and the proposed fee schedule.

20        So, with all of that, I hope that addresses your

21   Honor's questions and concerns.

22        THE COURT:  Enormously helpful to me.  Enormously

23   helpful.  Thank you.  So, you don't have a standard grid that

24   once you choose counsel they must accept.  This whole RFP

25   process means that the decisions that are made are very case

G4F3CREC

1    specific, which weigh among, other things, quality of counsel

2    but also risks of litigation.  Do I understand that correctly?

3              MR. HERRERA:  Exactly, your Honor.

4              THE COURT:  Thank you very much.  Very helpful.

5              MR. HERRERA:  Thank you.

6              MR. BROCKETT:  Your Honor, before you go on with your

7    fact findings, may I say just a word or two about *WorldCom*?

8    Would that be appropriate at this point?

9              Oh.  Okay.

10             THE COURT:  Sure.  Sure.  Mr. Brockett, educate me

11   about *WorldCom*.

12             MR. BROCKETT:  I just wanted to point out there are

13   three aspects of *WorldCom* versus this case that I just wanted

14   to point out to the Court.

15             And the first is that, as your Honor noted in her

16   opinion, the fee agreement to the retainer agreement with the

17   grid was negotiated with the class counsel after there had

18   already been indictments of the insiders and after there had

19   already been a significant decision in the plaintiffs' favor on

20   the motion to dismiss.  So, you weren't in the same posture

21   really as you are in this case.  And I would submit that the

22   risk profiles of the case at the time these grids and fee

23   agreements were entered into were arguably very different.

24             The other point I would make is that *WorldCom*, as your

25   Honor noted, is, what, 13 years old now.  And in between, since

G4F3CREC

1    then, there have been a number of cases in the antitrust

2    context in particular that have elevated the pleading standards

3    and have also elevated the class certification standards.

4    Cases like *Twombly*, like *Walmart*, and the Third Circuit's

5    opinion in *Hydrogen Peroxide*, all have talked about the

6    rigorous analysis that the Court must do in order to certify a

7    class.

8              So, I do think it is fair to say that there have been

9    developments in the law that are pretty unique to antitrust

10   that make them arguably in some instances more difficult cases

11   to prosecute than securities cases.

12             And just a final comment I would make about *WorldCom*

13   is that of course here, in addition to the money, we also

14   secured what we believe is important injunctive relief for the

15   marketplace going forward.

16             THE COURT:  Thank you very much, Mr. Brockett.  Yes,

17   well, we could spend a lot of time comparing the two cases, but

18   I'll spare you that.

19             Let me just say since I'm the one who inserted

20   *WorldCom* here, there is much one could say about the

21   differences between the two cases.  But one point is that the

22   attorneys' fee award in *WorldCom* was higher than that that is

23   requested here.

24             The thing that stood out in my mind was the percentage

25   of the fund here, the request is substantially higher, more

G4F3CREC

1    than twice the size of the *WorldCom* situation.  But again,

2    there are so many differences, so, I don't think we need to

3    spend more time on that.

4          So your request here for an award of 13.61 percent of

5    the fund or just under 14 percent of the fund attorneys' fees

6    in the amount of $253,758,000, and a request for approval of

7    expenses of roughly nine and a half million dollars.  Of which

8    the majority, vast majority is fees for experts, and experts

9    were essential in this case and still are, as this week has

10   shown.

11         So, the first factor I'm supposed to weigh is the time

12   and labor expended by counsel.  We have labor in terms of time

13   of close to, well, over 93,000 hours, which creates a lodestar

14   of, if we're going that route and I'm not, of over $40 million

15   so the multiplier is a little over six.

16         The magnitude and complexities of the litigation, the

17   second factor, I've already addressed.  The risk the litigation

18   I've already addressed.

19         The fourth factor, the quality of representation, well

20   it's been superb, and I think the fact that there is no

21   objection to this extraordinarily high fee request is

22   recognition of that fact.

23         The fifth factor is the requested fee in relation to

24   the settlement.  Well, the notice told the class that the fee

25   request may come up to 14 percent.  It's close to that figure

G4F3CREC

1    but not right, right at that limit.  And again, there were no

2    objections.

3            The sixth factor is the public policy considerations.

4    Counsel here, class counsel, made a significant investment

5    right out of their own pockets without any compensation in

6    order to litigate this case to the conclusion that they

7    reached.  This was difficult, complex litigation, and so that

8    kind of investment was made against a background that reflected

9    significant risk.

10           I think there is a public policy that is important in

11   this land to encourage top-tiered litigators to pursue

12   challenging cases like this.  Antitrust violations go to the

13   heart of our economy.  Our economic health and stability as a

14   nation depend on the rule of law and trust in the fairness and

15   transparency of our marketplace.  These issues are interwoven.

16   I think all of us can agree on that.  All of us want to live in

17   a country where law is respected, where the court system can be

18   effectively used to reach justice, and where our marketplaces

19   are places that have investor confidence, so people, when they

20   put their money down, can trust that they're in a level playing

21   field.

22           So, with that said, then, I approve this request for

23   attorneys' fees.  I've thought about it carefully, and I'm

24   happy to do so.  I'm also going to approve the request for

25   payment of expenses.

G4F3CREC

1          In that regard, I should note that on February 8, in

2    plaintiffs' supplemental brief, page six, they in essence asked

3    for approval from me that that at this point Garden City Group

4    and BRG costs be moved from administrative expenses to money

5    taken out of the settlement fund, at least up to the $15

6    million cap, if I understood that request correctly, and I

7    approve that request.

8          That takes us to the incentive awards.  While class

9    representatives should be compensated for out-of-pocket

10   expenses and lost wages, incentive payments should not

11   ordinarily be given to class representatives.  Incentive

12   payments raise grave problems of collusion, as I've discussed

13   in *Reed v. Continental Guest*, 2011 WL 1311886 at *4.  After

14   all, representative plaintiffs undertake to represent not only

15   themselves, but all members of the class in a fiduciary

16   capacity, and are obligated to do so fairly and adequately and

17   with due regard for the rights of those class members not

18   present to negotiate for themselves.  When the settlement

19   provides for incentive awards to the main plaintiffs not shared

20   by other class members, a serious question arises as to whether

21   the interests of the class have been relegated to the back

22   seat.

23          In this case, however, there is no basis to find that

24   the class representatives have been tempted to receive high

25   incentive awards in exchange for accepting suboptimal

G4F3CREC

1    settlements for absent class members.  It is just not an issue

2    here.  Nonetheless, I am disinclined to give such payments.

3         Before I continue with my analysis of the issue, I am

4    happy to hear argument, Mr. Brockett, from you or anyone else

5    who would like to be heard on the issue.

6         MR. BROCKETT:  Thank you, your Honor.  I just make a

7    couple of points.  First, as the Court noted, there is no

8    objection to the incentive payments here.  The class

9    representatives put in declarations, all of them have spent an

10   amount of time on the case.  And the case of the Salix

11   individuals, I think is it a special case because they put

12   themselves at risk in their profession by going out in front

13   against major and powerful banks.

14        And also, in the case of the Salix principals, there

15   is an award under the settlement that will go to Salix.  But

16   under the Salix agreement with the Front Point funds, which has

17   signed the claims, until a certain level is reached, the money

18   all goes to Front Point except for a little bit of money that,

19   reflecting positions the Salix principals had in the Front

20   Point partnership.

21        So, without an incentive award, the Salix principals,

22   all of whom devoted a substantial amount of time, very valuable

23   time to this case, will essentially go home with nothing.  And

24   so, I do think it presents a compelling equitable circumstance

25   that cries out for the Court to award these individuals

G4F3CREC

1    something to reflect the fact that they put their careers at

2    risk, they were willing to step up, and but for their

3    willingness to step up, and allow Quinn Emanuel to join this

4    case, this case could have gone a very, very different

5    direction and we may not be here today.  So that's all I have

6    to say.

7         MR. SIMON:  So first, I recognize completely your

8    leanings towards an incentive awards and I understand.  I just

9    would say, and you've already alluded to it the way this case

10   was prosecuted with Mr. Herrera and LACERA, their involvement,

11   including with what they did during discovery was extraordinary

12   as well.  Not only do we have a tremendous working

13   relationship, but they, every time we called and said we needed

14   something they were on it, they pulled staff.  And I recognize

15   that's part of being a class representative.  But, I would just

16   encourage the Court to think about whether or not the efforts

17   that they made should receive some type of compensation.  Maybe

18   not the amount that you feel uncomfortable with, but some

19   amount.  I want to encourage the Court to think about it, but I

20   know your leanings on the subject.

21        THE COURT:  Thank you very much.  As Mr. Brockett has

22   alluded to, Salix is an assignee here of the Front Point

23   claims.  Front Point closed in roughly 2009, and Salix was

24   formed in 2010, and they decided to pursue the CDS case in May

25   of 2013.  There are three individuals at Salix who formed Salix

G4F3CREC

who have contributed to this effort and have asked through

counsel for an incentive award.

Mr. Felgner has been a proprietary trader of exchange

traded funds at Wedbush Securities since before this lawsuit

was filed.  He applied for jobs with some of the dealer

defendants in 2014 and 2015 and did not obtain employment.  He

spent at least 120 hours working to assist counsel in this

litigation.

Mr. Donovan since 2009 has been self-employed as a

sell-side trader and portfolio manager.  He last summer in

roughly March got a consulting agreement with Quinn, but put in

very few hours under that consulting agreement before there was

a settlement.  He's always operated on the sell-side of the

business, as I understand it, even when he was at Front Point.

He worked an enormous amount of time on this case, at least or

roughly 250 hours.

Mr. Grannan is a founding partner of an entity called

Scoville Risk Partners and it does valuations in the energy and

commodities sectors.

The Salix representatives argue that Wall Street banks

may retaliate against them and deny them employment or impair

their ability to operate successfully in the financial

industry, particularly to the extent that these individuals

wish to engage in buy-side trading.

That may be true, regrettably.  I can't make a

G4F3CREC

1    judgment about that.  And if true, it is almost impossible to

2    demonstrate or rectify, and I recognize that.

3         Thankfully, however, each of these gentlemen has been

4    employed since the collapse of Front Point and during the

5    pendency of this litigation.  None sought employment at the

6    defendants between 2009 and 2013, or at least as far as is

7    revealed to me.  And only Mr. Felgner has sought employment

8    there since 2013.  These three gentlemen will receive very

9    small personal recoveries as a result of their Front Point

10   holdings.

11        They've been of enormous assistance to Quinn, in roles

12   that I think LACERA fairly could not provide.  They gave their

13   expertise in trading CDS and the CDS marketplace.  Mr. Donovan

14   especially, in giving over six weeks of his time, was a major

15   assistance to the litigation.

16        So, my decision not to award incentive fees is not

17   taken lightly, and should certainly not be taken as a

18   reflection of any judgment I have about their contribution.  I

19   know they have received thanks from counsel, and they should

20   feel it from the class as well.

21        But their endorsement of this settlement would mean

22   something different if they were advantaged in the way

23   absentees will not be.  I think this might be a closer question

24   if LACERA were not co-lead plaintiff.  They, these individuals

25   with Salix made the decision to continue as lead plaintiffs

G4F3CREC

when they knew the class would have prominent and capable lead

plaintiff without them, and after I had appointed Quinn as

counsel for the class.  I assume they did so because they

believed their work was important to help make the market more

transparent and open.  And for that, they have the thanks of

all of us.

        LACERA did a substantial amount of work here, and

because of its presence in the case it's given me enormous

assistance.  I've been able to know that I had enlightened

leadership for the class, someone who could work hard, provide

appropriate oversight to counsel, and evaluate the settlement

fairly, and in a sophisticated way.

        So, again, my decision not to award an incentive fee

to LACERA is not because I don't appreciate the work they did

here.  It is critical.

        There is an argument that LACERA makes that an award

to it of $200,000 would encourage other institutional investors

to take active roles in similar important cases.  They

underscore that they didn't expect an incentive award, and just

expected their pro rata share.

        I am confident that LACERA will continue, with

Mr. Herrera's assistance and the assistance of others, to

evaluate with care what they can do for their fiduciaries, and

through that, for the American investing public.

        That takes us to the plan of allocation.  Let me

G4F3CREC

1   describe the principles I'll apply to this portion of our

2   analysis.

3          A district court "has broad supervisory powers with

4   respect to the allocation of settlement funds." *In re*

5   *Holocaust Victim*, 424 F.3d, 146.  The plan of allocation must

6   meet the standards by which the settlement is scrutinized --

7   namely, it must be fair and adequate.

8          A plan need only have a reasonable, rational basis,

9   particularly if recommended by experienced and competent class

10  counsel.

11         In the case of a large class action, the apportionment

12  of a settlement can never be tailored to the rights of each

13  plaintiff with mathematical precision.  The challenge of

14  precisely apportioning damages to victims is often magnified in

15  antitrust cases, as damages in antitrust cases are rarely

16  susceptible to the type of concrete proof of injury which is

17  available in other contexts.

18         So the first issue I want to address is the Dodd-Frank

19  issue.  This relates to an issue I raised at our conference

20  call on October 27 in which I inquired whether the compression

21  rate of 20 percent was appropriate for the entire period.  But

22  now I raise it because I'm much more deeply involved with the

23  facts that counsel have kindly brought to my attention in this

24  approval process, so now I'm focused in particular on a single

25  objection that's been made about the compression rate for what

G4F3CREC

1    I'll call the Dodd-Frank era.

2           Here, we have a compression rate chosen of 20 percent

3    for the entire class period.  It is my understanding that the

4    theory behind the plaintiffs' case is that the bid-ask spread

5    in the CDS market, indeed in the securities market, decreases

6    when trading migrates to a more transparent, competitive

7    market.  So, the compression rate is the theoretical overcharge

8    from the difference between the actual pricing in a market and

9    the but-for world, the spread in the absence of a conspiracy,

10   and here a 20 percent figure was chosen.

11          It is my understanding that the Dodd-Frank legislation

12   went into effect in this marketplace in roughly January of

13   2013, which is in the midst of our class period.  And as part

14   of that reform, there was a requirement of realtime reporting

15   of a number of characteristics of a CDS trade, the price, the

16   time, the date, the nature of the trade.  And public

17   dissemination of that information, and therefore, an

18   achievement of a certain level of transparency that was absent

19   before that reform, which, as I understood it, was one of the

20   goals of this lawsuit.  So, to me, the existence of this

21   transparency should have resulted in a difference in the

22   compression rate.

23          Now, I understand the plaintiffs' argument, or at

24   least I think I do, that 20 percent of less is less than

25   20 percent of more.  That's not my point.

G4F3CREC

1          And so, my question is whether there shouldn't be a

2    different compression rate for whatever is the precise point in

3    time in which the marketplace achieved that greater

4    transparency.  So it would mean during the Dodd-Frank era, let

5    us say just theoretically, already the spreads are tighter, so

6    the damage recovery is going to be less, even if we applied the

7    20 percent.  But if we applied -- and I am just pulling a

8    number out of a hat, which is not what we would do if we

9    changed the spread, but just to make sure that counsel

10   understand what I'm getting at -- if the residual effect of the

11   conspiracy was such that during the Dodd-Frank era the

12   compression factor changed, and 10 percent or 5 percent is

13   really a more accurate compression rate, shouldn't we be using

14   that?  And wouldn't it be fairly easy to make that adjustment,

15   because it's totally date driven, and you know, before

16   January 1st, 2013, and after January 1st, 2013, or whatever the

17   appropriate date is, you have two different rates, compression

18   rates.  So, that's my question.

19          Anyone wish to be heard?

20          MR. OLSON:  Your Honor, Steig Olson for the

21   plaintiffs.  I'm happy to address the question.

22          THE COURT:  Thank you.

23          MR. OLSON:  So your Honor makes a number of very

24   compelling points, and certainly these are things we gave

25   consideration to.  The model we present in this case is a model

G4F3CREC

1    that we began building to litigate the case, and if we had

2    ultimately tried the case to a jury, we certainly would have

3    given consideration to adjustments in the compression

4    percentage.  So the points the Court raises are completely

5    fair.

6            To articulate why we support the plan as it stands

7    today, I would stress that the unique thing about this market

8    is that the spreads themselves which we model are themselves

9    the most accurate and objective barometer of changes in the

10   market over time.  They, the spreads are designed to detect

11   when risk factors go up and down, because of things like

12   greater efficiency and greater transparency in the market.

13           So our ultimate guidepost in putting together the plan

14   of allocation was to do it in the most objective way possible,

15   rooted in the data, and to avoid imposing assumptions on the

16   data that might to some class members appear that they favor

17   one class member over another.

18           We do believe that the model as it exists today takes

19   into account the additional efficiency and transparency brought

20   about by Dodd-Frank.  It does it in a precise and granular

21   level that's driven by the data.  So it does it on a

22   per-instrument basis because the innovations of Dodd-Frank, the

23   reforms of Dodd-Frank affected perhaps certain instruments

24   differently.

25           THE COURT:  Really?  In the CDS space?

G4F3CREC

```
 1              MR. OLSON:  Well, that's what the data tells us.
 2      That's what the data tells us.  I'm happy to hand up to the
 3      Court a chart that I can maybe use to illustrate this point if
 4      you would like.
 5              THE COURT:  Do you have copies for others?
 6              MR. OLSON:  I have I believe 15 copies.  I don't need
 7      to -- I can just hold it up and make the general point.
 8              THE COURT:  It might help to be a little closer to me
 9      than you holding it up where you are.
10              MR. OLSON:  I have another.
11              THE COURT:  Let's have a copy shared with the
12      objectors.  And why don't you send four or five copies into the
13      jury box, and another chunk of copies out into the audience.
14      Anyone who feels they're deprived of an opportunity,
15      certainly --
16              MR. OLSON:  I may have overstated the number I have.
17      I have four more.
18              THE COURT:  Okay.  Well, is there anyone who has been
19      deprived of a copy such that they prefer I not look at it?
20      Okay.  I think you're free to hand it up.
21              MR. OLSON:  Thank you, your Honor.
22              THE COURT:  We'll mark this as Court Exhibit 1 for
23      this session.  Okay.
24              MR. OLSON:  What this exhibit demonstrates, your
25      Honor, is that the modeling of the spreads changes over time in
```

G4F3CREC

1      a way that reflects the efficiency of the market, the risk

2      factors faced in the market.  I should note that this

3      particular instrument is one of the index CDS, one of the most

4      frequently traded ones.  It is the CDX investment grade

5      five-year tenor, which is the most liquid of this highly liquid

6      index.

7                THE COURT:  Is this one of those that is subject to

8      the index rollovers?

9                MR. OLSON:  Any index could potentially be rolled, but

10     this is not meant to implicate that issue.

11               THE COURT:  That's not dealing with that issue.

12               MR. OLSON:  Correct.  What this is showing is how the

13     spreads changed over time.

14               And the point I would make, your Honor, is this chart

15     is going to be different for every single instrument, because

16     of the level at which we estimated the spreads.  So these ups

17     and downs are going to be a little bit different for every

18     single instrument.

19               Dodd-Frank may have affected certain single named

20     instruments that are traded less frequently than it would have

21     traded -- than it would have affected this instrument.

22               What our approach does is really allow the data to

23     speak to us about that.  So, one can observe that, as would be

24     predicted, spreads do decline after the passage of Dodd-Frank.

25     But what --

G4F3CREC

1              THE COURT:  Not really.  Not on this chart.

2              MR. OLSON:  Well, you're right, your Honor.  It

3      doesn't happen abruptly.

4              THE COURT:  It doesn't really happen at all.  If it's

5      the beginning of 2013, where the Dodd-Frank went into effect,

6      we have spreads that are -- if I'm understanding this

7      correctly -- as typed during the period in 2010 to early 2011,

8      and indeed, right after the inauguration of Dodd-Frank, we had

9      a spike.  If I'm reading this correctly.

10             Am I reading this correctly?

11             MR. OLSON:  You are reading it correctly.  I believe

12     that this would reflect that there is more trading after

13     Dodd-Frank at the lower levels of this instrument than at any

14     time before.  Except for there are always spikes up and down,

15     of course.  And so, there are some spikes we see here that are

16     much higher earlier in the period.

17             THE COURT:  You know what?  I don't think I'm reading

18     it correctly.  Hold on one second.

19             (Pause)

20             THE COURT:  So, the axis, the vertical axis is the

21     spread.

22             MR. OLSON:  Correct.

23             THE COURT:  And the horizontal axis is the date.  And

24     the line conveys the volume at that intersection.  Is that --

25             MR. OLSON:  Yes.

G4F3CREC

1          THE COURT:  So --

2          MR. OLSON:  It is a monthly weighted average.

3          THE COURT:  Monthly weighted average.  So, we were at

4    a spread of .02, roughly, in the period I referenced earlier,

5    and post Dodd-Frank.

6          MR. OLSON:  There were times that that occurred,

7    correct.  I do believe that this reflects that heading into

8    Dodd-Frank, there was a decline in bid-ask spreads.

9          There is, as your Honor probably observes, a spike.  I

10   suspect if we drill down, we would find the reason for that.

11   But the point, the point that's meant to illustrate here is

12   that and what the spread data does allow us to do is actually

13   see what the trading data shows us about the improvements and

14   diminishments of deficiencies and risks in the market.  The big

15   spikes are because of the financial crisis.  The second big

16   spike is because of the European debt crisis.

17         The point is simply that we thought, since spreads are

18   themselves a barometer of market efficiency, the most effective

19   way of doing it would be to follow the spread.  Doing it

20   through the compression rate approach, which would have been

21   possible, is to some extent more arbitrary.  It is not driven

22   as much by the data.  It is more driven by our intuitions.

23         That's the point I wanted to make about why we select

24   the approach that we did.

25         THE COURT:  Anyone else wish to be heard?

G4F3CREC

1           MR. KING:  I would, please.  Thank you, your Honor.

2     I'm Ben King, I'm here on behalf of Silver Point.

3           So, what the chart shows, obviously, is spreads over

4     time, and I understand that.  But, it doesn't only -- the dips

5     and valleys and hills aren't only reflective of the amount of

6     information that's in the market, right.  There's many, many

7     other reasons why the spreads can go up or could go down.  Just

8     assuming that watching the spreads after a particular point in

9     time is going to give you sufficient information to see what

10    would have been the counterfactual world in which the

11    information wasn't provided, I don't think you can do that just

12    from the spreads.

13          THE COURT:  I'm going to get to what drives spreads

14    later.  I'm hoping to.  But, I think it's mainly, as I

15    understand it, factors that are tied to the individual

16    instrument and the quality of the underlying company and the

17    market forces as a whole.  Are you intending to refer to

18    something else?

19          MR. KING:  No.  What I was intending to show is that

20    this chart, you can't tell just from this chart what are the

21    effects of the Dodd-Frank Act and the release of additional

22    information.  Kind of the alleviation of the effects from the

23    defendants' misconduct.  Right.  Because the spreads could have

24    gone down or could have gone up or could have stayed the same

25    for a variety of reasons.  Perhaps the release of information

G4F3CREC

1    is one of them, but perhaps not.  Their contention that all you

2    have to do is multiply the same 20 percent to the pre

3    Dodd-Frank spreads to the post spreads will effectively capture

4    the effect of the Dodd-Frank Act is not true, and I think I can

5    demonstrate to you why in a pretty simple math problem.

6          They say before the Dodd-Frank Act you would use

7    20 percent as the compression factor, right.  But let's suppose

8    for the sake of argument that after the Dodd-Frank Act there

9    were no more anticompetitive effects.  That's not what I'm

10   saying, let's just pretend there were no more anticompetitive

11   effects at all.  There are still going to be spreads, right?

12   Dealers are still going to charge rates for these trades.  Yet

13   their 20 percent compression rate would still apply to that

14   post Dodd-Frank Act spread.  There is no way that just tracking

15   the model of the spreads will capture the effect of removing

16   the anticompetitive conduct.

17         So what you have to do is you have to figure out,

18   well, what do we think that the impact of the anticompetitive

19   conduct was before the Dodd-Frank Act.  And according to their

20   model they say that's 20 percent.

21         Then we have to think, well, how much did the

22   anticompetitive conduct affect the price of spreads after the

23   Dodd-Frank Act.  You can't tell that just by looking at the

24   spreads.  That might be one thing you want to look at but

25   that's not all you want to look at.

G4F3CREC

1          That's why I don't think you can saying applying the

2    20 percent post Dodd-Frank and pre Dodd-Frank will be able to

3    capture the alleviation of the anticompetitive conduct from the

4    Dodd-Frank rate.

5          THE COURT:  What should the compression rate be in the

6    Dodd-Frank era?

7          MR. KING:  They cite one study, this is cited in

8    Mr. Unni's papers.  He looks at a couple of indices, and for

9    one indice it decreased 43 percent after the Dodd-Frank Act.

10   For those people that traded on that indice, you might think

11   perhaps they didn't have any impact any longer from the

12   defendants' misconduct because the spreads went down

13   43 percent.  For the other one they say there is a 12 percent

14   decrease.

15         I don't think that I can tell you exactly what the

16   spreads, what the compression rate should be before and after

17   the Dodd-Frank Act.  I don't know how they came up with

18   20 percent.

19         So, but it is clear that it is less, right.  We know

20   at least for some of these indices there is a substantial

21   amount of information that is exactly the sort of information

22   that is sought to be produced from the defendants.  The whole

23   reason for this case is that they failed to provide some

24   information.

25         But the Dodd-Frank Act for many of the CDS indices

G4F3CREC

1    require that information to be provided.  So it is only

2    reasonable to assume that the compression percentage should be

3    less after the Dodd-Frank Act.

4            Do I have a particular solution to give you for how

5    much it should be?  I don't.  But I know it can't be the same.

6            THE COURT:  Thank you so much.  Anyone else wish to be

7    heard on this issue?  Okay.

8            Well, I think I've explored this enough.  If we were

9    to change the compression rate, we would be engaging in pure

10   speculation as to what that change rate should be.  That's

11   point number one.

12           Point number two is I have one objection from our

13   entire class of sophisticated class members addressed to this

14   issue.  One.  I've never had a class that is composed -- well,

15   I shouldn't say that.  Actually, this is a very sophisticated

16   class.  If they felt there was some unfairness in applying the

17   same rate throughout the entire period, I think I would have

18   heard more about that issue.

19           So I think it is a theoretically interesting issue,

20   but I think Court Exhibit 1 convinces me that this is such a

21   complex market, that for us to have any confidence in choosing

22   a second rate, we'd have to have a lot more information and

23   empirical studies and academic research than we have available

24   to us.  And I don't want to engage in pure speculation here.

25           Court Exhibit 1 shows that we were trading at or

G4F3CREC

around the same spread point before and after the Dodd-Frank

Act for this single instrument.

We could of course expend more resources in exploring

this, but I don't think it is necessary, so we'll stick with

the 20 percent compression rate for the entire period of time.

So let's move to the covered transaction issue.  This

may largely have disappeared as an issue.  The background is

that there was an objection from Silver Point that some of the

covered transactions that they had proposed or some of the

transactions they had proposed be accepted as covered

transactions.  They weren't sure they were going to get

satisfaction, and they were horrified to learn that they didn't

have any appeal rights should they be disappointed, and that

apparently comes from, at least all I could find is something

posted on the administrator's website which says the settlement

administrator's determination on a challenge is final and

non-appealable.

I'm more comfortable with a system that would allow a

class member to always appeal to the court, should an

administrator reach a conclusion that the class member feels is

wrong.  Seems to me basic part of due process, the second

opportunity to be heard.

Is there any objection to giving class members appeal

rights if they are unsatisfied with the administrator's

rulings?

G4F3CREC

1          MR. OLSON:  No objections from the plaintiffs, your

2     Honor.

3          THE COURT:  Okay.  So, thank you, Mr. Olson.  And

4     Mr. Olson, will you get me the appropriate order that would

5     take care of this issue?

6          MR. OLSON:  Absolutely, your Honor.

7          THE COURT:  Thank you very much.

8          That takes us to index rolls.  By the way,

9     Mr. Brockett, is Dr. Unni here?

10          MR. BROCKETT:  Yes, he is here.

11          THE COURT:  Dr. Unni, could you stand.  Dr. Unni,

12     thank you so much for your assistance to this Court.

13          DR. UNNI:  Thank you, your Honor.

14          THE COURT:  Your submissions have been enormously

15     helpful to me.  I expect, I hope you had a little help from

16     some attorneys sitting around here.

17          DR. UNNI:  Not inappropriate assistance, your Honor.

18          THE COURT:  No, not inappropriate.  But they would

19     perhaps suggest to you that I needed a fuller explanation of a

20     term or two, and you wrote out that fuller explanation, and I

21     really want to thank you.

22          DR. UNNI:  Thank you very much, your Honor.

23          THE COURT:  Yes.

24          So, I understand from Dr. Unni's submission of

25     April 1st at paragraph 27 that the plan of allocation includes

G4F3CREC

an adjustment for index rolls, and I'm just stating this

because if I've got it wrong, please, you'll help me

understand.  I understand that it is customary, indeed common,

that in March and September, index CDSs are rolled.  That's

because the index CDS, or at least some of them, are updated.

And at that point in time, when they're able to be rolled by an

individual investor into a new series, they are rolled and a

new series number is assigned.  And the investors may wish to

roll their exposure from one index CDS into the new series

because the index changes slightly, that is, the components of

the index.

        So, because this is such a customary trading decision,

it's been looked at with some care by Dr. Unni and class

counsel, and they decided to reduce the spread to better

reflect what actually happens in the market by exempting one

leg of the trade or the transaction from inclusion in our

recovery model.  And they were very conservative, at least they

describe it as such, in identifying which transactions really

reflect a roll from one series into another.  So it has to have

occurred on the same day, be the same index, and have a

different series number.  And the notional volume from the DTCC

data reflecting these rolls is something like close to $70

trillion, so it is not insignificant.

        Now, I have some preliminary questions about how this

single adjustment, and as far as I can tell this is the only

G4F3CREC

 1   adjustment that's being made, came about.  So let's step back.

 2            I'd like to know what notice the class was given and

 3   through what mechanism initially of the plan of allocation, and

 4   whether the index roll adjustment was incorporated into that

 5   initial announcement.  It is my understanding that it was not,

 6   but I'm happy to be educated.

 7            Then I'd like to understand the process that resulted

 8   in the adoption of this adjustment.  And it is my understanding

 9   that for many of the suggestions that have been made by the

10   objectors, and perhaps other class members who haven't

11   objected, but have had communication with class counsel, other

12   adjustments have been considered, and I have a lot of paper

13   addressed to those adjustments that have been suggested by

14   objectors appearing before me, and Dr. Unni has explained in

15   detail why the other adjustments have not been appropriate.

16   And we'll get to that in a moment.

17            So, can someone give me some background on the plan of

18   allocation and how this adjustment came about?

19            MR. OLSON:  I believe I have the pleasure of that,

20   your Honor.

21            THE COURT:  Mr. Olson, are you the attorney that's

22   been working most directly with Dr. Unni?  Don't be shy.

23            MR. OLSON:  Some days I feel that way, but it was

24   certainly a team effort.

25            THE COURT:  Team effort.

G4F3CREC

1          MR. OLSON:  I had taken a leading role to some degree,

2     and I really do appreciate your Honor singling out Dr. Unni's

3     work, because it has been tremendously impressive to all of us.

4     And he has not only helped explain these concepts to the Court,

5     but helped us work through them as well.  And I'll also mention

6     Dr. Unni is here with two of his colleagues, Elizabeth Davis

7     and Jerry O'Connell, who have also been tremendously valuable.

8          THE COURT:  Thank you.

9          MR. OLSON:  So the issue of index rolls, well, let's

10    take a step back.

11         As your Honor noted earlier this afternoon, we

12    presented a version of our damages model to the defendants

13    fairly early on in this process.  Because thanks to the work of

14    Dr. Unni and others, we believed it was sufficiently credible

15    to demonstrate how far along the process we were.  And we

16    received feedback from the defendants at that time, in the

17    context of a mediation.  They had the ability to identify

18    issues they thought where we were potentially overstating the

19    damages.  And that's something we took into account.

20         The other thing that we took into account was not just

21    the work of Dr. Unni and others at BRG, but the industry

22    consultants we retained in the matter.  And those involved,

23    include the Salix personnel you mentioned earlier, but we had

24    other industry consultant as well.  We are talking about people

25    we selected because they had a tremendous amount to bear.

G4F3CREC

1          As part of the process of building the model, after

2     the defendants had the ability to give us feedback and

3     criticism of it, and working with our industry consultants and

4     Dr. Unni, we identified the issue of index rolls as one we

5     needed to consider.

6          We then worked through a process that addresses that

7     issue, while meeting our fundamental guidepost here, which is

8     to address the issue in the most objective way rooted in the

9     data possible, so that we weren't imposing any assumptions that

10    weren't highly, highly defensible.  Because our concern was not

11    to do things that one class -- may have pitted one class member

12    against another.  We always wanted to take conservative

13    approaches rooted in the data as much as possible.

14         We worked with the BRG folks to determine whether

15    there was a way to do that using index rolls.  I can say, and I

16    won't be able to recall the dates of all this, but we had

17    multiple phone calls involving the BRG team, and our industry

18    consultants.  It wasn't one call, we circled back, we worked

19    through the issue with deliberation.

20         We ultimately came to the conclusion, based on the

21    input we received from our industry consultants, that there was

22    a conservative way to address the situation and the reduction

23    for index rolls that provided a very high level of confidence

24    that we were truly reflecting what the data displayed and what

25    the trade involved.

G4F3CREC

1          Your Honor laid it out very well, but it involved a

2     number of criteria that led us to that conclusion.  Ultimately,

3     it can be considered as avoiding a double counting by removing

4     the termination of the roll.  That's a sort of simple way to

5     describe it.

6          I think your Honor was alluding to a reference to the

7     point of allocation in the preliminary -- in the notice to the

8     class.  We gave a very general description at that time.  We

9     were working through the complexities still at that point.  But

10    I know we described it as a pro rata distribution based upon an

11    estimated spread inflation.

12         THE COURT:  Was that displayed on the website that the

13    notice sent class members to?

14         MR. OLSON:  Yes, the notice was presented on the

15    website.

16         MR. SIMON:  If I may answer that question directly.

17    On the website posted as of January 11, 2016 was an overview of

18    the plan for distributing the settlement fund to claimants.

19    And paragraph 6(d) says "In addition, plaintiffs' consulting

20    experts have removed duplicate transaction records, such as

21    where a trade information was submitted to the DTCC by both

22    counterparties, and taken other steps to avoid double counting

23    of transactions or the overstatement of affected notional

24    volume due to index rolls."

25         MR. OLSON:  That's where I was going next.

G4F3CREC

1          THE COURT:  Where do I have that document?

2          MR. SIMON:  It is on the website.

3          MR. OLSON:  It was submitted to the Court, and again

4    it was posted on -- it is Exhibit A, your Honor, to our

5    memorandum in support of final approval which was filed on

6    April 1st, 2016.  And it had been, as Mr. Simon observed, the

7    class was told the plan, the detail plan would be posted on the

8    website by January 11.  And it was posted on the website to all

9    class members by January 11.

10          THE COURT:  What paragraph of that document?

11          MR. SIMON:  The paragraph, your Honor, is 6(d) on page

12    three.

13          THE COURT:  I missed that and I had read that

14    document.  Thank you.

15          So, the index rolls were referred to in Exhibit A,

16    which is a copy of a document posted on the website available

17    to the class in early January?

18          MR. SIMON:  Correct.

19          MR. OLSON:  That's right, your Honor.  January 11.

20    Does the Court have any further questions?

21          THE COURT:  No.  On that.

22          Does anyone wish to be heard on the index roll

23    adjustment issue?

24          MR. KING:  Yes, ma'am.  If I could be heard briefly.

25          THE COURT:  Excuse me one second.  Counsel, I don't

G4F3CREC

1    know that that mic is on, so you just might have to keep your

2    voice up.

3         MR. KING:  Okay.

4         THE COURT:  We're taking steps to try to deal with

5    that if you could keep your voice up.

6         MR. KING:  You're not the first judge to tell me that

7    I've been too quiet.

8         On the index rolls, one of the important things in

9    identifying, we have two complaints about the index rolls.

10        THE COURT:  Excuse me just one second.  This is

11   Mr. King again, right?

12        MR. KING:  Yes, for Silver Point, yes.  The complaints

13   about the way the index rolls were treated fall into two

14   categories.  One, not enough were identified; and two, the

15   adjustment made is not sufficient on the ones they do identify.

16   There has been substantial back and forth between the -- we

17   never spoke directly with Mr. Unni to class counsel, and we

18   tried to figure out why he's not identifying more index rolls.

19        THE COURT:  Yes, I don't want to deal with that issue

20   right now.  I just want to deal with the adjustment rate.

21        MR. KING:  The adjustment rate.  Okay.  I can deal

22   with that one as well.  So, we and MF Global have presented

23   testimony through declarations from persons who are familiar

24   with the CDS industry.  One is Julia Numar who is a trader at

25   Citibank, she is a dealer at Citibank.  Mr. Austin Saypol who

G4F3CREC

is a trader at Silver Point.  And MF Global has introduced the

testimony of Mr. James Parascandola.  You saw his declaration

I'm sure.

THE COURT:  I've read every page.

MR. KING:  Yes.  All three of those testified to the

declarations that the adjustment that is being made by Mr. Unni

to take into account the decrease in spreads that are charged

on index rolls is insufficient, and it should be reduced

substantially lower.  So he knocks out all of one leg of the

trades, so basically reducing the total spread by 50 percent.

But, according to their testimony, the leg should be reduced by

another quarter to make it consistent with what actually goes

on in the market.

Now, I don't know where they got their 50 percent

from, from their determination to drop one leg.  They say they

spoke to some industry people, we don't know who they are.  But

they're not before you.  We have presented the declarations of

actual industry people for you, and they all uniformly say that

the adjustment that has been made is insufficient.

THE COURT:  Thank you very much.

Mr. Olson.

MR. OLSON:  I would just make two observations, your

Honor.  One is those declarants certainly were uniform.  In

fact, they appear to have copied each other's language and the

basis of their assertions was a single quote I believe one of

G4F3CREC

1     them received outside of the class period.

2          Second point I would make is that this is a remarkable

3     case where actually the original objections proposed, some of

4     them at least, the exact solution we implemented.  So, for

5     example, Anchorage exactly proposed that index rolls be reduced

6     by 50 percent, which is what we did, suggesting it was market

7     practice.  So I do believe we found the most objective way of

8     doing this, and we support the adjustment.

9          THE COURT:  So, I am going to accept the adjustment as

10    proposed by class counsel.  It will involve exempting one leg

11    of the transaction, and no further adjustment need be made.  I

12    don't find the declarations submitted by the objector to be

13    persuasive at all.  And I agree that what we have to do is

14    proceed in a conservative way to make sure all class members

15    are treated fairly.  And one single trade as an example outside

16    the class period is not persuasive that that's going to happen

17    if I adopt that across-the-board adjustment for the many years

18    and many trades at issue here.

19         So, I think that means at this point the plan of

20    allocation as proposed by class counsel is tentatively approved

21    by me, subject to hearing any further objections.

22         And we're now at 10 to four.  And so, first of all, if

23    anyone wants to take a break that's fine.  You're not captured

24    in this courtroom.  I won't mind if you leave the courtroom for

25    a few minutes at all and return.  You would be welcome to

G4F3CREC

1      return.

2                  But, Mr. Zelcs, am I pronouncing your name correctly,

3      sir?

4                  MR. ZELCS:  You are, your Honor, yes.

5                  THE COURT:  About how long did you want to make your

6      presentation, if you wish to make an oral presentation, and how

7      many separate issues would you like to focus on?

8                  MR. ZELCS:  Your Honor, I don't think it is necessary

9      for us to make an oral presentation beyond the declarations

10     that were submitted.  We're happy to stand on those.

11                 THE COURT:  Thank you very much, Mr. Zelcs.  That

12     helps deal with the timeframe issue.

13                 Okay.  So Mr. King, did you wish to make an oral

14     presentation with respect to any of the objections made on

15     behalf of your client?

16                 MR. KING:  Yes, your Honor.  I think I can be brief.

17     I think I could be done in 10, 15 minutes.

18                 THE COURT:  How many separate issues do you want to

19     addresses in those 10 or 15 minutes?

20                 MR. KING:  I think I am going to talk about two

21     issues.

22                 THE COURT:  Two issues?  Good.  I think then we're

23     able to take a break, all of us.  And we'll be able to wrap

24     this up on this phase of dealing with the objections by 4:30,

25     which means that would give me time to, in the last half hour,

G4F3CREC

1    deal with all remaining issues at least I am aware of.

2             So, we'll take a break for 10 minutes and resume at

3    4 o'clock.

4             (Recess)

5             THE COURT:  Please be seated, counsel.  So, Mr. King,

6    why don't we give you a good 10 minutes to deal with your two

7    issues.

8             MR. KING:  Thank you, your Honor.  So, one of the

9    issues I want to deal with is the nature of the data, and they

10   got the data from the DTCC warehouse as you are aware.  But

11   what we have found in analyzing the data that they specifically

12   gave to us, so I'm sure you are aware, if you are a class

13   member you can contact class counsel and say we'd like to see

14   the data that our award is based on and they'll give it to you.

15            THE COURT:  It is actually on the website accessible

16   to you, right?

17            MR. KING:  They gave you a code and you go in.  We

18   downloaded our data, and what we found is they have many of the

19   dates wrong.  We don't know why.  I don't know if it is a

20   problem in the DTCC dataset or which, there's 800 columns in

21   the DTCC dataset.  I don't know which one they used.

22            For example, they show we completed trades on

23   Saturdays, which is impossible.  That doesn't happen.  We

24   reviewed our data and 21 percent of the dates are wrong.  And

25   according to MF Global's declarant, 50 percent of MF Global's

G4F3CREC

1    dates are wrong.  I think this may help to explain why they

2    have not found as many index rolls as we thought that they

3    would based on the descriptions of what an index roll is.

4          One of the criteria for an index roll is simultaneity

5    or close thereto.  If one of the trade dates is off then of

6    course it won't pick that up as a roll, even if all the other

7    criteria are met.  So, everyone we've talked to in the industry

8    says that index rolls happen far more frequently than appears

9    Mr. Unni has found.  We've been curious about that.

10         As you may have seen from the correspondence, we'll

11   suggest something and they'll say no, that doesn't work.  Or

12   too many false negatives, false positives.  Perhaps this date

13   issue is one of the concerns.  Perhaps that's what driving the

14   disconnect.

15         So, we had many more things to say about these rolls,

16   but I think probably the simplest one I want to leave you with

17   is we're very concerned that the dates are not correct.

18         And I am not blaming Mr. Unni, he seems like a nice

19   man.  I'm sure he's done a fine job.  But it does seem like

20   some of the dates are wrong.  Perhaps before they finalize the

21   distributions, they can go back and scrub the data and see if

22   they can get the dates right.  That was my one point.

23         The second point I have regards what's known as

24   non-round tenors.  So, most CDS, particularly index CDS are

25   traded on what's known as round dates, three, five, seven

G4F3CREC

years.  Some CDS are traded on non-round dates like 4.75, 5.25.
For reasons that are beyond me and apparently it is just
historical.  The five-year tenors are much more liquid and much
more cheaper to trade.  The spreads are much narrower on the
round tenors.  They're much wider on the non-round tenors.

Mr. Unni had to find quote data from Markit or the
non-round tenors and apparently no such data exists or if it
does, it's sparse.

So what he does is he assumes that the quotes for
round tenors will also apply to the non-round tenors.

This will absolutely penalize the traders who trade
more proportionately in non-round tenors than in round tenors
because their spreads are assumed to be lower than they
actually were.  We know that's not true.

Now the beautiful part about this criticism of the
model is with the index rolls, index arbitrage, and all the
other ones, the problem is identifying -- one of the problems
is identifying which of the trades is part of that package
deal.  With the round and non-round trades there is not that
problem.  It's evident from the data which trades are round and
which ones are not round.

So all you have to do, so you need to make an
adjustment and not use the quotes for the round trades, or if
you do, you have to make an adjustment upwards to properly
reflect what would be the price the person actually paid.

G4F3CREC

1           The way it is now, we know for a fact that the quotes

2      assigned to the non-round tenors aren't right.  There is no

3      question about that.  Non-round tenor trades are much more

4      pricey.  I'm not saying this is a bad guy or anything like

5      that.  He seems like he did well.  But it is a problem and it

6      is prejudicing clients like mine who happen to deal in

7      non-round tenors.

8           Those are my two points.

9           THE COURT:  What percentage of Silver Point's business

10     was in non-round tenors?

11          MR. KING:  I can tell you 25 percent of our damages

12     are from non-round tenor trades.  So perhaps that translates to

13     25 percent of our CDS trades, but I'm not sure.

14          THE COURT:  Thank you very much, Mr. King.

15          MR. KING:  Thank you, your Honor.

16          THE COURT:  Mr. Olson.

17          MR. OLSON:  Thank you, your Honor.  I just begin by

18     observing that, as your Honor pointed out, we do have a highly

19     sophisticated class here who have been paying great attention

20     to this case.  They have been able to review hundreds and

21     hundreds of thousands of their own transactions since they were

22     posted on January 29.  And before the recent filings in this

23     presentation, no class member came back to us and said that

24     there's some fundamental problem with the dates of their trades

25     as recorded in the DTCC database.  Of course this is the

G4F3CREC

database of the industry, it is not anything Mr. Unni created.
And there is every indication that those dates are reliable
enough for a plan of allocation to proceed.

In fact, our experts did do cross checks to compare
the trade dates as they show up in DTCC with the confirms of
the trades that class members have been sending in as part of
the process where they can submit additional trades, and those
are matching up nearly all of the time.

Of course, in any massive dataset which we're talking
about here, there could be, for one reason or another, a few
dates here and there that are erroneous, data fields can be
erroneous.  There is absolutely no indication that there is any
systematic problem that in any way affects the plan of
allocation.

Similarly, with respect to non-round tenors, there was
not a issue that was mentioned by any class member again until
the filings this week.  I think that's an indication that this
is not a systematic issue that is a significant one to the
class as a whole.

As Dr. Unni explained in his supplemental declaration
on page 17, in responding to this new argument, the reality is
that the bid-ask quotes from the Markit quote database which
has over 3 billion transactions, that apply to non-round
tenors, are extremely infrequent.  So there is just no reliable
way to address that issue.

G4F3CREC

1          Unless the Court has any other questions.

2          THE COURT:  No, thank you.  I don't have questions

3     about the non-round tenor issue.  So, Mr. King, with respect to

4     the wrong date issue, you've had access to your data since

5     January.  When did you discover this problem?

6          MR. KING:  I was made aware of it probably a week

7     before we filed our papers in response to the motion for final

8     approval.  You know, we're just class members, right, so it is

9     not like we're in an adversarial position.  I don't think that

10    our people thought it was necessary to go and scrub the data to

11    see when the dates were wrong.  But then as we were preparing

12    for this hearing for our filing we realized this problem, yes.

13         THE COURT:  How many trades are affected by the

14    erroneous date issue for your client?

15         MR. KING:  There is 21 percent of our trades and I

16    don't know the raw number.  I believe my client is here.  Can I

17    confer with him for a second?

18         THE COURT:  Absolutely.

19         (Pause)

20         MR. KING:  So, we estimate that from all of our funds,

21    there are three Silver Point funds involved.  You put them all

22    together, it is about 10,000 trades, about 25 percent of those

23    have incorrect dates.  I think 4 percent of them have the

24    Saturday date problem and 21 percent of them have a wrong trade

25    date problem.

G4F3CREC

1          THE COURT:  How do you know it is the wrong trade date

2     when is it is a weekday?  What have you done to identify it as

3     an incorrect date?

4          MR. KING:  Sorry, your Honor.

5          (Pause)

6          MR. KING:  We compared our own internal documents to

7     theirs, and we found a correlation between what's called the

8     assignment date, all right, so sometimes a trade will occur

9     where instead of buying or selling a CDS, you will assign your

10    rights to that CDS to another trader.  It is effectively like a

11    sale, but it is a different form of selling perhaps, okay.  On

12    those it seems to be a convention in the industry that those

13    are reported as one day late from the time the transaction

14    actually occurred.  So in these situations where you have a

15    assignment as opposed to a true buy and sell, and the

16    assignment still counts as a transaction for purposes of the

17    class, those are recorded as one day off.  So that accounts for

18    21 percent of the problem.  The Saturdays are 4 percent of the

19    problem.

20         THE COURT:  Have you been in touch with the

21    administrator to identify at least the Saturday issue and which

22    trades are affected by that?

23         MR. KING:  No, I don't think so, because for our

24    purposes, it doesn't matter that much for our calculation of

25    our damages.  What it matters is for identifying other people's

1    index trades, because they're being assigned a bid-ask spread

2    that is wider than they actually paid.  Our complaint about the

3    index rolls and the single name rolls is the model isn't

4    capturing other people's trades and single named roll trades.

5    So it is assigning broader spreads to them than they actually

6    paid.  So when they get a broader spread, because the

7    distribution of the fund is pro rata, our payment goes down.

8              THE COURT:  So, the identification of Saturday dates

9    for 4 percent of your transactions is not resulting, in your

10   view, in your client's view, in incorrect calculation of your

11   damages.  You are concerned that if the Saturday date issue is

12   an issue for you, it may be an issue for other class members

13   too, and they will get a disproportionate share of the

14   recovery.

15             MR. KING:  Correct.

16             THE COURT:  Okay.  First, I'm going to ask you,

17   please, to identify -- can you do this by Monday? -- to the

18   administrator, the Saturday dates that make up the 4 percent of

19   the 10,000 trades.  So we can get this concrete and focused on

20   in a real hands-on way.  Can you do that?

21             MR. KING:  Yes, your Honor.  I believe we can.

22             THE COURT:  Thank you so much.

23             Mr. Olson, with respect to either of these issues, the

24   Saturday date trades or the assignment issue, is there anything

25   further that you wish to say?

G4F3CREC

1           MR. OLSON:  Just that, your Honor, our experts tested,

2      when this issue was first raised recently, whether the trade

3      date field was in fact the most reliable field existing in the

4      DTCC database to capture when a trade occurred, and reported

5      the results to the Court in Dr. Unni's supplemental declaration

6      including in a table at the end.  And concluded definitively

7      that trade date, as would be expected and as the DTCC

8      anticipates, is the most reliable field for identifying when

9      trades occurred.  I could --

10          THE COURT:  I have the April 14 supplemental

11     declaration of Dr. Unni in front of me.  Are you referring --

12          MR. OLSON:  The discussion of the issue begins at page

13     20, paragraph 50.

14          THE COURT:  Yes.

15          MR. OLSON:  And Dr. Unni conducted tests and analyses

16     to determine whether there was an alternative payment or trade

17     related field in the database that was somehow more reliable

18     than the trade date field, and reports for a number of reasons

19     over the next couple of pages that the data indicates the trade

20     date field is the most reliable.

21          THE COURT:  Thank you.  I know that class counsel will

22     work with the administrator and Dr. Unni to look at the

23     Saturday date issue, and I know that this week, because of

24     these unexpected -- at least unexpected to me -- filings have

25     meant that we've had a lot of extra work to do together to get

G4F3CREC

1    ready for today.  So, I don't want to put unreasonable time

2    pressure on you to respond.  But, do you think I could get a

3    supplemental report on this issue by maybe Thursday or Friday

4    next week?

5         MR. OLSON:  I'm sure we can do it by Thursday or

6    Friday at the latest.  We'll try to do it earlier.

7         THE COURT:  Good.  I have to say, it is my impression

8    that class counsel, the administrator, BRG have been enormously

9    responsive to the class, and there have been so many tests that

10   have been run and reported and described in Dr. Unni's

11   declarations to me to respond to various issues raised by the

12   class.  So, I have a lot of confidence in their work.  But they

13   can only respond if they're provided information that alerts

14   them to a potential problem and then perhaps a discussion can

15   clarify issues or put concerns to rest.  And so, I don't expect

16   that today's hearing is going to end the period in which

17   questions are asked and answered.  There is a fiduciary

18   obligation that class counsel and the administrator have to the

19   entire class that will last long beyond today.  And so, I have

20   every expectation that if there is information or questions

21   presented, that they will be responded to in an appropriate

22   way.  And I'm always available, always available, if there is

23   an objection or a question that I can help with, to give class

24   members confidence that their voice is being heard and their

25   concerns are being appropriately responded to.  A simple

G4F3CREC

letter, no longer than two pages, and I'll have a conference

call and we'll get it addressed and the schedule set if further

exploration is necessary.

So, objections were filed on February 29 by 5 sets of

class members.  One of them is made by MF Global who with its

counsel Korein Tillery made an unsuccessful application to be

appointed lead plaintiff, and later declined an invitation to

be added as a named plaintiff.  The other four are brought by

investment manager SABA Capital Management on behalf of certain

funds, and it is now represented by Korein Tillery as well.

The FFI Fund of related entities are represented by Ropes &

Gray.  The Silver Point Capital Funds are represented by Reid

Collins, and Mr. King has appeared today on their behalf and

then heard.  And the Anchorage Funds are now represented by

Joseph Hage Aaronson.

All five objectors criticized in one way or the other

the plan of distribution.  None of them objected to the size of

the settlement, the terms of the injunction, or the request for

attorneys' fees.  Silver Point and MF Global filed supplements

to their objections on April 12 which added new objections and

new analyses.  SABA filed a supplement to its objection on

April 13.  On April 14, FFI withdrew its objection to the plan

of distribution, but reserved its right to object to any

modification proposed by another objector.  On April 14

Anchorage wrote to withdraw one of its objections.  As a

G4F3CREC

1    result, there are now four sets of objectors.

2              These objections, each of which I've read and

3    considered, do not provide a basis to adjust the plan of

4    allocation.  The goal of the plan must be the equitable and

5    timely distribution of the settlement fund without burdening

6    the processes in a that will unduly waste that fund.

7              The sophisticated class is in an excellent position to

8    swiftly and competently assess whether the plan of distribution

9    and the model on which it is based achieves a fair distribution

10   of the settlement fund.  It has spoken.  With only four sets of

11   objections, the silence of virtually every member of the class

12   on this issue serves as an overwhelming endorsement of the

13   plan, and the fairness with which it will measure each member's

14   entitlement to a distribution.

15             The objections that have been made are deeply flawed.

16   Several objections in the first wave, which were the only

17   timely objections, have been essentially abandoned.  The four

18   objectors have offered suggestions or analyses that contradict

19   each other.  Certain objectors have taken positions in their

20   second objection that contradict those taken in their first.

21             Class counsel have taken their objections seriously,

22   done a great deal of work to test the objectors' hypotheses,

23   spending hundreds of thousands of dollars in doing so, and has

24   shown that none of the suggestions would improve the plan.

25             Let me discuss just a few objections in more detail.

G4F3CREC

The objectors have not shown that adjustments should be made
based on the identity of the buyer.  The bid-ask spreads in the
CDS market are driven by the nature of the particular
instrument being traded and market conditions more generally.
Specifically, it is driven by the types of product, for
instance, whether it is an index or single named product, the
terms of the CDS contract at issue, the company or companies to
which the product applies, and the market conditions more
generally.  This analysis is supported by empirical studies,
the model on which the plan of allocation is based is specific
to each contract, and the daily spread for that product, or as
close an approximation as can be made.  And that model properly
accounts for each of the major forces that should be taken into
account here.

          It is noteworthy that in discussing discrimination
against classes of traders, the objectors disagree as to who
precisely was advantaged or disadvantaged in their negotiations
with dealers.  In addition, they have not pointed to any
empirical research supporting their premise that a buyer's
identity had any material affect on the spreads, nor have they
presented any fair and efficient process for identifying which
traders belonged within the advantaged or disadvantaged class.

          Despite these limitations, class counsel took the
objections seriously.  Dr. Unni did an analysis of some of MF
Global's and Silver Point's most heavily traded CDS products

G4F3CREC

during 2010 and 2011, and found no unfavorable bias against

them or evidence of systematic bias in the market.

          Let me turn to the issue of packaged or linked trades.

The request by some of the objectors to make adjustments to

better identify linked trades beyond what has been identified

in the index rolls must also be rejected.  As a practical

matter, it is an almost impossible task to perform.  CDSs are

complex instruments, and they are associated with complex

trading strategies.  Linkage and arbitrage can occur in so many

different ways, through the combination of so many different

instruments, that any attempt to construct a process to

identify the linked trades will necessarily be under-inclusive,

and will likely be over-inclusive as well.  Indeed, linkage

occurs not just with in-linked trades within the CDS space, but

also by linking trades in the CDS space with trades in other

markets.  If there were a reliable and effective way to

identify more linked trades, and an objective and fair model

for adjusting the spread associated with linked trades, I would

certainly consider it.  And I believe class counsel would have

recommended it to me in any event.  But the objectors have not

presented such a model.  Nor is there basis for me to find with

any assurance that the use of the plan's current model treats

any particular class member or group of class members unfairly

in this regard.

          I've appointed separate counsel for identified

G4F3CREC

subclasses in the past in other cases, and I would do so here

if I deemed it appropriate.  But I have no basis to find that

it would be appropriate, much less necessary.

It is, of course, theoretically possible to imagine

that further work could identify with some reliability some

particular kind of linked trade associated with some particular

kind of trading strategy.  And perhaps, even, to show what

adjustment should be made to the spreads applied to that subset

of linked trades.  But there is no reliable evidence or

analysis that has been presented to me that this could be done

quickly or without further significant expenditure of the

settlement fund, that the work would capture all of the

allegedly linked trades, or even any material number of linked

trades, or that the identification would have a significant

impact, much less improve the fairness of, the way the

settlement fund is distributed across the class.  Moreover, it

would certainly delay distribution to the class, and delay is

costly to the class.

Moreover, and finally, other class members may have

additional well-placed objections regarding special treatment

for any newly identified subset of linked trades associated

with a particular trading strategy.

Class counsel is correct, if the trading strategy of

any of the four objectors was so unique that the plan of

allocation is unfair to them, and they have not made any

G4F3CREC

1    attempt, really, to show that it is so, then they should have

2    opted out.

3          That leaves us with what I think is the last issue,

4    and that is the Rule 7 bond.

5          There has been an application by plaintiffs' counsel

6    for me to impose a Rule 7 bond if there is an appeal, and it is

7    entirely premature for me to address that issue.  But, just in

8    case that might happen, I thought it would be of help to one

9    and all for you to have a statement from me of the principles

10   of law I expect to apply if an application is made to me.

11         Rule 7 of the Federal Rules of Appellate Procedure

12   provides that the district court may require an appellant to

13   file a bond or provide other security in any form and amount

14   necessary to ensure payment of costs on appeal.  A Rule 7 bond

15   is prospective in its focus and relates to the potential

16   expenses of litigating an appeal.  *Adsani*, 139 F.3d, 70, n.2.

17         The term "costs" in Rule 7 refers to all costs

18   properly awardable under the relevant substantive statute or

19   other authority.  In other words, all costs properly awardable

20   in an action are to be considered within the scope of the rule.

21   *Id.* at 72.  The *Adsani* court explicitly rejected a definition

22   of costs that would limit it to those enumerated in Rule 39.

23         As explained in my *General Electric* decision, 998 F.

24   Supp. 2d, Rule 38 of the Federal Rules of Appellate Procedure

25   allows the court of appeals to award damages to appellees who

G4F3CREC

1    are confronted with frivolous appeals.  *Id.* at 151.  An appeal

2    is frivolous for purposes of Rule 38 when it is totally lacking

3    in merit, framed with no relevant supporting law, conclusory in

4    nature, and utterly unsupported by the evidence.  *Id.* at 153.

5    Accordingly, when an objector lodges a frivolous appeal to a

6    class action settlement, a district court may impose a Rule 7

7    bond in the amount of the additional administrative expenses

8    that are reasonably anticipated from the pendency of the

9    appeal.  *Id.*.

10         A Rule 7 bond may also include attorneys' fees where

11   the district court concludes that the court of appeals might

12   award attorneys' fees as costs under Rule 38, because the

13   appeal is frivolous.  *Scholnick*, 820 F.2d, 15; and *In re 60*

14   *East 80th Street*, 218 F.3d, 118–19.

15         In setting a Rule 7 bond, a district court must not

16   create, however, an impermissible barrier to appeal.  I'm back

17   in my *General Electric* decision.  As such, there are at least

18   three factors that are relevant in assessing whether a Rule 7

19   bond should be imposed.  They are:  The appellant's financial

20   ability to post the bond, whether the appeal is frivolous, and

21   whether the appellant has engaged in any bad faith or vexatious

22   conduct.  Of course, the first two are of the greatest

23   importance.

24         As the court of appeals explained in *Adsani*, the

25   purpose of Rule 7 appears to be to protect the rights of

G4F3CREC

1    appellees brought into appeals courts.  In setting the amount

2    of a Rule 7 bond, a district court may prejudge the case's

3    chances on appeal.  It is neither bizarre nor anomalous for the

4    amount of the bond to track the amount the appellee stands to

5    have reimbursed.

6            Though there is some reference here to the ability to

7    award attorneys' fees because this is an antitrust action, I

8    don't find that that provides a basis for an award of

9    attorneys' fees through this bond, because of course the

10   antitrust laws work in a very selective way to shift attorneys'

11   fees.  They can only be shifted in the appropriate case against

12   a losing defendant.

13           Now, I want to thank Mr. King for appearing today and

14   bringing to my attention the issues he and his client most care

15   about.  And of course, Mr. Zelcs, you didn't speak, but I've

16   read your papers with care.  And while I don't find any merit

17   to the points that you raised, I believe they deserved careful

18   consideration, and I'm hopeful that the process that class

19   counsel and the administrator and their experts have put in

20   place will help satisfy your concerns and your clients'

21   concerns.

22           And again, I urge you, if you don't receive a

23   satisfactory response in any way, you should feel free and your

24   clients through counsel should feel free to contact me, and

25   I'll do my best to get a response and address any issue you

G4F3CREC

 1    have to raise.  It is important to me that every class member

 2    feels heard and treated fairly.

 3            Mr. King.

 4            MR. KING:  I want to say thank you, and thank you for

 5    giving me the opportunity to confer with my client when I was

 6    arguing earlier.  I appreciate it.

 7            THE COURT:  Of course, of course.

 8            Counsel, we have finished my list of agenda items, and

 9    we still have time about 20 minutes to address anything that

10    has not yet been covered.  Mr. Brockett?

11            MR. BROCKETT:  I just have one small item, your Honor.

12    In my supplemental declaration in support of the expenses --

13    this relates to the expenses -- on page nine I give a full

14    account of the expenses up through April 1st of 2016.

15            THE COURT:  Can you give me that page number again,

16    please.

17            MR. BROCKETT:  Sure.  Page nine of my supplemental

18    declaration.  It is appendix B, but it's labeled page nine.

19            THE COURT:  Yes.  I have page nine, appendix B.

20            MR. BROCKETT:  Yes.  Your Honor previously had noted

21    that the amount of expenses that class counsel were seeking was

22    9.5 million.  The updated number, which is the actual number

23    which was part of our expense reimbursement request is

24    10,086,000, which includes the additional expenses on top of

25    the 9.5 between the end of the year and April 1st.

G4F3CREC

1          THE COURT:  Thank you.  I approve that amount.

2          Let me just see if I can find my original set of

3     papers.  I have it.  In the January 29 filing, and I think we

4     talked about this at the time of preliminary approval, that I

5     wanted counsel to get to the class at an early point in time

6     their motion for attorneys' fees and the backup so the class

7     could have a full opportunity before objections and before an

8     optout decision to figure out what they wanted to do here.  And

9     I thank class counsel for doing that.

10          So, I went through the portions of the appendices, the

11    declarations, the attachments to that submission with some

12    care, looking at the way counsel organized their time, the

13    reports were by individual attorneys, they reflected how much

14    time individuals worked on this matter.  And I have a

15    declaration from Mr. Simon, too, with similar supporting

16    information.  And then I had the reports on expenses, and I

17    looked at that, including the amount for travel and meals, and

18    I read the descriptions of how those charges had been dealt

19    with.

20          But, outside professional services, which are the

21    heart of this, the creation of the damages model, that

22    understanding of where the injury was and how it could be

23    measured, and of course more recently, the response to the

24    objections and the responding to the class questions, even if

25    they weren't objections, takes time, it takes money, and it's

G4F3CREC

1    central to the representation of the class.  I reviewed it with

2    care, and have no hesitation in approving it.

3              Anything else, Mr. Brockett?

4              MR. BROCKETT:  No, your Honor.

5              THE COURT:  Any defense counsel wish to be heard?  I

6    should say there was a submission of course in which defendants

7    preserved their right to disagree about the merits of the

8    litigation without objecting to entry of judgment in accordance

9    with their settlement agreements.  And I read that as well.  No

10   defendant wishing to be heard.  We heard from the objectors.

11   And I want to thank everyone for their assistance today.  Thank

12   you.

13                              o0o

14

15

16

17

18

19

20

21

22

23

24

25